**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-13293 |
| | ) | Honorable David M. Lawson |
| INTERNATIONAL UNION, UNITED | ) | |
| AUTOMOBILE, AEROSPACE, AND | ) | |
| AGRICULTURAL IMPLEMENT | ) | |
| WORKERS OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**MONITOR'S INITIAL STATUS REPORT**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................1

    A.  The Monitor's Compliance Review ................................................................2

    B.  The Monitor's Investigative Work ...............................................................10

    C.  The Monitor's Oversight of the Referendum Election ................................11

I.   BACKGROUND ON THE CONSENT DECREE AND THE MONITORSHIP ..................13

    A.  Structure and Governance of the UAW .......................................................14

        1.  Governing Bodies .................................................................................15

            a.  The International Union ..................................................................15

            b.  Local Unions ..................................................................................17

        2.  Elections and Dues ...............................................................................18

            a.  Elections ........................................................................................18

            b.  Dues ...............................................................................................18

        3.  Other UAW Entities .............................................................................19

            a.  Community Action Program ...........................................................19

            b.  Joint Training Centers ....................................................................20

    B.  Criminal Laws Governing the Conduct of UAW Personnel ........................22

        1.  Taft-Hartley Act ..................................................................................22

        2.  LMRDA .................................................................................................23

        3.  Other Criminal Laws ...........................................................................23

    C.  Criminal Convictions of UAW Officials ......................................................25

        1.  Embezzlement of UAW Funds .............................................................29

        2.  Illegal Payments Involving the Chrysler Training Center ...................32

            a.  Use of Training Center Funds to Pay UAW Salaries and Benefits ......34

            b.  Use of Chrysler Training Center Funds for Personal Expenses ..........37

i

      c.   Transfer of Chrysler Training Center Funds to UAW Officials Through Corrupt Charities ..................................................................38

   3.  Bribes and Kickbacks Involving the GM Training Center ...........................39

      a.   Logo Products Schemes with Vendor A ...................................................40

      b.   Watch Scheme with Vendor B ..................................................................41

D.  The Consent Decree and the Monitorship ..................................................................42

   1.  Compliance Mandate ...................................................................................44

   2.  Investigative Mandate .................................................................................45

   3.  Elections Mandate .......................................................................................49

   4.  Other Monitorship Activities ......................................................................50

   5.  Reporting Obligation ...................................................................................51

II.  COMPLIANCE ..................................................................................................................54

A.  Compliance Team's Work ...........................................................................................57

   1.  Review of Work of Prior Consultants and Advisors ...................................57

   2.  Presentations ...............................................................................................59

   3.  Interviews ....................................................................................................59

   4.  Documents ...................................................................................................60

   5.  Other Activities ...........................................................................................60

B.  UAW Leadership .........................................................................................................61

   1.  The Leadership of the International Union ..................................................61

   2.  The Compliance Culture of the International Union ....................................63

      a.   Culture Under Presidents Jones and Williams .........................................63

      b.   Cultural Changes Under Presidents Gamble and Curry ...........................67

      c.   Continued Challenges to Cultural Reform ...............................................70

C.  Organizational Structure .............................................................................................74

   1.  Absence of a Compliance Function .............................................................74

        a.   The Union's Delay in Establishing a Dedicated Compliance Function ...............75

        b.   The Union's Decision Not to Disclose the May 2020 Draft to the Monitor.........77

    2.  Legal Department.................................................................................................84

    3.  Internal Audit .....................................................................................................86

D.  Internal Governance and Financial Controls ...........................................................89

    1.  The Union's Efforts at Reform .........................................................................91

    2.  Internal Governance...........................................................................................93

        a.   Job Descriptions and Qualifications ..........................................................94

        b.   Performance Reviews ..................................................................................98

        c.   Formal Training ........................................................................................101

        d.   Budgeting..................................................................................................106

    3.  Internal Financial Controls ..............................................................................107

        a.   Scope of Deloitte's Work..........................................................................108

        b.   Reimbursement of Employee Expenditures...............................................113

             1)  Background ...............................................................................................113

             2)  UAW's Remedial Efforts .........................................................................114

        c.   Vendor Selection Process ..........................................................................120

             1)  Background ...............................................................................................120

             2)  UAW's Remedial Efforts .........................................................................121

        d.   Approval for Expenditures.........................................................................125

             1)  Background ...............................................................................................125

             2)  UAW's Remedial Efforts .........................................................................126

E.  Reporting, Investigation, and Discipline of Misconduct .........................................128

    1.  Ethics Hotline...................................................................................................128

        a.   Reporting to the Ethics Hotline..................................................................129

      b.  The Investigative Process for the Ethics Hotline ................................132

    2.  Other Avenues for Reporting and Investigations.................................134

        a.  Reporting Outside the Ethics Hotline ...............................134

        b.  Investigative Process of Complaints Outside the Ethics Hotline.........................136

    3.  Discipline ................................................................................138

III. INVESTIGATIONS ................................................................................142

  A.  Scope of the Monitor's Investigative Mandate ...........................................143

  B.  Investigatory Tools ................................................................................146

    1.  Grand Jury and Other Government Investigative Material.......................146

    2.  Union Investigative Material ................................................147

    3.  Voluntary Interviews and Document Collection .......................149

    4.  Subpoenas ................................................................................150

    5.  UAW Ethics Hotline ................................................................150

    6.  Monitor's Hotline ................................................................151

  C.  Current Status of Investigations ................................................152

IV. ELECTIONS ................................................................................156

  A.  Rules for the Referendum ................................................158

    1.  Guiding Principles ................................................................159

    2.  Timing................................................................................160

    3.  Electorate ................................................................................160

    4.  Secret Mail-In Ballot ................................................161

    5.  Vendor Selection................................................162

    6.  Ballot Language ................................................163

    7.  Advocacy ................................................................................163

    8.  Results................................................................................166

B.  The Global Mailing List for the Referendum ................................................167

    1.  Improvement of the Global Mailing List ................................................167

    2.  Outreach to Local Unions ................................................169

    3.  Election Vendor's Tests ................................................170

    4.  Outreach to Members ................................................171

C.  Member Eligibility Information from LUIS ................................................171

D.  Administration of the Referendum ................................................172

    1.  Fielding Member Inquiries ................................................172

    2.  Referendum Forum Webcast ................................................173

    3.  Enforcement of Referendum Rules on Advocacy ................................................174

E.  Oversight of International Executive Board Elections ................................................176

    1.  Candidate Vetting ................................................176

    2.  Ensuring Compliant Elections ................................................179

Pursuant to Paragraph 57 of the Consent Decree (Dkt. No. 10), the Court-appointed Monitor, Neil M. Barofsky, respectfully submits to the Court this initial report ("Report") concerning the monitorship of the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "Union" or the "UAW").

## INTRODUCTION

After a wide-ranging investigation by the U.S. Department of Justice ("DOJ") resulted in the criminal convictions of two of the UAW's past presidents and other senior leaders, as well as the filing of a civil complaint against the Union itself, the UAW agreed to a Consent Decree and the appointment of a Monitor. The Monitor was appointed six months ago and given three distinct responsibilities under the Consent Decree: (1) a compliance mandate to help the UAW ensure that its compliance regime can prevent and remove fraud and corruption; (2) an investigations mandate to analyze and address suspected past and present misconduct; and (3) an elections mandate that involves overseeing a referendum vote that will determine the manner in which the Union will choose its leaders going forward.

This Report describes the Monitor's activities in these three areas during the first six months of this six-year monitorship. Each of these areas is a key part of the Monitor's work, but the bulk of this initial Report focuses on the Monitor's first task: an initial assessment of the UAW's efforts to institute the compliance reforms needed to ensure that fraud and corruption are truly a thing of the past. As detailed below, the Monitor's overall assessment of the Union's efforts is mixed. The Union has made great progress since late 2019 in beginning to implement a much improved control environment that is designed to better safeguard the funds of Union members from abuse. However, the Union must take more affirmative measures to fully eradicate the strong

remnants of the "toxic"[1] culture that characterized its recent past and still remain present today, including by improving its transparency to the Monitor and its members.  The Monitor looks forward to working collaboratively with the Union as it addresses these challenges and implements the recommendations included in this Report.

### A.    The Monitor's Compliance Review

Among the duties of the Monitor under the Consent Decree is the obligation to "remove fraud, corruption, illegal behavior, dishonesty, and unethical practices from the UAW and its constituent entities."[2]  In furtherance of that duty, the Monitor has assessed the Union's ongoing efforts to promote a culture of compliance with law, policies, and ethics.  That review has resulted in the 38 recommendations in this Report that are designed to assist in the UAW's ongoing reform efforts.

The Union's leadership deserves significant credit for committing the Union to various compliance reforms, such as hiring outside experts, installing an independently staffed ethics hotline to encourage the reporting of misconduct, creating an internal audit function, and beginning the process of establishing a robust controls environment.  But the Union has also fallen short in other areas, including in failing to promptly adopt a centralized compliance function and in not doing enough to respond to repeated warnings about the pressing need to transform its culture. Overall, the Union must not be complacent with its progress and must continuously work to transform commitments into reality by "walking the walk" in addition to "talking the talk."

---

[1] *Infra* Part II at 131 (quoting President's Office, Senior Staff #1 Interview at 6); *see also id.* (citing President's Office, Senior Staff #2 Interview at 5; IEB Member Interview at 7; IEB Member Interview at 2).  The quotations in this Introduction are largely drawn from the remainder of the Report and cited as such.  Further factual support and citations for the information in this Introduction are set forth in the remaining Parts of the Report.

[2] Consent Decree ¶ 28.

Consistently leading with actions as well as words will promote a culture of openness, transparency, and accountability.

**The Union Has Made Important Inroads Toward Change.** To say that the Union's leaders are coming up short in some areas should not take away from the meaningful changes that have occurred since the government started putting former UAW officials in prison. In 2019, the UAW replaced now-convicted felon Gary Jones with a new President, Rory Gamble, who publicly committed the UAW to a process of change. He heralded that "[d]ues dollars are sacred"[3] and pledged to the membership that the Union would zealously protect them.

To meet that commitment, then-President Gamble, along with the Union's Secretary-Treasurer at the time (and now President), Raymond Curry, announced a series of new programs to protect the financial well-being of the Union from fraud and abuse. Those efforts have included the rollout of an "Ethics Hotline" that staff and members can use to confidentially report misconduct, and the appointment of an "Ethics Officer." The Union also established a new internal audit function that has already issued an inaugural "culture risk assessment" outlining cultural challenges at the Union and making recommendations for improvements. The Union's leaders deserve credit for taking these important steps.

The Union has also brought in outside experts to assist in the process of reform. Beginning in 2019, the Union retained a team of consultants from Deloitte to assess the UAW's internal financial controls by comparing them to best practices and industry standards to identify gaps. That process resulted in the drafting of 13 new policies for the Union that address financial control issues, including travel and expense reimbursement, expenditure approvals, third-party vendors and procurement, and information technology ("IT") systems to move the Union from a paper-

---

[3] UAW Announces Stringent Financial Reforms at 3 (UAW-Mon_002581) (Dec. 2, 2019).

based system to a centralized, electronic one.  Although as of the drafting of this Report only two of those 13 policies have been adopted, the Union has recognized the need to move more expeditiously, committing in response to the Monitor's recommendation to adopting the balance of these policies over the next 60 days.  Given the recent past, the importance of developing a robust financial control system and plugging holes in the Union's existing framework for financial management cannot be overstated.

**The Union Needs to Do More to Encourage a Culture of "Speaking Up."**  Even the best financial control policies, however, depend on having personnel who both follow them and feel empowered to say something when they see something.  Numerous Union employees interviewed by the Monitor described how, during the presidencies of Gary Jones and Dennis Williams—each of whom is currently serving a prison sentence for his crimes—the Union's leaders cultivated a "culture of fear"[4] that was "toxic"[5] and openly hostile to compliance with law, policies, and ethics.

That culture has improved with Williams' and Jones' departures.  As one employee stated, when Rory Gamble became President, "you could feel the atmosphere in the building change."[6] But these underlying cultural issues did not just disappear upon the criminal convictions of the UAW's former leaders.  For example, in May 2020 the Union's Legal Department received a draft report from an outside consultant, Exiger, which found that the UAW had an "unhealthy culture"[7] in which staff were unwilling to disagree with superiors about problems or issues because they feared losing their position for speaking up.  Unfortunately, even after the Union's preliminary

---

[4] *Infra* Part II at 64 (quoting President's Office, Employee #2 Interview at 4).

[5] *Infra* Part II at 131 (quoting President's Office, Senior Staff #1 Interview at 6); *see also id.* (citing President's Office, Senior Staff #2 Interview at 5; IEB Member Interview at 7; IEB Member Interview at 2).

[6] *Infra* Part II at 68 (quoting Education Department, Employee #2 Interview at 4).

[7] *Infra* Part II at 135 (quoting Exiger Report at 27 (June 11, 2021)).

attempts at reform, Internal Audit reported earlier this year that there remains a "[f]ear of retaliation or intimidation for individuals speaking out on issues"[8] and employees continue to "feel they would be retaliated against if they spoke openly and freely."[9]  Or, as one employee explained: "[w]e work under harassment, retaliation, fear and intimidation.  If you speak out, they will [] take work from you or pile work on as punishment."[10]

The Monitor's own interviews confirmed employees are still "actually kind of afraid"[11] of reporting misconduct, either because they fear retaliation, or are not even willing to try, having previously seen their supervisors "turn[] their back on any wrongdoing"[12] or "look[] the other way."[13]

This reluctance includes reporting through the Ethics Hotline, which some employees suspect will just be another conduit through which the Union's leaders will either ignore their complaints or retaliate against them.  A culture in which employees believe that this reform, the Union's most important step yet to address the "culture of fear,"[14] is "a joke,"[15] and where employees still believe that "you get promoted in the UAW if you don't cause trouble,"[16]  is certainly one that still needs attention and repair.

It is therefore critical that the Union do more to make employees feel that the UAW encourages ethical behavior and protects those who make it a priority.  The Monitor has made

---

[8] Culture Risk Assessment at 7 (UAW-Mon_002424) (June 21, 2021).

[9] Culture Risk Assessment at 22 (UAW-Mon_002439) (June 21, 2021).

[10] *Id.*

[11] *Infra* Part II at 71 (quoting Accounting Department, Employee #14 Interview at 6-7).

[12] *Infra* Part II at 65 (quoting Accounting Department, Employee #13 Interview at 6).

[13] *Infra* Part II at 66 (quoting Accounting Department, Employee #14 Interview at 5).

[14] *Infra* Part II at 64 (quoting President's Office, Employee #2 Interview at 4).

[15] *Infra* Part II at 71 (quoting Accounting Department, Employee #12 Interview at 6; Accounting Department, Employee #13 Interview at 4).

[16] *Infra* Part II at 70 (quoting Accounting Department, Employee #12 Interview at 5).

numerous recommendations to addresses these areas of concern, which, to its credit, the Union has largely accepted. These include establishing a dedicated compliance department, making compliance and ethics a standing item on the agenda for every International Executive Board ("IEB") and "All Staff" meeting, providing regular compliance updates and ethics messaging by the President, making a push to better educate staff and members about the UAW's anti-retaliation policy and its Ethics Hotline, and much more. The Monitor looks forward to working with the Union to implement these recommendations.

**Lack of Transparency Remains a Key Hurdle to Cultural Change.** For an organization to promote compliance-minded behavior, transparency and information sharing must be the rules of the road. A corollary to encouraging employees to speak out when they see wrongdoing is promoting openness about leadership's expectations and decision-making, so that the rot of fraud and corruption is not given room to spread in shadowy places. As Internal Audit found, the Union is still suffering from a culture with "limited visibility and transparency across all levels" of the organization.[17] Internal Audit recommended that the Union do more to promote transparency at the UAW, citing comments from surveyed employees that, for instance, "the IEB doesn't communicate with staff,"[18] leaving them in the dark about the decision-making of leadership.

The Union has recognized the need for promoting transparency and has taken some positive steps. For example, President Curry recently held the first "all-hands" staff meeting in years and communicated directly to UAW staff about the need for an ethical culture. This is an important and positive step, and he has committed to having such meetings on a regular basis.

---

[17] Culture Risk Assessment at 7 (UAW-Mon_002424) (June 21, 2021).
[18] Culture Risk Assessment at 22 (UAW-Mon_002439) (June 21, 2021).

Yet, despite these commitments, more proactive steps to promote transparency are required of the Union's leaders.  This is illustrated by a recent lost opportunity for the IEB to affirmatively demonstrate its commitment to transparency with respect to the work of one of its hired consultants, Exiger.  In May 2020, Exiger provided the Union's outside counsel and Legal Department with a draft report that included 140 recommendations for how the Union could address critical and severe weaknesses in its compliance environment.  But rather than sharing the report with the IEB or President, the Legal Department effectively shelved it, failing to even reengage with Exiger for nearly a year.  The IEB eventually received a June 2021 "Final" version of the report, but not until September 2021.

The Legal Department's lack of transparency with the IEB was then echoed by the IEB's decision to choose the path of opacity with the Monitor.  Although the UAW shared with the Monitor the June 2021 version of Exiger's report, the Monitor's review uncovered the existence of the earlier May 2020 draft and was able to discern at least some of its contents by working directly with Exiger to obtain that information.  But the IEB has voted not to give the Monitor the May 2020 version of the report, stating that the report was commissioned by outside counsel and therefore privileged, even though the Union sought and received a Court Order that allows the Union to share privileged material with the Monitor without waiving privilege, as well as a common interest agreement with the Monitor that was executed for the same purpose.  Indeed, when the Union shared the June 2021 report with the Monitor, which it also claimed to be privileged, it did so citing those documents.

The Union's selective invocation of privilege to shield only the earlier version of the report does more than just deny transparency to the Monitor by not providing the fullest picture possible of the Union's compliance landscape; it also further risks damaging the IEB's credibility by

sending a potentially troubling signal regarding the Union's commitment to being fully open with its members and staff, who, given their already existing concerns about transparency at the UAW, may conclude that the IEB is purposefully hiding damaging information from them, the Court, and the Monitor.

Transparency must be modeled from the top. It must also be structurally built into an organization. On this score, the Union also has more work to do. For example, it was not until very recently—with the impending deadline of this public Report, and the Monitor's recommendations in advance of it—that the IEB voted to institute a dedicated compliance function, a basic transparency safeguard. The Union also lacks basic governance tools, like a regular and consistent process for budgeting expenses—a process that Exiger noted could further "help[] create transparency"[19] and provide the "accountability necessary for effectiveness"[20] by holding leaders responsible for their use of Union resources. And the Union does not regularly post job openings for hiring and promotions, which has contributed to some employees feeling that the UAW still has a "culture of favoritism"[21] in which the promotion process remains opaque.

The Monitor has made a number of recommendations to address these transparency issues, and the Union has, at least in part, accepted them. But in some instances the Union has equivocated—for example, responding that the Union would only take "under advisement"[22] the Monitor's recommendation that the UAW adopt formal Union-wide performance reviews, limiting its commitment to post job openings, and that it is only "discussing"[23] the Monitor's

---

[19] Exiger Report at 19 (June 11, 2021).

[20] *Id.*

[21] *Infra* Part II at 73 (citing Culture Risk Assessment Survey Responses (UAW-Mon_002464-67); Culture Risk Assessment at 16 (UAW-Mon_002433) (June 21, 2021); Culture Risk Assessment Draft at 23 (UAW-Mon_002799) (May 21, 2021)).

[22] *Infra* Part II at 101 (Union's Response to Monitor's Recommendation No. 12).

[23] *Infra* Part II at 107 (Union's Response to Monitor's Recommendation No. 17).

recommendation to implement a comprehensive formal budgeting process. The Monitor hopes that these equivocations will drop away and that the Union will fully embrace the Monitor's recommendations, in both letter and spirit, to fully turn the page on the past.

**The Union Is Taking Important Steps to Encourage Accountability.** Accountability is essential to fight the potential for fraud and corruption. In a healthy compliance environment, accountability is achieved by making sure that those who violate the organization's rules are detected and punished. That requires ensuring that those in control functions—the jobs that are responsible for detecting and reporting ethical failures—are competent and trained for those tasks. These control functions were trodden upon by the administrations of Williams and Jones and the work of rebuilding them is still ongoing. Indeed, some employees expressed concern that there remains "a lack of accountability at all levels for violations of cultural policies,"[24] while other employees lament that the Union fails to "[h]old those who abuse, harass, ridicule, demean, or humiliate others truly accountable for their actions," and expressed their desire that the Union would "stop enabling them by turning a blind eye to what they are doing to others."[25]

To its credit, the Union has taken some important steps to improve accountability. To better ensure that control function personnel have the skills to detect and expose corruption, the Union has announced the creation of a "new Staff Development Department" that will report to the Union's President. It has also accepted the Monitor's recommendation to adopt formal job descriptions when seeking to replace employees in key control positions, so as to better ensure that new hires have the minimum qualifications necessary for their compliance-related tasks. It has similarly agreed to better train its employees by deploying mandatory and repeatable online

---

[24] *Infra* Part II at 72 (quoting Culture Risk Assessment at 21 (UAW-Mon_002438) (June 21, 2021)).
[25] Culture Risk Assessment at 21 (UAW-Mon_002438) (June 21, 2021).

training on its new policies, including mandatory targeted additional training for certain groups within the UAW (such as IEB members, Department Heads, and other key staff members).  It has also accepted the Monitor's recommendation to implement new policies and procedures outlining the reporting and investigation process for suspected misconduct.

Additional details concerning the Monitor's activities in carrying out the Consent Decree's compliance mandate are set forth in Part II of this Report.

### B.      The Monitor's Investigative Work

As part of the Monitor's duties, the Consent Decree also provides the Monitor with the authority and the duty to investigate and address suspected misconduct at the Union.  Thus, apart from the Monitor's compliance work, the Monitor has also established an "Investigations" team that—pursuant to the Consent Decree—has begun the work of investigating suspected past and present malfeasance at the Union.  With the extraordinary cooperation of DOJ, the Monitor has obtained access to hundreds of thousands of documents relating to the federal investigations that led to the Consent Decree and has begun interviewing employees and personnel.

Although that work was slowed in getting off the ground by the Union's pace in making relevant documents and information available, including initially not being transparent with the Monitor about the Union's investigations into misconduct at its Local Unions, the Monitor currently has 15 open investigations and is hopeful the issues that were impeding its progress have been resolved.  The Monitor has concluded one investigation—involving allegations concerning the Union's current President Raymond Curry for conduct that occurred when he was a regional director involving his personal use of football tickets that the UAW had obtained in a vendor contract.  In that case, the Monitor determined not to bring charges and instead referred the matter to the Union's Ethics Officer for consideration of further action.

10

Additional details concerning the Monitor's activities in carrying out the Consent Decree's investigative mandate are set forth in Part III of this Report.

## C.      The Monitor's Oversight of the Referendum Election

The Consent Decree also tasks the Monitor with administering a Union-wide referendum in which Union members will decide whether the UAW will maintain its existing process of electing its leaders through a delegate system, or switch to a direct election system under which each UAW member would vote directly to elect Union leadership.  The Monitor is charged with administering and overseeing that vote.

During the first six months of the monitorship, the Monitor developed rules for the referendum in consultation with the UAW, DOJ, and the Department of Labor, Office of Labor-Management Standards ("OLMS"), as well as with input from the leadership of several Local Unions and UAW advocacy organizations.  The Monitor established a hotline for the referendum which has enabled hundreds of Union members and Local Union leaders to obtain answers to their questions and concerns about the referendum, and also hosted a public referendum forum webcast via Zoom videoconference and YouTube during which individuals who registered with the Monitor were able to publicly advocate in support of either side of the referendum question.

The Monitor also worked with the UAW to improve the mailing list used for the referendum to make sure that every eligible member and retiree can exercise their right to vote. Voting is underway and scheduled to be complete on November 29, 2021, with more than 170,000 ballots received as of November 10, 2021.

In addition to overseeing the referendum, the Consent Decree tasks the Monitor with supervising the election of IEB members throughout the monitorship and ensuring that those elections are conducted in a manner that is consistent with the UAW Constitution and the Consent

11

Decree, as well as with state and federal law.  The Monitor has done so with the handful of vacancies that became open on the IEB over the past six months.

Additional details concerning the Monitor's activities in carrying out the Consent Decree's election-related mandate are set forth in Part IV of this Report.

* * *

The Monitor's activities in each of the above areas are discussed in further detail in this Report.  Additional background concerning the criminal misconduct that gave rise to DOJ's complaint, and concerning the Consent Decree and the Monitor's appointment, is set forth in Part I of this Report.  Parts II through IV of the Report describe the activities of the Monitor in the three substantive areas summarized in this Introduction.  This submission constitutes the Monitor's initial Report to the Court on the Monitor's activities.

## I.       BACKGROUND ON THE CONSENT DECREE AND THE MONITORSHIP

The International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America—referred to as "United Auto Workers" or the "UAW"—is an international labor organization headquartered in Detroit, Michigan.  The UAW represents hundreds of thousands of workers in the United States and Canada in their labor negotiations and has over a thousand contracts with employers.  Its primary objectives are "[t]o improve working conditions, create a uniform system of shorter hours, higher wages, health care and pensions," and "to maintain and protect the interests of workers under the jurisdiction of this International Union."[26]  Although many UAW members are autoworkers, the UAW has broad reach and includes aerospace and agricultural implement workers, as well as workers in higher education and gaming establishments, among others.[27]

As a "labor organization,"[28] the UAW is subject to federal labor laws, including the Labor Management Relations Act of 1947 (also known as the Taft-Hartley Act) and the Labor Management Reporting and Disclosure Act of 1959 ("LMRDA").  Those laws and others— including numerous criminal laws that bar corrupt activities like diverting union funds to personal use—set out a detailed federal regulatory regime governing the conduct of union officers and personnel.

After numerous officials at the highest levels of the UAW's leadership, including two past presidents, admitted to breaking these laws and were criminally prosecuted, the UAW agreed to

---

[26] UAW Const., art. 2, § 1.

[27] UAW Const., art. 5.

[28] Specifically, the UAW is an "organization . . . in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work" in an "industry affecting commerce."  29 U.S.C. § 152(5) (definition of "labor organization" under the Taft-Hartley Act); 29 U.S.C. § 142(1) (definition of "industry affecting commerce" under the Taft-Hartley Act); 29 U.S.C. § 402(i), (j) (definitions of "labor organization" and "engaged in an industry affecting commerce" under the LMRDA).

enter into a Consent Decree in order to resolve the ongoing investigation into the UAW itself by the Department of Justice ("DOJ"). Under this Consent Decree, an independent, court-appointed monitor (the "Monitor") will oversee certain aspects of the UAW and assist the UAW in ensuring that it has rid itself of those who engaged in fraud, corruption, and other criminal conduct, and putting the necessary protections in place to best ensure that the criminal conduct of its past leaders will not repeat itself. The Consent Decree requires semi-annual reports, of which this is the Monitor's first, to U.S. District Judge David M. Lawson of the U.S. District Court for the Eastern District of Michigan.

This Part of the Report describes the background of the monitorship and the Consent Decree. First, it outlines the basic structure and organization of the UAW. Second, it provides an overview of the criminal laws most relevant to the conduct that led to the Consent Decree, and which the Monitor will continue to police for the duration of the monitorship. Third, it describes the misconduct outlined in the government's public filings in connection with the Consent Decree and in the criminal cases that gave rise to it. Fourth, this Part describes the Consent Decree and the responsibilities, powers, and authority it grants to the Monitor to root out fraud and any remaining corruption in the UAW. Details of the Monitor's work during the first six months of the monitorship are set forth in the other Parts of this Report.

## A.    Structure and Governance of the UAW

The UAW consists of two major components: (i) the International Union, the overarching organization that manages the affairs of the UAW; and (ii) Local Unions, which are hundreds of constituent bodies that operate under the auspices of the International Union and which represent specific subgroups of members. The International Union, the Local Unions, and a number of other constituent and related entities all play a role in the governance and administration of the UAW as set forth in the UAW's governing document, the UAW Constitution. Although not an exhaustive

overview, this section lays out some basic background information concerning the structure and governance of the UAW, principally based on the current UAW Constitution and Bylaws, most recently amended in 2018 and referred to herein as the "UAW Constitution."  The full text of the UAW Constitution can be found on the UAW website.

### 1. Governing Bodies

#### a. The International Union

The UAW has vested its highest authority in an International Convention, which convenes every four years and is composed of delegates elected from the Local Unions.[29]  Among its powers and responsibilities, the International Convention has the authority to amend the UAW Constitution.[30]

Between International Conventions, the International Union is governed by the International Executive Board (the "IEB"), which consists of the President, the Secretary-Treasurer, three Vice Presidents, and a Regional Director for each of the UAW's regions.[31]  There are currently eight regions, and therefore eight Regional Directors.  The 2018 UAW Constitution delineated nine regions—Regions 1, 1A, 1D, 2B, 4, 5, 8, 9, and 9A.[32]  Since then, and as a direct result of some of the misconduct that gave rise to the Consent Decree, the IEB voted to disband Region 5 and absorb it into Regions 4 and 8.[33]  The UAW Constitution provides the IEB with the authority to do so.[34]

---

[29] UAW Const., art. 7, § 1.
[30] UAW Const., art. 7, § 16.
[31] UAW Const., art. 7, § 1.
[32] UAW Const., art. 10, § 21.
[33] Associated Press, *UAW abolishes regional office plagued by embezzlement*, Detroit Free Press (Dec. 6, 2019).
[34] UAW Const., art. 10, § 21.

Each IEB member is employed full-time by the Union and receives a salary in an amount specified by the UAW Constitution.[35]   The IEB's powers and duties are enumerated in detail in the Constitution, as are the duties and powers of specific IEB members.   As a group, the IEB negotiates and approves contracts with employers, decides questions of constitutional interpretation, and passes on claims and appeals from subordinate bodies.[36]   The IEB also maintains the International Union Strike and Defense Fund, a more than $800 million pool of money whose primary purpose is to assist Local Unions engaged in authorized strikes and to otherwise support union members (including members of other unions) who are on strike or subject to an employer lockout.[37]

In addition to the IEB, the International Union employs numerous staff members and other types of employees that carry out the work of the Union.   Among the staff members are more senior personnel—department heads, for example, and "International Representatives," who are appointed by the IEB President—as well as assistant directors and administrative assistants.[38] There are also clerical employees, such as accounting bookkeepers, typists, and stock-room clerks, who perform administrative roles geared toward supporting staff members.   Staff members carry out the substantive work of the Union within a variety of departments, including collective bargaining departments that are responsible for coordinating negotiations and administering national agreements with specific employers and industries, finance and accounting departments, and public policy departments.   In addition, each region of the International Union employs its

---

[35] The IEB members' annual salaries are as follows: the International President makes $200,657.07; the International Secretary-Treasurer makes $186.165.17; the International Vice Presidents make $180,591.36; and the Regional Directors make $166,099.46.  UAW Const., art. 11, §§ 3-4.  The International President's annual salary was increased in 2018.  Nora Naughton, *UAW Oks provisions to lower union dues, hike president's pay*, Detroit News (June 12, 2018).

[36] UAW Const., art. 12, §§ 6-7, art. 19.

[37] UAW Const., art. 16, § 11.

[38] UAW Const., art. 14, §§ 1-3.

own staff, who assist in the administration of the particular region's activities, including political advocacy, recreation, and organizing.

### b.    Local Unions

There are more than 600 Local Unions in the UAW.  A Local Union is defined as a bargaining unit of 15 or more employees that has applied for and received a charter from the Secretary-Treasurer.[39]

Local Unions have a number of powers and duties under the Constitution.[40]  Each Local Union establishes its own bylaws (which are then ratified by the IEB), holds monthly meetings, and affiliates itself with the other UAW organizations, such as Community Action Program bodies, discussed further below.[41]  Each must be governed by an Executive Board, consisting of a President, at least one Vice President, a Recording Secretary, a Financial Secretary, a Treasurer, three Trustees, a Sergeant-at-Arms, and a Guide.[42]

Among the other responsibilities that they have to their members, Local Unions enter into contracts with employers.  Those contracts may be negotiated by Local Union bargaining committee representatives (which may include Local Union Officers), with participation from International Representatives.[43]  Once negotiations have concluded, the proposed contract is submitted to a vote of the Local Union. [44]  If it is approved by a majority vote, it is referred to the Regional Director for the UAW region in which the Local Union is located, who then makes a recommendation to the IEB on whether the contract should be approved.[45]

---

[39] UAW Const., art. 36, § 1.
[40] UAW Const., art. 37.
[41] *Id.*
[42] UAW Const., art. 38, § 1.
[43] UAW Const., art. 19, § 3.
[44] *Id.*
[45] *Id.*

### 2.      Elections and Dues

#### a.      Elections

Under the UAW Constitution, the IEB is currently elected by the delegates at the International Convention.  Members become delegates after they are elected by the members of the Local Unions themselves.[46]  The number of delegates and the number of votes at the convention that are apportioned to each Local Union are each determined by a formula set forth in the UAW Constitution.[47]  The officers and members of the IEB (as well as the International Trustees) are each elected by a majority vote of the voting delegates.[48]  Local Union elections are supervised by the Local Union's Election Committee, which is itself elected.[49]

#### b.      Dues

Union members must pay monthly dues to their Local Union.  The precise amount each member needs to pay is laid out in the UAW Constitution and depends on a number of factors, including how much the member is paid, how much money is in the International Union Strike and Defense Fund, whether the member is salaried or hourly, and whether the member has a legal right to strike.[50]  Dues are then allocated in specific percentages to the Local Union, the

---

[46] UAW Const., art. 8, § 23 ("Delegates to the International Convention shall be elected by secret ballot of the Local Union of which they are members and in no case shall be appointed.").

[47] The UAW Constitution provides for the apportionment of delegates: "Each Local Union shall have one (1) delegate for two hundred (200) members or less and one (1) additional delegate for the next three hundred (300) members or major fraction thereof, and one (1) additional delegate for each additional eight hundred (800) members or major fraction thereof, except Amalgamated Local Unions which elect as many delegates as they have units who average two hundred (200) dues-paying members or more, and that those units who have two hundred (200) members or more may elect their own delegates to the Convention and those with less than two hundred (200) shall be grouped together and vote as a miscellaneous group. . . ." UAW Const., art. 8, § 5.  The Constitution also provides for the apportionment of votes: "Each Local Union shall have one (1) vote for the first one hundred (100) members or less and one (1) additional vote for each additional one hundred (100) members or major fraction thereof, but no delegate shall have more than eight (8) votes. The votes shall be equally apportioned among the elected delegates of each Local Union . . ." UAW Const., art. 8, § 7.

[48] UAW Const., art. 10, § 4.

[49] UAW Const., art. 38, § 10.

[50] UAW Const., art. 16, § 2.

18

International Union General Fund, and the Strike and Defense Fund.[51]  The portion of dues that are allocated to the latter two categories are the amount the Local Union must remit to the International Union each month.[52]  Under the UAW Constitution, some fees and dues must be set aside by the Local and International Unions for specific purposes and funds, such as encouraging members to vote in federal and local government elections, a fund for educational or recreation activities, and a fund for retired members.[53]

### 3.   Other UAW Entities

There are a number of other entities that play or have played a role in the administration of UAW activities, some of which are subordinate to the International Union and some of which are independent from it but engaged in related work.

### a.   Community Action Program

One such entity is the "National CAP Advisory Council" for the UAW Community Action Program ("CAP"), which focuses on political engagement.  The CAP educates members on, and advocates politically for, issues that affect UAW members, including workers' rights, fair trade, initiatives for working families, and worker health and safety, and frequently engages with elected officials on local and national levels.[54]  The CAP also oversees political donations, political endorsements, charitable contributions, and the International CAP and Voluntary Community Action Program Committee ("V-CAP").[55]  The UAW's other political arm is the Legislative Department, which is responsible for all federal lobbying efforts for the UAW.[56]

---

[51] UAW Const., art. 16, § 5.
[52] UAW Const., art. 16, § 6.
[53] UAW Const., art. 16, § 9.
[54] Information concerning the UAW's Community Action Program is posted on the Union's website.
[55] Exiger Report at 42 (June 11, 2021).
[56] *Id.*

V-CAP is a political committee established by the IEB with the authority to make decisions on expenditures and contributions involving federal elections from a fund established by voluntary contributions from UAW members and their families, mostly through direct withdrawals from members' paychecks, dollar drives, and other fundraising initiatives. Contributions to the V-CAP are voluntary and are not deductible as charitable contributions for federal income tax purposes.[57]

The International President serves as the Chairperson of the UAW CAP Department and chairs the National UAW CAP Advisory Council.[58] Representation to the UAW National CAP Advisory Council is determined by the UAW President, subject to the approval of the IEB.[59] There are also Community Action Programs for specific regions and localities—for example, there is a "Midwest CAP" that engages in political advocacy in the Midwest.

### b. Joint Training Centers

Designated UAW personnel are assigned to jointly manage the "joint training centers" with personnel from each of the "big three" automaker employers. The training centers are not a part of the UAW—instead they are funded pursuant to the terms of the collective bargaining agreements with the relevant automaker and operated jointly between the automaker and the UAW, with each joint program center having its own Board of Directors comprised of company designees and UAW designees. Their stated purpose is primarily to provide training to UAW workers at the respective automakers, and each operates out of its own building in Southeast Michigan.

---

[57] *Id.*
[58] UAW Const., art. 23, § 11.
[59] UAW Const., art. 23, § 3.

The UAW operates training centers with General Motors Company, Fiat Chrysler Automobiles N.V., and the Ford Motor Company.[60]  These training centers are called, respectively, the UAW-GM Center for Human Resources (CHR) ("GM Training Center"); the UAW-Chrysler Skill Development & Training Program d/b/a the UAW-Chrysler National Training Center (NTC) ("Chrysler Training Center"); and the UAW-Ford National Programs Center (NPC) ("Ford Training Center").

Until 2019, the training centers were tax-exempt corporations, established as labor management committees subject to 29 U.S.C. § 186(c)(9).[61]  They were each run by a board with an equal number of members from both the UAW and the relevant automaker.  In 2019, however, the UAW ratified new contracts with the automakers that dissolved each training center corporation and replaced them with two Taft-Hartley non-profit trusts for each training center (one for labor-management activities and one for benefit-related activity).[62]  These trusts are also jointly controlled by the UAW and the automakers.[63]  Although each automaker-UAW pair continues to provide joint training services, the 2019 UAW-GM and UAW-Fiat Chrysler contracts required the physical GM and Chrysler training centers (owned by the training center corporations) to be sold, with the proceeds directed toward providing training services.[64]  The UAW-GM training center

---

[60] Chrysler Group and Fiat S.p.A merged in 2014 to form Fiat Chrysler Automobiles N.V.  In 2021, Fiat Chrysler Automobiles N.V. then merged with the PSA Group to form Stellantis.  Where reference is made to "Fiat Chrysler" in this report, it refers to the relevant entity at the time: Chrysler Group (up until 2014), Fiat Chrysler Automobiles N.V. (from 2014 to 2021), and Stellantis (beginning in 2021).

[61] Anti-Fraud Complaint ¶ 13(a), *United States v. Int'l Union, United Automobile, Aerospace, and Agricultural Implement Workers of America* (Dec. 14, 2020), Civil No. 20-cv-13293 (E.D. Mich.), ECF No. 1 ("Compl."); Michael Grimes, Plea Agreement at 4 (Sept. 4, 2019) ("Grimes Plea").

[62] Breana Noble, *UAW Training Center Reforms Seek Transparency, Higher Standards*, The Detroit News (June 22, 2020).

[63] *Id.*; Eric D. Lawrence, *Training Center in UAW Scandal Has Big Price Tag, But Will Its Role Change?*, Detroit Free Press (Nov. 28, 2020).

[64] Breana Noble, *UAW-GM riverfront training center sold, to be renamed 'The Icon,'* The Detroit News (Nov. 2, 2020).

has since been sold, and the UAW and GM have opened and started operating a much smaller building for UAW-GM joint training services.[65]  The UAW-Chrysler training center is currently for sale.[66]

### B.    Criminal Laws Governing the Conduct of UAW Personnel

The current monitorship arose because of the criminal conduct of more than a dozen senior UAW and Fiat Chrysler officials, including two recent past UAW presidents, who violated certain labor-specific laws as well as other federal statutes that have more general applicability for white-collar criminal activity.  This section provides background on these laws; it is not intended to provide an exhaustive overview, but merely serve as context and background for  this Report.

### 1.    Taft-Hartley Act

Union officials violated the Labor Management Relations Act of 1947 ("LMRA" or "Taft-Hartley Act"), 29 U.S.C. § 141 *et seq.*, which aims to "define and proscribe practices on the part of labor and management which affect commerce and are inimical to the general welfare."[67]  One of the many ways the Act effectuates that goal is by forbidding employers and those acting on their behalf from giving improper payments or other things of value to a union or its officers or employees.[68]  As a corollary, it is unlawful for a union officer or employee to "request, demand, receive, or accept, or agree to receive or accept" any prohibited payment or gift from an

---

[65] *Id.*

[66] Eric D. Lawrence, *Training center in UAW scandal has big price tag, but will its role change?*, Detroit Free Press (Nov. 28, 2020).

[67] 29 U.S.C. § 141(b).

[68] 29 U.S.C. § 186(a).  There are a number of categories of payments exempted from this rule—for example, "money or other thing of value paid by any employer to a trust fund established by such representative for the purpose of pooled vacation, holiday, severance or similar benefits, or defraying costs of apprenticeship or other training programs."  29 U.S.C. § 186(c)(6).

employer.[69]  This prohibition is intended to help ensure that union officers and employees—and, in particular, union negotiators—are not improperly influenced in their dealings with employers.

### 2.   LMRDA

Union officials also violated sections of the Labor Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. § 401 *et seq.*, which seeks to ensure that "labor organizations, employers, and their officials adhere to the highest standards of responsibility and ethical conduct in administering the affairs of their organizations, particularly as they affect labor-management relations."[70]  As is relevant here, the LMRDA gives every union officer a fiduciary responsibility over the money and property of the union.[71]  Relatedly, it makes it a crime for union officers or employees to embezzle union funds or other assets.[72]  In addition, the LMRDA imposes record-keeping and reporting obligations on unions and makes it a crime to knowingly make a false statement or material omission in a required report, or to willfully make a false entry or omission in a required record.[73]

### 3.   Other Criminal Laws

Union officials also violated various other general criminal laws.

**Fraud.**  For example, there are a number of forms of fraud Union officials committed that gave rise to the Consent Decree—specifically, mail fraud, wire fraud, honest services fraud, and bank fraud.  Conspiracy to commit any of those fraud offenses constitutes a crime as well.[74]

---

[69] 29 U.S.C. § 186(b)(1).
[70] 29 U.S.C. § 401(a).
[71] 29 U.S.C. § 501(a).
[72] 29 U.S.C. § 501(c).
[73] 29 U.S.C. § 439(b)-(c).
[74] 18 U.S.C. § 1349 ("Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.").

- Mail fraud occurs when a person uses the Postal Service or an interstate carrier to execute a scheme to defraud or to obtain money or property by false pretenses.[75]

- Wire fraud occurs when a person uses an electronic form of communication (*e.g.*, phones or email) across state lines to execute a scheme to defraud or to obtain money or property by false pretenses.[76]

- Honest services fraud is a type of mail or wire fraud in which the scheme to defraud is a scheme "to deprive another of the intangible right of honest services."[77]   Such fraud occurs when a person, using the wires or mail, violates a duty to act in the interest of an organization by taking bribes or kickbacks for their own benefit.[78]

- Bank fraud occurs when a person executes a scheme to defraud a financial institution or to obtain money or other assets under the control of a financial institution by means of false pretenses.[79]

---

[75] 18 U.S.C. § 1341 ("Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.").

[76] 18 U.S.C. § 1343 ("Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.").

[77] 18 U.S.C. § 1346 ("For the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services.").

[78] *Skilling v. United States*, 561 U.S. 358, 408-09 (2010) (placing this narrowing construction on 18 U.S.C. § 1346 to preserve it against a challenge that it was unconstitutionally vague).

[79] 18 U.S.C. § 1344 ("Whoever knowingly executes, or attempts to execute, a scheme or artifice—(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.").

**Money Laundering.**  Money laundering occurs when a person knows that the property involved in a financial transaction represents the proceeds of unlawful activity and conducts a financial transaction with the intent of promoting the unlawful activity or with knowledge that the transaction is designed to conceal the nature of the proceeds or avoid a state or federal transaction reporting requirement.[80]

**False Statements.**  Finally, it is also a crime to make false statements to or file false reports with federal agencies, including DOJ, the Department of Labor ("DOL"), or the Internal Revenue Service ("IRS").  This includes willfully falsifying a material fact, making a materially false statement, or using a false writing knowing that it contains a materially false statement in a matter within the jurisdiction of the executive branch.[81]  It is also a crime to conspire to commit any offense against the United States or a federal agency.[82]

## C.    Criminal Convictions of UAW Officials

Over the course of multiple years, the U.S. government investigated fraud, corruption, and other criminal conduct at the joint training centers and at the UAW itself.  The investigation resulted in a number of criminal convictions, a civil complaint against the UAW, and, ultimately, in this monitorship.  In all, eleven UAW officials pleaded guilty to fraud and corruption offenses:

---

[80] 18 U.S.C. § 1956(a)(1).
[81] 18 U.S.C. § 1001(a).
[82] 18 U.S.C. § 371.

| Name | Most Senior Title | Years in that Role | Pleaded Guilty to | Sentence |
|------|-------------------|--------------------|--------------------|----------|
| Joseph Ashton | UAW Vice President and Director of the UAW-GM Department[83] | 2010-2014[84] | Conspiracy to commit honest services wire fraud and conspiracy to commit money laundering[85] | 30 months[86] |
| Michael Grimes | Senior UAW official and Executive Board Member of the GM Training Center[87] | 2006-2018[88] | Conspiracy to commit honest services wire fraud and conspiracy to commit money laundering[89] | 28 months[90] |
| Norwood Jewell | UAW Vice President and Director of UAW-Chrysler Department[91] | 2014-2016[92] | Conspiracy to violate the LMRA[93] | 15 months[94] |
| Nancy Johnson | Senior official in the UAW-Chrysler Department[95] | 2014-2016[96] | Conspiracy to violate the LMRA[97] | 12 months[98] |

---

[83] Joseph Ashton, Plea Agreement at 4 (Dec. 5, 2019) ("Ashton Plea").

[84] *Id.*

[85] Ashton Plea at 2.

[86] DOJ, Press Release, *Former UAW Vice President Sentenced to 30 Months for Taking $250,000 in Bribes and Kickbacks* (Nov. 17, 2020).

[87] Grimes Plea at 4.

[88] *Id.*

[89] Grimes Plea at 2.

[90] DOJ, Press Release, *Former Senior UAW Official Sentenced to 28 Months for Taking Over $1.5 Million in Bribes and Kickbacks* (Feb. 19, 2020).

[91] Norwood Jewell, Plea Agreement ¶ 3 (Apr. 2, 2019) ("Jewell Plea").

[92] *Id.*

[93] Jewell Plea at 1-2.

[94] DOJ, Press Release, *Former UAW Vice President Norwood Jewell Sentenced to Prison for Conspiring with Fiat Chrysler to Accept Illegal Payments* (Aug. 5, 2019).

[95] Nancy Johnson, Plea Agreement ¶ 4 (July 23, 2018) ("Johnson Plea").

[96] *Id.*

[97] Johnson Plea at 1-2.

[98] Robert Snell, *Ex-UAW official Nancy Adams Johnson sent to prison*, The Detroit News (Dec. 18, 2018).

| Name | Most Senior Title | Years in that Role | Pleaded Guilty to | Sentence |
|------|------------------|-------------------|-------------------|----------|
| Gary Jones | UAW President[99] | 2018-2019[100] | Conspiracy to embezzle union funds and further racketeering activity, and conspiracy to evade taxes[101] | 28 months[102] |
| Virdell King | Senior official in the UAW-Chrysler Department [103] | 2008-2016[104] | Conspiracy to violate the LMRA[105] | 60 days, later amended to 1 day[106] |
| Keith Mickens | Senior official in the UAW-Chrysler Department[107] | 2010-2015[108] | Conspiracy to violate the LMRA[109] | 12 months[110] |
| Vance Pearson | Director of UAW Region 5[111] | 2018-2019[112] | Conspiracy to embezzle union funds and further racketeering activity[113] | 12 months[114] |

---

[99] Gary Jones, Plea Agreement ¶ 4 (June 3, 2020) ("Jones Plea").

[100] *Id.*

[101] Jones Plea at 2, 4.

[102] DOJ, Press Release, *Former International UAW President Gary Jones Sentenced to Prison for Embezzling Union Funds* (June 10, 2021).

[103] Virdell King, Plea Agreement ¶ 4 (Aug. 29, 2017) ("King Plea").

[104] *Id.*

[105] King Plea at 1-2.

[106] Robert Snell, *Disgraced UAW official spared prison after helping feds*, The Detroit News (Aug. 9, 2019).

[107] Keith Mickens, Plea Agreement at 3 (Apr. 5, 2018) ("Mickens Plea").

[108] *Id.*

[109] Mickens Plea at 1-2.

[110] DOJ, Press Release, *Two Former Fiat Chrysler Executives and a Senior UAW Official Sentenced to Prison for Scheme to Bribe Union Officials* (Nov. 7, 2018).

[111] Vance Pearson, Plea Agreement ¶ 2 (Feb. 7, 2020) ("Pearson Plea").

[112] *Id.*

[113] Pearson Plea at 2.

[114] DOJ, Press Release, *Former UAW Regional Director and Board Member Sentenced to Prison for Racketeering and Embezzlement Conspiracy* (July 6, 2021).

| Name | Most Senior Title | Years in that Role | Pleaded Guilty to | Sentence |
|---|---|---|---|---|
| Jeffrey Pietrzyk | Co-Director of the GM Training Center[115] | 2010-2014[116] | Conspiracy to commit honest services wire fraud and conspiracy to engage in money laundering[117] | On April 23, 2021, Pietrzyk died before he was sentenced[118] |
| Edward "Nick" Robinson | UAW Midwest CAP President[119] | 2010-2019[120] | Conspiracy to embezzle union funds and conspiracy to evade taxes[121] | 12 months[122] |
| Dennis Williams | UAW President[123] | 2014-2018[124] | Conspiracy to embezzle union funds[125] | 21 months[126] |

The crimes of these individuals fall primarily into three broad categories: (1) embezzling UAW funds for personal expenses; (2) receiving illegal payments and things of value from Fiat Chrysler by way of the Chrysler Training Center; (3) soliciting kickbacks and bribes for contracts involving the GM Training Center.

---

[115] Jeffrey Pietrzyk, Plea Agreement at 4 (Oct. 22, 2019) ("Pietrzyk Plea").

[116] *Id.*

[117] Pietrzyk Plea at 2.

[118] DOJ, Press Release, *Former International UAW President Dennis Williams Sentenced to Prison for Embezzling Union Funds* (May 11, 2021).

[119] Edward Robinson, Plea Agreement ¶ 4 (Mar. 2, 2020) ("Robinson Plea").

[120] *Id.*

[121] Robinson Plea at 2-3.

[122] DOJ, Press Release, *Former UAW Official Who Cooperated Against Two UAW Presidents Sentenced to 12 Months in Prison and Directed to Pay $342,000 in Restitution* (Jan. 27, 2021).

[123] Dennis Williams, Plea Agreement ¶ 4 (Sept. 30, 2020) ("Williams Plea").

[124] *Id.*

[125] Williams Plea at 2.

[126] DOJ, Press Release, *Former International UAW President Dennis Williams Sentenced to Prison for Embezzling Union Funds* (May 11, 2021).

Fiat Chrysler itself and three Fiat Chrysler officials have also pleaded guilty to offenses arising out of the same events.[127] Those officials are Alphons Iacobelli (former Fiat Chrysler Vice President for Employee Relations), Jerome Durden (former Fiat Chrysler financial analyst), and Michael Brown (former Fiat Chrysler Director of Employee Relations Department).[128] As a part of Fiat Chrysler's plea agreement, the company agreed that it would engage an independent compliance monitor (separate from the Monitor in this matter) with respect to the joint training center it operates with the UAW.[129]

This section provides a summary of the government's filings concerning the misconduct underlying those criminal convictions and the civil complaint against the UAW ("Complaint"), organized by those categories of misconduct, based on the cited government sources available to the public. After a draft of this Report was shared with the UAW, it asked the Monitor to include information contesting one of the allegations in the Complaint, which is also included below. The Complaint filed by DOJ against the UAW can be found on the Monitor's website, www.uawmonitor.com.

1.      **Embezzlement of UAW Funds[130]**

As alleged in DOJ's Complaint, over the course of roughly a decade, some of the most senior officials at the UAW—including two former UAW Presidents—engaged in criminal schemes to "embezzle over $1.5 million in UAW funds using UAW members' dues money and

---

[127] DOJ, Press Release, *FCA US LLC Charged For Making Illegal Payments To UAW Officials* (Jan. 27, 2021).

[128] *Id.*

[129] Robert Snell & Breana Noble, *FCA guilty in labor corruption scandal as auto industry marks new low*, The Detroit News (Mar. 1, 2021, 4:30 PM).

[130] For the conduct described in this section, numerous UAW officials pleaded guilty to various federal crimes. The civil complaint against the UAW that gave rise to the Consent Decree encompasses these corrupt activities. The individuals who pleaded guilty to the conduct described in this subsection are Gary Jones, Vance Pearson, Edward "Nick" Robinson, and Dennis Williams.

29

other funds to make personal purchase with no legitimate union purpose."[131]  They spent those funds on months-long vacations for themselves, as well as on golf equipment, meals, cigars, and other personal luxuries.[132]  The individuals convicted of this category of offenses were: Dennis Williams (UAW Secretary-Treasurer: 2010-2014, UAW President: 2014-2018), Gary Jones (UAW Region 5 Director: 2012-2018, UAW President: 2018-2019), Vance Pearson (UAW Region 5 Director: 2018-2019), and Edward "Nick" Robinson (UAW Midwest CAP President: 2010-2019).[133]  In many ways, the UAW and its members were the financial victims of the greed of these executives.[134]

One scheme was seeking reimbursement from the UAW for illegitimate personal expenses. For example, according to the Complaint, "former senior UAW officials used UAW funds to purchase," among other things, "months-long stays in villas in Palm Springs."[135]  This included former President Dennis Williams:  In its filings against Williams, the government explained that the then-UAW President "accepted a villa" in Palm Springs "[f]rom December 17, 2015 through March 31, 2016," "[f]rom December 1, 2016 through April 1, 2017," and "[f]rom December 20, 2017 through March 1, 2018," all paid for with UAW funds.[136]  "Ostensibly," these villas were for Williams' use "during a week-long January . . . UAW Region 5 conference and other UAW-related meetings."[137]

---

[131] Compl. ¶ 12(a); *see also, e.g.*, Pearson Plea ¶ 5.

[132] Compl. ¶ 12(a); *see also, e.g.*, Williams Plea ¶ 8.

[133] Compl. ¶ 12(f)-(i).

[134] The UAW was identified by DOJ's Victim Notification System as a victim of the offenses of Williams, Jones, Pearson, and Robinson.

[135] Compl. ¶ 12(a).

[136] Dennis Williams, Information ¶¶ 17, 19, 21 (Aug. 27, 2020) ("Williams Information").

[137] Williams Information ¶¶ 17, 19, 21 (Aug. 27, 2020).

Once in Palm Springs, senior UAW officials, including Williams, would run up tabs at restaurants and golf courses that were also paid for with "UAW members' dues money and other funds."[138] Specifically, according to the Complaint, "former senior UAW officials used UAW funds to purchase over $60,000 worth of cigars and cigar paraphernalia, sets of custom-made golf clubs, months-long stays in villas in Palm Springs, California, liquor, expensive meals, rounds of golf, over $100,000 in golf clothing and equipment, and hundreds of thousands of dollars in cash."[139]

Some officials routed their requests for disbursements of Union funds for personal use through the UAW's accounting department, but also took steps to conceal their activities.[140]  For instance, Vance Pearson, Edward "Nick" Robinson, and Gary Jones helped to establish "master account arrangements" with hotels in which the hotel would pay for non-conference related expenses such as "cigars, private villas, high-end liquor and meal expenses, golfing apparel, golf clubs, clothes, extravagant meals, spa services, and green fees" and then bill the UAW for those expenses as part of one master bill. [141]  The descriptions of these outside expenses in the master bills were often generic to hide their true nature (*e.g.*, meals and golf games might be referred to as "off-site functions") and often contained false descriptions.[142]

As detailed in the Complaint and other governmental filings, Robinson also submitted a number of receipts to the Midwest CAP for which he had already been reimbursed by the UAW—resulting in duplicate repayment for those expenses—and used the resulting cash to pay for

---

[138] Compl. ¶ 12(a).
[139] *Id.*
[140] Compl. ¶ 12(b)-(e).
[141] Pearson Plea ¶ 7; *see* Compl. ¶ 12(b).
[142] Vance Pearson, Criminal Complaint ¶ 28 (Sept. 12, 2019) ("Pearson Complaint"); *see* Compl. ¶ 12(b).

personal expenses for himself and other senior UAW officials.[143]  Jones was aware of and participated in this double billing scheme.[144]  When double billing, Robinson kept some cash for himself, and split the rest with Jones, Pearson, and other past Region 5 Union officials.[145]

In addition to constituting unlawful embezzlement of Union funds, the former UAW officials' graft also violated federal tax laws.  Just as individuals are required to file federal income taxes, the UAW is required to file reports with the IRS, including IRS Form 990.  When employees receive cash and other expensive perks, it is considered income by the IRS.  Robinson, Jones, and Pearson failed to disclose the cash that they embezzled as income on their own Form 1040 individual tax returns, a tax offense.[146]  As a result, according to the criminal information against Gary Jones, a UAW official filed IRS Form 990 on behalf of the UAW which contained certain "false statements due to the actions" of Robinson, Jones, and Pearson, which "prevented the IRS from making an accurate tax assessment with respect to funds diverted from the UAW for the personal benefit" of UAW officials including Jones, Robinson, Pearson and others.[147]

## 2.    Illegal Payments Involving the Chrysler Training Center[148]

Several former UAW officials also admitted to engaging in a years-long practice of accepting illegal payments and things of value from Fiat Chrysler, via the Chrysler Training Center, in violation of the Taft-Hartley Act.[149]  According to DOJ's Complaint, "[o]ver the course

---

[143] Robinson Plea ¶¶ 10-12; Compl. ¶ 12(c).

[144] Gary Jones, Second Superseding Information at 5-8 (Feb. 27, 2020) ("Jones Information").

[145] Edward Robinson, Information at 7-8 (Oct. 31, 2019) ("Robinson Information"); Robinson Plea ¶ 11; Jones Plea ¶ 12.

[146] Compl. ¶ 16(a), (e)-(g); *see* Jones Information at 14-16.

[147] Jones Information at 14-16; *see also* Compl. ¶ 16(e)-(g).

[148] For the conduct described in this section, numerous former UAW officials pleaded guilty to various federal crimes.  The civil complaint against the UAW that gave rise to the Consent Decree encompasses these corrupt activities.  The individuals who pleaded guilty to the conduct described in this subsection are Norwood Jewell, Nancy Johnson, Virdell King, Keith Mickens, and Monica Morgan (General Holiefield's wife).  General Holiefield died in 2015 and was not prosecuted.

[149] Compl. ¶ 13.

of the conspiracy, . . . Fiat Chrysler executives and employees[] unlawfully paid and delivered more than $3.5 million in prohibited payments and things of value directly and indirectly to UAW Vice President General Holiefield, UAW Vice President Norwood Jewell, UAW Assistant Director Virdell King, UAW Official Nancy Johnson, UAW Official Keith Mickens, and other former UAW officials."[150]  According to the Complaint and Alphons Iacobelli's (Vice President for Employee Relations at Fiat Chrysler) plea agreement, these prohibited payments and things of value included, for example, "paying off the mortgage on the personal residence of former UAW Vice President Holiefield, personal travel, designer clothing, cases of custom-labeled wine, furniture, jewelry, and custom-made watches,"[151] as well as "hundreds of thousands of dollars in prohibited payments from [Fiat Chrysler], through the [Chrysler Training Center]" to purported charitable organizations controlled by certain UAW officials.[152]  Additionally, as discussed below in further detail, according to DOJ's Complaint, the UAW inappropriately caused Fiat Chrysler and Ford, through the respective joint training centers, to overpay for salaries and benefits of certain UAW employees assigned to work at the joint training centers, and has since refunded approximately $15 million to those two training centers for the improperly charged chargebacks.[153]

According to the Complaint, Fiat Chrysler funded the Chrysler Training Center "to provide for the education, training, and retraining of workers and employees represented by the UAW."[154] The training center was jointly run by the UAW and Fiat Chrysler—during the relevant time period, primarily by Iacobelli, Jerome Durden (a Financial Analyst at Fiat Chrysler), and General

---

[150] Compl. ¶ 13(f).
[151] *Id.*
[152] Compl. ¶ 13(g); Alphons Iacobelli, Plea Agreement ¶ 9 (July 13, 2018).
[153] Compl. ¶ 13(1).
[154] Compl. ¶ 13(a).

Holiefield (Vice President and Director of the Chrysler Department at the UAW).[155]  From 2008 to 2014, Holiefield and Iacobelli were the co-chairmen of the "Joint Activities Board," the governing body of the Chrysler Training Center, with Durden serving as Controller of the Board from 2010 through 2015.[156]  When Holiefield retired in 2014, Norwood Jewell took over as the Vice President and Director of the Chrysler Department at the UAW, and therefore as the Co-Chair of the Joint Activities Board.[157]

As stated above, DOJ alleged that with the training center as a cover, Fiat Chrysler executives, including Iacobelli and Durden, diverted significant sums of money to UAW officials and their friends and families, including "more than $3.5 million in prohibited payments and things of value directly and indirectly" to UAW officials in violation of the Taft-Hartley Act.[158]

Additionally, Iacobelli and Durden embezzled money from the Chrysler Training Center for themselves.[159]  For example, the government's sentencing memorandum in Iacobelli's criminal case states that Iacobelli fraudulently used the Chrysler Training Center to embezzle millions of dollars to pay for personal services and purchases including "a Ferrari, jewel-encrusted pens, hundreds of thousands of dollars in improvements and additions to the pool at his residence, personal spending on his credit cards, and more."[160]

### a. Use of Training Center Funds to Pay UAW Salaries and Benefits

According to the government's Complaint, from 2003 to 2017, the UAW received over $300 million from the three joint training centers through a "chargeback" process pursuant to

---

[155] Jerome Durden, Plea Agreement ¶ 8 (Aug. 8, 2017) ("Durden Plea"); Compl. ¶ 13(d), (f).

[156] Durden Plea ¶ 8.

[157] Norwood Jewell, Plea Agreement ¶¶ 2, 15 (Apr. 2, 2019) ("Jewell Plea").

[158] Compl. ¶ 13, 13(f); *see also* Michael Brown, Plea Agreement at 3 (May 25, 2018) ("Brown Plea"); Iacobelli Plea ¶ 11.

[159] Durden Plea ¶ 33; Iacobelli Plea ¶ 25.

[160] Alphons Iacobelli, Government Sentencing Memorandum at 9 (Aug. 20, 2018) ("Iacobelli Government Sentencing Memorandum").

which the UAW assigned UAW officials to work at the training centers, and was reimbursed by the training centers for those officials' salaries and benefits.[161]   DOJ further alleged that "[a]s part of the improper conduct, certain former UAW officials caused the Ford Motor Company and Fiat Chrysler to pay certain 'chargebacks' through their respective training centers to the UAW that were not appropriate and where some of the employees either were not working at the assigned training center or were working less than full time at their training center."[162]   Prior to filing of the Complaint, the UAW refunded approximately $15 million total in improper chargebacks to the Chrysler Training Center (approximately $6.4 million) and Ford Training Center (approximately $8.6 million).[163]

According to Gary Jones' plea agreement, during the period of at least 2014 through 2016, Dennis Williams and other senior UAW officials caused the automobile companies to pay the chargebacks (through the training centers) "even though these UAW officials knew that these UAW officials and employees 'assigned' to the training centers spent most of their work time performing tasks for the UAW, reported to the UAW, and enforced the companies' compliance with the collective bargaining agreements on behalf of the union."[164]   With respect to the Chrysler Training Center over-chargebacks in particular, the government argued in Iacobelli's criminal case that the improper chargebacks were part of a scheme between the two organizations for Fiat Chrysler to make payments to the UAW through the Chrysler Training Center so that the UAW could reduce its expenses.[165] The government further asserted that Iacobelli and Fiat Chrysler

---

[161] Compl. ¶ 13(1).
[162] *Id.*
[163] *Id.*
[164] Jones Plea at 19.  Dennis Williams is referred to as "UAW Official B" in the plea agreement.
[165] Iacobelli Government Sentencing Memorandum at 7.

"viewed the chargebacks as a political gift to the UAW."[166]  Unlike with Fiat Chrysler, DOJ did not allege that Ford or its employees were knowingly involved in the Ford Training Center over-chargebacks.[167]

In addition to the chargebacks themselves, the UAW also charged a 7% "administrative fee" on the amount of all chargebacks paid by the automakers to the UAW for all salaries and benefits of UAW employees assigned to the three training centers.[168]  The Complaint stated that DOJ "believes these fees are excessive and do not properly reflect the true cost to the UAW of administering the chargebacks for the three training centers, with part of the administrative fees properly covering the UAW's cost in administering employees assigned to the training centers."[169] DOJ also alleged that "[t]wo former Presidents of the UAW . . . considered a portion of the 7% administrative fee to generate a profit for the UAW" and that the fees were "deposited directly into the union's general operating account and used to offset union expenses."[170]  In response to a draft version of this Report, the UAW took the position that the administrative fees were appropriate, and provided the Monitor with an expert report that it previously submitted to DOJ that provided an expert's analysis that the fees were reasonable.[171]

As alleged by DOJ, the chargeback and administrative fee scheme with Fiat Chrysler violated the Taft-Hartley Act provisions that prohibit an employer (Fiat Chrysler) from making,

---

[166] Iacobelli Government Sentencing Memorandum at 6-7.

[167] *See* Compl. ¶ 13(l).

[168] Compl. ¶ 13(m); *see* Jones Plea at 19-20.

[169] Compl. ¶ 13(m).

[170] *Id.*

[171] The expert retained by the UAW concluded in his report that the administrative fee charged to the Chrysler Training Center "was calculated accurately," and "was and is reasonable based on [the expert's] knowledge, experience, and training as well as review of" a circular published by the Office of Management and Budget.

and labor unions (the UAW) from accepting, payments of money and other things of value to labor unions representing the employer's employees.[172]

Dennis Williams also "caused the automobile manufacturing companies to pay hundreds of thousands of dollars for capital improvements" to the UAW's Black Lake conference facility, including the installation of audio-visual equipment.[173]  Specifically, Williams caused the three joint training centers to make over $300,000 in payments to a company named Bluewater Technologies Group for audio-visual upgrades to the Black Lake Center.[174]  As DOJ stated in the Complaint, "the money benefitted the UAW and its Black Lake property," even though the money was provided "purportedly to help with joint training activities conducted at the Black Lake Center."[175]  The UAW has since refunded the more than $300,000 paid by the joint program centers.[176]

### b.     Use of Chrysler Training Center Funds for Personal Expenses

As part of the schemes described above, UAW officials also tapped the Chrysler Training Center for payments totaling more than $1.5 million.  As alleged in the Complaint, "[b]etween 2012 and June 2015, Fiat Chrysler Vice President Iacobelli authorized the expenditure of more than $450,000 to pay for personal purchases made by UAW Vice President Holiefield and other former UAW officials on their [Chrysler Training Center]-issued credit cards."[177]  The Complaint further stated that UAW officials Virdell King, Norwood Jewell, Nancy Johnson, Keith Mickens, and General Holiefield all used these Chrysler Training Center funded credit cards to make

---

[172] 29 U.S.C. § 186; *see* Compl. ¶ 13, 13(l)-(m).
[173] Jones Plea at 19; *see* Compl. ¶ 13(n).
[174] Compl. ¶ 13(n).
[175] *Id.*
[176] *Id.*
[177] Compl. 13(j).

personal purchases for themselves and others.[178] The credit cards were issued at the direction of Iacobelli, who was aware of and encouraged the UAW officials to use the cards to purchase items for personal use like jewelry, furniture, electronics, and designer clothing.[179] As noted above, Iacobelli himself took more than $2 million from the Chrysler Training Center to pay for personal expenses.[180]

Iacobelli and other Fiat Chrysler managers also authorized additional improper payments made directly for the benefit of UAW officials.[181] By way of example, in 2014, Iacobelli authorized an expenditure of more than $250,000 of Chrysler Training Center funds to pay off Holiefield's mortgage.[182]

### c. Transfer of Chrysler Training Center Funds to UAW Officials Through Corrupt Charities

As another element of the past misconduct, as set forth in the Complaint, "Fiat Chrysler Vice President Iacobelli and other Fiat Chrysler executives and employees transferred hundreds of thousands of dollars in prohibited payments from Fiat Chrysler, through the [Chrysler Training Center], into tax-exempt organizations controlled by certain former UAW officials, including the Leave the Light On Foundation and the Making Our Children Smile Foundation, among others."[183] For example, $50,000 of Chrysler Training Center funds was contributed to the Leave the Light On Foundation, a purported charity controlled by Holiefield.[184] Holiefield then funneled the majority of the "donations" to a photography business owned by Holiefield's then-girlfriend

---

[178] Iacobelli Plea ¶ 18; Compl. ¶ 13(j).
[179] Iacobelli Plea ¶ 18.
[180] Alphons Iacobelli, First Superseding Indictment ¶¶ 23-39 (July 26, 2017) ("Iacobelli First Superseding Indictment").
[181] Iacobelli Plea ¶ 8.
[182] Compl. ¶ 13(f); Iacobelli Plea ¶ 20.
[183] Compl. ¶ 13(g).
[184] Iacobelli Plea ¶ 13.

and later wife, Monica Morgan, who spent the money on night clubs, restaurants, and other personal purchases.[185]  In February 2018, Morgan pled guilty to filing fraudulent tax returns and was sentenced to an 18-month prison term.[186]

### 3.    Bribes and Kickbacks Involving the GM Training Center[187]

The Complaint indicates that the GM Training Center, like the Chrysler Training Center, was also a locus of fraud, though the allegations detailed in the government's filings do not indicate the knowing participation of GM officials.  According to the Complaint, "[i]t was a part of the fraud, corruption, and illegality that certain former members of the International Executive Board, while employed by and associated with the UAW, unlawfully and knowingly implemented a scheme to defraud . . . the UAW membership's right to the honest services of the International Executive Board and of UAW officials, by accepting bribes and kickbacks in exchange for awarding contracts from the [GM Training Center] to certain contractors."[188]  Here, the relevant players were Joseph Ashton (UAW Vice President and Director of the GM Department), Michael Grimes (a senior UAW official and a member of the Executive Board of the GM Training Center), and Jeffrey Pietrzyk (a senior UAW official and the Co-Director of the GM Training Center).[189] They solicited and accepted millions of dollars in bribes and kickbacks from vendors by using their positions and their authority to approve vendor contracts.[190]  Moreover, Ashton, Grimes, and

---

[185] Iacobelli First Superseding Indictment ¶¶ 12-13.

[186] DOJ, Press Release, *Wife of Former UAW Vice President Sentenced to Prison for Criminal Tax Fraud* (July 13, 2018).

[187] For the conduct described in this section, numerous UAW officials pleaded guilty to various federal crimes.  The civil complaint against the UAW that gave rise to the Consent Decree encompasses these corrupt activities.  The individuals who pleaded guilty to the conduct described in this subsection are Joseph Ashton, Michael Grimes, and Jeffrey Pietrzyk.

[188] Compl. ¶ 11.

[189] Compl. ¶ 11(a).

[190] Compl. ¶ 11(a)-(h); Joseph Ashton, Information ¶ 14 (Nov. 6, 2019) ("Ashton Information").

Pietrzyk directed vendors to inflate the bids and invoices from vendors submitted to the GM Training Center and received a portion of the inflated profits from the vendors.[191]

### a.    Logo Products Schemes with Vendor A

A series of schemes involved an individual identified by DOJ in its public filings as "Vendor A" and his wife, who together owned a group of companies that sold custom logo products.[192]   The majority of Vendor A's business was providing UAW-branded clothing and accessories to the GM Training Center and in maintaining retail stores of branded products in GM plants.[193]  As set forth in the Complaint, in exchange for influencing the award of various contracts to Vendor A, Ashton, Grimes, and Pietrzyk demanded and accepted at least $1.5 million in kickbacks from Vendor A.[194]

In 2006, for example, Grimes recommended that Vendor A be awarded a contract to supply 23,000 watches that featured the UAW logo.[195]  Once Vendor A was awarded the contract, Vendor A gave Grimes a $60,000 "loan" so that he could purchase personal property in Rose Township, Michigan.[196]   Vendor A made the payment pursuant to a phony "consulting agreement" with Grimes, along with monthly cash kickbacks.[197]

Grimes, Ashton, and Pietrzyk repeated similar schemes with contracts for UAW-branded jackets and backpacks, which, when included with the other schemes, resulted in Grimes alone collecting almost $900,000 in bribes from Vendor A.[198]

---

[191] Ashton Information ¶¶ 20-21.
[192] Grimes Plea at 5; Compl. ¶ 11(b).
[193] Grimes Plea at 5.
[194] Compl. ¶ 11(b); Michael Grimes, Information, at 9-10 (Aug. 19, 2009) ("Grimes Information").
[195] Grimes Information ¶ 18.
[196] Grimes Information ¶¶ 18-19.
[197] Grimes Information ¶ 19.
[198] Grimes Information ¶¶ 23, 32.

**b.      Watch Scheme with Vendor B**

UAW officials also solicited kickbacks from other vendors.  One such scheme, referenced in the Complaint, involved a chiropractor based in Philadelphia and southern New Jersey ("Vendor B").[199]  Ashton knew Vendor B—in 2010, Ashton had convinced Vendor B to loan $250,000 to a construction company owned by an Ashton associate.[200]  When the construction company stopped making loan payments to Vendor B in 2012, Ashton proposed a solution.[201]  According to the criminal information in Ashton's case, Ashton "told Vendor B that the UAW was going to purchase over 50,000 watches, and directed Vendor B to open a company that could win the contract to supply the watches," and that the profits would be enough to cover the debt.[202]  Vendor B did so, and Ashton arranged for Vendor B to buy the watches from a manufacturer for approximately $2,300,000.[203]

At Ashton's direction, Vendor B then submitted a bid for the watch contract to Pietrzyk at the GM Training Center at a price of $3,973,000.[204]  Ashton and Pietrzyk then used their influence to award the watch contract to Vendor B at the requested price.[205]  Once the GM Training Center made the first payment to Vendor B, Ashton began demanding kickbacks for himself from Vendor B in the form of cash payments and checks.[206]  He also directed Vendor B to pay kickbacks to Pietrzyk, who passed on a portion of the cash to Grimes.[207]  Although Vendor B delivered 58,000

---

[199] Grimes Plea at 5; *see* Compl. ¶ 11(c)-(d).

[200] Ashton Information ¶ 17.

[201] Ashton Information ¶¶ 17-18.

[202] Ashton Information ¶ 18.

[203] Ashton Information ¶¶ 19-20.

[204] Ashton Information ¶ 21.

[205] *Id.*

[206] Ashton Information ¶¶ 23-25; Compl. ¶ 11(d).

[207] Ashton Information ¶ 26; Compl. ¶ 11(c)-(d).

watches to the GM Training Center in 2014, they were never distributed to UAW workers and are currently in storage.[208]

### D.      The Consent Decree and the Monitorship

On December 14, 2020, the United States brought a Complaint against the UAW and its constituent entities under the Anti-Fraud Injunction Act, 18 U.S.C. § 1345, in the U.S. District Court for the Eastern District of Michigan.[209]  The Complaint alleged that "[f]or over ten years, certain UAW officials, including certain former members of the International Executive Board, engaged in fraudulent, corrupt, and illegal conduct for their own benefit and to the detriment of the members of the UAW, their families, and the United States."[210]  The same day that the United States filed its Complaint, the parties announced that they had reached a civil and criminal settlement.[211]  Shortly thereafter, the parties jointly moved for the entry of a consent order setting forth the terms of the settlement.[212]  On January 29, 2021, the Court granted the motion and entered the Consent Decree.[213]

---

[208] Ashton Information ¶ 28; DOJ, Press Release, *Former UAW Vice President Sentenced to 30 Months for Taking $250,000 in Bribes and Kickbacks* (Nov. 17, 2020).  As discussed in Part II of this Report, the UAW brought charges under Articles 30 and 31 of the UAW Constitution to expel from membership in the Union the eleven UAW officials who pleaded guilty to fraud and corruption offenses (or used the threat of such charges to obtain resignation).

[209] *See generally* Compl.

[210] Compl. ¶ 7.

[211] DOJ, Press Release, *The United States Reaches a Settlement with the United Auto Workers Union to Reform the Union and End Corruption and Fraud* (Dec. 14, 2020).

[212] Joint Motion for Entry of Consent Order and Brief in Support, *United States v. Int'l Union, United Automobile, Aerospace, and Agricultural Implement Workers of America* (Jan. 5, 2021), Civil No. 20-cv-13293, ECF No. 7.

[213] Order Granting Joint Motion for Entry of Consent Decree, *United States v. Int'l Union, United Automobile, Aerospace, and Agricultural Implement Workers of America* (Jan. 29, 2021), Civil No. 20-cv-13293, ECF No. 9; Consent Decree, *United States v. Int'l Union, United Automobile, Aerospace, and Agricultural Implement Workers of America* (Jan. 29, 2021), Civil No. 20-cv-13293, ECF No. 10 ("Consent Decree").

The Consent Decree requires that a Monitor and an Adjudications Officer be appointed, each with specified powers under the Consent Decree.[214]  The monitorship will be in place for six years, and can be extended or curtailed only with Court approval.[215]  The UAW will pay for the reasonable compensation, expenses, and costs associated with the activities of the Officers.[216]

Among other things, the Consent Decree permanently enjoins the UAW and its constituent entities (and all of the current and future members of those bodies) from a range of conduct—including committing specified criminal activity, knowingly associating with a "barred person" (unless for permitted reasons), knowingly permitting a "barred person" to exercise influence over UAW affairs, and obstructing or interfering with the work of the Monitor or Adjudications Officer.[217]  Collectively, these constitute the "injunctive prohibitions" of the Consent Decree.

As contemplated by the Consent Decree, the UAW proposed a number of candidates for the position of Monitor to the government.  Following a review process, the government selected from those proposed candidates Neil Barofsky as Monitor and proposed him to the Court.[218]  On May 12, 2021, the Court appointed Barofsky to be the Monitor.[219]  On September 10, 2021, the Court appointed Gil M. Soffer to be the Adjudications Officer, following a similar process.[220]

---

[214] Consent Decree ¶ 22.

[215] Consent Decree ¶¶ 5-7.

[216] Consent Decree ¶ 25.

[217] Consent Decree ¶ 18.  Barred persons include the specific UAW officials convicted of malfeasance, as well as certain other categories of individuals (*e.g.*, members of criminal groups designated by the Federal Bureau of Investigation).  Consent Decree ¶ 20.

[218] Government's Motion for Appointment of Monitor, *United States v. Int'l Union, United Automobile, Aerospace, and Agricultural Implement Workers of America* (Apr. 12, 2021), Civil No. 20-cv-13293, ECF No. 28.

[219] Order Granting Unopposed Motion to Appoint Monitor, *United States v. Int'l Union, United Automobile, Aerospace, and Agricultural Implement Workers of America* (May 12, 2021), Civil No. 20-cv-13293, ECF No. 34.

[220] Order Granting Unopposed Motion to Appoint Adjudications Officer, *United States v. Int'l Union, United Automobile, Aerospace, and Agricultural Implement Workers of America* (Sept. 10, 2021), Civil No. 20-cv-13293, ECF No. 45 ("Order Appointing Adjudications Officer").

Broadly speaking, the mandate of the court-appointed Monitor is "to remove fraud, corruption, illegal behavior, dishonesty, and unethical practices from the UAW and its constituent entities."[221]   That mandate is subdivided further into three constituent areas over which the Monitor has authority and responsibilities: (1) a compliance mandate; (2) an investigative mandate; and (3) an elections mandate.  The Monitor has established teams in each of these three areas to carry out the Monitor's work and meet the Monitor's obligations under the Consent Decree.[222]

This section provides an overview of the Monitor's duties with respect to each of these three areas, and then briefly describes additional duties and activities of the Monitor with respect to this monitorship.   Subsequent Parts of this Report discuss the work that the Monitor has performed over the past six months in each of the three areas.

### 1.    Compliance Mandate

At the core of the Consent Decree is its grant to the Monitor of "the authority and duty to remove fraud, corruption, illegal behavior, dishonesty, and unethical practices from the UAW and its constituent entities."[223]   It further provides that the Monitor shall "have all of the powers, privileges, and immunities" of a receiver appointed under Federal Rule of Civil Procedure 66 and "which are customary for court appointed office[r]s performing similar assignments."[224]   Those

---

[221] Consent Decree ¶ 28.

[222] This Report cites to various emails and letters sent or received by members of the Monitor's team.  In those instances, the citation refers to all such persons as simply the "Monitor" for simplicity and ease of reference.

[223] Consent Decree ¶ 28.

[224] Consent Decree ¶ 27.

"customary" powers include the authority to ensure the compliance of an organization with applicable laws and judicial orders.[225]

The Monitor has established a team led by an internationally recognized leader in the field of organizational compliance to carry out the "Compliance Mandate."  Further details concerning the scope of the Monitor's authority and work pursuant to this Compliance Mandate are set forth in Part II of this Report.

### 2.      Investigative Mandate

As part of the Monitor's duty to remove fraud, corruption, illegal behavior, dishonesty, and unethical practices from the UAW and its constituent entities, the Consent Decree provides the Monitor with "the right and authority of the UAW International President and IEB to bring charges seeking to discipline, remove, suspend, expel, fine or forfeit the benefits" of numerous classes of individuals involved with the UAW, including officers, agents, and members, when those persons engage in specified misconduct.[226]  The Consent Decree includes detailed provisions setting forth the substantive scope of the Monitor's obligation to investigate and address corruption and misconduct, and also sets forth the procedures pursuant to which the Monitor may initiate and prosecute charges against individuals identified by the Monitor's investigatory activities.

With regard to substance, the Consent Decree authorizes the Monitor to bring disciplinary charges against UAW members for conduct that violates certain criminal laws involving labor organizations or employee benefit plans, *regardless of when* that conduct occurred (*i.e.*, regardless

---

[225] *See, e.g.*, *United States v. Am. Tobacco Co.*, 221 U.S. 106, 186-87 (1911) (directing "the appointment of a receiver . . . for the purpose of preventing a continued violation of the law"); *see also Morgan v. McDonough*, 540 F.2d 527, 529 (1st Cir. 1976); *Newman v. Alabama*, 466 F. Supp. 628, 635 (M.D. Ala. 1979).
[226] Consent Decree ¶ 29.

of whether it occurred before or after entry of the Consent Decree).[227] The Consent Decree also authorizes the Monitor to bring disciplinary charges for three additional categories of misconduct if that conduct occurred *after* entry of the Consent Decree: (1) engaging or conspiring to engage in *any* federal crime; (2) conduct that furthers the influence of a "barred person," as defined in the Consent Decree; and (3) obstructing or interfering with the Monitor's or the Adjudication Officer's work.

If the Monitor's investigative activities uncover conduct that is not within the Monitor's charging authority, but that nonetheless may violate the UAW's policies—or otherwise constitute fraud, corruption, and unethical conduct—the Monitor may refer such conduct to the IEB, which can decide whether to bring disciplinary charges under the UAW Constitution, or to the Union's

---

[227] Paragraph 29 of the Consent Decree defines the parameters of the Monitor's charging authority. It states, in whole:

> The Monitor shall have the right and authority of the UAW International President and IEB to bring charges seeking to discipline, remove, suspend, expel, fine or forfeit the benefits (with the exception of vested employee retirement benefits subject to Title I of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, et seq. or otherwise un-forfeitable benefits under the law) of any UAW International officer, representative, agent, member, employee or person holding a position of trust in the UAW, its constituent entities, or any employee benefit plan, labor management cooperation committee or voluntary employee beneficiary association in which such person acts on behalf of the UAW or its constituent entities, as well as officers of local unions who are also members of the UAW, when such person engages or has engaged in actions which (i) violate the injunctive prohibitions of this decree, (ii) violate any criminal law involving the establishment or operation of a labor organization, employee benefit plan, labor management cooperation committee, or voluntary employee beneficiary association, or (iii) further the direct or indirect influence of any barred person, or the threat of such influence anow [sic] or in the future, as described in this decree.

*Id.* The following are criminal laws within the meaning of Consent Decree ¶ 29(ii) that, on their face, involve "the establishment or operation of a labor organization, employee benefit plan, labor management cooperation committee, or voluntary employee beneficiary association": 29 U.S.C. §§ 162, 186, 431-32, 439, 461, 463, 501-04, 522, 530, 664, 1021-25, 1027, 1111, 1131, 1141, 1149.

Ethics Officer, who, among other things, can consider recommending discipline to the IEB.[228] The Monitor may also refer any matter to DOJ.[229]

The Consent Decree sets forth procedures by which the Monitor may bring charges for adjudication and potential sanction.  For most types of disciplinary charges, the Monitor has discretion to bring charges for adjudication and resolution by either the Adjudications Officer under a procedure set forth in the Consent Decree, or a UAW Trial Committee, pursuant to the rules in the UAW Constitution.[230]  Less serious charges may be adjudicated and resolved only by a UAW Trial Committee and not by the Adjudications Officer.[231]

The Adjudications Officer is an independent role established by the Consent Decree for hearing certain disciplinary matters.[232]  The Court appointed Gil M. Soffer to this role.[233]  The Trial Committee is a panel of twelve Union members chosen by a method outlined in the UAW Constitution to hear charges brought against an IEB officer or Union member.[234]  The Trial Committee decides its own rules of procedure, and the accused and accuser both have a right to be represented by counsel in the proceedings.[235] The Trial Committee issues a verdict after hearing all of the evidence, and a two-thirds vote is required to find the accused guilty and suspend or remove an officer from office or expel a member from membership in the Union.[236]

---

[228] Consent Decree ¶¶ 22, 28, 30; UAW Const., arts. 30-31; UAW Ethics Hotline FAQs (UAW-Mon_Exiger_000014-21).

[229] Consent Decree ¶ 60.

[230] Consent Decree ¶ 30.

[231] *Id.*

[232] Consent Decree ¶¶ 34-35.

[233] Order Appointing Adjudications Officer.

[234] UAW Const., art. 30, § 7.

[235] UAW Const., art. 30, § 5.

[236] UAW Const., art. 30, § 10.

The Consent Decree establishes detailed hearing and appeals procedures for resolution of disciplinary charges.[237]   For example, the Monitor must initiate any disciplinary proceeding through a written charge, and the charged party may be represented by counsel or by another UAW member.[238]  If the Monitor brings charges against an individual before the Adjudications Officer, the Adjudications Officer has the authority to impose discipline "up to and including expulsion from membership in the UAW and its constituent entities."[239]  When a disciplinary proceeding initiated by the Monitor is adjudicated and resolved by a Trial Committee, either the Monitor or the charged individual may appeal the Trial Committee's determination to the Adjudications Officer.[240]  If discipline is imposed by the Adjudications Officer, the person disciplined may appeal the decision to the Court.[241]

In addition to the authority to initiate charges, the Monitor may also disapprove the hiring or firing of a person or business entity or disapprove or terminate a commercial contract or other UAW obligation if he reasonably believes the action would violate the injunctive prohibitions of the Consent Decree, violate certain criminal laws involving labor organizations or employee benefit plans, or further the influence of a barred person.[242]

The Monitor has established a team led by former federal prosecutors and experienced investigations attorneys to carry out the "Investigative Mandate."  Further details concerning the scope of the Monitor's authority and work pursuant to this Investigative Mandate are set forth in Part III of this Report.

---

[237] Consent Decree ¶¶ 36-41, 51-54.
[238] Consent Decree ¶ 36.
[239] Consent Decree ¶ 34.
[240] Consent Decree ¶ 30(b).
[241] Consent Decree ¶¶ 51-54.
[242] Consent Decree ¶ 32.

### 3.    Elections Mandate

The Monitor is charged with administering a secret ballot referendum vote of all active UAW members and retirees on whether to keep the current system for electing members of the IEB (under which Local Unions elect delegates who in turn elect the IEB at the International Convention) or transition to a direct election system (under which all UAW members would directly elect the IEB), referred to in the Consent Decree as "one member, one vote" (the "Referendum").[243]

As directed by the Consent Decree, the Monitor has developed the rules, method, and ballot language for the Referendum with the UAW, after obtaining prior approval of them from the United States Department of Labor, Office of Labor-Management Standards ("OLMS").[244]  The Referendum is ongoing, and all ballots must be received by 10 a.m. EST on November 29, 2021.[245] If a simple majority of those who participate in the Referendum vote to transition to a direct election system, and if the results of the election are certified by OLMS and approved by the Court, the Consent Decree requires that the UAW Constitution be so amended.[246]  Further, if the Referendum result is a change to the direct election system, the Monitor—in consultation with the UAW—will then develop the new election rules and methods for the election of IEB members.[247] Regardless of the result of the Referendum, the Monitor will ensure that elections of the IEB follow the requirements of the UAW Constitution, all applicable laws, and the Consent Decree.[248]

---

[243] Consent Decree ¶ 8.

[244] Consent Decree ¶ 10.

[245] Order Granting Joint Motion to Amend Consent Decree to Extend Deadline for Completing Referendum, *United States v. Int'l Union, United Automobile, Aerospace, and Agricultural Implement Workers of America* (Sept. 9, 2021), Civil No. 20-cv-13293 (E.D. Mich.), ECF No. 46 (changing the date the Referendum must be completed by from November 12, 2021, to November 29, 2021).

[246] Consent Decree ¶ 12.

[247] Consent Decree ¶ 13.

[248] Consent Decree ¶ 45.

Further, under the Consent Decree, an individual may not run for office in the International Union ("International Office") if: (1) he or she has been found guilty of fraudulent or corrupt activity, either in court or in a UAW disciplinary proceeding, including before the Adjudications Officer, (2) his or her election would violate the Consent Decree's injunctive prohibitions, or (3) his or her election would be a crime involving the establishment or operation of a labor organization, employee benefit plan, labor-management cooperation committee or voluntary employee beneficiary association.[249]  Consistent with these prohibitions, a "barred person" may not run for International Office.  The Monitor must review all candidates for International Office and may prohibit candidates in the above referenced categories from running.[250]  These are objective criteria, and the Monitor will not evaluate effectiveness or moral fitness or assess if a candidate is otherwise qualified.  A person disallowed from running for office may appeal the Monitor's decision to the Adjudications Officer, and then to the Court.[251]

The Monitor has established a team led by personnel experienced with overseeing and monitoring Union elections to carry out the "Elections Mandate."  Further details concerning the scope of the Monitor's authority and work pursuant to this Elections Mandate are set forth in Part IV of this Report.

### 4.  Other Monitorship Activities

The Monitor has engaged in various efforts to ensure efficient and streamlined administration of the monitorship.

As part of ensuring proper administration of the Monitor's duties by team members working under his supervision, the Monitor has established various policies for carrying out the

---

[249] Consent Decree ¶ 46.
[250] *Id.*
[251] Consent Decree ¶¶ 47-49.

work under the Consent Decree. These include policies to address potential conflicts of interest; to govern the treatment of confidential information, data security, and privacy concerns; and to regulate the amount and manner of billing for the tasks of monitorship team members.

The Monitor has also hired vendors and third-party personnel in connection with carrying out monitorship responsibilities, in consultation with the UAW, including: an "e-discovery" vendor to process and host the voluminous electronic information the Monitor has received and will continue to receive in connection with the monitorship; a vendor to assist in sending and receiving ballots in connection with the Referendum, as detailed further in Part IV of the Report; and a consulting firm to assist with running the voicemail and email hotlines, investigate formal election protests, vet candidates for the IEB, and assist in investigations.

Finally, to assist in the work of the teams that the Monitor has established to carry out the various mandates of the Consent Decree, the Monitor has also established various mechanisms to communicate with the public and with UAW membership. The Monitor has established a website that hosts information relevant to the monitorship, which is available at www.uawmonitor.com. In addition, the Monitor has established various email and phone hotlines that are available to UAW members and the public, as detailed further in Part III (Investigations) and Part IV (Elections) of this Report.

### 5.    Reporting Obligation

The Monitor must file a written report with the Court at least every six months of the monitorship reporting on the Monitor's activities.[252] This is the first of these semiannual reports. In order to finalize this Report in time for submission to the Court, the Monitor set a cut-off date

---

[252] Consent Decree ¶ 58.

for facts of October 26, 2021.  As such, all of the information in this Report is as of that date, except where specifically noted.

The Monitor worked collaboratively with the UAW to ensure that its factual reporting is correct, and appreciates the UAW's cooperation, diligence, and effort in helping to finalize this Report.  The Monitor provided drafts of each Part of the Report to the Union for review between October 15, 2021, and October 26, 2021, to solicit the Union's feedback and seek to correct any potential factual errors or to fill in any relevant and material information that the Monitor may have neglected to include.  In response to those drafts, the Union provided comments and suggestions, many of which have been included in this Report.  In all events, the Monitor retained discretion to determine what facts should be included in the Report, with the key aim of a factually accurate Report.

To ensure that the Union's requests for factual corrections could be adequately considered and addressed, the Monitor set deadlines for the Union to respond to the provided drafts.  Although the Monitor was able to include many comments that were provided after those deadlines had passed, the Monitor was unable to address a set of comments provided by Deloitte concerning the internal audit services it provides to the UAW and its newly-formed Internal Audit Department, primarily because they directly contradicted information previously provided by both the UAW and Deloitte itself.  As a result of those comments, the Monitor and the UAW agreed that the Monitor should significantly truncate the Internal Audit section of Part II of this Report to afford the UAW and Deloitte an opportunity to work with the Monitor and clarify Deloitte's role with respect to Internal Audit.  The Monitor will give its more complete review in its next report.  Also not included in this Report are other comments, such as those that the Monitor deemed not sufficiently supported factually, or which contained arguments or characterizations with which the

Monitor did not agree.  Instead, the Monitor provided revised drafts to the Union on November 7 and 8, 2021, and invited the UAW to provide any such commentary in a letter to be included with this Report.  The UAW did not, however, provide such a letter to the Monitor, and has indicated that it may instead file a response directly with the Court.

In addition to these regular reports to the Court, the Monitor will also prepare a report summarizing the results of the Referendum on direct elections and provide it to OLMS for approval.[253]  Subject to that approval, that report will be filed with the Court for its approval.[254]

---

[253] Consent Decree ¶ 11.
[254] *Id.*

## II.    COMPLIANCE

Historically, the UAW[255] has not had a centralized compliance function dedicated to the task of ensuring the Union's compliance with law, policies, or ethical conduct.  Although certain departments in the International Union, like Accounting and Human Resources, performed some compliance-related tasks, none of the UAW's officers, staff, lawyers, or other employees held explicit responsibility for compliance.  Rather, the UAW has said that everyone at the Union was expected and entrusted to ensure compliance.

The Union likewise was lacking other basic institutional safeguards to ensure compliant behavior.  For example, the Union did not have formal written performance review processes, effective internal financial controls to detect or deter theft or fraud, or certain other basic governance tools that would have better enabled the organization to communicate its expectations and hold employees and officials accountable for complying with the Union's policies, ethical practices, and the law.  And, even though the UAW had an audit department to audit Local Unions' books and records, until 2020, the UAW did not have an internal audit function to audit the International Union's own financial and ethical practices.

Since the government exposed the fraud and corruption at the UAW described in Part I of this Report, the Union has taken laudable steps toward reform.  It has drafted and implemented new policies; retained highly qualified outside experts to identify and help remediate the deficiencies in its accounting systems and internal controls; established an Internal Audit Department; retained an external Ethics Officer who previously served as the Chair of the National Labor Relations Board; engaged in efforts to increase transparency and allow employees to more

---

[255] Unless the context requires, this Part generally uses the terms "UAW," "Union," and "International Union" to refer to the International Union—which was the focus of the criminal conduct underlying the Consent Decree—as distinct from the Local Unions, which are operated separately.

easily report misconduct or concerns through an "Ethics Hotline" and an "Ethics Ombudsman;" and, in response to a draft version of this Report, embraced many of the Monitor's additional recommendations for reform.  The Union has also taken some meaningful steps to change the overall culture of the UAW, particularly with respect to the tone from its top leadership.

This is an impressive list of reforms, and the UAW should be commended for undertaking them.  But, unfortunately, inconsistencies in the UAW's approach to reform have left it with significant work to shore up its compliance regime and to eradicate some of the cultural vestiges of the past.  The Union's inconsistent approach to reform is perhaps best exemplified by the UAW's divergent responses to the recommendations it received from two of its outside consultants, Exiger LLC ("Exiger") and Deloitte, both of which were retained by the UAW to provide recommendations for reforming processes and procedures at the Union.

On the one hand, for nearly two years the Union worked diligently with Deloitte to develop more than a dozen recommended policies to enhance the internal financial controls at the Union. On the other hand, the Union's lawyers largely ignored the compliance and cultural recommendations proffered by its other consultant, Exiger, not even sharing them with the Board until more than a year after Exiger offered them.  After the IEB finally received the recommendations made by Exiger, and after the UAW received a draft version of this Report incorporating many of them, the IEB began enacting Exiger's far-reaching recommendations.

To fulfill its promises to its members, the UAW must do more than just state that it is accepting the recommendations from its consultants and from the Monitor.  It must consistently implement them and fill the remaining compliance gaps.  It must also go beyond these recommendations and address the ongoing cultural issues concerning transparency, favoritism, nepotism, retaliation, and accountability that persist from the previous era.  These issues were

identified first in Exiger's report, later in a review by the Union's newly created Internal Audit function, and most recently by the Monitor's own work in this Report. The IEB must tackle these issues head on, and must lead by example by better prioritizing transparency, as further detailed below.

This Part discusses the Monitor's work to fulfill its compliance mandate. First, it provides a brief overview of the work the Monitor has done to assess the Union's compliance environment in the first six months since the Court's Appointment Order. Second, the Part discusses the tone for ethics and compliance that has been set by the Union's leaders. Third, the Part discusses the details around the Union's absence of a dedicated compliance function, as well as senior leadership's launch of a new Internal Audit function. Fourth, it analyzes the internal governance and financial controls at the Union, particularly focusing on the strong work that has been done to identify and then fill the policy and control gaps that helped allow the criminal misconduct of the UAW's former leaders to go unchecked. Finally, the Part discusses the processes in place at the Union through which misconduct in its ranks is reported, investigated, and sanctioned. The Monitor's recommendations, as well as the Union's response to each recommendation and the Monitor's reply to each response, are expressly set out in a highlighted boxes in the sections below for ease of reference.

In all, as set forth below, although the UAW should be applauded for the initial steps it has taken with respect to reforming its control environment, it has much more work to do. The sense of urgency it has shown since receiving a draft of this Report is impressive, but it must be maintained to give its members the comfort that the Union has the necessary protections in place.

## A.    Compliance Team's Work

In the first six months of the monitorship, the Monitor has undertaken substantial efforts to assess the Union's compliance environment and to prioritize the necessary areas of reform. This section provides an overview of the steps the Monitor has taken.

### 1.    Review of Work of Prior Consultants and Advisors

Deloitte and Exiger were engaged by the UAW to assess and strengthen the UAW's internal financial controls[256] and compliance functions and to provide recommendations for improvement. The Monitor's first order of business was to understand the analysis and recommendations already generated by Deloitte and Exiger in order to assess the current state of the UAW's compliance environment, which was accompanied by the Monitor's own efforts to test and update those findings.

**Deloitte.** In September 2019, the UAW engaged Deloitte to perform an assessment of the UAW's internal financial controls (the Deloitte "controls team"), most of which are performed by personnel within the Office of the UAW Secretary-Treasurer.[257] That work identified significant deficiencies in the UAW's internal control environment, including lax or missing controls around areas such as reimbursement of employee expenses, vendor selection processes, and the review and approval of disbursements to third parties, among other weaknesses. Deloitte worked with the UAW to develop 13 new policies and procedures, two of which have been approved by the IEB and implemented as of October 26, 2021. In response to the Monitor's recommendations, the Union has pledged to move forward with the remaining eleven. In addition to that work, the Union

---

[256] Internal financial controls include, among other things, the policies, procedures, and technology systems that the UAW uses to maintain its financial books and records.

[257] Meeting with Deloitte at 4 (July 1, 2021); Deloitte Introductory Presentation Deck at 4 (July 1, 2021).

has also hired a second team at Deloitte (the Deloitte "audit team") to work with the UAW's new internal audit function, detailed further below.

**Exiger.**  Exiger reported that it was engaged "to conduct a broad-based evaluation of the International's compliance controls, including the operations, departments, risks and governance of the International."[258]  Exiger's scope of work was defined so as not to duplicate Deloitte's work, which focused on financial controls and internal audit.[259]  Throughout April and May 2020, Exiger conducted a broad-based review of the International Union's compliance program.[260]  It interviewed nearly 30 International Union officials, staff, and clerical employees, reviewed documents, made factual findings, and in May 2020, issued 140 recommendations in what has been described to the Monitor as a "draft" report.[261]  But unlike the UAW's steady continued work with Deloitte on its internal controls, the Union's work with Exiger came to a halt immediately after Exiger sent its draft report.  At the time of the commencement of the monitorship in May 2021, it had been a year since Exiger had done any substantive work, and the compliance and cultural reforms at the heart of its recommendations were largely unaddressed.  Fortunately, soon after the Monitor was appointed, Exiger issued a new version of its report that the UAW described as "final" (the June 2021 Report), which was shared with the Monitor the following month.

To understand the scope and import of Exiger's work, the Monitor sought detailed information about its review and findings, including a briefing from Exiger about its activities.[262]  As detailed below, however, the UAW withheld the draft May 2020 report that initially set forth

---

[258] Exiger Report at 6 (June 11, 2021).

[259] Exiger Report at 6-7 (June 11, 2021); Meeting with Exiger at 3 (July 30, 2021).

[260] Exiger Report at 7-8 (June 11, 2021).

[261] Exiger Report at 7-63 (June 11, 2021); Meeting with Exiger at 2-3 (July 30, 2021); Letter from Exiger to UAW Outside Counsel at 1 (Aug. 30, 2021).

[262] Email from Monitor to UAW Outside Counsel and UAW General Counsel (June 1, 2021); Meeting with Exiger (July 30, 2021); Email from Monitor to Exiger (Aug. 2, 2021).

Exiger's 140 recommendations, stating that it was attorney work product.  Details and analysis of Exiger's work and the Union's response to it, including the recommendation that the UAW provide the Monitor with the initial May 2020 version of Exiger's report, are set forth below.

## 2. Presentations

In response to the Monitor's requests, UAW personnel and consultants have made multiple presentations to the Monitor on a variety of compliance-related topics, including presentations about the organizational structure and categories of personnel employed at the International Union; Deloitte's assessment of the UAW's internal financial controls and the UAW's efforts to remediate control weaknesses; Exiger's assessment of and recommendations to improve the UAW's compliance infrastructure; and Internal Audit's assessment of culture risk, among other topics.[263] In connection with those presentations, the UAW has provided the Monitor with relevant work papers, draft policies, reports, and other materials on the UAW's existing internal control environment, compliance program, and remediation efforts.[264]

## 3. Interviews

In addition to presentations or briefings by the Union or its consultants, the Monitor has interviewed more than 40 IEB members, UAW officials, staff, and clerical employees to obtain information relevant to the Monitor's work, some on multiple occasions.[265]  These interviews have

---

[263] *See, e.g.*, Meeting with Deloitte (July 14, 2021); Meeting with Exiger (July 30, 2021); Meeting with Deloitte (Sept. 1, 2021); Meeting with Deloitte (Oct. 6, 2021).

[264] Email from UAW Outside Counsel to Monitor (July 27, 2021); Email from UAW Outside Counsel to Monitor (Sept. 6, 2021).

[265] In this Part of the Report, the Monitor has taken steps to anonymize citations to interviews in order to protect the confidence and anonymity of the interviewees and to encourage continued forthrightness.  Several interviewees expressed concern about whether their comments could be tied back to their interviews out of a fear that they would be retaliated against for expressing their candid views.  As a result, the Monitor has used a general description of the source of information in citations in order to protect the privacy concerns of the individuals. Notwithstanding these protections, any individual who suspects that they are being subject to retaliation should contact the Monitor's hotline immediately.

included personnel from all levels of the International Union, including the President and Secretary-Treasurer; Regional Directors; Vice Presidents; additional key staff in the International Union who perform essential functions (including the Head of Internal Audit and the Chief Accountant); the Director of Human Resources and Director of Education; Administrative Assistants, staff, and clerical employees in the Accounting and Purchasing Departments; and many others.

### 4. Documents

The Monitor has also sought documents from the UAW that are critical for the Monitor's compliance mandate. The Union has produced voluminous material to the Monitor, although, with some exceptions, the UAW has been slow in providing relevant materials. After a series of requests beginning on June 1, 2021, the Monitor's team still had not received key materials and had to send a letter to President Raymond Curry on September 30, 2021, requesting that the UAW produce or confirm it was not producing materials in response to all outstanding requests by October 6, 2021.[266] In response, on October 5 and 6, 2021, the UAW finally produced materials responsive to these requests, or clarified that it was refusing to produce certain requested documents on the basis of privilege.[267]

### 5. Other Activities

The Monitor has engaged in other information gathering, such as attending IEB meetings, Ethics Advisory Committee meetings, and an all-hands staff meeting. The Monitor has attended these meetings in order to stay apprised of ongoing activities.

---

[266] Letter from Monitor to UAW President and UAW Outside Counsel (Sept. 30, 2021).
[267] Emails from UAW Outside Counsel to Monitor (Oct. 5-6, 2021).

### B.      UAW Leadership

The value that an organization places on an ethical and compliance-minded culture begins with the words and deeds of its leaders.  After years of corruption and misconduct at the most senior ranks of the UAW, the Union's current leadership must put that past behind it through their words and deeds.  This section discusses the compliance culture at the Union, as reflected by the organization's leaders, both past and present.

### 1.      The Leadership of the International Union

The operations of the International Union are carried out by elected officers—the President, Secretary-Treasurer, three Vice Presidents, and eight Regional Directors—their staff, and clerical employees.  The President and the Secretary-Treasurer oversee various departments that perform much of the Union's day-to-day work.   Between them, they are responsible for dozens of departments and hundreds of employees with responsibilities like maintaining the organization's accounting records, disbursing Union funds, approving vendor contracts, and training employees on the organization's policies and procedures.

**President.**  The UAW President is the most senior elected official in the Union and has broad authority under the Constitution to perform "duties as are necessary to protect and advance the interests of the International Union."[268]  The "Office of the President" oversees approximately 30 departments[269] with a senior leadership team that includes the General Counsel, a Chief of

---

[268] UAW Const., art. 13, § 1.

[269] UAW Department Head Listing (Aug. 1, 2021).   These include Aerospace, Citizenship Fund Department, Civil Rights Fund Department, Clerical Center, Constitutional Committee, Credentials Committee, Education & Mobilization Department, General Dynamics, Health & Safety, Human Resources, Information Systems, Legal, Local Union Officers, Public Relations, Research Department, Resolution Committee, Retirees Dues Fund Department, Rules Committee, Security Department, Sergeant-At-Arms, Skilled Trades, Social Security, Sourcing, Staff Council, Truck Department, UAW Arbitration Services, UAW Travel Department, UBE, UBG, and Washington Office.

Staff, and two senior staff called "Top Administrative Assistants."[270]  The departments housed within the Office of the President cover a wide range of responsibilities, some focused on internal management and governance (*e.g.*, Legal, Human Resources,[271] and Education[272]) and some focused on helping the UAW advance its external-facing priorities (*e.g.*, Legislative, International Affairs, and Civil and Human Rights).[273]

**Secretary-Treasurer.**  The UAW's Secretary-Treasurer has broad authority to oversee the financial matters of the International Union and serves as custodian of the International Union's funds.[274]  The departments reporting to the Secretary-Treasurer, particularly the Accounting Department and the Purchasing Department, perform an array of functions relating to the Union's financial operations, such as review of expenditures, disbursements, and transactions with third party vendors.  In 2020, the UAW created an Internal Audit Department that currently reports to the Secretary-Treasurer.[275]

---

[270] UAW President Interview at 2; Meeting with UAW General Counsel and UAW Outside Counsel at 1-3 (Aug. 6, 2021); Meeting with UAW General Counsel and UAW Outside Counsel at 2-3 (Aug. 16, 2021) (the UAW uses the title "Administrative Assistant" for senior staff members responsible for carrying out substantive, critical union functions, whereas personnel that carry out secretarial or traditional administrative functions are referred to as clerical employees).

[271] The Human Resources Department performs traditional human resources functions for the International Union and the Regions, such as onboarding new employees and administering personnel changes.  The Director of Human Resources, who has held her position for approximately seven years, is also tasked with investigating complaints and concerns that International Union employees raise to her attention, and to determine appropriate discipline.  Human Resources Department, Employee #1 Interview at 3; Meeting with UAW General Counsel and UAW Outside Counsel at 3 (Aug. 6, 2021).

[272] The President's Office also oversees the training of UAW personnel.  Until recently, responsibility for training fell under the Education Department, but President Curry shifted responsibility for training out of the Education Department into a newly-created department called "Staff Development."  Education Department, Employee #1 Interview at 2; President's Office, Senior Staff #1 Interview at 5.

[273] Office of the President Organizational Chart (Sept. 9, 2021).

[274] UAW Const., art. 13, §§ 14-15.

[275] Internal Audit Department, Employee #1 Interview at 2.

## 2.    The Compliance Culture of the International Union

In the Monitor's interviews with International Union staff, the Union's personnel described how the past administrations of Presidents Gary Jones and Dennis Williams each cultivated a culture that was often viewed as hostile to compliance with law and policies, how Presidents Rory Gamble and Raymond Curry have improved on that culture, and, lastly, how, notwithstanding those improvements, remnants of the culture under Jones and Williams still remain and pose a threat to the organization.  Both Internal Audit and Exiger separately reported similar findings to the UAW, which are also described in this section.[276]

### a.    Culture Under Presidents Jones and Williams

Two of the UAW's past presidents, Gary Jones (June 2018 to November 2019) and Dennis Williams (June 2014 to June 2018) pleaded guilty to federal charges of fraud and corruption and are currently serving prison sentences.[277]  Numerous UAW employees told the Monitor that both of those past presidents cultivated a culture that was hostile to employees' complying with policies and procedures or to raising ethical issues or concerns, and generally oversaw and imposed a tense and demeaning work environment.[278]  These employees explained to the Monitor that there was no check on the capricious whims of Jones and his senior staff who used their power to bully,

---

[276] Exiger Report at 21-25 (June 11, 2021); Culture Risk Assessment Draft at 10 (UAW-Mon_002766-76) (April 20, 2021); Culture Risk Assessment Draft at 7 (UAW-Mon_002777-2809) (May 21, 2021); Culture Risk Assessment Executive Summary at 4 (UAW-Mon_002413-17) (June 10, 2021); Culture Risk Assessment (UAW-Mon_002418-46) (June 21, 2021).

[277] UAW Statement on the Conviction and Sentencing of Former UAW Member and President Dennis Williams (UAW-Mon_002571-72) (May 11, 2021); Statement on the Conviction and Sentencing of Former UAW Member and President Gary Jones (UAW-Mon_002573-74) (June 10, 2021); Gary Jones, Judgment (June 10, 2021) ("Jones Judgment"); Dennis Williams, Judgment (May 9, 2021) ("Williams Judgment").

[278] IEB Member Interview at 1-3; IEB Member Interview at 6; President's Office, Employee #2 Interview at 3-4; President's Office, Employee #3 Interview at 4; Secretary-Treasurer's Office, Senior Staff #3 Interview at 4.

demean, and retaliate against disfavored employees, particularly those who spoke out against misconduct in the workplace.[279]

**Culture of Fear and Reprisal.** Numerous employees told the Monitor about the negative culture under Williams and Jones. One UAW employee told the Monitor that Presidents Jones and Williams cultivated a pervasive "culture of fear" where employees were at risk of losing their jobs and livelihoods if they spoke up about concerns or misconduct.[280] For example, according to multiple employees, Jones had a "personal grudge" against the Director of Education, which the Director of Education attributed to a time when she rejected Jones' request to reimburse hotel receipts he improperly claimed were related to lodging instructors for a training conference.[281] Jones tried to move her out of her role and halted staff development initiatives, dismantled the departments under her supervision, forbade training on certain topics including sexual harassment, and banned her from attending staff development sessions.[282] Another employee described how Jones arbitrarily transferred an employee to a new office across the country in retaliation for the employee's work on organizing activities that Jones disfavored.[283] Another employee characterized Jones as "hostile," and described how he created an environment where employees were afraid to make a mistake, evoke his disapproval, or speak up out of fear of retaliation.[284] One employee described how, under Jones's leadership, personnel were discouraged from speaking up, and told that they should not step out of line.[285] According to another employee, the culture at the

---

[279] President's Office, Employee #3 Interview at 4; President's Office, Senior Staff #1 Interview at 6-7; President's Office, Employee #2 Interview at 3-4.
[280] President's Office, Employee #2 Interview at 4.
[281] President's Office, Employee #2 Interview at 3; President's Office, Employee #3 Interview at 4.
[282] President's Office, Employee #2 Interview at 3; President's Office, Employee #3 Interview at 4.
[283] Vice President's Office, Employee #2 Interview at 2-3.
[284] President's Office, Employee #3 Interview at 4.
[285] President's Office, Employee #2 Interview at 4.

UAW under Williams and Jones was "toxic, terrible, discouraging, and upsetting."[286]  A number of employees used the term "PTSD" to describe their ongoing suffering from their experiences under Jones and Williams, a reflection of how the experience of past administrations may continue to impact the organization's personnel today.[287]

**Culture of Favoritism and Nepotism.**  UAW employees also described how Jones and Williams provided preferential treatment to certain senior leaders and to their favored employees, while punishing others without cause and prioritizing personal vendettas over training and development.  For example, a senior official in the Accounting Department described how Williams and Jones forced through exceptions to policies and procedures for favored employees and senior leaders.[288]  In practice, this meant that Williams and Jones were able to pick and choose which senior leaders and staff could be exempt from the normal restrictions on reimbursable expenditures.[289]  For example, according to one senior staff member, Williams and another senior staff member regularly dined at the Black Lake golf course clubhouse—a Union-owned golf course and education center in northern Michigan—at the UAW's expense in violation of Union policy.[290]

**Ignoring Reports of Misconduct.**  This culture of fear and favoritism—fostered by Jones and Williams—also went unchecked because employees were discouraged from speaking up, and when they did voice concerns, their concerns were often ignored.  According to employees in the Accounting Department, often concerns about questionable expenses incurred by Williams and Jones were escalated but people just "turned their back on any wrongdoing," including senior staff

---

[286] President's Office, Senior Staff #1 Interview at 6.
[287] IEB Member Interview at 7.
[288] Secretary-Treasurer's Office, Senior Staff #3 Interview at 6-7.
[289] Secretary-Treasurer's Office, Senior Staff #3 Interview at 6.
[290] Secretary-Treasurer's Office, Senior Staff #3 Interview at 7.

who "looked the other way."[291]  A top staff member in the Office of the President told the Monitor that when concerns regarding sexual harassment and "unacceptable" treatment of female employees were brought to Williams' attention, he responded by "sweep[ing] it under the carpet."[292]

**Undermining Compliance Controls.**  Employees also described how Jones and Williams undermined important control functions in the Secretary-Treasurer's Office.  According to senior staff members in the Accounting Department and Office of the President, when Williams became Secretary-Treasurer in 2010, he "slashed" the number of staff in the Accounting and IT Departments and dismantled certain accounting functions.[293]  In total, the Accounting Department lost a staff member and six bookkeepers, leaving their work for the remaining staff to try and cover.[294]  When the staff member complained to Williams and his top administrative assistants that the cuts were problematic and made it difficult to perform basic controls, the staff member was "overruled."[295]  In addition, this staff member explained that Williams also wanted accounting processes related to Black Lake to be a "standalone function"—outside the oversight of the Accounting Department—and he executed that change.[296]  Emblematic of his approach, the UAW's Chief Accountant told the Monitor that Williams asked the UAW's external auditors and the Chief Accountant to justify why the UAW needed internal controls at all.[297]

---

[291] Accounting Department, Employee #13 Interview at 6; Accounting Department, Employee #14 Interview at 5.
[292] President's Office, Senior Staff #2 Interview at 4.
[293] Accounting Department, Employee #1 Interview at 3; Secretary-Treasurer's Office, Senior Staff #4 Interview at 4.
[294] Accounting Department, Employee #1 Interview at 3.
[295] Accounting Department, Employee #1 Interview at 3-4.
[296] Accounting Department, Employee #1 Interview at 4.
[297] Accounting Department, Employee #1 Interview at 3.

This staff member also said that Jones often accused staff members in Accounting of not doing their jobs, and made clear that he "did not have much use" for Accounting.[298]   In all, personnel in Accounting generally "put their heads down and tried to keep targets off their backs."[299]

Other personnel echoed the view that the Jones and Williams presidencies were a "difficult period" for the Accounting Department and its ability to fulfill its role in performing financial controls for the International Union.[300]   According to one employee, "everybody knew" about Williams and others going to Palm Springs "for weeks on end, the parties they have, the liquor they drink, the cigars they smoke."[301]   According to the employee, if lower-level support staff raised issues about the reimbursement forms, they were told that senior UAW officials instructed the Accounting Department to pay the expenses, and that is what they did.[302]

### b.   Cultural Changes Under Presidents Gamble and Curry

Numerous International Union personnel conveyed to the Monitor that former President Rory Gamble (November 2019 to June 2021) and current President Raymond Curry (July 2021 to present) have worked hard to improve the culture at the Union.

Scores of personnel, from senior officials to staff members and clerical employees, told the Monitor about the positive change in tone at the top when former President Gamble came into office.[303]   One staff member in the President's Office described the change in tone from the

---

[298] Accounting Department, Employee #1 Interview at 4.

[299] *Id.*

[300] *Id.*

[301] Accounting Department, Employee #13 Interview at 5.

[302] Accounting Department, Employee #14 Interview at 5; Accounting Department, Employee #1 Interview at 7 (Accounting Department heads were instructed to, and did, pay questionable expenses for certain senior UAW officials).

[303] Education Department, Employee #2 Interview at 4; IEB Member Interview at 6; Accounting Department, Employee #15 Interview at 4; Accounting Department, Employee #1 Interview at 3.

President's Office as "night and day."[304]  According to the official, "a weight [was] lifted" when Gamble became President.[305]  As one employee in the Education Department described it, "you could feel the atmosphere in the building change."[306]  According to another employee, Gamble communicated transparently with employees about what was happening with the UAW when it was under investigation, rather than leaving them to just read about it in the newspaper.[307]

When he came into office, Gamble engaged in tangible efforts to convey a new tone from the Office of the President.  For example, Gamble initiated several ethics reforms, including the creation of an Ethics Hotline operated by an external Ethics Ombudsman and Ethics Officer (which are described below).[308]  In December 2019, Gamble and then-Secretary-Treasurer Raymond Curry also announced a series of financial reforms to put in place "checks and balances and accounting reforms that prevent financial malfeasance."[309]  Gamble emphasized that "[d]ues dollars are sacred," and expressed the commitment of the entire IEB "to establishing stringent financial controls and new procedures to address and fix any weaknesses in the system."[310]  As he put it, "[t]he UAW will hand over to our membership in 2022 a financially safeguarded union."[311]  The status of those financial reforms is described further below.

The current President, Raymond Curry, has told the Monitor that he is committed to continuing the cultural reform that Gamble initiated.[312]  According to Curry, prior to former UAW

---

[304] President's Office, Senior Staff #1 Interview at 7.

[305] *Id.*

[306] Education Department, Employee #2 Interview at 4.

[307] Accounting Department, Employee #15 Interview at 4.

[308] Exiger Report at 22 (June 11, 2021); *UAW Implements Ethics Reform Priorities with Hiring of First-Ever Ethics Officer and Activation of Confidential Ethics Hotline* at 2 (UAW-Mon_002706-10) (March 31, 2020).

[309] UAW Announces Stringent Financial Reforms at 1 (UAW-Mon_002579-82) (Dec. 2, 2019).

[310] UAW Announces Stringent Financial Reforms at 3 (UAW-Mon_002579-82) (Dec. 2, 2019).

[311] UAW Announces Stringent Financial Reforms at 3 (UAW-Mon_002579-82) (Dec. 2, 2019).

[312] UAW President Interview at 4.

officials' criminal sentencings, the UAW may have had pockets of resistance to ethical reform, but "things have changed."[313]  With the criminal sentences imposed on prior UAW officials, Curry said that the UAW can now shift its focus to the membership, the institution, and doing what is right going forward.[314]  He acknowledged the need for sustained positive messaging, and that long-term cultural change turns on the UAW's membership believing in the UAW as an institution.[315]

International Union employees have received the message from President Curry and have noted how it is positively impacting the culture at the International Union.[316]  For example, a senior staff member in the President's Office said that Curry knows everyone by name, speaks directly with staff, and wants to make sure that department leaders and officials treat people with respect.[317]  According to the staff member, Curry leads by example, which is "infectious."[318]  One IEB member observed that the increased openness from the President's Office has also improved communications with the Regions.[319]  Other IEB members similarly observed an emphasis on transparency from the President's Office under Curry's leadership.[320]  For example, the President convened an "All Staff Meeting" in September 2021, the first such meeting in nearly ten years, and emphasized the importance of trust, ethical behavior, and transparency in moving the UAW forward.

---

[313] UAW President Interview at 7.
[314] *Id.*
[315] UAW President Interview at 4.
[316] President's Office, Senior Staff #1 Interview at 7; Education Department, Employee #1 Interview at 4; IEB Member Interview at 6.
[317] President's Office, Senior Staff #1 Interview at 7.
[318] President's Office, Senior Staff #1 Interview at 8.
[319] International Secretary-Treasurer Interview at 4.
[320] IEB Member Interview at 2; IEB Member Interview at 2.

Several employees also described an improved attitude toward the Accounting Department under the leadership of Gamble and Curry, including when Curry served as Secretary-Treasurer. For example, according to one employee, the Accounting Department now has more resources and is no longer pressured by senior officers to make exceptions to the UAW's policies and procedures.[321]   Another clerical employee in the Accounting Department said that the UAW is making a concerted effort to "get the business straight" as it pertains to financial controls.[322]   The recently elected Secretary-Treasurer, Frank Stuglin, expressed to the Monitor his commitment to make whatever changes are necessary to overcome the "terrible" conduct by prior leaders, and "build back trust with the membership."[323]

### c.      Continued Challenges to Cultural Reform

To effect change, an improved tone must be internalized not only at the top, but at all levels of an organization.  A number of employees reported to the Monitor—as well as to Internal Audit and Exiger—that notwithstanding the efforts of Gamble and Curry, some vestiges of what they have described as the "toxic" culture from the old regimes still linger.  An ongoing reluctance on the part of some to report concerns for fear of retaliation, and continued perceptions of favoritism and nepotism, reflect that not all problematic aspects of the prior culture have been eradicated from the organization.

**Reluctance to Report Concerns and Fear of Retaliation.**  A number of employees told the Monitor that they continue to fear that their ability to advance and succeed in the International Union will suffer if they report misconduct or concerns.  According to one employee in the Accounting Department, "you get promoted in the UAW if you don't cause trouble."[324]   Another

---

[321] Accounting Department, Employee #1 Interview at 5-6.
[322] Accounting Department, Employee #14 Interview at 6.
[323] International Secretary-Treasurer Interview at 3.
[324] Accounting Department, Employee #12 Interview at 5.

employee in the Accounting Department reported being "actually kind of afraid" to report issues out of fear of retaliation.[325]  One department head said that employees are still expected to report concerns, in the first instance, up the "chain of command" as a sign of respect to department officers.[326]  But a number of employees said that they were reluctant to report concerns to their direct supervisors because they believed it would be pointless; when they reported concerns to those same supervisors in the past, the supervisors were not able to stop the misconduct.[327]

The reaction in some parts of the Union to the Ethics Hotline demonstrates that the fear of retaliation that was so prevalent during the Williams and Jones administrations still persists.  The UAW rolled out a new Ethics Hotline in March 2020 to encourage personnel to confidentially report concerns.  Although the Monitor will conduct a deeper review of the Ethics Hotline in a subsequent report, every indication is that the Hotline operates in a professional manner consistent with its design, which includes confidentiality safeguards that appear to be strictly followed.  Yet, notwithstanding those safeguards, some employees have expressed skepticism about whether they could report concerns to the Hotline without facing retribution.  Those employees told the Monitor that they believed that the Ethics Hotline was "a joke,"[328] and that they did "not think it would be confidential."[329]  A senior staff member recognized that some International Union staff "question the legitimacy and confidentiality" of the Ethics Hotline, given leadership's past track record.[330]  This senior staff member added that "the jury is still out" on the Ethics Hotline.[331]

---

[325] Accounting Department, Employee #14 Interview at 6-7.

[326] Chief Accountant Interview at 2-3.

[327] Accounting Department, Employee #14 Interview at 3, 5; Accounting Department, Employee #12 Interview at 4-5; Accounting Department, Employee #13 Interview at 5-6.

[328] Accounting Department, Employee #12 Interview at 6; Accounting Department, Employee #13 Interview at 4.

[329] Accounting Department, Employee #13 Interview at 3-4; Accounting Department, Employee #12 Interview at 4-5.

[330] President's Office, Senior Staff #2 Interview at 5.

[331] Id.

A recent report of the Union's newly formed Internal Audit function echoed the Monitor's findings.[332]  Between February and May 2021, the Union's new Internal Audit function conducted an assessment of the Union's culture risks, and prepared a final report in June 2021.[333]  In that culture risk assessment, Internal Audit found, among other things, that some UAW employees had "fear of retaliation or intimidation for individuals speaking out on issues."[334]  Internal Audit also found that the Union had "limited visibility and transparency across all levels" of the organization and lacked a "clear vision [and] strategy related to organizational culture."[335]  More specifically, Internal Audit reported that some UAW employees felt "there is a lack of accountability at all levels for violations of cultural policies."[336]  Other employees expressed that the Union needs to "[h]old those who abuse, harass, ridicule, demean, or humiliate others truly accountable for their actions" and to "stop enabling them by turning a blind eye to what they are doing to others."[337]

These issues were also identified as a result of the previous work of the Union's consultant, Exiger.  Exiger found that the UAW had an "unhealthy culture" in which staff were unwilling to disagree with superiors about problems and issues that arise because they feared losing their position for speaking up.[338]  Exiger found that the UAW did not consistently and clearly emphasize non-retaliation within its written policies and procedures.[339]  Exiger further reported that the lack of clear policies and procedures created inconsistent and ad-hoc messaging, as well as a lack of transparency.[340]

---

[332] Culture Risk Assessment (UAW-Mon_002418-46) (June 21, 2021).
[333] Culture Risk Assessment at 2 (UAW-Mon_002419) (June 21, 2021).
[334] Culture Risk Assessment at 7 (UAW-Mon_002424) (June 21, 2021).
[335] *Id.*
[336] Culture Risk Assessment at 21 (UAW-Mon_002438) (June 21, 2021).
[337] *Id.*
[338] Exiger Report at 27 (June 11, 2021).
[339] *Id.*
[340] Exiger Report at 29 (June 11, 2021).

**Favoritism and Nepotism.**  Several employees also recounted to the Monitor that the UAW's recent efforts to improve the UAW's culture have not fixed perceptions of nepotism and favoritism that flourished under Williams and Jones.[341]  These comments echoed what employees told Internal Audit and Exiger about nepotism and favoritism within the International Union.  For example, in connection with Internal Audit's culture risk assessment, some UAW employees reported to Internal Audit that the UAW has a "culture of favoritism and intimidation and self interest" in which leadership plays favorites when promoting employees or issuing discipline.[342]  Exiger similarly found that multiple staff and officials at the UAW, including former President Gamble, said that favoritism, nepotism, ignoring issues that have been raised, fear of retaliation and unequal enforcement of disciplinary violations at the UAW have been a persistent problem.[343]

---

**Monitor's Recommendation No. 1:** In all, although the improved tone from the top of the UAW is a critical, positive development, more must be done to turn the page on the past.  In particular, the leadership of the UAW must follow through on the reforms that have been initiated and follow up on the recommendations that have been made by the UAW's experts and auditors.  Joining and building on a recommendation made by Exiger, the Monitor recommends that the UAW:

(a) Conduct an annual "Town Hall" (or "All Staff" meeting like the one held on September 10, 2021) hosted by the President and IEB members conveying the core tenets of the Ethical Practices Codes and the culture of compliance expected of each and every official, employee and member of the UAW;

(b) Make compliance and ethics a standing item on the agenda for every IEB meeting and "All Staff" meeting with information obtained from a new Compliance and Ethics Committee recommended by Exiger and joined by the Monitor;

(c) Communicate regular compliance updates and ethics messaging by the President, the newly appointed Compliance Director (Recommendation No. 3), and the Ethics Officer; and

---

[341] Accounting Department, Employee #12 Interview at 5-6; Accounting Department, Employee #14 Interview at 4.

[342] Culture Risk Assessment Survey Responses (UAW-Mon_002464-67); Culture Risk Assessment at 16 (UAW-Mon_002433) (June 21, 2021); Culture Risk Assessment Draft at 23 (UAW-Mon_002799) (May 21, 2021).

[343] Exiger Report at 28 (June 11, 2021).

> (d) Create easily accessible and clear policies and procedures to codify the UAW's stance on prohibited activity.
>
> - **Union's Response:** The UAW's International Executive Board ("IEB") has already formally adopted and approved these measures. (See October 28, 2021 IEB minutes.) The UAW also accepts subpart (d) of the Recommendation, which was not encompassed in the measures previously approved by the IEB.
>
> - **Monitor's Reply:** The Monitor appreciates the UAW's quick adoption of this Recommendation and looks forward to working with the Union to implement it.

### C.    Organizational Structure

Any institution—whether a private or public corporation, a not-for-profit, or a political organization—benefits from checks and balances on those in positions of power. Such checks and balances are all the more critical when an organization relies principally on, and is entrusted with, the financial contributions of its members. The UAW's recent history illustrates how the Union's commitment to an ethical and compliant culture can rise and fall on the personal predilections of those in leadership.

Compliance officers and internal auditors help serve as an independent safeguard of members' hard-earned dues. Yet, as described in this section, the UAW still has no established compliance function. Fortunately, after receiving the Monitor's recommendations, the Union agreed to create one and has embarked on the process of hiring a compliance director to lead it. As to an internal audit function, although the UAW did take the important step of engaging a firm (Deloitte) to provide internal audit services and help it develop a new Internal Audit Department within the UAW, there remains significant confusion about the structure and leadership of the function, a state of affairs that can weaken its ability to identify and escalate problems to the IEB.

### 1.    Absence of a Compliance Function

A dedicated, resourced, and skilled compliance function can help an organization implement a more compliance-minded and ethical culture. If staffed with appropriately trained

personnel, it can monitor compliance with core policies and procedures and identify potential compliance weaknesses before they turn into significant problems.  Cultural challenges and lax internal controls heighten an organization's need for a robust compliance function.[344]

### a.    The Union's Delay in Establishing a Dedicated Compliance Function

The absence of a compliance function at the UAW is especially surprising given that the UAW's Legal Department has long been on notice that establishing a dedicated compliance function was a critical need for the Union.  As of May 2020, Exiger had already delivered to the Union's Legal Department and outside counsel a draft of a report detailing its findings regarding the UAW's compliance environment and culture.  Although, as discussed below, the UAW has not provided the Monitor with a copy of that version of the report, based on a claim of privilege, the Monitor has been able to determine that Exiger's May 2020 draft report ("May 2020 Report") included 140 recommendations for how to improve the UAW's compliance environment.[345] Included among Exiger's recommendations was one that the Union should establish a centralized compliance function, because, among other reasons, "[w]ithout a centralized compliance program, the UAW is at risk of being caught off guard by corruption, fraud, or unethical behavior."[346]

Upon receiving the May 2020 Report, the UAW's Legal Department did not share it or its recommendations with anyone else at the UAW, including with the UAW's President or the

---

[344] Exiger Report at 8-12 (June 11, 2021).  Citations for the above propositions are to the June 2021 "Final Draft" of the Exiger Report, because, as noted below, the UAW has not shared the content of the May 2020 draft with the Monitor.  As noted below, however, the Monitor has confirmed with Exiger that the recommendations included in the June 2021 Report were also contained in the May 2020 draft, and, in its review of the content of a draft of this Report, the Union has not disputed that the May 2020 draft from Exiger included these recommendations.

[345] Letter from Exiger to UAW Outside Counsel (Aug. 30, 2021).

[346] Exiger Report at 8 (June 11, 2021).

IEB.[347]  Nor did the Legal Department take meaningful action or reengage with Exiger about the report until April 2021,[348] when it apparently provided a handful of updates about the UAW's efforts in the intervening year to be included in an updated version of the report.

In June 2021, Exiger included those updates in a "Final Report" to the Union that reiterated the 140 recommendations it had first made in May 2020.[349]  That June 2021 version of the report ("June 2021 Report") was provided to the UAW's President, Raymond Curry, and then a month later to the Monitor, pursuant to the Monitor's request.  The recommendations in the June 2021 Report, Exiger told the Monitor, were the same ones first made in the May 2020 Report.[350]  Indeed, as Exiger has explained, the June 2021 Report was based on the work Exiger performed in 2020, and Exiger did not perform any additional fact finding after it completed the May 2020 Report other than receiving the above-referenced updates from the Union's lawyers.[351]

In August 2021, after extensive discussions between the Monitor and the UAW regarding the June 2021 Report, the UAW retained Exiger to implement its recommendations.[352]  First, in Phase One, Exiger will work to refresh its fact findings and recommendations,[353] and in Phase Two, Exiger will oversee the implementation of any of its recommendations that are adopted by the IEB.[354]  Exiger has begun its work on Phase One.

---

[347] Meeting with UAW Outside Counsel and UAW General Counsel at 2 (Sept. 15, 2021); Email from UAW Outside Counsel to Monitor (Sept. 22, 2021).
[348] Meeting with Exiger at 12 (July 30, 2021).
[349] The June 2021 Report notes changes from the May 2020 draft in footnotes to the later report.
[350] Meeting with Exiger at 6 (July 30, 2021).
[351] Meeting with Exiger at 3 (July 30, 2021).
[352] Letter from Exiger to UAW Outside Counsel (Aug. 30, 2021).
[353] Letter from Exiger to UAW Outside Counsel at 2 (Aug. 30, 2021); Meeting with UAW General Counsel and UAW Outside Counsel at 7 (Sept. 15, 2021).
[354] Letter from Exiger to UAW Outside Counsel at 2-3 (Aug. 30, 2021).

The IEB did not receive a copy of Exiger's June 2021 Report until September 10, 2021, and did not receive the May 2020 Report until early November 2021.[355]  The reactions of IEB members were initially mixed.  One senior official told the Monitor that they read the June 2021 Report several times and did not disagree with the content of the report—as they found it "very factual and very accurate."[356]  After reviewing the June 2021 Report for the first time, another senior official told the Monitor that it "came off to be a bitch session" in which some employees with an axe to grind could not let go of things from the past.[357]  But that same IEB member also said that the report showed that the UAW and its leadership have more work to do to give people a forum to air their concerns.[358]

After the Monitor provided the UAW with a draft copy of the Monitor's Report, the IEB passed several resolutions adopting recommendations included in the Exiger reports, and, as indicated below, has committed to adopt additional ones, in response to the Monitor's recommendations.  Although the IEB should be commended for its actions in moving to enact these reforms, as detailed below, its failure to act with sufficient transparency regarding the May 2020 Report risks overshadowing that accomplishment.

### b.    The Union's Decision Not to Disclose the May 2020 Draft to the Monitor

While the UAW has provided the Monitor with a copy of Exiger's June 2021 Report, the Union has declined to disclose the earlier May 2020 version based on an assertion that it is privileged.  The Monitor, of course, respects the sanctity of the UAW's assertion of privileges and has sought to accommodate them whenever possible.  However, the Union's decision not to share

---

[355] Meeting with UAW General Counsel and UAW Outside Counsel at 4-5 (Sept. 15, 2021).
[356] President's Office, Senior Staff #2 Interview at 14-15.
[357] IEB Member Interview at 8-9.
[358] *Id.*

the May 2020 Report with the Monitor is a lost opportunity for the Union's leaders to demonstrate a commitment to transparency and a clean break from the past. Just as importantly, it is also a decision that unnecessarily risks harm to the credibility of the IEB by potentially raising the perception among the UAW's staff and members that its leaders may be trying to hide something.

As noted above, the Union provided the June 2021 Report to the Monitor on July 26, 2021.[359] It soon became apparent to the Monitor that an earlier version of the report and its recommendations existed, and the Monitor requested that the Union provide a copy of it.[360] The Monitor made this request in order to more completely understand and assess the Union's receipt of Exiger's recommendations, including why the UAW had waited so long to implement Exiger's recommended reforms; to assess any reasons why the report had not been shared with the IEB; to see if there were any other recommendations that had been considered and discarded; and to see if any factual findings or other information relevant to the Monitor's assessment of the compliance environment at the Union had been removed or sanitized for the June 2021 Report.

The Monitor expected that the Union would share the May 2020 Report with the Monitor because the UAW and the Monitor have entered into a common interest agreement acknowledging that their "mutual interests may be best served by the UAW sharing its and its Counsel's [privileged] documents" with the Monitor, in order to "facilitate, promote, and expedite the work of the Monitor."[361] Further, the Union also specifically sought and obtained an Order from the Court under Federal Rule of Evidence 502(d) that allows it to share privileged materials with the

---

[359] Email from UAW Outside Counsel to Monitor (July 26, 2021).
[360] Email from Monitor to UAW Outside Counsel (July 31, 2021); Email from Monitor to Exiger (Aug. 2, 2021).
[361] Common Interest Agreement at 2 (July 6, 2021).

Monitor without waiving any privilege.[362]  The Union told the Court that it was seeking such an order because the UAW and the Monitor "share a common interest in rooting out illegal behavior and unethical practices within the UAW;" and that "the UAW is committed to thoroughly cooperating with the Monitor to achieve those goals."[363]  Because the UAW cited the protections of the Court Order and the common interest agreement in providing the June 2021 Report to the Monitor,[364] the Monitor expected that the May 2020 version of that very same report would be provided as well.

Surprisingly, however, the Union has refused to share the May 2020 Report, invoking the attorney work product privilege.  For support, and in response to the Monitor's observation that the June 2021 Report explicitly states that Exiger was "engaged" and "retained" by the UAW (and not counsel), the Union's outside counsel provided the Monitor with a quote from the text of counsel's engagement letter with Exiger, which states that Exiger was engaged by outside counsel in March 2020 in order "to assist you in providing legal advice and representation to the" Union in connection with the ongoing DOJ investigation.[365]  Outside counsel has also noted that the June 2021 Report is stamped on every page with the footer:  "Privileged and Confidential; Attorney Work Product. Prepared Under the Direction of Counsel."[366]  Citing these sources, the UAW has declined to provide the draft to the Monitor.

---

[362] Order Granting Defendant's Unopposed Motion for Order Governing Disclosure of Privileged Materials, *United States v. Int'l Union, United Automobile, Aerospace, and Agricultural Implement Workers of America* (Aug. 11, 2021), Civil No. 20-cv-13293, ECF No. 40.

[363] Unopposed Motion by Defendant UAW for Entry of an Order Governing Disclosure of Privileged Information to the Monitor, *United States v. Int'l Union, United Automobile, Aerospace, and Agricultural Implement Workers of America* (July 1, 2021), Civil No. 20-cv-13293, ECF No. 37.

[364] Email from UAW Outside Counsel to Monitor ("In preparation for the meeting with Exiger, attached is Exiger's report.  This report is being provided to the Monitor pursuant to the terms of our Common Interest Agreement and the expected entry of an Order under Rule 502(d).").

[365] Email from UAW Outside Counsel to Monitor (Nov. 5, 2021).

[366] Email from UAW Outside Counsel to Monitor (Nov. 5, 2021).

For the reasons discussed below, the Monitor respectfully believes that, given the distinct circumstances surrounding the May 2020 version of the report, the interest of being fully transparent with the Court, the Monitor, and the UAW's members outweighs the work product concerns cited by counsel, and has recommended that the IEB produce the May 2020 Report to the Monitor.

First, in balancing the competing interests, the Monitor believes that transparency and candor should be paramount.  Supreme Court Justice Louis Brandeis' famous adage that "sunlight is said to be the best of disinfectants" has been proven true time and time again, and whatever legal interest the UAW might have in shielding the May 2020 Report is more than overcome by the UAW's overwhelming and instant need for transparency.  Given the all too recent misconduct of its past leaders, the UAW should want to ensure that the Monitor has as full and clear a view of its compliance landscape as possible, so that the UAW and the Monitor can work collaboratively to put the necessary reforms in place.  Shielding relevant information from the Monitor will deprive the Union and its members of the best opportunity to identify the root causes of the compliance failures and cultural flaws that permitted the corruption described in Part I of this Report to go unchecked.  It also risks undermining recent efforts to increase transparency by exacerbating the already unsettling perception identified by both Exiger and the UAW's Internal Audit function that the UAW has ongoing transparency issues "across all levels" of the organization.[367]

Second, the failure to provide the May 2020 Report risks harm to the Union by potentially creating the *perception* that the IEB is hiding something, rather than being fully cooperative.  As in all cases when an organization chooses less transparency, the IEB's decision can have a corrosive impact on the Union's culture, because, without transparency—regardless of whether

---

[367] Culture Risk Assessment at 7 (UAW-Mon_002424) (June 21, 2021).

the Union has anything to hide—members and staff will inevitably be led to conclude that the reason that the IEB will not disclose the May 2020 Report is because there is something in the earlier version that they do not want the Court, the Monitor, and the members to see.

Third, failing to disclose the draft report sends the wrong message to the Union's members about accountability at the UAW.  As detailed above, the content of the draft report was initially shared with the Legal Department in May 2020, but the Legal Department did not share the report further within the Union for more than a year, despite the report's significant recommendations for reform.   This left the IEB—and by extension the UAW's members—without critical information to address reforms that were badly needed, and are only now being implemented. Declining to share the draft report deprives the Monitor of information necessary to understand and explain why the Legal Department decided not to share Exiger's recommendations in a timely manner, and to suggest whatever reforms might be necessary to address that situation.

Fourth, it is hard to discern the legal harm the UAW would suffer from disclosing the May 2020 version of a report when it has already provided the report's final version to the Monitor.[368] Even if fully protected by the work product doctrine—which can shield disclosure of certain documents prepared in anticipation of litigation—there seems to be little risk that disclosing the May 2020 Report to the Monitor pursuant to the Court's 502(d) Order will result in any exposure of the UAW's litigation strategy with respect to DOJ.  After all, Exiger explains in the June 2021 Report that it was engaged to "conduct a broad-based evaluation of the International's compliance

---

[368] There are compelling arguments that the work product protection would not apply to the May 2020 draft, and that, even if it did, the Monitor would still have access to it, under the Consent Decree.  The Monitor also has the option of subpoenaing the report.  The Monitor has chosen not to employ those options at this time, in part because they would not solve the cultural issue that is at the heart of the Monitor's recommendation for disclosure.  Instead, the Monitor wants to continue to give the IEB the opportunity to come to the conclusion on it is own that disclosure is the correct decision.

controls, including the operations, departments, risks and governance of the International,"[369] not

to plot litigation strategy.  And its 140 recommendations are clearly directed to the Union itself for

the purpose of improving the compliance environment, not to counsel for the purposes of

litigation.[370]

Because the Monitor strongly believed that withholding the May 2020 report would drive

the type of speculation described above, undercut the positive work that the IEB has done since

late 2019, and needlessly fuel the already-existing perception that there is a lack of transparency

at the UAW, the Monitor personally appealed to the IEB at a virtual meeting on November 4,

2021, recommending that the IEB provide the Monitor with a copy of the report in the interests of

being fully transparent.  The IEB voted to reject that recommendation.

> **Monitor's Recommendation No. 2:** The Monitor recommends that the UAW make the May 2020 Report from Exiger available to the Monitor pursuant to its common interest agreement with the Monitor and the Court's 502(d) Order.
>
> - **Union's Response:** The Union has rejected this recommendation, citing the work product doctrine.

---

[369] Exiger Report at 5-6 (June 11, 2021).

[370] The Union has asserted that the May 2020 Report and the June 2021 Report are subject to attorney work product protection that it does not intend to waive.  Assuming such protection applies, the Court has entered a Rule 502(d) Order that permits the Union to provide the Monitor with privileged material without waiving privilege, while, in turn, authorizing the Monitor to disclose such material "insofar as necessary for the fulfillment of his duties as set forth in the Consent Decree."  502 Order ¶ 4.  One of those duties is to "file with the Court a written report every six months about his . . . activities," Consent Decree ¶ 58, and, one of the Monitor's primary "activities" has been reviewing the UAW's compliance landscape, of which the Exiger reports are a significant component.  Many of this Report's examples are drawn from Exiger's work, and the Monitor has adopted many of the recommendations that work supported.  Without including those details, the Monitor could not fully inform the Court about the scope of his activities, nor report on the failures of transparency concerning them.  Their inclusion is thus necessary for the Monitor to fulfill his duties.  Further, the Consent Decree expressly does *not* authorize the filing of this Report, or any of its contents under seal.  Consent Decree ¶ 52.  Instead, the Consent Decree places the onus on a party seeking sealing to file a motion with the Court to obtain that relief prospectively, following notice in advance of the filing and an opportunity to confer.  Consent Decree ¶ 53.  The Union has been on notice of the Monitor's intention to publicly file this Report with content about both the May 2020 Report and the June 2021 Report since no later than October 26, 2021, and stated in response to the Monitor's inquiry that it would not seek to seal.

**Monitor's Recommendation No. 3:** Joining and building on a recommendation made by Exiger, the Monitor recommends that the UAW establish a Compliance Director position with specific roles and responsibilities to ensure adherence to applicable federal, state, and local rules and regulations.  The UAW should provide adequate authority and autonomy to the Compliance Director to make meaningful decisions, and ensure that the appointed individual has significant and relevant compliance expertise and knowledge of applicable federal, state, and local rules and regulations. The UAW should promptly post the position for a Compliance Director and begin the search process immediately; while the position remains open, the Legal Department should cover the responsibilities of the Compliance Director until the position is filled to avoid any further delay.

- **Union's Response:** The UAW agrees with this recommendation and has publicly posted the position for a Compliance Director.

- **Monitor's Reply:** The Monitor appreciates the UAW's quick adoption of this recommendation and looks forward to working with the Union to implement it.

**Monitor's Recommendation No. 4:** Joining and building on a recommendation made by Exiger, the Monitor recommends that the UAW establish a risk-based and right-sized Compliance function run by the Compliance Director that reports to the President's Office and to the Compliance and Ethics Committee described in Recommendation No 6.

- **Union's Response:** The UAW agrees with this recommendation and the IEB already formally adopted the substance of this recommendation at the October 28, 2021 IEB meeting.

- **Monitor's Reply:** The Monitor appreciates the UAW's quick adoption of this Recommendation and looks forward to working with the Union to implement it.

**Monitor's Recommendation No. 5:** Joining and building on a recommendation made by Exiger, the Monitor recommends that the UAW develop and conduct a periodic risk assessment of the International Union; the new Compliance function should lead the periodic risk assessment, and in the interim until a Compliance function is in place, the assessments should be conducted by Internal Audit and reported directly to the IEB.

- **Union's Response:** The UAW agrees with this recommendation and the IEB already formally adopted the substance of this recommendation at the October 28, 2021 IEB meeting.

- **Monitor's Reply:** The Monitor commends the UAW for the measures it adopted on October 28, 2021, but notes that the measures do not encompass the full scope of this Recommendation by not including the commitment to conduct periodic risk assessments in the future, led by the new Compliance function.  The Monitor reads the Union's Response to reflect its acceptance of this Recommendation, and the Monitor will work with the UAW to implement measures that address the Recommendation's full scope.

**Monitor's Recommendation No. 6:** Joining and building on a recommendation made by Exiger, the Monitor recommends that the UAW create a Compliance and Ethics Committee of individuals that would include the Compliance Director (as the head/owner of the Compliance and Ethics Committee), and might include the Head of the Legal Department, Head of Human Resources

83

("HR"), Head of Internal Audit, the UAW Ethics Officer, key senior staff, or other members of the UAW. The Compliance and Ethics Committee should have autonomy and a direct reporting line to the IEB with overall responsibility to prevent or correct corruption and unethical behavior. The UAW should define the mission, roles, and responsibilities of the newly created Compliance and Ethics Committee. The Compliance and Ethics Committee should:

(a)    Oversee and be accountable for implementing the Recommendations in this Report, as well as other recommendations and policies (from Exiger, Internal Audit, and Deloitte described in this Report) that have stalled in implementation; until the Compliance and Ethics Committee is in place, the UAW should form a subcommittee of the IEB or some other similar mechanism with the appropriate stature and authority to oversee and be accountable for that work;

(b)    Going forward, address matters to include, but not be limited to, potential violations of applicable laws and regulations and associated remedial actions, status of internal investigations, discussion of emerging risk areas, key risk indicators, significant deviations from UAW policies and procedures by employees, high risk vendor and other third party relationships, relevant legal and regulatory developments, the results of recent audit, or any other significant compliance and ethics-related issues; and

(c)    Meet on a periodic, at least quarterly, basis or more as needed.

- **Union's Response:** The UAW agrees with the majority of this recommendation and the IEB already adopted several parts of it at the October 28, 2021 IEB meeting. The question of which department within the UAW is most appropriate to address particular issues cannot be decided in a vacuum. There will certainly be issues that appropriately go to the Compliance Director, but there may well also be issues that are more appropriately handled by the Legal Department, or the Human Resources Department, for example.

- **Monitor's Reply:** The Monitor commends the UAW for the measures it adopted on October 28, 2021. The Monitor will work with the UAW to implement measures that address the Recommendation's full scope, taking into consideration the Union's Response.

## 2.    Legal Department

The Legal Department is headed by the General Counsel, who reports directly to the President.[371] The General Counsel has spent over 20 years at the UAW and has held his current position for over seven years.[372] The Legal Department oversees virtually all legal needs of the UAW including coordinating the work of outside counsel, advising the IEB, and working with the

---

[371] Office of the President Organizational Chart (Sept. 9, 2021).

[372] Meeting with UAW General Counsel and UAW Outside Counsel at 3 (Aug. 6, 2021); UAW General Counsel Interview (UAW-Mon_002455) (Apr. 1, 2021).

President and Chief of Staff on a daily basis.[373]  Under the General Counsel, the Legal Department has 18 employees, including ten other attorneys: a deputy general counsel, six associate general counsels, and three assistant general counsels.[374]  The Legal Department provides advice and support on a wide range of Union activities including litigation, significant transactions, joint training centers, and organizing and political activities.[375]

In its June 2021 Report, Exiger identified several shortcomings in the Legal Department. First, Exiger observed that Legal Department attorneys only occasionally and informally monitor for updates to federal and state regulations.[376]  It observed that the Legal Department had no centralized inventory of all federal, state and local legal and regulatory requirements, and no policies and procedures that assign responsibility to individuals for monitoring, tracking, and ultimately filing reports with the applicable regulatory bodies, nor any process for certifying compliance with regulatory requirements.[377]  To address those gaps, Exiger recommended that the UAW implement a "formal process for monitoring material updates to federal, state and local legal and regulatory and reporting requirements" and designate a UAW employee "responsible for the implementation and ownership of that process."[378]  The Monitor adopts that recommendation below.

Exiger also found that the Legal Department does not have any dedicated attorneys assigned to monitoring or enforcing employees' compliance with the law, UAW's ethical code, or

---

[373] Meeting with UAW General Counsel and UAW Outside Counsel at 3 (Aug. 6, 2021); UAW General Counsel Interview (UAW-Mon_002455) (Apr. 1, 2021).
[374] Meeting with UAW General Counsel and UAW Outside Counsel at 3 (Aug. 6, 2021); UAW General Counsel Interview (UAW-Mon_002455) (Apr. 1, 2021).
[375] Meeting with UAW General Counsel and UAW Outside Counsel at 3 (Aug. 6, 2021); Meeting with UAW Legal Counsel, UAW General Counsel, and UAW Outside Counsel (Sept. 3, 2021).
[376] Exiger Report at 10 (June 11, 2021).
[377] Exiger Report at 10 (June 11, 2021).
[378] Exiger Report at 15 (June 11, 2021).

the UAW's internal policies and procedures.[379]  Exiger found that this gap exposed the UAW to potential regulatory and reputational risks and prevented the UAW from having a comprehensive view into areas of risk, red flags, training priorities, and ultimately, accountability.[380]  As noted above, the Monitor joins Exiger in recommending that this role be assigned to the newly created compliance department, and builds on it by recommending that the Legal Department serve this role in the interim.

The Monitor's own interviews have revealed that some personnel at the International Union lack trust in the Legal Department.  Several UAW employees expressed concern about members of the Legal Department sitting in on informational interviews with the Monitor, leading the Monitor to stop that practice.  Several members of the IEB also expressed concern about the Legal Department not acting with sufficient transparency with respect to the IEB.[381]

---

**Monitor's Recommendation No. 7:** The Monitor adopts Exiger's recommendation that the UAW implement a formal process for monitoring material updates to federal, state, and local legal and regulatory and reporting requirements, and designate a UAW employee responsible for the implementation and ownership of that process.

- **Union's Response:** The UAW agrees with this recommendation and the IEB already formally adopted the substance of this recommendation at the October 28, 2021 IEB meeting.

- **Monitor's Reply:** The Monitor commends the UAW for the measures it adopted on October 28, 2021, but notes that the measures adopted on October 28 do not encompass the entire scope of this Recommendation, as the UAW did not commit to designating a UAW employee responsible for the implementation and ownership of this process.  The Monitor reads the Union's Response to reflect its acceptance of this Recommendation, and the Monitor will work with the UAW to implement measures that address the Recommendation's full scope.

---

### 3.    Internal Audit

Distinct from an independent compliance function, the role of an internal audit function is to serve as an independent, objective evaluator of an organization's governance, its compliance

---

[379] Exiger Report at 10 (June 11, 2021); Meeting with Exiger at 13 (July 30, 2021).
[380] Exiger Report at 10 (June 11, 2021).
[381] IEB Member Interview at 10; IEB Member Interview at 11.

with its own policies and procedures, and the strength of its internal controls.  A robust internal audit function helps an organization identify and correct compliance and risk issues.

To its credit, in August 2020, the UAW formally established an Internal Audit function, hiring a Director and an Assistant Director of Internal Audit and engaging the outside consulting firm Deloitte to provide internal audit services.[382]  According to its charter, the new Internal Audit function was created to "provide independent, objective assurance and advisory services" and to "ascertain that UAW's risk management, control, and governance processes, as designed and represented by the UAW, are adequate and functioning in a proper manner."[383]

During the period covered by this Report, the Monitor conducted an internal assessment of the Internal Audit process, and prepared a draft section of this Report addressing potential concerns with the structure of the Internal Audit Department, including regarding the allocation of responsibilities between Deloitte and the UAW's own Internal Audit staff.  In response to a draft of the Report, however, the UAW and Deloitte provided the Monitor with conflicting and contradictory information about their respective views of the allocation of roles and responsibilities between staff in the UAW's Internal Audit Department and Deloitte.

On the one hand, the UAW has repeatedly described Deloitte as leading an outsourced Internal Audit function in which the UAW's Director of Internal Audit acts as a "liaison" to facilitate the flow of information between the UAW and Deloitte.[384]  And in the Monitor's own interviews with the Deloitte personnel engaged in the Internal Audit work, they corroborated the view that the UAW had "outsourced" internal audit to them, that they took the lead in conducting

---

[382] Meeting with Deloitte at 1, 3-4 (Oct. 15, 2021); *see generally* Internal Audit Engagement Letter (UAW-Mon_002976-82) (Aug. 19, 2020).
[383] Internal Audit Charter at 1 (UAW-Mon_002761).
[384] Email from UAW Outside Counsel to Monitor (Oct. 18, 2021).

risk assessments for the UAW, and that the UAW's Director of Internal Audit served in only a liaison role, in part, because she has no prior audit experience.[385]

On the other hand, in Deloitte's written response to a draft of this Report, Deloitte took a position that was sharply at odds with that shared depiction, claiming instead that Internal Audit is "co-sourced" between the UAW and Deloitte, and that Deloitte is only "assisting" and "supporting" the UAW's Internal Audit Department. Deloitte further claimed, in direct contradiction to the UAW's assertions that its intent has been that Deloitte lead the function, that "Deloitte is not able to lead audits on its own."[386]

The Monitor can only engage in an assessment and recommendation process based on a solid factual footing. Yet, Deloitte's comments to the draft report made new, critical factual statements that contradicted what appeared to be an already established factual record. At this point, the Monitor has been unable to engage in a full examination of Deloitte's new assertion, in part because they were made well after the Monitor's deadlines and the Monitor has had no time to do so. As a result, the Monitor will need to work with both Deloitte and the UAW to clarify the roles and responsibilities for performing internal audits, and report on the UAW's progress in resolving them in a subsequent report.

But, regardless of the confusion about roles and responsibilities between Deloitte and the Internal Audit Department, the Monitor has already made certain observations that raise concerns about whether the newly-formed Internal Audit team can provide independent, objective assurance on the UAW's internal control environment. Although the Monitor was prepared to report on those concerns and had prepared draft recommendations, given the confusion around Internal

---

[385] Meeting with Deloitte at 3-4, 12 (Oct. 15, 2021).
[386] Deloitte Redline of Monitor's draft Report at 6 (Nov. 5, 2021).

Audit's structure, the Monitor, with the agreement of the UAW, has withdrawn those findings and recommendations until the next report.  In particular, the Monitor will examine and report on: (1) whether Internal Audit's structure and personnel have the requisite independence and autonomy to withstand pressure to alter internal audit findings and risk assessments, including most recently on its culture risk assessment; (2) how Internal Audit will perform audits on new internal financial controls that the UAW has implemented based on the recommendations of another Deloitte team, in order to ensure that one Deloitte team is not evaluating controls recommended by another Deloitte team; and (3) whether the IEB is receiving complete and timely information on Internal Audit's activities to fulfill the IEB's oversight responsibility as required in Internal Audit's charter.

> **Monitor's Recommendation No. 8:** In order to promote the independence of the UAW's Internal Audit Department and mitigate the risk of undue pressure or influence on Internal Audit, the UAW should work with the Monitor and Deloitte to clarify the roles, responsibilities, and reporting structure of the UAW's Internal Audit Department and the external consultants who provide the UAW with internal audit services.
>
> - **Union's Response:** The UAW agrees with this Recommendation and intends to institute it.
>
> - **Monitor's Reply:** The Monitor appreciates the UAW's quick adoption of this Recommendation and looks forward to working with the Union to implement it.

### D.      Internal Governance and Financial Controls

For years leading up to the Consent Decree, certain former senior officials at the UAW personally enriched themselves and others with stolen Union and Joint Training Center funds.  As discussed above, part of the problem was a culture that allowed corruption to continue undeterred, and the absence of a centralized compliance function that could help halt its spread.

But beyond those core failings, the UAW also lacked certain basic governance tools and financial controls that, at a minimum, would have made it more difficult for the former UAW officials to abuse their offices.  For example, the Union lacked tools to promote transparency about how the Union's money was spent and then track significant variations, such as a formal and

consistent budgeting process.  It also lacked the tools to ensure that competent and qualified personnel were appointed to positions responsible for safeguarding UAW funds.  And it was missing clear policies and procedures for financial controls around how the Union's money could or should be spent, such as a clear and independent expense approval process.

One significant area of the Monitor's focus has been making recommendations to help ensure that the UAW has appropriately qualified and trained personnel in key compliance related positions.  The Monitor has made these recommendations fully aware of, and with deep respect for, the UAW's proud tradition rooted in its Constitution of promoting from within, and elevating members from the factory floor to positions of leadership at the International Union.  That is an important and commendable aspect of the UAW's culture.  But the preservation of that culture can be coupled with compliance-minded changes.  There are still certain positions for which the right experience and qualifications are essential, and for others, the preference for promotion from within makes it all the more important that members who rise through the ranks into key control or leadership positions receive the tools and training to succeed in the positions they assume, particularly when those positions require them to perform compliance-related tasks.

With the help of its outside consultants, the Union has identified numerous ways to improve, and some important and significant progress has been made.  Working with Deloitte, the UAW has drafted 13 new policies that have either been adopted or are close to being so, although implementation remains a challenge.  But much more remains to be done in the areas of compliance reform and ethics, where change has come far too slowly, leaving many of the shortfalls noted above still in place.  As a result, the Union has significant work to do to in establishing the necessary tools that can help prevent fraud and corruption from recurring.  This section summarizes the work the Union has done to reform its internal processes; it then covers

certain basic governance tools that are still missing at the Union; and finally, it reviews and assesses the Union's progress in implementing financial controls.

### 1. The Union's Efforts at Reform

The UAW has taken some vital steps to improve the internal processes in place to prevent fraud and corruption. That effort started from the top. In December 2019, former President Gamble and then Secretary-Treasurer Curry announced a series of financial reforms.[387] In emphasizing that "dues dollars are sacred," Gamble predicted that the UAW "will hand over to our membership in 2022 a financially safeguarded union."[388]

The financial reforms Gamble and then-Secretary-Treasurer Curry announced in December 2019 included the following:

- Retention of Deloitte to "conduct a complete assessment of all accounting and financial processes and procedures."[389]

- A "comprehensive expansion of financial training for all UAW personnel responsible for any financial/accounting duties," including training on new accounting policies and procedures.[390]

- Increased centralization of accounting and financial operations, where financial operations "will be more centralized with oversight from the Secretary-Treasurer's Office[.]"[391]

- The engagement of a new external accounting firm "that will be handling the financial audit work of the International Union for 2019, conducting a one-year lookback into all financials."[392]

- Increased staffing with the addition of four auditors, "all with post-secondary coursework in accounting/finance/tax regulation to assist with increased auditing process."[393]

---

[387] UAW Announces Stringent Financial Reforms at 1-3 (UAW-Mon_002579-81) (Dec. 2, 2019).
[388] UAW Announces Stringent Financial Reforms at 3 (UAW-Mon_002581) (Dec. 2, 2019).
[389] UAW Announces Stringent Financial Reforms at 2 (UAW-Mon_002580) (Dec. 2, 2019).
[390] *Id.*
[391] UAW Announces Stringent Financial Reforms at 2-3 (UAW-Mon_002580-81) (Dec. 2, 2019).
[392] UAW Announces Stringent Financial Reforms at 2 (UAW-Mon_002580) (Dec. 2, 2019).
[393] UAW Announces Stringent Financial Reforms at 1-2 (UAW-Mon_002579-80) (Dec. 2, 2019).

The UAW has made progress on the reforms announced in 2019. It engaged Deloitte to conduct a detailed assessment of the UAW's internal financial controls,[394] and as a result of that work, the UAW, with help from Deloitte, developed 13 new accounting and IT policies and procedures, of which, as of October 26, 2021, two had been approved by the IEB, with the remaining policies in line to be presented to the IEB in the next two months.[395]

The UAW has also taken several steps to centralize oversight of its financial controls by: (i) requiring all employees to submit their expenses through a centralized electronic review platform (called "Concur"), (ii) adding measures to improve oversight of financial transactions at Black Lake, and (iii) developing a plan to transition the Regions' community action and political activity accounts to the Accounting Department at the International Union.[396] The UAW also hired a new external audit firm,[397] created a new Internal Audit function (as discussed above), and added auditors to the UAW team that audits the books and records of the Local Unions.[398]

It has also made specific reforms to improve oversight of Union expenditures. For example, in February 2019, the UAW issued "Guidelines for Expenditures of Union Funds" to clarify the role and responsibility of individuals within the UAW who are authorized to approve the use of UAW funds ("authorized signers") after the Secretary-Treasurer at the time, Curry, learned that nearly all expense reports submitted in the prior month were approved without review

---

[394] *See generally* Meeting with Deloitte (July 1, 2021); Meeting with Deloitte (July 14, 2021).

[395] Deloitte Introductory Presentation at 6 (July 1, 2021); Chief Accountant Interview at 14; UAW Moving Forward Travel Policy Training Sheet (UAW-Mon_002810-39). Although not formally approved by the IEB as of October 26, 2021, the cut-off date for this Report, the Accounting Department is already observing new controls reflected in draft policies on Financial Close and Reporting Processes and Fixed Assets. The UAW has also created a centralized repository for policies on MyUAW, its intranet site, is developing training materials and review aids for draft policies, and implemented an automated process for dues collected in the Michigan region.

[396] Meeting with Deloitte at 1-6 (Oct. 6, 2021).

[397] UAW Announces Stringent Financial Reforms at 2 (UAW-Mon_002580) (Dec. 2, 2019).

[398] Meeting with UAW General Counsel and UAW Outside Counsel at 2 (Sept. 20, 2021).

of the relevant receipts.[399]  The guidelines require that expenditures of Union funds must have a legitimate business purpose, be reasonable in amount, relate to the UAW's mission, and be supported by adequate documentation.[400]  They further require that those approving expenditures of Union funds must verify the accuracy of supporting invoices, confirm expenditures are appropriate, and authorize the payment of an invoice with a personal signature.[401]

Notwithstanding these improvements, the Monitor has identified weaknesses in the compliance environment and internal financial controls that, if left unaddressed, will make it more difficult for the Union to detect and prevent financial malfeasance.  In many of these areas, the same deficiencies were identified in the controls assessment conducted by Deloitte—or in the report of the Union's other consultant, Exiger—as well as by the new Internal Audit Department following its culture risk assessment between February and May 2021.  This section includes the Monitor's recommendations in each area, many of which echo recommendations already made by the Union's own experts.

### 2.       Internal Governance

It is common for large organizations to implement basic safeguards to ensure that funds are used effectively and guarded from corruption, and that their personnel are qualified for their roles and also equipped to do the tasks being asked of them.

---

[399] Email from UAW President to IEB (UAW-Mon_001399) (Feb. 20, 2019); Email from Chief Accountant to UAW President (UAW-Mon_001401-001402) (Feb. 27, 2019); Chief Accountant Interview at 7; Guidelines for Expenditures of Union Funds (UAW-Mon_001412-13).

[400] *See* Email from Chief Accountant to UAW President (UAW-Mon_001401-001402) (Feb. 27, 2019); Email from UAW President to IEB (UAW-Mon_001403) (Feb. 20, 2019); Guidelines for Expenditures of Union Funds (UAW-Mon_001412-13).

[401] *See* Email from Chief Accountant to UAW President (UAW-Mon_001401-001402) (Feb. 27, 2019); Email from UAW President to IEB (UAW-Mon_001403) (Feb. 20, 2019); Guidelines for Expenditures of Union Funds (UAW-Mon_001412-13).

Those sorts of safeguards were missing in the period leading to the Consent Decree.  As detailed above, former senior Union leaders pushed through inappropriate uses of Union funds without the need to justify those expenditures against an annual budget, and were largely able to steamroll those who had the courage to try and pushback on their efforts.  Without fundamental measures—like basic budgeting, the use of job descriptions to fill vacancies, performance reviews for Union personnel, and employee training—to hold leaders accountable, the Union is still vulnerable to the acts of corruption that characterized its recent history.

### a.   Job Descriptions and Qualifications

Nepotism and favoritism can flourish in an organization that has no job descriptions or qualification requirements, and can impede the effectiveness of an organization's important control functions.  As noted above, nepotism was a historical problem for the UAW.  To cite just one example, Exiger included in its report an anecdote about a former UAW Vice-President who allegedly used his position and connections to have family members brought on as full-time staff at the UAW, and Exiger observed how "these types of favors can easily lead to situations where a Union official's responsibilities toward membership is compromised and trust in leadership is seriously eroded."[402]  This is, of course, not to say that otherwise qualified employees should be barred from employment because they are related to someone in the Union.  But they also should not get an unfair advantage over more qualified applicants, or fill roles they are unqualified to hold.

Job descriptions and qualifications, along with broad posting of available job positions, help limit the pernicious influence of nepotism.  As the June 2021 Exiger Report describes, they require department heads to articulate their actual employment needs, and ensure that personnel

---

[402] Exiger Report at 48 (June 11, 2021).

who perform important control functions have the requisite skills to perform those controls.[403]
They also mitigate the risk that jobs are doled out as personal favors, and help prevent corrupt
leaders from hiring pliant and unqualified people who will do their bidding out of loyalty to the
leader appointing them, not to the Union or their professional standards.[404]  They bring greater
rigor to hiring decisions so that personnel are hired who have—or can acquire through training—
the skills necessary to perform the job.[405]

The Union currently does not use written job descriptions that define the roles and
responsibilities for most Union personnel.[406]  According to one top staff member, even when the
UAW does post a job opening, the job selection process can be political and can lead to the
advancement of people who may be good individuals, but who, as one IEB member put it,
"probably are not the most highly skilled."[407]  Employees interviewed by the Monitor across
functions and departments confirmed that they have never seen a job description for many of the
positions they held at the UAW.[408]  According to the Director of Human Resources, her
department also does not maintain any formal written job descriptions.[409]  Instead "[job]
descriptions are only developed for more unique positions" where the UAW seeks external
candidates.[410]  After the Monitor completed its interviews of Accounting personnel, the Union
provided the Monitor with what it said were descriptions of bookkeeper positions, a role in the

---

[403] Exiger Report at 46-47 (June 11, 2021).

[404] *Id.*

[405] *Id.*

[406] IEB Member Interview at 7; IEB Member Interview at 3-4; Accounting Department, Employee #3 Interview at 4; Accounting Department, Employee #15 Interview at 2.

[407] IEB Member Interview at 3-4.

[408] Accounting Department, Employee #3 Interview at 5; Education Department, Employee #1 Interview at 4; Accounting Department, Employee #15 Interview at 2; Education Department, Employee #2 Interview at 2; Accounting Department, Employee #5 Interview at 2; Accounting Department, Employee #9 Interview at 3; Accounting Department, Employee #8 Interview at 3.

[409] Human Resources Department, Employee #1 Interview at 4.

[410] *Id.*

Accounting Department.  It is unclear, however, how the UAW has employed these descriptions, as Accounting personnel previously told the Monitor that they had not seen written job descriptions for their roles,[411] and a senior staff member in Accounting also told the Monitor that the UAW had not used job descriptions for any positions in Accounting.[412]

The UAW generally fills positions in Accounting through internal promotions without posting the openings,[413] and it has not made any external hires in the last two or three years.[414] Most Administrative Accountants have worked for the UAW for over a decade and have held several roles within the UAW prior to being promoted to their current position.[415]

That practice can suppress morale.  By way of example, the Union appointed three of the five Administrative Accountants to their current positions in March 2020, promoting them from clerical bookkeepers to UAW staff, without posting the positions first.[416]  Personnel expressed great frustration to the Monitor over this, particularly because, in their eyes, some of those promoted were not qualified to perform the roles assigned to them.[417]  In response to a draft of this Report, the UAW insisted that these employees were in fact fully qualified, but that is not the relevance of the example.  Instead, this example illustrates the ongoing perception by staff and employees—rightly or wrongly—that the UAW still has what they have described as a

---

[411] Email from UAW Outside Counsel to Monitor (Sept. 23, 2021); Accounting Department, Employee #5 Interview at 2; Accounting Department, Employee #9 Interview at 3.

[412] Email from UAW Outside Counsel to Monitor (Sept. 23, 2021); Accounting Department, Employee #3 Interview at 5.

[413] Accounting Department, Employee #3 Interview at 5; Accounting Department, Employee #5 Interview at 2; Accounting Department, Employee #8 Interview at 3.

[414] Accounting Department, Employee #3 Interview at 5.

[415] Accounting Department, Employee #2 Interview at 1-2; Accounting Department, Employee #7 Interview at 1-2; Accounting Department, Employee #6 Interview at 2; Accounting Department, Employee #5 Interview at 2; Accounting Department, Employee #8 Interview at 2.

[416] Accounting Department, Employee #2 Interview at 1-2; Accounting Department, Employee #7 Interview at 1-2; Accounting Department, Employee #6 Interview at 1-2.

[417] Accounting Department, Employee #2 Interview at 2; Accounting Department, Employee Interview #12 at 5; Accounting Department, Employee #7 Interview at 2-3.

nontransparent "good old boys culture."[418]  A more transparent system of hiring and promotion that lays out what the qualifications are for each job and gives an open opportunity for those who are qualified to apply will help alleviate that perception.

Exiger also found that the UAW lacked a consistent process to ensure that all employees have appropriate experience and qualifications for their jobs,[419] that "department heads are also not required to post job qualifications for internal openings within their respective departments," and that "department heads are appointed by the President with no job qualification or description posted for these positions."[420]  Exiger's report cautioned that, without formal job qualification descriptions for key positions within the UAW, there is "risk that otherwise unqualified candidates will be hired to positions due to favoritism, nepotism, discrimination or other ethically problematic reason that undermines the values of fairness espoused in the UAW Constitution."[421]

> **Monitor's Recommendation No. 9:** Joining and building on a recommendation made by Exiger, the Monitor recommends that the UAW develop job descriptions for certain job openings within the UAW, including qualification requirements, if appropriate.  At a minimum, the UAW should develop job descriptions for all positions in the Accounting Department, Purchasing Department, Internal Audit, Investments, and Information Technology, as well as any other departments that contain positions the UAW considers to require professional or technical skills.
>
> - **Union's Response:** The UAW agrees with this recommendation and intends to institute it.
>
> - **Monitor's Reply:** The Monitor appreciates the UAW's quick adoption of this Recommendation and looks forward to working with the Union to implement it.

---

[418] Culture Risk Assessment at 16 (UAW-Mon_002433) (June 21, 2021).

[419] Exiger Report at 46 (June 11, 2021); Meeting with Exiger at 3 (July 30, 2021); Email from UAW Outside Counsel to Monitor (Oct. 12, 2021); Meeting with UAW General Counsel and UAW Outside Counsel at 2-3 (Sept. 15, 2021).

[420] Exiger Report at 46 (June 11, 2021); Meeting with Exiger at 3-4, 11-12 (July 30, 2021); Email from UAW Outside Counsel to Monitor (Oct. 12, 2021); Meeting with UAW General Counsel and UAW Outside Counsel at 2-3, 7 (Sept. 15, 2021).

[421] Exiger Report at 46 (June 11, 2021); Meeting with Exiger at 3-4, 11-12 (July 30, 2021); Email from UAW Outside Counsel to Monitor (Oct. 12, 2021); Meeting with UAW General Counsel and UAW Outside Counsel at 2-3, 7-8 (Sept. 15, 2021).

**Monitor's Recommendation No. 10:** Joining and building on a recommendation made by Exiger, the Monitor recommends that the UAW create a nepotism policy that:

(a)      Prohibits UAW officials from using their status as a UAW official to hire family members and other close personal friends without demonstrated qualifications for the position;

(b)      Requires candidates for those positions to disclose whether they have a relative working at the UAW; and

(c)      Requires Human Resources to review the information disclosed in response to Recommendation 10(b), in consultation with the Compliance Director as needed, to determine whether a conflict of interest exists.

- **Union's Response:** The UAW IEB has already directed that the Union will retain Exiger to provide guidance and advice on a potential nepotism policy.  (See Oct. 28, 2021 IEB meeting minutes).

- **Monitor's Reply:** The UAW passed a resolution to "work with Exiger on preparing recommendations on this for IEB consideration" and "reach out to other labor unions to determine what policies they have adopted, if any, to help inform practices in this area." The Monitor considers the Union's Response an acceptance and looks forward to working with the UAW and Exiger to develop and implement a nepotism policy.

**Monitor's Recommendation No. 11:** The Monitor recommends that open staff positions at the International Union, other than the Executive and Top Administrative Assistant positions, should be advertised to International Union personnel to afford them an opportunity to apply and be considered for the staff position.

- **Union's Response:** The UAW agrees with this recommendation and intends to institute it, in a manner consistent with its obligations under its collective bargaining agreements, with respect to staff positions that are not, in essence, political appointments (e.g., Executive Administrative Assistant; Top Administrative Assistant; and Administrative Assistant position, for example, which are not Staff Council positions).

- **Monitor's Reply:** The Monitor considers the Union's Response to this as unclear, as it suggests that that the UAW might seek to exclude from the scope of this recommendation some of the key control functions, such as senior staff in Accounting, Education, and Human Resources, among other departments.  The Monitor will report on the UAW's progress to advertise open staff positions, in a manner consistent with its obligations under its collective bargaining agreements, including open Administrative Assistant positions, in the Monitor's next report.

### b.    Performance Reviews

If job descriptions help better ensure that key positions within the Union will be held by people who are qualified for the role, performance reviews help hold employees and their

supervisors accountable for meeting objectives and acting in line with an organization's ethical and compliance expectations.  Performance reviews also help develop employees: helpful regular feedback can give an underperforming employee the opportunity to right the ship, and positive feedback can help those who are performing well to advance in the organization.  Performance reviews are particularly important for UAW employees in control functions, like Accounting and Purchasing, where personnel are performing compliance-related tasks and are entrusted to be good stewards of the UAW's finances.

But the UAW does not mandate regular and consistent performance reviews for its staff. According to the Director of Human Resources, the UAW does not conduct formal performance reviews, but instead managers and department heads are encouraged to provide ongoing feedback to employees in their departments.[422]  And although some UAW officials reported to the Monitor that they have provided regular informal oral feedback to the individual members of their teams,[423] one IEB member said that feedback is not delivered as often as it should be, and several other officials and employees of the International Union reported to the Monitor that, in practice, they do not consistently provide or receive performance reviews.[424]  One result of the absence of formal performance reviews, as one IEB member put it, is that the UAW does not have a history of removing officials, staff members, or employees who do not perform well.[425]

---

[422] Human Resources Department, Employee #1 Interview at 6.
[423] IEB Member Interview at 7; IEB Member Interview at 6.
[424] IEB Member Interview at 7 (when asked about Exiger's critique that the UAW does not have a formal review process, IEB Member did not disagree; when asked if there are informal review processes, IEB Member said that this was not the UAW's normal practice in their experience); IEB Member Interview at 6 (when asked about performance reviews, IEB Member said that most of the time, employees get "one-to-one affirmation," but admitted there is no formal performance review process or checks); Human Resources Department, Employee #1 Interview at 6 (no formal review process).
[425] IEB Member Interview at 12.

Several IEB members and other senior staff expressed support for having performance reviews to communicate feedback and expectations, although they expressed concern that the UAW's collectively bargained contracts with its employees might limit the performance review process.[426] One IEB member expressed to the Monitor their support for developing a formal performance review process, which would provide feedback to employees and communicate expectations.[427] Another IEB member explained that such a process would help force the necessary "courageous conversations" with staff to help them identify strengths and weaknesses,[428] and of training UAW personnel in management positions so they can more effectively develop their teams.[429]

Further, the UAW's Internal Audit team observed in its draft culture risk assessment report that the lack of a performance management process has left employees that it surveyed with the desire to be recognized and complimented for their hard work.[430]

---

**Monitor's Recommendation No. 12:** Joining and building on recommendations made by Exiger and a discussion point raised by Internal Audit, the Monitor recommends that the UAW develop International Union-wide performance review and performance management processes, taking into account any limitations on those processes under its collective bargaining agreements. The performance review and management processes should be overseen by Human Resources in consultation with the Compliance and Ethics Committee.

The performance review process should:

(a) Develop categories in which each staff member or employee will be evaluated;

(b) Periodically appraise employees of their strengths and weaknesses;

(c) Evaluate the heads of departments to ensure that they are qualified and performing at the requisite level; and

---

[426] President's Office, Senior Staff #2 Interview at 6; Meeting with UAW General Counsel and UAW Outside Counsel at 6 (Sept. 15, 2021).
[427] IEB Member Interview at 5-6.
[428] IEB Member Interview at 5.
[429] IEB Member Interview at 7-8.
[430] Culture Risk Assessment Draft at 24 (UAW-Mon_002800) (May 21, 2021).

(d) Include an assessment of disciplinary actions and adherence to the UAW's compliance and ethical standards when considering an employee of the International for advancement.

In addition, supervisors should have a performance management process that includes:

(e) Mentoring for junior staff to always act ethically and with integrity, a message that should be continuously reinforced;

(f) Periodic check-ins to discuss employee projects, concerns and progress, including any ethics and compliance issues that require discussion and follow-up;

(g) Constructive feedback, which creates a sense of comfort and trust; and

(h) Fostering a speak-up culture.

- **Union's Response:** The UAW will take this recommendation under advisement as to formal, written performance reviews, but agrees with the substantive sentiments set forth in the sub-paragraphs of this recommendation and intends to pursue implementation of the substance of this recommendation in a manner consistent with the collective bargaining agreements the UAW has with its unionized employees (e.g., OPEIU and Staff Council).

- **Monitor's Reply:** The Monitor will work with the UAW to implement this Recommendation in a manner consistent with its obligations under its collective bargaining agreements, and will report on the UAW's progress in the Monitor's next report.

### c.   Formal Training

During the period of misconduct that preceded the Consent Decree, a number of UAW officials contributed to an unhealthy culture across the Union where senior leaders mistreated staff members and employees.  In order to move forward and improve, one IEB member told the Monitor that formal management training, including how to properly discipline employees, would be "very valuable" to the Union.[431]  The importance of training personnel in control functions also featured prominently in the UAW's announcement of financial reforms in December 2019, during which former President Gamble and Secretary-Treasurer Curry announced that the UAW would

---

[431] IEB Member Interview at 4-5.

undertake "comprehensive expansion of financial training for all UAW personnel responsible for any financial/accounting duties" including training on new accounting policies and procedures.[432]

The UAW has made some progress.  Currently, the Union offers online training on various financial topics to personnel in the Accounting Department, and is working with its outside auditor, Calibre, to develop additional training courses.[433]  The Chief Accountant reported that she encourages her staff to take the training courses and is open to even more opportunities, but she also recognized that trainings can and should be made more regular and systematic.[434]  And the UAW has also taken several important steps to improve its training.  It has deployed policy-specific training for the two new policies that have recently been approved by the IEB on travel and expenses (the T&E Policy) and on the formation of policies.  Training on those policies is stored centrally on the UAW's intranet site ("MyUAW") so it is repeatable, and may be provided in virtual or in-person format.  The UAW has said that it provided training to all employees who deal with the T&E Policy, and the training format was either a live webinar or "self-guided."[435]

In another promising move, President Curry has announced the creation of a new Staff Development Department under his supervision that will focus exclusively on staff development and training.  The UAW also approved funding for an online learning management system ("LMS") that will store training materials for use by UAW personnel.  Responsibility for developing staff training materials in LMS and training personnel will shift from the Education

---

[432] UAW Announces Stringent Financial Reforms at 2 (UAW-Mon_002580) (Dec. 2, 2019).

[433] Chief Accountant Interview at 13.  Calibre confirmed this with the Monitor during a later debriefing. Meeting with Calibre at 6-7 (Oct. 14, 2021).

[434] Chief Accountant Interview at 13-14; UAW Redline of Monitor's draft Report at 50 (Oct. 31, 2021).

[435] Email from UAW Outside Counsel to Monitor (Oct. 5, 2021); UAW Travel & Expense Policy Training Attendance Sheets (UAW-Mon_002810-39) (Oct. 5, 2021); UAW Redline of Monitor's draft Report at 51 (Oct. 31, 2021).

Department to the new Staff Development Department.  As of October 26, 2021, however, no one had been selected to head the department and it is still under development.

More work is needed.  The UAW still needs to develop a formal mandatory training program for its officers and staff.  According to the Director of Education, the "lack of role specific learning paths" is the UAW's most significant training gap.[436]  The Director of Education characterized the current approach to staff training as more "reactionary"—*i.e.*, providing training when requested—rather than providing consistent and periodic training for all International Union personnel.[437]

The need for formalized training in the Accounting Department is particularly acute.  In place of formal training, employees in Accounting reported a variety of informal practices.  Some employees said they participated in online training modules, utilized subscriptions to training webinar programs, or attended periodic in-person training offered at conferences, which are available to personnel but not mandatory.[438]  For example, one employee described taking training modules, but "primarily learned" by watching her predecessor clear expenses.[439]  Numerous other personnel in the Accounting Department, however, described a lack of training and instead being trained primarily by their predecessors or peers,[440] which carries risk that incorrect practices are handed down from one worker to the next.  According to one clerical employee in the Accounting Department, the UAW does not provide any formal training other than the prior person who held

---

[436] Education Department, Employee #1 Interview at 3.

[437] Education Department, Employee #1 Interview at 4.

[438] Accounting Department, Employee #4 Interview at 4; Accounting Department, Employee #7 Interview at 3; Accounting Department, Employee #15 Interview at 2; Accounting Department, Employee #4 Interview at 4.

[439] Accounting Department, Employee #10 Interview at 3.

[440] Accounting Department, Employee #5 Interview at 2-3; Purchasing Department, Employee #1 Interview at 2; Accounting Department, Employee #7 Interview at 3; Accounting Department, Employee #4 Interview at 4; Accounting Department, Employee #11 Interview at 2-3; Accounting Department, Employee #8 Interview at 3-4; Accounting Department, Employee #12 Interview at 3.

the position telling you how to do the job, and then "you either sink or swim."[441]  One staff person in the Accounting Department said she learned on the job by "trial and error."[442]  Another clerical employee in the Accounting Department said her training to learn how to perform her new job consisted of a two-hour Zoom call with the previous person who held the same position, and after the call, the employee was "on her own."[443]

The UAW's Internal Audit Department also identified training as an area for improvement. In its culture risk assessment report, Internal Audit recommended that the UAW "improve and streamline existing training offerings and develop additional training courses to address key issues."[444]  The report observed that the UAW had a "lack of ethics and compliance trainings" and noted that trainings should be formalized and required on a periodic basis.[445]

Further, in its report, Exiger found that "[t]he UAW has no cohesive training program" and expressed concern that, without one, personnel "may have significant gaps in their understanding of compliance, legal and regulatory requirements, which affects their ability to make correctly reasoned, knowledgeable and effective decisions on behalf of the Union."[446]

---

**Monitor's Recommendation No. 13:** Joining and building on a recommendation made by Exiger, the Monitor recommends that the UAW develop policies and procedures with core annual compliance and ethics training requirements for the entire International Union on regulatory expectations and UAW Policies and Procedures.  The training should include real-life examples and include guidance on how to obtain ethics advice as needs arise.

- **Union's Response:** The UAW agrees with this recommendation and intends to institute it.

- **Monitor's Reply:** The Monitor appreciates the UAW's quick adoption of this Recommendation and looks forward to working with the Union to implement it.

---

[441] Accounting Department, Employee #14 Interview at 3.
[442] Accounting Department, Employee #10 Interview at 2-3.
[443] Accounting Department, Employee #12 Interview at 3.
[444] Culture Risk Assessment at 23 (UAW-Mon_002440) (June 21, 2021).
[445] *Id.*
[446] Exiger Report at 49 (June 11, 2021).

**Monitor's Recommendation No. 14:** Joining and building on a recommendation made by Exiger, the Monitor recommends that the UAW conduct mandatory training on anti-retaliation and hostile work environments for all International Union personnel, including officials, staff, and clerical employees.

- **Union's Response:** The UAW agrees with this recommendation and intends to institute it.

- **Monitor's Reply:** The Monitor appreciates the UAW's quick adoption of this Recommendation and looks forward to working with the Union to implement it.

**Monitor's Recommendation No. 15:** Joining and building on a recommendation made by Exiger, the Monitor recommends that the UAW provide specific additional training required for certain groups within the UAW (IEB members, Department Heads, and Department personnel) and create and maintain a tracker for mandatory periodic training listing the date/time/place of training, who attended the training, and who has failed to attend the training. This list should be maintained by the Education or Staff Development Department and forwarded to the Compliance Director and Compliance Department, and the UAW should create disciplinary actions for International officials and employees who fail to consistently attend mandatory trainings.

- **Union's Response:** The UAW agrees with this recommendation and intends to institute it.

- **Monitor's Reply**: The Monitor appreciates the UAW's quick adoption of this Recommendation and looks forward to working with the Union to implement it.

**Monitor's Recommendation No. 16:** The Monitor recommends that the UAW devote additional resources to training the existing staff and employees in the Accounting and Purchasing Departments to ensure they have the technical expertise to perform the responsibilities assigned to them, including responsibilities under the new and draft policies developed with input from Deloitte and the Recommendations contained in this Report. In particular, the UAW should:

(a) Prioritize role-specific training for existing staff who oversee Accounts Payable and Payroll, and administrative assistants and administrative accountants who are responsible for reviewing employee expenditures and vendor payments, to serve as an effective check on payments before they are made; any new hires into those positions should have formal accounting degrees, formal education in accounting, or substantial accounting experience;

(b) Prioritize role-specific training for personnel in the Purchasing Department with responsibilities under the Procurement Policy and these recommendations; evaluate whether additional hires are needed for the Purchasing Department, and if so, hire personnel who have significant experience with procurement and due diligence procedures;

(c) Develop and implement a plan within the next 30 days to provide formal, role-specific training to all Accounting and Purchasing Department staff and clerical employees; training should be completed within 90 days;

(d) Provide immediate, comprehensive, and in-person training on the T&E Policy to all Accounting Department personnel who did not receive in-person training;

105

(e) Provide comprehensive, in-person, role-specific training to all Accounting and Purchasing Department personnel on the draft Procurement Policy and related due diligence procedures contained in Recommendation No. 25 once they are finalized and implemented.

- **Union's Response:** The UAW agrees with this recommendation and intends to develop and implement training on the items identified in this recommendation on a timely basis, the precise timing of which depends on various factors.

- **Monitor's Reply:** The Monitor appreciates the UAW's quick adoption of this Recommendation and looks forward to working with the Union to implement it.

### d.   Budgeting

Engaging in a budgeting process allows an organization to set financial priorities, allocate resources according to those priorities, promote transparency around those priorities, and hold the organization's leaders accountable for their use of the organization's resources.[447]

Budgets also can help deter malfeasance. As the Union's consultant Exiger observed, the absence of a formal budgeting process "makes it difficult to accurately track spending and determine where wasteful/fraudulent spending occurs."[448] In other words, without a budget, it is easier to avoid scrutiny of wasteful and improper spending, like renting a villa for three months on the Union's dime.

The Monitor's interviews confirmed that, as of today, the President's Office, the Secretary-Treasurer's Office, and the senior staff and department heads within those divisions largely do not have a formal budgeting process to project and plan expenditures for the next fiscal year.[449] One Top Administrative Assistant in the President's Office confirmed that departments under his direction do not have traditional annual budgets or budgeting processes.[450] According to one Vice President, some discrete functions rely on traditional budgets to project their expenses for the year,

---

[447] Exiger Report at 19-20 (June 11, 2021).
[448] Exiger Report at 20 (June 11, 2021).
[449] President's Office, Senior Staff #2 Interview at 2-3; IEB Member Interview at 8; IEB Member Interview at 5-6; President's Office, Senior Staff #1 Interview at 3.
[450] President's Office, Senior Staff #1 Interview at 3.

but the use of a budget is ad hoc and not consistent across departments.[451]  And one IEB member

confirmed for the Monitor that the Regions do not receive a budget or have the opportunity to

make budgetary requests.[452]  Exiger flagged this issue in its report, noting that budgets will help

ensure that the Union acts as "a good steward of the dues" of its members.[453]

---

**Monitor's Recommendation No. 17:** Joining and building on a recommendation made by Exiger, the Monitor recommends that the UAW implement a formal budgeting process, starting no later than fiscal year 2023, for all International Union departments and regions on an annual basis in order to establish expected spending by department and region.

- **Union's Response:** The UAW is discussing this recommendation and agrees that some form of budget process is appropriate and is consulting with Exiger on this topic.

- **Monitor's Reply:** The Monitor considers the Union's Response to be a partial acceptance of this Recommendation.  The Monitor will work with the UAW to implement this Recommendation, and will report on the UAW's progress in the Monitor's next report.

---

### 3.    Internal Financial Controls

Among its financial reforms, the UAW, through the retention of Deloitte, has undertaken

a comprehensive internal controls assessment, which has resulted in advice and recommendations

on how to fill any control gaps.  The UAW, with support from Deloitte, has done very good work

to assess the state of the UAW's financial controls environment, identify where improvements are

needed, and begin the process of making those improvements.   Although the pace of the

remediation work has been in some circumstances too slow, to its credit, the UAW has

implemented a new Travel & Expense Policy, centralized accounting controls, and has committed

to implementing most of the Monitor's recommendations.  One area that needs prompt attention

is putting the necessary IT structures in place to allow for full implementation of the adopted

policies.

---

[451] IEB Member Interview at 8.
[452] IEB Member Interview at 5-6.
[453] Exiger Report at 20 (June 11, 2021).

### a.     Scope of Deloitte's Work

Beginning in 2019, a team of consultants from Deloitte's advisory services conducted an assessment of the UAW's internal financial controls by comparing them to best practices and leading industry standards.[454]   Deloitte then worked with the UAW to provide advice and recommendations around the development of policies and procedures to remediate the identified internal control gaps and deficiencies.[455]   Generally speaking, when a control environment fails as significantly as it did at the UAW, a root cause analysis is conducted to determine exactly what went wrong and how, so that reform of the control environment can occur with these failures in mind.   This would have included a forensic analysis of problematic transactions to determine how or why the Union's internal controls failed to detect and prevent the embezzlement and other abuses that led to the criminal convictions and civil complaint.[456]

Deloitte, apparently recognizing this standard, initially offered to perform a forensic analysis.[457]   That request was denied, with the Legal Department telling Deloitte that the UAW was already performing an internal investigation of past misconduct, as was the FBI.[458]   As such, the UAW did not want another third party involved in such a look back—Deloitte's scope was set at performing a current state assessment and "internal control gap analysis."[459]   At the UAW's direction, Deloitte thus proposed policies and control improvements to meet industry standards and best practices generally, instead of tailoring them to the specific failures that allowed the past

---

[454] One of the leading standards taken into account by Deloitte was the "COSO" framework (a framework to enhance internal controls sponsored by the Committee of Sponsoring Organizations of the Treadway Commission).  The COSO framework is intended to help organizations improve performance by developing thought leadership that enhances internal control, risk management, governance and fraud deterrence.

[455] Meeting with Deloitte at 5-6 (July 1, 2021).

[456] Meeting with Deloitte at 2, 19 (July 14, 2021).

[457] Meeting with Deloitte (Oct. 14, 2021).

[458] *Id.*

[459] *Id.*

criminal conduct to occur.[460]  In light of the absence of a comprehensive forensic analysis, the Monitor will conduct a targeted forensic analysis of certain historical transactions as part of its investigative and compliance mandates.

Although the UAW has developed a number of important policies, implementation has been, in certain areas, too slow.  As of October 26, 2021, 11 of the 13 new recommended policies were still in draft form pending approval by the IEB.

### Category 1 – IEB approved

| Policy | Status |
|---|---|
| **International Union, UAW Policy Framework** ("Policy Framework").  The Policy Framework sets forth guidelines for policy development, design, approval, and maintenance, and is intended to centralize and simplify the creation of new policies, including establishing guidelines for policy ownership and policy custodians.[461]  Previously, the UAW had existing formal and informal policies, not all of which were documented.[462] | Adopted by the IEB on April 28, 2021. |
| **Travel & Expense Reimbursement Policy** ("T&E Policy").  The T&E Policy applies to the applicability, review, approval, and exception process for policies and guidance regarding (1) credit card transactions and (2) travel and expense related transactions for all UAW employees.[463] | Adopted by the IEB on April 28, 2021. |

### Category 2 – Draft – Pending system changes to finalize & IEB approval

| Policy | Status |
|---|---|
| **Procurement Policy.**   The Procurement Policy provides guidelines and rules around processes related to the selection of | Drafted as of January 21, 2021.  Pending.  Policy |

---

[460] *Id.*
[461] Deloitte Introductory Presentation Deck at 7 (July 1, 2021).
[462] Meeting with Deloitte at 5 (July 1, 2021).
[463] Travel & Expense Reimbursement Policy § 1.

| | |
|---|---|
| vendors, purchase of goods and services, and authorization of payment approval for all entities that have International Union signatories and that implicate International Union funds. | completion is dependent on IT development. |
| **Department Purchasing Card ("P-Card") Policy.** The P-Card Policy applies to the applicability, review, approval, and exception processes relating to P-Card transactions, including the procurement of goods and services for the International Union. | Drafted as of January 21, 2021. Pending. Policy completion is dependent on IT development. |
| **Financial Close and Reporting Process ("FCRP") Policy.** The FCRP Policy provides guidelines and rules to all UAW personnel involved in the financial reporting process, which encompasses processes related to the generation of journal entries, closing of the general ledger each month, and review and issuance of financial statements. | Drafted as of April 15, 2021. Pending. |

**Category 3 – Draft – In development with management**

| Policy | Status |
|---|---|
| **IT Change Management Policy** (together with the IT Operations Policy and IT User Access Management Policy, the "IT Policies"). The IT Policies are intended to achieve several objectives: (1) protect UAW information from theft, loss, disclosure, or alteration through secure user access management; (2) ensure that only authorized individuals have the right amount of access to information or information systems; (3) document requirements and provide guidelines for effective implementation of IT operations; (4) establish and enforce a standard process for planning, testing, approving, implementing, and reporting changes; and (5) prevent or minimize risks to the UAW technology environment as a result of a "Change Request" being implemented.[464] | Drafted March 15, 2021. Pending. Policy completion is dependent on IT development. |
| **IT Operations Policy.** See above. | Drafted March 15, 2021. Pending. Policy completion is dependent on IT development. |

---

[464] Deloitte Introductory Presentation Deck at 6 (July 1, 2021).

| | |
|---|---|
| **IT User Access Management Policy.** See above. | Drafted March 15, 2021. Pending.  Policy completion is dependent on IT development. |
| **Benefits & Insurance Policy.**  The Benefits & Insurance Policy provides policy statements related to a number of processes, including: Health, Dental, Vision, Life & Disability and Other; Data Maintenance; Payment Approval/Authorization; Pensions; and 401(k). | Drafted as of May 24, 2021; revised as of October 29, 2021.[465]  Pending. |
| **Community Action Programs ("CAP") and Political Action Committees ("PAC") Policy.**  The CAP & PAC Policy applies to all CAP Councils & PACs, UAW personnel, local union members, and all other UAW parties who interact with UAW CAP & PAC funds, and provides policy statements as to a wide-array of CAP and PAC-related processes, including candidate endorsements, identification and approval of political disbursements, monitoring and recordkeeping, and more. | Drafted as of April 9, 2021. Pending. Policy completion is dependent on IT development. |
| **Fixed Assets Policy.** The Fixed Assets Policy provides rules and guidance around the fixed asset business cycle, which includes processes related to the acquisition of assets, management and maintenance of property, and review and approval of capital expenditures. | Drafted as of May 12, 2021; revised as of October 29, 2021.[466]  Pending. |
| **Payroll Policy.** The Payroll Policy provides rules and guidance around the payroll process, which encompasses process related to time reporting, maintenance of employee information, and disbursement of payroll and payroll-related items. | Drafted as of May 4, 2021; revised as of October 29, 2021.[467]  Pending. |

---

[465] On November 3, 2021, in response to receiving a draft of the Monitor's Report, the UAW informed the Monitor that the Benefits & Insurance Policy was revised as of October 29, 2021 and that refinements and iterations of review are still ongoing.

[466] On November 3, 2021, in response to receiving a draft of the Monitor's Report, the UAW informed the Monitor that the Fixed Assets Policy was revised as of October 29, 2021, and should be considered part of "Category 2."

[467] On November 3, 2021, in response to receiving a draft of the Monitor's Report, the UAW informed the Monitor that the Payroll Policy was revised as of October 29, 2021, and that it is "[p]ending only as to applicability to Black Lake."

| | |
|---|---|
| **Cash Policy.**  According to Deloitte, the Cash Policy provides rules and guidance around the payroll process, which encompasses process related to bank account management and cash management, recording, and reconciliations.  As of the date of this Report, the Monitor has not yet been provided with a copy of the draft Cash Policy. | Drafted as of October 29, 2021.  Pending only as to applicability to Black Lake. |

Over the last six months, the UAW, Deloitte, and the Monitor have held several meetings to discuss the draft policies, during which the Monitor has shared its views and feedback on the policies with Deloitte and the UAW.[468]  During those meetings and in related communications, the UAW has repeatedly told the Monitor that the outstanding draft policies have not yet been presented to the IEB for approval because they require IT systems that are not yet in place, or the policies are still undergoing revisions.[469]  The UAW was also apparently under the misimpression that it should not adopt the draft policies without detailed written feedback from the Monitor, even though the Monitor had provided extensive feedback at multiple meetings with the UAW and Deloitte and offered to provide additional written feedback.[470]  Most importantly, however, any misunderstanding has now been resolved and, as noted below, the UAW has indicated that it has accepted the Monitor's recommendation to act on the draft policies expeditiously.

Of course, the adoption of policies is only meaningful if they are effectively implemented. One barrier to implementation is that several of the policies depend on having a robust IT environment which does not yet exist.  The IT staff has recently reported to the Monitor that it is understaffed, even after hiring two programmers and engaging a former staff member as a

---

[468] Meeting with Deloitte (July 1, 2021); Meeting with Deloitte (July 14, 2021); Meeting with Deloitte (Sept. 1, 2021); Meeting with Deloitte (Oct. 6, 2021).

[469] Deloitte Introductory Presentation at 6 (July 1, 2021); Meeting with Deloitte at 15 (July 14, 2021); Meeting with Deloitte at 1-2 (Sept. 1, 2021); Meeting with Deloitte at 6-7 (Oct. 6, 2021); Meeting with Deloitte at 5 (Oct. 7, 2021).

[470] Meeting with Deloitte at 2 (Sept. 1, 2021).

consultant to focus on system upgrades that would support the policies.[471]  More importantly, as of October 26, 2021, the IEB had yet to give the green light for IT to move forward with the necessary upgrades, notwithstanding that the need to do so has been apparent for some time.

> **Monitor's Recommendation No. 18:** The Monitor recommends that, within 30 to 60 days of this Report, the UAW work with the Monitor and Deloitte to finalize the eleven remaining draft accounting and IT policies, and that the IEB subsequently vote on them, as well as on the IT upgrades necessary to allow their implementation.
>
> - **Union's Response:** The UAW agrees with this recommendation and intends to comply with it within approximately the next 30-60 days, as reasonable given the circumstances particular to each of the outstanding draft policies.
>
> - **Monitor's Reply:** The Monitor appreciates the UAW's quick adoption of this Recommendation and looks forward to working with the Union to implement it.

Despite these delays, the Union has made some significant progress.  The balance of this section describes the UAW's efforts to enhance internal financial controls in areas most relevant to the misconduct underlying the Consent Decree: (a) the reimbursement of employee expenditures; (b) the Union's process for selecting vendors; and (c) the Union's process for approving expenditures, whether to reimburse employee expenses or pay vendors.

### b.      Reimbursement of Employee Expenditures

### 1)      Background

Former UAW officials pled guilty to a series of crimes wherein they apparently took advantage of gaps in the UAW's expenditures systems, including exploitation of the UAW's processes to hide improper expenditures.[472]  Improper expenses of UAW officials for "off-site rooms" and "off-site functions" might have been detected and stopped in a more robust controls

---

[471] Secretary-Treasurer's Office, Senior Staff #4 Interview at 4.

[472] DOJ, Press Release, *Former International UAW President Gary Jones Sentenced to Prison for Embezzling Union Funds* (June 10, 2021).

environment.[473]  So too might more stringent and more centralized procedures have detected the

duplicate receipts submitted by now-convicted UAW leaders.[474]

Deloitte's work included a review of the Union's expense reimbursement process.  Deloitte

identified in its written reports, called "process narratives," a number of high-risk control gaps and

deficiencies around the reimbursement of employee expenditures, including:

- The UAW provided International Union staff with credit cards, but the Union did not have adequate controls around authorized users, approvers, spending limits, or guidance regarding what constitutes a valid business purpose for expenses charged to the credit cards.[475]

- The UAW had no delegation of authority rules for who could approve credit card charges, meaning that subordinates could and did approve charges made by their direct supervisors.[476]

Overall, Deloitte's process narrative stated that the UAW's employee expense policies were "not

robust enough to determine what is and what is not a valid business purpose thus leaving too much

to judgement both in terms of what is submitted and what the reviewer is assessing as valid

business purpose."[477]

Deloitte listed those control gaps and deficiencies as creating a high risk that non-approved

or improper expenses could be reimbursed.[478]

### 2)     UAW's Remedial Efforts

To its credit, the Union has taken a number of significant steps to address these issues.

---

[473] Vance Pearson, Criminal Complaint ¶ 28 (Sept. 12, 2019) ("Pearson Complaint").

[474] Edward Robinson, Plea ¶¶ 10, 12, 17 (Mar. 2, 2020) ("Robinson Plea"); Anti-Fraud Complaint ¶ 13(c), *United States v. Int'l Union, United Automobile, Aerospace, and Agricultural Implement Workers of America* (Dec. 14, 2020), Civil No. 20-cv-13293 (E.D. Mich.), ECF No. 1 ("Compl.").

[475] Payroll Process Narrative (Pay-10) at 7-9 (UAW-Mon_001750-52).

[476] Payroll Process Narrative (Pay-10) at 9 (UAW-Mon_001752).

[477] *Id.*

[478] Payroll Risk and Control Matrix and Deficiency Listing (Pay-10 Deficiency Description and Risk Ranking) at 1 (UAW-Mon_001756).

**Centralized Reimbursement Platform.**   One of the most significant improvements adopted to enhance controls around the reimbursement of employee expenditures is the new requirement that all employee expenses be submitted through a centralized, electronic expense review platform (called "Concur"), including expenses incurred by officials and staff in the Regions.[479]  This process should detect duplicate receipts that are included in the system because all employee expenditures, even those incurred by Regional employees, are ultimately reviewed by staff in the Accounting Department before they are processed for reimbursement.  However, many of the Regional CAP and political action committee ("PAC") accounts currently remain under the control of the Regions, and have not yet been transferred to the control of the International Union.[480]  As a result, a corrupt Regional official would still have an avenue to obtain one reimbursement from the International Union and obtain a duplicate reimbursement from the regional CAP and PAC account for the same expense, conduct for which Edward "Nick" Robinson was ultimately convicted.[481]  As described above, the UAW has a draft policy in development to enhance controls around CAP and PAC accounts by ensuring all financial activity related to CAP and PAC accounts are recorded, monitored, and reported in a consistent manner across the International Union.[482]

**Credit Cards**.  Reimbursements are subject to a new T&E Policy that was implemented by the UAW on April 28, 2021, and will be subject to a Department Purchasing Card Policy (when

---

[479] Emails from Chief Accountant to Monitor (Oct. 7-8, 2021).

[480] Chief Accountant Interview at 14; Meeting with Deloitte at 5 (Oct. 6, 2021).

[481] UAW Statement on the Sentencing of Former Member Nick Robinson at 1 (UAW-Mon_002613) (Jan. 27, 2021).

[482] Draft Community Action Programs ("CAP") & Political Action Committees ("PAC") Policy (Apr. 9, 2021) ("Draft CAP & PAC Policy"); Deloitte Policy Discussion at 4 (UAW-Mon_002887) (Oct. 6, 2021). The UAW has also developed a plan of action, with support from Deloitte, to centralize oversight of the regional CAP and PAC accounts, but that plan has not yet been implemented, in part due to needed IT system enhancements.  Deloitte Policy Discussion at 4 (UAW-Mon_002887) (Oct. 6, 2021).

implemented), which, taken together, define the parameters for use of UAW-issued credit cards, clarify what are appropriate and legitimate business expenditures, and impose greater documentation and approval requirements.

The T&E Policy and draft Department Purchasing Card Policy set forth rules for the use of UAW-issued credit cards, including credit limits and acceptable charges on the cards.  Various cards are available to different union personnel, each with different features:

- **P-Cards.**  "P-Cards" are for "frequent purchases of low-dollar items for day-to-day activities" of the UAW, like event organizing expenses, approved charitable donations, small parts for maintenance repair, educational expenses, or non-employee travel expenses.[483]

- **Corporate Cards.**  Corporate Cards are for "legitimate union business that is directly related to the goals and mission of the union,"[484] and "*must be used* for all travel or other business-related expenses in connection with UAW business."[485]

- **Enhanced Corporate Cards.**  "Enhanced Corporate Cards" are available to IEB and Senior Administrative Staff, and allow for increased credit limits that are "based on the employee's role in the organization."[486]  Enhanced Corporate Card holders can use their cards to purchase first class airline tickets for business travel of more than 200 miles for themselves and their senior staff;[487] use them for business meals that do not exceed $150 per person,[488] or for "reasonable" alcohol costs (although not "excessive" alcohol costs);[489] and make business entertainment purchases "with prior approval from the appropriate Officer or IEB member."[490]

The Secretary-Treasurer "or their designee" has broad authority under the policies for deciding who has access to which type of card, approving account changes to these cards

---

[483] Draft Department Purchasing Card Policy §§ 4, 21, 23 (Jan. 21, 2021).

[484] Travel & Expense Reimbursement Policy § 9 (Apr. 28, 2021).

[485] Travel & Expense Reimbursement Policy § 8 (emphasis in original).

[486] Travel & Expense Reimbursement Policy § 14.

[487] Travel & Expense Reimbursement Policy §§ 63-67.

[488] Travel & Expense Reimbursement Policy § 85.

[489] Travel & Expense Reimbursement Policy § 86.

[490] Travel & Expense Reimbursement Policy § 91.

(including credit limit increases), and determining when cards should be revoked or terminated.[491] Both the draft Department Purchasing Card Policy and the T&E Policy state that no UAW-issued card may be used for "prohibited" charges:  these include wire transfers and cash advances, property rentals, dating and escort services, massage parlors, lotteries, and gambling transactions.[492]

**Non-Credit Card Expenses.**  Not all employee-related travel and expenses must go through UAW-issued credit cards.  For example, UAW staff and officials may be reimbursed for expenses paid in cash or charged to a personal credit card, if the expenses include itemized receipts and articulate a legitimate business purpose.[493]

**Master Billing Arrangements.**  The T&E Policy also contemplates that lodging for certain events, like employee attendance at conferences, may be paid with "Master Billing Arrangements" instead of being charged to an individual employee's corporate card.[494]  The T&E Policy does not define or describe how Master Billing Arrangements should work, but the UAW has indicated that Master Billing Arrangements will go through the purchase order process described in the draft Procurement Policy once it is implemented.[495]

**Documentation.**  UAW's policies require documentation to support reimbursement of employee expenses, including itemized receipts and a detailed description of the business purpose for the expense, which are then reviewed by personnel in the Accounting Department (as discussed further below).  The policies direct Accounting to reject submissions that fail to adequately document the business purpose, and state that repeated instances of noncompliance may result in

---

[491] Travel & Expense Reimbursement Policy §§ 26-27; Draft Department Purchasing Card Policy § 15.
[492] Draft Department Purchasing Card Policy § 28; Travel & Expense Reimbursement Policy § 15.
[493] Travel & Expense Reimbursement Policy § 13.
[494] Travel & Expense Reimbursement Policy § 73.
[495] Meeting with Deloitte at 7-8 (Sept. 1, 2021).

disciplinary action for both the employee submitting the report and the reviewer who approved it.[496]

The Chief Accountant told the Monitor that, as employees adjust to the new policy, there have been some instances of UAW personnel providing insufficient support for expense reimbursements.[497] Similarly, a senior staff member who reviews and approves expense reports told the Monitor that they had sent a dozen requests back, including to Regional Directors, and said they would not be processed if the backup information was insufficient or the payment request form was not filled out properly.[498] The Chief Accountant reported that, in every instance, the insufficient description was identified to the submitter and corrected. It is commendable that Accounting staff is robustly enforcing these new policies.[499]

**Monitoring.** To enforce compliance with the policies, both the T&E Policy and the draft Department Purchasing Card Policy state that "all expenses are subject to periodic monitoring and/or audit for compliance with UAW policies," but they do not state who will do that monitoring or how it will be conducted.[500] As described above, the UAW does not have a centralized compliance function or a dedicated compliance officer. Internal Audit has planned an audit of senior officials' expenditures for 2022.[501]

> **Monitor's Recommendation No. 19:** The Monitor recommends that the UAW revise the T&E Policy to clarify the scope of "Master Billing Arrangements" under the policy, and/or develop an implementing procedure for Master Billing Arrangements, and expressly require that all expenses submitted under Master Billing Arrangements include itemized receipts and supporting documentation.

---

[496] Email from Chief Accountant to Monitor (Oct. 8, 2021); Travel & Expense Reimbursement Policy § 41; Draft Purchasing Card Policy § 35.
[497] Chief Accountant Interview at 9-10.
[498] President's Office, Senior Staff #2 Interview at 5-6.
[499] Chief Accountant Interview at 9-10.
[500] Travel & Expense Reimbursement Policy § 122; Department Purchasing Card Policy § 44.
[501] 2021-2022 UAW Audit Plan, 2021 Audit Schedule at 1 (UAW-Mon_002965).

- **Union's Response:** The UAW agrees with this recommendation and intends to institute it, to the extent this has not already been instituted.

- **Monitor's Reply:** The Monitor appreciates the UAW's quick adoption of this Recommendation and looks forward to working with the Union to implement it.

**Monitor's Recommendation No. 20:** The Monitor recommends that the newly-created Compliance Department conduct periodic risk-based reviews, as part of its monitoring responsibilities, of compliance with the T&E Policy and the draft Department Purchasing Card Policy.  The review should the following:

(a)  Expenditures on Corporate Cards, Enhanced Corporate Cards, and P-Cards;

(b)  First-class airline ticket use under the T&E Policy;

(c)  Alcohol purchases;

(d)  Business entertainment;

(e)  Employee-related travel and expenses paid in cash or charged to personal cards;

(f)  Master Billing Arrangements;

(g)  Documentation of the legitimate business purpose supporting reimbursement of expenses under the T&E Policy and the draft Department Purchasing Card Policy

- **Union's Response:** The UAW agrees with this recommendation and intends to institute it.

- **Monitor's Reply:** The Monitor appreciates the UAW's quick adoption of this Recommendation and looks forward to working with the Union to implement it.

**Monitor's Recommendation No. 21:** The Monitor recommends that the Compliance Department conduct quarterly reviews of changes to UAW-issued corporate cards approved by the Secretary-Treasurer under the T&E Policy and the draft Department Purchasing Card Policy, including the Secretary-Treasurer's approval of new card users and credit limit increases.

- **Union's Response:** The UAW agrees with this recommendation and intends to conduct such reviews at least semi-annually, depending on available resources and the advice of its auditors.

- **Monitor's Reply:** The Monitor appreciates the UAW's quick adoption of this Recommendation and looks forward to working with the Union to implement it.

**Monitor's Recommendation No. 22:** Joining and building on a recommendation made by Exiger, the Monitor recommends that the UAW centralize oversight of the Regional CAPs, including centralizing the reporting of all Regional CAP and PAC activity and contributions as part of the recommended Compliance and Ethics Committee.  In the interim, oversight of improvements to the Regional CAP and PAC activities, including implementation of the UAW's draft policy on

119

CAPs and PACs and the UAW's "plan of action" on CAPs and PACs, should be overseen by a subcommittee of the IEB per Recommendation No. 6.

- **Union's Response:** The UAW agrees with this recommendation and intends to institute it.

- **Monitor's Reply:** The Monitor appreciates the UAW's quick adoption of this Recommendation and looks forward to working with the Union to implement it.

### c.    Vendor Selection Process

### 1)    Background

Several senior Union officials pleaded guilty to fraud and embezzlement of the GM training center by taking advantage of the lax vendor selection process there[502] to obtain massive kickbacks from vendors in exchange for awarding the vendors inflated contracts.[503]

Although that conduct occurred at a training center, and not at the UAW, the Union must be on guard against similar embezzlement schemes, and the current vendor selection process has flaws that need to be addressed, which the UAW has already recognized through Deloitte's internal controls assessment.   The assessment found that the UAW's current three-bid policy is not consistently being enforced,[504] has no set criteria to select vendors, and does not specify the kinds of purchases that must undergo the three-bid process.[505]   The current three-bid policy also does not define who is required to review and approve the bids to ensure the appropriate vendor is selected.[506]   Instead, secretaries and bookkeepers in the regions—who have varying skills and backgrounds—carry out the three-bid process.[507]   In its work for the Union, Exiger made similar observations about gaps and deficiencies in the UAW's vendor selection process.[508]

---

[502] Ashton Plea at 1-2; Michael Grimes, Grimes Plea at 1-2; Jeffery Pietrzyk, Plea Agreement at 1-2 (Oct. 22, 2019) ("Pietrzyk Plea").

[503] Ashton Information at 2-9; Grimes Information at 2-14.

[504] Disbursements Process Narrative (Control Deficiency (DISB-2)) at 3 (UAW-Mon_001578).

[505] *Id.*

[506] *Id.*

[507] Disbursements Design Evaluation DISB-2 (UAW-Mon_001558).

[508] Exiger Report at 54 (June 11, 2021).

The internal controls assessment also found that the UAW currently does not have any process to determine whether existing or proposed vendors have a potential conflict of interest with the UAW.  For example, a vendor should not be selected merely because its owner or manager has a personal relationship with someone at the UAW.[509]  The UAW also currently does not perform background checks or conduct any other due diligence on new or existing vendors.[510]  It only requires vendors to provide a W-9 in order to receive payments.[511]

### 2)      UAW's Remedial Efforts

Deloitte has recommended that the UAW take steps to remediate the issues identified in its findings by adopting a new "Procurement Policy."  That policy was drafted in January 2021, but has not yet been approved by the IEB or implemented.[512]  The Procurement Policy goes a long way to addressing the issues that Deloitte identified, though additional measures would help the UAW mitigate the risks of potential financial malfeasance through its vendor relationships.

The UAW has explained that it currently lacks the IT infrastructure to fully implement the policy,[513] and has not yet approved several IT-related policies that are needed in order to accomplish those changes.  In response to a draft of this Report, the UAW informed the Monitor that a number of challenges related to IT will impact the Union's ability to effectively implement some of the IT and procurement policies.  These include attracting and retaining qualified

---

[509] Meeting with Deloitte at 9 (July 14, 2021); Disbursements Risk and Control Matrix and Deficiency Listing (Control Gap (DISB-3)) at 1 (UAW-Mon_001584).

[510] Meeting with Deloitte at 9-10 (July 14, 2021).

[511] *Id.*

[512] The Accounting Department has also been reviewing and cleaning up the Union's "vendor master file," a list of nearly 170,000 persons or entities receiving payments from the Union or providing services to the Union.  The Chief Accountant told the Monitor that the vendor master file is very outdated and includes duplicate vendors and vendors that have not worked with the Union for years.  The Union requested IRS Form W-9 from vendors in the system that did not have one on file with the UAW.  *See* Meeting with Deloitte at 10-11, 16-17 (July 14, 2021); Chief Accountant Interview at 11-12.

[513] Meeting with Deloitte at 6 (Oct. 6, 2021).

personnel to support a severely understaffed IT department, dealing with custom IT systems that are not fully documented, and replacing a key IT department employee who had been with the Union for more than 25 years after that employee's abrupt retirement.  The UAW informed the Monitor that, despite those challenges, the Union has made significant progress on developing a technology tool with purchase order capability to effectively implement the procurement policy and will continue to act expeditiously to implement the other pending policies, as soon as practical.

---

**Monitor's Recommendation No. 23:** The Monitor recommends that the IEB promptly approve the expenditures necessary to upgrade or enhance the UAW's existing IT platforms to support the new accounting and IT policies, and provide a timeline by which the policies should be operationalized.  Such upgrades should take into account the cost and practicality of the proposed solution.

- **Union's Response:** The UAW intends to expeditiously address the IT issues and enhancements that are necessary to implement the compliance policies/enhancements that have been approved, taking into account the cost and practicality of the proposed solution.

- **Monitor's Reply:** The Monitor appreciates the UAW's quick adoption of this Recommendation and looks forward to working with the Union to implement it.

---

**Competitive Bidding.**  If adopted, the Procurement Policy would generally require the Union to engage in competitive bidding, but would also allow awarding contracts without competitive bidding, referred to as a "sole source" selection, in "certain circumstances."[514]  Under the Policy, the determination of what bid to accept would be made by the employee requesting the purchase,[515] who must document the analysis they used to select the winning vendor, and upon awarding the contract, to provide that documentation to Purchasing.[516]  Depending on the nature of the contract and its dollar value, additional approvals may be required, as discussed below.  Purchasing is responsible under the Policy for verifying the appropriateness of procurement

---

[514] Draft Procurement Policy § 35.  A "sole source" contract generally refers to a contract that was obtained from one vendor or bid without any competitive bid process.
[515] Draft Procurement Policy § 36.
[516] Draft Procurement Policy §§ 36, 48-49.

documentation.[517]  In discussions with the Monitor, the UAW and Deloitte indicated that they still needed to clarify the timing and scope of Purchasing's review responsibilities in the vendor selection process, including whether and when Purchasing was expected to perform a substantive review of proposed new vendors.[518]  Unlike the T&E Policy which expressly contemplates periodic monitoring and/or auditing of expenses for compliance with the UAW's policies,[519] the draft Procurement Policy does not include a process to conduct periodic checks or audits of vendor selection decisions.

> **Monitor's Recommendation No. 24:** The Monitor recommends that the UAW work with the Monitor and Deloitte to clarify the role of Purchasing in reviewing and/or approving vendors under the Procurement Policy, taking into account staffing and resources.
>
> - **Union's Response:** The UAW agrees to work with Deloitte and the Monitor on this recommendation and intends to institute it.
>
> - **Monitor's Reply:** The Monitor appreciates the UAW's quick adoption of this Recommendation and looks forward to working with the Union to implement it.

**Due Diligence.**  Once a vendor is selected, but before the contract is awarded, the draft Procurement Policy would require due diligence "to determine if the vendor is 'responsible,' meaning the vendor has the capability, capacity, and financial stability" to deliver the goods or services the UAW has requested.[520]  Once again, it is the employee requesting the purchase who would conduct the due diligence and "may consult with Purchasing to lead the vendor due diligence analysis."[521]  The due diligence performed on the vendor consists of obtaining and verifying certain basic information about the vendor, such as the vendor's legal entity name and

---

[517] Draft Procurement Policy § 49.
[518] Meeting with Deloitte at 10-11 (Oct. 6, 2021).
[519] Travel & Expense Reimbursement Policy § 122.
[520] Draft Procurement Policy § 42.
[521] Draft Procurement Policy § 42.

contact details, the vendor's tax or employee identification number, and similar information.[522]  It does not, for example, require prospective vendors who have substantial business with the UAW to disclose their owners or key employees to determine whether they may have been engaged in past misconduct, including misconduct relating to the Union, or may be "barred persons" under the Consent Decree.

---

**Monitor's Recommendation No. 25:** The Monitor recommends that the UAW work with the Monitor and Deloitte to develop a risk-based due diligence procedure to support the Procurement Policy and identify potential high risk vendors and "barred persons" under the Consent Decree, while mitigating the risk of financial misconduct in the procurement process.

- **Union's Response:** The UAW agrees to work with Deloitte and the Monitor on this recommendation and intends to institute it.

- **Monitor's Reply:** The Monitor appreciates the UAW's quick adoption of this Recommendation and looks forward to working with the Union to implement it.

**Monitor's Recommendation No. 26:** The Monitor recommends that the Compliance Department perform periodic risk-based monitoring of vendor relationships, including sole source contracts.

- **Union's Response:** The UAW agrees with this recommendation and intends to institute it.

- **Monitor's Reply:** The Monitor appreciates the UAW's quick adoption of this Recommendation and looks forward to working with the Union to implement it.

**Monitor's Recommendation No. 27:** Joining and building on a recommendation made by Exiger, the Monitor recommends that the UAW develop and maintain a list of all prohibited or terminated third parties, vendors, and "barred persons" as required under the Consent Decree.

- **Union's Response:** The UAW agrees with this recommendation and intends to institute it.

- **Monitor's Reply:** The Monitor appreciates the UAW's quick adoption of this Recommendation and looks forward to working with the Union to implement it.

---

**Conflicts of Interest.**   The draft Procurement Policy, if implemented, would require prospective vendors to provide a "certification regarding potential organizational or personal conflict[s] of interest."[523]   Under the draft process, the conflict of interest certification is a self-

---

[522] Draft Procurement Policy § 43.
[523] Draft Procurement Policy § 43; Meeting with Deloitte at 17-18 (July 14, 2021).

certification:  the vendor either affirmatively discloses that it has a conflict of interest or represents to the UAW that it does not have one.[524]  The draft process does not require vendors who have substantial contracts with the Union to provide information that would allow the UAW to make its own assessment of potential conflicts of interest.[525]

The UAW has not yet implemented the conflict of interest certification process.[526]

> **Monitor's Recommendation No. 28:** The Monitor recommends that the UAW work with the Monitor and Deloitte to develop a risk-based procedure to supplement the conflict of interest self-certification in the Procurement Policy.
>
> - **Union's Response:** The UAW agrees to work with Deloitte and the Monitor on this recommendation and intends to institute it.
>
> - **Monitor's Reply:** The Monitor appreciates the UAW's quick adoption of this Recommendation and looks forward to working with the Union to implement it.

### d.    Approval for Expenditures

### 1)    Background

Regardless of whether an expenditure of Union funds is for an employee reimbursement or pursuant to a vendor contract, the appropriate personnel at the Union are supposed to approve all disbursement of funds.  In the past, former UAW officials obtained approval for personal expenditures by submitting fraudulent payment request forms to the UAW's Accounting Department.  Although conferences, leadership receptions, or off-property housing or banquets were listed as the purported purpose for many requests, the forms fraudulently concealed the true purpose of the disbursements, which was to divert UAW funds for personal gain.[527]

---

[524] Meeting with Deloitte at 17-18 (July 14, 2021).

[525] *Id.*

[526] Meeting with Deloitte at 10, 17 (July 14, 2021); Chief Accountant Interview at 11-12.

[527] Gary Jones, Second Superseding Information at 12 (Feb. 27, 2020) ("Jones Information"); Pearson Complaint, at 13-16.

The internal controls assessment of approval processes conducted by Deloitte found that the Union's controls around approving expenditures—whether employee reimbursement or vendor contracts—were either deficient or non-existent.[528]  Deloitte's process narratives stated the Union had "no formalized policy" for approving purchases from third parties, creating risk that inappropriate expenditures would not be detected until after the payment was approved.[529]  The process narratives also stated that the Union lacked clear rules for whose approval was required to approve what kinds of expenditures.[530]  Without rules that restrict to whom approval authority may be delegated, the person submitting the expense could have his direct subordinate approve his expenses.[531]  The process narratives further stated that the Union had "no independent governance, monitoring and approval over leadership/executive expenditures."[532]  As a result, the Union did not have controls to ensure that expenditures initiated by senior leaders, whether incurred for their own travel or to pay a UAW vendor, received appropriate scrutiny.

### 2)      UAW's Remedial Efforts

The Union has taken a number of important steps to address deficiencies around the approval processes for expense reimbursements and vendor purchases, although several other measures recommended by Deloitte are unfinished.

**T&E Policy.**  As noted above, in April 2021 the IEB approved a new T&E Policy, which includes express review and approval requirements for the reimbursement of employee travel and related expenses.  For example, the T&E Policy requires that an employee's supervisor, in addition

---

[528] Disbursements Process Narrative at 2-3 (UAW-Mon_001577-78); Payroll Process Narrative at 7-10 (UAW-Mon_001745).

[529] Disbursements Process Narrative at 3 (UAW-Mon_001578); Meeting with Deloitte at 6 (July 14, 2021).

[530] Disbursements Process Narrative (Design Deficiency (DISB-SH-5) and Design Deficiency (DISB-R-5)) at 4-5 (UAW-Mon_001579-80).

[531] *Id.*; Payroll Process Narrative at 9 (UAW-Mon_001752).

[532] Disbursements Process Narrative (Control Gap (DISB-17)) at 7 (UAW-Mon_001582); Payroll Process Narrative (Control Gap (DISB-17)) at 9 (UAW-Mon_001752).

to a member of the payroll department in Accounting, review and approve the employee's expense report.[533]  The T&E Policy does not specify who should review and approve expenses incurred by elected officials of the UAW— the President, Secretary-Treasurer, the three Vice Presidents, and the Regional Directors.  The UAW, however, implemented an approval process in the Concur system that routes these officials' expenditures to the designated approvers.[534]  It will fall to Internal Audit, as part of its upcoming audit of executive expenditures, to assess whether approvers are appropriately exercising their approval authority.[535]

**Procurement Policy.**   The draft Procurement Policy includes various approval requirements that, if implemented, would bring greater scrutiny to purchasing decisions beyond employee related travel and expenses.  For example, under the draft Policy most purchases from third parties who provide services to the International Union would require a purchase order and advance approval, subject to certain exceptions, rather than deferring approval until after the purchase is made.[536]

The Policy would also impose new requirements that certain expenditures be approved by "authorized signers," but does not specify who these "authorized signers" are.[537]  Instead, the Union relies on a confusing, decentralized system of authorization that renders it difficult to audit or oversee, with multiple lists of signers in various locations that do not specify who is authorized to approve expenditures for whom.[538]

---

[533] Travel & Expense Reimbursement Policy § 120.

[534] Meeting with Deloitte at 7 (Oct. 6, 2021); Concur Travel and Expense Approval Process (UAW-Mon_003671-72) (Nov. 2, 2021).

[535] Meeting with Deloitte at 7-8 (Oct. 6, 2021); Internal Audit Plan at 1 (UAW-Mon_002966).

[536] Meeting with Deloitte at 16 (July 14, 2021); Draft Procurement Policy § 19.

[537] Draft Procurement Policy §§ 10, 14, 19, 32-33.

[538] Draft Procurement Policy §10; Authorized Signers for Disbursements from Political Action Funds (including V-CAP, National CAP, National PAC, Michigan CAP, Michigan V-PAC, Regional CAP Funds, and CFCG) (UAW-Mon_002529-39); Draft Delegation of Authority Matrix (UAW-Mon_002283) (Dec. 10, 2020).

**Monitor's Recommendation No. 29:** Joining and building on a recommendation made by Exiger, the Monitor recommends that, to avoid potential conflicts of interest and undue influence, the UAW should generally prohibit staff and employees who have approval authority from approving the activities of their supervisors, unless narrow exceptions are necessary. Approvals under those exceptions should be reviewed by the Compliance Department.[539] In addition, the UAW should centralize the list of "authorized signers," and the Compliance Department should periodically review the list of authorized signers and monitor how UAW officials delegate their approval authority.

- **Union's Response:** The UAW agrees with this recommendation and intends to implement whatever parts of it have not already been implemented.

- **Monitor's Reply:** The Monitor appreciates the UAW's quick adoption of this Recommendation and looks forward to working with the Union to implement it.

### E.   Reporting, Investigation, and Discipline of Misconduct

An important part of an organization's ability to encourage a compliant culture is its ability to identify and investigate misconduct within its ranks, and to impose appropriate discipline when misconduct is confirmed to have occurred. A key part of the Monitor's mandate is the oversight of discipline at the UAW. This section provides an overview of the state of the processes at the International Union to identify, investigate, and discipline misconduct.

### 1.   Ethics Hotline

UAW personnel can report certain instances of suspected misconduct through an "Ethics Hotline" set up in 2020. Reports to the Ethics Hotline are reviewed and investigated by Exiger, in its separate role as the UAW's Ethics Ombudsman,[540] and investigative findings are sent to the UAW's Ethics Officer, Wilma Liebman.[541]

---

[539] Exiger Report at 18 (June 11, 2021).
[540] UAW Ethics Hotline Overview at 2 (Aug. 19, 2021). The online reporting function is available at http://www.lighthouse-services.com/uaw.
[541] UAW Ethics Hotline Overview at 2, 5 (Aug. 19, 2021).

### a.     Reporting to the Ethics Hotline

On November 15, 2019, then-President Gamble announced ethics reforms that included the creation of the UAW Ethics Hotline,[542] which was formally launched on March 31, 2020.[543] Leading up to the launch, the UAW engaged in a variety of efforts to promote the Ethics Hotline. On March 31, 2020, then-President Gamble provided a public statement touting the UAW's "series of ethics reforms," including "a confidential ethics hotline system, which will be screened and investigated by a highly experienced third-party Compliance and Ethics investigative firm."[544] Gamble added that the UAW's implementation of ethics reforms "mark[ed] an important step in the progress of [the UAW's] ethics reform agenda and underline [the UAW's] unwavering pledge to [the UAW's] members that their Union is committed to operating at the highest level of integrity on their behalf."[545]  Today, the Union continues to promote the Ethics Hotline as "protect[ing] the UAW and its members by promoting business integrity and transparency."[546]

Separate and apart from the Exiger Report described above, Exiger also operates the Ethics Hotline for the UAW and serves as the UAW's "Ethics Ombudsman."[547]  As Ethics Ombudsman, Exiger is responsible for screening and investigating reports received through the Ethics Hotline with the oversight of the UAW's Ethics Officer.[548]  According to the UAW, the Ethics Officer "is empowered to investigate allegations, complaints, or matters referred to her by Exiger or otherwise, and to hold hearings at her discretion."[549]   The Ethics Officer, Liebman, is well

---

[542] Message to Members from Rory Gamble on Reforms at 2 (UAW-Mon_002660) (Nov. 15, 2019).

[543] *UAW Implements Ethics Reform Priorities with Hiring of First-Ever Ethics Officer and Activation of Confidential Ethics Hotline*, UAW (Mar. 31, 2020), https://uaw.org/uaw-implements-ethics-reform-priorities-hiring-first-ever-ethics-officer-activation-confidential-ethics-hotline/.

[544] Statement from Rory Gamble (UAW-Mon_002552) (Mar. 31, 2020).

[545] Statement from Rory Gamble (UAW-Mon_002552) (Mar. 31, 2020).

[546] UAW Ethics Hotline FAQs at 1 (UAW-Mon_Exiger_000014).

[547] UAW Ethics Hotline Overview at 2 (Aug. 19, 2021).

[548] UAW Ethics Hotline Overview at 2 (Aug. 19, 2021).

[549] UAW Ethics Hotline FAQs at 5 (UAW-Mon_Exiger_000018).

qualified for the role: among other accomplishments in her career, she previously was a member of the National Labor Relations Board ("NLRB") from 1997-2009, and served as its Chair from 2009-2011.[550]

According to a set of "Frequently Asked Questions" ("FAQs") and the "Ethics Hotline Overview" prepared by Exiger and published by the Union, any UAW member, staff, official, employee, member of an associated Local Union, or third party may report ethical concerns to the Ethics Hotline related to fraud, financial mismanagement, racial or sexual harassment or discrimination, or improper use of Union resources by UAW International officials, staff, or employees.[551] The FAQs and Ethics Hotline Overview provide examples of the types of issues that should be reported to the hotline including: misuse of Union funds, kickbacks or bribery, conflicts of interest, fraud, malfeasance related to accounting, auditing or internal controls, racial or sexual harassment or discrimination, and "other violations of the Ethical Practices Code or Administrative Letters."[552]

The UAW includes information about the Ethics Hotline on its website. The website includes links to an Ethics Hotline Overview, FAQs about the Ethics Hotline, and an online form to submit complaints.[553] The Ethics Hotline is available 24 hours a day and 7 days a week.

The Union promotes the Hotline as confidential, but not necessarily anonymous.[554] In practice, "confidential" means that Exiger will disclose each report and the identity of the person who made the report to the Ethics Officer,[555] who has discretion to disclose reports to the UAW

---

[550] *Overall Reforms, Establishment of a UAW Ethics Officer*, UAW, https://uaw.org/ethics/.

[551] UAW Ethics Hotline Overview at 2 (Aug. 19, 2021); UAW Ethics Hotline FAQs at 2-3 (UAW-Mon_Exiger_0000015-16).

[552] UAW Ethics Hotline FAQs at 2-3 (UAW-Mon_Exiger_000014-15); UAW Ethics Hotline Overview at 4 (Aug. 19, 2021).

[553] *UAW Ethics Reforms*, UAW, https://uaw.org/ethics/.

[554] Exiger Report at 59 (June 11, 2021); UAW Ethics Hotline Overview at 4 (Aug. 19, 2021).

[555] UAW Ethics Hotline FAQs at 5 (UAW-Mon_Exiger_000018).

International's General Counsel or their designee, if the Ethics Officer concludes that disclosure "is necessary to ensure that the International Union can fully investigate, discharge its legal and fiduciary duties, and review its operations as necessary."[556]  The Ethics Officer has informed the Monitor that Exiger does not routinely notify the General Counsel of incoming reports and most incidents reported to the Hotline are never shared with the General Counsel.[557]  When they are shared, the Ethics Officer provides only a description of the incident, and not the report itself or the identity of the person making the report, unless the reporter has waived confidentiality.[558]  For those making a report by phone, they must provide their identity and contact information, and the toll-free phone service is staffed with non-UAW third-party employees from Lighthouse Services who serve as Report Intake Specialists.[559]

Although the Ethics Hotline has been described by some as a very positive development,[560] the UAW must strive to overcome a degree of skepticism surrounding it.[561]  Unfortunately, some employees have described the Ethics Hotline as a "joke" and said they would not use it to report concerns out of a misplaced fear that their names would be conveyed to UAW leadership.[562] Senior officials have recognized that employees question the trustworthiness of the Ethics Hotline, in part due to confidentiality concerns and "PTSD" from experiences under prior "toxic" administrations.[563]  Other senior officials reported to the Monitor that they cannot yet answer whether staff will utilize the Ethics Hotline or view it as a viable avenue for reporting, though they

---

[556] UAW Ethics Hotline FAQs at 4-5 (UAW-Mon_Exiger_000017-18).
[557] Email from Wilma Liebman, External Ethics Officer, to Monitor (Oct. 26, 2021).
[558] *Id.*
[559] *Id.*; UAW Ethics Hotline Policy and Procedure at 3, 7 (UAW-Mon_Exiger_000055, 59) (Aug. 19, 2021).
[560] IEB Member Interview at 6.
[561] Accounting Department, Employee #12 Interview at 6.
[562] *Id.*; Accounting Department, Employee #13 Interview at 3-4.
[563] *See* President's Office, Senior Staff #2 Interview at 5; IEB Member Interview at 7; IEB Member Interview at 2.

noted that they are aware that some staff members feel uncomfortable reporting through the Hotline.[564]  Nonetheless, one employee stated that calls to the Hotline are not anonymous, and misperceived that the Hotline was run by attorneys for the UAW who will "side with the UAW."[565] One employee told the Monitor that they did not think anyone at the UAW would believe concerns raised by clerical employees given the nature of UAW's culture.[566]  This employee said that they were "blacklisted" for speaking up years ago, and feels that the same thing could happen today because the UAW still "is not a place where you can say anything like that."[567]  Another employee said for similar reasons that no clerical employee "would ever use the hotline."[568]  It is imperative that the UAW counter these misperceptions about the hotline.

> **Monitor's Recommendation No. 30:** The Monitor recommends that IEB officials, senior staff, and department heads invite the Ethics Officer to speak to their teams about the Ethics Hotline to address concerns about the Hotline, as well as other measures to better promote and educate members about the hotline.
>
> - **Union's Response:** The UAW agrees with this recommendation, and indeed the UAW has already invited the Ethics Officer and Ethics Ombudsman to speak to various groups of UAW personnel and a number of those presentation have already occurred.  We intend to continue this practice.
>
> - **Monitor's Reply:** The Monitor appreciates the UAW's quick adoption of this Recommendation and looks forward to working with the Union to implement it.

### b.    The Investigative Process for the Ethics Hotline

When a report if made to the Ethics Hotline, it is investigated.  To conduct investigations, Exiger engages in a fact gathering process, which may include interviews and document review.[569] Throughout the investigation, Exiger provides updates to the Ethics Officer on the status of the

---

[564] IEB Member Interview at 3.
[565] Accounting Department, Employee #12 Interview at 6.
[566] Accounting Department, Employee #13 Interview at 4.
[567] Accounting Department, Employee #13 Interview at 6.
[568] Accounting Department, Employee #12 Interview at 6.
[569] UAW Ethics Hotline: Year 1 Report at 6 (UAW-Mon_Exiger_000149) (Aug. 16, 2021); UAW Ethics Hotline FAQs at 7 (UAW-Mon_Exiger_000020).

investigation.[570]  The Ethics Officer may determine that a report warrants further investigation or can be closed based on the results of the investigation or unresponsiveness by the reporter.[571]

Once the Ethics Officer determines that a report can be closed, Exiger and the Ethics Officer prepare a response letter describing the final outcome of the investigation and the steps taken to reach the conclusion.[572]

If the Ethics Officer were to find that an actionable violation occurred, the Ethics Officer has discretion to prepare a report and recommendation—"directed to the official or entity with responsibility over the person(s) who engaged in the violation"—to consider taking remedial measures or discipline.[573]  Even where the Ethics Officer concludes no disciplinary action is warranted, she can send a report to "the appropriate UAW authority" describing any systemic issues identified in the investigation, or making recommendations for policy or procedure changes to avoid future misconduct.[574]  The "appropriate UAW authority" is not defined in the Ethics Hotline materials, but examples are given, including the IEB, the President, or the General Counsel.[575]  As of October 26, 2021, no such violations have been reported.[576]

On August 16 and 17, 2021, Exiger issued an "Ethics Hotline: Year 1" report and an "Ethics Hotline: Year 2" report describing the volume and nature of reports made to the Ethics Hotline and Exiger's investigation of them.[577]  Exiger also recently provided the Monitor with copies of all reports received to-date, with the names of those making the tip redacted, as well as Exiger's

---

[570] UAW Ethics Hotline FAQs at 8 (UAW-Mon_Exiger_000021).
[571] UAW Ethics Hotline: Year 1 Report at 6 (UAW-Mon_Exiger_000149) (Aug. 16, 2021).
[572] *Id.*
[573] UAW Ethics Hotline FAQs at 8 (UAW-Mon_Exiger_000021).
[574] *Id.*; UAW Ethics Hotline Policy and Procedure at 3 (UAW-Mon_Exiger_000055) (July 26, 2021); UAW Ethics Hotline Overview at 5 (Aug. 19, 2021).
[575] UAW Ethics Hotline FAQs at 6 (UAW-Mon_Exiger_000019).
[576] Exiger Ethics Hotline Log (Oct. 15, 2021).
[577] UAW Ethics Hotline: Year 1 Report (UAW-Mon_Exiger_000144-75) (Aug. 16, 2021); UAW Ethics Hotline: Year 2 Report (UAW-Mon_Exiger_000176-94) (Aug. 17, 2021).

report log that tracks Exiger's handling of each report.[578]  The Monitor will perform a review of the Hotline and cover its results in a subsequent report.

One investigation conducted by Exiger resulted in a recommendation from the Ethics Officer to the IEB.[579]  A reporter alleged conflict of interest concerns regarding Gary Jones voting on his own paid leave of absence when he was still President.[580]  Although the investigation concluded that no ethical violation occurred, the Ethics Officer recommended that the IEB adopt a conflict of interest policy to address an officer's ability to vote on questions of pecuniary and financial personal interest.[581]  The IEB voted to adopt such a policy.[582]

## 2. Other Avenues for Reporting and Investigations

Outside of the Ethics Hotline, UAW employees may report concerns through other means such as talking to a supervisor, the Human Resources Department, the Legal Department, or the Monitor.  The process of investigation at the Union depends on how the report comes in.

### a. Reporting Outside the Ethics Hotline

In addition to the Hotline, UAW staff and employees may also report potentially unethical conduct "to resources closest to the situation, such as the person's supervisor or boss."[583]

One such avenue is the Legal Department.  There is no description available to employees as to what types of concerns should be raised to it,[584] although the Ethics Hotline FAQs generally state that UAW officials, staff, and employees "may be able to address their concerns (depending

---

[578] Exiger Hotline Log (Oct. 22, 2021); Exiger Master Report Log (July 31, 2021).
[579] UAW Ethics Hotline: Year 1 Report at 6-7 (UAW-Mon_Exiger_000149-50) (Aug. 16, 2021); Ethics Officer Interview (July 6, 2021).
[580] UAW Ethics Hotline: Year 1 Report at 6 (UAW-Mon_Exiger_000149-50) (Aug. 16, 2021).
[581] UAW Ethics Hotline: Year 1 Report at 7 (UAW-Mon_Exiger_000149-50) (Aug. 16, 2021).
[582] *Id.*; Conflict of Interest Policy (UAW-Mon_003076).
[583] UAW Ethics Hotline FAQs at 2 (UAW-Mon_Exiger_000015).
[584] *Id.*

on the nature) to the UAW International Legal Department."[585]  The FAQs also state that concerns related to harassment or discrimination other than sexual or racial harassment and discrimination should be directed to Legal or Human Resources,[586] although not many employees use the Human Resources route.[587]  According to the UAW, the Legal Department will often involve the Human Resources Department when complaints come to the Legal Department.

UAW employees, from top officials to clerical workers, have shared negative feedback regarding the viability of reporting misconduct or concerns to the UAW's Human Resources or Legal Departments, which echo the concerns described above regarding confidentiality and fear of retaliation.  One employee said they would "never" reach out to Human Resources with concerns; nor would the employee raise concerns to the Legal Department because the employee "did not think it would be confidential."[588]  A senior official characterized Human Resources as "not strong enough for the job" and acknowledged that employees are "probably not wrong" to be concerned that senior officials will retaliate against employees who say something bad about them.[589]  The senior official recounted how, years ago, upon receiving a report from a UAW employee that a member of the IEB was engaged in sexual harassment, a reaction from Human Resources was to describe the harasser as a "nice guy."[590]

Exiger observed similar deficiencies in the robustness of the UAW's reporting processes to Human Resources and the Legal Department and cited an "unhealthy culture" and fear of retaliation that has chilled employees from raising concerns.[591]  It too reported that "multiple staff

---

[585] *Id.*
[586] UAW Ethics Hotline FAQs at 3 (UAW-Mon_Exiger_000016).
[587] Human Resources Department, Employee #1 Interview at 5; Exiger Report at 60-61 (June 11, 2021).
[588] Accounting Department, Employee #13 Interview at 3-4.
[589] IEB Member Interview at 10, 13.
[590] IEB Member Interview at 13.
[591] Exiger Report at 27-28 (June 11, 2021).

and officials" told Exiger that "ignoring issues that have been raised, fear of retaliation and unequal enforcement of disciplinary violations at the UAW International have been a persistent problem."[592]

---

**Monitor's Recommendation No. 31:** Joining and building on a recommendation made by Exiger, the Monitor recommends that the UAW publicize the different avenues for members, officials, staff and employees to report misconduct at the International level, including reference to the Monitor's own hotline. IEB officials should provide clear and consistent communications about avenues to report concerns, including outside the "chain of command," and directly to the Compliance Director and/or the Compliance and Ethics Committee, once they are in place.

- **Union's Response:** The UAW agrees with this recommendation, has taken a number of steps to implement this already, and intends to institute it.

- **Monitor's Reply:** The Monitor appreciates the UAW's quick adoption of this Recommendation and looks forward to working with the Union to implement it.

**Monitor's Recommendation No. 32:** Joining and building on a recommendation made by Exiger, the Monitor recommends that the UAW clearly state that it will strictly enforce non-retaliation against a good faith claimant, referring back to the newly created policy on non-retaliation.

- **Union's Response:** The UAW agrees with this recommendation, has already instituted it, and intends to continue reinforcing this message.

- **Monitor's Reply:** The Monitor appreciates the UAW's quick adoption of this Recommendation and looks forward to working with the Union to implement it.

---

**b.    Investigative Process of Complaints Outside the Ethics Hotline**

The International Union does not have a written investigative process or documented procedure for how it investigates reports that are raised outside of the Ethics Hotline.[593]

According to the Director of Human Resources, when a complaint comes to her attention, she works with the relevant department head to interview the employees involved, including the person reporting the concern and the individuals accused of wrongdoing.[594] The department heads sit in on the interviews, and sometimes someone from UAW leadership and/or a member from the

---

[592] Exiger Report at 28 (June 11, 2021).
[593] Human Resources Department, Employee #1 Interview at 5-6.
[594] *Id.*

UAW Legal Department attends as well.[595]  The Director said that she takes notes during the interviews and saves them, then prepares an investigation summary.[596]  Human Resources does not have any policy on how to conduct interviews, and during her tenure at the UAW, the Director has not received training on how to conduct investigations.[597]

**Monitor's Recommendation No. 33:** Joining and building on a recommendation made by Exiger, the Monitor recommends that the UAW create and track information on compliance-related complaints made to the UAW and the ultimate resolution, and to require all departments and regions to track and log all complaints related to the UAW that were determined to be credible, and how they were disciplined.

- **Union's Response:** The UAW agrees with this recommendation and the IEB recently adopted this recommendation at the October IEB Meeting.

- **Monitor's Reply:** The Monitor commends the UAW for the measures it adopted on October 28, 2021, but notes that the measures adopted on October 28 do not encompass the entire scope of this Recommendation, including that the UAW require all departments and regions to track and log all complaints related to the UAW that were determined to be credible, and how they were addressed.  The Monitor reads the Union's Response to reflect its acceptance of this Recommendation, and the Monitor will work with the UAW to implement measures that address the Recommendation's full scope.

**Monitor's Recommendation No. 34:** Joining and building on a recommendation made by Exiger, the Monitor recommends that the UAW devote adequate resources to investigations, including resources in the Compliance Department who can conduct investigations in consultation with the Legal Department as needed.

- **Union's Response:** The UAW agrees with this recommendation and will determine the appropriate personnel/resources to conduct investigations given the nature of the complaint being addressed.

- **Monitor's Reply:** The Monitor will work with the UAW to fully implement this Recommendation, including helping it to determine the appropriate personnel and resources to conduct investigations, and will report on the UAW's progress in the Monitor's next report.

**Monitor's Recommendation No. 35:** Joining and building on a recommendation made by Exiger, the Monitor recommends that the UAW train relevant personnel on how to handle intake of misconduct allegations.

---

[595] *Id.*
[596] *Id.*
[597] *See id.*

- **Union's Response:** The UAW agrees with this recommendation and intends to institute it.

- **Monitor's Reply:** The Monitor appreciates the UAW's quick adoption of this Recommendation and looks forward to working with the Union to implement it.

### 3.     Discipline

The UAW Constitution provides that discipline is determined either by the President or pursuant to procedures outlined in Articles 30 and 31, depending on the circumstances.  For example, the President may withdraw any field assignment made to any elected official when he becomes convinced that the officer "has been derelict in her/his duty or been guilty of a dishonest act."[598]  The President may remove from payroll any International Representative who is "derelict in the performance of any duty, guilty of any dishonest act, or to conserve the finances of th[e] International Union, pending the approval of the International Executive Board at its next session."[599]  Under Articles 30 and 31 of the UAW Constitution, there are specific procedures to charge and punish alleged violations of the UAW Constitution or "conduct unbecoming a member of the Union."[600]

Article 30 describes the process to bring charges against and conduct trials of International Officers and IEB members; Article 31 sets forth the process for other Union members.[601]  The UAW used these constitutional provisions to charge and punish a number of former UAW officials and staff members who were criminally charged following the government investigation (or used the threat of such charges to obtain resignation), including: Gary Jones, Dennis Williams, Vance Pearson, Joseph Ashton, Norwood Jewell, Edward "Nick" Robinson, Nancy Johnson, Jeffrey

---

[598] UAW Const., art. 13, § 4.
[599] UAW Const., art. 13, § 5.
[600] UAW Const., arts. 30, 31.
[601] *Id.*

Pietrzyk, Michael Grimes, Keith Mickens, and Virdell King.[602] That process was also used to initiate harassment charges against Richard Rankin, then-Director of Region 2B and an IEB member, before the matter was subsequently settled with his resignation from the Union.[603]

In most instances, according to the Director of Human Resources, the President makes the final decision related to discipline.[604] For matters investigated by Human Resources, the Director prepares disciplinary recommendations, which she documents in the investigation summary document and presents to the President.[605] Once the President makes a decision regarding discipline, Human Resources documents the decision in the same Excel spreadsheet the Director uses to track reports.[606]

On the topic of discipline, Exiger found an absence of a formal, consistent disciplinary process and a perception that the UAW does not mete out discipline in fair and consistent ways. For example, Exiger observed that members of the IEB, the President, Regional Directors and other senior leaders in positions of authority are not constrained by any written disciplinary policies and instead "have wide latitude on disciplinary measures."[607] Exiger recounted how one employee said violations of ethical standards are "pushed aside and not remediated" and provided an example of how an individual accused of sexual harassment was simply moved to another region and allowed to retire, rather than subject to discipline.[608] One senior administrative

---

[602] *Id.*; UAW Executive Board Files Article 31 Charges to Expel Former Officers and Staff Who Have Been Convicted of Criminal and Unethical Conduct (UAW-Mon_002587-88) (Jan. 31, 2020); UAW Executive Board Files Article 30 Charges Against Gary Jones and Vance Pearson (UAW-Mon_002585) (Nov. 20, 2019); Statement on the Conviction and Sentencing of Former UAW Member and President Dennis Williams (UAW-Mon_002571-72) (May 11, 2021).

[603] Article 30 Charges against Richard Rankin (UAW-Mon_002889-92) (Mar. 30, 2020); Joint Statement of the UAW and Director Richard Rankin (UAW-Mon_002559-60) (Aug. 4, 2020).

[604] Human Resources Department, Employee #1 Interview at 6.

[605] *Id.*

[606] *Id.*

[607] Exiger Report at 28 (June 11, 2021).

[608] *Id.*

assistant similarly told the Monitor that, when credible allegations of misconduct were brought to the attention of UAW officials in the past, the leadership "swept it under the carpet."[609]   Exiger found that "the lack of clear policies and procedures leads to inconsistent, and ad- hoc messaging, a lack of transparency and unreliable access to disciplinary decisions."[610]

Exiger's report also included recommendations to create policies and procedures around a disciplinary process that includes defined parameters for discipline; consistent application of discipline; and which will assign the role of memorializing, tracking, and monitoring disciplinary actions and communicating disciplinary decisions to a to-be-created compliance department.[611]

**Monitor's Recommendation No. 36:** The Monitor adopts Exiger's recommendation that the UAW issue a policy or communication via the Ethics section of the UAW website, discussing consequences for failure to comply with the UAW Ethical Practices Codes, other policy requirements, and the disciplinary process.

- **Union's Response:** The UAW agrees with this recommendation and intends to institute it.

- **Monitor's Reply:** The Monitor appreciates the UAW's quick adoption of this Recommendation and looks forward to working with the Union to implement it.

**Monitor's Recommendation No. 37:** The Monitor adopts Exiger's recommendation that the UAW include an explicit non-retaliation statement within a Code of Conduct (or expanded Ethical Practices Code recommended by Exiger) that provides examples of retaliation and a statement on disciplinary action for retaliation.   The non-retaliation and disciplinary message should be reiterated in applicable policies, such as the UAW's EEO Policy and the UAW No Harassment and Discrimination Policy, and provide that retaliation will be an offense for which penalties may include termination and expulsion.

- **Union's Response:** The UAW agrees with this recommendation, has already reiterated this policy, and intends to continue to do so.

- **Monitor's Reply:** The Monitor appreciates the UAW's quick adoption of this Recommendation and looks forward to working with the Union to implement it.

---

[609] President's Office, Senior Staff #2 Interview at 4.
[610] Exiger Report at 29 (June 11, 2021).
[611] *Id.*

**Monitor's Recommendation No. 38:** Joining and building on a recommendation made by Exiger, the Monitor recommends that the UAW create policies and procedures outlining the misconduct reporting and investigation process to include the following:

(a) A requirement to inform the Compliance Department of any allegations of misconduct, even those that have been resolved at a department or regional level;

(b) Explain the entire investigatory process when misconduct is alleged, and likely time frame;

(c) Tracking and review of whether individuals who lodged complaints were subsequently terminated or demoted as a retaliatory measure; and

(d) A statement that personnel chosen to conduct investigations must be qualified and impartial.

- **Union's Response:** The UAW agrees with the substance of this recommendation and intends to institute that substance.  There are not always ways to set a specified timeframe for how long an investigation will take, and there are also privacy concerns or collective bargaining issues that arise in various investigations which preclude the sharing of certain information, thus those items will likely be taken on a case-by-case basis, which we understand Exiger agrees is appropriate.

- **Monitor's Reply:** The Monitor appreciates the UAW's quick adoption of this Recommendation and looks forward to working with the Union to implement it, including helping it to determine the appropriate investigative process where privacy or collective bargaining issues are at issue, and will report on the UAW's progress in the Monitor's next report.

\* \* \*

The work of the Monitor reviewing the potential areas for compliance improvements is not complete after six months.  In the ensuing period, the Monitor will be examining, among other things, resolution of reports to the Ethics Hotline, the UAW's progress on recommendations and policies, the continued development of the Internal Audit Department, anticipated audit reports for the balance of 2021 and first quarter of 2022 from Internal Audit, the details of the compliance environment and controls around the joint training centers, the Union's Strike and Defense Fund, CAP and PAC accounts, regional activity funds, and so-called "flower funds."  The Monitor will report on those areas as this work is completed.

III.    **INVESTIGATIONS**

As detailed above, in the past several years, eleven former officials, including some at the highest levels of the UAW, have pleaded guilty to charges of corruption, fraud, and other misconduct involving the misuse and theft of Union or joint training center funds. Those judicial resolutions followed years of investigation and fact gathering by DOJ, but they did not necessarily resolve every instance of actual or suspected misconduct that occurred within the UAW. As a result of the government's investigation, the UAW agreed in the Consent Decree that "further cooperative efforts, subject to judicial supervision and assistance as outlined in th[e] consent decree, are necessary and appropriate."[612]

Under the Consent Decree, the Monitor has the responsibility to undertake investigative efforts to identify and address misconduct at the Union. As detailed below, that broad imperative requires the Monitor to investigate and address both *past* misconduct that may have not yet been addressed by DOJ's criminal prosecutions, as well as misconduct that occurs *during* the monitorship.

The Consent Decree provides various tools to accomplish that assignment. For instance, it gives the Monitor the power to compel the production of documents and testimony from Union officers and employees, as well as from third parties. In addition to the Consent Decree, the Monitor's investigations team has taken its own steps to enforce its mandate, including the establishment of a hotline to receive information from Union members and the public about potential misconduct. Beyond that, the Monitor has received significant cooperation from DOJ. Among other things, DOJ has provided the Monitor with certain secret grand jury materials from

---

[612] Consent Decree at 1-2.

its prior investigations pursuant to an Order entered by the Court, so that the Monitor can use the evidence gathered in those prior government efforts in its own investigations.

The Monitor also has access to investigative material from the UAW itself.  Although the UAW's response to the Monitor's request for certain documents and information was unfortunately delayed, after the UAW recently made a series of productions, the process of obtaining evidence from the UAW may now be on the right track.  To date, the Monitor has concluded one investigation and has opened 15 others that are currently underway.

This Part describes the work that the Monitor has done so far pursuant to the Consent Decree's investigative mandate, and specifically the groundwork the Monitor has laid for pursuing cases of misconduct at the Union.  First, it outlines the scope of misconduct that the Monitor has jurisdiction over and the procedures for bringing charges concerning alleged misconduct.  Second, it identifies the investigatory tools at the Monitor's disposal.  Third, it describes the status of the investigations that have been undertaken by the Monitor since entry of the Consent Decree, including a referral the Monitor has made to the Union's Ethics Officer.

## A.    Scope of the Monitor's Investigative Mandate

Under the Consent Decree, the Monitor has the authority to investigate suspected misconduct at the UAW and commence charges based on that misconduct.  A range of individuals affiliated with the UAW are included within the scope of this charging authority, including "any UAW International officer, representative, agent, member, employee or person holding a position of trust in the UAW, its constituent entities, or any employee benefit plan, labor management cooperation committee or voluntary employee beneficiary association in which such person acts

143

on behalf of the UAW or its constituent entities, as well as officers of local unions who are also members of the UAW."[613]

The scope of the Monitor's charging authority depends, however, on *when* the conduct in question occurred.  The Monitor can charge the following kinds of conduct *regardless of when it occurred*:

- Violating "any criminal law involving the establishment or operation of a labor organization, employee benefit plan, labor management cooperation committee, or voluntary employee beneficiary association."[614]  This includes, but is not limited to:

  - Embezzling Union assets as an officer or employee;[615]

  - Requesting, accepting, or agreeing to accept anything of value from an employer or its representative;[616]

  - Willfully making false statements or entries in the Union's financial reports filed annually with the Secretary of Labor;[617] and

  - As related to employee benefit plans, receiving or agreeing to receive fees, kickbacks, commission, gifts, loans, money, or other thing of value with intent to be influenced with respect to that plan.[618]

In addition, the Monitor can also charge the following conduct, but *only if it occurred after* entry of the Consent Decree:

- Engaging in (or conspiring to engage in) any federal crime;[619]

- Knowingly associating with a Barred Person (unless for permitted reasons), permitting a Barred Person to exercise influence over the affairs of the UAW or its constituent entities, or furthering the direct or indirect influence of any Barred Person or the threat of such influence;[620] or

---

[613] Consent Decree ¶ 29.

[614] *Id.*

[615] 29 U.S.C. § 501.

[616] 29 U.S.C. § 186.

[617] 29 U.S.C. § 431(b).

[618] 18 U.S.C. § 1954.

[619] Consent Decree ¶¶ 18-19, 29.

[620] Consent Decree ¶¶ 18, 20-21, 29.

- Obstructing or interfering with the Monitor's or the Adjudication Officer's work.[621]

Regarding the second prong, a "Barred Person" is defined in the Consent Decree as:

- Any of the eleven UAW officials who pleaded guilty to offenses underlying the Consent Decree (Joseph Ashton, Michael Grimes, Norwood Jewell, Nancy Johnson, Gary Jones, Virdell King, Keith Mickens, Vance Pearson, Jeffrey Pietrzyk, Edward "Nick" Robinson, and Dennis Williams);

- "[A]ny convicted individual currently prohibited from serving in an office or employment by 29 U.S.C. § 504 or 29 U.S.C. § 1111;"[622]

- "[A]ny person enjoined from serving in a prohibited position or employment with a labor organization, employer association, employee benefit plan or as a consultant to such organizations;"

- "[A]ny person who is a member of a criminal group designated by the Federal Bureau of Investigation;" and

- Any person designated as barred from the Union by the Monitor, under the disciplinary processes set forth in the Consent Decree.[623]

The Monitor has multiple ways to seek adjudication of misconduct that falls within the scope of this charging authority. The Monitor can initiate formal charges before either the Court-appointed Adjudications Officer or a Trial Committee convened under the UAW Constitution.[624] The Monitor can also refer matters, regardless of whether the Monitor has jurisdiction over them, to the IEB for consideration of other discipline under the UAW Constitution, or to the Union's Ethics Officer, who, among other things, can consider recommending discipline to the IEB.[625]

---

[621] Consent Decree ¶¶ 18, 29. These categories of misconduct are largely captured by the Consent Decree's "injunctive prohibitions," violations of which the Monitor is authorized to investigate and charge. *Id.*

[622] As pertinent, these statutes prohibit individuals with certain convictions from holding certain positions in labor organizations and employee benefit plans within a 13-year period after such conviction or the end of imprisonment therefor. 29 U.S.C. §§ 504, 1111.

[623] Consent Decree ¶ 20.

[624] Consent Decree ¶¶ 29-30. The Consent Decree also details the procedures for each method of bringing charges. Consent Decree ¶¶ 36-44.

[625] Consent Decree ¶¶ 22, 28, 30; UAW Const., arts. 30-31.

The Monitor can also choose to refer the matter to DOJ for it to consider criminal charges.[626]  In instances in which the Monitor chooses to bring its own charges, it may seek to "discipline, remove, suspend, expel, fine or forfeit the benefits (with the exception of vested employee retirement benefits)" of the charged UAW official, employee, or member.[627]

In addition to this charging authority, the Monitor has the power to disapprove the hiring, appointment, reassignment, or discharge of any person or business entity by the UAW or its constituent entities, and to disapprove or terminate any commercial contract, lease, or other obligation of the UAW or its constituent entities, if the Monitor believes that such action would violate the injunctive prohibitions of the Consent Decree, violate certain state and/or federal laws, or further the influence of a Barred Person.[628]

## B.    Investigatory Tools

The Consent Decree gives the Monitor certain powers in carrying out its investigative mandate, including enlisting the UAW to provide its "cooperative efforts" in support of such investigations.[629]  This section describes the Monitor's efforts to date to harness these resources.

### 1.    Grand Jury and Other Government Investigative Material

As noted above, the Consent Decree followed on the heels of years of investigation by DOJ into wrongdoing at the Union.  In June 2021, the Court gave DOJ permission to share certain grand jury materials that would typically remain secret under Federal Rule of Criminal Procedure 6(e).[630] As a result, DOJ has provided the Monitor with grand jury materials—including more than 100

---

[626] Consent Decree ¶ 60.
[627] Consent Decree ¶¶ 29, 42-43.
[628] Consent Decree ¶ 32.  The prohibition against associating with Barred Persons is detailed elsewhere in the Consent Decree.  Consent Decree ¶¶ 18, 20-21.
[629] Consent Decree at 1-2.
[630] Order Granting in Part Government's Unopposed Motion to Authorize Disclosure of Grand Jury Materials, *United States v. Int'l Union, United Automobile, Aerospace, and Agricultural Implement Workers of America* (June 7, 2021), Civil No. 20-cv-13293 (E.D. Mich.), ECF No. 36.

grand jury witness transcripts and myriad other documents—from its closed investigations into misconduct at the UAW.  DOJ has also provided the Monitor with other investigative materials not covered by Rule 6(e), including more than 100 reports of witness interviews conducted during DOJ's investigation and, with court approval, more than a dozen copies of sealed search warrant applications.  Prosecutors from the U.S. Attorney's Office and federal law enforcement agents have also met with the Monitor's team on several occasions to provide information about past misconduct.  The cooperation of DOJ and the federal law enforcement agencies who conducted the investigation into the UAW has been extraordinary.

In early September, the Monitor received nearly 700,000 documents from DOJ's closed investigations.  Since that date, the Monitor's team has been conducting targeted searches through this repository of materials for evidence of potential past misconduct that was not previously charged, and will continue to review these materials for use in ongoing and future investigations.

Additionally, OLMS provided the Monitor with investigatory documents, transcripts of phone calls, and other leads that OLMS believes could be of interest to the Monitor.  The lead OLMS investigator continues to provide such information to the Monitor as OLMS obtains further leads.

### 2.    Union Investigative Material

Over the past several years, as concerns over corruption arose, the UAW retained outside counsel to represent the Union in the government's inquiry into the misconduct underlying the Consent Decree.  As part of that representation, the UAW's outside counsel interviewed UAW personnel and collected and reviewed documents relevant to the government's inquiry.

At the outset of the monitorship, the Monitor met with the UAW's outside counsel, who provided an overview of the facts of the prosecuted criminal conduct.[631]

In July 2021, the Monitor requested documents and information from the Union's own review, as well as information relating to other allegations known and investigations undertaken by the Union on issues concerning the Monitor's investigative mandate, including those into misconduct at the Local Union level.[632]   The Monitor requested this information because it is relevant to several of the Monitor's open investigations, and because it would prevent the inefficiencies and waste of Union resources that would result if the Monitor had to repeat the work already done by the UAW's outside counsel.

Following a period of delay, on October 13, 2021, the UAW produced the requested information and documents to the Monitor, or came to a workable accommodation of the Monitor's requests, after multiple requests in the interim.[633]   That production included a list of investigations regarding misconduct at Local Unions, as well as a list of individuals interviewed by the UAW in connection with the government's investigation.[634]

The Monitor has also worked to receive investigative information from the Union in a manner that accommodates the Union's assertion of the work product protection concerning its outside counsel's investigative files.   The Union's outside counsel has expressed concern that

---

[631] Meeting with UAW Outside Counsel and UAW General Counsel at 1-7 (May 24, 2021).

[632] Email from Monitor to UAW Outside Counsel and UAW General Counsel (July 27, 2021).

[633] Email from Monitor to UAW Outside Counsel (Aug. 23, 2021) (reiterating Investigations Related Information & Document Requests, dated July 27, 2021); Email from Monitor to UAW Outside Counsel (Aug. 26, 2021) (same); Email from Monitor to UAW Outside Counsel (Sept. 3, 2021) (same); Email from Monitor to UAW Outside Counsel UAW General Counsel (Sept. 9, 2021) (transmitting request tracker and requesting call to discuss unfulfilled compliance and investigations requests); Email from Monitor to UAW Outside Counsel and UAW General Counsel (Sept. 21, 2021) (same); Letter from Monitor to UAW President and UAW General Counsel (Sept. 30, 2021); Email from UAW Outside Counsel to Monitor (Oct. 13, 2021).

[634] Email from UAW Outside Counsel to Monitor (Oct. 13, 2021).

sharing certain information from its investigation could be construed as a waiver of certain privileges. To accommodate this concern, the Monitor supported the Union's effort to seek from the Court an Order pursuant to Federal Rule of Evidence 502(d), which allows the Union to provide the Monitor with privileged or other legally protected material without that production constituting a waiver of the privilege or protection.[635] On August 11, 2021, the Court granted that Order.[636] That Order generally requires the Monitor to keep such information confidential, but does permit the Monitor to disclose privileged information when the Monitor determines that such disclosure is "necessary for the fulfillment of his duties as set forth in the Consent Decree."[637]

Notwithstanding this effort, the UAW has still declined to produce certain documents to the Monitor, asserting privilege over particular efforts it undertook in its internal review, such as outside counsel's notes of interviews of certain UAW employees.[638] As an accommodation, the Monitor agreed, in lieu of reviewing those notes, to participate in sessions with an attorney representing the UAW during which the attorney will summarize the interviews.[639]

### 3.    Voluntary Interviews and Document Collection

The Monitor can obtain information by interviewing witnesses willing to talk to the Monitor and collecting their documents, and the Monitor has begun doing so. For example, the Monitor's investigations team members have conducted voluntary investigative interviews, including with witnesses who have been cooperating with DOJ's criminal investigations. And after the Monitor receives outside counsel's summaries of the interviews conducted as part of the

---

[635] Order Granting Defendant's Unopposed Motion for Order Governing Disclosure of Privileged Materials, *United States v. Int'l Union, United Automobile, Aerospace, and Agricultural Implement Workers of America* (Aug. 11, 2021), Civil No. 20-cv-13293, ECF No. 40.
[636] *Id.*
[637] *Id.*
[638] Email from UAW Outside Counsel, to Monitor (Oct. 13, 2021).
[639] Meeting with UAW Outside Counsel at 2 (Oct. 27, 2021).

UAW's own investigation, the Monitor will then be able to move forward with scheduling investigative interviews of other UAW personnel as well. The Monitor expects that process to go smoothly, given the excellent level of cooperation the Monitor has received from the UAW in scheduling compliance interviews, as discussed in Part II of this Report.

### 4.     Subpoenas

The Consent Decree gives the Monitor the authority to issue subpoenas for testimony or for documentary or other evidence.[640] The Monitor may enforce those subpoenas by initiating disciplinary procedures or by seeking an order from the Court.[641] As of October 26, 2021, the Monitor has not used this authority and has instead been able to convince third parties to voluntarily provide information. If voluntary cooperation were to become insufficient to obtain necessary information, however, the Monitor would rely on this subpoena power to obtain documents and testimony.

### 5.     UAW Ethics Hotline

The UAW has established an Ethics Hotline, which is currently staffed by the Union's consultant, Exiger. According to the UAW website, "[t]he Ethics Hotline is available to officials, staff, and employees of the UAW International, members of associated Local Unions, and third parties who work with or have professional interactions with UAW International officials, staff, and employees, such as vendors, contractors, and partners,"[642] to report ethical concerns, including

---

[640] Consent Decree ¶ 39.
[641] *Id.*
[642] UAW Ethics Hotline FAQs (UAW-Mon_Exiger_000014-21).

concerns of "[f]raud," "[f]inancial mismanagement," or the "[i]mproper use of Union resources by UAW International officials, staff, or employees."[643]

The Monitor requested from the Union the reports that had already been made to the Ethics Hotline, as well as—going forward—the reports in real time, so that the Monitor can decide when and whether to follow up on any complaints or tips.[644]  The Monitor first requested these reports on July 27, 2021,[645] but it was not until October 6, 2021, that Exiger provided all of the past underlying reports to the Monitor.[646]  Exiger is now providing the reports on a weekly basis.[647]

### 6.  Monitor's Hotline

The Monitor's team has also established its own email and voicemail hotlines through which individuals can—among other things—provide tips and complaints about potential misconduct at the UAW.  The contact information for these hotlines is posted on the Monitor's website—which went live on August 13, 2021—at https://www.uawmonitor.com/contact.  One of the hotlines is focused on the UAW Referendum (which is detailed further in Part IV of this Report) and other elections-related concerns; the other, "general" hotline is meant to allow UAW members and other members of the public to contact the Monitor with any question, concern, tip, or complaint that does not pertain to the Referendum or other elections matters.

Members have used both hotlines for both purposes.  The Monitor's hotlines together have received approximately 2,400 communications as of October 26, 2021, including approximately 500 to the general hotline.  Assisted by a consultant, the Monitor's team has and will continue to

---

[643] UAW Ethics Hotline Overview at 2 (Aug. 19, 2021).

[644] Email from Monitor to UAW General Counsel and UAW Outside Counsel (July 27, 2021) (attaching document requests).

[645] *Id.*

[646] Email from Flora Tartakovsky, Exiger Director, to Monitor (Oct. 1, 2021); Email from Flora Tartakovsky, Exiger Director, to Monitor (Oct. 6, 2021).

[647] Email from Monitor to Flora Tartakovsky, Exiger Director (Oct. 12, 2021).

review these communications, tips, and complaints.  When the information provided falls within the Monitor's investigative mandate, the Monitor will make use of the information in ongoing investigations or, where appropriate, open new ones.

### C.    Current Status of Investigations

The Monitor has begun to investigate alleged historical misconduct at the UAW by certain current and retired UAW members, officers, and employees, as well as the UAW's relationship with certain vendors.  As of October 28, 2021, the Monitor has concluded one historical investigation and has 15 investigations currently open and ongoing.  The Monitor will continue to assess whether to open additional investigations into both historical and post-Consent Decree conduct.  As noted in Part IV of this Report, the Monitor has separately conducted several investigations into potential violations of the rules concerning the upcoming Referendum vote.

One of the Monitor's investigations, concerning the Union's current President, Raymond Curry, has concluded.  Shortly after the monitorship commenced, DOJ conveyed to the Monitor information about a number of individuals that it had acquired during the course of its investigation, and in particular information related to "closed" cases that it was no longer pursuing at that time.  Included in that disclosure of information was an allegation that the UAW's current President, Raymond Curry, had inappropriately accepted tickets to a football game in 2017 when he was the Director of Region 8.

As detailed below, following an investigation, the Monitor concluded that Curry's conduct did not meet the Monitor's threshold for initiating a disciplinary charge for historical conduct, and instead referred the matter to the Union's Ethics Officer.  Following the Monitor's referral to the Ethics Officer, the Ethics Officer expressed to the Monitor a preference not to disclose any of the details of the Monitor's investigation to date in this Report, in order to protect the integrity of her investigative process, which is still ongoing.  At the same time, President Curry expressed in

writing to the Monitor that he "wants to be transparent and does not object to the inclusion of the

Monitor's discussion of the allegations regarding the football game ticket in the Monitor's report,

so long as publication of that material does not interfere with the integrity of the Ethics Officer's

investigation."[648]  With the Ethics Officer's consent, the Monitor deferred to the preference of

Curry as the subject of the investigation and has therefore provided the summary contained in this

Report.

The Monitor's investigation showed that when Curry was the Regional Director, he signed

contracts on behalf of the Union with marketing vendors to purchase advertising that promoted the

Union at sporting events (such as football games), and that those contracts offered either a "ticket

allowance" for the Union or "merchandising points" that could be used by the Union to acquire

tickets.[649]  Curry signed six such contracts on behalf of the Union, with values ranging from $8,500

to $50,000.[650]

Although he usually forwarded the tickets that the Union received to someone else for

distribution to other members, Curry used tickets from one of these agreements on one occasion

to attend the national college football championship game nearly five years ago.[651]  Curry

explained that, on the day of the game, he was already in the area where the game was located

working on a contract negotiation with three other UAW staff members.[652]  Curry used the tickets

to attend the game, and brought with him three other staff members who were there negotiating

with him.[653]  Shortly after the Monitor was appointed but before the Monitor commenced its

---

[648] Email from Counsel to UAW President, to Monitor (Nov. 7, 2021).
[649] Letter Referral from Monitor to Wilma Liebman, External Ethics Officer (Oct. 28, 2021).
[650] Advertising Contracts (UAW-Mon_000203; UAW-Mon_000215; UAW-Mon_000218; UAW-Mon_233; UAW-Mon_00239; UAW-Mon_000253).
[651] Letter Referral from Monitor to Wilma Liebman, External Ethics Officer (Oct. 28, 2021).
[652] *Id.*
[653] *Id.*

investigation into these allegations, on May 17, 2021, Curry paid back the $1,900 face value of the four tickets to the UAW.[654]

At the time that Curry attended the game, the UAW had in place a general policy that "Union representatives may not receive meals, gifts, tickets to sporting events, concerts or other events, or any other item of value from vendors under any circumstances."[655]  However, the Monitor was told that the UAW historically interpreted that policy as allowing the UAW to receive tickets and then raffle them off to UAW staff or to distribute them randomly to members, although it appears that this was an unwritten practice of which Curry said he was not aware.[656]

The Monitor concluded that Curry's conduct did not meet the Monitor's threshold for initiating a disciplinary charge for historical conduct.[657]  This decision was influenced by the limits on the types of historical misconduct for which the Monitor may bring charges under the Consent Decree, as well as the Monitor's determination that although Curry's conduct might implicate certain of the UAW's policies or Ethical Practices Codes, the age of the conduct, its lack of relative materiality, and the ambiguity regarding the policy at issue did not warrant the Monitor's continued consideration of the matter.[658]

It was not until early October that the UAW provided the Monitor with the necessary information and documents to close the inquiry.  The Monitor did not refer the matter to the IEB at that time because the IEB had decided in September (with Curry recused) that Curry had committed no policy or ethical violation, even though the Union was on notice that the Monitor had not yet completed its investigation and was contemplating a likely referral to the IEB.  On

---

[654] *Id.*
[655] *Id.*
[656] *Id.*
[657] *Id.*
[658] *Id.*

154

October 28, 2021, the Monitor instead referred the matter to Wilma Liebman, the independent Ethics Officer of the UAW, who, as noted in Part II of this Report, is empowered to investigate ethics matters, and is thus in the best position to analyze the circumstances and determine if any policy violation occurred.  The Monitor will further report on Ethics Officer Liebman's findings, if any, in a subsequent report.

Further, as a direct result of this investigation, the Monitor recommended that the UAW change its policy regarding vendor agreements to prevent further confusion.  Specifically, the Monitor recommended that the UAW make explicit in all new or renewed vendor agreements that (i) the UAW does not accept tickets to sporting, concerts, or other entertainment events from vendors, and (ii) vendors should not offer or provide tickets to sporting, concerts, or other entertainment events to UAW personnel.[659]  The Monitor also made recommendations for how to address tickets in *existing* vendor agreements (*e.g.*, establishing a procedure run by the Legal Department to sell tickets on the secondary market with proceeds of the sale provided to the UAW for the benefit of its members, or to take other measures to avoid the potential for UAW personnel involved in contracting decisions from receiving tickets as a perk or incentive).[660]  As a result of this incident and the Monitor's related recommendations, the UAW has since issued a revised policy, and it should now be crystal clear that the acceptance of any ticket as part of any vendor agreement is a violation of UAW policy.

---

[659] Letter from Monitor to UAW General Counsel (July 13, 2021).
[660] *Id.*

## IV.    ELECTIONS

Under the UAW Constitution, the Union currently elects its President and other members of the IEB through a delegate election system.[661]  Individual Union members elect delegates from their Local Union to represent them at the UAW Constitutional Convention,[662] and those delegates in turn vote to elect the UAW's top leaders.[663]  Several of the individuals convicted of the crimes underlying this Consent Decree were elected through this process, including former UAW Presidents Dennis Williams[664] and Gary Jones.[665]

The Consent Decree gives the UAW's members an opportunity to vote on whether they want to change the manner in which the UAW elects IEB members.[666]  Specifically, the Consent Decree requires the UAW to hold a Union-wide Referendum to decide whether it will maintain its existing delegate election process or switch to a direct election system under which each UAW member would vote directly to elect the President, Secretary-Treasurer, and the other members of the IEB.[667]

The Consent Decree tasks the Monitor with overseeing this Referendum, in consultation with the UAW and in cooperation with the U.S. Department of Labor, Office of Labor-Management Standards ("OLMS"), which must approve the rules, method, and ballot language

---

[661] UAW Const., art. 10, § 4.
[662] UAW Const., art. 7, § 1(a).
[663] UAW Const., art. 10, § 4.
[664] Michael Wayland, *UAW elects new union president; Dennis Williams wins 98.5% of the vote*, M Live (Jan. 20, 2019).
[665] Ed Finkelstein, *UAW elects St. Louis' Gary Jones as new International President,* Labor Tribune (June 26, 2018).
[666] Consent Decree ¶ 8; *see also* David Shepardson, *UAW members set to vote by Nov. 12 on election rules –monitor*, Reuters (Aug 13, 2021).
[667] Consent Decree ¶ 8.

used in the Referendum.[668]  As of the date of this Report, the Referendum is ongoing, with a final

date for the receipt of ballots set for November 29, 2021.[669]

In addition to overseeing the Referendum, the Consent Decree tasks the Monitor with

supervising the election of IEB members throughout the multi-year term of the monitorship and

ensuring that those elections are conducted in a manner that is consistent with the UAW

Constitution and the Consent Decree, as well as state and federal law.[670]

This Part of the Report describes the Monitor's work over the past six months concerning

this election mandate, including the steps taken so far to administer the Referendum and to oversee

IEB elections.  First, it summarizes the Monitor's work with the UAW and OLMS to jointly

establish the rules governing the Referendum and the process by which those rules were

determined.  Second, it describes the substantial efforts undertaken by the Monitor and the UAW

to update and modernize its mailing list to ensure that all eligible voters receive Referendum

ballots.  Third, it provides an overview on the Monitor's work to administer the Referendum.  And

finally, it describes the Monitor's work so far in vetting IEB candidates and overseeing IEB

candidate elections.

---

[668] Consent Decree ¶¶ 9-10.

[669] Order Granting Joint Motion to Amend Consent Decree to Extend Deadline for Completing Referendum at 2, *United States v. Int'l Union, United Automobile, Aerospace, and Agricultural Implement Workers of America* (Sept. 9, 2021), No. 20-cv-13293 (E.D. Mich.), ECF No. 46 ("Order Extending Referendum Deadline").

[670] Consent Decree ¶ 45.

## A.    Rules for the Referendum

The Consent Decree mandates that the "Monitor and the UAW shall develop the rules, method, and ballot language to be used in the referendum, and shall obtain approval from OLMS for those rules, method and ballot language prior to conducting the referendum."[671]

On August 13, 2021, with the agreement of the UAW and the approval of OLMS, the Monitor issued "Interim Rules" to govern the Referendum.[672]  On September 17, 2021, subsequent to the Court's September 9, 2021 Order extending the deadline by which the Referendum must be completed to November 29, 2021, the Monitor issued a set of "Second Interim Rules" reflecting updated dates and deadlines.[673]  On November 8, 2021, the Monitor finalized the rules for the Referendum (together, referred to as simply the "Rules" or the "Referendum Rules").[674]  A complete copy of the updated Referendum Rules is available on the Monitor's website at www.uawmonitor.com/electionsreferendum.

The Referendum Rules were developed in consultation with the Department of Justice ("DOJ"), OLMS, and the UAW, as well as with input from the leadership of several local unions and independent advocacy organizations within the UAW, such as the advocacy group Unite All Workers for Democracy ("UAWD").[675]  The Monitor began meeting with these stakeholders

---

[671] Consent Decree ¶ 10.

[672] Office of the Monitor, *Interim Rules for the 2021 Referendum of the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America* (Aug. 13, 2021) ("First Interim Rules").

[673] Office of the Monitor, *Second Interim Rules for the 2021 Referendum of the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America* (Sept. 17, 2021) ("Second Interim Rules").

[674] Office of the Monitor, *Final Rules for the 2021 Referendum of the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America* (Nov. 8, 2021) ("Referendum Rules").

[675] UAWD had previously sought unsuccessfully to "intervene"—*i.e.*, formally become a legal party to the case that resulted in the Consent Decree.  Opinion and Order Denying Motion by Unite All Workers for Democracy and Scott Houldieson to Intervene at 13, *United States v. Int'l Union, United Automobile,*

shortly after entry of the Appointment Order in order to discuss critical topics such as the composition of the electorate, the method of voting, and the means of communicating with members about the Referendum.[676]   Throughout this process, the Monitor gave voice to the concerns of the advocacy groups and Local Unions, and indeed, many of their valuable suggestions and ideas were incorporated into the Rules and the ballot itself, which, as noted above, were only adopted after they were agreed to by the UAW and approved by OLMS.[677]   The Monitor would like to commend the UAW, DOJ, and OLMS for the hard work and commitment toward a fair election that they all demonstrated in the negotiation of the Referendum Rules.

The Rules set forth the Monitor's guiding principles for the Referendum, as well as specific rules for the timing of the election, the method of voting, and other matters of election administration.   The remainder of this section summarizes the key aspects of the Rules.

### 1.      Guiding Principles

Three core principles have guided the establishment of the Rules governing the Referendum vote.[678]   First, the Referendum will be run in a fair and impartial manner, and the Monitor will remain neutral as to its outcome.   Second, the Monitor will seek to ensure that the UAW and its members strictly adhere to the Rules, the Consent Decree, the UAW Constitution, and applicable federal law, including the LMRDA.   Third, the Monitor will seek to protect the

---

*Aerospace, and Agricultural Implement Workers of America* (Apr. 27, 2021), No. 20-cv-13293 (E.D. Mich.), ECF No. 32.  UAWD has played an active role in providing feedback on the Interim Rules, including on the method of voting and on the efforts to improve the member mailing list described in Subpart B, below.  UAWD has formally registered with the Monitor as an advocate in favor of the direct election system.

[676] Meeting with UAWD (May 19, 2021); Meeting with Higher Education Locals (July 26, 2021).

[677] Meeting with UAWD (May 19, 2021) (suggesting a test mailing; voicing concerns about equal access in advocacy); Email from Monitor to Elections Team (July 22, 2021) (circulating UAWD suggestion that the Monitor establish an independent website); Email from UAWD member to the Monitor Election Hotline (Oct. 5, 2021) (suggesting the Monitor email the membership about the Referendum Forum webcast).

[678] Referendum Rules at 4.

right of every eligible member and retiree to vote on the Referendum by secret ballot.  These principles are based on the mandates of the Consent Decree and informed by the UAW Guide for Local Union Election Committees and OLMS guidance.

### 2.    Timing

When it was originally entered, the Consent Decree required that the Referendum occur within six months of the Monitor's appointment—*i.e.*, by November 12, 2021.[679]  By Order dated September 9, 2021, the District Court granted the parties' joint motion to amend the Consent Decree and extended by 17 days the deadline by which the Referendum must be completed, to November 29, 2021.[680]  This extension allowed for finalizing the Referendum Rules, selecting the preferred election vendor whose schedule required the additional time, and providing additional time for disseminating information concerning the Referendum to UAW members.[681]

### 3.    Electorate

All members in good standing as of November 19, 2021, are eligible to vote in the Referendum, including part-time workers, reinstated members, and retired members.[682]   As discussed further below, the lack of complete and up-to-date centralized records in the UAW's global database—Local Union Information System ("LUIS")—has required the Local Unions to provide significant and, in the final weeks of the Referendum period, regular updates to ensure

---

[679] Consent Decree ¶ 8.
[680] Order Extending Referendum Deadline at 2.
[681] Joint Motion for Minor Modification of Consent Order as to the Date the Referendum Vote Must Be Concluded at 1-2, *United States v. Int'l Union, United Automobile, Aerospace, and Agricultural Implement Workers of America* (Sept. 7, 2021), No. 20-cv-13293 (E.D. Mich.), ECF No. 43.
[682] Referendum Rules at 6.

that the UAW's information regarding the standing of its members will be accurate at the time of counting the ballots.

### 4.     Secret Mail-In Ballot

The Consent Decree requires that the Referendum be conducted by "secret ballot vote," but does not specify the method by which those ballots should be submitted.[683]   Following discussions with the various stakeholders noted above,[684] the Monitor, the UAW, and OLMS jointly agreed that the Referendum should be conducted by mail-in ballot.[685]   Mail-in voting— with all ballots required to be returned to a single, secure location—presented the best way to balance the need to promote the participation of all eligible voters with OLMS's strict standards for ballot secrecy and security.[686]

Before reaching this conclusion, however, the Monitor considered and discussed with various stakeholders a range of voting methods, including in-person voting and electronic voting:

- **In-person voting**, which is the voting method traditionally used within the UAW, was rejected because of concerns that, among other things, it could have potentially depressed voter participation due to COVID-19, which could have discouraged the turnout of members to vote in an in-person election, particularly retired members or other members in high-risk demographics.[687]

- **Electronic voting** was rejected principally because the Monitor and the UAW, in consultation with OLMS, determined that electronic voting may not necessarily provide the same level of ballot secrecy and security as mail-in balloting.[688]   Electronic voting would likely have posed further problems

---

[683] Consent Decree ¶ 8.
[684] Meeting with UAWD (May 19, 2021); Meeting with Higher Education Locals (July 26, 2021).
[685] Referendum Rules at 6; Meeting with UAW, DOJ, and OLMS (July 27, 2021).
[686] Meeting with UAW, DOJ, and OLMS (July 27, 2021).
[687] Meeting with UAW (May 28, 2021); Meeting with UAWD (July 1, 2021).
[688] Meeting with UAW, DOJ, and OLMS (July 27, 2021).

for the UAW given that the Union's database initially only included email addresses for less than 5% of its membership.[689]

### 5.    Vendor Selection

The UAW, through a process that the Monitor participated in and closely supervised, selected an election vendor to oversee all mailings, collections, and tabulations of the secret ballots.[690]  After the UAW solicited and received various proposals, the joint team of Merriman River Group and Election Systems & Software ("ESS") (collectively, the "Election Vendor") was selected based upon their experience and ability to undertake the administration of a secret mail-in ballot on the large scale required for the Referendum vote.

Included in that experience is Merriman River Group's role as senior consultant to the Office of the Election Supervisor for the International Brotherhood of Teamsters, a role that it has held for twenty years.  Its responsibilities there include analyzing data, supervising mailing and re-mail operations, operating a call center, processing returned as undeliverable ballots, testing eligibility, and conducting quality control during the tabulation phase.[691]  In each election cycle for the Teamsters, Merriman River Group has collaborated with ESS, which has been responsible for printing ballots and envelopes, hiring print and mail vendors, and tabulating completed ballots.[692]

Although the UAW conducted the vendor selection process, as noted above, the Monitor was directly involved in the process.  First, the Monitor and the UAW worked together to develop a list of potential vendors.  The UAW then sent Requests for Proposal to several businesses, some

---

[689] At the outset, the LUIS database contained just over 1,000,000 member records but only approximately 41,000 of those records included email addresses.  Email from UAW General Counsel to Monitor (July 29, 2021).

[690] Referendum Rules at 6.

[691] Email from Vendor to Monitor (Oct. 1, 2021).

[692] *Id.*

that had been recommended by other major unions and others that it thought might be capable of handling a large, secret-ballot election. Next, the Monitor and the UAW vetted the four vendor teams that submitted proposals, interviewed each of the prospective vendors, and evaluated their proposals. The UAW then selected Merriman River Group and Election Systems & Software, and the Monitor concurred with that decision.[693]

### 6.      Ballot Language

The ballot asks the voting member to vote for either retaining the existing delegate system or adopting a direct election system.[694] The ballot defines and describes each system using neutral language, approved by both OLMS and the UAW after close consideration of the views of various stakeholders.[695]

### 7.      Advocacy

The Consent Decree requires that the Referendum be "conducted consistent with the standards applicable to the officer election provisions established in Title IV of the LMRDA."[696] Among other things, including the requirement of a secret ballot, Title IV explicitly prohibits the use of union funds to promote a candidate in an election.[697]

The initial question of whether Title IV's prohibition of the use of union funds in a *candidate* election should apply to the current *referendum* election is one for which there has been intense disagreement among the parties.[698] The Monitor engaged in discussions with the various

---

[693] *Id.*
[694] Referendum Ballot.
[695] Referendum Rules at 8.
[696] Consent Decree ¶ 9.
[697] 29 U.S.C. § 481(g) ("No moneys received by any labor organization by way of dues, assessment, or similar levy, and no moneys of an employer shall be contributed or applied to promote the candidacy of any person in an election subject to the provisions of this subchapter. Such moneys of a labor organization may be utilized for notices, factual statements of issues not involving candidates, and other expenses necessary for the holding of an election.").
[698] Meeting with UAW (July 15, 2021).

stakeholders, including a series of virtual meetings with the UAW, DOJ, and OLMS, to determine how to interpret this provision of the Consent Decree.  The Monitor also received and considered input from other stakeholders, including Local Unions and advocacy groups.[699]

During these discussions, the UAW communicated its position that, in negotiating the Consent Decree, it was its intent to permit the use of Union resources to sponsor education and advocacy on the Referendum.[700]  However, DOJ indicated that it was concerned that such an interpretation of the Consent Decree could result in the IEB using International Union resources to overwhelm the efforts of other groups within the Union who are advocating in favor of the direct election system.  Although DOJ was agreeable to allowing some limited uses of Union resources for advocacy in the referendum, OLMS took the position that the language of the Consent Decree unambiguously incorporated Title IV's wholesale ban.  As a result, OLMS explained that it would likely refuse to certify the results of the Referendum if the Rules allowed the use of union resources for advocacy.  Given this impasse, and because the Consent Decree grants ultimate approval authority to OLMS, OLMS's view that Title IV's ban applied to the Referendum carried the day. Therefore, the Rules issued by the Monitor include a prohibition on the use of union resources to advocate for either side of the Referendum question.[701]

With the agreement of the UAW, OLMS, and DOJ, however, the Monitor titled the initial set of rules issued on August 13, 2021, as "Interim Rules" to allow for the opportunity for DOJ and the UAW to seek an amendment to the Consent Decree to potentially permit some use of Union resources for advocacy during the Referendum.[702]  After extensive negotiations, on October

---

[699] Letter from UAWD to Monitor (July 9, 2021).

[700] Meeting with UAW (July 15, 2021).

[701] Referendum Rules at 14-15.

[702] First Interim Rules at 4.

8, 2021, the parties made that motion to the Court to further modify the Consent Decree,[703] but that motion was denied on October 12, 2021.  Among other things, the Court found that because of how close the motion was to date that ballots for the Referendum were to be sent out, "it would not be equitable or just under the circumstances to upset established regulations for the conduct of the referendum on the eve of voting, particularly where those procedures have been a matter of public record for many months since the decree was issued."[704]  The Monitor subsequently removed the "Interim" designation from the Rules, issued some additional guidance concerning the inspection of membership lists and observation of the vote count to ensure conformity with Title IV, and confirmed that the Rules in place were final for the Referendum.[705]

Although the Rules ban the use of union funds for advocacy, they expressly provide that individual Union members may advocate without using union resources.  Specifically, the Referendum Rules state that a "Union member, including a member who is a Union officer or employee, has the right to . . . support or oppose either side of the Referendum question and to make personal contributions to the advocacy of either side of the Referendum question."[706]  To facilitate a fair and equal democratic process, the Monitor created a system whereby individuals or groups within the Union who desired to communicate more broadly with the membership could register with the Monitor to access certain Union resources, namely the UAW's Global Mailing List, for the purpose of that advocacy.[707]  Registered individuals and groups were also invited to

---

[703] Joint Motion for Modification of Consent Order, *United States v. Int'l Union, United Automobile, Aerospace, and Agricultural Implement Workers of America* (Oct. 8, 2021), No. 20-cv-13293 (E.D. Mich.), ECF No. 47.

[704] Order Denying Joint Motion to Modify Consent Decree at 5, *United States v. Int'l Union, United Automobile, Aerospace, and Agricultural Implement Workers of America* (Oct. 12, 2021), No. 20-cv-13293 (E.D. Mich.), ECF No. 48.

[705] Referendum Rules at 4-6.

[706] Referendum Rules at 13.

[707] Referendum Rules at 13-14, 16.

participate in an organized Referendum Forum webcast, overseen by the Monitor, during which participants offered their views on the Referendum question and asked questions of the Monitor.[708] Details around the Forum webcast are discussed further below.

### 8. Results

On October 26, 2021, the Election Vendor, accompanied by a private security officer and under the Monitor's oversight, began the process of picking up all ballots returned to the U.S. Post Office box designated for this Referendum.  This pick-up process will continue every weekday morning through November 29, 2021, at 10 a.m. EST, the deadline by which ballots must be received.  Once the ballots are picked up, they are stored at the Election Vendor's counting facility, which is equipped with around-the-clock, on-site security provided by a private firm as well as security cameras that record and stream all activity for observation.

On November 29, 2021, the Election Vendor will begin its tabulation process, which will be closely overseen by the Monitor and OLMS.[709]  Representatives of the UAW and other Union groups who previously registered with the Monitor as advocates have been invited to observe the counting of the votes to ensure that supporters of both sides of the Referendum question can be represented.[710]  The Election Vendor will only count votes of active or retired individuals who are in good standing with the UAW, as determined by the final list provided from the LUIS database as of the November 19, 2021, eligibility deadline.[711]  Once all votes have been counted, the results will be transmitted to the Monitor.

---

[708] Referendum Rules at 14.
[709] Referendum Rules at 12.
[710] Referendum Rules at 17-18; Letter from Monitor to Registrants (Nov. 9, 2021).
[711] Referendum Rules at 7.

As directed by the Consent Decree, the Monitor will announce those results as unofficial and prepare a report summarizing them to OLMS ("Referendum Report").[712]  As described in the Consent Decree and in the Referendum Rules, OLMS will then review the Referendum Report to determine if the Referendum was properly conducted and that no violation of the Rules affected the outcome thereof.[713]  If OLMS certifies the Referendum, the Referendum Report will be filed with the Court for final approval.  Whatever election system is selected will then be used in future IEB elections.  If OLMS does not endorse the Referendum results, it shall provide to the parties a statement outlining the reasons for its decision no later than 14 days after the Referendum Report is provided to it.  The parties may appeal OLMS's decision to the Court.  If the Court finds that the Referendum was not properly conducted and that a violation of the rules affected the outcome thereof, a new Referendum will be held as soon as practicable thereafter using the same provisions and methodology described in the Consent Decree.[714]

**B.     The Global Mailing List for the Referendum**

Mail-in voting requires a comprehensive and accurate list of the electorate's mailing addresses.  A substantial component of the Monitor's work regarding the Referendum has been to oversee a months-long process to improve and expand the Global Mailing List to be used in connection with the Referendum, and to otherwise update the voter eligibility information stored by the Union.  This section describes those efforts.

**1.     Improvement of the Global Mailing List**

At the onset of the monitorship, the UAW did not have a sufficiently accurate or comprehensive mailing list for its members.  The UAW's system for maintaining a contact list was

---

[712] Consent Decree ¶ 11.
[713] *Id.*; Referendum Rules at 9.
[714] Consent Decree ¶ 11.

dependent on receiving information about members from the Local Unions through LUIS—but not all of the Local Unions routinely uploaded (or even had the technological capacity to routinely upload) that information to the International Union.[715]  The result was a mailing list that required significant attention from the Monitor and the UAW.

To address this concern, the Monitor and the UAW worked collaboratively to improve the list, including: (a) coordinating direct outreach to Local Unions to ask them to encourage their members to update their email and mailing addresses;[716] (b) working with the Election Vendor to identify and address flaws in the current mailing list;[717] and (c) undertaking efforts to reach members directly, including through the Monitor's website and hotline.

The UAW deserves great credit for its efforts to improve its mailing list.  There have now been numerous updates to the mailing list, which was provided to the Election Vendor on October 7, 2021, to be used as the Global Mailing List for the official ballot mailing.[718]  In all, over a million member and retiree addresses were uploaded.[719]  Importantly, that list continues to be updated and additional ballots continue to be mailed out based on new information from LUIS. Further, if any member has still not yet received a ballot or has joined the Union since the ballots were mailed, they should immediately request one by e-mailing UAWBallot@merrimanriver.com, an e-mail established by the Monitor in conjunction with the Election Vendor to handle such requests.

---

[715] Meetings with UAW and Vendor (July and Aug. 2021).
[716] Letter from Monitor to Local Union Officers (July 12, 2021).
[717] Referendum Rules at 8.
[718] Email from UAW to Vendor (Oct. 7, 2021).
[719] *Id.*

### 2.   Outreach to Local Unions

The Monitor undertook concerted efforts to work with Local Unions in order to update the Global Mailing List for the Referendum.  Most notably, in July 2021, the Monitor and the International Union sent a joint letter to all Local Union officers, asking that those officers immediately contact the members of their Local Union and request that they update their mailing addresses and email addresses as soon as possible.[720]  Following this outreach, Local Unions began submitting updated information to LUIS.

The Monitor and the UAW also assisted specific Local Unions that sought assistance in updating their electronic records.  Two Local Unions, for example, flagged that they needed assistance in inputting their members' data into LUIS, as they had not previously maintained their addresses in an electronic form.[721]   The Monitor coordinated outreach from the UAW's Information Technology ("IT") team to assist these Locals in updating these records.  Both the UAW's IT Director and the help desk for LUIS were available to assist Local Unions as well.[722] In addition to submitting information through LUIS, some Local Unions updated their member contact information by emailing the information to the UAW's IT Director or to the Monitor, who worked with the UAW to ensure that it was uploaded into the LUIS system.[723]

Although the Monitor provided that all Local Unions should target an initial deadline of July 28, 2021, to update their mailing lists,[724] the UAW continues to accept updated contact information for purposes of the Referendum's Global Mailing List and the Election Vendor continues to issue new ballots accordingly.

---

[720] Letter from Monitor to Local Union Officers (July 12, 2021).
[721] Email from Local Union to Monitor (Aug. 2, 2021).
[722] Letter from Monitor to Local Union Officers (July 12, 2021).
[723] Email from Monitor to UAW (Sept 24, 2021) (forwarding two Local Union list updates that came to the Monitor's Election Hotline).
[724] Letter from Monitor to Local Union Officers (July 12, 2021).

### 3.      Election Vendor's Tests

In addition to working with the Local Unions, the Monitor also oversaw testing and improvements to the Global Mailing List by working directly with the Election Vendor.  In August 2021, the UAW sent an updated Global Mailing List to the Election Vendor.  The Election Vendor then ran those addresses through the National Change of Address ("NCOA") database maintained by the United States Postal Service.  The Postal Service identified approximately 46,000 of the Global Mailing List's 1,052,390 addresses with identifiable errors and another approximately 89,000 addresses where the UAW member in question had moved to a new address since January 1, 2018.

On August 27, 2021, the Elections Vendor mailed postcards regarding the upcoming Referendum to everyone on the Global Mailing List at that time, as well as to the corrected addresses which it received from the NCOA database.[725]  In addition to informing members of the upcoming Referendum, the Elections Vendor was able to identify addresses that still needed to be updated for the 91,000 postcards that were returned as undeliverable because it appeared that the member no longer lived at that address.  The Election Vendor transmitted the list of returned-as-undeliverable postcards to the UAW, which in turn provided this information to Local Unions to aid in their effort to update member addresses.  In addition, the Election Vendor is employing a different database vendor to further analyze the list of addresses from the returned postcards and was able to obtain new updated addresses for more than half of them.  Supplemental ballots are being sent to the new addresses, to the extent that they had not yet otherwise been updated by the Local Unions.

---

[725] Referendum Rules at 10-11.

### 4. Outreach to Members

Finally, the Monitor reached out directly to the electorate to encourage eligible voters to update their contact information with their Local Unions. This outreach took a variety of forms, including:

- Since it went live, the Monitor's website has included content encouraging UAW members to update their contact information.[726] The website also directs members to contact the Monitor via a dedicated phone and email Election Hotline through which members may ask questions, provide direct updates, and lodge informal complaints relating to the Referendum.[727]

- Over the hotline, the Monitor received numerous questions regarding updating addresses from individual members and Local Unions, and advised them accordingly.

- Further, as noted above, in July 2021, the Monitor and International Union posted a joint letter to all UAW members on the UAW's website making the same request.[728] That letter was also mailed to all of the email addresses that the UAW had on file in the LUIS system.

- A one-page Referendum information poster outlining the key election dates and encouraging members to update their address information has also been sent to Local Unions to be posted on jobsites and in Union facilities, as well as on the Monitor's website and the UAW's website, to promote the Referendum and ensure everyone eligible to vote receives a ballot.[729]

### C. Member Eligibility Information from LUIS

In addition to needing to update mailing addresses, the Monitor determined that the LUIS database's accounting of whether members were in good standing, and therefore whether they were eligible to vote, also had to be refreshed. As the LUIS system is entirely reliant on the Local Unions to provide frequent and accurate updates, and because Local Unions demonstrated varying

---

[726] *Elections/Referendum*, UAW Monitor, https://www.uawmonitor.com/electionsreferendum.

[727] *Contact*, UAW Monitor, https://www.uawmonitor.com/contact.

[728] Letter from Monitor to Members (July 12, 2021).

[729] *Elections/Referendum*, UAW Monitor, https://www.uawmonitor.com/electionsreferendum; *Attention: All UAW Members 2021 Referendum on International Executive Board (IEB) Election Method*, UAW, https://uaw.org/attention-uaw-members-2021-referendum-international-executive-board-ieb-election-method/.

levels of diligence and technical sophistication in this regard, this aspect of the LUIS database also needed substantial updating.

Accordingly, after receiving guidance from OLMS, the Monitor and the International Union sent a joint letter to all Local Union officers directing that they update the LUIS system and provide accurate information reflecting the standing of their members.[730]  The Local Unions were asked to provide weekly updates on this data, and have been directed to report on a daily basis any changes during the final week of the Referendum.[731]  Ballots will be sent out accordingly, if eligible individuals—including new members—have not previously received them.  After the November 19, 2021, 5 p.m. EST, eligibility deadline, the Local Unions will need to make a final update to ensure the Election Vendor has an accurate list of members in good standing for the vote tabulation.

## D.       Administration of the Referendum

In addition to the efforts to improve the quality of the Global Mailing List, the Monitor has been working to enforce the Referendum Rules since they were first issued in August.

### 1.       Fielding Member Inquiries

The Monitor's Election Hotline—which has been promoted in the Rules, on the Monitor's website, and in other communications such as the Referendum postcard—has enabled Union members and Local Union leaders to seek answers to their questions and concerns about the Referendum.  As of October 26, 2021, the Monitor had received over 1,900 calls or emails to the Election Hotline from members seeking to update contact information, report a deceased UAW member, or ask questions about the Referendum or voice a related concern.  Based on these calls, the Monitor transmitted corrected addresses it received to the UAW, which used that information

---

[730] Letter to Local Union Officers (Nov. 4, 2021).
[731] Letter to Local Union Officers (Nov. 4, 2021).

to update the Global Mailing List.[732]  In addition, the Monitor developed a "Frequently Asked Questions" (FAQ) section on its website (www.uawmonitor.com/electionsreferendum) in response to questions submitted through the Election Hotline.

## 2.    Referendum Forum Webcast

On October 7, 2021, the Monitor hosted a public Referendum Forum webcast via Zoom videoconference and YouTube during which individuals who registered with the Monitor were able to advocate in support of either side of the Referendum question.[733]  All registrants were required to submit a "Declaration in Connection with Registration for Referendum Advocacy to the Monitor" in which they attested to their understanding of the Referendum Rules, their desire to advocate in good faith in connection with the Referendum question, and to the extent they intended to access the Global Mailing List, that they would use it properly.[734]  In total, 49 UAW members registered as advocates and submitted a declaration.

At the outset of the webcast, the Monitor offered brief remarks after which the 28 registrants in attendance were allotted two minutes each to speak in support of their position.  At the conclusion of the speeches, Neil Barofsky and Glen McGorty (who helps oversee the Election mandate of the monitorship) took questions about the Referendum for a little over an hour.[735]  The Monitor has posted a recording of the Referendum Forum on its website at www.uawmonitor.com/electionsreferendum so that all UAW members who wish to view the Forum webcast can do so at their convenience.  The Monitor also requested that the UAW post the Forum webcast recording on the UAW website; however, the UAW declined to do so.

---

[732] Email from UAW to Monitor (Sept. 30, 2021) (describing UAW efforts to update list based on Monitor hotline calls).

[733] UAW Referendum Forum Webcast Rules (Oct. 1, 2021).

[734] UAW Monitorship Declaration – Advocacy Registration.

[735] *Id.*

### 3.    Enforcement of Referendum Rules on Advocacy

During the administration of the Referendum, the Monitor has been investigating allegations of inappropriate conduct related to the use of Union resources to advocate for either side of the Referendum.  As noted above, the Rules prohibit such use of Union resources.  Three of the incidents that have occurred so far are noted in this section, along with an example of a Local Union seeking the Monitor's guidance on whether certain conduct would violate the Referendum Rules.

In one instance, the Monitor investigated an allegation that comments made by UAW President Raymond Curry advocating in favor of the delegate system at a virtual media roundtable on August 26, 2021, violated the rules barring Union officials from advocating when acting in their official capacities.[736]  After consulting with OLMS and investigating the circumstances of the comments, the Monitor concluded that Mr. Curry's comments were permissible under one of the exceptions detailed in the rules (which permit brief spontaneous comments made in response to a question), but nonetheless reminded Mr. Curry and other members of the IEB, to maintain great caution when commenting on their position on the Referendum while acting in their official capacities.[737]

In another instance, the Monitor found that a Trustee of a Local Union violated the Rules after they sent an email to a Union distribution list with official UAW email addresses (and targeted Union leaders gathering to meet in connection with official Union business), in which they advocated that the recipients should vote in favor of the direct election option and invited them to encourage their constituencies to support that position, including with a link to the "One Member,

---

[736] Letter from Monitor to UAW President (Sept. 8, 2021).
[737] *Id.*; Referendum Rules at 15.

One Vote" website where the recipients could formally pledge support and donate funds.[738] A warning was issued to the Trustee who sent the email that further violations could result in disciplinary action under the Consent Decree, and the cosigners on the email were also given notice of the transgression.[739]

Third, a UAW member made allegations to the Monitor that Union resources may have been used to facilitate a Referendum-related meeting that occurred alongside an official Union regional leadership meeting, and that the IEB might be scheduling similar pretextual "official" meetings across the Union in order to evade the prohibition on using Union funds to facilitate advocacy.[740] In response, the Monitor determined that the regional meeting in question had been long planned and did not involve the use of Union resources for Referendum-related activity, and that there was no evidence of pretextual meetings being planned by the IEB.[741]

A fourth matter handled by the Monitor arose from a request by the President of a Local Union. On September 2, 2021, the Local Union's Executive Board issued a resolution creating a system whereby members would be given access to the Local Union's mailing list to advocate on the Referendum question. The President of the Local Union sought confirmation from the Monitor that the resolution and their proposed approach was permissible under the Referendum Rules.[742] After consulting with OLMS, the Monitor approved the proposal with the condition that equal access be given to all members seeking to use it, irrespective of which side of the Referendum question they support.[743]

---

[738] Letter from Monitor to UAW Member (Sept. 23, 2021).
[739] *Id.*
[740] Email from UAW Member to Monitor (Sept. 23, 2021).
[741] Letter from Monitor to UAW Counsel (Sept. 27, 2021); Letter from UAW Counsel to Monitor (Oct. 1, 2021).
[742] Email from Local Union to Monitor (Sept. 7, 2021).
[743] Email from Monitor to Local Union (Sept. 9, 2021).

### E.      Oversight of International Executive Board Elections

Apart from the mandate to oversee the Referendum, the Consent Decree also directs the Monitor to oversee the elections for International Office.[744]  This responsibility is two-fold.  First, the Monitor must vet any candidate for International Office to ensure that the candidate is permitted to run for office under the Consent Decree.[745]  Second, the Monitor must oversee such elections in accordance with the requirements of the UAW Constitution, the Consent Decree, and applicable law.[746]

#### 1.      Candidate Vetting

The Consent Decree requires the Monitor to prohibit any candidate from running for International Office if they meet certain pre-defined criteria.[747]  Under the Consent Decree, an individual may not run for International Office if:

> (1)    they have been found guilty of fraudulent or corrupt activity, either in court or in a UAW disciplinary proceeding;
>
> (2)    their election would violate the Consent Decree's injunctive prohibitions; or
>
> (3)    their election would be a crime involving the establishment or operation of a labor organization, employee benefit plan, labor-management cooperation committee or voluntary employee beneficiary association.[748]

Regarding the "fraudulent or corrupt activity" covered under the first prong of the standard, this term is not further defined within the Consent Decree.  For this reason, the Monitor has consulted with DOJ regarding this term and the type and nature of the criminal activity that would fall within it.  Based on these conversations and a review of the entire Consent Decree, the Monitor

---

[744] Consent Decree ¶ 45.
[745] Consent Decree ¶ 46.
[746] Consent Decree ¶ 45.
[747] Consent Decree ¶ 46.
[748] *Id.*

has concluded that, in some circumstances, it is necessary to look into the underlying facts to determine if it is properly classified as "fraudulent or corrupt activity" on a case-by-case basis. In consultation with DOJ, the Monitor has concluded that there is a materiality test implicit in the Consent Decree's prohibition of any candidate who has been found guilty of fraudulent or corrupt activity at any point in time. In other words, the Monitor is treating very old and/or very minor conduct as not triggering the candidate prohibition under the Consent Decree. Such information would also not be included in the Monitor's report.

Regarding the third prong of the standard, under Title V of the LMRDA, certain crimes are only disqualifying if the conviction or punishment occurred within the past 13 years. For example, with respect to narcotics offenses, the LMRDA disqualifies a candidate if they have "been convicted of, or served any part of a prison term resulting from [their] conviction of . . . violation of narcotics laws . . . for the period of thirteen years after such conviction or after the end of such imprisonment, whichever is later."[749] Therefore, to the extent the Monitor finds criminal conduct that predates these deadlines, that criminal conduct, no matter how severe, would not disqualify the candidate and would not be described in the Monitor's reports.

The Monitor has developed a vetting process to determine whether candidates for International Office fall into any of these categories:

- The UAW must notify the Monitor of the identity of the candidate or candidates at least four weeks before Constitutional Convention elections and at least two weeks before any vacancy-filling elections that occur between Conventions.

- Once the names are received, the Monitor provides each candidate with a declaration form, which requires the candidate to affirm that they are not prohibited from holding office because of falling within one of the three categories noted above, and which asks for certain information.

---

[749] 29 U.S.C. § 504(a).

- Following receipt of the form, the Monitor pulls the candidate's disciplinary history from the UAW, if any; runs a background check to identify any state or federal criminal convictions; searches the database of investigations material gathered over the course of the monitorship for relevant documents; and consults with DOJ as needed to gather any additional relevant information about the candidate.

- If the Monitor identifies any disciplinary or criminal history, the Monitor's Elections Team conducts further investigation as needed. The Monitor may conduct an interview with the candidate during this process.[750]

The Monitor's role in vetting candidates is limited, however, in that the Monitor does not opine on the qualifications of any candidate and does not have the ability to disqualify a candidate who is under investigation but has not yet been found guilty of wrongdoing.[751] The only role for the Monitor is to determine whether the candidate is disqualified under the objective prohibitions listed in the Consent Decree.[752]

If a candidate fails the vetting process, the Monitor must then communicate that determination in writing to the candidate, the UAW, and DOJ.[753] If the candidate requests, the Monitor must provide them with the "papers or other materials relied upon" in making the Monitor's decision.[754] A disqualified candidate is entitled to appeal the Monitor's decision to the Adjudications Officer, and, ultimately, to the Court, under procedures set forth in the Consent Decree.[755] The UAW and DOJ also have the right to appeal decisions of the Monitor or Adjudications Officer to allow, or to disallow, a candidate to seek office.[756]

During the period covered by this Report, the Monitor vetted several IEB officers and Regional Directors pursuant to the above process, including Raymond Curry for the position of

---

[750] UAW Paragraph 46 Protocol at 2 (June 7, 2021).
[751] Meeting with DOJ (May 21, 2021); UAW Paragraph 46 Protocol at 1-2 (June 7, 2021).
[752] Consent Decree ¶ 46.
[753] UAW Paragraph 46 Protocol at 2 (June 7, 2021).
[754] *Id.*
[755] Consent Decree ¶¶ 47, 48.
[756] Consent Decree ¶ 49.

President; Frank Stuglin for the position of Secretary-Treasurer; Charles (Chuck) Browning for the position of Vice President; James Harris for Region 1 Director; and Laura Dickerson for Region 1A Director.  Those processes revealed no disqualifying information.

### 2.    Ensuring Compliant Elections

As noted, the Consent Decree requires that "[n]o matter the result of the referendum on the 'one member, one vote' issue, the Monitor or his or her representative shall ensure that the election of the members of the IEB of the UAW shall follow the requirements of the UAW Constitution, and all applicable state and federal laws, and this decree."[757]  The Monitor did so with respect to the election of each of the IEB officers that it vetted (as described above).

Although the President, Secretary-Treasurer, and Vice President were elected at an IEB meeting, the Regional Director elections occurred at special regional conventions for Regions 1 and 1A, called for by the UAW in accordance with Article 10, Section 18 of its Constitution.[758] The Monitor received regular updates during the planning process,[759] vetted the candidates in accordance with the procedures above, and reviewed the UAW's call letters notifying the delegates about the conventions prior to the UAW sending them out.[760]  The call letters contained the Monitor's phone and email hotlines for election issues.[761]

In connection with these elections, the Monitor addressed complaints concerning the timing of notice for nominating delegates:

- One UAW delegate for the Region 1 Special Election convention notified the Monitor, and then later stated on the record at the convention, that they

---

[757] Consent Decree ¶ 45.

[758] Official Call Letter – Region 1 (July 27, 2021); Official Call Letter – Region 1a (July 27, 2021); UAW Const., art. 10, § 18 (directing the UAW to hold special regional conventions to fill Regional Director vacancies and providing that "[s]uch vacancy shall be filled by a member elected by the delegates from the Local Unions in the region").

[759] Meeting with UAW (July 9, 2021); Meeting with UAW (July 31, 2021).

[760] Email from UAW to Monitor (July 16, 2021).

[761] Official Call Letter – Region 1 (July 27, 2021); Official Call Letter – Region 1a (July 27, 2021).

had not received notice of the Special Election in time to forward a nomination.[762]  Following receipt of the delegate's complaint, the Monitor learned that notice of the election had been posted to the UAW's LUIS system on July 27, 2021, but had not been mailed to the delegate by the Local Union until August 13, 2021,[763] which was after the August 6, 2021 deadline for nominations.[764]  However, the delegate informed the Monitor at the time of their complaint that they did not want to nominate an additional candidate.[765]

- The Monitor received a similar complaint from a UAW delegate from another Local Union in Region 1, *i.e.*, that this member's Local Union had not mailed the letter to the delegate in time to advance a nomination.[766] However, this member also told the Monitor that the member did not want to advance a nominee.[767]

Because of these complaints, the Monitor considered asking the UAW to postpone the Region 1 Special Election and conferred with OLMS concerning its view.  OLMS expressed the position that a postponement was not necessary because the notice complied with the UAW Constitution, and because neither complainant actually wanted to nominate a candidate.  As a result, the Monitor did not direct the UAW to postpone the election.  Had either member sought to advance a nominee, the Monitor would have intervened to give the member the chance to do so.

Both special regional conventions were held as planned.  A member of the Monitor's team attended and observed the Region 1 Convention and Special Election (which was in Warren, Michigan on August 26, 2021) and the Region 1A Convention and Special Election (which was in Taylor, Michigan on August 27, 2021).  Mr. Harris and Ms. Dickerson were elected as Regional Directors for Region 1 and Region 1A, respectively, on a voice vote.

---

[762] Email from UAW Member to Monitor (Aug. 22, 2021).

[763] Email from UAW to Monitor (Aug. 23, 2021).

[764] Although the UAW Constitution typically permits nominations on the floor, Article 8, § 2, the Consent Decree requires that the Monitor vet candidates and have a reasonable amount of time to do so.  Consent Decree ¶ 46.  Because the terms of the Consent Decree govern over any inconsistent provisions of the UAW Constitution, Consent Decree ¶ 16, the earlier deadline applies.

[765] Email from UAW Member to Monitor (Aug. 23, 2021).

[766] Email from UAW Member to Monitor (Aug. 24, 2021).

[767] *Id.*

There were no formal election protests that challenged the campaign conduct or results of the special regional conventions.   A delegate was turned away from the Region 1 special convention for failing to be in good standing.   No other issues arose.

* * *

Pursuant to Paragraph 58 of the Consent Decree, the foregoing Report constitutes the initial

report of the Monitor, Neil M. Barofsky.

**Date:   November 11, 2021**

_____

Neil M. Barofsky, Monitor

*Respectfully filed with the Court on behalf*
*of the Monitor by counsel to the Monitor,*

/s/ Michael W. Ross
Michael W. Ross
JENNER & BLOCK LLP
919 Third Avenue
New York, New York 10022
(212) 891-1600 (t)
(212) 891-1699 (f)