**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-13293 |
| | ) | Honorable David M. Lawson |
| INTERNATIONAL UNION, UNITED | ) | |
| AUTOMOBILE, AEROSPACE, AND | ) | |
| AGRICULTURAL IMPLEMENT | ) | |
| WORKERS OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**MONITOR'S SECOND STATUS REPORT**

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................1

I.   OVERVIEW OF THE REFERENDUM AND RULES PROCESS...........................3

II.  PROCESS OF DEVELOPING THE RULES ........................................................4

    A.  Input from Various Stakeholders ................................................................5

    B.  Comparative Analysis................................................................................6

    C.  Guiding Principles ....................................................................................7

III. SUMMARY OF THE RULES ...........................................................................8

    A.  Role and Responsibility of the Monitor......................................................9

    B.  The Use of Mail-In Ballots ......................................................................10

    C.  Retirees ..................................................................................................11

    D.  Vetting by the Monitor.............................................................................17

    E.  Nomination Method..................................................................................21

    F.   Slates .....................................................................................................22

    G.  Campaigning and Access.........................................................................24

    H.  Rules Against Anti-Democratic Conduct ..................................................25

    I.   Ranked Choice vs. Run-Off Election........................................................26

    J.   Campaign Finance ..................................................................................28

IV. FUTURE MILESTONES ................................................................................31

Pursuant to Paragraph 58 of the Consent Decree (Dkt. No. 10), the Court-appointed Monitor, Neil M. Barofsky, respectfully submits to the Court this second status report ("Second Report") concerning the monitorship of the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "Union" or the "UAW").

## INTRODUCTION

As directed by the Consent Decree entered on January 29, 2021, the Monitor was given three responsibilities upon appointment: (1) to help the UAW ensure that its compliance regime can prevent and remove fraud and corruption; (2) to investigate and address suspected past and present misconduct; and (3) to administer a referendum vote to decide the manner in which the Union would choose its senior-most leaders going forward, implement any change arising from that referendum, and oversee the Union's elections of its leadership during the monitorship.[1] On November 11, 2021, the Monitor filed with the Court an "Initial Status Report" of monitorship activities, which described the Monitor's activities in each of these three areas.[2]

This Second Report focuses solely on the Monitor's issuance of rules to govern the 2022 UAW International Officer Election (the "Rules"), pursuant to the election-related mandate. The Consent Decree provided that, if the direct election system were to prevail in the referendum, it would be the responsibility of the Monitor to both "develop all election rules and methods" for the direct election of the Union's International Executive Board (the "IEB" or "International Officers"), "in consultation with the UAW,"[3] and to "ensure that the election . . . shall follow the

---

[1] Consent Decree, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (Jan. 29, 2021), Civil No. 20-cv-13293, ECF No. 10 ("Consent Decree").

[2] *See generally* Monitor's Initial Status Report, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (Nov. 11, 2021), Civil No. 20-cv-13293, ECF No. 49 ("Monitor's Initial Status Report").

[3] Consent Decree ¶ 13.

requirements of the UAW Constitution, and all applicable state and federal laws, and [the Consent Decree]."[4]  In other words, the Consent Decree requires the Monitor to set the processes and procedures for the direct election, and then to take the necessary steps to ensure that they are followed.  This will be the Union's first election in which members vote directly to elect the IEB.

This Second Report describes the development of the Rules and their enforcement mechanisms, highlights their key features, and discusses expected upcoming activities as the Union moves toward this historic election later this year.  Further detail concerning these matters is set forth below.  This submission constitutes the Monitor's Second Report to the Court on the Monitor's activities.  Although the Monitor is required to provide an update to the Court at least every six months, those reports may be filed at shorter intervals, and the Monitor anticipates that the next report will be provided prior to the next six-month deadline and will address the Monitor's compliance and investigative mandates, which are not addressed in this Second Report.

---

[4] Consent Decree ¶ 45.

## I.        OVERVIEW OF THE REFERENDUM AND RULES PROCESS

The Consent Decree tasked the Monitor with administering and overseeing a Union-wide secret ballot referendum in which Union members were to decide whether the UAW would maintain its existing process of electing its leaders through a delegate system, or would adopt a direct election system under which each UAW member would vote directly to elect the most senior Union leadership.[5]  The Monitor oversaw this referendum (the "Referendum") in consultation with the UAW and in cooperation with the U.S. Department of Labor, Office of Labor-Management Standards ("OLMS"), and worked with both the UAW and OLMS to develop the rules, method, and ballot language used in the Referendum.  Referendum ballots were mailed out in October 2021 and were due on November 29, 2021.

On December 2, 2021, the Referendum vote count was completed.  In total, 140,586 votes were counted; of those, 89,615 members voted for the direct voting system (63.7%), and 50,971 members voted for the delegate voting system (36.3%).  As such, the vote count was in favor of the direct voting system.  The Monitor transmitted a "Referendum Report" to OLMS on January 7, 2022[6] and, on January 19, 2022, OLMS endorsed that Report.[7]  Subsequently, on January 31, 2022, the Court granted the Monitor's Unopposed Motion for Approval of Referendum Results, and ordered that the UAW Constitution be amended, prior to the International Officer election

---

[5] Consent Decree ¶ 8.

[6] *See generally* Monitor's Referendum Report, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (Jan. 24, 2022), Civil No. 20-cv-13293, ECF No. 52-2 ("Referendum Report"); *see also* Consent Decree ¶ 11.

[7] OLMS Endorsement, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (Jan. 24, 2022), Civil No. 20-cv-13293, ECF No. 52-3.

taking place at or following the next UAW Constitutional Convention, to incorporate the "one member, one vote" principle with respect to International Officer elections.[8]

## II.    PROCESS OF DEVELOPING THE RULES

Shortly after the Referendum vote count was complete, the Monitor began working with the UAW to design and implement a direct election system.  As detailed below, the Monitor, in consultation with the UAW, developed the Rules for the upcoming general election of UAW International Officers, which will occur later this year (the "2022 UAW International Officer Election," the "2022 Election," or the "Election").[9]  These Rules will remain in effect for future UAW International Officer elections unless and until they are subsequently modified (for example, based on lessons learned from the 2022 Election or by constitutional amendment).

The Monitor is also in the process of conferring with the UAW to draft language to amend the UAW Constitution to include the direct election system.  Such amendments to the Constitution will take place at the next Constitutional Convention, set to occur July 25-28, 2022.[10]  As discussed below, in addition to adopting the necessary changes to the UAW Constitution to effect the direct election system, the amendments will empower the UAW Convention delegates to choose how the UAW wants to proceed in the event that a candidate for International Office does not receive a majority of votes on the first ballot: either through a run-off election by mail of the top vote-getters

---

[8] Order Granting Joint Motion to Approve Referendum Results, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (Jan. 31, 2022), Civil No. 20-cv-13293, ECF No. 53, at 1-2 ("Order Approving Referendum Results"); *see also* Order Amending Deadlines for Completion of Change in Election Method and Amendment of UAW Constitution, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (Mar. 16, 2022), Civil No. 20-cv-13293, ECF No. 56 ("Order Amending Deadlines").

[9] Consent Decree ¶ 13.

[10] *See* Order Approving Referendum Results at 2-3; Order Amending Deadlines at 1-2; Consent Decree ¶ 12; Office of the Monitor, *Official Rules for the 2022 International Officer Election of the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America* at 4 (May 11, 2022) ("Rules").

in any given race; or by the use of ranked choice voting ballots, in which voters would rank the candidates in order of their preference (also referred to as an "instant run-off").

In designing and adopting the Rules, the Monitor was guided by the goal of having a fair, honest, open, and informed election, ensuring that no members are disenfranchised who have rights to participate in the current system, and reflecting a strong commitment to democratic values. As part of that process, the Monitor: (1) obtained input from various key stakeholders; (2) reviewed and considered comparable systems of union-wide direct elections; and (3) was guided by the key principles described below.

### A.   Input from Various Stakeholders

Under the Consent Decree, the Monitor is responsible for developing "all election rules and methods for the election of members of the IEB during the period of oversight" and must do so "in consultation with the UAW."[11] To that end, the Monitor held a series of meetings with the UAW in the months following the Referendum.[12] The views of the UAW were communicated through a working group made up of current members of the IEB, and set up by the Union to interface with the Monitor's Elections Team (the "IEB Working Group"), as well as with the UAW's internal and external counsel.[13] The IEB Working Group, typically through its counsel, also regularly articulated its positions to the Monitor's Elections Team via email.[14] The Monitor

---

[11] *See* Consent Decree ¶ 13.

[12] Meeting with UAW (Dec. 17, 2021); Meeting with UAW (Dec. 22, 2021); Meeting with UAW (Jan. 5, 2022); Meeting with UAW (Jan. 11, 2022); Meeting with UAW (Feb. 3, 2022); Meeting with UAW (Feb. 17, 2022); Meeting with UAW (Mar. 4, 2022).

[13] That team consisted of the Union's President, Secretary-Treasurer, a Vice President, two Regional Directors, the UAW's then-Acting General Counsel, and, at times, outside counsel. *See, e.g.,* Meeting with UAW (Jan. 5, 2022).

[14] *See, e.g.*, Email from UAW then-Acting General Counsel to Monitor (Jan. 13, 2022) (communicating position on retirees' eligibility to vote and hold International Office); Email from UAW then-Acting General Counsel to Monitor (Mar. 3, 2022) (changing position from there should be campaign contribution caps to there should not be campaign contribution caps).

carefully considered the UAW's views on various aspects of the Rules, although, as described below, the Monitor did not adopt those positions in all instances.

The Monitor also consulted with OLMS in developing the Rules.[15]  Although OLMS played a much smaller role in the development of these Election Rules than it did with respect to the Referendum Rules—for which its approval was required[16]—it provided valuable guidance on important provisions of the Labor-Management Reporting & Disclosure Act of 1959 ("LMRDA") for the Monitor to consider.

Further, the Monitor received input from other stakeholders who contacted the Monitor to express their views on the proposed Rules.  This included reviewing submissions from and meeting with members of the UAW's Member Advisory Committee on Ethics, the steering committee of the advocacy group Unite All Workers for Democracy ("UAWD"),[17] as well as individual UAW members who contacted the Monitor through the Monitor's Election Hotline.  Members of the Monitor's Elections Team reviewed all materials submitted by the interested parties and spoke with members, whose views were carefully considered on a variety of issues.

### B.    Comparative Analysis

Part of the Monitor's process in developing the Rules was to research the various iterations of direct election systems that could be administered.  For example, the Monitor studied the election systems of other large unions with local chapters that directly elect their top leadership, including the American Postal Workers Union, the International Longshore and Warehouse Union,

---

[15] Meeting with OLMS (Jan. 27, 2022); Meeting with OLMS (Mar. 18, 2022).

[16] Consent Decree ¶ 10.

[17] Meeting with UAWD (Dec. 16, 2021); Meeting with UAWD (Jan. 14, 2022); Meeting with UAWD (Feb. 9, 2022); Meeting with UAWD (Mar. 3, 2022); *see also* UAWD Recommendations to the UAW Monitor (Jan. 10, 2022); UAWD Position Statement to the Monitor on Additional Election Rules for the 2022 UAW International Executive Board Elections (Jan. 27, 2022); Follow up to 2-9-22 Meeting (Feb. 17, 2022).

the International Association of Machinists and Aerospace Workers, the United Steelworkers, and the International Brotherhood of Teamsters ("Teamsters").

As part of that process, the Monitor reviewed these other unions' elections literature, including their constitutional provisions on elections,[18] election rules,[19] and dedicated election websites.[20] The Monitor's Elections Team also met numerous times with the Elections Supervisor for the Teamsters,[21] who shared information and feedback regarding his experience administering the direct election of its top officers. Ultimately, these other unions' practices informed aspects of the Rules developed by the Monitor.

### C.   Guiding Principles

Because the UAW has never before had a direct election system, the drafting of the Rules was guided by several principles. The most important guiding principle was to implement a direct election system that would require as few changes as necessary to the Union's existing structures, systems, and Constitution. Thus, when an existing UAW practice or approach was amenable to the new direct election system in a manner that was fair and practical, the preference was to adapt it to the Rules. By disrupting as little of the UAW's historical culture and practices as possible, the Monitor sought to create a direct election system that would remain familiar to members, while at the same time carrying out the mandated direct election reform of the Referendum.

---

[18] *See, e.g.*, *International Brotherhood of Teamsters Constitution*, International Brotherhood of Teamsters (adopted 2016), https://teamster.org/wp-content/uploads/2018/12/73119teamstersconstitution.pdf ("Teamsters Constitution").

[19] *See, e.g.*, *Rules for the 2020-2021 IBT International Union Delegate and Officer Election*, Office of the Election Supervisor for the International Brotherhood of Teamsters (June 24, 2020), https://www.ibtvote.org/files/Rules-2020-2021-IBT-International-Union-Delegate-and-Officer-Election-20200624.pdf.

[20] *See, e.g.*, *IBT Vote*, Office of the Election Supervisor for the International Brotherhood of Teamsters (2022), https://www.ibtvote.org/.

[21] Meeting with Teamsters Elections Supervisor (Dec. 15, 2021); Meeting with Teamsters Elections Supervisor (Jan. 3, 2022); Meeting with Teamsters Elections Supervisor (Mar. 18, 2022).

In adopting a system designed to adhere closely to the UAW's existing Constitution and practices, the Monitor looked to the UAW Constitution, Public Review Board decisions, and other documents, and also consulted with the IEB Working Group.   Where the UAW's existing procedures were incompatible with a direct election system or otherwise inadequate, the Monitor then looked, where practical, to the best practices of international unions that did employ such a system, as noted above.  The Monitor also looked to existing labor laws surrounding the election of union officers as an important touchstone.  Finally, the Monitor was guided by what was practically achievable given the relatively short time frame to implement this new voting system.

Underlying this approach was a commitment to certain basic principles of impartiality, fairness, and democratic participation: (1) that the 2022 Election be run in an impartial manner; (2) that the 2022 Election strictly adhere to the Rules, the Consent Decree, the UAW Constitution (including the forthcoming amendments thereto), and applicable federal law, including the LMRDA; and (3) broad enfranchisement, with every eligible member able to vote by secret ballot.[22]  These principles animated the development of various aspects of the Rules, as detailed further below.

## III.   SUMMARY OF THE RULES

In designing the UAW's new direct election system, the Monitor worked closely with the UAW to construct a comprehensive set of Rules to reflect the principles described above.  The Rules have been drafted pursuant to the Consent Decree, the UAW Constitution (including the forthcoming amendments thereto), and applicable federal laws and regulations, including the

---

[22] Rules at 4.

LMRDA. A copy of the Rules is attached as Exhibit A to this Second Report, and they are available on the Monitor's and the UAW's websites.[23]

This section summarizes some of the key features of the Rules.

### A.      Role and Responsibility of the Monitor

The Rules establish the Monitor's authority to oversee the 2022 UAW International Officer Election, as dictated by the Consent Decree and the Court's January 31, 2022 Order.

The Rules cite the obligations and duties of the Monitor as set forth in the Consent Decree, which requires that the Monitor ensure that those participating in the Election comply with all applicable constitutional and legal requirements:[24] the Monitor will faithfully and impartially supervise all phases of the 2022 Election and interpret, enforce, and, when necessary, amend the Rules in consultation with the UAW in order to carry out and oversee the 2022 Election.[25]

Under the Rules, and pursuant to his duty to ensure compliance, the Monitor will receive and resolve any allegations of Rule violations, objections, and protests. The Monitor played the same role during the Referendum, and will continue to do so for the time being. The goal, however, is for that role to transfer to the UAW itself, initially with Monitor oversight, and, eventually, after the monitorship is terminated, without any role for the Monitor. The Monitor will work with the UAW to transition to such a system, and the Rules will be amended as necessary and appropriate.[26]

---

[23] *See* Court-Appointed, Independent Monitor of the UAW, *UAW International Elections*, UAW Monitor, https://www.uawmonitor.com/elections.

[24] Consent Decree ¶ 45 ("[T]he Monitor or his or her representative shall ensure that the election of the members of the IEB of the UAW shall follow the requirements of the UAW Constitution, and all applicable state and federal laws, and this decree.").

[25] Rules § 1-1.

[26] In the UAW's view, the Rules should have assigned the adjudication of objections, protests, and rule violations to the UAW itself, under the processes currently set forth in the Constitution. It further claims that assigning this role to the Monitor for the direct election "goes beyond the contours of the Consent Decree." But, as noted above, the Monitor played this adjudicating role during the Referendum without

The Rules also make clear that, consistent with the explicit direction in the Consent Decree, the Rules are not intended to "eliminate or limit a union member's right to seek relief from the Secretary of Labor and OLMS pursuant to the LMRDA, 29 U.S.C. § 401, *et seq.*"[27]  An aggrieved UAW member has the right to subsequently file a protest with the Secretary of Labor and OLMS, if they believe a violation of the LMRDA has occurred.[28]

### B. The Use of Mail-In Ballots

The Rules establish that the 2022 UAW International Officer Election will be conducted by mail-in ballots with a centralized vote count location.[29]

As with the Referendum, the UAW will select an election vendor to oversee all mailings, collections, and tabulations of the secret ballots (the "Election Vendor") pursuant to a competitive bid process for the 2022 UAW International Officer Election.  Once the proposals are received, the UAW, in consultation with the Monitor, will select the vendor or vendors best equipped to undertake the administration of a secret, mail-in ballot on the large scale required for this Election.

---

objection from the Union, and an immediate transition of that role to the Union would be premature and risk undermining the integrity of the 2022 Election.  Among other things, the UAW's current system for handling protests is designed to address issues that might arise in a Convention-based delegate election that traditionally was dominated by a single party, and not the far more complex direct election contemplated by the Rules.  Furthermore, there is no current mechanism to timely address allegations of Rule violations under the UAW's current system, nor would there even be one in place until the commencement of the Convention in late July.  Nor does the Monitor believe that there are sufficient safeguards in place in the existing system to give members the necessary assurance that the adjudications process would be independent and free of bias or influence.  Therefore, the Monitor will continue to adjudicate allegations of Rule violations and other protests, and the Monitor is committed to working with the UAW to ensure that an effective and fair process for handling election protests will be adopted so that this role can be transferred back to the UAW.

[27] Rules § 1-2; Consent Decree ¶ 13.

[28] Rules § 1-2.

[29] The Monitor's reasons for applying a mail-in ballot approach, as opposed to other possible election methods, are substantially the same as those that led to a mail-in ballot for the Referendum.  *See* Monitor's Initial Status Report at 161-62.

Relying on a mail-in ballot means that the UAW must have accurate mailing information for its members.  As detailed further in the Monitor's Initial Status Report, the UAW relies on Local Unions to provide their members' mailing addresses in order to maintain and update its mailing lists, and the Monitor continues to work with the UAW to improve the accuracy of those lists.[30]  Because the 2022 Election, like the Referendum, will also be conducted exclusively by mail-in ballot, the Monitor will work with the UAW to create and execute a plan to further improve the accuracy of the Global Mailing List for this Election.[31]

### C.      Retirees

Under the Rules, as with the Referendum, retirees will be eligible to vote in the 2022 UAW International Officer Election.  However, the President of the UAW and the full IEB have interpreted the UAW Constitution as prohibiting retirees from running for International Office, as discussed below.  This decision has been challenged by certain individual retirees seeking to run for office, as well as other UAW members who object to it.  Those objections are pending.

**Retiree Voting.**  Under the Rules, all UAW members in good standing (as of October 31, 2022) will be eligible to vote in the 2022 UAW International Officer Election, including members who are part-time workers, reinstated members, and retired members (the "Electorate").[32]

The Monitor's determination that retirees should be included in the Electorate was based on the Monitor's interpretation of the UAW's existing constitutional provisions and practices.  For example, the UAW Constitution provides that any retired member in good standing is entitled to "retired membership status," which provides "all of the privileges of membership," with three

---

[30] *See* Monitor's Initial Status Report at 167-71.
[31] Meeting with UAW Regional Directors (Mar. 24, 2022).
[32] Rules § 2-5.

enumerated exceptions that are not relevant to the election of International Officers.[33]  As a matter of UAW practice, moreover, retired members have previously voted directly and indirectly for International Officers, whether by serving as Constitutional Convention delegates (who then voted for International Officers), voting for delegates to the Constitutional Convention (who then cast such votes), or being involved in retiree-specific groups, which also elect members to serve as Constitutional Convention delegates (who then voted for International Officers).[34]  To hew as closely as possible to those constitutional provisions and practices, the Monitor established Rules allowing retirees to vote in the Election.

Retirees' eligibility to vote was discussed with the UAW over a period of time.  Initially, the UAW's lawyers advised the Monitor that they interpreted the UAW Constitution as prohibiting retirees from voting and provided arguments for that position.[35]  However, the UAW ultimately agreed with the Monitor that retired members should be eligible to vote in the Election.[36]

**Retirees as Candidates.**  By contrast, the Rules establish that retirees cannot run for International Office.[37]

Unlike in the case of retiree voting—in which constitutional provisions and practices clearly pointed in favor of their participation—the Monitor found the UAW Constitution to be ambiguous when it comes to retirees serving as candidates for International Office.

---

[33] UAW Const., art. 6, § 19 (retirees do not have the right to vote in elections "conducted pursuant to Article 19, Section 3 [ratification of contracts with employers]; Article 45, Section 2 [election of stewards and/or committeepersons]; and Article 50, Sections 1 and 5 [strike authorization and cessation].").

[34] Meeting with UAW at 5 (Jan. 11, 2022); UAW Const., art. 55, §§ 4(b), (f); UAW Const., art. 10, § 4.

[35] Email from UAW then-General Counsel to Monitor (Sept. 27, 2021); Email from UAW then-Acting General Counsel to Monitor (Jan. 13, 2022); Email from UAW then-Acting General Counsel to Monitor (Jan. 23, 2022); Meeting with UAW at 5 (Jan. 11, 2022).

[36] Meeting with UAW then-Acting General Counsel (Jan. 28, 2022).

[37] Rules § 3-1.

On one hand, the UAW Constitution contains no express prohibition on retired members running for International Office.  Article 10 of the UAW Constitution, which sets forth the qualifications for International Office, does not enumerate being an active member as a qualification,[38] which could suggest that there is no restriction on retirees holding such office. Further, Article 6, Section 19 of the Constitution states that retired members in good standing are entitled to "retired membership status," which provides "all of the privileges of membership," without having to pay membership dues,[39] with only three exceptions, none of which include running for International Office.[40]  It is not articulated in the Constitution whether or not holding International Office constitutes a "privilege" of membership.

On the other hand, there is a body of decisions reached through the Union's formal mechanisms for interpreting the UAW Constitution that have concluded that retired members are ineligible to run for certain offices in similar contexts.  For example, in 2002, the IEB adopted a constitutional interpretation which provides that "[r]etired members are ineligible to run for any local union position which carries responsibility for grievances or bargaining required by the Collective Bargaining Agreement(s) and/or local union bylaws."[41]  Although that constitutional interpretation applied to Local Union officers, International Officers also carry responsibilities for grievances and/or collective bargaining.[42]

The Union has also established a Public Review Board ("PRB") which serves, jointly with the UAW's Convention Appeals Committee, as the Union's final appellate authority for, among

---

[38] UAW Const., art. 10.

[39] UAW Const., art. 6, § 19.

[40] *See supra* note 33.

[41] UAW Const., art. 6, § 19(3) interpretation (2002).

[42] *See, e.g.*, UAW Const., art. 12, §§ 3, 17; UAW Const., art. 13, § 25; UAW Const., art. 19, § 2; UAW Const., art. 20; UAW Const., art. 33, §§ 2(a), 3(d).

other things, appeals of any decision of a Local Union (and, for example, as the exclusive appellate authority for complaints related to alleged violations of the UAW's Ethical Practices Codes).[43] Decisions of the PRB have concluded that retirees are ineligible for Local officer positions that "involve collective bargaining duties,"[44] which presumably includes International Officer positions.  For example:

- In *King v. UAW Local 600 Executive Board*, PRB Case 1499 (Sept. 19, 2005), the PRB ruled that a retiree could not run for Financial Secretary-Treasurer of his Local Union, holding that the "policy forbidding retirees from holding offices which involve collective bargaining duties applies to any office, not only those described in Article 45."[45]

- In *Hawkins v. Local Union 7, UAW*, PRB Case 1283 (Jan. 28, 2000), the PRB "found that the language of Article 6, §19, by excluding retirees from elections conducted pursuant to Article 19, §3; Article 45, §2; and Article 50, §§1 and 2, evinced the Constitutional framers' intent to exclude retirees as a class from participation in all aspects of the collective bargaining and contract administration processes."[46]

- In *Pearson v. Local Union 140, UAW*, PRB Case 1534 (Feb. 15, 2006), the PRB again affirmed the prohibition against retirees running for such offices, endorsing the International Union's policy arguments in support of such a prohibition.[47]

---

[43] *See* UAW Const., arts. 32-33.  The PRB was established on April 8, 1957 by action of the delegates to the sixteenth Constitutional Convention of the International UAW.  *See The Public Review Board*, UAW (2022), https://prbuaw.org/about-the-prb/; UAW Const., art. 32, §1 (the PRB was formed "[f]or the purpose of ensuring a continuation of high moral and ethical standards in the administrative and operative practices of the International Union and its subordinate bodies, and to further strengthen the democratic processes and appeal procedures within the Union as they affect the rights and privileges of individual members or subordinate bodies").

[44] *King v. UAW Local 600 Executive Board*, PRB Case 1499 at 9 (Sept. 19, 2005); *see also Pearson v. Local Union 140, UAW*, PRB Case 1534 at 7-8 (Feb. 15, 2006) (quoting *King*, PRB Case 1499 at 9); *Hawkins v. Local Union 7, UAW*, PRB Case 1283 at 5 (Jan. 28, 2000) (discussed in *King*, PRB Case 1499 at 9).

[45] *King*, PRB Case 1499 at 9.

[46] *King*, PRB Case 1499 at 9 (describing *Hawkins*, PRB Case 1283).

[47] *Pearson*, PRB Case 1534 at 7-8 ("Retired members are not as accountable to the current Union membership as active ones.  They may be less accessible.  They may also be more prone to represent the interests of other retired members instead of current members.  All of these factors may diminish the ability of the Union to react to the changing nature of the work place [sic].  They may also expose the Union to legal liability.") (quoting *King*, PRB Case 1499 at 9).

Despite this record of decisions, however, neither the above-referenced PRB rulings nor the 2002 constitutional interpretation explicitly address the eligibility of retired members to run for *International Office*, since each of those decisions and/or interpretations involved Local Union positions.[48]  This may be because, to the Monitor's knowledge, no retiree previously ran, or sought to run, for International Office, leaving no directly controlling precedent.

After considering the different positions from advocates on both sides of this issue, the Monitor concluded that both had meritorious arguments, arising out of an ambiguity in the UAW Constitution as to whether retirees could run for International Office.  The Monitor therefore concluded that the particular circumstances surrounding this issue *required* invoking the UAW Constitution's procedures for resolving constitutional ambiguity, rather than the Monitor resolving that ambiguity personally.  The UAW Constitution provides that the Union's President has the authority to decide "all questions involving interpretation of th[e] Constitution," and thus may issue constitutional interpretations.[49]  Pursuant to this provision, on March 15, 2022, the Monitor requested that the International President clarify whether UAW retirees in good standing could run for International Office under the UAW Constitution.[50]

On March 24, 2022, the UAW President issued a memorandum adopting two new constitutional interpretations, which concluded that retired members are not eligible to be nominated, run for, or be elected as an International Officer.[51]  The President's constitutional interpretations are subject to appeal to the IEB (and then to the Constitutional Convention),[52] or

---

[48] *See* UAW Const., art. 6, § 19(3) interpretation (2002); *King*, PRB Case 1499 at 9; *Pearson*, PRB Case 1534 at 7-8; *Hawkins*, PRB Case 1283 at 5 (discussed in *King*, PRB Case 1499 at 9).

[49] UAW Const., art. 13, § 8; *see also* UAW Const., art. 33, § 2.

[50] Letter from Monitor to UAW International President (Mar. 15, 2022).

[51] UAW International President, Memorandum and Constitutional Interpretations (Mar. 24, 2022).

[52] UAW Const., art. 13, § 8; *see also* UAW Const., art. 33, § 2.

the IEB may consider the decision of the President on any such issue on its own initiative.[53]   The

President thus requested that the IEB review and consent to this interpretation.[54]   On April 1, 2022,

the IEB considered the President's analysis and adopted these interpretations of the UAW

Constitution.[55]

Given the UAW President's constitutional interpretation, and the IEB's adoption thereof,

the Monitor included a prohibition against retired members running for International Office in the

Election Rules.

Upon learning that the Monitor had deferred to the constitutional process described above,

one retiree appealed the ruling to the Adjudications Officer, under the Consent Decree, and sought

to have the Rule prohibiting retirees from running for International Office held in abeyance.[56]   The

Monitor took no position on either the appeal or the abeyance request, other than to recite the basis

for his deferral to the President of the UAW and the materials upon which he relied in doing so.[57]

On April 19, 2022, the Adjudications Officer denied the request for an abeyance, and, on

April 22, 2022, the Adjudications Officer affirmed the actions of the Monitor.[58]   Like the Monitor,

the Adjudications Officer made clear that he himself took no position on the merits of whether the

President of the UAW made the correct decision in his interpretation of the UAW Constitution,

but rather the Adjudications Officer "agree[d] with the Monitor's assessment that the Constitution

is ambiguous as to whether retirees are eligible for International Office," ruled that, consistent with

---

[53] UAW Const., art. 12, § 6.

[54] UAW Const., art. 12, § 6.

[55] IEB Meeting (Apr. 1, 2022).

[56] Appeal to Adjudications Officer (Apr. 12, 2022).

[57] Letter from Monitor to Adjudications Officer (Apr. 19, 2022).

[58] Email from Adjudications Officer to Retiree (Apr. 19, 2022); Decision of the Adjudications Officer at 1, 8 (Apr. 22, 2022).

the UAW Constitution, the Monitor had appropriately referred the question to the Union's President, and that the Consent Decree and UAW Constitution prescribed the mechanism for any further appeal.[59]   The retiree subsequently filed a motion appealing the Adjudication Officer's ruling to the Court.[60]   That appeal is pending.

Other active and retired members have appealed the UAW President's constitutional interpretations prohibiting the candidacy of retired members to the IEB itself.[61]   Unless and until one of these appeals is granted, the Rules will continue to prohibit retirees from running for International Office.

### D.      Vetting by the Monitor

The Rules also set forth a process by which prospective candidates' eligibility to run for office under the Consent Decree, the UAW Constitution, and the Rules will be confirmed.[62]

In setting the Rules on this topic, the main issues the Monitor addressed were: (1) deciding what eligibility requirements the Monitor would assess; (2) settling on the process for such vetting, including any rights to appeal a determination by the Monitor that a prospective candidate is not eligible; and (3) establishing the timing for seeking the Monitor's vetting.

**Eligibility.**   The Consent Decree and the UAW Constitution contain requirements that a UAW member must meet in order to be eligible to run for International Office.   The Rules require the Monitor to vet prospective candidates to ensure that they are eligible under both documents' criteria.

---

[59] Decision of the Adjudications Officer at 7-8 (Apr. 22, 2022).

[60] *See* Motion for Interpretation of the Union Constitution, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (Apr. 27, 2022), Civil No. 20-cv-13293, ECF No. 57.

[61] Appeal to IEB (Apr. 15, 2022); Appeal to IEB (Apr. 30, 2022); Amended Appeal to IEB (May 1, 2022).

[62] Rules § 3-2.

First, as described in the Monitor's Initial Status Report, the Consent Decree contains eligibility provisions that require the Monitor to prohibit a prospective candidate from running for International Office if they have been found guilty of fraudulent or corrupt activity, either in court or in a UAW disciplinary proceeding; if their election would violate the Consent Decree's injunctive prohibitions; or if their election would be a crime involving the establishment or operation of a labor organization, employee benefit plan, labor management cooperation committee, or voluntary employee beneficiary association.[63] These requirements are incorporated into the Rules.[64]

Second, the Consent Decree requires the Monitor to "ensure that the election of the members of the IEB of the UAW shall follow the requirements of the UAW Constitution . . . ."[65] This includes ensuring that prospective candidates are qualified to run for International Office under the Union's constitutional requirements—*e.g.*, whether a prospective candidate has been a member in good standing for 12 consecutive months;[66] whether a Regional Director candidate has worked in the region;[67] and whether a member has engaged in certain conduct contrary to the Union's interests, such as furtherance of another union with the purpose of supplanting the UAW or promotion of organized workplace rackets (which would make the member ineligible to run for

---

[63] Consent Decree ¶ 46; Monitor's Initial Status Report at 176.

[64] *See* Rules § 3-1.

[65] Consent Decree ¶ 45.

[66] *See* UAW Const., art. 10, § 6.  The UAW Constitution currently requires a candidate to have been in continuous good standing for 12 consecutive months preceding the date of nomination.  Under the new direct election system, where elections do not occur immediately following nomination but in the months that follow, good standing for 12 months preceding the 2022 Convention *and* the member continuing in good standing thereafter are required.  *See* Rules § 3-1.

[67] UAW Const., art.10, § 2 (a member running for a Regional Director position must have worked at least 90 working days in a workplace(s) located within the region, and their Local Union must be located within the region).

and hold Office).[68]  A process for vetting those constitutional eligibility requirements through which the Monitor verifies each prospective candidate's eligibility under these criteria has been incorporated into the Rules.[69]

A draft of the Rules initially contemplated that the Monitor himself would run these constitutional eligibility checks.  The UAW expressed its strong preference that the Monitor act "as a check on the back end of the UAW process,"[70] rather than through vetting candidates in advance.  The Monitor agreed that the UAW should play an important role in this process, and, under the Rules, the Monitor will provide the prospective candidate names to the UAW and ask for it to verify in the first instance whether the individuals meet the necessary constitutional criteria (such as whether they have been a member in good standing) in a timely manner.  The Monitor will presume that the information relied on, and determination reached, by the Union are both accurate; but ultimately the Monitor will verify and decide each Candidate's constitutional eligibility.  The Monitor may also seek additional information in particular cases to reach that decision.

**Vetting Process.**  The Rules establish the specifics of the Monitor's process to vet candidates.

---

[68] *See* UAW Const., art. 10, §§ 7, 8, 12.  Specifically, a member is ineligible under these provisions if they are a member of or subservient to any political organization which owes its allegiance to any government other than the United States or Canada, directly or indirectly, such as the Communist, Fascist, or Nazi Organization (Section 7); are affirmatively engaged in the promotion, implementation, furtherance, or support of organized workplace rackets, such as numbers or bookmaking (Section 8); or have affirmatively engaged in: (a) the promotion, implementation, furtherance, or support of any other union or collective bargaining group with the purpose or intent of supplanting the UAW, or any subordinate body thereof, as the recognized collective bargaining agent; (b) efforts to decertify the UAW or any subordinate body thereof as the recognized collective bargaining agent; or (c) aiding or abetting an employer or another union to thwart organizing efforts by the UAW to become the bargaining agent (Section 12).

[69] *See* UAW Const., art. 10, §§ 2, 6, 7, 8, 12; Rules §§ 3-1, 3-2.

[70] UAW Comments on Draft Second Report (May 5, 2022).

Among other things, any prospective candidate must complete and submit to the Monitor a Candidate Declaration Form, available on the Monitor's website.[71]  The prospective candidate must attest in the Candidate Declaration Form to eligibility under the Consent Decree and the UAW Constitution, and must execute the Declaration under penalty of perjury.[72]

Following the submission of that Form, working closely with the UAW, the Monitor will conduct a review of the Form, run a background check, potentially conduct additional investigation, and make a determination.[73]  As noted above, the Monitor will also work closely with the UAW to obtain the information necessary to verify a member's constitutional eligibility to run for International Office.[74]  If the Monitor concludes that a prospective candidate is not eligible to run for International Office, based on the criteria noted above, the prospective candidate will have the right to appeal that determination to the Court-appointed Adjudications Officer,[75] and the Adjudications Officer's decision may be further appealed to the District Court.[76]  The Consent Decree provides that any determination by the Monitor regarding a prospective candidate's eligibility for International Office that is not appealed through these procedures may not be otherwise appealed or challenged.[77]

Upon the Monitor's determination, the appeal procedures will be communicated to any prospective candidate who the Monitor determines is not eligible to run for International Office.

---

[71] Rules § 3-2.

[72] Rules § 3-2.

[73] Rules § 3-2.

[74] Rules § 3-2.

[75] Rules §§ 3-2, 9-6; Consent Decree ¶ 47.

[76] Rules §§ 3-2, 9-6; Consent Decree ¶¶ 48-49.

[77] Consent Decree ¶ 48.

As noted in the Initial Status Report, the Monitor's role in vetting candidates under these criteria is purely objective—the Monitor will not opine on the suitability of any prospective candidate beyond these specific eligibility criteria.[78]

**Timing.**   In order to provide time for the Monitor's vetting and any appeal from the Monitor's determination, as well as to permit time for campaigning pursuant to the Rules, any UAW member seeking to run for International Office may submit their Candidate Declaration Form to the Monitor now, or at any time *no later than* three calendar days after nominations are made at the Convention.[79]   A prospective candidate will be presumed to be a "Bona Fide Candidate" (and have all the rights and responsibilities of a Bona Fide Candidate, described below) if they submit a Candidate Declaration Form which is complete, and which on its face demonstrates that the individual meets the eligibility requirements.[80]   The Monitor will then work with the UAW to complete the vetting procedure as quickly as possible, and will thereafter officially inform the prospective candidate of their eligibility to run for International Office.[81]

### E.   Nomination Method

The Rules reflect the longstanding UAW practice that Candidates for International Office must be nominated (and accept the nomination) on the floor of the Constitutional Convention by Convention delegates,[82] without any need for a petition or minimum threshold to become an eligible Candidate.[83]   Nominated Candidates will then appear on the 2022 Election ballot, rather than any vote taking place at the Constitutional Convention.   Although other international unions

---

[78] Monitor's Initial Status Report at 178; Rules § 3-2.

[79] Rules §§ 2-1, 3-2.

[80] Rules § 3-2.

[81] Rules Election Timeline; Rules § 3-2; *see also* Rules § 4-7.

[82] Meeting with UAW at 4 (Jan. 11, 2022).

[83] *See* Meeting with UAW at 4 (Jan. 11, 2022).

require a more significant showing of support before being placed on the ballot, neither the UAW nor any other stakeholder with whom the Monitor communicated advocated that the UAW should adopt more stringent requirements for the nomination process. Following the principles enumerated above, the Rules, therefore, do not alter the existing nomination process.

### F. Slates

The Rules provide each Candidate the right to seek nomination, be nominated, campaign, and appear on the ballot as a member of a slate of multiple candidates for International Office (a "Slate").[84] If a Candidate is part of a Slate, then the ballot will identify the Slate or Slates associated with that Candidate.[85]

A Slate is "non-binding," however, because voters will not be required to vote for all candidates from the same Slate. Instead, voters will be free to "mix and match" by choosing candidates across multiple Slates for different offices. In other words, voters will vote for individual Candidates for each office, and accordingly may select Candidates from various Slates if desired.[86]

The use of non-binding Slates is consistent with past UAW practice. The use of Slates is not expressly addressed in the UAW Constitution, although the UAW has adopted a constitutional interpretation that prohibits *binding* slates (*i.e.*, those in which a member must vote for all candidates on a slate).[87] Consistent with that ruling, the UAW has used *non-binding* slates (*i.e.*, those in which a member can vote for any individual candidate, regardless of what slate they are

---

[84] Rules § 6-3.
[85] Rules § 6-1.
[86] Rules § 6-4.
[87] UAW Const., art. 38, § 10, Interpretation (1) (revised June 23, 1983).

on) at UAW conventions, including as recently as 2018.[88]   Other large unions also use non-binding

slates.[89]   Allowing non-binding Slates is intended to permit Candidates to run on a political vision

and gain the potential benefit of having the electorate associate those Candidates with such vision

(and with other Candidates who may share the same vision), without constraining voters' choices,

consistent with pro-democratic principles.

Under the Rules, in order to form a Slate, all Candidates running on the Slate must agree

to be listed on it.[90]   To evidence that mutual consent, Candidates who want to run together on a

Slate will all need to sign a Slate Declaration Form providing the position that each Candidate

seeks, and the name of the Slate to be formed.[91]   No Candidate may be compelled to run as a

member of a Slate.[92]   A Candidate may associate themselves with more than one Slate, but they

must provide notice to and receive written consent from all members of each Slate with which they

will associate, and they assume all the responsibilities for any and all Slates of which they are a

member, including the Slate's campaign finance disclosure and record-keeping obligations.[93]   The

number of Slate members may not exceed a single Candidate for each open office (one for

International President, one for International Secretary-Treasurer, three for International Vice

President, and one for each of nine Regional Director positions, totaling 14 Candidates).[94]

---

[88] 2018 UAW Constitutional Convention Proceedings at 315 (rules committee recommending procedure), 316 (rules committee report adopted), 331-56 (announcement of slates and voting).

[89] *See, e.g.*, *Rules for the 2020-2021 IBT International Union Delegate and Officer Election*, Office of the Election Supervisor for the International Brotherhood of Teamsters (June 24, 2020), https://www.ibtvote.org/files/Rules-2020-2021-IBT-International-Union-Delegate-and-Officer-Election-20200624.pdf.

[90] Rules § 6-3.

[91] Rules § 6-3.

[92] Rules § 6-3.

[93] Rules § 6-3; *see also* Rules § 8; *infra* § J ("Campaign Finance").

[94] Rules § 6-3.

Amended declarations may be submitted adding additional Candidates to the Slate.[95]   Because unanimity is required to be on a Slate, if a Slate wishes to remove one or more previously-declared Candidates from the Slate, they may do so at any time by emailing the Monitor and copying all other members of the Slate.[96]   Similarly, if a Candidate wishes to leave a Slate, they may do so in the same fashion.[97]

The Monitor will accept Slate Declaration Forms from the date the Rules are issued until September 1, 2022.[98]   For each Slate, the candidates must designate a "Slate treasurer" who will have primary responsibility for any financial disclosures that may be submitted on behalf of the Slate.[99]

### G.      Campaigning and Access

Providing equal access to Union resources for Candidates or Slates for the purpose of campaigning is an important component of a free and fair election, and Title IV of the LMRDA requires that all Candidates or Slates have the opportunity to achieve a level of visibility across the entire active and retired membership population of the Union.

The Rules reflect these Title IV requirements, including: (1) ensuring various equal rights around inspection (including the Union's membership lists, worksite lists, and certified Convention delegate list); (2) the equal right to attend the meetings of Local Unions and address the membership, subject to a process set out in the Rules; (3) the opportunity to have campaign literature published in the summer 2022 edition of *Solidarity* magazine, which will be mailed to

---

[95] Rules § 6-3.

[96] Rules § 6-3.

[97] Rules § 6-3.

[98] Rules § 6-3.

[99] Rules § 6-3.

all members in September 2022; (4) the opportunity to have campaign literature published on the UAW website; and (5) for Candidates for International President, the opportunity to participate in a scheduled Candidate Forum. The Monitor and the UAW will consider the scheduling of additional forums for Candidates for other offices, and other means of providing visibility to all Candidates.

### H. Rules Against Anti-Democratic Conduct

Consistent with the guiding principles of fairness and access, the Rules seek to prevent any anti-democratic efforts or policies in the UAW's new direct election system.[100] The Rules specifically prohibit any retaliation or threat of retaliation by the International Union or its Local Unions, or by any individual officer, employee, or member thereof (or by anyone else), against any Union member, officer, or employee for exercising any right guaranteed by the Rules.[101] This includes every member's freedom to advocate for or against any Candidate or Slate, to run for International Office and/or to join any Slate, and to donate funds to or vote for or against any Candidate or Slate.[102] This also applies to any adverse employment action taken against UAW staff during the pendency of the 2022 Election in retaliation for their democratic participation in the Election.[103] For example, during the pendency of the Election, no Union staff member will be required to take an unpaid leave of absence or resign due to their participation in the electoral process.

---

[100] *See* Rules at 4.

[101] Rules § 4-5.

[102] Rules § 4-5.

[103] *See* Rules § 4-5 (applying the anti-discrimination principle to any "Union member, officer, or employee"); Rules § 10-2 (listing "action affecting a member's employment, Union job referral status, or Union membership status or position" as an example of Election-related misconduct).

I.        **Ranked Choice vs. Run-Off Election**

The UAW Constitution currently requires, under the delegate election system, that the election of International Officers "shall be determined by a majority of the delegates voting."[104] When there are a certain number of nominees for an International Office and no candidate receives a majority vote, the UAW Constitution requires a run-off election to determine the winner.[105] Because the direct voting system will be conducted by mail (and not at the Convention), the Constitution must be amended as to how such a run-off will be conducted.

Stakeholders have advocated two alternative methods for addressing this situation in the new direct election system.  The first method, advocated by the IEB Working Group, would require a run-off election by mail of the top vote-getters in any given race in the event no Candidate has secured a majority of the votes for that seat.  The IEB Working Group strongly prefers a run-off election due to the "long-standing" practice in the Union to hold run-off elections where no candidate receives a majority vote, as dictated by the Constitution.[106]

Alternatively, other groups have suggested the use of "ranked choice" voting (sometimes referred to as an "instant run-off"), which establishes the winner by allowing voters to rank the Candidates in order of their preference on the initial ballot, so that no separate run-off ballots are

---

[104] UAW Const., art. 10, § 4.  "In the election of the Vice Presidents each delegate may vote for three (3) candidates.  If there are five (5) or more nominees for the three (3) offices and less than three (3) candidates receive a majority vote, the candidate receiving the lowest number of votes shall be eliminated from the run-off election, and in each successive run-off election the candidate receiving the lowest number of votes shall be eliminated, unless such elimination would result in reducing the number of candidates in nomination to a figure equal to the remaining vacancy or vacancies."  UAW Const., art. 10, § 4.  "In any election for International President, International Secretary-Treasurer, [or] International Executive Board Member [*i.e.*, Regional Director] . . . where there are three (3) or more candidates and, on the first ballot no such candidate receives a majority, there shall be a run-off between the two (2) candidates who received the highest number of votes on the first ballot."  UAW Const., art. 10, § 5.

[105] UAW Const., art. 10, §§ 4-5.

[106] UAW Const., art. 10, § 5; Meeting with UAW (Feb. 17, 2022); Meeting with UAW (Mar. 4, 2022); Email from UAW then-Acting General Counsel to Monitor (Feb. 13, 2022).

required.  More specifically, under a ranked choice system, voters can choose to rank the Candidates in a sequence of first, second, third, etc., so that—if no one gets a majority—there is effectively an instant run-off that eliminates Candidates in a series of rounds, emulating the effect of separate ballots on shrinking sets of Candidates.[107]  Advocates say that ranked choice voting honors the will of the majority, consistent with the UAW Constitution, and does so in a less expensive and more timely manner than implementing a run-off election, which they say would cause an unnecessary expenditure of millions of dollars for the Union and delay the results by months.  They also argue it will provide a more democratic outcome, as they predict a significant drop-off in the number of voters who would participate in a subsequent, separate run-off election.  The IEB Working Group has objected to ranked choice voting, saying that it is not used by other unions and is potentially undemocratic because it may result in the election of officers who are not the first choice of the majority of voters.

In the Monitor's view, both the run-off and ranked choice voting approaches have merit.  The Monitor concluded that the choice of which one should be adopted in the UAW Constitution is best made by the Union itself.  Therefore, and consistent with the UAW's constitutional approach to amendments, proposed amendments to the UAW Constitution will be drafted for ratification at the Convention, thereby formally adopting the direct election system as required by the Consent Decree.  As part of that process, the delegates to the Convention will have a choice of what system to adopt:

---

[107] The first round consists of the votes as cast.  If no one has a majority of the vote in the first count, the Candidate with the fewest first-place preferences is identified and deleted from the voting for subsequent rounds.  The second preference Candidates of the voters who voted for that now-eliminated Candidate are transferred to those second preference Candidates.  This continues until there is a majority preference for a Candidate.

- One option would require a run-off election by mail of the top vote-getters in any given race in the event no Candidate has secured a majority of the votes;

- The other option would require the use of "ranked choice" voting ballots, which establish the winner by giving voters the option of ranking the Candidates in order of their preference so that no separate run-off is required.

The Rules have been drafted to reference both potential systems so that, depending on the delegates' decision, one of the two sets of amendments will be adopted, and the Rules will be amended to reflect such decision.[108]

### J.    Campaign Finance

The Rules apply the campaign finance restrictions of Title IV of the LMRDA, which restrict the use of Union or employer resources in connection with political campaigning for Union offices.[109]

In reaching the decision to limit campaign finance rules concerning the source of permissible funds to Title IV alone, the Monitor gave great weight to the UAW historically having had no restrictions on how funds may be raised, donated, or spent in its elections beyond standard Title IV prohibitions.  The Monitor considered restrictions on sources beyond Title IV, such as a prohibition on funds from non-member donors (which was advocated for by the IEB Working Group) or campaign contribution limits (which was championed by other interested groups), but ultimately determined that implementing these types of prohibitions was impractical given the short time available to prepare a campaign finance system for this Election, and that the

---

[108] Rules §§ 1-1, 2-3, 2-14, 6-2.
[109] LMRDA, Title IV, § 401(g).

prohibitions contained within Title IV were sufficient.[110]  Thus, the Rules conform as closely as possible to the UAW's historical practices, although they do include several new and important enforcement mechanisms, as discussed below.

The application of Title IV to the Election is detailed further in the Rules, which make clear that union and employer resources are the only prohibited sources of campaign funding, and that Candidates, Slates, and any other individuals or groups seeking to raise, donate, and/or expend resources in connection with the 2022 UAW International Officer Election (defined in the Rules as "Covered Parties") have explicit record-keeping and disclosure requirements for all resources used in the Election.  The system puts great responsibility on these individuals and entities to make sure that they do not receive, raise, donate, or spend funds prohibited under Title IV.

There are two critical aspects of this system to help ensure strict compliance with Title IV and to avoid any unfairness or disparate treatment in the campaign finance system:

- *First*, the Monitor has adopted a "True Source Rule," which requires all contributions or funds to come from the identified individual or entity disclosed to the Monitor under the Rules' specific disclosure requirements, and not from any other person or entity (irrespective of whether that person or entity is otherwise permitted to make contributions) who in turn provides funds to the reported donor.[111]  In other words, there must be complete transparency as to the source of any monies involved in the Election, and further, any use of a "straw man" to mask the true origin of campaign contributions is strictly prohibited.

- *Second*, the "True Purpose Rule" requires all contributions or funds to be tendered for the unambiguous and express purpose of either: (1) supporting a Candidate or Slate of Candidates in the 2022 UAW International Officer

---

[110]  Implementing such additional restrictions was simply not possible given the timeline for the 2022 Election.  For example, discussions with the Teamsters indicated that its system—which includes both campaign contribution limits and limits donations to only those given by members—took a considerable amount of time and resources to implement, including creating proprietary software and undergoing many election cycles of refinement.  The Monitor and the UAW will closely assess the current Election, and reevaluate afterwards whether such provisions would be appropriate for future International Officer elections.

[111]  Rules § 8-1.

Election; or (2) furthering a political cause or goal in connection with the Election.[112]

Both the True Source Rule and the True Purpose Rule are designed to ensure complete transparency of all money impacting the Election—a crucial component of a fair and democratic election—and also to facilitate enforcement of Title IV restrictions by the Monitor.  The Rules, applying to all funds intended to be used in connection with the Election regardless of when collected, may impact the ability of Candidates, Slates, or Covered Parties from utilizing multi-purpose funds, like some of the Union's Officers' so-called "flower funds," in connection with this Election.[113]  Such funds are not categorically prohibited, but the individuals seeking to utilize them in connection with the Election must demonstrate complete adherence to the True Source and True Purpose Rules, or the funds in question will not be usable.[114]

Finally, in the interest of transparency as to source and purpose, the Rules establish a detailed system whereby Candidates, Slates, or Covered Parties must open independent bank accounts for Election-related funds, which must be the sole source for paying for campaign expenditures, and make initial and periodic disclosures to the Monitor accounting for the source of contributions and all Election-related expenditures.[115]  The disclosure statements will be made available for inspection by other Candidates and Slates during the Election period.[116]  The Rules also provide options for how to dispose of unused campaign funds.[117]

---

[112] Rules § 8-1.

[113] Rules § 8-1.

[114] Rules § 8-1.

[115] Rules §§ 8-6, 8-8.

[116] Rules § 8-8.

[117] Rules § 8-10.

## IV.    FUTURE MILESTONES

The issuance of the Rules will recognize the commencement of the 2022 UAW International Officer Election cycle.

The following important dates are upcoming:

- From July 25-28, 2022, the 2022 Constitutional Convention will be held in Detroit, MI, during which, among other things, Convention delegates will nominate individuals to run for UAW International Office and will adopt amendments to the UAW Constitution.

- In September 2022, there will be at least one UAW International Officer Election Candidate Forum, allowing Candidates for International President to address the membership at large.  The forum will be recorded and posted on the Monitor's and the UAW's websites.

- On October 17, 2022, the first formal mail distribution of mail-in ballots will be distributed to the electorate.  Members will be able to request replacement ballots—or a first ballot if they never received one—through November 11, 2022.  The Monitor strongly encourages members to place their ballots in return mail no later than November 18, 2022, and the deadline for all ballots to be received by the designated U.S. Post Office or Postal Facility is November 28, 2022 at 4 p.m. ET.

- Under the direct supervision of the Monitor, the Election Vendor will begin the tabulation of ballots on November 29, 2022 at 9 a.m. ET.  Once the tabulation of ballots is complete, the unofficial results will be announced by the Monitor.  If the delegates at the 2022 Constitutional Convention choose to adopt a ranked choice (instant run-off) system, the Candidates who received a majority of the vote will be announced as the unofficial victors of their races at this time.  If the delegates at the 2022 Constitutional Convention choose to adopt a traditional run-off system, with separate balloting, there will be a run-off election ("Run-Off Election") for any race where no Candidate received a majority of the vote.  The Candidates who did receive a majority of the vote will be announced as the unofficial victors of their races at this time.

- In or about December 2022, within seven days of the unofficial announcement of the results, all official victors of International Officer races will be sworn in.  If the delegates at the 2022 Constitutional Convention choose to adopt a traditional run-off system, with separate balloting for any unresolved offices where no individual received a majority of the votes, a Run-Off Election will be held to determine the winner of those offices.

- It is anticipated that such Run-Off Election ballots will be distributed no later than January 2023, and the ballots returned and counted in February 2023, with the victors announced and sworn in within seven days of the unofficial announcement of the Run-Off Election results.

\*       \*       \*

Pursuant to Paragraph 58 of the Consent Decree, the foregoing Report constitutes the second report of the Monitor, Neil M. Barofsky.

**Date:  May 11, 2022**

_____
Neil M. Barofsky, Monitor

*Respectfully filed with the Court on behalf
of the Monitor by counsel to the Monitor,*

/s/ Michael W. Ross
Michael W. Ross
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, New York 10036
(212) 891-1600 (t)
(212) 891-1699 (f)