**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-13293 |
| | ) | Honorable David M. Lawson |
| INTERNATIONAL UNION, UNITED | ) | |
| AUTOMOBILE, AEROSPACE, AND | ) | |
| AGRICULTURAL IMPLEMENT | ) | |
| WORKERS OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**MONITOR'S THIRD STATUS REPORT**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

I.   UPDATE CONCERNING INVESTIGATIONS ......................................................7

II.  UPDATE CONCERNING COMPLIANCE-RELATED ACTIVITIES ................................19

     A. Transparency and Cooperation with the Monitor ................................................20

     B. Implementation of the Monitor's Recommendations ........................................22

          1. Adoption of Policies ..............................................................................23

          2. Instilling a Culture of Compliance and Accountability ...............................25

          3. Conference Expenditures and Master Billing Arrangements .....................28

     C. Recommendation on Branded Merchandise .......................................................30

III. UPDATE CONCERNING ELECTION ACTIVITIES ...........................................32

Pursuant to Paragraph 58 of the Consent Decree (Dkt. No. 10), the Court-appointed Monitor, Neil M. Barofsky, respectfully submits to the Court this third status report ("Third Report") concerning the monitorship of the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "Union" or the "UAW").

## INTRODUCTION

On November 11, 2021, the Monitor filed with the Court an "Initial Status Report" of monitorship activities which, among other things, described certain shortfalls with the UAW's level of transparency and cooperation with the Monitor, but ultimately expressed hope, soon proven to be premature, that efforts made by the Union immediately prior to the issuance of that report showed that the Union was "on the right track."[1]  The Monitor cited a series of examples supporting that assessment, including that the Union had sought and received an Order from the Court under Federal Rule of Evidence 502(d) allowing it to share work product from its own internal investigative efforts without risking a waiver of privilege (the "502 Order").[2]  The Monitor further reported that, pursuant to that Order, the Union had promised to share the notes of its investigative interviews in order to assist the Monitor in his duty under the Consent Decree to continue aspects of the government's corruption investigation.[3]  The Initial Status Report gave the Union credit for agreeing to give the Monitor this investigative information and—based on that and other instances in which the Union had promised cooperation with the Monitor's work—

---

[1] *See* Monitor's Initial Status Report, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (Nov. 11, 2021), Civil No. 20-cv-13293, ECF No. 49 at 143 ("Monitor's Initial Status Report").

[2] Order Granting Def.'s Unopposed Mot. for Order Governing Disclosure of Privileged Materials, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (Aug. 11, 2021), Civil No. 20-cv-13293, ECF No. 40.

[3] *See* Monitor's Initial Status Report at 149-50.

1

expressed optimism that the Union's delays in providing needed information to the Monitor were at an end.[4]

Unfortunately, after the filing of the Initial Status Report—from November 2021 through March 2022, as detailed further below—the Union's cooperativeness veered sharply in the wrong direction. Rather than the UAW providing the promised oral interview summaries to the Monitor, the Union withdrew from its commitment to do so, citing concerns that the Monitor might improperly use that information in a way that could become public.[5] The Union also further slowed its production of other investigative materials to the Monitor and declined to timely share certain information about its efforts to implement compliance reforms.

Making matters worse, as the Monitor tried to carry on with his work, the Monitor uncovered evidence that the Union's leadership and its then-lawyers were concealing from the Monitor an investigation by the Union into the mishandling of a sum of cash by a regional Assistant Director, a senior Union official. The Union withheld information about this misconduct and the related investigation even though, from early in the monitorship, the Monitor has had a standing request to the Union for prompt disclosure of information about all investigations into potential financial misconduct or corruption taking place in the Union. The Monitor had also specifically warned the Union's President in writing about the need to comply with that demand, following a previous failure to do so. The Union compounded that violation of its obligation to cooperate with the Monitor by improperly excluding a representative of the Monitor from an "executive session" of a meeting of the Union's International Executive Board ("IEB") in which factual information

---

[4] *See* Monitor's Initial Status Report at 10, 143, 149.
[5] In the context of the Consent Decree, public disclosure would mean including the information in a filing of disciplinary charges against a Union official or in a status report to the Court. The Union claimed that it had changed its position because the Union believed that the Monitor might improperly disclose the information publicly. This was plainly pretextual, as discussed *infra* at footnote 37.

about this ongoing investigation was shared.  It was only during the course of unrelated investigative work that the Monitor independently learned of the misconduct underlying the undisclosed investigation.

These actions resulted in the apparent obstruction and interference with the investigative work of the Monitor in violation of Paragraph 18(d) of the Consent Decree, which enjoins the Union and its officials from "[o]bstructing or otherwise interfering, directly or indirectly, in any way or degree, with the work of the [Monitor] or his/her/their designated agents and representatives."[6]  The Union's concealment of evidence of the misconduct of one of its leaders and its own investigation into that misconduct interfered with the Monitor's ability to carry out his work under the Consent Decree, and prevented the Monitor from conducting his own investigation in a timely and independent manner.

Faced with the discovery of this conduct, along with other actions detailed in this Report that evinced a pattern of uncooperative conduct by the Union, the Monitor concluded that he had little recourse but to bring these matters to the attention of the U.S. Department of Justice ("DOJ"), the other party to the Consent Decree.  In reaction, U.S. Attorney Dawn N. Ison convened a meeting with her senior staff, UAW President Raymond Curry and the UAW's General Counsel, and the Monitor and a senior member of his team.  At that meeting, the U.S. Attorney expressed her concerns about what she described as the Union's violations of the Consent Decree for not disclosing information to the Monitor, and its "gamesmanship" by seeking the 502 Order from the Court for the purpose of providing investigative information to the Monitor, promising to do so,

---

[6] *See* Letter from Monitor to UAW International President (Mar. 9, 2022); Consent Decree, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (Jan. 29, 2021), Civil No. 20-cv-13293, ECF No. 10, ¶ 18(d) ("Consent Decree").  As discussed *infra,* the UAW disputes that its actions violated the Consent Decree, but has agreed to accommodations to ensure that these actions do not occur again.

and then reneging on that promise.  She insisted that the Union change course by committing to concrete steps toward cooperation with the Monitor, or face action from the Department of Justice for its violations of the Consent Decree.  In that meeting, the Union President disputed that the Union violated the Consent Decree, but nonetheless committed to "a total reset" with the Monitor.

That meeting appears to have had a significant and positive impact on the Union's approach to the monitorship.  Following the meeting with the U.S. Attorney, and under the leadership of the Union's new General Counsel—who made a pledge early in her tenure to cooperate with the Monitor—the Union reversed its prior decisions to withhold information from the Monitor and began a new, transparent posture that has persisted through the date of this Report.  This includes now honoring its commitment to share materials from its prior investigative work; improving the process for getting investigative and compliance materials to the Monitor; and sharing information with the Monitor and cooperating in efforts to implement compliance reforms.  Finally, the Union has removed from their previous roles the lawyers who participated in the concealment of the investigation from the Monitor and, with new counsel, is providing improved transparency into new and ongoing investigations.  The Union should be commended for its reaction and response to the meeting with the U.S. Attorney.

Notwithstanding the challenges posed by the Union during the early period covered by this Report, its subsequent change in approach has helped the Monitor make meaningful progress in working with the Union to carry out the Consent Decree's investigative and compliance mandates. With regard to the investigative mandate, the Monitor recently took action against two former Union officials for embezzling Union funds (charging one and settling charges with the other), and has opened five new investigations based on the review of documents, witness interviews, and other materials.  This includes an investigation into a senior UAW leader that was initiated by the

Monitor upon receiving information directly from the UAW.  In total, the Monitor is currently working on 19 open investigations.

With regard to the compliance mandate, the Monitor is working with the Union to carry out reforms in response to the 38 recommendations made by the Monitor in the Initial Status Report, including through the adoption of new policies and procedures to prevent fraud and abuse. Among the significant steps taken by the Union described in this Report, the Union has engaged a new internal audit service provider, implemented new financial controls around vendor relationships, and provided additional resources for IT system upgrades.  The Monitor also issued two new recommendations that the Union has adopted.  First, after the Monitor learned that the UAW used Union resources to purchase approximately 1,500 backpacks with the name and title of an IEB member who is currently running for IEB office, approximately half of which were distributed at a conference, the Monitor expressed concern that such actions might violate the Labor-Management Reporting & Disclosure Act of 1959 ("LMRDA"), Title IV, 29 U.S.C. § 401(g), and recommended that the Union adopt a policy to prohibit the use of Union funds for such merchandise.  Second, after learning of significant expenditures at conferences that were made with inadequate oversight or policy controls, the Monitor recommended that the Union adopt procedures to police expenditures at Union conferences.  Further detail concerning these developments is set forth below.[7]

---

[7] As with the Monitor's prior reports, in order to finalize this Report for submission to the Court, the Monitor set a cut-off date of June 28, 2022 for the inclusion of facts in the Report, such that all of the information in this Report is as of that date, except where specifically noted.  In order to ensure the factual accuracy of this Report, the Monitor provided the Union with drafts of the body of this report in advance of its filing to solicit the Union's feedback, and to seek to correct any potential factual errors or to fill in any relevant and material information that the Monitor may have neglected to include.  In response to that draft, the Union helpfully provided thoughtful comments and suggestions, many of which have been included in this Report. In all events, the Monitor retained discretion to determine what facts should be included in the Report, with the key aim of a factually accurate Report.

Although there are positive changes in the Union's cooperation and transparency with the Monitor, given the amount of work still ahead, it is still too soon to fully assess the Union's progress in carrying out the reforms it must enact to sustain much needed cultural change.  To its credit, the Union has drafted a new code of conduct and anti-bribery policy, conducted ethics and compliance trainings, and started to use formal job descriptions, job postings, and competitive hiring processes—all of which will address the vestiges of the "toxic" culture described in the Monitor's Initial Status Report.  Yet, in many ways, the recent improvement in transparency and collaboration from the UAW has revealed the great distance the UAW has yet to cover in order to implement the recommendations in the Initial Status Report.  For example, although it is commendable that the IEB has approved additional policies to tighten financial controls, critical draft policies still need to be approved and implemented, and the Union is, despite its efforts to recruit one, still without a dedicated Compliance Director.

Nonetheless, at present, the Union once again appears to be on the right track.  To be sure, this is not the first time the Monitor is expressing optimism about the UAW's cooperation after a change of approach by the Union.  But, unlike in November 2021, it appears that the Union now has a stronger foundation in place for lasting cooperation and transparency.  Under the stewardship of a new General Counsel, supported by new outside counsel and buttressed by the commitment of the Union's President to a watchful U.S. Attorney to a "total reset" in relations with the Monitor, the Union is better poised to make progress during the next period of the monitorship.

Further detail concerning these matters is set forth below.  This submission constitutes the Monitor's Third Report to the Court on the Monitor's activities.  The Monitor will provide another update within six months.

## I.  UPDATE CONCERNING INVESTIGATIONS

A core aspect of the Consent Decree is the Monitor's duty to root out any lingering fraud and corruption from the Union,[8] ensuring that the government's investigation was complete and that any further attempts at defrauding the Union are stopped.  The Monitor's Initial Status Report, filed in November 2021, reported on the status of the Monitor's activities to carry out that mandate to "investigate suspected misconduct at the UAW and commence charges based on that misconduct."[9]

Since the filing of the Initial Status Report, the Monitor has continued to make progress in carrying out that mandate.  The Monitor reported in the Initial Status Report that, as of October 28, 2021, he had 15 open and ongoing investigations into alleged historical misconduct at the UAW by current and retired UAW members, officers, and employees, as well as the UAW's relationship with certain vendors.[10]  As discussed in further detail below, one of these investigations has resulted in the Monitor settling charges against a former senior Union staff member.  The Monitor has also brought charges against a second individual, a former Local Union officer.  In addition to these two matters, the Monitor is currently working on a total of 19 open investigations, including five new matters that were opened since the filing of the Initial Status Report.

In furtherance of that work, the Monitor's team, guided by recommendations from DOJ, has continued to conduct targeted searches through the repository of materials provided by DOJ from its closed investigations for evidence of potential past misconduct.[11]  The Monitor has also

---

[8] *See* Consent Decree ¶ 28.
[9] Monitor's Initial Status Report at 143.
[10] Monitor's Initial Status Report at 152.
[11] *See* Monitor's Initial Status Report at 147.

requested and reviewed certain additional information from DOJ, including grand jury witness transcripts and records of witness interviews, and expects to soon receive certain requested financial account records.[12]   The Monitor has requested and reviewed documents from the UAW concerning certain vendor relationships,[13] and has issued subpoenas to third parties regarding the same topic.[14]

Since the Initial Status Report, the Monitor also conducted investigative interviews of 24 current employees, staff, and officers of the International Union, concerning potential past misconduct at the International Union.[15]   Two of the Monitor's new investigations have resulted

---

[12] Email from Monitor to DOJ (Feb. 3, 2022) (requesting documents); Email from Monitor to DOJ (Feb. 7, 2022) (requesting documents); Email from DOJ to Monitor (Feb. 8, 2022) (producing documents); Email from DOJ to Monitor (Feb. 11, 2022) (producing documents); Meeting with DOJ (June 1, 2022); Email from DOJ to Monitor (June 2, 2022) (producing documents); Email from Monitor to DOJ (June 22, 2022) (requesting documents); Email from DOJ to Monitor (June 23, 2022) (agreeing to provide documents).

[13] Email from Monitor to UAW then-Acting General Counsel (Dec. 3, 2021) (requesting documents); Email from Monitor to UAW Outside Counsel and UAW then-Acting General Counsel (Jan. 18, 2022) (requesting information); Email from UAW Outside Counsel to Monitor (Jan. 28, 2022) (producing documents); Email from Monitor to UAW Outside Counsel (Feb. 2, 2022) (requesting documents); Email from UAW Outside Counsel to Monitor (Feb. 3, 2022) (producing documents); Email from UAW Outside Counsel to Monitor (Feb. 11, 2022) (producing documents); Email from UAW General Counsel to Monitor (Mar. 17, 2022) (producing documents).

[14] Entity A Subpoena (Feb. 16, 2022); Entity A Aff. of Service (Feb. 17, 2022); Entity B Subpoena (Feb. 16, 2022); Entity B Aff. of Service (Feb. 17, 2022); Entity C Subpoena (Feb. 16, 2022); Entity C Aff. of Service (Feb. 17, 2022); Entity D Subpoena (Feb. 16, 2022); Entity D Aff. of Service (Feb. 17, 2022); Entity E Subpoena (Feb. 16, 2022); Entity E Aff. of Service (Feb. 17, 2022).

[15] These interviews became necessary after the Union backed out of its agreement to provide the Monitor with oral summaries of its previously conducted interviews, discussed in detail above.  Interview of UAW Employee #1 (Feb. 22, 2022); Interview of UAW Employee #2 (Feb. 24, 2022); Interview of UAW Employee #3 (Feb. 24, 2022); Interview of UAW Employee #4 (Feb. 25, 2022); Interview of UAW Employee #5 (Feb. 25, 2022); Interview of UAW Employee #6 (Feb. 28, 2022); Interview of UAW Employee #7 (Feb. 28, 2022); Interview of UAW Employee #8 (Mar. 1, 2022); Interview of UAW Employee #9 (Mar. 1, 2022); Interview of UAW Employee #10 (Mar. 2, 2022); Interview of UAW Employee #11 (Mar. 2, 2022); Interview of UAW Employee #12 (Mar. 3, 2022); Interview of UAW Employee #13 (Mar. 4, 2022); Interview of UAW Employee #14 (Mar. 11, 2022); Interview of UAW Employee #15 (Mar. 11, 2022); Interview of UAW Employee #16 (Mar. 15, 2022); Interview of UAW Employee #17 (Mar. 16, 2022); Interview of UAW Employee #18 (Mar. 29, 2022); Interview of UAW Employee #19 (Mar. 30, 2022); Interview of UAW Employee #20 (Apr. 1, 2022); Interview of UAW Employee #21 (Apr. 5, 2022); Interview of UAW Employee #22 (Apr. 5, 2022); Interview of UAW Employee #23 (Apr. 7, 2022); Interview of UAW Employee #24 (Apr. 20, 2022).

from information obtained during this set of interviews. Additional interviews have been conducted by the Monitor's investigations team in connection with allegations of misconduct by the leadership of one of the UAW's Local Unions (a different Local Union than the one that resulted in the charges described below).[16]

The Monitor's team also continues to take in and follow up on information that comes in through both the Monitor's own hotlines and the UAW's Ethics Hotline, staffed by Exiger.[17] This has resulted in the formal opening of one investigation, the referral of two others to DOJ,[18] and the referral of other credible allegations of misconduct at Local Unions to the UAW itself to investigate. For these, although the Monitor defers to the UAW to conduct the investigations, the Monitor keeps tabs on the Union's efforts and has suggested, when appropriate, additional investigative steps.[19] As to reports to the UAW's Ethics Hotline, Exiger continues to share information with the Monitor in a manner that preserves the anonymity of the reporter, and the Monitor is closely following Exiger's progress on its investigations.[20]

---

[16] Interview of International Auditor #1 (Feb. 18, 2022); Interview of International Auditor #2 (Feb. 18, 2022); Monitor's Hotline Interview (Mar. 9, 2022); Monitor's Hotline Interview (Apr. 8, 2022); Monitor's Hotline Interview (May 18, 2022).

[17] *See* Monitor's Initial Status Report at 150-52. As discussed in the Initial Status Report, both the Monitor's and Exiger's hotlines receive a large number of communications. For the Exiger Hotline, the Monitor looks into some information provided in these communications when it falls within the scope of the Monitor's mandate. This has, on occasion, resulted in further action; many others are closed without opening a formal investigation. The Monitor takes a similar approach with his own hotline.

[18] Meeting with DOJ (Feb. 1, 2022); Email from Monitor to DOJ (Feb. 4, 2022); Meeting with DOJ (June 1, 2022).

[19] Email from Monitor to UAW (Feb. 22, 2022) (attaching documents); Email from UAW to Monitor (Mar. 4, 2022) (attaching memoranda); Email from UAW to Monitor (Mar. 11, 2022) (attaching memorandum); Email from Monitor to UAW (Mar. 16, 2022); Email from UAW to Monitor (Apr. 2, 2022); Email from UAW to Monitor (Apr. 7, 2022); Email from UAW to Monitor (Apr. 20, 2022) (attaching memorandum and exhibits); Meeting with UAW General Counsel (June 7, 2022).

[20] Meeting with Exiger (Apr. 29, 2022); Meeting with Exiger (May 13, 2022); Email from Monitor to Exiger (May 13, 2022); Email from Exiger to Monitor (May 24, 2022); Email from Monitor to Exiger (June 2, 2022); Email from Monitor to Exiger (June 13, 2022); Email from Exiger to Monitor (June 13, 2022); Email from Exiger to Monitor (June 17, 2022); Email from Exiger to Monitor (June 28, 2022).

The Monitor also provided input to the Adjudications Officer as he drafted the rules applicable to disciplinary proceedings initiated by the Monitor under the Consent Decree.[21]  The Adjudications Officer met with both the UAW and DOJ to confer about the Adjudications Officer's rules.  Those rules, finalized on June 25, 2022,[22] are posted on the Adjudications Officer's website.[23]

Following the finalization of the Adjudications Officer's rules, the Monitor has filed formal disciplinary charges with the Court-appointed Adjudications Officer against one individual, and has settled charges with another, each of them for embezzlement of Union assets:

- On July 6, 2022, the Monitor filed disciplinary charges against Timothy Edmunds, former Financial Secretary-Treasurer of UAW Local 412, after Edmunds pleaded guilty in federal court to embezzling approximately $2 million from UAW Local 412 between 2011 and 2021 in a scheme involving personal use of the UAW Local 412 debit card and transfer of funds from UAW Local 412 bank accounts to Edmunds' personal account.[24] The Monitor charged that Edmunds' violations of federal law, the UAW Constitution, the Ethical Practices Codes, and the Administrative Letters warranted disciplinary action.[25]

- On July 18, 2022, the Monitor entered into a stipulation with former Region 5 Assistant Director Danny Trull (who held that position from September 2012 to December 2015) in which Trull agreed not to contest the Monitor's allegations regarding his participation in the embezzlement scheme related to master account arrangements with hotels for which Vance Pearson, Edward "Nick" Robinson, and Gary Jones were convicted, as well as to be

---

[21]  Email from Adjudications Officer to Monitor (June 16, 2022) (attaching draft rules); Emails (3) from Monitor to Adjudications Officer (June 17, 2022).

[22]  Email from Adjudications Officer to UAW General Counsel and Monitor (June 26, 2022) (attaching final rules).

[23]  Court-Appointed UAW Adjudications Officer, *Disciplinary Hearings Process before the Adjudications Officer*, UAW Adjudications (2022), https://www.uawadjudications.com/rules.

[24]  Timothy Edmunds Charging Information at 2-4 (July 6, 2022) ("Edmunds Information").

[25]  Edmunds Information.

expelled and debarred for life from the UAW for these actions.[26]  The
stipulation is currently pending before the Adjudications Officer.[27]

Edmunds' charging information is posted on the Monitor's website and Trull's stipulation
will be posted on the Adjudications Officer's website if approved.[28]  The action against Edmunds
is ongoing, and further updates will be provided in a subsequent report to the Court.

These activities to investigate and address suspected misconduct at the Union have
proceeded notwithstanding uncooperative actions taken by the UAW in the aftermath of the Initial
Status Report that ultimately required the intervention of the U.S. Attorney for the Eastern District
of Michigan.  As described in the Initial Status Report, although the Union was initially slow to
provide relevant investigative information to the Monitor,[29] by the time of that Report, its
cooperation seemed to improve, leading the Monitor to report to the Court that he was "hopeful
the issues that were impeding [his] progress ha[d] been resolved."[30]

In the period immediately following the filing of the Initial Status Report, however, the
Union returned to a much more uncooperative posture, as illustrated in three key areas.

First, shortly after the Initial Status Report was filed, the Union backed out of its
commitment to provide the Monitor with critical investigative materials—namely, information
from scores of interviews the Union's lawyers had conducted between 2014 and 2020 in response
to the government's investigation into criminal misconduct.[31]  At the outset of the monitorship, the

---

[26] Danny Trull Stipulation (July 18, 2022) ("Trull Stipulation"); *see also* Monitor's Initial Status Report at
29-31.

[27] Trull Stipulation.

[28] Court-Appointed, Independent Monitor of the UAW, *Disciplinary Charges Filed by the Monitor*, UAW
Monitor (2022), www.uawmonitor.com/charges.

[29] Monitor's Initial Status Report at 148-49.

[30] Monitor's Initial Status Report at 10.

[31] UAW – CTSPC Interviews (Oct. 12, 2021).

Monitor requested that the Union share the notes of those interviews to aid the Monitor in carrying out the Consent Decree's investigative mandate.[32]   In response, the Union's legal counsel expressed concern that sharing the notes could waive the Union's privileges, despite the fact that the Union had sought[33] and obtained the 502 Order noted above allowing the Union to share materials with the Monitor without risk of such waiver.[34]

Eventually, the Union proposed, and the Monitor accepted, a compromise whereby the Union's counsel would read the notes to members of the Monitor's team, rather than turning over the notes themselves, a compromise the Monitor reported to the Court in the Initial Status Report.[35] Shortly after the Monitor's Initial Status Report was filed, however, the UAW changed its position, with counsel, and then UAW President Raymond Curry, informing the Monitor that they would not provide the summaries of the interviews after all.[36]   This change in position was particularly surprising given that the Union's counsel had told the Court, when seeking the 502 Order, that the UAW's intent in seeking that order was to "allow us to facilitate the monitor's work, rather than

---

[32] The Monitor sought this information for several reasons.  First, access would increase efficiency and save significant expense.  The Monitor would presumably not have to redo many of the interviews conducted by the UAW once he understood what certain individuals previously reported, and, for other individuals, the scope of those interviews could be narrowed significantly.   Equally as important, access to the prior interviews could provide evidence that otherwise will be lost to the Monitor, either because the interviewees forgot information in the intervening years since they first gave the interviews, or because the interviewees are no longer available to the Monitor due to a departure from the UAW (of which there are dozens) or an unwillingness to speak to the Monitor.

[33] Mot. for Order Governing Disclosure of Privileged Materials, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (July 1, 2021), Civil No. 20-cv-13293, ECF No. 37.

[34] Order Granting Def.'s Unopposed Mot. for Order Governing Disclosure of Privileged Materials, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (Aug. 11, 2021), Civil No. 20-cv-13293, ECF No. 40.

[35]  Monitor's Initial Status Report at 148-49 ("As an accommodation, the Monitor agreed, in lieu of reviewing those notes, to participate in sessions with an attorney representing the UAW during which the attorney will summarize the interviews.").

[36] Email from UAW Outside Counsel to Monitor (Dec. 6, 2021); Email from Monitor to UAW Outside Counsel (Dec. 9, 2021); Email from UAW Outside Counsel to Monitor (Dec. 10, 2021); Email from UAW International President to Monitor (Dec. 29, 2021).

forcing the monitor to redo a whole bunch of leg work, that we can short circuit for him and his team by providing them information that we have learned during the course of our representation."[37]   In other words, the intent was to facilitate the sharing of information, such as the results of the UAW's investigative interviews.

Second, in the period after the Initial Status Report was filed, the Union further slowed its pace of production of other relevant investigative information.  After the filing of the Initial Status Report—although information began to flow with respect to Local Unions that had previously been withheld—for investigations into senior officers at the International Union itself, the Union repeatedly failed to even respond to the Monitor's requests for interviews and documents, with

---

[37] *See* Hr'g before Hon. David M. Lawson, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (July 29, 2021), Civil No. 20-cv-13293, ECF No. 55 at 6 ("July 2021 Hr'g"); *see also* July 2021 Hr'g at 4 ("[W]e want to be able to share information with the monitor so that we can facilitate his work and achieve the goals of the Consent Order which the Court oversees."); July 2021 Hr'g at 5 ("[I]t would be a great enhancement . . . to the efficiency of the monitor's work if we were allowed to share privileged information with them without the risk of waiving any privilege."); July 2021 Hr'g at 5-6 ("I have been involved in this case for six years, five or six years; right? And so we have a good deal of work that I and my firm have done on this which would be very useful, I think, to the monitor for us to be able to share that[.]"); July 2021 Hr'g at 9-10 ("[B]oth of us want this to occur, to have this protection, so that we can provide additional substantive information to the monitor which . . . from his point of view and from ours is going to greatly assist him in carrying out his duties.").
   The Union claimed that it had changed its position because the Union could no longer trust that information provided to the Monitor would be kept secret—stating that the Monitor had "not maintained the confidentiality of privileged information previously provided to it by the UAW in the manner intended" by the Court's 502 Order, as well as in a Common Interest Agreement entered into by the UAW and the Monitor.  Email from UAW Outside Counsel to Monitor (Dec. 10, 2021).  This claim was obviously pretextual.  Although the Union failed to specify the basis for its claim, it was apparently referring to the Initial Status Report that was provided to the Court, which was the only document the Monitor had publicly filed at that time.  But, as the Court is well aware, the Union never sought to prevent public disclosure of any content of the Monitor's Initial Status Report despite ample notice of multiple drafts of the report and an opportunity to do so, and in fact had affirmatively told the Monitor it would *not* be seeking to prevent public disclosure of any filed information.  *See* Consent Decree ¶ 53 ("Any party that anticipates filing any material that has been designated or regarded by any other party as confidential or otherwise potentially subject to filing under seal must provide reasonable notice to the interested party of the proposed filing, so that the interested party will have ample time, if it so desires, to file a motion for leave to file the material in question under seal."); Monitor's Initial Status Report at 82, n.370.

information only flowing, if at all, after repeated demands and lengthy delays.[38]  As a result, the

Monitor's ability to advance investigations, already impeded by the UAW's change in position on

sharing the results of its prior investigative interviews, was further slowed by a lack of timely

assistance from the Union.

Third, as the Monitor attempted to proceed with his investigative work, he uncovered

evidence that the Union and its then-lawyers were withholding information from the Monitor about

recent alleged misconduct by one of its senior leaders.[39]  During an investigative interview with a

Union employee on an unrelated topic, the Monitor learned that the UAW was investigating—

without any disclosure to the Monitor or to DOJ—the mishandling of a sum of cash by a regional

Assistant Director, a senior Union official.  The Monitor further learned that, in addition to failing

to disclose its investigation to the Monitor, the Union also had taken steps to *conceal* the

investigation from the Monitor, in apparent violation of the Consent Decree by interfering with

---

[38] As one example, because the UAW refused to provide the interview downloads discussed above, the Monitor needed to conduct his own interviews, at least with those still employed at the Union.  But the Union ignored the Monitor's initial request to schedule investigative interviews with current employees and officials of the UAW, as well as a follow-up request.  It was only after the Monitor notified the UAW of his intent to serve subpoenas on individuals and sought its cooperation in accepting service that the UAW responded and began coordinating interviews.  Email from Monitor to UAW Outside Counsel and UAW then-Acting General Counsel (Feb. 7, 2022); Email from Monitor to UAW Outside Counsel and UAW then-Acting General Counsel (Feb. 9, 2022); Email from Monitor to UAW Outside Counsel and UAW then-Acting General Counsel (Feb. 15, 2022); Email from UAW Outside Counsel to Monitor (Feb. 15, 2022).  As a second example, in response to document requests made December 3, 2021, relating to specified vendors the Monitor is investigating in connection with allegations regarding corruption of UAW officials, only after two months and multiple requests did the UAW provide a partial production, and only finally concluded production of the requested materials on March 17, 2022—three-and-a-half months after the requests were made.  *See* Email from Monitor to UAW then-Acting General Counsel (Dec. 3, 2021); Email from Monitor to UAW then-Acting General Counsel (Dec. 21, 2021); Email from Monitor to UAW Outside Counsel (Jan. 11, 2022); Email from UAW Outside Counsel to Monitor (Jan. 28, 2022); Email from UAW General Counsel to Monitor (Mar. 17, 2022).

[39] That conduct occurred before the Union's current General Counsel had assumed her role and replaced outside counsel responsible for interfacing with the Monitor concerning investigative issues.

14

the Monitor's ability to investigate that suspected misconduct.  That conduct took at least two forms:

1.  In July 2021, the Monitor issued a standing request to the Union to disclose information about any and all investigations it was conducing into potential financial misconduct or corruption.  In September 2021, the Monitor expressly warned UAW President Raymond Curry of the need to comply with that ongoing demand—as a necessary means for the Monitor to carry out his duties under the Consent Decree—after the Union had failed to disclose to the Monitor an investigation into wrongdoing by senior officials at a Local Union.[40]  Despite that request and the subsequent warning, the Union conducted its investigation into the potential misconduct by the regional Assistant Director noted above and did not disclose this to the Monitor.

This failure to disclose was more than just a failure of transparency.  A key component of the Consent Decree is the Monitor's duty to investigate and potentially charge suspected financial malfeasance by senior Union leaders.[41]  When the UAW conducts an investigation into such misconduct without first notifying the Monitor, it prevents him from conducting an independent investigation in a timely manner with witnesses free of prior influence, from monitoring how the UAW conducts its investigation, and/or from referring the matter to DOJ.  In addition, an undisclosed investigation can impact evidence or witnesses, depriving the Monitor of the opportunity to best ensure that the investigation is conducted without the risk of taint or other interference.[42]

2.  In addition, the Union took affirmative steps to prevent the Monitor from learning of the investigation by excluding a representative of the Monitor from an "executive session" of a meeting of the IEB (where no notes or minutes are taken) in which factual information about this ongoing investigation was shared and discussed.  Although the Monitor is generally entitled under the Consent Decree to attend IEB meetings, the Union improperly excluded the Monitor from access to this session by invoking Paragraph 55 of the Consent Decree—which allows the Union to exclude the Monitor from "portions of meetings protected by the attorney-client privilege . . ."—by claiming the session would involve a "Legal

---

[40] *See* Letter from Monitor to UAW International President (Mar. 9, 2022).

[41] *See* Consent Decree ¶¶ 28-29.

[42] The UAW disputes that it is obligated to inform the Monitor of any ongoing or newly initiated investigations into financial misconduct of its leaders and disputes that it thus violated the Consent Decree in failing to notify the Monitor of its investigation into this potential misconduct.  Regardless of the merits of that position, which both the Monitor and DOJ dispute, the UAW has agreed to disclose any such investigation to the Monitor going forward.

Department" report.  The IEB excluded the Monitor from this portion of the meeting—and thereby prevented him from learning of the ongoing investigation—even though the Monitor had previously warned UAW President Raymond Curry and the UAW's then-Acting General Counsel that the Union had already improperly used this provision to exclude the Monitor from portions of meetings in which facts, as opposed to legal advice, had been discussed.  Although the Monitor had issued a letter that recommended that the Union discontinue that practice, President Curry did not respond to the Monitor's letter and, instead, continued to engage in the practice by subsequently using it at the aforementioned meeting to shield factual information from the Monitor about the mishandling of cash by the regional Assistant Director.[43]  The UAW's outside counsel at the time, when confronted by the Monitor, acknowledged that these facts were discussed at the meeting and that the UAW intended to disclose the facts to the Monitor at some undetermined, later time.[44]

These actions interfered with the investigative work of the Monitor in apparent violation of Paragraph 18(d) of the Consent Decree, which enjoins the Union and its officials from

---

[43] *See* Letter from Monitor to UAW International President (Mar. 9, 2022).

[44] *See* Email from UAW Outside Counsel to Monitor (Mar. 3, 2022); Email from UAW Outside Counsel to Monitor (Mar. 5, 2022).  The Union similarly disputes that its exclusion of the Monitor from this session was a violation of the Consent Decree, in part because it claims that the Monitor was properly excluded from the discussion because of privilege concerns.  This position has little legal merit, given the strong line of authority that makes clear that that a board such as the IEB cannot use the cloak of privilege to shield facts such as those discussed at the IEB meeting. *See Zavala v. City of Baton Rouge*, No. CV 17-656-JWD-EWD, 2020 WL 2574650, at *7-8 (M.D. La. May 21, 2020); *In re Domestic Airline Travel Antitrust Litig.*, No. MC 15-1404 (CKK), 2020 WL 3496748, at *7 (D.D.C. Feb. 25, 2020) (collecting cases), *report and recommendation adopted*, No. MC 15-1404 (CKK), 2020 WL 3496448 (D.D.C. May 11, 2020); *Chumbley v. Bd. of Educ. for Peoria Dist. 150*, No. 1:14CV01238, 2015 WL 4572777, at *1 (C.D. Ill. July 29, 2015) (citing *Sandholm v. Dixon Pub. Sch. Dist. No. 170*, No. 09 C 50119, 2010 WL 899032, at *3 (N.D. Ill. Mar. 10, 2010)); *United States v. Town of Colo. City*, No. 3:12-CV-8123-HRH, 2014 WL 5431222, at *3 (D. Ariz. Oct. 27, 2014); *In re Tier 1 JEG Telecomm. Cases*, No. 3:09-CV-00055, 2012 WL 12918269, at *1 (S.D. Iowa July 19, 2012) (citing *N.J. v. Sprint Corp.*, 258 F.R.D. 421, 444 (D. Kan. 2009)); *Sky Harbor Air Serv., Inc. v. Reams*, No. 08-CV-150-D, 2010 WL 11562029, at *4 (D. Wyo. Jan. 12, 2010); *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 235 F.R.D. 447, 453 (N.D. Ill. 2006) (quoting *Larson v. Harrington*, 11 F.Supp.2d 1198, 1201 (E.D. Cal. 1998) (internal quotation omitted)); *Hinsdale v. City of Liberal, Kan.*, 961 F.Supp. 1490, 1494 (D. Kan. 1997); *Duttle v. Bandler &* Kass, 127 F.R.D. 46, 52 (S.D.N.Y. 1989); *Pownell v. Credo Petroleum Corp.*, No. 09-CV-01540-WYD-KLM, 2011 WL 1045418, at *3-4 (D. Colo. Mar. 17, 2011).  Regardless, as with the issue of notifying the Monitor of open investigations, the Monitor and the Union have reached a workable resolution of this issue and the Union will be sharing information with the Monitor about the subject of IEB executive sessions, as noted below.

"[o]bstructing or otherwise interfering, directly or indirectly, in any way or degree, with the work of the [Monitor] or his/her/their designated agents and representatives."[45]

Faced with this pattern of uncooperative and obstructive behavior, along with the ongoing lack of cooperation with respect to the Monitor's compliance mandate (discussed below), the Monitor informed the U.S. Attorney's Office for the Eastern District of Michigan of the Union's conduct. The Monitor's communication of this information to the government led to a meeting on March 31, 2022, between, on the one hand, U.S. Attorney for the Eastern District of Michigan Dawn Ison and her senior staff, and, on the other hand, the Union's International President Raymond Curry, and the Union's then-recently hired General Counsel.[46] The Monitor and a senior member of his team attended the meeting as well.

At that meeting, the U.S. Attorney expressed her strong disapproval of the Union's uncooperative posture toward the monitorship, including its "gamesmanship" by first promising, and then withdrawing from its commitment to provide, interview summaries, and "clear violations" of the Consent Decree by the Union for, among other things, failing to disclose ongoing investigations into misconduct at the Union. U.S. Attorney Ison cautioned the Union about the consequences of not changing course, including potential government action against the UAW for violating the Consent Decree. The U.S. Attorney insisted that the Union take concrete steps toward transparency and cooperation with the Monitor, and she explained that the Union would need to make a good faith showing of transparency with the Monitor, including through prompt

---

[45] *See* Letter from Monitor to UAW International President (Mar. 9, 2022); Consent Decree ¶ 18(d). The Monitor has opened an investigation to determine whether any specific individual's conduct may have constituted interference or obstruction of the monitorship and therefore violated the Consent Decree, although that investigation is on hold pending further investigation by DOJ of the underlying facts.

[46] Meeting with UAW and DOJ (Mar. 31, 2022).

compliance with outstanding requests for information.[47]  Although President Curry disputed that the UAW had violated the Consent Decree, he did make a commitment to the U.S. Attorney that the Union would "do a total reset" with the Monitor, and cited his replacement of the UAW's former General Counsel and outside counsel as evidence of his commitment to change.[48]

The Union's meeting with the U.S. Attorney, along with its hiring of a new General Counsel, was an inflection point.  Following the meeting, the Union made material changes to its stance toward each of the issues outlined above.

First, with regard to the interview summaries, the Union reversed its decision to break its agreement to provide the Monitor with oral descriptions of the notes of the witness interviews it conducted in the course of the government investigation into Union misconduct.[49]

Second, regarding the production of other investigative material, the Union has improved its pace of production of information, and, under the supervision of the new General Counsel, has established a more transparent and responsive process for providing information to the Monitor.

Third, with regard to the Union's concealment of investigations into misconduct, important progress has been made.  The Union confirmed President Curry's representation that he had removed the lawyers involved from their previous roles, and the UAW has committed to provide real-time transparency into new and ongoing investigations.[50]  The Union has also committed to change its practices concerning exclusion of the Monitor from IEB meetings: the Union is now providing the Monitor with more specific information about the topics of meetings subject to

---

[47] Meeting with UAW and DOJ at 1-2, 6-10 (Mar. 31, 2022).

[48] Meeting with UAW and DOJ at 4-5 (Mar. 31, 2022).

[49] Separately, the Union also agreed after the meeting to reverse its previous position and provide the Monitor with the notes of the interviews conducted by its consultant, Exiger, in connection with its work, with only the names of interviewees redacted to maintain their anonymity.  For a discussion of the role of Exiger and its interviews, *see* Monitor's Initial Status Report at 58-59, 75-82.

[50] Call with UAW General Counsel (July 11, 2022).

attorney-client privilege in executive session so that the Monitor can have greater confidence that facts, as opposed to legal advice, are not being shielded from the Monitor.  This accommodation has been effective since it has been implemented and has addressed the Monitor's concerns.  The UAW has also improved its transparency with the Monitor regarding ongoing investigations.  For example, in one instance, the UAW provided information about circumstances concerning a senior UAW leader that launched one of the Monitor's formal investigations.[51]

Fourth, the UAW provided the Monitor with the May 2020 draft report issued by the Union's outside consultant, Exiger, which, as discussed in the Initial Status Report, had previously been withheld.[52]  The Monitor is currently evaluating that report, including materials contained within it that were removed from the June 2021 version of the report previously shared with the Monitor.[53]

These improvements in transparency and the increase in cooperation have all occurred under the stewardship of a new General Counsel at the Union, who has laudably made transparency and cooperation with the Monitor a priority for her early tenure.  The UAW's change in General Counsel, assisted by new outside counsel, has ushered a sea change, and renews the Monitor's cautious optimism that the Union has turned a corner in its commitment to the monitorship.

## II.     UPDATE CONCERNING COMPLIANCE-RELATED ACTIVITIES

As discussed in the Initial Status Report, the Monitor assessed the Union's ongoing efforts to promote a culture of compliance with law, policies, and ethics, and made 38 recommendations to assist the UAW in its ongoing reform efforts.  The Union accepted nearly all the Monitor's recommendations.

---

[51] Email from UAW General Counsel to Monitor (Mar. 31, 2022).

[52] Email from UAW General Counsel to Monitor (Apr. 1, 2022).

[53] *See* Monitor's Initial Status Report at 4-5, 55-59, 75-82.

Since the Initial Status Report, the Monitor has worked with the Union to implement the Monitor's recommendations to improve its compliance culture.  For example, the Monitor worked with the Union to develop and implement procedures to screen vendors, seek a new internal audit service provider, develop an anti-nepotism policy, bring greater scrutiny to conference expenditures, and impose rules on branded merchandise during elections.

That progress has been made despite certain challenges with the Union's level of cooperation with the Monitor in regard to the compliance mandate, which, as with the investigative mandate, declined during the period immediately following the filing of the Initial Status Report.  As above, since the appointment of the Union's new General Counsel and its meeting with U.S. Attorney Ison, the Union's level of cooperation has improved dramatically and it has made important progress to implement several of the Monitor's recommendations for reform, although much work still remains.  Finally, as detailed below, during the period covered by this Report, the Monitor identified new compliance issues for which recommendations were necessary—specifically, concerning oversight of conference expenses and the distribution of merchandise bearing the names of candidates running for IEB office.

### A.     Transparency and Cooperation with the Monitor

In the period immediately following the Initial Status Report, in addition to the lack of cooperation detailed above concerning the Monitor's investigations mandate, the Union also did not adequately cooperate with the Monitor in carrying out the Consent Decree's compliance mandate.  First, in response to the Monitor's requests, the Union initially did not provide the Monitor with certain categories of compliance-related documents.[54]  Second, the Union did not

---

[54] Meeting with Deloitte and UAW (Dec. 17, 2021); Email from UAW to Monitor (Feb. 3, 2022); Letter from Monitor to UAW (Feb. 7, 2022); Meeting with UAW (Feb. 9, 2022); Letter from Monitor to UAW (Mar. 21, 2022).

actively communicate with the Monitor about the steps it was taking toward implementing the Monitor's recommended reforms.[55]   Third, the Union was slow to produce draft compliance policies and other documents for review and feedback.[56]

Following the Monitor's meeting with the U.S. Attorney and the Union described above, and under the stewardship of a new General Counsel, the Union has improved its level of transparency and cooperation with the Monitor in each of these areas.   It has produced the categories of documents that were previously withheld, has begun to communicate more transparently about the Union's efforts to implement recommendations from the Initial Status Report (including the assignment of process owners to each recommendation who will be accountable for implementing the recommendation), and has provided the Monitor with draft compliance policies and documents for review and feedback (including a draft anti-nepotism policy, anti-bribery policy, code of conduct, and outline for a Compliance and Ethics Committee).[57]

This change in stance is illustrated by the Union's embrace of transparency concerning the status of its Internal Audit function.   In the Initial Status Report, the Monitor raised concerns about whether the Union's newly-formed Internal Audit team could provide independent and objective assurance about the UAW's internal control environment.[58]   The Monitor recommended that the UAW work with the Monitor to clarify the roles, responsibilities, and reporting structure of the

---

[55] Email from Monitor to UAW Outside Counsel and UAW then-Acting General Counsel (Jan. 7, 2022); Email from UAW Outside Counsel to Monitor (Jan. 18, 2022); Email from UAW to Monitor (Mar. 3, 2022); Meeting with UAW General Counsel (Apr. 1, 2022); Meeting with UAW General Counsel (May 2, 2022); Email from Monitor to UAW General Counsel (July 8, 2022).

[56] Letter from Monitor to UAW General Counsel (Mar. 31, 2022); Email from UAW to Monitor (Mar. 31, 2022); Email from Exiger to Monitor (Apr. 7, 2022).

[57] Email from UAW to Monitor (Mar. 31, 2022); Email from Exiger to Monitor (Apr. 7, 2022).

[58] Monitor's Initial Status Report at 88-89.

UAW's Internal Audit Department and the external consultants who were providing the UAW with internal audit services.[59]   After an initial period of delay in providing information about the status of Internal Audit, the Union has been more transparent with the Monitor.  It informed the Monitor of its decision to engage a new service provider that does not labor under the same conflict issues that the Monitor had identified with respect to the previous provider,[60] solicited the Monitor's feedback on the draft request for proposal, and shared proposals from service providers with the Monitor.[61]   The UAW has engaged a new service provider who started in June 2022, and the Monitor will assess and report on those efforts in subsequent reports.  So far, the new service provider has started the process of reviewing prior audit reports and risk assessments, and plans to conduct a refreshed risk assessment, including one focused on the Union's progress as to cultural reform.[62]

### B.      Implementation of the Monitor's Recommendations

In working to implement the Monitor's recommendations, the Union has made progress in some areas, but still has a great deal of work to do in others.

---

[59] Monitor's Initial Status Report at 89.

[60] Email from UAW Outside Counsel to Monitor (Feb. 10, 2022); Meeting with UAW (Feb. 14, 2022); Monitor's Initial Status Report at 86-89 ("[T]he Monitor will examine and report on . . . how Internal Audit will perform audits on new internal financial controls that the UAW has implemented based on the recommendations of another Deloitte team, in order to ensure that one Deloitte team is not evaluating controls recommended by another Deloitte team."); Monitor's Initial Status Report at 89, Monitor's Recommendation 8 ("In order to promote the independence of the UAW's Internal Audit Department and mitigate the risk of undue pressure or influence on Internal Audit, the UAW should work with the Monitor and Deloitte to clarify the roles, responsibilities, and reporting structure of the UAW's Internal Audit Department and the external consultants who provide the UAW with internal audit services.").

[61] Email from UAW Outside Counsel to Monitor (Feb. 10, 2022); Meeting with UAW (Feb. 14, 2022); Email from UAW then-Acting General Counsel to Monitor (Mar. 9, 2022); Letter and Email from UAW General Counsel to Monitor (Mar. 29, 2022) (producing documents); Meeting with UAW (May 2, 2022).

[62] Meeting with UAW and Internal Audit Service Provider (June 21, 2022).

### 1.      Adoption of Policies

As described in the Initial Status Report, the UAW had developed a number of important policies to address financial gaps, but many of them had remained in draft form since early 2021, and progress in enacting and implementing them remained too slow. The Monitor's chief recommendation in this area was to increase the pace of progress, and after the Monitor initially suggested implementation of the policies within 30 days of the Initial Status Report, the UAW pledged it would do so within 60 days, given the circumstances particular to each of the outstanding draft policies.[63]

As of the operative date of this Report, the IEB has approved 6 of the 11 additional policies it promised to implement in response to the Initial Status Report, and the Union has also implemented aspects of a seventh policy.[64] The Union has also conducted trainings on several of those policies,[65] and has implemented a system to track and follow up on attendance at the training sessions.[66] Other policies are still far from implementation. For example, the draft policy to

---

[63] Monitor's Initial Status Report at 113.

[64] For the seventh, the Union adopted two procedures concerning the draft Procurement Policy to manage the Union's relationship with vendors. The IEB approved the Vendor Selection Process Documentation Policy and Vendor Due Diligence Process Documentation Policy at an April 25, 2022 meeting. IEB Meeting (Apr. 25, 2022). These policies were implemented on June 6, 2022. Approval and implementation of the entire Procurement Policy is planned for August 2022. *See* UAW and Deloitte Status Update at 2 (June 8, 2022).

[65] Email from UAW General Counsel to Monitor (July 12, 2022); Administrative Staff Training Attendee List (Mar. 21-24, 2022 and June 13-16, 2022); P-Card Policy Training Completion List (July 12, 2022); Policy Framework Training Completion List (July 12, 2022); Travel & Expense Reimbursement Policy Training Completion List (July 12, 2022); P-Card Policy for P-Card Holders Training Completion List (July 12, 2022); P-Card Policy for Reviewers Training Completion List (July 12, 2022); Vender Selection Training Completion List (July 12, 2022); Vender Due Diligence Training Completion List (July 12, 2022); Change Agent Training on Procurement Pre-Purchase Activities Attendee List (June 2, 2022 and June 22, 2022); IT Change Management Policy Training Completion List (July 12, 2022).

[66] Email from UAW General Counsel to Monitor (July 12, 2022); Administrative Staff Training Attendee List (Mar. 21-24, 2022 and June 13-16, 2022); P-Card Policy Training Completion List (July 12, 2022); Policy Framework Training Completion List (July 12, 2022); Travel & Expense Reimbursement Policy Training Completion List (July 12, 2022); P-Card Policy for P-Card Holders Training Completion List

impose controls around CAP and PAC accounts is not slated for IEB approval until sometime in 2023.[67]   Similarly, the Union has made some progress to address the Monitor's recommendation to hasten the pace of IT upgrades necessary for implementation of the new accounting and IT policies.   In January 2022, the IEB approved additional resources to support the IT system upgrades,[68] and guidebooks have been drafted to explain the IT changes currently underway.[69]  But the Union still needs to approve and implement the two IT policies that were in draft form at the time of the Initial Status Report.

It is important for the Union to pick up the pace.  For example, the delay in adopting policies that impose greater scrutiny of Union expenditures has meant that payments can continue to be made to third parties without the proper controls.  This resulted in the renewal of at least one vendor relationship with a consultant who would have been a candidate for the type of enhanced scrutiny promised in the draft policies, had they been in place.  Although the Monitor is not currently alleging misconduct with respect to this vendor, the circumstances of the renewal are still instructive.  The Monitor learned that the Union had paid more than $850,000, from 2012 through 2021, to an overseas consultant who was paid for stretches of time despite having no active agreement in place, and, when there was an agreement in place, without requiring him to provide regular reports on his activities—facts that should lead to greater scrutiny of the relationship when renewing the agreement.  To the Union's credit, after the Monitor raised questions about the

---

(July 12, 2022); P-Card Policy for Reviewers Training Completion List (July 12, 2022);  Vender Selection Training Completion List (July 12, 2022); Vender Due Diligence Training Completion List (July 12, 2022); Change Agent Training on Procurement Pre-Purchase Activities Attendee List (June 2, 2022 and June 22, 2022); IT Change Management Policy Training Completion List (July 12, 2022).

[67] UAW and Deloitte Status Update at 2 (June 8, 2022).

[68] IEB Meeting (Jan. 4, 2022).

[69] Email from UAW General Counsel to Monitor (July 12, 2022); Draft IT Guidebooks (July 12, 2022)*; see also* Draft IT Training Materials (July 12, 2022).

consultant, the Union first required him to enter into a new contract with a six-month term, which included explicit obligations to provide regular reports; it has also decided not to renew the consultant's agreement once it expires.  Once the appropriate policies are in place, these are the types of relationships that should automatically receive the proper level of scrutiny.

## 2.    Instilling a Culture of Compliance and Accountability

In the Initial Status Report, the Monitor reported an ongoing reluctance of staff to report concerns for fear of retaliation, continued perceptions of favoritism and nepotism, and lack of accountability, indicating that problematic aspects of the prior culture have not been eradicated from the organization.[70]   The Monitor also observed inconsistencies in the UAW's approach to reform, which left the Union with significant work to abolish some of the cultural vestiges of the past.[71]  The Monitor emphasized that the leadership of the UAW must address the ongoing cultural issues concerning transparency, favoritism, nepotism, retaliation, and accountability that persist from the previous era, follow through on the reforms that have been initiated, and follow up on the recommendations that have been made by the UAW's experts and auditors in which the Monitor joined.[72]

The Monitor recommended specific steps for UAW leadership to take, including:

- Creating a new Compliance Director position and establishing a Compliance and Ethics Committee;

- Establishing an annual town hall or "all staff" meeting hosted by the UAW President and IEB members to communicate the culture of compliance expected of UAW officials, staff, and members;

---

[70] Monitor's Initial Status Report at 70.
[71] Monitor's Initial Status Report at 70-73.
[72] Monitor's Initial Status Report at 73 (Rec. No. 1).

- Making compliance and ethics a standing item on the agenda for every IEB meeting with information obtained from the Compliance and Ethics Committee; and

- Communicating regular compliance updates and ethics messaging from the President, the Compliance Director (when appointed), and the Ethics Officer.[73]

Since the Initial Status Report, the Union has taken some steps to advance these recommendations, but more must be done.  For example, the UAW created and posted a job description for a Compliance Director position and interviewed candidates (making one offer that was not accepted), but has yet to fill the role.[74]  The Union has also drafted the "Terms of Reference" for a Compliance and Ethics Committee, which describe the Committee's mission, the structure of its membership, and its areas of responsibility,[75] but in the absence of a Compliance Director, has yet to convene the Committee or establish a timeline by which the Committee will begin its work.[76]

In the Initial Status Report, the Monitor also recommended that the UAW:

- Develop job descriptions for certain job openings within the UAW, including qualification requirements;[77]

- Create a nepotism policy that, among other things, prohibits UAW officials from using their status to hire family members and other close personal friends without demonstrated qualifications for the position;[78]

---

[73] Monitor's Initial Status Report at 73 (Rec. No. 1), 83 (Rec. No. 3).

[74] Email from UAW then-Acting General Counsel to Monitor (Mar. 9, 2022); Meeting with UAW (May 2, 2022).

[75] Draft Compliance and Ethics Committee Terms of Reference (May 25, 2022); Email from Exiger to Monitor (May 25, 2022); UAW/Exiger Action Plan Spreadsheet (Apr. 27, 2022).

[76] The Monitor has recommended, and continues to recommend, that the UAW Legal Department temporarily fill the roles for which the Compliance Director would otherwise be responsible for the purpose of implementing and overseeing related reforms until a Compliance Director is hired.

[77] Monitor's Initial Status Report at 97 (Rec. No. 9).

[78] Monitor's Initial Status Report at 98 (Rec. No. 10).

- Advertise open staff positions at the International Union, other than the Executive and Top Administrative Assistant positions, to International Union personnel to afford them an opportunity to apply and be considered;[79]

- Develop International Union-wide performance review and performance management processes;[80]

- Develop policies and procedures with core annual compliance and ethics training requirements for the entire International Union;[81] and

- Implement a formal budgeting process, starting no later than fiscal year 2023, for all International Union departments and regions on an annual basis in order to establish expected spending by department and region.[82]

The Union has since taken some steps to begin implementing these recommendations. The Union has started to create job descriptions, post openings, and utilize competitive processes in recent months as certain positions within the Union have become open, including in HR, IT, and Purchasing.[83] With regard to policies and procedures that reflect the Union's commitment to compliance and ethics, the Union has drafted a code of conduct, an anti-bribery and corruption policy, a statement against retaliation, and an anti-nepotism policy.[84] Those documents, when published, will help convey that an improved tone at the top is being reflected in Union policy. But in order to reap that benefit, the Union must finalize those documents, present them to the IEB for approval, and implement them. Further, the Union has provided training on compliance, ethics,

---

[79] Monitor's Initial Status Report at 98 (Rec. No. 11).

[80] Monitor's Initial Status Report at 100-101 (Rec. No. 12).

[81] Monitor's Initial Status Report at 104 (Rec. No. 13).

[82] Monitor's Initial Status Report at 107 (Rec. No. 17).

[83] Email from UAW General Counsel to Monitor (July 12, 2022); Assistant HR Director – Job Description; Assistant HR Director – Candidate Tracker; ITS Department Clerk – Job Description; Helpdesk Manager – Job Description; IT Programmer – Job Description; Purchasing Department Designer – Job Description and Applicant Tracker; Purchasing Specialist – Job Description.

[84] Email from Exiger to Monitor (Apr. 7, 2022).

and sexual harassment, including several days of in-person training for more than 125 International Staff members in March and June 2022.[85]

### 3.    Conference Expenditures and Master Billing Arrangements

The UAW needs to make greater progress to curb the financial risks associated with UAW-hosted conferences and "Master Billing Arrangements," which are frequently used by organizations, including the UAW, to pay expenses associated with conferences.  In the Initial Status Report, the Monitor observed financial risks related to the Union's use of Master Billing Arrangements, a particular area of concern given Union officials' historical abuse of conferences in general, and Master Billing Arrangements in particular, for personal gain.[86]

At the time of the Initial Status Report, the UAW had indicated that Master Billing Arrangements would eventually go through the purchase order process described in the draft Procurement Policy once it was implemented.  The Monitor recommended that the Union either clarify the scope of "Master Billing Arrangements" and/or develop an implementing procedure for Master Billing Arrangements, and expressly require that all expenses submitted under Master Billing Arrangements include itemized receipts and supporting documentation.[87]   The UAW accepted that recommendation but has not yet implemented it.

---

[85] Email from UAW General Counsel to Monitor (July 12, 2022); Administrative Staff Training Attendee List (Mar. 21-24, 2022); March 21-24 Administrative Staff Training, Detroit, MI; Email from UAW to Monitor (Mar. 15, 2022) (attaching agenda); *see also* Administrative Staff Training Attendee List (June 13-16, 2022).

[86] Monitor's Initial Status Report at 29-31, 89-90, 125-26.  For example, former Union officials who embezzled over $1.5 million in Union funds established "master account arrangements" with hotels in which the hotel would pay for non-conference related expenses such as "cigars, private villas, high-end liquor and meal expenses, golfing apparel, golf clubs, clothes, extravagant meals, spa services, and green fees," and then billed the UAW for those expenses as part of one master bill—hiding the true nature of the expenses with generic and false descriptions.

[87] Monitor's Initial Status Report at 118-19 (Rec. No. 19).

Conferences are a vital component of what the UAW does, and education of its members has long been a top priority of the UAW.  With the impacts of Covid-19 receding, the conference schedule for the UAW has picked up considerably.  Between February and May 2022, the Union hosted numerous conferences and plans to host many additional conferences for the balance of 2022.[88]  These conferences can cost over a million dollars each, and can involve upwards of a thousand attendees from across the country, but still have insufficient controls.  For example, the UAW does not require a budget for each conference, and largely leaves conference planning and expenditures to the individual IEB official or staff member hosting the conference.  There are similarly no guidelines or policies governing how much can be spent on the conferences as a whole, or on the various sub-expenses, including food, beverages, or entertainment.

Some conference expenditures might benefit from enhanced scrutiny.  For example, the Financial Officer's Conference (the "FOC") in New Orleans[89] featured a $300,000 dinner reception for the approximately 1,000 conference attendees, and another $19,200 dinner party for approximately 80-100 conference attendees.[90]  The Union has told the Monitor that these expenses are consistent with past conferences, appropriate and typical for a Union that is as large as the UAW, and has noted that there is no policy that prohibits them.  Although that may very well be the case, given the sums involved, the Monitor conveyed to the Union the importance of imposing controls on these sorts of expenditures to provide conference planners with clear guidance on what

---

[88] The materials produced by the Union in response to the Monitor's requests for document and information regarding conferences reflect that there were at least 24 conferences and large in-person trainings between February and May 2022.

[89] March 13-18, 2022 (New Orleans, Louisiana).

[90] FOC Payment Request Form (Apr. 19, 2022).

is appropriate.  The Monitor also stressed the need for transparency and controls around such expenditures so that the abuses of the UAW's past are not repeated.[91]

The Monitor's inquiries into conference activities and expenses have initiated a commitment from the Union to implement controls around conference expenditures going forward.  The Monitor and the Union are working together to devise measures that, if effectively implemented by Union leadership, will bring greater oversight and accountability to conference expenditures,[92] and help to mitigate the risks of corruption afforded by the lax policies of the past.[93]

On March 30, 2022, after learning of the FOC expenditures, the Monitor recommended that until such controls are in place, the Union should require advance approval from the UAW General Counsel, or from the Compliance Director (once the position is filled), for all UAW-funded conference expenditures in excess of $20,000, a role the UAW General Counsel has informed the Monitor that she has subsequently adopted.[94]

### C.    Recommendation on Branded Merchandise

During the period covered by this Report, the Monitor also issued a new recommendation to the Union concerning the expenditure of Union funds relating to elections for International Office.

In March 2022, an allegation was submitted to the Monitor's hotline that the UAW had branded certain merchandise with the names of IEB officials who were running for reelection and had distributed, or planned to distribute, the branded merchandise to attendees at UAW-hosted

---

[91] Although the Union's T&E Policy contains provisions that prohibit reimbursement of business meals above $150 per person and prohibit "excessive alcohol costs," the T&E Policy is not expressly applicable to expenditures at conferences.  T&E Policy ¶¶ 85-86.

[92] Meeting with UAW General Counsel (May 2, 2022); Meeting with UAW General Counsel (June 2, 2022).

[93] Monitor's Initial Status Report at 29-31, 89-90, 125-26.

[94] Letter from Monitor to UAW General Counsel (Mar. 30, 2022).

conferences in Spring 2022.[95]  The Monitor later confirmed that a total of approximately $95,000 in Union funds were used to pay for approximately 1,500 backpacks for two conferences, branded with the name and title of Secretary-Treasurer Frank Stuglin,[96] and that approximately 800 of them were distributed at the first of these conferences.[97]

On March 30, 2022, the Monitor brought the matter to the UAW's attention.[98]  Specifically, the Monitor expressed concern that, given the upcoming election of International Officers, the distribution of UAW-purchased branded merchandise bearing the name of a candidate could be viewed as a violation of the Labor-Management Reporting & Disclosure Act of 1959 ("LMRDA"), Title IV, 29 U.S.C. § 401(g), which prohibits the contribution or application of union funds to promote the candidacy of any person in an election.  The Monitor recommended that the Union cease distribution of any other merchandise that is branded with the name of a candidate, informed the Union that the Monitor would prohibit such practices in the then-pending election rules, and recommended that the UAW independently implement its own policy to prohibit the use of Union funds to promote UAW officers or candidates for office in such a manner.[99]

In response, the UAW embroidered over Secretary-Treasurer Stuglin's name on the backpacks that had not yet been distributed, and decided not to distribute other branded items, such as mugs and pens, bearing his name.[100]  It also agreed not to distribute merchandise branded with

---

[95] Monitor Hotline Report (Mar. 25, 2022).

[96] FOC Payment Request Form (Mar. 4, 2022); IPS Conference Payment Request Form (Mar. 26, 2022); Monitor Hotline Report (Mar. 4, 2022); Monitor Hotline Report (Mar. 25, 2022); Monitor Hotline Report (Apr. 10, 2022).

[97] FOC Payment Request Form (Mar. 4, 2022); Monitor Hotline Report (Mar. 25, 2022).

[98] Letter from Monitor to UAW General Counsel (Mar. 30, 2022); Meeting with UAW General Counsel (Apr. 1, 2022).

[99] Letter from Monitor to UAW General Counsel (Mar. 30, 2022); Meeting with UAW General Counsel (Apr. 1, 2022).

[100] Monitor Hotline Report (Apr. 7, 2022).

other officers' names at other conferences during election years.[101]   On May 11, 2022, the Monitor issued the rules that govern IEB elections.[102]   The rules prohibit the use of Union funds "to purchase any merchandise that is distributed to members that is branded with the name or otherwise identifying information of a Candidate, Slate of Candidates, or Covered Party."[103]

## III.   UPDATE CONCERNING ELECTION ACTIVITIES

The Monitor's Second Status Report provided an update on the Monitor's progress in establishing rules for the upcoming election of the Union's International Officers, as well as the upcoming UAW Convention at which the Union's Constitution will be amended to implement the direct election process.[104]   Since that report, which was filed in May 2022, the Monitor has continued to work with the Union toward needed tasks for the upcoming Convention and election. The Monitor will provide a further update concerning those activities in a subsequent report.

---

[101]  *See* Proper Use of Union Funds in Union Elections Policy (Apr. 25, 2022); *see also* IEB Meeting (Apr. 25, 2022).

[102]  Official Rules for the 2022 International Officer Election of the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (May 11, 2022), Civil No. 20-cv-13293, ECF No. 59-1 ("Election Rules").

[103]  Election Rules § 8-3; *see also* Election Rules § 4-6.

[104]  *See* Monitor's Second Status Report, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (May 11, 2022), Civil No. 20-cv-13293, ECF No. 59.

* * *

Pursuant to Paragraph 58 of the Consent Decree, the foregoing Report constitutes the third

report of the Monitor, Neil M. Barofsky.

**Date:  July 19, 2022**

_____
    Neil M. Barofsky, Monitor

*Respectfully filed with the Court on behalf*
*of the Monitor by counsel to the Monitor,*

/s/ Michael W. Ross
Michael W. Ross
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, New York 10036
(212) 891-1600 (t)
(212) 891-1699 (f)