**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-13293 |
| | ) | Honorable David M. Lawson |
| INTERNATIONAL UNION, UNITED | ) | |
| AUTOMOBILE, AEROSPACE, AND | ) | |
| AGRICULTURAL IMPLEMENT | ) | |
| WORKERS OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**MONITOR'S NINTH STATUS REPORT**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

I.   NON-COOPERATION DURING RECENT IEB INVESTIGATIONS...................8

   A.  Open Investigations of IEB Members..............................................................8

   B.  The Union's Lack of Cooperation ................................................................10

   C.  The Monitor's Right to Access Union Documents........................................13

      1.  Consent Decree .....................................................................................13

      2.  Union President's Memorandum ...........................................................17

      3.  Secretary-Treasurer's Position..............................................................18

      4.  Rule 502(d) Order.................................................................................19

      5.  Common Interest Agreement.................................................................20

      6.  DOJ's Position ......................................................................................20

      7.  Past Practice..........................................................................................21

II.  ADDITIONAL INVESTIGATIVE ACTIVITIES .............................................23

   A.  Investigations of Alleged Misconduct Predating the Consent Decree...........23

      1.  Disciplinary Action Taken....................................................................24

      2.  Referral to Ethics Officer......................................................................27

      3.  Matters Closed Without Action ............................................................27

   B.  Post-Consent Decree Investigations ............................................................28

   C.  Investigative Tools......................................................................................29

   D.  Other .........................................................................................................31

Pursuant to Paragraph 58 of the Consent Decree (Dkt. No. 10), the Court-appointed Monitor, Neil M. Barofsky, respectfully submits to the Court this ninth status report ("Ninth Report") concerning the monitorship of the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "Union" or the "UAW").

## INTRODUCTION

Following a U.S. Department of Justice ("DOJ") investigation that resulted in the criminal convictions of numerous senior Union officials, including two past Presidents, the UAW agreed to a Consent Decree and the appointment of a Monitor beginning on May 12, 2021.[1]  Under that decree, the Monitor was given three responsibilities: (1) to help the UAW ensure that its compliance regime can prevent and remove fraud and corruption; (2) to investigate and address suspected past and present misconduct; and (3) to administer a referendum vote to decide the manner in which the Union would choose its senior-most leaders, implement any change arising from that referendum, and oversee the Union's elections of its International Executive Board ("IEB") members during the monitorship.

This Ninth Report summarizes the first three years of the Monitor's investigative work, including the recent lapse in the UAW's cooperation with the Monitor as it pertains to the Union's top-ranked officials.  As described below, shortly after the issuance of the Monitor's Third Report on July 19, 2022, and until recently, the Union was cooperative with the Monitor's investigative work, which largely involved lower-level officials, Local Unions, or more senior officials from prior administrations.  In these matters, the Union provided responsive documents as necessary,

---

[1] Consent Decree, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (Jan. 29, 2021), Civil No. 20-cv-13293, ECF No. 10 ("Consent Decree"); Order Granting Unopposed Motion to Appoint Monitor, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (May 12, 2021), Civil No. 20-cv-13293, ECF No 34.

explicitly recognizing as recently as December 2023 that because the Monitor "stands precisely in the shoes of the Union" itself, the Union should "share any and all information requested," including privileged materials.[2]   Details concerning those investigations are included in this Report.

Before providing those details, however, the Report first discusses the current status of the Union's level of cooperation, which started to erode in February 2024, after the Monitor began investigating current members of the IEB—including the President, Secretary-Treasurer, and one of the Union's Regional Directors.

### The Union's Recent Non-Cooperation with the Monitor

In February 2024, the Union's IEB passed a motion "in support of [the President] withdrawing all of the field assignments assigned to the Secretary-Treasurer" that were not constitutionally required to be within her remit and made certain other policy changes in response to allegations that the Secretary-Treasurer had engaged in misconduct while carrying out her financial oversight responsibilities.[3]   In response, the Secretary-Treasurer lodged allegations of her own against the Union's President that, among other things, the charges against her were false, and that the removal of her authority was improperly instigated in retaliation for her refusal or reluctance to authorize certain expenditures of funds at the request of and/or for the benefit of those in the President's Office—and to dilute her power to make similar denials in the future—not in response to any malfeasance on her part.

---

[2] Memorandum from International President to All UAW Personnel at 3 (Aug. 23, 2023) ("August 2023 Cooperation Memo"); Memorandum from International President to All UAW Personnel at 3 (Dec. 6, 2023) ("December 2023 Cooperation Memo").

[3] IEB Meeting (Feb. 20, 2024).

The countervailing claims between the President and Secretary-Treasurer soon became public and the Monitor opened an investigation to ensure that they were quickly and thoroughly vetted.  More recently, the Monitor expanded this investigation to include additional allegations of retaliation by the President against one of the Union's Vice Presidents, explained further below.  Separately, in April 2024, the Monitor opened an unrelated investigation into another IEB member, a Regional Director, after receiving allegations of potential embezzlement.

Given the seriousness of the allegations and the high level of concern that the Monitor witnessed throughout the Union as a result of them, the Monitor sought to act quickly, with a goal of promptly determining the truth and bringing closure to the open allegations.  Although the Union has cooperated in making UAW employees and senior leaders available to be interviewed by the Monitor's investigative team, the Union has not cooperated in producing documents that are relevant to the investigation in a complete and timely manner, instead requiring the Monitor to conduct those interviews without the benefit of the full production of potentially relevant and contemporaneous documents.

The Monitor has attempted for months to garner the Union's cooperation in gathering the information needed to conduct a full investigation, but the Union has effectively slow-rolled the Monitor's access to requested documents.[4]  The Union has justified its delays by advancing arguments about privilege that had previously been rejected by the Monitor and DOJ,[5] and by claiming that it can only produce documents requested by the Monitor after an unspecified time period for the Union to first review the documents itself, so that it may then potentially identify

---

[4] As noted below, the Union has produced a relatively small number of documents, most of which were produced last week and after the Union had received an initial draft of the Report.

[5] *See* Monitor's Third Status Report, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (July 19, 2022), Civil No. 20-cv-13293, ECF No. 77 at 12-13 ("Monitor's Third Status Report").

and withhold certain documents for privilege and confidentiality "on a case-by-case basis."[6]  As of the date of this Report, more than three months after the Monitor's initial document request, the Union has produced a very small portion (approximately 2,600 documents) of the current potentially relevant pool of approximately 116,000—and with more than 80% of those documents only produced on June 6, 2024, days before the issuance of this Report.  There has been a similar lack of production for the Monitor's embezzlement investigation into one of the Union's Regional Directors.

The Union's arguments for delaying, and potentially denying, the Monitor's access to documents marks a shift in its position on cooperation.  As noted above, in both August and December 2023, just months before the Monitor's investigation was open, the Union's President issued a memorandum to all staff that cannot be squared with the arguments the Union is now relying on to justify its delay of the Monitor's work.  In the memorandum, the Union President noted that Monitor inquiries should be answered "without hesitation" and stated that the Union "will share any and all information requested" with the Monitor—without concern about privilege—both because the Monitor "stands precisely in the shoes of the Union" for the purposes of investigating misconduct and because "the Monitor will protect all available privileges."[7]

The President's previously issued statement reflects the long-standing position of the Monitor and DOJ, as well as the plain intent of the Consent Decree, which provides that the Monitor has the "right and authority of the UAW International President and IEB" to bring investigative charges and operates with the "powers and privileges" of a Rule 66 receiver.  It also reflects that any perceived risk of waiver to the Union for sharing materials with the Monitor was

---

[6] Email from UAW General Counsel to Monitor (May 22, 2024).

[7] August 2023 Cooperation Memo at 3; December 2023 Cooperation Memo at 1, 3.

mooted early in the monitorship when the Union moved the Court and received a Rule 502(d) Order protecting the privilege, and also entered into a common interest agreement with the Monitor.[8]

Despite this record, the UAW has argued that it was not the Union but *the Monitor* who has changed his position, asserting, among other things, that the Montor's position on privilege was raised for the "first time ever"[9] with respect to the current investigations.  But, as detailed below, the Monitor's position on privilege long predates the current investigation.  Most notably, in August 2022—well before the instant investigation was opened—the Monitor sought, and obtained, privileged materials from the Union in connection with an investigation into the former President and others from the prior administration, and offered the very same bases for the Monitor's access to privileged documents as set forth in this Report.  DOJ has similarly rejected the Union's argument that the Monitor's position has changed in the current matter, explaining to the Union that "the Monitor has been wholly consistent over time that, when acting in his disciplinary/investigative capacity, he stands inside the union's privilege and enjoys all of the rights and authorities of the IEB and Union President."[10]

With more than three months having passed since the inception of the Monitor's investigation, and only a small fraction of the requested documents produced, the Monitor's assessment is that the Union's delay of relevant documents is obstructing and interfering with his access to information needed for his investigative work, and, if left unaddressed, is an apparent violation of the Consent Decree.  DOJ similarly informed the Monitor that it believes that "[t]he Union's position is making it difficult, if not impossible, for the Monitor to fulfill his mandate to

---

[8] *See infra* Part I(C).
[9] Email from UAW General Counsel to Monitor (June 7, 2024)
[10] Email from DOJ to UAW General Counsel (June 7, 2024).

remove fraud, corruption and illegality from within the UAW as required by Paragraph 22 of the Consent Decree."[11]   Notably, the Union's Secretary-Treasurer has also disavowed the Union's current position as non-cooperative and inconsistent with her own direction to Union staff to fully cooperate.[12]

None of this should be read to mean that the Monitor does not acknowledge or respect the importance of privilege, as he has since the inception of this monitorship.  Indeed, out of respect for the sanctity of privilege, the Monitor has repeatedly agreed to steps that could help assure the Union that production of privileged materials would not result in waiver of privilege, and has sought to work with the Union to obtain information in a manner that is cooperative, efficient, and meets the needs of his mandate under the Consent Decree.  Unfortunately, those efforts at cooperation have not succeeded with regard to the current investigations, which continue to drag on.  If the Monitor cannot resolve this logjam through cooperation and negotiation with the Union in the coming weeks, the Monitor may need to seek intervention from the Court to enforce the Consent Decree.

**The Monitor's Other Investigative Work**

Details of the Monitor's other investigative work during the first half of this monitorship are also described in this Report.  As detailed further below, under the Consent Decree, the Monitor has the responsibility to investigate and address suspected misconduct at the Union, including past misconduct that may have not yet been addressed by DOJ's criminal prosecutions, as well as misconduct that occurs during the monitorship.  As detailed below, for past misconduct, the Monitor has concluded his work, completing 20 investigations into potential misconduct prior to

---

[11] Email from DOJ to Monitor (June 6, 2024).

[12] *See infra* Part I(B).

the Consent Decree, and, of those, pursuing discipline in five matters, referring one matter to the

Union's Ethics Officer, and closing or seeking more limited relief for the remainder.  For suspected

misconduct during the monitorship, the Monitor has opened 24 investigations and several remain

open and active as of this Ninth Report.  Further details concerning these activities are below.[13]

\* \* \*

A report addressing the compliance-related aspects of the Monitor's activities will be filed

shortly, along with an update on the Monitor's election-related activities.

---

[13] The Monitor provided a first draft of this Report to the Union, through its General Counsel and
Compliance Director, copying outside counsel, on May 10, 2024, and requesting the Union's feedback.
That draft included a paragraph about the Monitor's conclusion, based on information to that point, that the
Union had not cooperated with the Monitor's investigation based on its reliance on previously discredited
claims of privilege to delay its production of documents.  In the ensuing weeks, the Union took a series of
positions disputing the Monitor's conclusion about the Union's cooperation.  This Report responds to those
arguments throughout and also provides more detail about this issue than the original draft, in order to
provide further context in which to explain the Monitor's non-cooperation conclusion.  In addition, this
Report also references the ways in which the Union has been cooperative since receiving the initial draft,
such as continuing to schedule interviews, producing additional documents, and hiring outside vendors.  It
also includes information to the extent it was feasible for the period through June 7, 2024.

I.    **NON-COOPERATION DURING RECENT IEB INVESTIGATIONS**

The Consent Decree directs the Monitor to investigate certain types of suspected misconduct at the Union and pursue disciplinary remedies if warranted.[14]  As noted above, the Union's level of cooperation with the Monitor's work under that mandate began to erode in February 2024, after the Monitor began investigating three current members of the IEB—the President, the Secretary-Treasurer, and one of the Regional Directors.  Included below is a description of the circumstances surrounding the Monitor's current investigations into those IEB members and the actions that the UAW has taken to delay or potentially deny the Monitor the access to information needed to resolve them.

A.    **Open Investigations of IEB Members**

In February 2024, the Union's IEB passed a motion "in support of [the President] withdrawing all of the field assignments assigned to the Secretary-Treasurer" that were not constitutionally required to be within her remit and made certain other policy changes in response to allegations that the Secretary-Treasurer had engaged in misconduct while carrying out her financial oversight responsibilities.[15]  The stated basis for those allegations was that the Secretary-Treasurer had abused her authority by improperly delaying and denying financial expense requests by the President's Office and certain IEB members, and allegedly threatened to deny legitimate expense requests if IEB members did not vote in favor of her priorities.

In response, the Secretary-Treasurer, and others, lodged allegations against the Union's President that, among other things, those IEB actions were improperly instigated in retaliation for

---

[14] *See* Monitor's Initial Status Report, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (Nov. 11, 2021), Civil No. 20-cv-13293, ECF No. 49 at 143-46 ("Monitor's Initial Status Report"); Monitor's Third Status Report at 7.

[15] IEB Meeting (Feb. 20, 2024).

her refusal or reluctance to authorize certain expenditures of funds at the request of and/or for the benefit of those in the President's Office—and to dilute her power to make similar denials in the future—not in response to any malfeasance on her part.

Based on allegations made by various complainants concerning these issues, and because both sets of allegations involved financial misconduct, in late February 2024 the Monitor opened an investigation into the actions of both the President and Secretary-Treasurer.  The Monitor hoped to resolve an investigation into these allegations promptly, given the serious nature of the claims being leveled between the Union's two most senior officials—claims that, according to reports received by the Monitor, were causing divisions and negatively impacting morale among Union staff.[16]  A prompt investigation was also necessary as its results could potentially warrant reversal of the significant structural changes associated with the reassignment of nine departments overseen by the Secretary-Treasurer.

A few months later, the Monitor expanded this investigation to include allegations advanced against the Union's President by another IEB member:  the Vice President who had been overseeing the Union's relationship with Stellantis.  On May 29, 2024, the President removed the Stellantis Department from that Vice President's oversight and reassigned it under his own control. For support, the Union President issued a memorandum asserting this action was taken because of that Vice President's "dereliction of duty" in connection with certain collective bargaining issues.  Shortly thereafter, the Monitor received allegations from the Vice President and other Union staff that the explanation in the President's memorandum was pretextual and false, and that

---

[16] The Monitor will report further about the impact of these divisions within the Union in a report concerning his compliance mandate that is anticipated to be filed shortly.

the President removed the Vice President's assignment as retaliation against him for, among other things, refusing to engage in acts of financial misconduct to benefit others.

In addition to these investigations, in April 2024 the Monitor separately opened an investigation into another IEB member, a Regional Director, involving allegations of embezzlement.

At this stage, it is important to emphasize that the allegations are just allegations. They prove nothing in themselves, and nothing in this Report should be construed as reaching any conclusion about possible charges, if any, for suspected misconduct.

### B.      The Union's Lack of Cooperation

The Union has partially cooperated in these investigations, but has also put up roadblocks that are interfering with the Monitor's ability to promptly and credibly conduct them.

With regard to scheduling interviews of Union witnesses, the Union has cooperated with the Monitor's work, scheduling numerous interviews of Union personnel, including senior Union officials. With one exception, which has been resolved,[17] the witnesses have been cooperative and have answered all of the Monitor's questions.

But those interviews have been conducted without the benefit of a full document production that would potentially allow the Monitor to test, challenge, or verify the assertions made by witnesses during questioning. That is because, with regard to the production of documents, the Union has not cooperated to the necessary degree, delaying its production to a pace that the Union's Secretary-Treasurer has called a "lack of cooperation"[18] and which DOJ characterized as "unacceptable."[19]

---

[17] *See infra* n.40.

[18] Secretary-Treasurer, Comments to June 2024 Draft Monitor Report at 2.

[19] Email from DOJ to UAW General Counsel (June 7, 2024).

Specifically, at the end of February 2024, after learning of the competing allegations described above, the Monitor requested documents from the UAW General Counsel that would enable the Monitor to conduct an investigation.[20] But the Union has still not fully complied with the Monitor's document requests. By early April 2024, the Union had produced just 18 documents. To assist in speeding the pace of production, the Monitor provided the UAW with a list of search terms and custodians to facilitate the production of electronic documents, and directed the UAW to provide all documents hitting on those terms so the Monitor's investigative team could review the identified materials, as a more efficient way of obtaining the needed documents.[21]

In response, the UAW took the position that the Monitor was not entitled to access the Union's electronic records without first providing the Union with the "ability to review documents that are protected by the attorney-client privilege or concerning collective bargaining strategy."[22] The Union indicated that it would need to perform this review to "screen the data for documents that we may want to designate as privileged and confidential," and that the UAW's "intention is to designate [as privileged] and produce all of it with some exceptions that we may have to address on a case-by-case basis."[23]

---

[20] Letter from Monitor to UAW (Feb. 29, 2024). The Union's General Counsel oversaw the Union's interaction with the Monitor concerning the investigation and the Union's response to a draft of this Report.

[21] The search terms for the investigation involving allegations against the President and Secretary-Treasurer initially brought back a list of approximately 59,000 documents; the Monitor later updated the search terms in response to ongoing investigative work, which the Union said resulted in approximately 158,000 document hits. After the Union hired outside counsel and a vendor, the Union indicated that the search terms actually generated over 200,000 hits including families. The Monitor then revised certain search terms in an effort to tailor the results, which lowered the population to 116,646 hits including families.

The Monitor also requested documents concerning the embezzlement investigation noted above, and the UAW proposed search terms to facilitate document production. The search terms for that investigation generated approximately 8,000 hits. No documents from that search have been produced.

[22] Email from UAW General Counsel to Monitor (May 22, 2024).

[23] Email from UAW General Counsel to Monitor (May 22, 2024).

Although the Monitor told the Union that he had no objection to it reviewing the documents, the Monitor pushed back on the substance of the Union's privilege position (as detailed further below); and, just as importantly, the Monitor emphasized that, because he was entitled to prompt access to all documents irrespective of privilege, a lengthy pre-production review would unacceptably delay the investigation.[24]   On May 18, 2024—two and a half months after the Monitor's initial document request—the UAW informed the Monitor that it had retained outside counsel to assist in reviewing and producing the documents.[25]   On May 23, the UAW informed the Monitor that it had retained an electronic discovery vendor as well.[26]

Throughout this process—and recognizing that the most efficient process initially requested had been rejected by the Union—the Monitor has made various efforts to work cooperatively with the Union to obtain the needed documents.  Among other things, the Monitor requested detailed hit counts to understand which of the terms were driving the volume and expressed willingness to consider modifications of terms as appropriate; suggested that the Union prioritize the production of documents responsive to a few of the search terms that generated low hit counts, and then produce documents on a rolling basis thereafter; and informed the Union that he had no objection to the Union conducting a parallel review of the documents after producing them to the Monitor, during which it could identify which documents it believed were privileged and confidential and therefore could designate them as protected from disclosure.[27]   Most recently, the Monitor also revised certain search terms related to the investigations into the President and

---

[24] Email from Monitor to UAW Associate General Counsel (May 10, 2024); Meeting with UAW General Counsel (Apr. 30, 2024); Meeting with UAW General Counsel (May 1, 2024).

[25] Email from UAW Associate General Counsel to Monitor (May 18, 2024).

[26] Email from UAW Associate General Counsel to Monitor (May 23, 2024).

[27] Emails from Monitor to UAW Associate General Counsel (May 8, 10, 15, 2024).

Secretary-Treasurer that reduced the total number of document hits requested by approximately 40%.[28]  These proposals have had only limited success.  As of the date of this Report, the Union has produced approximately 2,600 of the 116,000 potentially responsive documents.  Almost all of these documents (over 2,100) were produced on June 6, 2024.[29]

### C.     The Monitor's Right to Access Union Documents

For numerous reasons, detailed further below, the Monitor has concluded that the Union's privilege and confidentiality positions—both to delay its production of documents to the Monitor, and potentially to shield information entirely—are without merit and have been preventing the Monitor from carrying out his work under the Consent Decree.

### 1.     Consent Decree

The Consent Decree requires the Union to provide the Monitor with full access to the requested documents.

The Consent Decree gives the Monitor "the authority and duty to remove fraud, corruption, illegal behavior, dishonesty, and unethical practices from the UAW and its constituent entities."[30] In aid of that mandate, the Monitor has the "right and authority of the UAW International President and IEB to bring charges seeking to discipline" UAW members and personnel for, among other things, violating criminal laws relating to the operation of a Union.[31]  That authority to charge inherently includes the same access to the records of the Union as the President or the IEB, including records over which the Union itself might assert a privilege against disclosure to

---

[28] Email from UAW Outside Counsel to Monitor (June 5, 2024).

[29] In the investigation involving allegations against the Regional Director, the Union has produced just 42 documents and no documents based on search terms.

[30] Consent Decree ¶ 28.

[31] Consent Decree ¶¶ 29-30, 36.

outsiders.[32]  In other words, when it comes to investigations, the Consent Decree provides that the Monitor is no outsider:  just as the President or the IEB has the right to view such records of the Union when investigating potential misconduct, so too can the Monitor standing in their shoes.

Further illuminating the broad intent of this provision to vest the Monitor with the authority of the President and IEB when the Monitor is exercising his investigative and charging authority, the Consent Decree also confers upon the Monitor "all of the powers, privileges and immunities of a person appointed pursuant to Rule 66 of the Federal Rules of Civil Procedure and which are customary for court appointed offices [sic] performing similar assignments."[33]  With the "powers and privileges" of a Rule 66 receiver, the Monitor has access to all records of the Union, including privileged records.  Indeed, Courts have repeatedly held that those with receiver authority have this power because they can "take any action which could be taken by the officers, directors, partners, members and trustees" of the business.[34]  Courts have also found that those with such receiver authority can waive or assert privilege and work product.[35]  Thus, with the "powers,

---

[32] Under Article 32 of the UAW Constitution, the IEB has the power to investigate a complaint, which inherently includes access to books and records of the Union.  *See* UAW Const. art. 32, § 5 (explaining that the IEB "shall have the initial responsibility for investigating" complaints received by the Public Review Board alleging, among other things, violations of the UAW Ethical Practices Code by International officers and staff).

[33] Consent Decree ¶ 27.

[34] *United States v. Beckman*, No. CRIM. 11-228, 2012 WL 1342813, at *2 (D. Minn. Apr. 18, 2012); *see also United States v. Cohen*, No. CR. WDQ-14-0310, 2015 WL 2261661, at *19 (D. Md. May 7, 2015), *aff'd in part, appeal dismissed in part*, 888 F.3d 667 (4th Cir. 2018); *S.E.C. v. Ryan*, 747 F.Supp.2d 355, 362 (N.D.N.Y. 2010); *CFTC v. Cap. Blu Mgmt., LLC*, No. 110CV02029WSDGGB, 2010 WL 11508355, at *3 (N.D. Ga. July 26, 2010) (citing *United States v. Shapiro*, No. 06 Cr. 357(KMW)(FM), 2007 WL 2914218, at *5-6 (S.D.N.Y. Oct. 1, 2007)).

[35] *See, e.g.*, *MFS & Co., LLC v. Caterpillar, Inc.*, No. 09-14063, 2010 WL 11549935, at *4 (E.D. Mich. Sept. 20, 2010); *Burkett v. Hyman Lippitt, P.C.*, No. 05-CV-72110-DT, 2006 WL 6651035, at *4 (E.D. Mich. May 24, 2006); *Sec. & Exch. Comm'n v. GPB Cap. Holdings, LLC*, No. 21CV583MKBVMS, 2023 WL 8468467, at *17-18 (E.D.N.Y. Dec. 7, 2023); *Lightfoot v. Miss Lou Properties, Inc.*, No. CIV.A. 05-3776-PB-SS, 2006 WL 4029569, at *6 (E.D. La. Sept. 1, 2006), *subsequently aff'd sub nom. Nat'l Bus. Consultants Inc. v. Lightfoot*, 292 F. App'x 298 (5th Cir. 2008); *Grassmueck v. Ogden Murphy Wallace, P.L.L.C.*, 213 F.R.D. 567, 572 (W.D. Wash. 2003); *Woodson v. Am. Transit Ins. Co.*, 280 A.D.2d 328, 328 (N.Y. App. Div. 2001).

privileges and immunities" of a receiver over the Union, the Monitor has the same ability to access privileged material as Union leaders when exercising his investigative mandate.

This conclusion makes common sense. The Consent Decree must allow the Monitor to access all documents when the Monitor acts in his investigative role, including those that are privileged, otherwise the Union would be able to shield documents from the Monitor's view in any investigation involving counsel, or by involving lawyers to frustrate the investigation. That would be particularly true with respect to the President of the UAW, since the Union's Legal Department reports directly to the President and is part of the President's Office. Indeed, the Consent Decree gave the Monitor this authority because DOJ did not trust the Union to investigate its senior-most officers on its own, as many of those leaders, including two prior Presidents, had just been convicted of felonies. To defer to the President's Office the decision about what documents the Monitor could see or not see when conducting an investigation would contradict the letter and the spirit of the Consent Decree.

The Union has argued that it can withhold documents as privileged from the Monitor based on Paragraph 55 of the Consent Decree.[36] But the plain language of that provision only pertains to the Monitor's attendance at IEB meetings:

> The Monitor shall have the right to be notified of and attend all meetings of the IEB and the authority to distribute information to the membership of the UAW about the activities of the Officers or his/her/their designated representatives. ***The Monitor shall not be entitled to attend or listen to meetings or portions of meetings protected by the attorney-client privilege or concerning collective bargaining strategy.*** The Monitor shall keep confidential any information learned

---

[36] The Union's privilege concern has focused on documents relating to the General Counsel's preparation of its response to the Monitor's February 2024 document request. Although for the reasons provided herein, the Monitor is entitled to have access to those documents, the Monitor has told the Union that his investigative team is not interested in them and that the Monitor would use search terms to screen and segregate those documents from review. This offer was rejected, as was the Monitor's attempt to determine what other documents the Union contemplates withholding.

during IEB meetings, except as may be necessary to carry out of [sic] his, her, or their functions as set forth herein.[37]

This provision pertains solely to when the Monitor attends an IEB meeting—which he does as an observer—and not in the investigative context, where he stands in the shoes of the President and IEB.  The IEB's ability to conduct a portion of an IEB meeting without the presence of the Monitor in which they receive legal advice or discuss collective bargaining does not enable the Union to broadly protect other communications or documents, outside that context, from his review during the course of an investigation.  If that was the intent of the parties when drafting the Consent Decree, they would have simply said so, and not limited these restrictions to IEB meetings.[38]

Further, the context in which the Consent Decree was formed also makes clear that the Union's position on a "collective bargaining" privilege is irreconcilable with the intent of the Consent Decree.  Part of the government's investigation leading up to the Consent Decree involved allegations of corrupt payments made by Fiat Chrysler Automobiles United States of America LLC to senior Union officials in order to undermine collective bargaining.[39]  With that investigation as

---

[37] *See* Consent Decree ¶ 55 (emphasis added).

[38] *See* Consent Decree ¶¶ 29-30, 36.  The Union has also argued that the Monitor's power is limited to *charging* misconduct, but does not extend to *investigating* suspected misconduct in aid of potential charges. But the power to investigate is inherent in the power to charge, and it would make no sense for the Consent Decree to give the Monitor the charging responsibility without the authority to access the information needed to determine whether charges are warranted in the first place.  Indeed, in the three years of the monitorship, the Union never previously suggested the Monitor had no power to investigate suspected misconduct in aid of his charging decision or prior to bringing charges, including when it sought a 502(d) Order from the Court, noted below.  The Union has also taken the position that, pursuant to Paragraph 41 of the Consent Decree, it is entitled to assert privilege in the "later stages" of the investigation and disciplinary process.  That provision, however, only applies to the potential attorney-client privileges of an individual "who is the subject of a disciplinary charge."  It does not apply to the attorney-client privilege of the Union itself.

[39] Monitor's Initial Status Report at 32-39; Press Release, FCA US LLC Charged for Making Illegal Payments to UAW Officials (Jan. 27, 2021), available at https://www.justice.gov/usao-edmi/pr/fca-us-llc-charged-making-illegal-payments-uaw-officials.

part of the backdrop to the Consent Decree, it would frustrate the intent of the decree for this provision to shield collective bargaining entirely from the Monitor's purview—*i.e.*, one of the areas of activity that led to the investigation that resulted in the Consent Decree. Moreover, given that the core business of the UAW is collective bargaining, the Union's reading of the Consent Decree would effectively bar any investigation by the Monitor into financial misconduct relating to a significant portion of the Union's activities.

A portion of the current investigation is illustrative. It would be impossible to test the proffered justification for removing the Stellantis Department from the Vice President's oversight without testing the President's proffered collective bargaining justification for doing so. To carve out from the Monitor's investigation documents that pertain to what will likely be a determinative issue in these investigations cannot be reconciled with the language and intent of the Consent Decree.[40]

### 2. Union President's Memorandum

A recent memorandum from the Union's President supports the Monitor's position on privilege. In a memorandum to all staff regarding "Cooperation with the Monitor" that was sent both in August 2023 and December 2023, the UAW President acknowledged that "[f]or years the UAW has proven itself incapable of monitoring itself in making sure that its leadership did not engage in criminal conduct."[41] As a result, the President "instruct[ed] All Staff to cooperate fully

---

[40] During a recent interview of a Union witness concerning these allegations, the UAW invoked a "collective bargaining" privilege and on this basis the witness did not answer certain questions. After the Monitor later explained to the General Counsel that he would need to publicly identify this incident as an example of the UAW's apparent violation of the Consent Decree by rendering investigation into the Vice President's allegations impossible, the UAW agreed to make the witness available for an additional interview to cover these topics. Email from UAW General Counsel to Monitor (June 3, 2024). Even so, the UAW has not abandoned its position that it has such a collective bargaining privilege, and so may still withhold responsive documents. Email from UAW General Counsel to Monitor (June 7, 2024).

[41] August 2023 Cooperation Memo at 2; December 2023 Cooperation Memo at 2.

with the Monitor in all regards as it regards financial impropriety, corruption, and internal union election-related matters."[42]   The President further emphasized the need for that cooperation to be prompt, explaining that after receiving an inquiry from the Monitor, staff were permitted to report that inquiry to the General Counsel, but noted that "advising the General Counsel should not be an excuse to delay full and complete cooperation with the Monitor."[43]

The President's memorandum acknowledged that when conducting investigations, the Monitor "stands precisely in the shoes" of the UAW when it comes to privileged documents:

> One of the serious issues I considered in making this directive is concerns about privilege, in other words, how can we safely share information with the Monitor and protect the various privileges we have available.  ***This concern is completely resolved by an agreement reached between the President's Office and the Monitor that the Union will share any and all information requested based upon the understanding that the Monitor stands precisely in the shoes of the Union***, and that the Monitor will protect all available privileges.[44]

As a result, the memorandum provided that: "[g]iven the protection of the privilege as well as the Court-Ordered mandates of the Consent Decree, there is no reason or basis for any member of the staff or leadership of this Union not to abide by this directive to be fully cooperative with the Monitor."[45]

### 3.   Secretary-Treasurer's Position

The Union's Secretary-Treasurer has also expressed concern about the Union's current level of cooperation.  After the Monitor shared an initial draft of this Report with the Union, the Union's Secretary-Treasurer contacted the Monitor to provide feedback that contradicted the position the Union has taken through its General Counsel.  In those comments, the Secretary-

---

[42] August 2023 Cooperation Memo at 1; December 2023 Cooperation Memo at 1.

[43] August 2023 Cooperation Memo at 1; December 2023 Cooperation Memo at 1.

[44] August 2023 Cooperation Memo at 3 (emphasis added); December 2023 Cooperation Memo at 3 (emphasis added).

[45] August 2023 Cooperation Memo at 3; December 2023 Cooperation Memo at 3.

Treasurer stated that she opposed a request that had been made by the Union's General Counsel to remove the references to the Union's non-cooperation in the Monitor's Report.  She further stated that, as Secretary-Treasurer, she had "exercised my Constitutional authority as Secretary-Treasurer to instruct the UAW's General Counsel to fully cooperate with the Monitor in his investigation. To the extent that the Union and/or its agents are failing to fully cooperate with the Monitor's investigation, they are acting contrary to my express instructions and in derogation of my Constitutional authority as UAW Secretary-Treasurer.  See UAW Constitution, Article 13, Section 14."[46]

### 4.      Rule 502(d) Order

The Court's entry of a Rule 502(d) Order in this case further supports the Monitor's position.  At the beginning of the monitorship, to alleviate the UAW's concerns about waiver of the privilege, the UAW sought from the Court and obtained an Order pursuant to Federal Rule of Evidence 502(d) ("502(d) Order") confirming that the UAW can provide the Monitor with privileged or other legally protected material without that production constituting a waiver of the privilege or protection.[47]  That Order undercuts any assertion that waiving the privilege would be a legitimate concern of the Union for sharing documents with the Monitor during the course of an investigation, and underscores that the Monitor is inside that privilege.

---

[46] Secretary-Treasurer, Comments to June 2024 Draft Monitor Report at 2-3.

[47] Order Granting Defendant's Unopposed Motion for Order Governing Disclosure of Privileged Materials, *United States v. Int'l Union, United Automobile, Aerospace, and Agricultural Implement Workers of America* (Aug. 11, 2021), Civil No. 20-cv-13293, ECF No. 40 ("502(d) Order").  Pursuant to the 502(d) Order, the UAW may identify when producing information what information it considers privileged, and the Monitor shall not disclose that information to any other person or entity without the written consent of the UAW or authorization of the Court, except insofar as necessary for the fulfillment of the Monitor's duties.

### 5.    Common Interest Agreement

As another protective measure, the Union previously asked the Monitor to enter into a common interest agreement with the Union in order to shield privileged information provided to the Monitor from claims that a privilege had been waived.[48]  Under that agreement, the UAW may designate materials as common interest materials, and the Monitor shall maintain the confidentiality of these materials except insofar as necessary for the fulfillment of the Monitor's duties under the Consent Decree.[49]

### 6.    DOJ's Position

The Monitor has also sought and obtained the views of DOJ in connection with the Union's conduct.  DOJ has stated the following:

> The Union's position is making it difficult, if not impossible, for the Monitor to fulfill his mandate to remove fraud, corruption and illegality from within the UAW as required by Paragraph 22 of the Consent Decree.  A continued refusal to produce relevant documents and information to the Monitor threatens to obstruct or otherwise interfere with the work of the Monitor.[50]

In addition, in response to the Union's argument that the Monitor's position is new (as discussed further below), DOJ provided the following response:

> As we said on our call last week and as we've noted since, we do have a great deal of concern about the scope and nature of the UAW's privilege assertions here.  We also do not think the Monitor's position regarding privilege is anything new, as your e-mail implies.  Indeed, we believe the Monitor has been wholly consistent over time that, when acting in his disciplinary/investigative capacity, he stands inside the union's privilege and enjoys all of the rights and authorities of the IEB and Union President.  Even if that were not the case, we believe that the Rule 502 Order that is in place fully protects the interests of the union itself.[51]

---

[48] Common Interest Agreement (July 6, 2021).

[49] *Id.*

[50] Email from DOJ to Monitor (June 6, 2024).

[51] Email from DOJ to UAW General Counsel (June 7, 2024).

DOJ also stated that the current pace of the Union's production of information was "unacceptable," and indicated that "the position that the UAW is taking is less than cooperative and appears to be impeding the Monitor's efforts to fulfill his mandate."[52]  DOJ also expressed hope the "the UAW will recommit itself to timely production of material to assist the Monitor in doing his job."[53]

### 7.     Past Practice

The past practice of the Monitor and the Union is consistent with the Monitor's current pursuit of privileged materials to carry out his work under the Consent Decree.

This is at least the fourth time since the beginning of the monitorship that the Monitor has sought privileged materials from the Union as part of carrying out his responsibilities under the Consent Decree.  In each case, the Monitor has respected the importance of privilege concerns, and, in part to avoid unnecessary litigation before the Court, the Monitor has attempted to work with the Union in order to come to a reasonable accommodation about the Union's concerns about producing such materials to the Monitor.[54]  And in each case the Union provided those materials, although in some instances only after the issuance of a public report.

Most recently, in March 2022, the Monitor opened an investigation into whether senior Union officials, including the Union's then-President, interfered with or obstructed the Monitor's work by failing to disclose alleged financial misconduct by multiple Union officials.[55]  In the course of that investigation, the Monitor sought privileged materials from the Union.  The Monitor

---

[52] Email from DOJ to UAW General Counsel (June 7, 2024).

[53] Email from DOJ to UAW General Counsel (June 7, 2024).

[54] *See* Rule 502(d) Order at 2.

[55] *See* Monitor's Third Status Report at 14-19.  As noted below, that investigation remains open.  The Monitor did not pursue an investigation of the underlying misconduct because it was subject to investigation by DOJ.

took the same privilege position then (*i.e.*, in August 2022[56]) as he does now—namely, that the Monitor stands in the shoes of the Union for the purposes of privilege—based on the powers of a receiver that the Consent Decree confers on him and because he has the right and authority of the President and IEB with respect to disciplinary charges.  In the context of that investigation, the UAW eventually produced all privileged documents that were requested.  To be sure, the UAW initially withheld privileged documents and provided the Monitor a privilege log, but, following pushback by the Monitor, the Union produced the underlying documents.[57]

Further, the all-staff memorandum sent by the Union's President in August 2023 and December 2023 demonstrates the consistency of the Monitor's approach and the Union's prior acceptance of it.  The President's memorandum was explicitly "based upon the understanding that the Monitor stands precisely in the shoes of the Union."[58]  That language—which mirrors the wording used by the Monitor in his discussions with the Union in 2022—adopted the same stance taken by the Monitor, then and now, about the Monitor's investigative authority and his ability to access privileged documents.

---

[56] Meeting with then-UAW General Counsel (Aug. 17, 2022).

[57] The Monitor also sought and obtained privileged documents in at least two other contexts.  As reported in the Monitor's Initial Status Report, to aid in his oversight of changes to the Union's compliance regime, the Monitor sought production of a report prepared by an outside consultant to the Union that contained scores of recommendations for how the Union could address critical and severe weaknesses in its compliance environment, and over which the Union claimed privilege.  *See* Monitor's Initial Status Report at 77-84.  After the Monitor sought and recommended the production of that report, as recounted in the Initial Status Report, the Union eventually reversed course and provided the report to the Monitor.  *See* Monitor's Third Status Report at 19.  In addition, as described in the Monitor's Third Status Report, the Union initially agreed to provide the Monitor the notes of the witness interviews the Union conducted in the course of the government investigation into Union misconduct, in order to enable his investigative work into historical misconduct.  After initially breaking that agreement, as reported in the Monitor's Third Status Report, the Monitor agreed to accept from the Union oral read-outs of the notes of those interviews.  *See* Monitor's Third Status Report at 11-13, 18.

[58] *See supra* Part I(C).

Notwithstanding the foregoing, the Monitor has taken a collaborative posture with the UAW from the beginning of the monitorship, seeking to obtain the Union's cooperation in conducting his investigative work, before resorting to more significant measures to enforce the Consent Decree.  The Monitor is continuing to engage with the UAW about its level of cooperation—*e.g.*, the Union made its largest production of documents just days before this Report was filed—and is hopeful that the Union will return to its previously collaborative posture.  Should that process not succeed, however, the Monitor may need to seek the Court's intervention to enforce the Consent Decree.

## II.    ADDITIONAL INVESTIGATIVE ACTIVITIES

As noted above, under the Consent Decree, the Monitor has the responsibility to investigate and address misconduct at the Union, including both past misconduct that may have not yet been addressed by DOJ's criminal prosecutions, as well as misconduct that occurs during the monitorship.  This Part of the Report discusses each type of investigation, and then describes other aspects of the Monitor's investigative work.

### A.    Investigations of Alleged Misconduct Predating the Consent Decree

As discussed in the Initial and Third Status Reports, the Monitor has investigated allegations of misconduct predating the Consent Decree at the UAW by current and retired UAW members, officers, and employees, as well as allegations of misconduct arising out of the UAW's relationships with certain vendors.[59]  The Monitor has conducted a total of 20 such pre-Consent Decree investigations, all of which have now been resolved and closed.  Almost all of these investigations involved allegations of potential misconduct that DOJ received during the course of its investigation into historical malfeasance within the UAW and which it referred to the Monitor

---

[59] *See* Monitor's Initial Status Report at 142, 146-47, 152; Monitor's Third Status Report at 7.

for further investigation under the Consent Decree.[60]  Other investigations of pre-Consent Decree misconduct involved allegations that the Monitor identified during the course of investigating the matters referred to him by DOJ.

As set forth in more detail below, of the 20 pre-Consent Decree investigative matters, the Monitor pursued formal discipline in five (5) of the matters; referred one (1) matter to the UAW's Ethics Officer; and closed twelve (12) of the matters without further action.  The Monitor also requested reimbursement of funds from employees in two (2) of the matters.

### 1.    Disciplinary Action Taken

Based on pre-Consent Decree misconduct the Monitor identified during his investigations, the Monitor pursued discipline in five (5) matters, including against four (4) former International UAW employees—Danny Trull, James Beardsley, Amy Loasching, and James Hardy—and one (1) Local Union official, Timothy Edmunds.  Each of these individuals has now been expelled from UAW membership and designated as a "barred person" under Paragraph 20(e) of the Consent Decree.[61]  The circumstances of each of these cases is discussed in more detail below.

- **Danny Trull**.  Trull is a former Region 5 Assistant Director.  He retired from the UAW in 2015.  As described in the Monitor's Third Status Report, the Monitor pursued disciplinary action against Trull for his participation in an embezzlement scheme related to master accounts with hotels for which former UAW President Dennis Williams, among others, was convicted.[62]  Specifically, Trull abused his position as Assistant Director to authorize approximately $344,000 in disbursements of UAW funds to pay for personal expenditures, including cigars, private villas, high-end liquor and meal expenses, and golf, for certain senior UAW officials, including himself.[63]  On July 22, 2022, the Adjudications Officer ordered Trull permanently expelled and debarred from the UAW and the Monitor

---

[60] *See* Monitor's Initial Status Report at 142, 147.

[61] *See* Consent Decree ¶¶ 20(e); 36.

[62] *See* Monitor's Initial Status Report at 29-31; Monitor's Third Status Report at 10-11.

[63] *See* Monitor's Third Status Report at 10-11; Danny Trull Stipulation at 3-4 (July 22, 2022) ("Trull Stipulation").

designated him as a "barred person" under Paragraph 20(e) of the Consent Decree.[64]  The order is posted on the Adjudications Officer's website.[65]

- **James Beardsley**.  Beardsley is a former Administrative Assistant to former UAW Vice President Richard Shoemaker.  Beardsley retired from the UAW in 2004.  The Monitor's investigation found that Beardsley also participated in the embezzlement scheme related to master accounts with hotels described above and which involved former UAW President Dennis Williams.  The Monitor found that UAW officials improperly authorized disbursement of, and Beardsley improperly accepted, approximately $85,000 of UAW funds for Beardsley's personal benefit, including for lodging, golf green fees and merchandise, meals, liquor, and cigars.  To resolve the Monitor's investigation, Beardsley entered into a stipulation with the Monitor on November 7, 2023, in which Beardsley acknowledged that he had permanently resigned his UAW membership and agreed to be designated by the Monitor as a "barred person" under Paragraph 20(e) of the Consent Decree.[66]  The stipulation is posted on the Monitor's website.[67]

- **Amy Loasching**.  Loasching is a former Administrative Assistant to former UAW President Dennis Williams.  Loasching retired from the UAW in 2016.  The Monitor's investigation found that Loasching also participated in the above-described embezzlement scheme related to master accounts with hotels.  The Monitor found evidence that UAW officials improperly authorized disbursement of, and Loasching improperly accepted, approximately $25,000 of UAW funds for Loasching's personal benefit, including for lodging, golf outings and apparel, and meals.  The Monitor's investigation also found evidence that Loasching improperly directed UAW Maintenance Department workers, whom she oversaw as part of her duties as an Administrative Assistant, to perform work on her personal condominium residence while on UAW time.  In connection with the investigation, the Monitor requested an interview with Loasching.  Rather than be interviewed by the Monitor, Loasching resigned her UAW membership.  On June 6, 2024, based on the investigation described above, the Monitor designated Loasching as a "barred person" under Paragraph

---

[64] Trull Stipulation at 5-6.

[65]  Court-Appointed UAW Adjudications Officer, *Adjudications*, UAW Adjudications Officer, www.uawadjudications.com/adjudications.

[66] *See* James Beardsley Stipulation (Nov. 7, 2023).

[67] Court-Appointed, Independent Monitor of the UAW, *Disciplinary Action by the Monitor*, UAW Monitor, www.uawmonitor.com/charges.

20(e) of the Consent Decree.[68]   The designation notice is posted on the Monitor's website.[69]

- **James Hardy**.  Hardy is a former Assistant Director in the UAW-Chrysler Department under former UAW Vice President General Holiefield.  Hardy retired from the UAW in 2013.  The Monitor's investigation found that Hardy engaged in a job-selling scheme in which Hardy accepted thousands of dollars in exchange for referring individuals for jobs at Chrysler.  Based on this misconduct, on June 5, 2015, Hardy entered into a pre-trial diversion agreement with the government for misprision of the felony of wire fraud. Because this matter did not clearly fit within the Monitor's charging authority for pre-Consent Decree misconduct, the Monitor referred disciplinary charges against Hardy to the UAW for adjudication under Paragraph 30 of the Consent Decree.[70]  To resolve these charges, on June 6, 2024, Hardy signed an agreement with the UAW to permanently resign his UAW membership.[71]   On May 21, 2024, Hardy also entered into an agreement with the Monitor in which Hardy agreed to be designated as a "barred person" under Paragraph 20(e) of the Consent Decree.[72]   The Monitor's agreement with Hardy is posted on the Monitor's website.[73]

- **Timothy Edmunds**.  Edmunds is a former Financial Secretary-Treasurer of UAW Local 412.  The Monitor filed charges against Edmunds after he pleaded guilty in federal court to embezzling approximately $2 million from UAW Local 412 between 2011 and 2021 in a scheme involving personal use of the UAW Local 412 debit card and transfer of funds from UAW Local 412 bank accounts to Edmunds' personal accounts.[74]  On July 28, 2022, the Adjudications Officer ordered Edmunds permanently expelled and debarred from the UAW and the Monitor designated him as a "barred

---

[68] *See* Notice of Designation of Amy Loasching as a Barred Person (June 6, 2024).

[69] Court-Appointed, Independent Monitor of the UAW, *Disciplinary Action by the Monitor*, UAW Monitor, www.uawmonitor.com/charges.

[70] Paragraph 30 of the Consent Decree concerns the alternative resolution of disciplinary charges and allows the Monitor to refer disciplinary charges to the UAW for adjudication pursuant to the rules in the UAW Constitution.

[71] Settlement Agreement on Article 31 Charges and Relinquishment of Membership (June 6, 2024).

[72] *See* James Hardy Stipulation (May 21, 2024).

[73] Court-Appointed, Independent Monitor of the UAW, *Disciplinary Action by the Monitor*, UAW Monitor, www.uawmonitor.com/charges.

[74] *See* Monitor's Third Status Report at 10-11.  The Monitor's charges against Edmunds are posted on the Monitor's website.  Court-Appointed, Independent Monitor of the UAW, *Disciplinary Action by the Monitor*, UAW Monitor, www.uawmonitor.com/charges.

person" under Paragraph 20(e) of the Consent Decree.[75]  The order is posted on the Adjudications Officer's website.[76]

### 2.      Referral to Ethics Officer

In October 2021, the Monitor referred an investigation to Wilma Liebman, the UAW's then-Ethics Officer, related to the acceptance of football tickets by Raymond Curry in 2017 when he was a Regional Director.[77]  The Monitor reported on the details of this investigation in the Initial Status Report.[78]  On March 15, 2022, then-Ethics Officer Liebman issued a report with her findings and recommendations, including finding no evidence that Curry violated UAW policy or otherwise acted unethically in connection with the acceptance of these tickets, and the conclusion that the vendor policy enacted by the UAW in response to the Monitor's recommendation was an appropriate action to avoid the appearance or suggestion of impropriety in the future.[79]

### 3.      Matters Closed Without Action

The Monitor closed 12 matters because the Monitor found insufficient evidence to adequately substantiate the allegations or otherwise warrant pursuing disciplinary action.[80]

---

[75] Timothy Edmunds Stipulation (July 28, 2022).

[76]  Court-Appointed UAW Adjudications Officer, *Adjudications*, UAW Adjudications Officer, www.uawadjudications.com/adjudications.

[77] *See* Monitor's Initial Status Report at 152-55.  Liebman has since resigned from this position.

[78] *See* Monitor's Initial Status Report at 152-55.

[79]  Ethics Officer, *Report Re Ray Curry's Use of Sports Tickets/Investigative Findings and Recommendations* (Mar. 15, 2022), available at https://uaw.org/wp-content/uploads/2023/11/uaw-ethics-officer-report-1.pdf.

[80]  In two additional investigations, the Monitor closed the investigation after seeking reimbursement from the relevant employee.  An investigation by the Monitor found that, in May 2015, two International UAW employees accepted theme park tickets for their and their family members' personal use that had been purchased using funds from the then-UAW-Chrysler National Training Center ("NTC").  One employee accepted tickets for either Disney World or Universal Studios in the amount of $217.26; the other accepted tickets for Disney World in the amount of $852.  The Monitor requested that the employees reimburse the NTC in these amounts, which they did after the Monitor informed them that NTC funds had been used to purchase the tickets they received.  The Monitor did not pursue disciplinary action in these matters because the Monitor's investigation did not find evidence proving that they were aware at the time they accepted the tickets that the NTC had paid for them.

**B.      Post-Consent Decree Investigations**

In addition to investigations of allegations of misconduct predating the Consent Decree, the Monitor has investigated allegations of misconduct after the entry of the Consent Decree.[81]  As detailed further below, the Monitor has opened 24 such investigations, and 7 of them remain open and active.  In addition to conducting these investigations, the Monitor has worked with the Union to establish processes by which the Union itself can track and investigate complaints of misconduct on its own, at the International and Local level.

Since the start of the monitorship, the Monitor has opened 24 investigations into allegations of post-Consent Decree misconduct.  These investigations have involved allegations of financial misconduct, including misuse of funds, vendor kickbacks, and theft of time (*i.e.*, payment for hours not worked), at both the International and Local Union level.

**Closed Investigations.**  Of these 24 investigations, the Monitor has resolved, closed, or paused 17 investigations, as follows:

- **Referral to DOJ.**  The Monitor found sufficient evidence of criminal misconduct and therefore referred two investigations to DOJ for further investigation.[82]  The Monitor may reopen an investigation referred to DOJ at the conclusion of DOJ's investigation, but stands down during the pendency of any criminal investigation so as to not inadvertently interfere with that process.

- **Referral to the UAW.**  The Monitor referred nine investigations into potential misconduct at the Local Union level to the UAW.  In these cases, the Monitor initially opened investigations based on the nature of the allegations, but later determined that these matters should be handled by the UAW.  For example, the Monitor opened an investigation into allegations that a Local Union official failed to report over $100,000 in payments to a vendor on the Local Union's LM-2 reports, but during the course of the investigation, the Monitor determined that the amount was much smaller.

---

[81] *See* Monitor's Initial Status Report at 45-48, 142-46.

[82] Under Paragraph 60 of the Consent Decree, "[t]he Monitor may refer any matter to the United States Attorney for appropriate action."

Because of the relatively low dollar amount, the Monitor determined that the allegations would best be reviewed by the UAW itself.

- **Closed Without Action.**  The Monitor closed six investigations without action because the investigations did not substantiate the allegations or otherwise did not warrant pursuing disciplinary action.

**Open Investigations.**  Seven of the investigations remain open and active.[83]  Five of these investigations involve alleged misconduct by current and former International Union staff and officials,[84] including the three IEB members discussed above, while the other two involve alleged misconduct at the Local Union level.

### C.   Investigative Tools

In carrying out his investigative responsibilities, the Monitor has continued to utilize the investigative tools at the Monitor's disposal described in the Monitor's prior reports.[85]  Those have included the following:

- **Documents.**   The Monitor has reviewed thousands of documents (privileged and non-privileged), including the repository of documents provided by DOJ from its closed investigations;[86] financial account records from DOJ;[87] documents obtained directly from the UAW; documents

---

[83] As evidenced by the closing of several investigations without action over the course of the monitorship, the opening of an investigation by the Monitor does not mean that there will be disciplinary charges associated with that investigation or that the individual whose conduct the Monitor is investigating has engaged in misconduct.  There should be no presumption that the number of open investigations correlates to the number of eventual charges.

[84] The Monitor has continued to investigate the conduct surrounding the Union's prior failure to disclose an ongoing investigation into financial misconduct.  As described in the Third Status Report, the Monitor learned that the Union had failed to disclose an investigation it was conducting into alleged financial misconduct by a senior leader despite a standing request to the Union that it disclose all such investigations, and that the Union affirmatively prevented the Monitor from learning of the investigation by excluding the Monitor from an IEB meeting during which the investigation was discussed.  *See* Monitor's Third Status Report at 14-17.  The Monitor's investigation of this matter is ongoing.  The Monitor will provide a further update on this investigation in a subsequent report.

[85] *See* Monitor's Initial Status Report at 146-52; Monitor's Third Status Report at 7-9.

[86] *See* Monitor's Initial Status Report at 146-47.

[87] *See* Monitor's Third Status Report at 7-8.

received as a result of third-party subpoenas;[88] and documents submitted by those reporting to the Monitor's hotlines.

- **Interviews.**  Since the Third Status Report, the Monitor has conducted dozens of interviews related to alleged misconduct, including interviews with International Union staff, Local Union members and officials, and non-UAW third parties.  In addition, the firm hired by the Monitor to assist with the intake of new complaints to the Monitor's hotlines has conducted dozens of additional interviews in the course of that work.

- **Hotlines.**  The Monitor's team also continues to take in and follow up on information that comes in through both the Monitor's own hotlines and the UAW's Ethics Hotline, staffed by Capgemini (formerly Exiger).[89]

- **Historical UAW Interviews.**  The Monitor also received summaries of the UAW's prior interviews of 102 witnesses related to pre-Consent Decree conduct.

- **Investigation Referrals by the UAW**.  Building on the progress noted in the Third Status Report, since March 2022,[90] the UAW has been regularly notifying the Monitor of allegations of potential fraud, corruption, or financial misconduct when the UAW becomes aware of such allegations. The Monitor's process is first to review any allegations of misconduct relayed to the Monitor by the UAW to determine whether the Monitor should investigate the allegations or whether the UAW may proceed with its own investigation.  If the Monitor refers the matter to the UAW to investigate the allegations itself, which generally occurs when the allegations involve relatively low dollar amounts and/or noncompliance with internal rules, the UAW keeps the Monitor apprised of its investigative work.

---

[88] *See* Monitor's Third Status Report at 8.

[89] *See* Monitor's Initial Status Report at 150-52; Monitor's Third Status Report at 9.  In September 2023, Capgemini acquired the division of Exiger that oversaw the UAW's Ethics Hotline.  Exiger, *Capgemini Will Acquire its FCC Advisory Division as Exiger Continues to Accelerate and Focus the Scaling of its Third Party Risk and Supply Chain Management Technology Business* (Sept. 8, 2023), available at https://www.exiger.com/perspectives/exiger-announces-capgemini-will-acquire-its-fcc-advisory-division-as-exiger-continues-to-accelerate-and-focus-the-scaling-of-its-third-party-risk-and-supply-chain-management-technology-business/.

[90] *See* Monitor's Third Status Report at 11-19.

### D.     Other

The Monitor has also developed processes to help the Union better conduct its own investigations, so that it is better equipped to handle allegations of misconduct, particularly once the monitorship period ends.  This oversight takes several forms:

- In October 2023, the UAW began to formalize its internal tracking of investigations by creating a spreadsheet of all internal UAW investigations, audits, administratorships,[91] and other relevant matters, both at the International and Local Union levels ("Investigations Tracker").  The Monitor has access to the Investigations Tracker, which the UAW updates regularly.

- The Monitor and UAW (including members of the Legal Department, Compliance Department, President's Office, and Secretary-Treasurer's Office) meet regularly to review updates to the Investigations Tracker and to allow the Monitor to provide feedback to the UAW regarding the investigative steps taken and remedial action proposed.  The Monitor has overseen a total of 76 investigative matters handled by the UAW, 37 of which are currently open and 39 of which have been closed.

- The Monitor has also provided discrete feedback to the UAW on its processes for investigations.  For example, following an influx of time theft allegations to the Monitor's hotline and the UAW's Ethics Hotline, the Monitor developed a time theft investigation checklist with best practices for investigating such allegations.  To aid in the Union's work, the Monitor provided this checklist to the Union at the same time he referred to the UAW six time theft investigations.

These efforts have enabled the Monitor to oversee the work being done by the Union as relevant to the Monitor's mandate, but also to assess, and suggest improvements to, the UAW's own investigative process more generally, with the ultimate goal of helping the UAW to create a robust investigative process capable of handling its own investigations once the Monitor no longer

---

[91] Article 12, section 3 of the UAW Constitution empowers the IEB to designate one of its members as an administrator over a Local Union, having "full authority over and supervision of all functions of the Local Union," where necessary to "prevent or correct corruption of financial malpractice," "assure the performance of collective bargaining agreements or other duties as a bargaining representative," "restore democratic procedures within any chartered subordinate body," or "otherwise assure carrying out the legitimate objectives of the International Union by such subordinate body."

oversees the UAW.  Additional information about the Monitor's oversight of the Union's own investigative function and the Union's implementation of the Monitor's investigations-related recommendations will be in the Monitor's forthcoming report, discussed below.

Many of the reports of alleged misconduct received by the Monitor involve alleged misconduct at the Local Union level.  Most of the Local Union allegations that the Monitor receives involve relatively low dollar amounts and/or noncompliance with Local Union bylaws or other internal rules, rather than violations of federal law.  The Monitor has determined that these allegations should generally be referred to the Union for investigation, with potential exceptions depending on the particular facts of each matter.  The Monitor reached this conclusion for two related reasons.  First, when the allegations involve relatively low dollar amounts, it is more efficient for the Union to develop its own processes for these allegations, rather than devoting Monitor resources.  Second, because allegations of Local Union financial misconduct arise frequently, it is important that the Union develop and carry out best practices for investigating these matters on its own.

* * *

Pursuant to Paragraph 58 of the Consent Decree, the foregoing Report constitutes the ninth report of the Monitor, Neil M. Barofsky.

**Date:  June 10, 2024**

_____
Neil M. Barofsky, Monitor

*Respectfully filed with the Court on behalf*
*of the Monitor by counsel to the Monitor,*


  /s/ Michael W. Ross         
Michael W. Ross
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, New York 10036
(212) 891-1600 (t)
(212) 891-1699 (f)

## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2024, the foregoing Report was served electronically on all counsel of record via the CM/ECF system.  In addition, pursuant to Paragraph 58 of the Consent Decree, the foregoing Report was served on consent by electronic mail upon the United States, the UAW's International President, the International Executive Board, and designated counsel for UAW.

   /s/Michael W. Ross
Michael W. Ross
