## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,    )

            )

        Plaintiff,    )

            )

    v.    )    Case No. 20-13293

            )    Honorable David M. Lawson

INTERNATIONAL UNION, UNITED )

AUTOMOBILE, AEROSPACE, AND )

AGRICULTURAL IMPLEMENT    )

WORKERS OF AMERICA,    )

            )

        Defendant.    )

## MONITOR'S MOTION TO ENFORCE THE CONSENT DECREE

The Court-appointed Monitor ("Monitor") for the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW" or "Union") respectfully moves the Court pursuant to Paragraph 69 of the January 29, 2021 Consent Decree (ECF No. 10, PageID.135) for enforcement of the Consent Decree, including (a) an Order declaring that the Consent Decree gives the Monitor direct and immediate access to Union documents in connection with his investigations, including privileged and confidential documents; and (b) an Order compelling the Union to produce the documents previously requested by the Monitor in connection with the open investigations into three current International Executive Board ("IEB") members, without exception.

1

Under Paragraph 69 of the Consent Decree, "[t]he Officers or any party to this consent decree may apply to the Court by filing an appropriate motion for any order necessary or appropriate to implement this decree . . ."

Before filing this Motion, and pursuant to E.D. Mich. L.R. 7.1, the Monitor conferred with and explained to counsel for all parties, *i.e.*, the United States and the UAW, the nature of this Motion and its legal basis.   The Monitor obtained concurrence from the United States, but not from the UAW, in the Monitor's request to enforce the Consent Decree.   In turn, the Union has also filed a motion seeking relief confirming its disagreement with the Monitor's position.

As additional background, on June 10, 2024, the Monitor filed the Ninth Status Report, which summarized the dispute between the parties and disclosed the Monitor's intention to file the instant Motion if the parties were unable to reach an agreement.   On June 18, 2024, the parties met in person at the U.S. Attorney's Office. During that meeting, the U.S. Attorney and the Monitor expressed the view that, given the plain language of the Consent Decree and the protections provided by the 502(d) Order, the Union's positions on privilege and confidentiality were not well-founded.   Moreover, the U.S. Attorney and the Monitor made clear that the Union's stance on privilege and confidentiality was having the effect of delaying and obstructing the Monitor's investigation.   The Union disagreed, the parties were unable to reach an agreement, and the Monitor once again informed the parties of

his intention to file the instant Motion if the dispute could not be resolved.  At the end of the meeting, the Union told the United States and the Monitor that the Union planned to bring the dispute to the Union's International Executive Board, which, according to the Union, would make the final decision about whether to cooperate with the Monitor.  The Monitor heard nothing further from the Union, and the Monitor began to prepare the instant Motion.

On July 3, 2024, the Union filed a Motion to Clarify the Consent Decree.  *See* ECF No. 127, PageID.2352-2383.   The Union did not contact the Monitor beforehand to state its intention to file a motion or to confirm the Union's position; instead, the Monitor learned of the Union's intended motion hours before it was filed when the United States informed the Monitor that it had been informed by counsel for the Union that the Union planned to file its own motion.  In response, the Monitor contacted counsel for the Union, who stated that a lawyer for the Union was supposed to have reached out to the Monitor to inform him of the Union's forthcoming motion.  In that call, the Monitor informed the Union that the Monitor would file the instant Motion, as previously stated, including noting the relief requested, and asked the Union to defer filing its motion until the Monitor did so. The Union maintained its position and, a few hours later, filed its own motion.

The Monitor plans to respond separately to the Union's motion by the deadline prescribed by the Court's rules.

For the reasons stated herein and in the accompanying Brief, the Monitor respectfully requests that the Court grant the Monitor's Motion to Enforce the Consent Decree.

Respectfully submitted,

/s/ Michael W. Ross_____
Michael W. Ross
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600 (t)
(212) 891-1699 (f)
State Bar ID 4482501 (New York)

*Counsel for the Monitor*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,　　　)
　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff,　　　　)
　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　)　　　Case No. 20-13293
　　　　　　　　　　　　　　　)　　　Honorable David M. Lawson
INTERNATIONAL UNION, UNITED )
AUTOMOBILE, AEROSPACE, AND )
AGRICULTURAL IMPLEMENT　　)
WORKERS OF AMERICA,　　　　)
　　　　　　　　　　　　　　　)
　　　　　　　　Defendant.　　　)

# BRIEF IN SUPPORT OF MONITOR'S
# <u>MOTION TO ENFORCE THE CONSENT DECREE</u>

# **TABLE OF CONTENTS**

INDEX OF AUTHORITIES ........................................................................... ii

ISSUE PRESENTED ................................................................................... iii

CONTROLLING AUTHORITY ................................................................... iv

INTRODUCTION .........................................................................................1

BACKGROUND ...........................................................................................3

   A.   The Monitor's Open Investigations................................................3

   B.   The Union's Lack of Cooperation with the Monitor's Document Requests .5

   C.   The Parties Met and Conferred .....................................................9

ARGUMENT ...............................................................................................10

   I.   The Consent Decree Gives the Monitor Direct and Immediate Access to the Union's Documents for Investigations ...............................................10

   II.   The Monitor's Access to Documents Has Been Confirmed by the Parties to the Consent Decree ...............................................................................18

   III.   The Rule 502(d) Order Removes Any Concern over Waiver.....................20

   IV.   Relief is Necessary to Enforce the Content Decree ....................................23

CONCLUSION ...........................................................................................25

i

# INDEX OF AUTHORITIES

**Cases**

*CFTC v. Weintraub,* 471 U.S. 343 (1985) .................................................13

*Cobell v. Norton*, 213 F.R.D. 48 (D.D.C. 2003)............................................... 13, 23

*Digital Media Sols., LLC v. S. Univ. of Ohio, LLC*, 59 F.4th 772 (6th Cir. 2023)..13

*Hopson v. Morris Brown Coll.*, No. 1:05-CV-0055-JEC-ECS, 2009 WL 10696385
  (N.D. Ga. July 23, 2009) .................................................................25

*Lorain NAACP v. Lorain Bd. of Educ.*, 979 F.2d 1141 (6th Cir. 1992) .................10

*MFS & Co., LLC v. Caterpillar, Inc.*, No. 09-14063, 2010 WL 11549935 (E.D.
  Mich. Sept. 20, 2010) ....................................................................13

*S.E.C. v. Elfindepan, S.A.*, 169 F. Supp. 2d 420 (M.D.N.C. 2001) ........................13

*S.E.C. v. Ryan*, 747 F. Supp. 2d 355 (N.D.N.Y. 2010)....................................13

*U.S. v. Volvo Powertrain Corp.*, 758 F.3d 330 (D.C. Cir. 2014) ...........................23

*Evoqua Water Techs., LLC v. M.W. Watermark, LLC*, 940 F.3d 222 (6th Cir. 2019)
  ............................................................................................18

*United States v. Bd. of Educ. of City of Chicago*, 592 F. Supp. 967 (N.D. Ill. 1984)
  ............................................................................................24

*United States v. ITT Cont'l Baking Co.*, 420 U.S. 223 (1975)................................14

*Williams v. Vukovich*, 720 F.2d 909 (6th Cir. 1983) .......................................23

**Other Authorities**

Consent Decree .......................................................................... *passim*

## <u>ISSUE PRESENTED</u>

Whether the Consent Decree grants the Court-appointed Monitor with direct and immediate access to Union documents, including privileged and confidential documents, when carrying out his investigative mandate under the Consent Decree.

## <u>CONTROLLING AUTHORITY</u>

Consent Decree ¶¶ 22, 27, 28, 29

## INTRODUCTION

The success of the Consent Decree between the United States and the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW" or "Union") stands at a critical juncture. The UAW's refusal to promptly produce documents requested by the Monitor for use in investigating three current members of the Union's highest governing body, the International Executive Board ("IEB")—based on assertions of privilege and confidentiality—risks undermining the purpose of the Monitor's appointment and the objectives of the Decree. The Monitor respectfully seeks Court intervention to enforce the Consent Decree.

In response to pervasive criminal conduct among senior UAW officials that resulted in two prior UAW Presidents serving prison terms—and as an alternative to prosecution of the Union itself—the United States and the UAW entered into the Consent Decree, which was designed to implement significant reforms and eliminate corruption within the Union. To that end, the Consent Decree provided for the appointment of a Monitor with "the authority and duty to remove fraud, corruption, illegal behavior, dishonesty, and unethical practices from the UAW and its constituent entities." Consent Decree ¶ 28, ECF No. 10, PageID.119. Among other things, the Monitor was charged with investigating suspected financial misconduct committed by Union personnel and pursuing disciplinary charges if warranted.

1

In February 2024, the Monitor began investigating allegations of financial misconduct and retaliation involving current IEB members, including the Union's two highest officials, its President and Secretary-Treasurer.  In April 2024, the Monitor began a separate investigation into a Regional Director for embezzlement. To carry out his investigative mandate, the Monitor needs complete and timely access to Union records.

Despite the Monitor's repeated requests, the Union has not provided such access to Union documents for these investigations, insisting that the Union must engage in what has become a lengthy pre-production review and asserting that it will withhold or redact documents as it deems necessary to protect privilege and confidentiality.  As detailed below—and in the Monitor's Ninth Status Report—by taking that position, the Union has effectively stalled the Monitor's work.  These investigations would likely have been resolved by now had the Union cooperated with the Monitor's requests.

As detailed further below, the plain language of the Consent Decree, the circumstances leading to its formation, and the parties' own statements about its meaning all support the Monitor's right to direct and immediate access to documents for investigatory purposes, including privileged and confidential documents.  The clear intent of the Consent Decree is to ensure that the Monitor has a free hand in circumstances like these, where he is investigating allegations of financial

2

misconduct, corruption, and criminal activity at the highest levels of the Union. To implement the Consent Decree, the Monitor respectfully requests that the Court issue an Order confirming the Monitor's authority to direct and immediate access to such records and compelling the Union to produce the documents currently subject to pending requests.

## BACKGROUND

This Brief includes background relevant to the Monitor's request for relief.

### A.  The Monitor's Open Investigations

The Monitor[1] has opened investigations concerning three members of the Union's IEB—the President, Secretary-Treasurer, and a Regional Director. These investigations concern the following allegations.

***First***, the Monitor is investigating competing allegations of financial misconduct between the UAW's President and Secretary-Treasurer (the "President-ST Investigation"). At the February 20, 2024 meeting of the Union's IEB, the Union's Compliance Director made a "Special Compliance Report," which included allegations that the Secretary-Treasurer had abused her power by improperly delaying or denying financial expense requests by the President's Office and certain IEB members, and that the Secretary-Treasurer had threatened to deny legitimate

---

[1] For purposes of this Brief, the term "Monitor" refers to the Monitor as well as agents of the Monitor acting under his direction.

3

expense requests if IEB members did not vote in favor of her priorities. *See* Arain Decl. ¶ 4.[2] As a result, the IEB voted in favor of a motion authorizing the President to withdraw certain authority from the Secretary-Treasurer. The President thereafter removed nine of the Secretary-Treasurer's departments from her supervision. *See* ECF No. 124, PageID.2317.

In response, the Secretary-Treasurer alleged that the Union President had instigated the above actions in retaliation for, among other things, her refusal or reluctance to authorize certain improper expenditures of funds at the request of and/or for the benefit of those in the President's Office, and was an attempt to dilute her authority to make similar denials in the future. *See* Arain Decl. ¶ 5.

After a complaint was lodged by the Secretary-Treasurer, the Monitor opened an investigation into these competing claims.

***Second***, in May 2024, the Monitor expanded the above investigation concerning the President to include new allegations advanced by another IEB member: the Vice President who had been overseeing the Union's relationship with Stellantis (the "President-VP Investigation"). On May 29, 2024, the President removed the Stellantis Department from that Vice President's oversight and reassigned it under his own control, citing the Vice President's "dereliction of duty"

---

[2] Citations to "Arain Decl." refer to the Declaration of Ali M. Arain, filed contemporaneously herewith.

in connection with certain collective bargaining issues.  *See* Arain Decl. ¶ 18; Ex. 7. Thereafter, the Monitor received complaints from the Vice President and others that the President's explanation was false.  These complainants alleged that the President instead removed the Vice President's assignment in retaliation for, among other things, the Vice President's "refusal to accede to demands by [the President] and his agents that [the Vice President] take actions . . . that would have benefitted [the President's] domestic partner and her sister."  *See* Arain Decl. ¶ 19; Ex. 10.

*Third*, in April 2024, the Monitor opened an investigation into another IEB member, a Regional Director, involving allegations that this senior Union official embezzled UAW funds by using a UAW corporate credit card for personal purchases and misappropriating Union property (the "Regional Director Investigation").

In all events, although the above allegations are serious, with several potentially implicating federal criminal statutes, they are merely allegations, subject to investigation, and the Monitor has not determined or endorsed their veracity.

## B.  The Union's Lack of Cooperation with the Monitor's Document Requests

To carry out his work under the Consent Decree, the Monitor has requested documents from the Union in furtherance of these investigations.

**The President-ST Investigation.**  On February 29, 2024, the Monitor sent a letter to the Union's General Counsel requesting that the Union produce six categories of documents relating to the President-ST Investigation.  *See* Arain Decl.

¶ 8; Ex. 3.  More than a month later, on April 3, 2024, the Union produced just 18 documents in response to these requests, all from one Union employee, and without a proposal to collect electronic files.  *See* Arain Decl. ¶ 9; Ex. 4.

Recognizing that the Union was not conducting a complete or prompt collection, and to reduce the burden on the UAW, the Monitor then provided the UAW with a list of search terms and custodians to facilitate the production of electronic documents, and directed the UAW to simply turn over all documents hitting on those terms so the Monitor could conduct his own review.  *See* Arain Decl. ¶ 10.  The search terms were broadly worded to encompass potentially relevant materials to enable the Monitor to review for relevant materials, rather than having the Union itself review the documents.  That approach would speed the pace of the production and enable the Monitor to make judgments about relevance, as discussed further below.

According to the Union, these search terms generated a list of 216,044 documents—although the Union would not turn over that complete set of documents to the Monitor.  After further discussion and in the interest of progressing the investigation, the Monitor agreed to revised terms, resulting in 116,646 documents. *See* Arain Decl. ¶ 16.

But the UAW also refused to produce these documents as requested, arguing that the Monitor is not entitled to access the Union's files without first giving the

6

Union the "ability to review documents that are protected by the attorney-client privilege or concerning collective bargaining strategy." *See* Arain Decl. ¶ 30. The Union stated that it would perform this review to "screen the data for documents that we may want to designate as privileged and confidential," and would be withholding certain documents based on such designation. *See* Arain Decl. ¶ 30.

That pre-production review stalled the Union's production and the Monitor's investigation.[3] The Monitor and the Union communicated concerning this position for several weeks, as the Monitor made efforts to work cooperatively. *See* Arain Decl. ¶¶ 13-16.[4] But the Monitor's attempts to garner the Union's cooperation were unsuccessful, as the Union delayed production of the vast majority of responsive materials. *See* Arain Decl. ¶¶ 13-17, Ex. 6. To date, of the 116,646 total documents identified by the revised search terms, the Union has produced 70,681 documents,

---

[3] Although the Monitor initially had no objection to the Union promptly reviewing the documents, the Monitor objected to the substance of the Union's privilege position and emphasized that his right to prompt document access meant that a lengthy pre-production review at this point in the process, more than two months after the initial document request, would unacceptably further delay the investigation. *See* Arain Decl. ¶ 14.

[4] For instance, the Monitor requested hit counts to assess which terms were driving the volume and expressed willingness to consider modifications; suggested that the Union prioritize the production of documents responsive to terms with low hit counts and produce documents on a rolling basis; and suggested ways in which the Union could designate materials as privileged while still promptly producing documents to the Monitor. The Union often did not substantively respond to the Monitor's requests until weeks after they were made, causing further delay. *See* Arain Decl. ¶¶ 13-16, Ex. 6.

with 68,509 documents produced in the last 3 weeks, around the time of the filing of the Monitor's Ninth Status Report.

The Union has stated that it intends to redact or fully withhold an unspecified number of documents as privileged or confidential. *See* Arain Decl. ¶¶ 30-31.

**The President-VP Investigation.** In connection with the President-VP Investigation, the Monitor conducted initial interviews after the May 29 allegations came to light, and on July 3, 2024, sent a letter to the Union's General Counsel requesting that the Union produce four categories of documents. *See* Arain Decl. ¶ 24; Ex. 12. The Monitor will provide the Union with search terms and custodians to help target responsive documents and communications for electronically stored information to satisfy the requests. *See* Arain Decl. ¶ 24; Ex. 12.

**The Regional Director Investigation**. On April 17, 2024, the Monitor requested that the Union produce six categories of documents relating to the Regional Director Investigation. *See* Arain Decl. ¶ 26. On May 7, 2024, after no documents had been produced, the Monitor requested an update on the production. The UAW subsequently proposed search terms to identify responsive documents that generated 10,571 documents. On June 28, 2024, the Union produced 1,638 documents from that search. The Union has not provided a timeline for production of the remaining documents.

## C.    The Parties Met and Conferred

As noted above, in the weeks after the document requests for the President-ST Investigation, the Monitor engaged in substantial dialogue, through emails, calls, and in-person discussions with the Union to attempt to garner the Union's cooperation with the Monitor's requests.[5]

Following the filing of the Ninth Report, on June 18, 2024, the Union and the Monitor met in person with attorneys representing the United States, including the U.S. Attorney for the Eastern District of Michigan (the "U.S. Attorney") to discuss the Union's cooperation with the monitorship, including the Union's position concerning the production of documents.  The U.S. Attorney and the Monitor stated in that meeting that, given the plain language of the Consent Decree and the protections provided by the 502(d) Order, the UAW's positions on privilege and confidentiality were not well-founded.  Moreover, the U.S. Attorney and the Monitor made clear that the Union's stance on privilege and confidentiality was having the effect of delaying and obstructing the Monitor's investigation.  The UAW reiterated its position, stating that it intended to engage in a pre-production review of

---

[5] The Monitor has also worked with the Union to schedule interviews of witnesses; in this regard, the Union has cooperated by scheduling numerous interviews of Union personnel.  But those interviews have been conducted without the benefit of a full document production that would potentially allow the Monitor to test, challenge, or verify the assertions made by witnesses during questioning.

documents prior to providing them to the Monitor and to withhold or redact documents as it deemed necessary.  *See* Arain Decl. ¶ 31.

After that meeting, the Union has maintained its position and continued to conduct a pre-production review of documents prior to producing them to the Monitor, and it has filed a motion in support of that position.[6]

## **ARGUMENT**

## I.   **The Consent Decree Gives the Monitor Direct and Immediate Access to the Union's Documents for Investigations**

The Court has inherent authority to interpret the Consent Decree and, in doing so, begins with the text itself to effectuate the intent of the parties in entering into the Decree.  *See Lorain NAACP v. Lorain Bd. of Educ.*, 979 F.2d 1141, 1148 (6th Cir. 1992).  Based on the text of the Consent Decree alone, the Monitor is entitled to direct and immediate access to Union documents requested in furtherance of his investigative mandate, including privileged and confidential documents.

The Court entered the Consent Decree after eleven senior UAW officers had been convicted of felonies, including two past Presidents, and it included express language to ensure that wrongdoing at the Union would be investigated and addressed by an independent individual, armed with the powers of the Union itself:

---

[6] This Brief is filed in support of the Monitor's requested relief and does not respond to all the arguments made in the Union's motion, which was filed on hours' notice, as the Monitor prepared this application.  The Monitor plans to respond to the Union's motion on the default time provided by the Court's rules.

- The Consent Decree gives the Monitor "the authority and duty to remove fraud, corruption, illegal behavior, dishonesty, and unethical practices from the UAW and its constituent entities." Consent Decree ¶ 28, ECF No. 10, PageID.119.

- The Consent Decree then states: "Therefore, the Monitor shall have the following powers, rights, and responsibilities set out below" to carry out those duties. The first of these enumerated powers endows the Monitor with the "right and authority of the UAW International President and IEB to bring charges seeking to discipline" UAW personnel for, among other things, violating criminal laws relating to the operation of a Union. *See* Consent Decree ¶¶ 18(d), 28-30, 36, ECF No. 19, PageID.114-115, 119-120, 122-123.

- To buttress that authority further, the Consent Decree states that "in addition to the powers and duties enumerated in this decree," the Monitor shall have "all of the powers, privileges and immunities of a person appointed pursuant to Rule 66 of the Federal Rules of Civil Procedure and which are customary for court appointed offices [sic] performing similar assignments." Consent Decree ¶ 27, ECF No. 10, PageID.118-119.

Taken together, these provisions make clear that the Monitor stands in the shoes of the UAW itself when conducting the Union's disciplinary process, and thus may access Union documents when carrying out his duties, including privileged and confidential documents, as if acting as the Union itself.

*First*, the Monitor has the same "right and authority" of the Union's President and IEB to bring charges. As those with responsibility over the Union's affairs, including the investigations that would lead to such charges, the President and IEB may access Union documents needed to investigate and charge suspected

11

misconduct—including any documents over which the Union itself has a privilege.[7]
Standing in the shoes of the President and IEB for these purposes, the Monitor's
"right and authority" to charge thus includes the same access to Union documents
enjoyed by the IEB and the President themselves to investigate wrongdoing before
such charges are brought, including privileged documents.[8]

 ***Second***, confirming the intent to grant the Monitor with broad investigative
authority, including access to privileged and confidential documents, the Consent
Decree gives the Monitor the "powers and privileges" customary of a Rule 66
receiver charged with investigating wrongdoing.  As courts have held, those with
receiver authority have the same rights and powers of the company's management
because they step into the shoes of the entity.  *See Digital Media Sols., LLC v. S.
Univ. of Ohio, LLC*, 59 F.4th 772, 779 (6th Cir. 2023); *S.E.C. v. Ryan*, 747 F. Supp.
2d 355, 367-68 (N.D.N.Y. 2010).  Consistent with that authority, courts have found

---

[7] Under Article 32 of the UAW Constitution, the IEB has the power to investigate a
complaint, which inherently includes access to books and records of the Union.  *See*
Ex. 15, UAW Const. art. 32, § 5.  Under Article 33, the President has the authority
to collect documents and investigate the actions of any IEB member, International
Representative, arm of the UAW, Local Union, and other subordinate bodies.  *See*
Ex. 15, UAW Const. art. 33, §§ 1, 3(d).

[8] The Union has argued that this power is limited to charging misconduct, without
the power to investigate misconduct.  But the power to investigate is inherent in the
power to charge, otherwise the Monitor would have to charge first and seek support
for such charges later.  It would also mean that the Union could choose to have its
own senior officers, and not the Monitor, first investigate suspected misconduct, the
very opposite result intended by the Consent Decree.

that those acting as a receiver stand inside the privilege and work product of the entity. *See, e.g.*, *MFS & Co., LLC v. Caterpillar, Inc.*, No. 09-14063, 2010 WL 11549935, at *4 (E.D. Mich. Sept. 20, 2010); *see generally CFTC v. Weintraub,* 471 U.S. 343 (1985).

Court-appointed officers tasked with investigations may access the books and records of the organization and, in connection with such access, obtain privileged documents needed to fulfill their investigative duties to uncover potential wrongdoing. *See*, *e.g.*, *S.E.C. v. Elfindepan, S.A.*, 169 F. Supp. 2d 420, 431 (M.D.N.C. 2001) (explaining that, without succession to the attorney-client privilege, the receiver would encounter difficulties in discovering hidden assets and other potential schemes); *Cobell v. Norton*, 213 F.R.D. 48, 54 (D.D.C. 2003) (holding that monitor was entitled to production of privileged documents to conduct investigation into potential misconduct).

Here, the Monitor's investigative mandate is designed to function as that of a Court-appointed receiver. When pursuing charges and seeking discipline, he enjoys the powers and authorities of the Union itself, supplanting the Union's own authority for those matters. With the "powers, privileges and immunities" customary of a receiver, the Monitor has the right to access privileged material when exercising his investigative mandate.

13

*Third,* the circumstances surrounding entry of the Consent Decree support the Monitor's access to Union documents, including privileged documents. *See United States v. ITT Cont'l Baking Co*., 420 U.S. 223, 238 (1975) (stating that "the circumstances surrounding the formation of the consent order" constitute an "aid to construction" properly employed in construing consent decrees).   In the years leading up to the entry of the Consent Decree, the government investigated several senior UAW leaders, resulting in convictions of eleven UAW officials for fraud and corruption offenses, including two former UAW Presidents. *See* Complaint, ECF No. 1, PageID.33-41; Monitor's Initial Status Report, ECF No. 49, PageID.471-474. The crimes leading to these convictions included acts similar to some allegations advanced in the current investigations—*i.e.*, the abuse by senior Union officials of their positions of authority to obtain Union funds for personal purposes or to otherwise financially benefit their friends and family. *See* Monitor's Initial Status Report, ECF No. 49, PageID.474-488.  They also involved abuses of the collective bargaining process for personal gain. *Id.*  Based on that history, the Consent Decree delegated authority to the Monitor because the Union could not be trusted to investigate and discipline its senior-most officers on its own.

*Fourth*, as a practical matter, without complete access to documents, the intent of the Consent Decree would be undermined because the Monitor would be unable to effectively carry out his responsibility to "remove fraud, corruption, illegal

behavior, dishonesty, and unethical practices from the UAW." The Monitor cannot do this job if those who are the targets of the Monitor's investigation can slow the pace of document production and decide which documents the Monitor can see. Instead, the Monitor must be able to directly access documents without interference or oversight from anyone who may be impacted by the outcome of the investigation. *See* Consent Decree ¶ 18(d), ECF No. 10, PageID.114-115 (barring Union constituents from "[o]bstructing or otherwise interfering, directly or indirectly, in any way or degree, with the work of the Officers . . .").

The Union's conduct in the President-ST Investigation shows the unworkability of denying the Monitor direct and immediate access to Union materials. The Monitor first sought documents from the Union in late February. After more than a month, the Union then produced just 18 documents. As the Monitor tried to work with the Union to break the logjam—*e.g.*, offering search terms, asking for the documents to be produced in tranches—the Union interposed a review of the documents for privilege and confidentiality as a reason for delay. The Union has already produced some privileged and confidential documents, but it has indicated that it will unilaterally choose to withhold or redact others. That position has deprived the Monitor of the ability to fully uncover the facts. It has also left an uncertain timeline for completion of the investigation, as well as granting itself discretion to selectively redact or fully withhold documents that may be critical

to the investigation.  The same can be said for the Regional Director investigation.

These types of delays are not consistent with the intent of the Consent Decree.

*Fifth*, the Union has claimed that Paragraph 55 of the Consent Decree

precludes the Monitor's access to privileged and collective bargaining materials.

But, by its terms, that paragraph sets out only a narrow exception to the Monitor's

access that applies *only to portions of IEB meetings*, stating that "[t]he Monitor

shall not be entitled to attend or listen to [IEB] meetings or portions of [IEB]

meetings protected by the attorney-client privilege or concerning collective

bargaining strategy."  Consent Decree ¶ 55, ECF No. 10, PageID.131.  Thus, the

Consent Decree gives the Union a single forum to engage in privileged and collective

bargaining-related communications outside the view of the Monitor.  This is

consistent with the overall structure of the Consent Decree, because in such meetings

the Monitor serves merely as an observer and does not stand in the shoes of the

Union or act as a receiver as he does when he conducts the UAW's disciplinary

process for financial misconduct.

Moreover, there is nothing in the language of Paragraph 55 that extends its

application outside of those meetings or supersedes the other provisions of the

Consent Decree discussed above.  If anything, the inclusion of Paragraph 55 in the

Consent Decree *confirms* the Monitor's position: there would be no need for the

Consent Decree to include an exception to the Monitor's access to privileged and

16

collective bargaining materials in the context of IEB meetings if it did not otherwise grant him such access when carrying out his duties.

Consistent with that reading, the Consent Decree's preamble addresses—and rejects—the Union's assertion that collective bargaining concerns override the objectives of addressing corruption. In the preamble, the Decree acknowledges that the UAW remains free to negotiate or administer its collective bargaining agreements without government oversight; but it carves out an exception, stating "*except as may be necessary to ensure the elimination of fraud, corruption, or illegal conduct*." ECF No. 10, PageID.109 (emphasis added). That language mirrors Paragraph 28 that gives the Monitor "the authority and duty to remove *fraud, corruption, illegal behavior*. . ." ECF No. 10, PageID.119 (emphasis added). Thus, the preamble provision reflects the intent of the Consent Decree that collective bargaining concerns yield to the Monitor's investigative authority—including access to documents in furtherance of it.[9] This, of course, is consistent with the U.S. Attorney's investigation leading to the Consent Decree, which uncovered corruption that undermined the collective bargaining process.

---

[9] The Union's concern is apparently not about interference with its control of collective bargaining decisions, but the potential disclosure of collective bargaining information. That concern is unfounded, as the Monitor has had access to highly sensitive Union documents from the start of the monitorship and has not inadvertently disclosed such information. The Monitor has procedures in place to avoid such disclosure, including secure servers and protocols limiting access.

For the foregoing reasons,[10] the Consent Decree supports the Monitor's direct and immediate access to Union documents, including privileged materials.

## II. The Monitor's Access to Documents Has Been Confirmed by the Parties to the Consent Decree

Beyond the text itself, other indications of the intent of the Consent Decree support the Monitor's access to Union documents, including privileged documents. *See Evoqua Water Techs., LLC v. M.W. Watermark, LLC*, 940 F.3d 222, 229 (6th Cir. 2019) (courts interpret agreements to determine the intent of the parties).

*First*, as a party to the Consent Decree, the United States's position is that the Monitor is entitled to access to the Union's privileged documents for investigations. The United States has been consistently clear on this issue, noting in 2022 that it fully supported the Monitor's position on privilege.[11]  The United States reaffirmed

---

[10] The Union has advanced additional arguments related to the Consent Decree, which the Monitor will address more fully in his response to the Union's motion. For example, the UAW claims that Paragraph 57 of the Consent Decree states that the Monitor cannot access confidential documents, ignoring that it presumes the Monitor has such access and addresses the circumstances under which the Monitor would seek to disclose such documents to third parties.  Similarly, the UAW claims that Paragraph 37 means that the Union's production of documents is non-compulsory until after the Monitor files charges, but that paragraph governs disciplinary actions against individuals for failing to provide documents to the Monitor and does not excuse the UAW from doing so.  The Union has also cited the American Bar Association's Criminal Justice Standards, but, as the Monitor will explain in his response, those standards are guidance for drafting and do not trump the language of the Consent Decree and the intent of the parties.

[11] *See also* Monitor's Third Status Report, ECF No. 77, PageID.1225-1226, 1237-1240 (describing the Union's March 31, 2022 meeting with the U.S. Attorney and

this position in its recent discussions with the Union and the Monitor, stating that it was the intent of the language chosen for the Consent Decree that the Monitor would be entitled to direct access the Union's documents, including privileged documents, in carrying out his investigative mandate.  It also confirmed its agreement with the Monitor's reading of Paragraph 55.  This was conveyed by the U.S. Attorney in a meeting with the Union—attended by its President and General Counsel—and the Monitor, as noted above.

***Second***, the Court should consider the position of the Union ***just before*** these investigations began.  In December 2023, the Union President echoed precisely the same position on the Monitor's access to privileged information as the Monitor and the United States.  In a formal memorandum to all staff regarding "Cooperation with the Monitor" that was sent in August 2023 and December 2023, the UAW President "instruct[ed] All Staff to cooperate fully with the Monitor in all regards as it regards financial impropriety, corruption, and internal union election-related matters," including the directive that "[a]ny inquiry from the Monitor or his staff regarding any issues should be answered without hesitation and forthrightly."  Ex. 13 at 1; Ex. 14 at 1.  In doing so, the President acknowledged that "***the Union will share any and all information requested based upon the understanding that the Monitor***

---

the Monitor, after which the Union pledged to cooperate with the Monitor after a period of withholding privileged investigative materials).

*stands precisely in the shoes of the Union*, and that the Monitor will protect all available privileges." Ex. 13 at 3; Ex. 14 at 3 (emphasis added). The memorandum provided that: "[g]iven the protection of the privilege as well as the Court-Ordered mandates of the Consent Decree, there is no reason or basis for any member of the staff or leadership of this Union not to abide by this directive to be fully cooperative with the Monitor." Ex. 13 at 3; Ex. 14 at 3.

The Union is now acting contrary to this directive. The President's memorandum was explicitly "based upon the understanding that the Monitor stands precisely in the shoes of the Union." Ex. 13 at 3; Ex. 14 at 3. That language adopted the same words used by the Monitor in August 2022 when he described his position on access to privileged documents. *See* Monitor's Ninth Status Report, ECF No. 124, PageID.2336-2337. Then and now, the President's directive to supply privileged materials and cooperate with the Monitor correctly describes the Union's obligations under the Consent Decree.

## III. The Rule 502(d) Order Removes Any Concern over Waiver

The Court's entry of a Rule 502(d) Order in this case further undermines the Union's use of privilege and confidentiality assertions to delay access to documents.

At the beginning of the monitorship, and as discussed in the Monitor's Initial Status Report, ECF No. 49, PageID.524-525, 594-595, the UAW sought the Monitor's agreement for it to seek from the Court an Order pursuant to Federal Rule

of Evidence 502(d) ("502(d) Order") confirming that the UAW could provide the Monitor with privileged or other legally protected material without that production constituting a waiver of the privilege or protection with respect to third parties. Although the Monitor believed that such an Order was unnecessary, he had no objection to the Union seeking the comfort it would provide the Union. That Order was granted. *See* Order Granting Defendant's Unopposed Motion for Order Governing Disclosure of Privileged Materials, ECF No. 40, PageID.398-400.

The 502(d) Order provides that the "UAW may provide privileged or otherwise legally protected information to the Monitor in connection with this case, and it shall notify the Monitor what information, if any, it shares with the Monitor that it believes is privileged or otherwise protected." ECF No. 40, PageID.399. Further, when the UAW does produce "privileged or otherwise protected information, including information protected by the attorney work product doctrine," that production "shall not be deemed a waiver" by the UAW "of any claim of privilege or protection, including but not limited to the attorney-client privilege and the work product doctrine." ECF No. 40, PageID.399.[12] The 502(d) Order undercuts any assertion that waiving the privilege is a legitimate concern of the Union for sharing documents with the Monitor during the course of an investigation.

---

[12] The Union also asked the Monitor to enter into a common interest agreement under which any privileged materials provided by the UAW to the Monitor are protected from waiver. *See* Monitor's Ninth Status Report, ECF No. 124, PageID.2335.

Despite these protections, the Union has argued that the language in the 502(d) Order that states that the Union "shall notify" the Monitor what materials are privileged imposes an obligation on the Union to first review all documents before producing them to the Monitor, effectively trumping the unimpeded access to documents given by the Consent Decree. But nothing in the 502(d) Order states that the Union's designation of privilege must occur **before** it produces documents to the Monitor. This makes sense given that the purpose of the 502(d) Order was to ensure that a party in another litigation could not claim that the Union's disclosure constituted a waiver of the privilege.[13] Nor does anything in the Order give the Union a right to pre-review all documents to stall access to Union documents.[14]

As the Monitor informed the Union, the Union could designate documents as privileged under the 502(d) Order in several ways, while still promptly providing documents to the Monitor. For example, it could produce and designate all documents provisionally as privileged pending further review, *see generally Cobell*,

---

[13] The Order contains express language to that effect, saying that the production of materials "shall not be deemed a waiver by the defendant in this or any other federal or state proceeding of any claim of privilege or protection." *See* ECF No. 40, PageID.399.

[14] The Union has also argued that, because the 502(d) Order says that the Union "may provide" documents to the Monitor, it does not require the Union to produce such documents. But this language does not describe the Union's obligation to disclose documents; rather, it means merely that in the course of producing documents, some "may" be privileged, while others may not be.

22

213 F.R.D. at 55 (endorsing this approach), or conduct its own review in parallel to the Monitor's.  The purpose of the 502(d) Order is to protect against disclosure to *third parties*, not to the Monitor—these procedures would accomplish that, whereas the Union's position turns that purpose on its head.

## IV.   Relief is Necessary to Enforce the Content Decree

Courts have a continuing duty to enforce the provisions of a consent decree to ensure compliance.  *See Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983).  To do so, courts have discretion to fashion appropriate remedies to enforce a consent decree.  *See U.S. v. Volvo Powertrain Corp.*, 758 F.3d 330, 343 (D.C. Cir. 2014).

In the current circumstances, the Monitor respectfully submits that two forms of relief are appropriate.  *First*, an Order declaring that the Monitor has direct and immediate access to documents, including privileged documents, is necessary to effectuate the terms of the Consent Decree.

The Monitor cannot do his job of investigating and addressing allegations of corruption and criminal misconduct by the Union's senior-most leaders under the Union's reading of the Consent Decree.  Under that reading, as demonstrated by the UAW's conduct during the President-ST Investigation, the Monitor must wait for the Union to decide whether to cooperate with an investigation while it seemingly ignores the Monitor's document requests; wait further as the Union performs a pre-production review in which the Union's leaders and the lawyers who report to them

identify which privileged and confidential documents it will choose to share with the Monitor and which it will not; and wait further still as the question is put to the members of the IEB for final determination (three of whom, in this instance, are the subjects of the Monitor's investigation). This is not the independent oversight contemplated by the Consent Decree.

Further, the Union's position has led to the same result in the Regional Director Investigation and will inevitably do the same with respect to the President-VP Investigation. Nor is this the first time that the Union has made assertions of privilege to block the production of documents, only to later relent and provide the Monitor with the requested information. [15]

A declaration is appropriate to ensure that these types of impediments to the Monitor's investigations do not occur again. *See United States v. Bd. of Educ. of City of Chicago*, 592 F. Supp. 967, 970-75 (N.D. Ill. 1984) (entering order declaring the meaning of consent decree provisions and requiring prospective compliance where a party had shown a "pattern of non-compliance" with a consent decree's requirements). Without the requested relief, the Union could effectively delay

---

[15] As noted in the Ninth Status Report, the assertions made by the Union about privilege during the President-ST Investigation are the fourth time that the Monitor has faced claims of privilege by the Union in connection with attempts to gain access to the Union documents. *See* Ninth Status Report, ECF No. 124, PageID.123-124.

resolution of the above investigations indefinitely, and, as the end of the Monitor's term eventually approaches, run out the clock on future investigations.

**Second,** the Monitor also requests an Order specifically directed at the existing document requests, so that the Monitor can complete those investigations— relief that the Court may also grant. *See Hopson v. Morris Brown Coll.*, No. 1:05-CV-0055-JEC-ECS, 2009 WL 10696385, at *3 (N.D. Ga. July 23, 2009) (entering order compelling party to produce documents required under a consent order). An Order compelling the Union to produce the requested documents would enforce the terms of the Consent Decree by allowing the Monitor access to the documents needed to complete his work.

## CONCLUSION

Based on the foregoing, the Monitor respectfully requests that the Court grant the Monitor's requested relief.

Respectfully submitted,

/s/ Michael W. Ross_____
Michael W. Ross
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600 (t)
(212) 891-1699 (f)
State Bar ID 4482501 (New York)

*Counsel for the Monitor*

25