# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-13293 |
| | ) | Honorable David M. Lawson |
| INTERNATIONAL UNION, UNITED | ) | |
| AUTOMOBILE, AEROSPACE, AND | ) | |
| AGRICULTURAL IMPLEMENT | ) | |
| WORKERS OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## MONITOR'S RESPONSE TO THE UAW'S
## MOTION TO CLARIFY CONSENT DECREE

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................1

BACKGROUND ................................................................................................3

ARGUMENT ......................................................................................................6

   I.   The UAW's Brief Mischaracterizes the Consent Decree ..............................6

      A.   Paragraph 27 Supports the Monitor's Access to Union Documents ..........7

      B.   Paragraph 55 Applies Only to IEB Meetings .............................................11

      C.   Paragraph 37 Does Not Limit the Monitor's Access ................................15

      D.   Paragraphs 38, 39, 41 Do Not Apply to the UAW ...................................18

      E.   Paragraph 57 Concerns Disclosure of Documents ...................................21

   II.   The 502(d) Order Does Not Prevent the Monitor's Access ........................22

   III.   ABA Standards Do Not Supersede the Consent Decree .............................23

CONCLUSION ................................................................................................25

i

# INDEX OF AUTHORITIES

## Cases

*Cain Rest. Co. v. Carrols Corp.*, 273 F. App'x 430 (6th Cir. 2008)........................22

*Cobell v. Norton*, 213 F.R.D. 48 (D.D.C. 2003)..................................... 9, 10, 15, 23

*Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343 (1985)..............8

*Evoqua Water Techs., LLC v. M.W. Watermark, LLC*, 940 F.3d 222 (6th Cir. 2019) .............................................................................................................................24

*Joint Council 73 v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers*, 741 F. Supp. 491 (S.D.N.Y. 1990) ........................................................... 9, 12, 20

*Lorain NAACP v. Lorain Bd. of Educ.*, 979 F.2d 1141 (6th Cir. 1992) .................24

*N.L.R.B. v. Jackson Hosp. Corp.*, 257 F.R.D. 302 (D.D.C. 2009) .........................13

*N.L.R.B. v. Serv. Emps. Int'l Union, Loc. 521*, No. C-07-80170MISC-JF, 2008 WL 152176 (N.D. Cal. Jan. 16, 2008).........................................................................13

*O'Malley v. NaphCare, Inc.*, No. 3:12-CV-326, 2014 WL 806381 (S.D. Ohio Feb. 28, 2014)..............................................................................................................24

*United States v. Amodeo*, No. 92 CIV 7744 (RPP), 1996 WL 11187 (S.D.N.Y. Jan. 11, 1996)..............................................................................................................20

*United States v. Dist. Council of New York City & Vicinity of United Bhd. of Carpenters & Joiners*, No. 90 CIV. 5722 (CSH), 2004 WL 1542258 (S.D.N.Y. July 9, 2004) ...........................................................................................................9

## Other Authorities

Consent Decree ............................................................................... *passim*

## <u>ISSUE PRESENTED</u>

Whether, under the Consent Decree, the UAW is permitted to review, designate, and/or redact or withhold confidential and privileged information in response to requests for production of documents served by the Monitor.

## **CONTROLLING AUTHORITY**

Consent Decree ¶¶ 22, 27, 28, 29

**<u>RESPONSIVE BRIEF</u>**

The Monitor respectfully submits this Response to the UAW's Motion to Clarify the Consent Decree, ECF No. 127.

**<u>INTRODUCTION</u>**

The Union's Motion fundamentally misconstrues the intent of the Consent Decree.  Granting it would undermine the Decree's core purpose of enabling the Monitor to "remove fraud, corruption, illegal behavior, dishonesty, and unethical practices from the UAW and its constituent entities."  *See* ECF No. 10, PageID.119.

The Consent Decree was drafted in response to corruption within the Union that led to convictions of multiple senior UAW officials.  Against that backdrop, the Decree placed aspects of the Union's disciplinary function outside the control of Union management by appointing a Monitor.  In that context, it gave the Monitor the "right and authority" of the Union's President and International Executive Board ("IEB"), and "all of the powers, privileges and immunities" of a receiver in furtherance of that mandate.  For that grant of authority to be effective, the Monitor must be able to insist on direct and immediate access to Union documents, including privileged and confidential documents, free of oversight by the Union officials who are or may become subject to a corruption investigation.

But the UAW argues that the Consent Decree gives the Monitor no right to access the Union's privileged or confidential materials in furtherance of his

1

investigative mandate at any point, and no right to **any** documents until after he brings charges. In the UAW's view, senior Union leaders—even when they are subject to an investigation—can pre-review all documents before they are produced, for a potentially indefinite period of time, and then withhold or redact documents in their discretion. It could not have been the intent of the Consent Decree to appoint a Monitor to hold senior Union officials accountable for acts of corruption, but then to give those same officials discretion to decide what information the Monitor can access in determining whether charges are warranted.

Nor would it make sense for the Consent Decree to require the Monitor first to charge Union officials before accessing Union documents, as the Union argues. The power to charge inherently includes the power to investigate and the Union's contrary reading would require the Monitor—if he wanted to vet allegations of corruption by reviewing documents—to charge a senior official first, based solely on potentially uncorroborated allegations. The Consent Decree cannot have contemplated such an unreasonable and unfair approach.

To advance its position, the Union's Brief repeatedly mischaracterizes the text of the Consent Decree. For example, where the Consent Decree creates a narrow exception to the Monitor's access to privileged and collective bargaining discussions (*i.e.*, Paragraph 55 making IEB meetings a sole forum for excluding the Monitor from certain oral communications), the Union makes it the rule. Where the Consent

2

Decree permits privilege assertions by third parties (*e.g.*, Paragraphs 38 and 39 concerning privilege of third parties), the Union adopts them for itself.  And where the Consent Decree explains that during disciplinary hearings the Monitor's access is unfettered (*i.e.*, Paragraph 37), it claims that the provision precludes an obligation to cooperate before charges are brought and that privileged and confidential documents are excluded.  These and other arguments are addressed further below.

For the reasons set out herein, the Court should deny the Union's Motion.

## BACKGROUND

Over the last several months, the Monitor has opened several investigations into alleged financial misconduct and/or corruption involving three of the most senior members of the Union's management:  the President, Secretary-Treasurer, and a Regional Director.

The first of those investigations involves competing allegations between the UAW's President and Secretary-Treasurer, the Union's two most senior officials.  At the February 20, 2024 meeting of the Union's IEB, it voted to remove certain authority from the Secretary-Treasurer following a "Special Compliance Report" that included allegations that the Secretary-Treasurer had abused her power by improperly delaying or denying financial expense requests, and that the Secretary-Treasurer had threatened to deny legitimate expense requests if IEB members did not vote in favor of her priorities.  In response, the Secretary-Treasurer alleged that

3

the Union President had instigated the above actions in retaliation for, among other things, her refusal or reluctance to authorize certain improper expenditures of funds at the request of and/or for the benefit of those in the President's Office.  The Monitor opened an investigation into these competing claims.   *See* ECF No. 128-1, PageID.2455-2456.

In May 2024, the Monitor began investigating additional allegations against the Union's President. On May 29, 2024, the President removed the Stellantis Department from a Vice President's oversight and reassigned it under his own control, citing the Vice President's "dereliction of duty" in connection with certain collective bargaining issues.  But the Vice President and other complainants alleged that the President had removed the Vice President's assignment in retaliation for, among other things, the Vice President's "refusal to accede to demands by [the President] and his agents that [the Vice President] take actions . . . that would have benefitted [the President's] domestic partner and her sister."  ECF No. 128-12, PageID.2497.

Third, the Monitor opened an investigation into another IEB member, a Regional Director, involving allegations that this senior Union official embezzled UAW funds by using a UAW corporate credit card for personal purchases and misappropriating Union property.  *See* ECF No. 128-1, PageID.2461.

4

To carry out his work under the Consent Decree, the Monitor requested documents from the Union in furtherance of these investigations and also provided search terms to the Union meant to identify with more specificity the documents requested.[1]  In response, the Union has taken the position that it must conduct a pre-production review of all requested documents for privilege and confidentiality concerns, and even then, it will not produce certain documents based on assertions of privilege and confidentiality over its collective bargaining discussions.  *See* ECF No. 128-1, PageID.2455-2462.

The Union's position in these investigations marked a reversal from that taken by the Union's President in a formal memorandum to all staff regarding "Cooperation with the Monitor" that was sent both in August 2023 and December 2023.  Then, the UAW President "instruct[ed] All Staff to cooperate fully with the Monitor in all regards as it regards financial impropriety, corruption, and internal union election-related matters."  ECF No. 128-15, PageID.2509.  In doing so, the President acknowledged that when conducting investigations, the Monitor "stands precisely in the shoes" of the UAW, including as it relates to access to privileged

---

[1] These search terms were not an additional request that "far exceeded the scope of the prior requests," as the Union says.  *See* ECF No. 127, PageID.2367.  They were an attempt to identify the documents responsive to the Monitor's February request that the Union had failed to produce.  As discussed in the Monitor's Motion to Enforce the Consent Decree, the Monitor provided these search terms after the Union—following a delay of over a month—had produced just 18 documents from a single Union employee.  *See* ECF No. 128, PageID.2433-2434.

documents.   ECF No. 128-15, PageID.2509, 2511; *see also* ECF No 128-1, PageID.2463; ECF No. 128-16, PageID.2513, 2515.  The Union's conduct during the noted investigations conflicts with the President's memorandum.

Further factual background is contained in the Monitor's Motion to Enforce the Consent Decree.  *See* ECF No. 128, PageID.2431-2438.

## <u>ARGUMENT</u>

The Consent Decree grants the Monitor the right to insist on direct and immediate access to the Union's documents, including privileged and confidential documents, to further his investigative mandate to "remove fraud, corruption, illegal behavior, dishonesty, and unethical practices from the UAW and its constituent entities." *See* ECF No. 10, PageID.119.  The Union's contrary reading would render the Monitor's mandate ineffectual by allowing Union leadership to decide what documents the Monitor can see and when he can see them, including when those same leaders are themselves subject to investigation.

This Brief responds to the Union's arguments about the meaning of the Consent Decree.  Further detail on the Monitor's position is set out in the Monitor's Motion to Enforce the Consent Decree, ECF No. 128, PageID.2420-2453.

## I.   **The UAW's Brief Mischaracterizes the Consent Decree**

The Union's arguments regarding the Consent Decree are incorrect based on the plain language of the provisions it cites.

### A.    Paragraph 27 Supports the Monitor's Access to Union Documents

The UAW argues that Paragraph 27—which gives the Monitor "all of the powers, privileges and immunities" of a receiver—does not give the Monitor direct and immediate access to Union documents. However, other than disparaging the grant of authority in that paragraph, the Union does not offer a credible explanation as to what it believes the provision was intended to accomplish. Its arguments also conflict with the Consent Decree and case law.

*First*, the Union argues that a court-appointed officer can directly access documents only when the officer takes full control of the entity. But, by design, the Consent Decree did not turn management of the entire Union over to the Monitor; instead, it was specifically intended to avoid a full government takeover. In doing so, the Consent Decree gave the Monitor a more focused remit—to "remove fraud, corruption, illegal behavior, dishonesty, and unethical practices from the UAW," with the "right and authority" of the Union's senior management for that more limited purpose. Consent Decree ¶¶ 28-29, ECF No. 10, PageID.119. Thus, the Monitor has assumed the role of management of the Union for a specific purpose and is entitled to documents for that purpose to the same extent as management. Just because there was not a ***full*** takeover of the Union does not mean the Monitor does not have receiver authority and accompanying access to documents in furtherance of the ***partial*** assumption of authority the Consent Decree mandates.

7

**Second**, contrary to the Union's argument, the decision in *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 345 (1985), does not require a full takeover for a court-appointed officer to access documents.  In that case, although a bankruptcy trustee had assumed full control, the Supreme Court did not hold that a full takeover was **required** for a court-appointed officer to fall within privilege.  Instead, the Court considered whether the trustee stood in the shoes of management in determining control of the privilege, and, in explaining its reasoning, emphasized the very same concerns the Monitor has cited here.  The Supreme Court said that when a court-appointed officer is tasked with investigating the conduct of management, the officer's investigative goals "would be substantially defeated if the [] directors were to retain the one management power that might effectively thwart an investigation into their own conduct."  *Id.* at 353-54.  It further reasoned that allowing the managers subject to the investigation to control access to privileged documents would make investigations "extremely difficult," because management could use privilege as a shield against those investigative efforts.  *Id.* at 353.

Those principles apply here.  The Monitor was appointed because of misconduct at the highest levels of the Union, and he was given responsibility for bringing charges to remedy and discipline misconduct, acting on behalf of the entity itself.  *See* ECF No. 128, PageID.2442-2443.  Just as in *Weintraub,* allowing senior UAW management to control the Monitor's document access in connection with his

8

investigations would "substantially defeat[]" the purpose of appointing a Monitor and render his work "extremely difficult" to carry out.  It could not have been the intent of the Consent Decree to enable the outcome that *Weintraub* warned against.

    ***Third***, despite the UAW's arguments to the contrary, *see* ECF No. 127, PageID.2382, it is customary to appoint court officers for more limited functions and to provide them direct access to documents.  For example, in the union context, courts appoint officers to investigate wrongdoing, and—without ordering a full takeover—those officers get access to books and records.  *See United States v. Dist. Council of New York City & Vicinity of United Bhd. of Carpenters & Joiners*, No. 90 CIV. 5722 (CSH), 2004 WL 1542258, at *1 (S.D.N.Y. July 9, 2004) (discussing court officer appointed to investigate alleged union corruption reviewing union documents in the course of his investigations); *Joint Council 73 v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers*, 741 F. Supp. 491, 493 (S.D.N.Y. 1990) (discussing access to books and records for court-appointed investigations officer, one of three court-appointed roles).

    Further, at least one court has rejected the precise approach the Union is now taking.  In *Cobell*, the court-appointed officer was tasked with, among other things, monitoring a trust's reform activities, which included investigating the accuracy of statements made about the trust reform status.  *See Cobell v. Norton*, 213 F.R.D. 48, 60 (D.D.C. 2003).  In a dispute about access to documents, the court explained:

> [W]hen the Monitor issues a request for documents pursuant to his authority as court monitor, the Monitor is proceeding as an adjunct of the Court, and is therefore entitled to production of the documents requested, any claims of privilege notwithstanding. The issue of privilege only becomes relevant if the Monitor wishes to discuss the content of the documents in his reports to the Court, or provide them to plaintiffs. . . . Therefore, it was improper for defense counsel to refuse to comply with a document request made by the Monitor on the grounds that the documents requested were protected under attorney-client privilege. The proper course of action would have been to comply with the Monitor's request, while simultaneously informing the Monitor that defendants were asserting attorney-client privilege with respect to the requested documents. Instead, defense counsel repeatedly refused to turn over documents requested by the Monitor . . . and challenged the authority of the Monitor to make such requests.

*Id.* at 55. The court granted access to the contested materials. *Id.* at 57, 62.

**Finally,** despite the Union's contrary arguments, *see* ECF No. 127, PageID.2367-2368, the Monitor's approach to document collection has not unduly burdened the Union, because it is based on his right to direct and immediate access to Union materials. After the Union failed to make a meaningful production in response to the Monitor's initial request, the Monitor provided search terms that were broadly worded to encompass potentially relevant materials. Those terms were **not** intended for **the Union** to review the documents itself, but instead to encompass sufficient material to allow **the Monitor** to review them in furtherance of his investigative mandate. After the Union rejected the Monitor's request for immediate production, the Monitor tried to work with the Union to obtain the materials anyway. *See* ECF No. 128, PageID.2434-2435. Although the Union suggests an undue burden based on the Monitor's approach, *see* ECF No. 127, PageID.2367-2369, any

burden is the result of the Union's decision not to turn over the materials as it was obligated to do.

**B.    Paragraph 55 Applies Only to IEB Meetings**

The Union also misconstrues Paragraph 55.  It argues that Paragraph 55 of the Consent Decree—although "nominally" referring only to certain oral communications at IEB meetings—actually applies to all privileged and confidential materials in the Union's possession.  The Union misreads the provision.

***First,*** the Union selectively quotes and then misconstrues Paragraph 55 by replacing the narrow language of the provision with more expansive language that does not exist.  According to the Union, the documents requested by the Monitor include information protected by the attorney-client privilege or work product and collective bargaining strategy, and says the Monitor "'shall not be entitled' to such materials" under Paragraph 55.  *See* ECF No. 127, PageID.2360, 2372-2373.  But the word "materials" does not appear in Paragraph 55; instead, Paragraph 55 says that the Monitor is not entitled "to attend or listen to meetings or portions of [IEB] meetings protected by the attorney-client privilege or concerning collective bargaining strategy."   The provision states in full:

> The Monitor shall have the right to be notified of and attend all meetings of the IEB and the authority to distribute information to the membership of the UAW about the activities of the Officers or his/her/their representatives.  The Monitor shall not be entitled to attend or listen to meetings or portions of meetings protected by the attorney-client privilege or concerning collective bargaining strategy.  The Monitor shall keep confidential any information

11

> learned during IEB meetings, except as may be necessary to carry out his, her, or their functions as set forth herein.

Consent Decree ¶ 55, ECF No. 10, PageID.131.  Nothing in the provision indicates that it applies more broadly than its text.

Further, the Consent Decree's preamble makes clear that the Union's collective bargaining materials are subject to oversight when they become implicated by the Monitor's investigatory mandate.  It states that, although the Union is free to negotiate or administer its collective bargaining agreements without oversight, it also creates an exception: "as may be necessary to ensure the elimination of fraud, corruption, or illegal conduct."  *See* ECF No. 10, PageID.109.  That exception language in the preamble mirrors the grant of the authority to the Monitor: *i.e.*, that "[t]he Monitor has the authority and duty to remove fraud, corruption, illegal behavior . . . ."  Consent Decree ¶ 28, ECF No. 10, PageID.119.

*Second*, the Union's repeated references to the importance of protecting collective bargaining material do not salvage its misreading of Paragraph 55.  The importance of protecting disclosure of collective bargaining information from third parties is not in dispute.  But the Monitor is ***not a third party*** because he functions as the Union for purposes of investigations.  ECF No. 128, PageID.2438-2441.  *See Joint Council 73*, 741 F. Supp. at 493 (discussing that the Teamsters' executive board had delegated "the investigation and discipline of union misconduct to the court-appointed officers").

12

Indeed, the Union devotes a significant portion of its Brief to discussing the importance of protecting collective bargaining information from disclosure and recounting the framework of the country's labor laws and the protections courts have afforded to collective bargaining materials when sought by an opposing party in collective bargaining. *See* ECF No. 127, PageID.2371, 2375-2380. But the Monitor is not an adversary of the Union in collective bargaining negotiations, and those cases are irrelevant here. *See* ECF No. 127, PageID.2371, 2375-2380; *see, e.g.*, *N.L.R.B. v. Jackson Hosp. Corp.*, 257 F.R.D. 302, 314-15 (D.D.C. 2009) (discussing disclosure to non-adversary); *N.L.R.B. v. Serv. Emps. Int'l Union, Loc. 521*, No. C-07-80170MISC-JF, 2008 WL 152176, at *3 (N.D. Cal. Jan. 16, 2008) (same).

Moreover, the Union's concerns about the risks of providing collective bargaining information to the Monitor are not well-founded. The Consent Decree, which contemplates the disclosure of highly confidential information to the Monitor, creates (in Paragraphs 53 and 57) mechanisms whereby the Union can seek court intervention for any document it wants to protect from disclosure. *See* ECF No. 10, PageID.130. With respect to legally protected information, the Court's 502(d) Order expressly prohibits the Monitor from disclosing information received pursuant to the Order without the Union's consent or the Court's authorization, except as necessary to fulfill his duties. *See* ECF No. 40, PageID.399.

13

As a matter of practice, the Union's stated concerns about disclosing information are also ill-founded.  Since early in the monitorship, the Monitor has received confidential and highly sensitive information, including privileged and collective bargaining information.  *See* ECF No. 127, PageID.2376.  Having repeatedly disclosed such materials to the Monitor, the Union's argument about the harm of third-party disclosure appears to be a selective invocation of that risk in order to shield some documents from scrutiny, but not others.[2]

The Union also argues that sharing privileged information with the Monitor will chill communications with counsel, but the Union has repeatedly shared privileged information with the Monitor in the past, thus putting the Union's senior officials on notice that their communications with Union counsel may be disclosed to the Monitor.  Further, in his memoranda issued in August and December 2023, the Union's President put all International Union staff on notice that privileged material would be provided to the Monitor, without exception.  *See* ECF No. 128, PageID.2447-2448, 2452.  The Union cannot now cite concerns about chilling communications when it would simply be following through on disclosures it has repeatedly made and said it would continue to make.

---

[2] The Monitor has procedures in place to avoid disclosure of such materials, including secure servers and protocols limiting access.

*Third*, the Union cites cases in the Rule 26 context in support of its collective bargaining arguments, *see* ECF No. 127, PageID.2378-2379, but Rule 26 governs civil discovery between litigation adversaries and is thus inapplicable here. The Monitor's document requests are not issued in connection with pending litigation, and they are not governed by Rule 26. *See Cobell*, 213 F.R.D. at 53, 55 (explaining that "it would certainly be bizarre for the actions of a court-appointed judicial official to be governed by the provisions of the Federal Rules that regulate the actions of parties engaged in discovery," and that "the Monitor is a judicial official whose requests for documents do not constitute 'discovery'"). Like in *Cobell*, the Monitor here is a court-appointed officer acting in an investigatory capacity who is not subject to discovery rules. *See* Consent Decree ¶¶ 22, 26-27, ECF No. 10, PageID.117-118.

### C.   Paragraph 37 Does Not Limit the Monitor's Access

The Union also asserts that "[b]efore filing disciplinary charges, the Monitor may only enlist the *voluntary* 'cooperative efforts' of the Union," because he can only require the Union to produce documents once disciplinary proceedings have commenced, citing Paragraph 37. *See* ECF No. 127, PageID.2363 (emphasis in original). But the Union misreads Paragraph 37 as displacing his power to investigate, when, instead, it merely grants him direct and immediate access to documents during the hearing process. Paragraph 37 provides:

> The Monitor or Adjudications Officer may require any component of the UAW, or its constituent entities, or any officer, agent, representative, member or employee of the UAW or any of its constituent entities to produce any book, paper, document, record or other tangible object for use in any hearing initiated by the Monitor or conducted by the Adjudications Officer. Any willful failure by the UAW or its affiliated entities to comply with any such request may be used by the Trial Committee or the Adjudications Officer, to determine whether such entity should be subject to the imposition of discipline.

Consent Decree ¶ 37, ECF No. 10, PageID.123-124. The provision confirms the Monitor's direct and immediate access to "any" Union document for hearings and does not displace his right to obtain such documents before a charging decision.

*First*, Paragraph 37 underscores the Monitor's direct access to materials, including privileged materials. It is contained in a subsection of the Consent Decree setting forth the procedures for disciplinary hearings brought by the Monitor and requires production of records ***without any exception for privilege or confidentiality***. That provision for access to Union records stands in contrast to the provisions in the paragraphs immediately following it—Paragraphs 38 and 39—that ***do provide*** for privileged materials to be withheld when such information is sought from a third party. As discussed further below, Paragraph 38 addresses Union officials on third-party boards and allows the Monitor access to only "non-privileged" documents in that context; and Paragraph 39 addresses third-party subpoenas and makes them "subject to" Rule 45, including privilege assertions. By contrast, Paragraph 37 requires production of "any book, paper, document, record or

other tangible object" with no exception for privilege.  Given the Consent Decree's specific references to privilege exceptions when discussing the Monitor's access to documents in other paragraphs (Paragraphs 38, 39, and 41), the absence of such an exception in Paragraph 37 affirms the Monitor's direct access all to Union documents, including privileged ones.

***Second***, the Union is incorrect that Paragraph 37 displaces the Monitor's document access before charges are brought.  The paragraph addresses the procedures for hearings, but does not purport to displace pre-charging authority of the Monitor.  Nor does the paragraph purport to define the only circumstances in which the UAW must give documents to the Monitor.

Importantly, the Union's reading of Paragraph 37 would lead to unreasonable consequences.  It would require the Monitor to file formal disciplinary charges against an individual before gaining access to documents and conducting a full investigation into potential misconduct.  It would mean that the Monitor would have to bring charges based merely on allegations, without corroborating proof, and then seek support afterwards.  That would be unfair to the charged Union official, who would bear the stigma of a corruption charge before a thorough investigation could take place.  It would also enable the Union to wield its decision to cooperate before a charge as a political weapon:  for example, Union leaders could accuse a political rival of misconduct and then, by refusing to cooperate, force the Monitor to charge

the rival based solely on untested allegations.[3]  That cannot be what the drafters of the Consent Decree intended.

### D.    Paragraphs 38, 39, 41 Do Not Apply to the UAW

The Union also miscites various provisions of the Consent Decree that it claims indicate an intent to limit the Monitor's access to Union documents and other privileged information.  But those provisions refer to privileges held by ***third parties and charged officials*** from whom the Monitor may seek information, not the Union itself.

**Paragraph 38.**  The Union argues that Paragraph 38 supports its position because it "requir[es] UAW officials serving on outside boards to provide only 'non-privileged records.'"  ECF No. 127, PageID.2373.  But the Union fails to provide key context.  This provision provides in full:

> The UAW expressly recognizes that the UAW Ethical Practices Code applies
> to UAW officials and members in every capacity.  UAW officials serving on
> ***outside boards and entities*** are required to provide non-privileged records to
> which they are privy, ***subject to 14 days' written notice to the entity and to
> objection to the Court by that third party***, upon request of the Monitor.  The
> UAW expressly recognizes that this provision applies to UAW officials

---

[3] The unfairness of these delays is compounded when the President or a member of his office is the one advancing allegations against other senior officials.  For example, resolution of the current investigations may result in findings that would exonerate the Secretary-Treasurer and the Vice President and warrant reversal of the reassignment of their departments.  If that is the case, in addition to unfairly extending the time for which they are bearing the stigma of the accusations against them, the President's decision to delay the Monitor's access would also unfairly extend the status quo of their department reassignments.

serving on any outside entity, specifically including the United Auto Workers Voluntary Employee Beneficiary Association (VEBA) Trust, any labor-management committee, fund, or trust formed under 29 U.S.C. § 186(c), and any charity or entity with a tax-exempt designation assigned by the United States Internal Revenue Service under 26 U.S.C. § 501.

Consent Decree ¶ 38, ECF No. 10, PageID.124 (emphasis added).

This provision applies to UAW officials serving on "outside boards and entities," and the privileged records contemplated are of those outside the Consent Decree—*i.e.*, those of third-party organizations on whose boards UAW officials sit, but not of the Union itself.  It merely clarifies that the Monitor does not have access to the privileged materials of those parties, and does not speak to the Monitor's ability to access the ***Union's own*** privileged materials.

**Paragraph 39.**  The Union argues that Paragraph 39 "require[es] the court to quash a document subpoena issued by the Monitor if it 'requires the disclosure of privileged or other protected matter.'"  ECF No. 127, 2372-2373.  Again, this mischaracterizes the provision, which reads in full:

The Monitor shall have the right and authority to issue subpoenas requiring the attendance and presentation of testimony of any person or the production of documentary or other evidence pursuant to authority conferred by the Court under this consent decree and subject to Federal Rule of Civil Procedure 45. Witnesses shall be paid the same fee and mileage allowances which are paid subpoenaed witnesses in the courts of the United States and such payments shall be made by the UAW.  In the case of contumacy or willful failure to obey a subpoena issued under this Paragraph, the Monitor may seek to: (i) impose discipline upon the person in accordance with this decree; or (ii) seek an order from the Court requiring the person to testify or to produce documentary or other evidence.

19

Consent Decree ¶ 39, ECF No. 10, PageID.124.

This provision provides a mechanism for the Monitor to obtain documents and testimony from ***third parties***, who are not under the UAW's control, to aid in his investigations and/or to require attendance at disciplinary hearings.  But the UAW is not a third party because the Monitor stands in the shoes of the UAW for investigations, and the Monitor has no reason to issue a subpoena to the UAW.  *See* ECF No. 128, PageID.2438-2441.  Moreover, as discussed above, it is Paragraph 37, not Paragraph 39, that addresses documents of the Union itself in the context of hearings, and that provision does not require a subpoena.  *See United States v. Amodeo*, No. 92 CIV. 7744 (RPP), 1996 WL 11187 (S.D.N.Y. Jan. 11, 1996) (no subpoena for court officer to access union documents)*; Joint Council 73*, 741 F. Supp. at 493 (same).

**Paragraph 41.**  The Union argues that Paragraph 41 of the Consent Decree "prohibit[s] discipline for failure to produce documents where there is a 'valid claim of attorney-client or other legally valid privilege'" as support for its position.  ECF No. 127, PageID.2373.  Again, the Union selectively cites the provision and takes it out of context.  Paragraph 41 states, in relevant part:

> If any person who is the subject of a disciplinary charge refuses to testify or to provide evidence at a hearing initiated by the Monitor under this decree on the basis of his or her privilege against self-incrimination, (i) the Trial Committee (at trial) and the Adjudications Officer (at trial or on appeal) may take an adverse inference from that assertion of the Fifth Amendment, consistent with federal law; or (ii) the Monitor may seek an order from the

20

Court requiring the person to testify or to produce documentary or other evidence if the assertion of the Fifth Amendment privilege is not legally justified. Also, failure to testify or provide evidence in the absence of a valid claim of attorney-client or other legally valid privilege may be the basis for discipline. The Monitor may request that the Court find in contempt of court any person who improperly refuses to testify or provide evidence at any hearing resulting from charges brought by the Monitor under the terms of this decree. . . .

Consent Decree ¶ 41, ECF No. 10, PageID.125.

This provision does not apply to the UAW itself, but to an individual "who is the subject of a disciplinary charge." It does not include the Union itself, and it clarifies that the Monitor is not entitled to draw an adverse inference in a disciplinary hearing against a charged individual for failing to produce privileged communications for the hearing, such as those between them and their personal lawyer concerning their defense. These protections do not apply to the Union.

### E. Paragraph 57 Concerns Disclosure of Documents

Finally, the Union argues that Paragraph 57 of the Consent Decree "limit[s] the Monitor's right to review documents to 'non-confidential' books and records, necessarily shielding 'confidential' attorney-client communications and collective bargaining strategy from disclosure." ECF No. 127, PageID.2372. This again is a mischaracterization of the provision, which reads in full:

The UAW expressly acknowledges the Monitor's right to review, and upon not less than 14 days' notice to the IEB, *disclose* non-confidential financial data, books, records, audit findings, and other similar records to UAW members concerning the establishment or operation of the UAW or its constituent entities. If there is a dispute between the Monitor and the UAW

21

regarding whether any such materials the Monitor intends to ***disclose*** are confidential and should not be made available to third parties, the Monitor or the UAW parties may appeal to the Court for a decision on such dispute.

Consent Decree ¶ 57, ECF No. 10, PageID.131 (emphasis added).

Paragraph 57 presumes that the Monitor has access to both confidential and nonconfidential documents—its provisions govern instances when the Monitor is seeking to disclose those materials, and grants the Union a mechanism to appeal to the Court to protect them from such disclosure.  Nowhere in the provision does it purport to limit the Monitor's access to non-confidential documents only, especially in the context of the Monitor's disciplinary authority.  If this provision was intended to limit the Monitor to non-confidential documents only, it would have said so—especially as it would nullify Paragraph 37, which provides the Monitor with broad and direct access to materials with no such limitations.  *See Cain Rest. Co. v. Carrols Corp.*, 273 F. App'x 430, 433 (6th Cir. 2008) (explaining that any apparent conflicts between contract provisions "should be harmonized").

## II.   The 502(d) Order Does Not Prevent the Monitor's Access

The Union misreads the 502(d) Order in arguing for its position.

***First***, the Union argues that the language stating that the Union "may provide" privileged or otherwise protected materials means that the Order allows, but does not require, that the Union provide those materials.  *See* ECF No. 127, PageID.2372-2373.  But this language does not describe the Union's obligation to disclose

22

documents; rather, it means merely that in the course of producing documents, some "may" be privileged or otherwise protected, while others may not be.

*Second*, the Union argues that because the 502(d) Order provides that the Union "shall notify" the Monitor what information is privileged or otherwise protected, the Order acknowledges "the Union's right to review and designate documents" before providing them to the Monitor. ECF No. 127, PageID.2373. But nothing in the 502(d) Order states that it supersedes the unimpeded access to documents provided by the Consent Decree, or that designation of documents as privileged or protected must occur *before* the Union produces documents to the Monitor. *See Cobell*, 213 F.R.D. at 55.

## III.  ABA Standards Do Not Supersede the Consent Decree

The Union relies on the American Bar Association's Criminal Justice Standards ("ABA Standards") for support of its interpretation of the Consent Decree, and particularly the provision providing that "the Host Organization should not be required to disclose information that is subject to the attorney-client privilege or the attorney work-product doctrine, or the disclosure of which would otherwise be inconsistent with applicable law."  *See* ECF No. 127, PageID.2361, 2371-2372, 2381-2382.

This reliance is misplaced.  As one court has noted, "as influential as the ABA's Criminal Justice Standards have been to courts, they are only persuasive

authority." *O'Malley v. NaphCare, Inc.*, No. 3:12-CV-326, 2014 WL 806381, at *13 (S.D. Ohio Feb. 28, 2014).   That is because courts interpret consent decrees according to their plain language and the intent of the parties, regardless of what the ABA Standards might say.  *See Lorain NAACP v. Lorain Bd. of Educ.*, 979 F.2d 1141, 1148 (6th Cir. 1992); *Evoqua Water Techs., LLC v. M.W. Watermark, LLC*, 940 F.3d 222, 229 (6th Cir. 2019).  Indeed, the ABA Standards themselves reflect that the language of the Decree governs by defining "Monitor" to mean a person or entity "[w]hose responsibilities and authority are established by Court Order . . . ." ECF No. 127-2, PageID.2389.

Moreover, investigative monitorships are not as common as those focused on monitoring compliance, as the ABA recognizes.  *See* ABA Standards, ECF No. 127-2, PageID.2387 (explaining that monitorships "frequently involve remedial measures within the Host Organization's corporate compliance and ethics program").  And, where monitorships do involve investigations, monitors are often given access to privileged materials, as discussed above.  *See Amodeo*, 1996 WL 11187 at *1-2.

The views of the parties to the Consent Decree confirm that reading, notwithstanding the ABA guidance.  The United States has confirmed that its intent in drafting the Consent Decree was to grant the Monitor direct and immediate access to documents and other information, including privileged materials, and fully

supports the Monitor's motion.  *See* ECF No. 128, PageID.2446-2447.  The Union itself confirmed the same position as recently as December 2023, just before the instant investigations began, via memoranda from the Union's President to all staff. *See* ECF No. 128, PageID.2447-2448.  Those indicia of the intent of the language used in the Consent Decree undermine the Union's stated interpretation now.

In short, the controlling authority here is the Consent Decree itself, which entitles the Monitor to direct and immediate access to Union documents.

## CONCLUSION

For the foregoing reasons, the Monitor respectfully requests that the Defendant's Motion to Clarify Consent Decree be denied.

Respectfully submitted,

/s/ Michael W. Ross_____
Michael W. Ross
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600 (t)
(212) 891-1699 (f)
State Bar ID 4482501 (New York)

*Counsel for the Monitor*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-13293 |
| | ) | Honorable David M. Lawson |
| INTERNATIONAL UNION, UNITED | ) | |
| AUTOMOBILE, AEROSPACE, AND | ) | |
| AGRICULTURAL IMPLEMENT | ) | |
| WORKERS OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2024, the foregoing Response to the UAW's Motion to Clarify Consent Decree was served electronically on all counsel of record via the CM/ECF system.

/s/ Michael W. Ross
Michael W. Ross
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600 (t)
(212) 891-1699 (f)
State Bar ID 4482501 (New York)

*Counsel for the Monitor*