UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                              Case Number 20-13293

v.                                                     Honorable David M. Lawson

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE, AND
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA,

        Defendant.
_____/

## ORDER GRANTING IN PART MONITOR'S MOTION TO ENFORCE CONSENT DECREE AND DENYING DEFENDANT'S MOTION TO CLARIFY CONSENT DECREE

        In the months and years before this lawsuit was filed, defendant International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America, popularly known as the United Auto Workers, or UAW, a venerable trade union founded on principles of equality and the dignity of work and workers, was beset with corruption that infested its leadership. As spelled out in some detail below, union leaders — even presidents — were prosecuted and convicted of crimes arising from the use and abuse of their leadership positions, sometimes at the expense of the rank and file. The United States found it necessary to step in and seek oversight, to propose important changes in the leadership structure, and to keep close watch on the Union's administration for a time so that corruption could be rooted out while preserving the Union's independence when discharging its core function: representing its members in its collective bargaining endeavors.

        The complaint in this case was followed quickly by a consent decree negotiated by the parties and approved by the Court. Among the several features of the decree was authorization for

the appointment of a Monitor who would be empowered to oversee the operation of the Union and investigate and bring disciplinary charges aimed at removing corruption, illegal behavior, and unethical practices from the UAW.  However, the Monitor is not empowered to involve himself in the Union's core function — negotiating and administering the Union's collective bargaining agreements — "except as may be necessary to ensure the elimination of fraud, corruption, or illegal conduct."  Consent Decree, ECF No. 10, PageID.109.

A dispute has arisen from the Monitor's investigation activity involving certain complaints over the conduct of high-ranking Union officials.  The Monitor has demanded the production of a large volume of documents, most of which the UAW has agreed to produce subject to its own review for privileged materials and redaction.  That review has proved to be time-consuming.  The UAW believes that it can withhold documents from the Monitor that are subject to the attorney-client privilege or that contain strategic or sensitive collective bargaining information.  The parties have filed dueling motions in which the Monitor seeks a ruling compelling the Union immediately to produce to the Monitor all documents responsive to his document requests without regard to whether such documents may be subject to a claims of privilege, and the Union resists that demand, praying for a "clarification" of the Consent Decree to the effect that it is entitled to withhold from the Monitor any material that it believes is covered by a privilege claim.  The Court heard oral argument from the parties and the Monitor on November 26, 2024.

The Consent Decree provides the Monitor with broad powers to obtain relevant documents in pursuit of his investigation.  The Decree recognizes the Union's right to hire attorneys of its own choosing and to establish an attorney-client relationship.  However, with a narrow exception, the Union does not have a right to withhold documents from the Monitor pending its privilege review, as that action would eviscerate the Monitor's investigative prerogatives granted by the

Decree. The Union may interpose objections to the disclosure or dissemination of documents and information by the Monitor to the government, non-parties, or the public; and its compliance with the Monitor's production demands does not compromise that privilege. But the Union's privilege review cannot be permitted to delay production of documents to the Monitor in the first instance. Similarly, the Union has a right to maintain the confidentiality of its collective bargaining strategies and decisions, but its review of documents to designate materials for protection may not delay production unreasonably, as the Monitor has been charged with the duty to investigate even that activity "to ensure the elimination of fraud, corruption, or illegal conduct." *Ibid.*

Although the Union has raised a good-faith dispute over the meaning of the Consent Decree's grant of investigative authority to the Monitor, the Court agrees with the Monitor's interpretation of the Decree's grant of authority to the Monitor to obtain the materials he seeks in this instance. The Monitor's motion to enforce the Consent Decree will be granted, with the exceptions outlined below, and the Union's motion for clarification of the consent decree seeking approval of its pre-production document review will be denied.

I.

A proper understanding of the meaning and purpose of the Consent Decree requires some historical context.

A.

On December 14, 2020, the government filed its complaint in this case under the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. §§ 401 *et seq.*, against the UAW. That iconic union represents hundreds of thousands of non-managerial workers in automobile manufacturing and other industries throughout Michigan, the United States, and the world. The UAW's International Executive Board (IEB) is the managing body of the UAW, which

is comprised of a president, secretary, three vice presidents, and eight regional directors. The board governs the union's affairs by, among other things, imposing discipline, approving or suspending bylaws of local bargaining units, and interpreting and enforcing the UAW's constitution. UAW locals, aided and overseen by the umbrella authority of the international union, negotiate collective bargaining agreements on behalf of members in workplaces around the country and the world, according to local circumstances.

According to the complaint, since 2010, certain members of the executive board engaged in fraudulent and illegal transactions that included money laundering, receipt and payment of union funds for goods and services that never actually were delivered, and receipt and payment of kickbacks and bribes by certain employers of union members. Among other things, members of the executive board accepted bribes and kickbacks for steering contracts that were awarded by the UAW-GM Center for Human Resources, which was a member training center jointly operated by the Union and General Motors Corporation and its successor (GM). Other union executives conspired over several years to embezzle for their personal use more than $1.5 million in union funds by subterfuges such as submitting vouchers for travel and lodging expenses that never were incurred. Also, union executives accepted payments from employers, including FCA US, LLC (Chrysler), in exchange for compromising negotiations over bargaining agreements in ways that favored employers over rank-and-file union members. Still other executive board members were aware of the fraud, embezzlement, and bribery crimes, but took no action to stop them, contrary to their obligations under federal law to investigate and redress any violations of applicable federal laws by union officials.

According to the government, union executives made, or caused the union to make, deceptive representations to the Department of Labor and the Internal Revenue Service in various

financial reports and disclosures to conceal the proceeds of their schemes. The complaint enumerates in exhaustive detail those and other fraudulent and illegal schemes and identifies the former union officials who conspired to carry them out. In 2019 and 2020, more than a dozen executives who were involved in the schemes pleaded guilty to a variety of federal crimes including wire fraud, mail fraud, embezzlement, violations of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 *et seq.*, and violations of the LMRDA.

Contemporaneously with the complaint, the parties jointly filed a motion for entry of a consent decree embodying terms of an agreement that they had reached before the suit was filed, which provided for injunctive restrictions against the Union and its officers, and also for the appointment of a Monitor and other officials (such as an Adjudications Officer) to keep tabs on the union's activities and report on the defendant's compliance with the consent decree and applicable federal laws. The Court struck the proposed consent decree that had been attached as an exhibit to the motion because it was filed in violation of procedural rules. In response to that housekeeping action, the parties filed a revised joint motion with a brief that included more expansive details about the terms of the proposed consent decree. On January 29, 2021, after it had received no opposition to the joint motion, the Court entered the proposed consent decree.

The Consent Decree establishes an initial term for Court supervision of six years, which may be extended or shortened upon good grounds shown by any party. The Consent Decree also provides for the appointment of a Monitor to oversee the Union's compliance with its terms. On May 12, 2021, the Court granted an unopposed joint motion to install Neil M. Barofsky in that office. Among other things, the Consent Decree empowers the Monitor to monitor the conduct of officers and principal employees of the Union, oversee the elections of officers, impose discipline or review the imposition of discipline in matters implicating the integrity of the Union's business

affairs, review and repudiate contracts undertaken by the Union, and in general to exercise all of the powers vested in the IEB for the purposes of correcting any malfeasance in the Union's dealings which may occur.

Several provisions of the Consent Decree are relevant to the particular dispute presently before the Court. First, in the preamble, the Consent Decree recites the following as a central premise of its implementation:

> The defendant union acknowledges that there have been criminal convictions, allegations, sworn testimony, and judicial findings of past problems with fraud, corruption, and criminal conduct by certain officials within the UAW and certain of its related entities. By bringing certain criminal prosecutions and related proceedings, the United States has halted and punished past fraud, corruption, and criminal conduct, and the parties enter into this agreement to ensure that no further unlawful activity occurs.
>
> The United States and the UAW agree that it is imperative that the UAW, as one of the largest trade unions in the world, be free of such criminal conduct, [and] that every aspect of the operations of the UAW and its constituent entities be conducted with integrity and for the benefit of its members, . . . . The parties agree that further cooperative efforts, subject to judicial supervision and assistance as outlined in this consent decree, are necessary and appropriate.

Consent Decree, ECF No. 10, PageID.108-09. To that end, the Consent Decree enjoins the Union and its officers from engaging in any criminal activity, including acts that would constitute mail or wire fraud and embezzlement, and from "[o]bstructing or otherwise interfering, directly or indirectly, in any way or degree, with the work of the [Monitor or his] designated agents and representatives." *Id.* ¶ 18(d), PageID.114-15.

Second, the Consent Decree provides for the appointment by the Court of two officers to supervise the Union's conduct and, as necessary, to investigate suspected violations and to pursue enforcement actions under the Decree against any Union members or officers suspected of improper conduct:

> The Court will approve and appoint the two Officers — a Monitor and an Adjudications Officer. As outlined in this decree, these Officers shall have the

> authority to and shall remove fraud, corruption, and illegality from within the UAW and its constituent entities; and otherwise enforce the injunctive prohibitions of this decree not requiring court approval or adjudication.

*Id.* ¶ 22, PageID.117. Third, the Decree expressly vests the Monitor with "the right and authority" of the Union's President and IEB, which the Monitor is authorized to exercise to pursue disciplinary actions against any person who has acted improperly contrary to the provisions of the Decree:

> The Monitor has the authority and duty to remove fraud, corruption, illegal behavior, dishonesty, and unethical practices from the UAW and its constituent entities. Therefore, the Monitor shall have the following powers, rights, and responsibilities set out below.
>
> The Monitor shall have the right and authority of the UAW International President and IEB to bring charges seeking to discipline, remove, suspend, expel, fine or forfeit the benefits . . . of any UAW International officer, representative, agent, member, employee or person holding a position of trust in the UAW, its constituent entities, or any employee benefit plan, labor management cooperation committee or voluntary employee beneficiary association in which such person acts on behalf of the UAW or its constituent entities, as well as officers of local unions who are also members of the UAW, when such person engages or has engaged in actions which (i) violate the injunctive prohibitions of this decree, (ii) violate any criminal law involving the establishment or operation of a labor organization, employee benefit plan, labor management cooperation committee, or voluntary employee beneficiary association, or (iii) further the direct or indirect influence of any barred person, or the threat of such influence now or in the future, as described in this decree.

*Id.* ¶¶ 28, 29, PageID.119. Fourth, the Decree states that "[e]ither party may hereafter apply to the Court to modify or enforce this consent decree by filing an appropriate motion, and the Court may grant such relief as may be equitable and just having due regard for the remedial purposes of this decree and the circumstances at the time of the motion." *Id.* ¶ 69, PageID.135.

The Consent Decree makes clear that the Monitor is not empowered to take over or administer the operations of the Union generally or to exercise any authority over its day-to-day activities:

> The United States and the UAW agree that honest and duly-elected officials of the UAW are the best equipped to collectively bargain on behalf of its members and to enforce said agreements vigorously and aggressively. To that end, the United States and the UAW agree that the UAW shall continue to negotiate and administer its collective bargaining agreements absent oversight or approval from the United States government . . .

with the caveat that oversight of bargaining activity is allowed as "may be necessary to ensure the elimination of fraud, corruption, or illegal conduct." *Id.* PageID.109. Recognizing that independence, the Decree states that, although the Monitor has the right to be notified of all IEB meetings and to tell the membership about the Union's officers' activities,

> [t]he Monitor shall not be entitled to attend or listen to meetings or portions of meetings protected by the attorney-client privilege or concerning collective bargaining strategy[, and t]he Monitor shall keep confidential any information learned during IEB meetings, except as may be necessary to carry out of his, her, or their functions as set forth herein.

*Id.* ¶ 55, PageID.131. And with respect to any charge brought by the Monitor and decided by the Adjudications Officer, the IEB "retains the right to hire counsel of its choosing." *Id.* ¶ 54, PageID.130.

The Consent Decree does not place the Union in receivership, and the Monitor is not authorized to perform the functions of a receiver. Nor is the Monitor an agent of the United States. Instead, the Monitor was appointed to assist the Court in the enforcement of the Consent Decree's objectives of rooting out corrupt and unethical practices. The Decree nevertheless equips the Monitor with the tools receivers have at their disposal for achieving those ends in analogous circumstances:

> The Officers and his/her/their designee(s) shall, in addition to the powers and duties enumerated in this decree, have all of the powers, privileges and immunities of a person appointed pursuant to Rule 66 of the Federal Rules of Civil Procedure and which are customary for court appointed offices performing similar assignments.

*Id.* ¶ 27, PageID.118-19. The Monitor is not an operations officer, but he shares investigative and charging duties with Union leadership, and he is vested with broad inquisitorial powers to inquire into the Union's business affairs, with narrow exceptions.

Notably, the UAW Constitution vests in the IEB and its President authority to investigate complaints and appeals regarding misconduct by Union officers that may implicate violations of the UAW Ethical Practices Code. *See* UAW Const., Art. 32, § 5, ECF No. 128-17, PageID.2520-21. The IEB President also is authorized to investigate complaints about the operations of any subsidiary of the International Union or officers thereof, and in that capacity the President is empowered to compile from the Union's records all pertinent information relevant to a charge of impropriety. *See* UAW Const., Art. 33, § 1; *id.* § 3(d), PageID.2528; *see also id.* at 2527.

Early on in the proceedings in this case, the Union sought, without opposition, an order under the authority of Federal Rule of Evidence 502(d) declaring that any production of privileged material to the Monitor would not be deemed to constitute a waiver of the attorney-client privilege. The Court granted that motion on August 11, 2021. *See* Order Governing Disclosure of Privileged Materials, ECF No. 40, PageID.399 ("The UAW may provide privileged or otherwise legally protected information to the Monitor in connection with this case, and it shall notify the Monitor what information, if any, it shares with the Monitor that it believes is privileged or otherwise protected. The UAW's production to the Monitor of any privileged or otherwise protected information, including information protected by the attorney work product doctrine, shall not be deemed a waiver by the [Union] in this or any other federal or state proceeding of any claim of privilege or protection, including but not limited to the attorney-client privilege and the work product doctrine.").

B.

In his present motion, the Monitor represents that between February and July 2024, he began several investigations of alleged impropriety by current members of the IEB, concerning (1) allegations by the President that the Secretary-Treasurer improperly delayed or denied remuneration for valid expense reports submitted by the President and other Union officials, and that the Secretary-Treasurer threatened to deny other valid expense claims unless IEB members voted in favor of initiatives favored by her; (2) counter-allegations that the IEB voted improperly to strip authority from the Secretary-Treasurer's office at the instigation of the President, allegedly in retaliation for the Secretary-Treasurer's complaints about improper expenditures of union funds; (3) additional allegations that the President improperly stripped an IEB Vice President of authority over ongoing contract negotiations between the Union and automaker Stellantis, allegedly because the Vice President refused to accede to the President's demands that the VP support certain initiatives before the IEB that would have resulted in personal benefits for the President and members of his family; and (4) allegations that an IEB Regional Director embezzled union funds by using a UAW-issued credit card for personal expenses.

The Monitor says that he made document requests in connection with the various investigations and that the Union produced disclosures indicating that it had identified between 10,000 and more than 100,000 electronic records responsive to each of the requests. However, the Union produced only token portions of the records right away. The Monitor represents that, despite repeated consultations and meetings involving the UAW's counsel, the Monitor and his counsel, and government counsel, the Union has withheld the lion's share of the productions, delaying the Monitor's investigations by many months, ostensibly on the sole ground that the

Union needs to review all of the documents to determine if any may be subject to withholding based on claims of privilege.

The Monitor says that he told Union officials that he would have to seek Court intervention, and in fact he telegraphed that intention in his Ninth Report to the Court filed on June 10, 2024. *See* ECF No. 124, PageID.2321. In an apparent attempt to head off the Monitor's demand for Court intervention, the Union made a race to the courthouse by filing its motion for clarification of the consent decree on July 3, 2024. The Monitor followed with his motion for enforcement filed on July 8, 2024. The case has, for the most part, lain dormant in its present post-judgment posture, and the parties' cross-motions are the only matters presently pending before the Court.

II.

The Monitor urges the Court to interpret the Consent Decree as conferring upon him the unfettered authority to obtain direct and immediate access to all of the defendant's documents without regard to whether the Union has or intends to assert any claim of privilege. The government largely echoes the Monitor's arguments. The UAW, in its motion to "clarify" the Decree, maintains that paragraph 55 affords it a right to review and designate all materials responsive to the demand for potential privilege claims prior to production, and it argues that the Monitor's authority granted by paragraph 29 to obtain access to information held by the Union is conditioned on the Monitor's bringing of "charges," not his pursuit of "investigations."

"'A consent decree has attributes of both a contract and of a judicial act.'" *Evoqua Water Techs., LLC v. M.W. Watermark, LLC*, 940 F.3d 222, 229 (6th Cir. 2019), *cert. denied*, 140 S. Ct. 2762 (2020) (quoting *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983)). "'Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms.'" *Ibid.* (quoting *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971)). "'[T]he

scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.'" *Ibid.* (quoting *Armour*, 402 U.S. at 682). "The consent decree is a judicial act because it 'places the power and prestige of the court behind the compromise struck by the parties.'" *Ibid.* (quoting *Williams*, 720 F.2d at 920).

"In the absence of controlling federal law, contractual interpretation of [a] [c]onsent [j]udgment is governed by [state] law," and "[u]nder Michigan law, '[t]he primary goal in the construction or interpretation of any contract is to honor the intent of the parties.'" *Ibid.* (quoting *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 127 n.28, 517 N.W.2d 19, 29 n.28 (1994)). "A court 'must look for the intent of the parties in the words used in the instrument.'" *Ibid.* (quoting *Michigan Chandelier Co. v. Morse*, 297 Mich. 41, 49, 297 N.W. 64, 67 (1941)). "[D]istrict courts retain jurisdiction to enforce their own orders, including [consent judgments entered by their authority]." *City of Highland Park v. EPA*, 817 F. App'x 42, 51 (6th Cir. 2020) (citing *Pedreira v. Sunrise Children's Servs., Inc.*, 802 F.3d 865, 871 (6th Cir. 2015) ("[W]hen a court enters a consent decree, it retains jurisdiction to enforce the decree.")).

A court's power to enforce a consent decree includes the "inherent equitable power to modify a consent decree if satisfied that the decree 'has been turned through changing circumstances into an instrument of wrong.'" *Waste Mgmt. of Ohio*, 132 F.3d at 1146 (quoting *United States v. Knote*, 29 F.3d 1297, 1302 (8th Cir. 1994)). This power arises from the "injunctive quality of a consent decree," which "compels the approving court to . . . modify the decree if 'changed circumstances' subvert its intended purpose." *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1018 (6th Cir. 1994) (quoting *Williams*, 720 F.2d at 920). "[E]ven if the consent decree does not expressly grant the district court jurisdiction to modify the decree, it is well-settled that 'courts retain the inherent power to enforce agreements entered into in settlement

of litigation pending before them.'" *Ibid.* (quoting *Sarabia v. Toledo Police Patrolman's Ass'n*, 601 F.2d 914, 917 (6th Cir. 1979)). Whether a situation rises to the level where judicial modification is appropriate "is a factual issue for the district court to decide in the first instance." *Waste Mgmt. of Ohio*, 132 F.3d at 1146.

The Monitor (and the government) places heavy emphasis on the language in paragraph 27 of the decree, which grants him "all of the powers . . . of a person appointed pursuant to Rule 66 of the Federal Civil Procedure and which are customary for court appointed officers performing similar assignments." ECF No. 10, PageID.119. He believes that the reference to Rule 66, which deals generally with receivers, compels the conclusion that the Monitor "stands in the shoes" of the IEB and the Union president, allowing him to waive any privileges that the Union seeks to assert here. He points to cases in which a receiver was appointed over an entity and allowed to "tak[e] possession of all its property and becom[e] its manager," *Digital Media Sols., LLC v. S. Univ. of Ohio, LLC*, 59 F.4th 772, 779 (6th Cir. 2023), and had "the power to waive the attorney-client privilege on behalf of the [entity, which] passe[d] to the receiver," *United States v. Graf*, 610 F.3d 1148, 1157 (9th Cir. 2010) (citations omitted).

That argument is not particularly compelling here, however. Rule 66 merely states that "the practice in administering an estate by a receiver or similar court-appointed officer must accord with the historical practice in federal courts or with a local rule." Fed. R. Civ. P. 66; *Digital Media*, 59 F.4th at 778. It says nothing about a receiver's authority. And a receiver's powers are not defined under common law. *Huntington Nat'l Bank v. Buccaroo LLC*, No. 22-11290, 2023 WL 11963650, at *1 (E.D. Mich. Oct. 18, 2023). Instead, a "receiver is the fiduciary agent of the court with limited powers which are defined by the order of his appointment." *Federal Sav. & Loan Ins. Co. v. PSL Realty Co.,* 630 F.2d 515, 521 (7th Cir.1980). And "[a]s an officer of the court,

the receiver's powers are coextensive with his order of appointment," *Liberte Cap. Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006) (citing 13 *Moore's Federal Practice* ¶¶ 66.02-.03 (3d ed.1999)), nothing more, nothing less. As stated earlier, though, the Union is not in receivership, and the Monitor is not a receiver. That reality — and paragraph 27 itself — merely leads us back to the Consent Decree to determine the Monitor's authority to override the Union's privilege claims.

Fortunately, the Consent Decree provides a path to an answer. Paragraphs 28 and 29 vest the Monitor with "the authority and duty to remove fraud, corruption, illegal behavior, dishonesty, and unethical practices from the UAW and its constituent entities," and "the right and authority of the UAW International President and IEB to bring charges seeking to discipline, remove, suspend, expel, fine or forfeit the benefits . . . of any UAW International officer" suspected of engaging in conduct that may violate the law or the injunctive prohibitions of the decree. *Id.* at 119. Under the UAW Constitution, the President of the IEB is authorized broadly to obtain any information from the Union and its constituent entities needed to pursue investigation and adjudication of complaints of misconduct by international or local officials. *See* UAW Const., Art. 32, § 5, ECF No. 128-17, PageID.2520-21 ("[T]he member shall submit their complaint to the International Executive Board through the International President who shall forward a copy of the complaint directly to the Chairperson of the Public Review Board. *The International Executive Board shall have the initial responsibility for investigating the complaint*."); *id.*, Art. 33, § 1; *id.* § 3(d), PageID.2528 ("The International President may, in his discretion, decide an appeal [challenging actions by lower Union officials] [and] [i]n such a case, the International President *may designate a representative to conduct any investigation or hearing deemed necessary*, in accordance with the procedures of this Subsection. The International President *shall base their decision on the files*

*and records of the case*, and such briefs as may be submitted."); *see also id.* at 2527 ("Upon receipt of an appeal, the International President *shall secure* from the Local Union, Amalgamated Local Union or other subordinate body, *a complete statement of the matters at issue, including copies of all charges and records, minutes, transcripts of testimony and other material relating to the appeal*.") (emphases added).  The Union has not identified any provision of its charter that would prohibit the IEB or its President from freely accessing all records in the Union's possession, regardless of any potential assertion of privilege, and such a constriction of the Monitor's authority is, as the government and the Monitor point out, contrary to any reasonable interpretation of the Monitor's broad mandate to root out corruption and fraud in the Union's operations.

It is true that the Consent Decree carves out exceptions to the Monitor's broad investigatory authority to access information in the Union's possession, but none of those carveouts appear to apply in the circumstances of the present dispute.  The Decree provides for limitations on production of privileged material by officers related to their duties as officials of "outside boards and entities."  *See* Consent Decree ¶ 38, PageID.124 ("UAW officials serving on outside boards and entities are required to provide non-privileged records to which they are privy, subject to 14 days' written notice to the entity and to objection to the Court by that third party, upon request of the Monitor.").  But no one has suggested that the Monitor's document demands encompass that field, and that provision does not imply any generalized bar against production of privileged materials relating to the Union's internal operations or the conduct of IEB officers in their stations on the Union's own international board.  The Consent Decree also states that the Monitor shall not be allowed to attend personally any meetings that may involve privileged conversations or discussions about collective bargaining strategy.  *See id.* at ¶ 55, PageID.131 ("The Monitor shall not be entitled to attend or listen to meetings or portions of meetings protected by the attorney-

client privilege or concerning collective bargaining strategy."). Certainly, the Monitor is not empowered to insert himself into labor negotiations, and the Union may protect from disclosure the documents that reflect the substance of such meetings. But that narrow carveout says nothing about prohibiting the Monitor from having full access to other *documents* and *information* in the Union's custody. And the Monitor may in some instances have access even to those materials when "necessary to ensure the elimination of fraud, corruption, or illegal conduct." Consent Decree, ECF No. 10, PageID.109. Recall, for instance, that one of the instigating incidents leading to this case was the acceptance by Union executives of payments from employers, including FCA US, LLC (Chrysler), in exchange for compromising negotiations over bargaining agreements in ways that favored the employer over rank-and-file union members.

The Union has not suggested that the document demands at issue here encompass minutes or other recordings of meetings that are protected by the attorney-client privilege. Emails, messages, and letters that might discuss such meetings would not fall within that rubric. Beyond the carveout protecting minutes and recordings of meetings on certain protected topics, the assertion of the attorney-client privilege does not make much sense in the context of the investigative authority that the Consent Decree confers upon the Monitor, which, as discussed earlier, is coextensive with that of the Union president and the IEB. It is well recognized that the privilege may be used only to withhold evidence to the extent that preventing the disclosure is consistent with the purpose of the privilege. *Fisher v. United States*, 425 U.S. 391, 403 (1976) ("[S]ince the privilege has the effect of withholding relevant information from the fact-finder, it applies only where necessary to achieve its purpose."). The Monitor presently is conducting what amounts to an internal investigation, discharging his duty to the Court to carry out the objectives of the Consent Decree. The federal decisions on point have recognized that allowing information

to be withheld from court-appointed officers like the Monitor would be inconsistent with the full exercise of the investigatory and supervisory powers of such officers, and that the privilege therefore must yield to the supervisory imperative where necessary for a court-appointed officer to fulfill his mandate, particularly where fraud or malfeasance is suspected. *E.g.*, *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 354 (1985) ("Respondents contend that the trustee can adequately investigate fraud without controlling the corporation's attorney-client privilege. They point out that the privilege does not shield the disclosure of communications relating to the planning or commission of ongoing fraud, crimes, and ordinary torts. The problem, however, is making the threshold showing of fraud necessary to defeat the privilege. Without control over the privilege, the trustee might not be able to discover hidden assets or looting schemes, and therefore might not be able to make the necessary showing."). The Union may not interpose the attorney-client privilege to withhold and screen or redact documents from the Monitor during the present investigation of the complaints outlined above, with the exception of minutes or other recordings of meetings that include attorney-client privileged communications or collective bargaining strategy.

The Union's argument that the Monitor's authority is limited to bringing "charges" only and does not embrace inquisitorial "investigation" of the basis for charges is contrary to both the law and common sense, since it would be impossible for the Monitor to assemble the basis for bringing a charge unless he is permitted unfettered access to information in the first instance to determine if grounds for charging exist. Certainly, once a charge is brought, the Union's obligation to produce documents is absolute. The Consent Decree declares: "The Monitor or Adjudications Officer *may require any component of the UAW*, or its constituent entities, or any officer, agent, representative, member or employee of the UAW or any of its constituent entities *to produce any*

*book, paper, document, record or other tangible object* for use in any hearing initiated by the Monitor or conducted by the Adjudications Officer." Consent Decree ¶ 37, ECF No. 10, PageID.123 (emphasis added). That language, however, cannot be read reasonably as narrowing or restricting the Monitor's investigatory authority. As the Supreme Court has explained, when considering the analogous situation of withholding of information by a debtor from a bankruptcy trustee based on assertions of privilege, "[i]t would often be extremely difficult to conduct this inquiry if the former management were allowed to control the corporation's attorney-client privilege and therefore to control access to the corporation's legal files." *Weintraub*, 471 U.S. at 353. Here, the Monitor is investigating complaints about alleged misconduct by Union leadership. The Consent Decree charges him with that responsibility. The Decree's "goal" of rooting out corruption and unethical conduct "would be substantially defeated if the [Union and the IEB] were to retain the one management power that might effectively thwart an investigation into their own conduct." *Id.* at 354.

Under the Consent Decree, the Union's right to screen, redact, or withhold documents demanded by the Monitor is extremely narrow. It is limited to those documents that are the functional equivalent of attending or listening to meetings that are protected by the attorney-client privilege or that involve collective bargaining strategy. That would amount to meeting minutes and recordings of such meetings. That narrow slice of documentation does not justify the extensive document review that the Union has undertaken in response to the Monitor's demands during the past year.

That is not to say that the Union is powerless to protect a larger tranche of documents from disclosure by the Monitor. Any concerns the Union may have about waiver of the privilege or unauthorized dissemination of privileged material are addressed adequately by the protective order

issued by the Court, which declared that the Union does not waive any claim of privilege by producing privileged information to the Monitor, and that the Monitor is prohibited from disseminating privileged material to the government, any third party, or the public without the Union's consent. In addition to the protections afforded by that order, any concerns about improper use of material subject to a claim of privilege may be addressed by the simple expedient of requiring the Monitor to give notice to the Union before disseminating any materials that conceivably could be subject to a colorable privilege claim, so that the Union may have an opportunity to assert the privilege if it so desires.

The Union may not delay the production of documents demanded by the Monitor for his use in investigating misconduct complaints except for minutes and recordings of meetings that specifically involve discussions of collective bargaining strategy or attorney-client privileged conversations. The Union's motion for "clarification" of the Consent Decree seeking a broader application of the privilege, or authorizing a production delay to facilitate a document review, is in substance a request for a modification of the terms of the Decree that would engraft into its language a broad prerogative to withhold purportedly privileged information from the Monitor. The defendant has not shown that any changed circumstances necessitate such a modification in order to avoid subverting the intended purpose of the Decree, and there are no grounds for such "clarification." *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1018 (6th Cir. 1994). Moreover, an interpretation of that nature would contradict the Decree's plain terms and would eviscerate its prophylactic mandate.

### III.

The Consent Decree confers upon the Monitor broad authority to investigate complaints of

fraud, corruption, illegal behavior, dishonesty, and unethical practices by the UAW and its constituent entities. To that end, the Monitor may demand that the Union produce documents and other materials that may inform his investigations. The Union may not delay production of those documents or materials to review them for any purpose, except for minutes and recordings of meetings that involve discussions of collective bargaining strategy or attorney-client privileged conversations.

Accordingly, it is **ORDERED** that the Monitor's motion to enforce the Consent Decree (ECF No. 128) is **GRANTED IN PART**. The defendant UAW must produce without further delay unredacted copies of all documents demanded by the Monitor that are responsive to the demands for production, except for minutes and recordings of meetings that involve discussion of collective bargaining strategy or attorney-client privileged conversations. Minutes and recordings of such meetings may be withheld temporarily so that the UAW may conduct an appropriate privilege review. If production of such minutes or recordings is redacted or refused, the UAW promptly must furnish an appropriately detailed privilege log.

It is further **ORDERED** that the Monitor may not disclose or disseminate any materials that could be subject to a colorable privilege claim unless it gives notice to the Union before dissemination, allowing a reasonable time for the UAW to object. If an objection is made, no dissemination may be made to any person or entity, including the government, absent further order of the Court.

It if further **ORDERED** that the defendant's motion to clarify the Consent Decree (ECF No. 127) is **DENIED**.

s/David M. Lawson<br>
DAVID M. LAWSON<br>
United States District Judge

Dated: December 16, 2024