**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-13293 |
| | ) | Honorable David M. Lawson |
| INTERNATIONAL UNION, UNITED | ) | |
| AUTOMOBILE, AEROSPACE, AND | ) | |
| AGRICULTURAL IMPLEMENT | ) | |
| WORKERS OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**MONITOR'S TWELFTH STATUS REPORT**

### TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

I. The February 20, 2024 Meeting ................................................................. 18

II. Allegations Against Secretary-Treasurer Mock ......................................... 22

    A. Denial of Expense Exception Requests .................................................. 23

        1. Relevant Policy ................................................................................ 24

        2. Secretary-Treasurer Mock's Approach to T&E Policy Exceptions........ 26

        3. Denial of Organizing Administrative Assistant Lauren Farrell's Taxi Expense Exception ................................................................................ 31

        4. Denial of Organizing Top Administrative Assistant Brian Shepherd's Flight Expense Exception .................................................................... 33

        5. Denial of Top Administrative Assistant to the President Chris Brooks's Pizza Expense Exception ...................................................................... 35

        6. Enhanced Corporate Cards ............................................................. 38

    B. Allegations of Mock's Delay and Obstruction .......................................... 41

        1. Procurement Policy ......................................................................... 42

        2. Conexion Contract (Media Buy in Chattanooga)................................ 44

        3. Feldman Strategies ......................................................................... 48

        4. Online Store .................................................................................... 50

        5. Signs .............................................................................................. 52

    C. Alleged Abuse of Authority to Influence Votes ......................................... 58

        1. Regional Director Green .................................................................. 59

        2. Regional Director Miller .................................................................. 62

III. Allegations Against President Fain ............................................................ 64

    A. The Stated Reasons for the Removal of Secretary-Treasurer Mock's Oversight Were Without Support .............................................................................. 65

    B. The Sanctions Against Secretary-Mock Were Premeditated and Cloaked .... 66

        1. President Fain and his Office Pre-Determined to Seek to Remove Departments from Secretary-Treasurer Mock's Supervision and then Closely Coordinated the Motion Before the IEB................................................................... 67

        2. President Fain and his Office Initiated and Influenced the Drafting of the Special Compliance Report................................................................. 75

    C. Further Evidence of Retaliatory Motivation............................................. 81

        1. The "Slit [Their] Fucking Throats" Incident ...................................... 82

2. Incidents Involving Two Additional Departments.................................................. 84

3. Anecdotes of Hostility Toward Secretary-Treasurer Mock..................................... 87

IV. CONCLUSION ........................................................................................................ 88

Pursuant to Paragraph 58 of the Consent Decree (Dkt. No. 10), the Court-appointed Monitor, Neil M. Barofsky, respectfully submits to the Court this twelfth status report ("Twelfth Report") concerning the monitorship of the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "Union" or the "UAW").

## INTRODUCTION

This Report presents the findings of the Monitor's investigation into the competing allegations of misconduct between UAW President Shawn Fain and Secretary-Treasurer Margaret Mock, the two seniormost officials in the Union.  For the reasons set forth below, the Monitor concludes that Mock was falsely accused of misconduct, subjected to retaliatory action by Fain, and improperly stripped of her responsibility for various departments and board assignments.  The allegations against her—centered on claims that she "weaponized" financial policies, obstructed Union operations, and sought to improperly influence Board votes—were either unsupported or outright unfounded.  Instead, the Monitor's investigation found that Mock consistently and strictly applied Union policy, guided by a commitment to accountability in the wake of the UAW's past financial scandals.  Her removal was not the result of dereliction of duty or dishonesty, but rather a consequence of her refusal to grant exceptions to the strict policy restrictions governing the expenditure of Union resources, including to those within Fain's inner circle.  As the investigation revealed, Fain acted on a premeditated plan to take action against Mock—one that aligned with Fain's earlier, widely reported warning that he would "slit [the] fucking throats" of anyone who interfered with his staff.  Fain followed through on that threat by orchestrating a coordinated effort to discredit and disempower a fellow elected officer.  Because these actions were unjustified and violative of the UAW's Constitution and Ethical Practices Code, the Union's International

1

Executive Board ("IEB" or "Board"), or one of the Union's appellate boards, should immediately reverse Fain's actions and return Mock's departmental responsibilities and board assignments.

At an IEB meeting on February 20, 2024, as part of the President's Report, Compliance Director Marni Schroeder presented a Special Compliance Report ("the Report") that detailed a series of allegations against Mock, including claims that Mock misused her financial oversight authority and obstructed Union operations. The Report specifically alleged that Mock engaged in a "pattern" of misconduct that was intended to politically "weaponize[]" various Union policies. This included charges that Mock refused to grant members of Fain's staff reimbursement exception requests for legitimate expenses and corporate cards with higher credit card limits. The Report also accused Mock of "abusing the authority of her office" to "delay, obstruct and even block" approvals for necessary Union activities, such as the purchase of media for an organizing campaign in Tennessee, the rollout of the UAW's online store, and orders for strike-related signage. The Report accused Mock of further abusing her position by conditioning the approval of otherwise legitimate expenses by other IEB members on their agreement to cast their IEB votes in favor of measures championed by Mock. Mock—who had received no advance notice that these allegations were to be levied against her at the IEB meeting and was not given an opportunity to participate in the investigation into her that resulted in the Report—responded to the allegations by stating that she always applied the Union's policies faithfully and consistently and denied any intent to obstruct approvals for legitimate Union business expenses. Fain rejected Mock's explanation, telling the IEB that she used financial policy to "inhibit and block and play games" rather than enforce standards.

After the Special Compliance Report concluded and several amendments to UAW policy were made in response to it, Regional Director Laura Dickerson introduced a motion that sought,

based primarily on the findings of the Special Compliance Report, to support the President's removal of all field assignments from Mock's oversight except those mandated by the UAW Constitution.   Regional Director LaShawn English seconded that motion.   Despite Mock's objections, the IEB adopted the motion, with one abstention and two opposing votes.

Following the meeting, Fain removed eleven departments from Mock's supervision, citing as support the IEB's motion and the UAW Constitution's provision that the "International President shall have power to withdraw any field assignment made to any elected officer when they become convinced that the officer has been derelict in their duty or been guilty of a dishonest act." Fain reassigned nine of those departments to himself, one department to Dickerson, and one department to English.  He also reassigned Mock's seats on the AFL-CIO and IndustriALL Global Union boards to English.

In response, Mock lodged allegations with the Monitor that Fain had instigated these actions in retaliation for, among other things, Mock's refusal or reluctance to authorize improper expenditures of funds at the request of and/or for the benefit of those in the President's Office. She further alleged that Fain was following through on previous retaliatory threats he had publicly made.  Mock also challenged the actions taken against her by filing an appeal under the UAW Constitution to the Union's Convention Appeals Committee ("CAC") and an Ethical Practices Code Complaint with the Union's Public Review Board ("PRB"), both of which have been held in abeyance by the Union pending the Monitor's investigation.

The Monitor initiated an investigation into the dueling allegations of misconduct between Mock and Fain.  While investigating these issues, the Monitor learned of various other allegations against both Mock and Fain that related to the initial claims under investigation.  As the Court is aware, the Monitor's investigation into these issues was delayed due to the Union's decision to

withhold documents on grounds of privilege, necessitating motion practice before the Court that ultimately led to the Court's decision on December 16, 2024, requiring the production of the withheld materials. Notwithstanding the Court's Order, the Monitor did not receive immediate production of all relevant documents. In fact, a number of relevant documents were not produced until May 9, 2025, and some document requests are still outstanding.[1]

This Report addresses the results of the Monitor's investigation into the allegations made against Mock in the Special Compliance Report, as well as Mock's allegations that Fain removed Mock's assignments in retaliation for her refusal to authorize certain expenditures.

**Allegations Against Secretary-Treasurer Mock**

The Special Compliance Report presented at the February 20, 2024 IEB meeting alleged financial misconduct in three categories: "weaponiz[ing]" the Union's expense policy by selectively denying reimbursement exceptions for political purposes; obstructing the work of other departments by intentionally delaying approval of vendors and purchases; and attempting to

---

[1] In furtherance of this investigation, the Monitor requested that the Union produce documents and e-discovery from approximately 22 custodians. The UAW produced approximately 128,000 documents. Some of those documents were initially produced with redactions on grounds of privilege, but, following motion practice and the Court's December 16, 2024 Order, the UAW produced the previously redacted documents in full. *See* Monitor's Eleventh Status Report, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (Jan 13, 2025), Civil No. 20-cv-13293, ECF No. 151, at 2-3. On February 25, 2025, the Monitor sent clarifying requests for documents that had already been requested but not yet produced. On April 30, 2025, the Monitor asked the Union to confirm that it had produced all documents. The Union subsequently informed the Monitor that it had not. Indeed, as of the date of this Report, the Union still has not produced certain text and WhatsApp messages from approximately 5 custodians. However, the Monitor is issuing the Report without the benefit of these documents because too much time has already passed since the inception of the investigation and the need to exonerate Mock from the false charges against her. If the Monitor receives additional documents that impact the findings of this report, he will issue an update to the Court. In addition to requesting and reviewing relevant documents, the Monitor also interviewed 32 people during this investigation. The Monitor has not completed the embezzlement investigation involving a Regional Director described in the Monitor's Ninth Report because the Union has still not produced all requested documents. Monitor's Ninth Status Report, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (June 10, 2024), Civil No. 20-cv-13293, ECF No. 124, at 3-4.

4

influence Board votes by threatening to withhold expense approvals unless IEB members voted in support of Board measures supported by Mock.   After a thorough investigation, the Monitor concluded that these claims were almost entirely unsupported or unfounded.

The first category of allegations—that Mock "weaponized" the expense policy for political purposes—was wholly unsubstantiated.   The Special Compliance Report claimed that Mock denied certain policy exception requests—which are requests for reimbursement of expenses that violate Union policy—on a "politicized" basis.   Contrary to that claim, the Monitor found overwhelming evidence that Mock applied a consistent, policy-driven approach to all exception requests, regardless of the political affiliation of those making them.   As to the specific denials alleged in the Report, the Monitor's review of documents and interviews of witnesses confirmed that in each cited instance of a supposedly "politicized" exception denial, Mock sought and followed the advice of the relevant subject matter expert (the Union's long-standing Chief Accountant), applied the written policy by its terms, and based her decisions on fiscal discipline rather than personal or political motivations.   The evidence showed that Mock approved more than two-thirds of the expense exception requests reviewed by the Monitor and followed a uniform approach when evaluating them.   She consistently approved exceptions when compliance was not feasible (*e.g.*, an employee's UAW credit card was rejected), and denied exception requests when compliance with policy was possible but not followed (*e.g.*, an employee failed to obtain or provide a receipt).   Mock applied this methodology to employees in her own Office as well as in the President's Office and repeatedly emphasized to colleagues her commitment to strict adherence to policy in light of the Union's past financial scandals.   She described this approach as essential to restoring trust and preventing further misuse of funds.

The second set of allegations involved claims that Mock used her role to delay or obstruct the work of other departments.  The Monitor found no evidence that Mock improperly impeded or delayed any projects or purchasing decisions.  Instead, the delays cited in the Special Compliance Report reflected routine review processes and necessary due diligence carried out by Mock and her staff.  The Monitor's investigation also revealed that some of the allegations of delay or obstruction were attributable to Mock's adherence to Union vendor selection policies adopted in response to the fraudulent behavior that led to the Consent Decree, despite strong pressure from the President and his Office to set those rules aside.  Mock also adhered to the formal process that allowed appeals of her decisions.  For example, when Mock denied the approval of a sole-source vendor as a violation of Union policy, she did so promptly, working through the Christmas holidays to allow Fain to appeal her decision to the IEB, as Fain had stressed the importance he believed the contract held for the Union.  Although Mock was accused of unduly delaying the contract to the detriment of the Union, it was the President's Office that decided not to bid out the contract in a manner consistent with Union policy, and it was Fain who waited seven weeks to appeal her decision to the IEB.

The third set of allegations—that Mock attempted to condition expense approvals on Board members' votes for her initiatives through "direct and indirect threats"—was also unsubstantiated. Although the Special Compliance Report described this accusation as a "pattern of Secretary-Treasurer Margaret Mock trying to influence current or future Board decisions" and that the Compliance Department had "received reports from many" members of the IEB, the Monitor's investigation identified only two specific incidents.  In both, the Regional Directors in question explicitly denied that Mock had offered them a quid pro quo or expressly conditioned the granting of their expense requests in return for favorable votes.  Furthermore, in both instances, the

6

statements that they attributed to Mock that formed the apparent basis of the charge against her were not threatening on their face. As such, along with some apparent inconsistencies in their accounts, the Monitor found the Special Compliance Report's allegations that Mock had engaged in such activity to be not credible or supported.

Indeed, the only substantiated issue raised in the Special Compliance Report was an allegation that Mock selected yard sign designs for the Union's strikes of large automobile manufacturers in 2023 that were different from the ones proposed by the Union's Communications Department. Although the Monitor found that Mock was wrong to do so, this conduct on its own did not support a finding that she was "derelict" in her duties and thus did not justify the reassignment of eleven departments and two external board appointments.

Based on his investigation, the Monitor concludes that the material allegations against Mock lack factual support and fail to meet the constitutional threshold for reassigning her responsibilities—namely, a finding that she was either derelict in her duties or guilty of a dishonest act. The Union, through the IEB or otherwise, should therefore immediately reverse Fain's actions removing eleven departments from Mock's supervision and removing her from two board positions.[2]

**Allegations Against President Fain**

The Monitor's investigation also confirmed Mock's allegations that Fain, along with members of his Office, acted with retaliatory intent in removing departmental supervision and board assignments from Mock. According to Mock, her oversight of eleven departments and two external board positions was stripped in response to her refusal to approve certain expenditures

---

[2] Although the Monitor does not appear to have authority under the Consent Decree to compel such action, it could be accomplished by actions taken by Fain, the IEB, the PRB, or the CAC.

7

that violated Union policy. She further asserted that this action, in addition to punishing her, was intended to reduce financial scrutiny and controls, and to serve as a cautionary message to others who might resist similar requests from the President. The Monitor found that her allegations of unfair retaliation were substantiated by the evidence gathered throughout the investigation.

The Monitor's investigation found evidence of Fain's retaliatory intent through multiple avenues, including the unsupported and pretextual nature of the reasons given for Mock's removal in the Special Compliance Report, the premeditated and coordinated effort by Fain and his staff to cloak their influence over both the Special Compliance Report and the IEB motion to authorize the removal of her departments, and documented instances of hostility toward Mock and departments under her supervision.

To determine whether the actions taken against Mock were retaliatory, the Monitor first considered if the proffered, nonretaliatory justifications for doing so—that Mock was "derelict" in her duty—were valid. As noted above and detailed further below, the Monitor found that the Special Compliance Report's findings were almost entirely unsupported, and that Mock's actions, rather than constituting a dereliction of duty or a dishonest act, were consistent with established policy and the responsibilities of her office.

After determining that the stated reasons for punitive actions against Mock were invalid, the next step in the Monitor's review was to examine whether Fain acted on a good-faith—but mistaken—belief that the allegations against her were true, or whether the evidence indicated that he acted with illegitimate, retaliatory intent. The Monitor determined that Fain's intent was retaliatory after assessing how the allegations against Mock were assembled, how they were presented to the IEB, and how the removal of Mock's departments was ultimately carried out. As outlined in greater detail below, the Monitor found that the President's Office heavily influenced

8

the drafting of the erroneous Special Compliance Report, pretextually manipulated the Report to support an already-made decision to seek to remove Mock's assignments, and that Fain and his staff scripted the motion to support the removal of Mock's departments to make it appear that someone else was behind it.  In other words, the Monitor found, notwithstanding Fain's claim that he was acting in what he believed to be the best interests of the Union, compelling evidence of retaliatory and illegitimate intent.

Witness accounts and corroborating evidence established that the decision to remove Mock's oversight responsibilities was premeditated and made well in advance of the Special Compliance Report that was later cited as its justification.  Multiple witnesses recounted conversations weeks in advance of the IEB meeting in which the President's Office discussed stripping departments from Mock's supervision.  For example, Dickerson confirmed that she had spoken with Fain weeks before the IEB meeting and agreed to make the motion to support the removal of Mock's departments, well before the Special Compliance Report was finalized. Dickerson confirmed that the findings in the Report played no role in her decision to support the motion and that she was not even aware of the Report until it was presented at the meeting itself— further indicating that the Report served merely to legitimize a decision already made.  In addition, evidence uncovered by the Monitor corroborated that Fain and members of his staff had discussed removing Mock's departments with additional UAW officials in advance of the Report.

As further evidence of retaliatory intent, Fain made statements to the Monitor that confirmed his intent to deliberately conceal his commanding role in the effort to remove Mock's departmental responsibilities. Rather than exercising his constitutional authority directly, as he later did when stripping a department from another IEB member, Fain told the Monitor that he approached Dickerson and English in advance of the February 20, 2024 IEB meeting and asked

9

them to move and second the motion to authorize the removal of Mock's departments. Fain acknowledged that he did so to make it appear as if they were the ones driving the motion, justifying his efforts to conceal his role by stating that he believed having Black women present the motion against Mock, who is also Black, would shield him from potential accusations of racism. According to Fain, "I thought it would be better coming from her than me, a white guy."

The Monitor also uncovered corroborating evidence that the motion brought by Dickerson at the February 20, 2024 IEB meeting was not independently conceived but carefully staged by Fain's Office. The evidence uncovered by the Monitor indicated that the language Dickerson read aloud, including its reference to the Special Compliance Report, was drafted in advance by Fain's top Administrative Assistant, Chris Brooks, in coordination with senior members of the President's team, and Fain then texted the language directly to Dickerson. Although presented as her own, Dickerson's motion used the language provided by Fain's staff, including a reference to the Special Compliance Report, even though Dickerson admitted that she had never seen nor considered the Report or its contents in advance of her agreeing to make the motion.

As to the Special Compliance Report itself, the Monitor's evidence demonstrated that it was heavily shaped and substantially written by Fain's staff. Fain admitted that he went to Schroeder and asked her to "put together a list" of allegations against Mock to present to the IEB, and Brooks described the choice to issue a report as a "collaborative" decision between Fain and Schroeder. Brooks and other members of the President's staff gathered and submitted materials for inclusion in the Special Compliance Report and directed others to do the same. Brooks and Communications Director Jonah Furman were also actively involved in drafting a substantial portion of the Special Compliance Report, including the motions for policy changes included within it. According to Brooks, he provided edits to ensure the Report was "correctly

10

characterizing" what was happening in the departments. Documents uncovered by the Monitor also demonstrated that Furman provided substantive edits to portions of the Report, including deleting Schroeder's initial conclusions and drafting the entire concluding paragraph of the Report that emphasized its most damning finding—that Mock had allegedly improperly "weaponized" her role. This paragraph was read aloud verbatim at the meeting, and the charge of weaponization was quickly reiterated by Fain shortly after Dickerson made the motion to support the removal of Mock's departmental responsibilities.

The sloppy manner in which the Special Compliance Report was prepared further reinforces the Monitor's conclusions. The Report failed to take into consideration customary investigative steps, omitted exonerating and mitigating evidence, and ignored key witnesses. Among other shortcomings in the process as described in further detail below, Schroeder never contacted Mock or most of her staff during the preparation of the Report. Schroeder also failed to speak with the Chief Accountant or examine her documents to assess whether Mock's denial of exceptions followed policy guidance or represented an abuse of discretion. Had Schroeder done so, she would have learned that Mock had sought and followed the advice of the Chief Accountant for each of the allegedly "politicized and weaponized" decisions to deny expense reimbursement. Instead, Schroeder relied primarily on information provided by individuals aligned with the President's Office.

Ultimately, the Monitor concluded that the process by which the Report was prepared resulted in a pretext that was manipulated and shaped by the President's Office to support a decision that had already been made.

Finally, in further assessing whether Fain orchestrated the removal of Mock's departmental responsibilities and board assignments based on the good faith but mistaken belief that she acted

11

in dereliction of her duties, the Monitor examined prior statements and actions by Fain that could shed light on his state of mind.  In conducting that analysis, the Monitor identified additional instances that corroborated a finding of retaliatory intent.

For example, at a staff meeting involving hundreds of participants in late 2023, several attendees recalled Fain making a statement to the crowd he would "slit" or "cut" the "fucking throats" of anyone who "messed" with certain members of his core team.  Although Fain later said the statement was intended to be a lighthearted remark and characterized it as an expression of loyalty to his staff, attendees interviewed by the Monitor did not interpret it as humorous or rhetorical.  Some cited the statement as indicative of what Fain would do to those who opposed or challenged the prerogatives of the President's Office.

In two additional incidents, Fain was also reported to have expressed anger toward employees in departments overseen by Mock based on his belief that they were acting at Mock's direction.  In one case involving the Print Shop, an employee was subjected to verbally abusive behavior by Fain over a design issue.  The incident began after Fain had heard from Furman that Mock wanted her photo included alongside Fain's on the back of a publication outlining a tentative contract between the Union and a company.  Fain reportedly confronted the Head of the Print Shop in a tirade, demanding, among other things, that she tell him, "Who told you to put [Mock's] motherfucking photo on there? This is my motherfucking membership."  Witnesses stated that the interaction, during which Fain admitted he "got shitty," was aggressive and left staff in tears.  In another incident involving the Properties and Maintenance Department, Fain reacted with anger over the department's opposition to hanging a banner on Union property because they feared that doing so would void the Union headquarters' building warranty.  Fain believed this opposition

was the result of obstruction by Mock. These two departments were among those reassigned from Mock's oversight to Fain's.

The investigation also revealed additional reported examples of animosity from Fain toward Mock, including Fain repeatedly cursing at Mock. For instance, in one incident, a witness said that they heard Fain express frustration at Mock's insistence that she had a fiduciary duty to the members, telling her "Your only responsibility is to sign the fucking check."

Based on his investigation, the Monitor concluded that the removal of departmental responsibilities and board assignments from Mock's supervision was the result of retaliation by Fain.

**Deferral of Charging Decision**

The Monitor conducted this investigation into competing allegations of misconduct between the UAW's two most senior officers under his Court-ordered "duty to remove fraud, corruption, illegal behavior, dishonesty, and unethical practices from the UAW and its constituent entities."[3] Pursuant to that investigative mandate, the Monitor is empowered to lodge disciplinary charges for conduct that violates federal criminal laws; furthers the influence of a "barred person"

---

[3] Consent Decree, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (Jan. 29, 2021), Civil No. 20-cv-13293, ECF No. 10 ("Consent Decree") ¶ 28; *see also* Monitor's Initial Status Report, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (Nov. 11, 2021), Civil No. 20-cv-13293, ECF No. 49 at 45 ("Monitor's Initial Status Report"). As the Court recently explained, the Monitor has "broad authority to investigate complaints" of any such conduct. Consent Decree Enforcement Order, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (Dec. 16, 2024), Civil No. 20-cv-13293, ECF No. 150 at 19-20 ("Consent Decree Enforcement Order"); *id.* at 9 ("The Monitor is not an operations officer, but he shares investigative and charging duties with Union leadership, and he is vested with broad inquisitorial powers to inquire into the Union's business affairs, with narrow exceptions.").

as defined in the Consent Decree; interferes with the work of the Monitor or Adjudications Officer; or violates the UAW Constitution or other policies, such as the Union's Ethical Practices Code.[4]

Here, the Monitor has determined that the allegations of wrongdoing against Mock were substantially unfounded and that there was no evidence that Mock had "been derelict in [her] duty or been guilty of a dishonest act" such that there would have been any constitutional justification to withdraw the departments under Mock's supervision or remove Mock's board assignments.[5] Based on those findings, there is an imminent need for the Monitor to bring this portion of his investigation to a close.  As noted above, Mock has appealed to the Union's PRB and CAC,[6] each

---

[4] *See generally* Monitor's Initial Status Report at 45-48.  For the last category of charges, violations of the UAW Constitution and Ethical Practices Code, the Monitor's charges are referred for adjudication before the Union's Trial Committee: "Alternative resolution of disciplinary charges: a. In his or her sole discretion, in lieu of bringing charges before the Adjudications Officer as described below, the Monitor may refer Article 30 or Article 31 disciplinary charges for adjudication pursuant to the current rules in the UAW Constitution.  For any such referrals, within 14 days of a final disposition, the Monitor or the charged party shall have the right to appeal the determination to the Adjudications Officer and, if necessary, the Court pursuant to the procedures set forth in this decree. b. In cases of Article 30 or Article 31 disciplinary charges that do not involve possible violations of federal or state criminal law based on fraud, financial misconduct, corruption, obstruction of a federal investigation, a violation of 18 U.S.C. §§ 1951 or 1954, or a violation of 29 U.S.C. §§ 186 or 501, the Monitor shall refer the charges for adjudication pursuant to the current rules in the UAW Constitution.  For any such referrals, within 14 days of a final disposition, the Monitor or the charged party shall have the right to appeal the determination to the Adjudications Officer and, if necessary, the Court pursuant to the procedures set forth in this decree."  Consent Decree ¶ 30; *see also* UAW Const. arts. 30-31.

[5] UAW Constitution, art. 13, § 4.

[6] Initially, Mock brought two appeals: one, an Article 33 appeal before the Convention and Appeals Committee ("CAC"), alleging that the IEB violated Article 13, Section 4 of the UAW Constitution by finding her "derelict in [her] duty," and two, an appeal before the IEB asking the IEB to overturn Fain's removal of her departments as infringing upon the constitutional duties of the Secretary-Treasurer.  *See* Article 33 Appeal to the Convention Appeals Committee (filed Mar. 21, 2024) ("Mar. 21 CAC Appeal"); Appeal to International Executive Board from February 23, 2024 Decision and Action of International President Shawn Fain (filed Mar. 21, 2024) ("Mar. 21 IEB Appeal").  Later, Mock appealed to the Public Review Board, alleging violations of due process and unethical treatment. *See* Alleged Violations of UAW Ethical Practices Code (filed Apr. 14, 2024) ("Apr. 14 PRB Appeal").  *See also* Article 33 Appeal to the Convention Appeals Committee re Chief Accountant Hiring (filed Oct. 15, 2024) (challenging the IEB's order requiring Mock to hire an alternative candidate for Chief Accountant); Additional Alleged Violations of UAW Ethical Practices Codes (filed Dec. 8, 2024) (challenging Fain's actions, including removing Mock as chair of the Investment Advisory Committee, berating Mock for cooperating with the Monitor, and criticizing Mock's efforts to implement a budget).

of which has the authority to overturn the decision to withdraw departments from Mock's supervision and remove her board assignments.[7]  However, in consultation with the Monitor, the Union has held Mock's appeals in abeyance and deferred advancing them for appellate review pending conclusion of the Monitor's investigative work.[8]  The Monitor urges the immediate restoration of Mock's oversight of these departments by Fain or the IEB itself, and if that fails to happen, strongly encourages the PRB and CAC to order that remedy.

The Monitor has also found that the actions of the Union's President and members of the President's Office were retaliatory.  Although the Union's Ethical Practices Code includes retaliation as a potential predicate for disciplinary action,[9] the Monitor is deferring bringing charges under the applicable standards at this time.  Since the Secretary-Treasurer's allegations were first made, various other allegations concerning a retaliatory pattern of conduct concerning the President and the President's Office have been made.  Due to delays in that investigation caused

---

[7] UAW Const. art. 32, § 3(a) ("The Public Review Board shall have the authority and duty to make final and binding decisions on all cases appealed to it . . . and to deal with matters related to alleged violation of any UAW Ethical Practices Codes."); *see, e.g.*, *Gaston-Kelley v. UAW DaimlerChrysler Department*, PRB Case 1476 II, at 23 (granting reinstatement); *Franklin v. UAW Stellantis Department*, PRB Case 1853, at 18 (the same); *Jefferson*, CAC, session 3/02 (reinstating a grievance).

[8] Ordinarily, appeals against an International Officer are investigated and decided by the IEB before subsequent appellate review by the CAC or the PRB.  UAW Const., art. 33, §§ 2(a), 3(d).  However, to avoid interfering with the Monitor's investigation, the Union has held Mock's appeals in abeyance until the Monitor has concluded his investigation.  Letter from Top Administrative Assistant to the International President to Counsel for the Secretary-Treasurer (Apr. 16, 2024) ("UAW Letter of Abeyance").

[9] UAW Ethical Practices Codes, Democratic Practices § 5; *see Local 2320 v. UAW International Executive Board*, PRB Case 1873, at 14-15 (agreeing that claims of retaliation can be brought under the Ethical Practices Codes); *Gainer v. UAW National General Motors Department*, PRB Case 1635 (entertaining a retaliation claim under the Ethical Practices Codes).  The Ethical Practices Code also contemplates potential violations for unethical treatment and failure of due process.  UAW Ethical Practices Code, Democratic Practices § 3; *see, e.g.*, *Gaston-Kelley v. UAW DaimlerChrysler Department*, PRB Case 1476, at 20 ("We agree with Gaston-Kelley that the protection afforded by the Ethical Practices Codes goes beyond freedom from invidious discrimination or political reprisal. A UAW member does have the right to expect ethical treatment by the Union."); *Franklin v. UAW Stellantis Department*, PRB Case 1853, at 14 (finding that appellant's removal from her appointed position was inconsistent with the Ethical Practice Code's guarantee of due process).

15

by the Union, the Monitor is still in the process of investigating those allegations, including but not limited to claims made by Vice President Boyer that Fain also retaliated against him by removing the Stellantis Department from his oversight.[10] For now, the Monitor has determined to defer any charges as those investigations continue. The Monitor will provide the Court with further updates on those activities in a future report.

**The Union's Review of This Report**

Consistent with past practice, the Monitor provided a draft of the factual portions of this report to the Union on May 30, 2025, to confirm the factual accuracy of the findings of this report, and to allow the Union, Fain, and Mock to identify and correct any alleged factual inaccuracies before publication. The Monitor consistently follows this practice because so much of the investigation is dependent on information and documentation provided by the Union itself, and, as noted above, the document production in this investigation was both voluminous and incomplete, raising the possibility that the Union or the individuals alleged to have engaged in misconduct might have access to other documents or information that would shed further light on the evidence presented in this report. As with his prior reports, the Monitor requested that the Union submit any corrections in writing, supported by appropriate documentation, and asked the Union to provide feedback to the Monitor by June 6, 2025. Previously, the Union has meaningfully engaged in this process by submitting proposed written redline edits or other written comments identifying alleged factual errors or omissions—but for this report, the Union declined to follow that process.[11]

---

[10] Article 33 Appeal to International Executive Board (filed Jun. 27, 2024); Brief in Support of Monitor's Motion to Enforce the Consent Decree, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (Jul. 8, 2024), Civil No. 20-cv-13293, ECF No. 128 at 5-8.

[11] On June 6, 2025, the Union responded to the Monitor's May 30, 2025 request for feedback, stating that "[t]here are so many factual and other issues with the report that a back and forth by email would not be productive," and requested instead that the Monitor receive feedback in an in-person meeting with the UAW

Other than three members of the IEB who contacted the Monitor to further discuss their statements in this report, the Union opted to provide only limited, high-level feedback without documentary support, notwithstanding its General Counsel's assertion that there are "many factual and other issues with the report."[12]   In each instance where the Union provided relevant feedback, the Monitor has either accepted the Union's suggestion by modifying the draft report or identified the suggested edit and explained why it was rejected below.   After discussion with the U.S. Department of Justice ("DOJ") about the Union's responses to the draft report, the Monitor moved forward with filing this report, which reflects the information and input provided by the Union to the Monitor as of the date and time of its issuance.[13]

---

legal team, Compliance Director, President's Office, Secretary-Treasurer's Office, and any IEB member who would like to attend.  The Monitor responded that, although he would welcome the opportunity to promptly meet with that group, the Union's proposal to provide factual feedback during such a meeting was unworkable for numerous reasons, including because the group setting would not be an appropriate forum to receive such feedback, as that would inevitably create unnecessary pressure on individual witnesses to conform or change their accounts to the views expressed.  Moreover, the Union's requested meeting would require significant coordination to schedule and likely delay completion of the report for several weeks.  The Monitor reiterated that the most efficient way for the Union to identify any alleged factual inaccuracies or omissions was to do so in writing, consistent with past practice.  The Monitor also offered multiple times that, as an alternative to written comments, he would participate in a phone call or videoconference to receive the Union's feedback orally.  The Union did not provide detailed written comments on the report, nor did it accept the Monitor's offer to provide feedback orally, other than three IEB members who spoke with the Monitor after reviewing a draft of the report.  In addition, the Union still has not proposed dates for a meeting, notwithstanding that the Union promised to do so "shortly" in an email to the Monitor on June 10, 2025.

[12] President Fain was not among those who reached out to provide the Monitor feedback on the draft report.  To the extent that Fain challenges any part of his attributed statements in this report, the Monitor requested that a court reporter transcribe the Monitor's second interview with Fain so that there could be no discrepancy as to what was said.  Fain, however, stated that he would only participate in the interview if it was not transcribed.  In the interests of advancing the investigation, the Monitor agreed to proceed without a court reporter.

[13] In the limited feedback the Union provided to the Monitor in connection with this report, the Union said that "[i]t would be impossible to acknowledge that all the facts in the report are accurate because you have limited the role of the UAW Legal Department in the investigation by not disclosing witnesses to us, excluding us from interviews and not sharing documents with us."  The Monitor invited UAW counsel to attend nearly all witness interviews, and UAW counsel was indeed present for the interviews of more than 90% of the witnesses in this investigation.  Certain witnesses, however, expressly requested that UAW

17

I.      **The February 20, 2024 Meeting**

The agenda for the February 20, 2024 IEB meeting listed "Compliance Report" as an item for discussion, which is a standing agenda item for quarterly IEB meetings.[14] Beyond a notation that "donations" would be covered, the agenda did not indicate that the report would differ from the one that Compliance Director Marni Schroeder usually presented at each IEB meeting.[15] Schroeder, however, did not wait to present the Special Compliance Report as part of her Compliance update. Instead, it was delivered as part of the "President's Report" section of the meeting and was introduced by President Shawn Fain as "some compliance issues that need[ed] to be discussed."[16]

Compliance Director Schroeder largely read a written version of the Report into the record, pausing at different intervals to advance motions for policy changes, which were also included in the Report, arising out of her findings. First, Schroeder said that the "most concerning big picture issue that has been brought to my attention is the Secretary-Treasurer's attempts or apparent attempts to use the authority of her office to influence Board members' votes," alleging that she learned about a "pattern of Secretary-Treasurer Mock trying to influence current or future Board decisions by making both direct and indirect threats that she will obstruct the transaction or deny an expense request if her fellow Board members do not vote the way she would like."[17] Next, Schroeder presented on examples of Secretary-Treasurer Margaret Mock allegedly "abusing the

---

counsel not be present. With respect to the Union's claim that the Monitor did not provide documents, the Monitor based his investigation on documents produced by the Union to the Monitor. As with the Union's other feedback, the Union did not further explain or provide any supporting documentation for this claim.

[14] *E.g.,* IEB Meeting Minutes (Nov. 28, 2023).

[15] IEB Meeting Agenda (Feb. 20-22, 2024).

[16] IEB Meeting Minutes (Feb. 20, 2024).

[17] IEB Meeting Minutes (Feb. 20, 2024).

authority of her office" to obstruct the decisions of the IEB, such as alleged delays with ordering signs for the 2023 strike against the Big Three automobile manufacturers, the approval of "the purchase of the media buying in Chattanooga, Tennessee," and the launch of the UAW's online store.[18]   Schroeder then recommended a motion to change the UAW policy framework such that new and updated policies would not require the approval of the President or the Secretary-Treasurer before proposal to the IEB.[19]   In discussion on that motion, Mock was given an opportunity to respond to the allegations, saying she felt the need to "defend myself from the salacious attacks of our Compliance Director," noting that she "was never interviewed or asked any questions regarding any of what was said."[20]   Mock then proceeded to deny the Report's allegations that she had inappropriately delayed approval of the various items outlined by Schroeder, stating that she was merely following and implementing UAW policy.[21]

President Fain responded that Secretary-Treasurer Mock was not acting out of a desire to follow policy but rather to "inhibit and block and play games with this stuff."[22]   Next, Fain asked whether there was any further discussion on the motion.[23]   Regional Director Laura Dickerson began to raise a new motion before stopping herself, saying, "Actually I have another motion. So should we vote on this one first. And then I can bring my motion forward. Are you done with your

---

[18] IEB Meeting Minutes (Feb. 20, 2024).
[19] IEB Meeting Minutes (Feb. 20, 2024).
[20] IEB Meeting Minutes (Feb. 20, 2024).
[21] IEB Meeting Minutes (Feb. 20, 2024).
[22] IEB Meeting Minutes (Feb. 20, 2024).
[23] IEB Meeting Minutes (Feb. 20, 2024).

– okay, not yet?"[24]  Fain then proceeded to ask who was in favor of the current motion to change the UAW policy framework.  The IEB then passed the motion.[25]

Compliance Director Schroeder then resumed reading the Special Compliance Report and presented additional allegations against Secretary-Treasurer Mock, alleging that she "politicized and weaponized" the Union's Travel & Expense Reimbursement Policy ("T&E Policy"), after which Schroeder raised a motion to change the policy to allow each employee two automatic exceptions to the T&E Policy per calendar year and, because staff often reached their credit limit on business expenses, to increase UAW credit card limits to $12,000 a month for the Organizing Department and Communications Department staff.[26]  Further discussion by other IEB members ensued before the IEB approved the motion.[27]

Next, Compliance Director Schroeder presented the issue of members of President Fain's staff being denied Enhanced Corporate Cards by the Secretary-Treasurer's Office based on grounds that Schroeder alleged were "not true" and raised a motion to provide Enhanced Corporate Cards to Fain's seven Top Administrative Assistants under the T&E Policy.[28]  The IEB approved the motion.[29]

Compliance Director Schroeder next discussed various policy exception applications for reimbursement that were denied by Secretary-Treasurer Mock, all of which were for those in the President's Office, which Schroeder described as "inappropriate[]," and recommended a motion

---

[24] IEB Meeting Minutes (Feb. 20, 2024).
[25] IEB Meeting Minutes (Feb. 20, 2024).
[26] IEB Meeting Minutes (Feb. 20, 2024); Special Compliance Report (Feb. 20, 2024) at 3.
[27] IEB Meeting Minutes (Feb 20, 2024).
[28] IEB Meeting Minutes (Feb 20, 2024); Special Compliance Report (Feb. 20, 2024) at 4-5.
[29] IEB Meeting Minutes (Feb. 20, 2024).

to reverse these decisions.[30]  Mock responded that she adhered to the T&E Policy in making her

decisions, and, contrary to allegations that she had "politicized and weaponized" the policy when

denying requests for policy exceptions, explained that she had taken the same position for herself

and those in the Secretary-Treasurer's Office.[31]  Following additional discussion amongst other

IEB members, the IEB approved the exception requests.  Schroeder then finished delivering her

Report, concluding that "it is clear that compliance as a principle is being broadly misapplied and

weaponized for either personal, political or simple bureaucratic reasons."[32]

At the end of Compliance Director Schroeder's presentation, Regional Director Dickerson

again spoke up, and made—and Regional Director LaShawn English seconded—the following

motion:

> Based on the Compliance Report that we just heard and many of the challenges that
> have been expressed by many people sitting around this table throughout the day, I
> make a motion in support of President Fain withdrawing all of the field assignments
> assigned to the Secretary-Treasurer with the exception of any constitutionally
> mandated departments so that the Secretary-Treasurer can focus on complying with
> the core constitutional obligations of the office.[33]

Secretary-Treasurer Mock responded that the proposed motion would result in her

assignments being taken away for doing her job, protecting the membership, and following the

UAW's policies and procedures.[34]  President Fain then said Mock was withholding approval of

expense requests because she "didn't like the person or whatever and [she] weaponized it."[35]

---

[30] IEB Meeting Minutes (Feb. 20, 2024).

[31] IEB Meeting Minutes (Feb. 20, 2024).

[32] IEB Meeting Minutes (Feb. 20, 2024).

[33] IEB Meeting Minutes (Feb. 20, 2024).

[34] IEB Meeting Minutes (Feb. 20, 2024).

[35] IEB Meeting Minutes (Feb. 20, 2024).

Mock denied the allegation.[36]  After further discussion amongst other members of the IEB, Mock expressed that she was "extremely disturbed" that "this is being made based on items that just were levied at me that are not true."[37]  There was additional discussion amongst the Board before the IEB passed the motion, with Vice President Rich Boyer abstaining and Mock and Vice President Mike Booth voting against the motion.[38]

Following the February 20, 2024 IEB meeting, President Fain reassigned the Technical Office and Professional ("TOP") Department from Secretary-Treasurer Mock to Regional Director Dickerson and the Women's Department from Mock to Regional Director English.[39]  Fain also reassigned the following departments to his own Office: Purchasing, ITS, Print Shop, Warehouse, Benefits and Pensions, Auto/Labor Leader Insurance, Properties and Maintenance, Travel and Events, and Union Building Corporation and Properties Departments.[40]  He also reassigned Mock's board positions for labor organizations AFL-CIO and IndustriALL Global Union to English.[41]

## II.    Allegations Against Secretary-Treasurer Mock

The Special Compliance Report presented at the February 20, 2024 IEB meeting made three principal categories of allegations that Secretary-Treasurer Mock engaged in financial misconduct:  (A) Mock allegedly "weaponized" the Union's expense policy by denying policy

---

[36] IEB Meeting Minutes (Feb. 20, 2024).

[37] IEB Meeting Minutes (Feb. 20, 2024).

[38] IEB Meeting Minutes (Feb. 20, 2024).

[39] President's Office Organizational Chart (Dec. 10, 2024).  On August 6, 2024, President Fain reassigned the Purchasing Department to Vice President Chuck Browning.  Email from Union to Monitor (July 30, 2024).

[40] President's Office Organizational Chart (Feb. 23, 2024).

[41] M. Mock Interview (May 18, 2024).

exceptions for "politicized" purposes; (B) Mock allegedly used departments that reported to her to delay, obstruct, and block the work of other departments, "abusing the authority of her office. . . to tell other officers of the Board how to run their regions or departments"; and (C) Mock allegedly attempted to corruptly use her approval authority to influence Board members' votes, allegedly offering a quid pro quo in which she would approve certain expenses only in exchange for votes in her favor.[42] In the course of investigating these allegations, the Monitor learned of additional allegations against Mock as well, but determined that they were not substantiated.[43]

These three categories of allegations are addressed below. As detailed herein, the Monitor's investigation found that, other than Secretary-Treasurer Mock not implementing the Communications Department's proposed design for certain yard signs, none of the allegations of misconduct by Mock were substantiated or had merit. As a result, none of the allegations met the applicable standard to remove Mock's assignments under the UAW Constitution, which requires a finding that the Officer "has been derelict in their duty or was guilty of a dishonest act."[44] Accordingly, for these reasons alone, President Fain's actions should be immediately reversed, with each of the departments and assignments reinstated.

### A. Denial of Expense Exception Requests

The Special Compliance Report, as read by Compliance Director Schroeder at the February 20, 2024 IEB meeting, alleged that "the Travel and Expense Reimbursement policy has been

---

[42] Special Compliance Report (Feb. 20, 2024) at 1, 3, 5-6; IEB Meeting Minutes (Feb. 20, 2024).

[43] The Monitor investigated these other allegations of misconduct against Mock and found that they were unsubstantiated, determining that the actions complained of were generally the result of good faith and consistent application of Union policies by the Secretary-Treasurer or other steps taken to save the Union money. The Monitor is not including a detailed summary of the allegations and the Monitor's findings because the allegations were not raised in the Special Compliance Report and therefore were not part of the stated basis for finding Mock to be in dereliction of duty and the actions taken against her.

[44] UAW Const., art. 13, § 4.

politicized and weaponized by the Secretary Treasurer's office,"[45] and as a result "reasonable policy exceptions have been denied" by Secretary-Treasurer Mock.[46] Schroeder raised to the IEB various policy exception applications for reimbursement that were denied by Mock, which Schroeder described as "inappropriate[]," and moved to reverse these decisions.[47]

This subsection first describes the T&E Policy in place at the relevant time, as well as the approach to exceptions under the policy taken by Secretary-Treasurer Mock; it then addresses the specific allegations of improper exception denials made against Mock.

### 1.    Relevant Policy

The Union adopted its T&E Policy in April 2021 in the aftermath of the criminal convictions of UAW officials for abuse of the previous version of that policy.[48] The 2021 version of the policy covers the reimbursement of expenses related to travel and other business-related costs for all UAW employees.[49] At all times relevant to the Monitor's investigation,[50] the policy covered all employees at the staff level or higher who were provided with a UAW-issued corporate card.[51] The T&E Policy contained the following relevant provisions:

---

[45] Special Compliance Report (Feb. 20, 2024) at 3.

[46] Special Compliance Report (Feb. 20, 2024) at 5; IEB Meeting Minutes (Feb. 20, 2024).

[47] IEB Meeting Minutes (Feb. 20, 2024).

[48] Monitor's Initial Status Report at 89-90, 109, 126-27.

[49] Monitor's Initial Status Report at 126-127.

[50] Version 1.0 was in effect from April 28, 2021, until Version 1.1 was approved on June 6, 2023. Version 1.1 was in effect until February 20, 2024, and covers the time period relevant to the accusations in the Special Compliance Report. References to the policy discussed herein are to those versions of the policy, which do not meaningfully differ. The only change between the two versions that is material here is that Version 1.1 specified the supervisors for employees' expense reports. Version 1.1 also added that "[o]n a quarterly basis, the UAW Compliance & Ethics Committee will review all processed expense reports and supporting documentation for the President and Secretary-Treasurer to ensure compliance with UAW policies." T&E Policy (Version 1.1) at 13.

[51] T&E Policy (Version 1.0, 1.1) at 2.

- The policy required that the UAW corporate credit card be used for all travel and other business-related expenses related to UAW business.[52]

- The policy provided that an itemized receipt must be attached to the expense report for all transactions and specifically stated that "[o]ut-of-pocket expenses submitted without receipts will not be reimbursed."[53]

The policy also contained various provisions relating to exceptions:

- The policy discouraged exceptions by providing that "[i]ndividual exceptions to this policy are not expected."[54]

- The policy further stated that, where an exception is requested, "the employee must notify their supervisor and such requests must be approved in advance by the President or Secretary-Treasurer as outlined in the Policy Framework."[55]

- The policy provided that, if there is an "emergency where preapproval is not possible, the employee must alert their supervisor and ultimately the President or Secretary-Treasurer as soon as reasonably possible of the exception once it has occurred."[56]

Further, the Union's "Request for Approval of Travel & Expense Policy Exception" form requires approval or denial and a signature from the Secretary-Treasurer.[57]  As a check on this authority, the UAW Constitution provides that the IEB "may rescind, reverse, or repeal any action of any of the International Officers or International Representatives," including the denial of a policy exception.[58]  Any decision by an International Officer can also be raised to the Union's Compliance and Ethics Committee, which has discretion to elevate to the IEB a recommendation

---

[52] T&E Policy (Version 1.0, 1.1) at 2.
[53] T&E Policy (Version 1.0, 1.1) at 6.
[54] T&E Policy (Version 1.0, 1.1) at 13.
[55] T&E Policy (Version 1.0, 1.1) at 13.
[56] T&E Policy (Version 1.0, 1.1) at 13.
[57] Request for Approval of Travel & Expense Policy Exception (Jan. 16, 2023).
[58] UAW Const., art. 12, § 18.

to reverse the decision, which the IEB can approve or deny.[59] Finally, Staff Council members can submit a grievance challenging a denial of a policy exception, which, after exhausting the grievance procedures outlined in the UAW Staff Manual, may ultimately be elevated to the IEB Appeals Committee for reconsideration.[60]

### 2.    Secretary-Treasurer Mock's Approach to T&E Policy Exceptions

One of the allegations in the Special Compliance Report is that the Secretary-Treasurer "politicized and weaponized" the T&E Policy by denying legitimate exception requests for political purposes.[61] In assessing that allegation, the Monitor examined the Secretary-Treasurer's overall process for evaluating requests for exceptions to provide context and determine whether she discriminated against certain people she politically disfavored, as alleged in the Special Compliance Report and reiterated by President Fain in his comments to the IEB, or if her approach to the cited exception denials was consistent with an overall nondiscriminatory approach. The Monitor found determinative evidence that Secretary-Treasurer Mock treated applications for exceptions under the same standards, consistently sought and followed expert advice and policy analysis on exception requests, and that there was no merit in the allegation that she "politicized and weaponized" these decisions by making them through a political filter based on who was asking for the exception.

According to Secretary-Treasurer Mock, her duty is to ensure the UAW's money is spent wisely and every dollar is accounted for.[62] As a result, she explained to the Monitor, if she cannot look at a UAW member and stand behind an action that bears her name, she would not go through

---

[59] Compliance and Ethics Committee Terms of Reference (Aug. 6, 2024).
[60] UAW Staff Manual (2016); C. Browning Interview (May 6, 2024).
[61] IEB Meeting Minutes (Feb. 20, 2024); Special Compliance Report (Feb. 20, 2024) at 3.
[62] M. Mock Interview (June 6, 2024).

with the action.[63]  Consistent with those comments by Mock, a staff member who has requested anonymity because they said they are fearful of retaliation by the President if they are identified in this report told the Monitor that, based on conversations with Mock, the staff member believes that Mock is "afraid" or "nervous" to allow numerous exceptions because of the history of corruption at the UAW.[64]  That staff member also told the Monitor that Mock has said that Mock is "not going to jail for anybody."[65]

During the investigation, Secretary-Treasurer Mock explained to the Monitor, and the Monitor confirmed, that the process for evaluating a request for an exception to the T&E Policy included Kim Geromin—the Chief Accountant and "second-in-command financial officer at the UAW" at the times relevant to the events at issue—reviewing the request and then providing a recommendation to Mock with a "short blurb" on the policy justification for Geromin's reasoning.[66]  Mock relied on Geromin, in part, because Geromin had been on UAW staff since 1994 and had held the Chief Accountant position since 2007.[67]  Before making a decision, Mock would then review the request, Geromin's recommendation, and the T&E Policy itself.[68]  Mock told the Monitor that she generally would follow Geromin's recommendation, which was corroborated by the documentary evidence reviewed by the Monitor:  it shows that for each of the exception denials cited in the Special Compliance Report as examples of Mock's alleged "politiciz[ation] and weaponiz[ation]" of the policy, Mock reviewed and implemented Geromin's

---

[63] M. Mock Interview (June 6, 2024).
[64] UAW Staff Interview.
[65] UAW Staff Interview.
[66] M. Mock Interview (Apr. 18, 2024); K. Geromin Interview (May 21, 2024).
[67] K. Geromin Interview (May 21, 2024).
[68] M. Mock Interview (Apr. 18, 2024); K. Geromin Interview (May 21, 2024).

27

recommendation, a fact not referenced in the Special Compliance Report.[69] Mock stated that she was generally inclined to deny any exception request that did not comply with the T&E Policy, and she was unwilling to give people special treatment, including herself.[70]

In addition, Geromin, the Union's Chief Accountant, explained to the Monitor that the historical decision to craft the T&E Policy to require staff to charge the UAW-issued card and submit receipts was to implement a financial control mechanism.[71] Geromin said that when the T&E Policy was first implemented, the Accounting Department was more lenient in enforcing this requirement.[72] However, after "almost a year with reminders," Geromin and her then-supervisor, former Secretary-Treasurer Frank Stuglin, determined that they either needed to "change policy or enforce policy."[73] They then began to enforce the T&E Policy more strictly.[74]

Documents were provided to the Monitor for 73 T&E Policy exception requests in 2023, which showed that, of these, Secretary-Treasurer Mock approved 50 and denied 23.[75] The Monitor's review of these decisions showed that Mock applied a consistent approach to them. Broadly speaking, Mock followed Chief Accountant Geromin's recommendations and approved requests where it was not feasible for the employee to comply with the policy.[76] For example, of the 50 exceptions reviewed by the Monitor that were granted in 2023, Mock approved 34 of them because an employee first tried to use their UAW credit card in compliance with the T&E Policy,

---

[69] M. Mock Interview (Apr. 18, 2024); K. Geromin Interview (July 25, 2024).
[70] M. Mock Interview (June 6, 2024).
[71] K. Geromin Interview (May 21, 2024).
[72] K. Geromin Interview (May 21, 2024).
[73] K. Geromin Interview (May 21, 2024).
[74] K. Geromin Interview (May 21, 2024).
[75] Chart of T&E Policy Exceptions (2023).
[76] Chart of T&E Policy Exceptions (2023).

but their card was rejected and they therefore had to use their personal credit card.[77] A typical example was where Geromin recommended that Mock approve an employee's exception request for reimbursement for using their personal credit card for tolls because, according to an email from Geromin to Mock, there are "some toll authorities that do not accept the UAW corporate card."[78]

By contrast, Chief Accountant Geromin recommended denying, and Secretary-Treasurer Mock subsequently denied, exception requests for noncompliance with UAW policy where compliance with the policy was possible but not followed. For example, in 2023, Mock denied one request where an employee exceeded the allowable cost of a business meal and another request for an employee who exceeded the number of permitted days for a car rental.[79] She also denied three separate requests for an employee in her department who was experiencing trouble with her UAW card and kept using her personal card, despite the employee having the ability to order a new UAW card.[80] Mock also consistently denied exception requests where employees did not comply with the policy due to claimed inadvertence or mistake. For example, in 2023, Mock

---

[77] Chart of T&E Policy Exceptions (2023).

[78] Email from K. Geromin to M. Mock (Feb. 14, 2024). In this example, instead of using their corporate card as required by the T&E Policy, the staff member charged tolls to their personal card because their UAW card was not accepted. Mock also granted an exception request for Todd Brien, her Executive Administrative Assistant and Chief of Staff, for paying the Union's wireless telephone bill on his UAW card rather than through the normal Purchasing Department process because the Union "had become overdue and needed immediate payment." Chart of T&E Policy Exceptions (2023); Request for Approval of Travel & Policy Expense Approval (June 15, 2023). The applicable policy at the time required that utility payments of this type and amount be processed by the Purchasing Department, which would typically pay the vendor by check. Threatened with the potential of immediate disruption to wireless telephone service for International staff because the payment was overdue, and due to concern that going through the standard process (i.e., ordering a check) would take too long, resulting in a suspension of service, Brien put the overdue payment on his UAW card. Email from Provider to Secretary-Treasurer's Office (June 15, 2023). In his exception request, Brien cited to the T&E Policy section that stated that "[t]he Corporate Card is to be used for legitimate union business that is directly related to the goals and mission of the union." T&E Policy (Version 1.0, 1.1) at 2.

[79] Chart of T&E Policy Exceptions (2023).

[80] Chart of T&E Policy Exceptions (2023).

denied nine requests for employees who claimed they accidentally used their personal credit card instead of their UAW card and three requests for employees who did not have their UAW credit card with them when making a purchase and had instead used their personal card.[81]

Secretary-Treasurer Mock also stated that she applied the same stringent rules to herself, not submitting expenses unless she had the necessary receipts.[82]  The Monitor verified, based on the documents produced by the Union, that in 2023 and up until the February 20, 2024 IEB meeting, Mock did not submit any exception requests on her own behalf.[83]

---

[81] Chart of T&E Policy Exceptions (2023).  In the limited feedback the Union provided to the Monitor in connection with this report, the Union stated that there were "facts that were excluded from the report," but the only example the Union cited in support of that claim was that the report did not include "greater context surrounding the Special Compliance Report including the numerous grievances filed by Staff Council and resolved by the IEB grievance panel."  As with the Union's other feedback, the Union did not further explain or provide any factual corrections or supporting documentation for this claim.  The Monitor did, however, review the Staff Council grievances filed in 2023 that were provided to the Monitor, and they do not alter the conclusions in this report.  Of the 23 exception request denials by Mock in 2023 that were reviewed by the Monitor, documents were provided for three that were grieved and elevated by staff members to the IEB Appeals Committee for reconsideration.  All three were previously reviewed by the Monitor in his initial analysis of T&E exception request denials and deemed consistent with Mock's approach of strict adherence with the T&E Policy.  Indeed, two members of the IEB Appeals Committee who reviewed these grievances in 2023 confirmed this conclusion.  One member, Regional Director Campbell, told the Monitor that the committee "appreciated that [Mock] was holding [staff] accountable to policy," stating that her "[d]ecisions came from [a] black and white reading of policies."  He said that even though the committee overturned Mock's denials, they "didn't disagree with [her] decisions."  Instead, Campbell said the committee "revisit[ed]" the expenses "to make sense [of them] in the real world."  B. Campbell Interview (June 20, 2024).  Another member of the committee, Vice President Browning, told the Monitor that he did not "think [Mock] acted outside what the policy is" but, as a member of the IEB Appeals Committee, he voted to overturn the denials to be "more understanding."  C. Browning Interview (May 6, 2024).  In 2023, the IEB Appeals Committee also considered five other grievances related to expense reimbursement requests, but those were unrelated to Mock, as they were denials by Mock's predecessor, Frank Stuglin, or expense requests that were denied by staff members' supervisors and were therefore not raised to Mock as T&E Policy exception requests.

[82] M. Mock Interview (Apr. 18, 2024).

[83] The Monitor requested documents from the UAW including all "Request for Approval of Travel & Expense Policy Exception" forms for certain custodians, including Mock.  The Monitor reviewed these documents and did not locate any exception requests submitted by Mock.

### 3.    Denial of Organizing Administrative Assistant Lauren Farrell's Taxi Expense Exception

The first example of an alleged improper expense denial cited by Compliance Director Schroeder in the Special Compliance Report to the IEB was the denial of an exception request submitted by Administrative Assistant Lauren Farrell, who is in the Organizing Department, which reports to the President, for taxi reimbursement without the submission of a receipt.[84]

This denial was consistent with the plain text of the T&E Policy.[85]   Administrative Assistant Farrell did not submit a receipt with her request, and Secretary-Treasurer Mock denied it.  Farrell said that she had requested an electronic receipt ("E-receipt") from the taxi service but never received one.[86]  The denial was consistent with the policy's requirements that "[e]xpenses without a receipt will not be the responsibility of UAW and must be submitted by the employee as a personal expense,"[87] and that "failure to attach itemized, legible expense receipt documentation will result in the rejection of the expense report."[88]  The policy contemplated the circumstance experienced by Farrell, stating that "[i]f the vendor does not provide E-receipts, or if the employee claims an expense paid for in cash or on his/her personal credit card, it is the employee's responsibility to obtain an itemized receipt for the transaction and submit such receipt with the

---

[84] IEB Meeting Minutes (Feb. 20, 2024); Special Compliance Report (Feb. 20, 2024) at 5-6.

[85] The Monitor does not take any position in this report whether, as a matter of discretion, any of the exception requests described in the Special Compliance Report should have been approved or denied. Instead, the Monitor reviewed the exception denials to determine if they were consistent with the applicable policy, and whether the intent behind the denials was political, as alleged.  As noted above, the Monitor has determined that Mock's denials were consistent with policy, were not politically motivated, and therefore could not have been in dereliction of her duty.

[86] Chart of T&E Policy Exceptions (2023).

[87] T&E Policy (Version 1.0, 1.1) at 6.

[88] T&E Policy (Version 1.0, 1.1) at 6.

expense report."[89]   The policy also says that "[i]ndividual exceptions to this policy are not expected."[90]

After Administrative Assistant Farrell made her request for an exception, Chief Accountant Geromin recommended to Secretary-Treasurer Mock, via an email reviewed by the Monitor, that she deny the exception request because Farrell did not provide an itemized receipt.[91]   Mock followed this recommendation and declined the request for reimbursement on December 8, 2023.[92] The Monitor also reviewed documentation related to other examples of exception requests for failure to submit a receipt, including an employee in Region 6 who did not provide a receipt for parking, an employee in the President's Office who did not submit a receipt for a taxi trip, and an IEB member who also failed to submit a receipt for a taxi.[93]   Indeed, the IEB member whose request was denied cited the same reason as Farrell—that they had requested an E-receipt but did not receive it.[94]   All of these exception requests were denied.[95]   In two instances reviewed by the Monitor where Mock *did* grant exception requests for taxis taken by employees—one employee in one of President Fain's departments and the other in Region 2B—the employees paid cash after their UAW cards were rejected but submitted receipts.[96]

In short, the Monitor's investigation showed that Administrative Assistant Farrell's exception denial was not an example of Secretary-Treasurer Mock "weaponizing" her office as

---

[89] T&E Policy (Version 1.0, 1.1) at 6.
[90] T&E Policy (Version 1.0, 1.1) at 13.
[91] Email from K. Geromin to M. Mock (Dec. 6, 2023).
[92] Request for Approval of Travel & Expense Policy Exception (Dec. 8, 2023).
[93] Chart of T&E Policy Exceptions (2023).
[94] Chart of T&E Policy Exceptions (2023).
[95] Chart of T&E Policy Exceptions (2023).
[96] Chart of T&E Policy Exceptions (2023).

alleged in the Special Compliance Report; instead, the denial was consistent with Union policy and Mock and Chief Accountant Geromin's overall approach to exceptions when an employee had not submitted a receipt.

### 4. Denial of Organizing Top Administrative Assistant Brian Shepherd's Flight Expense Exception

The second example of an allegedly politically driven expense denial cited in the Special Compliance Report—and also presented for reversal at the February 20, 2024 IEB meeting—was Secretary-Treasurer Mock's denial of an exception request submitted by Top Administrative Assistant Brian Shepherd in the Organizing Department, which is part of the President's Office. Shepherd sought reimbursement for an airline ticket, which he said was booked by his clerical on his personal credit card by mistake.[97]

This denial was also consistent with the UAW's policy and practice.  The T&E Policy states that the UAW-issued corporate card "must be used for all travel or other business-related expenses in connection with UAW business."[98]  Here too, the request went through the usual approval process, with Chief Accountant Geromin recommending that it be rejected.[99]  Geromin expressed in a December 13, 2023 email that she "would recommend that this request be denied because the employee had the ability to use their UAW credit card as required by the policy but did not."[100]  The rejection was consistent with the policy of denying exception requests when tickets are booked on a personal credit card, and Geromin made this recommendation even as she noted that a similar expense denial had recently been overturned by the IEB after escalation from

---

[97] Special Compliance Report (Feb. 20, 2024) at 6; Request for Approval of Travel & Expense Policy Exception (Oct. 24, 2023); IEB Meeting Minutes (Feb. 20, 2024).
[98] T&E Policy (Version 1.0, 1.1) at 2.
[99] Email from K. Geromin to M. Mock (Dec. 13, 2023).
[100] Email from K. Geromin to M. Mock (Dec. 13, 2023).

the Compliance and Ethics Committee.[101]  On December 18, 2023, the Secretary-Treasurer's Office emailed Top Administrative Assistant Shepherd that his request was denied because he "had the ability to use [his] UAW credit card but did not as required by the Travel & Expense Policy."[102]  In her interview, Secretary-Treasurer Mock confirmed that she denied this exception request because even though Shepherd claimed that it was a mistake made by someone in his office, it was Shepherd's responsibility to ensure he used the correct card consistent with Union policy.[103]

The Monitor verified that Secretary-Treasurer Mock consistently denied exception requests similar to Top Administrative Assistant Shepherd's where an employee or their clerical inadvertently used their personal credit card for UAW business, including for employees in Organizing, Citizenship Funds, Auditing, Region 6, Region 8, and Region 9.[104]  Although one could say that such strict application of the policy when an employee makes a "mistake" by using their personal credit card may appear rigid, it is also fairly easy to see how a different approach could result in these exceptions becoming the rule, as any employee could use their personal credit card, thus evading the financial control, simply by later claiming it was a mistake.  Regardless, the documents reviewed during the investigation showed that Mock did not deny the request for political reasons but instead acted consistently with her commitment to follow the letter of the policy, the recommendations of her Chief Accountant, and the admonition of Union policy at the time against granting exceptions.

---

[101] K. Geromin Interview (May 21, 2024); Email from K. Geromin to M. Mock (Dec. 13, 2023).

[102] Email from M. Mock to B. Shepherd (Dec. 18, 2023).

[103] M. Mock Interview (June 6, 2024).

[104] Chart of T&E Policy Exceptions (2023).

### 5.    Denial of Top Administrative Assistant to the President Chris Brooks's Pizza Expense Exception

The third example of an improper expense denial cited in the Special Compliance Report was that Secretary-Treasurer Mock improperly denied an exception request for Chris Brooks, President Fain's Top Administrative Assistant, for buying pizza on his UAW card at an Organizing Department meeting at which Fain was present.[105]  Fain and Brooks attended the meeting in Chattanooga, Tennessee in connection with a rally to support Volkswagen employees in their efforts to unionize Volkswagen's assembly plant.[106]  According to interviewees, Brooks picked up pizza for the event's attendees and, when his UAW credit card was declined, he used his personal credit card.[107]  Mock denied Brooks's exception request, citing the T&E Policy.[108]

Secretary-Treasurer Mock's denial followed the letter of the policy.  According to the policy, "[i]n the case of certain meal and/or entertainment expenses where more than one employee participates in the business activity, the employee at the highest level of authority in attendance shall incur the business expenses of others (*e.g.*, business meals or entertainment)."[109]  In this situation, President Fain attended the meeting and was "the employee at the highest level of authority;" therefore, per the policy, Fain was responsible for the "business expenses of others," *i.e.*, the pizza for the meeting.[110]  The denial was also the recommendation of Chief Accountant Geromin, who wrote to Mock that "the charge should have been put on Shawn [Fain]'s card as the

---

[105]  IEB Meeting Minutes (Feb. 20, 2024).

[106]  Special Compliance Report (Feb. 20, 2024) at 6; C. Brooks Interview (May 31, 2024).

[107]  C. Brooks Interview (May 31, 2024); M. Schroeder Interview (June 5, 2024); S. Fain Interview (June 5, 2024).

[108]  Request for Approval of Travel & Expense Policy Exception (Dec. 18, 2023).

[109]  T&E Policy (Version 1.0, 1.1) at 9.

[110]  The Monitor's review did not yield any other example where this type of exception request had been made to the Secretary-Treasurer.

highest authority in attendance."[111]   In her interview with the Monitor, Geromin stated that she recalled recommending the denial of the exception request because Fain attended the meeting and held the highest level of authority.[112]

In interviews with the Monitor, Secretary-Treasurer Mock and Chief Accountant Geromin confirmed that their approach here was strict application of the policy.[113]   According to Geromin, the policy includes this provision to deter those in positions of authority from directing their subordinates to make certain purchases that could be illegitimate.[114]   These policy changes were made to deter conduct similar to that which led to the Consent Decree, whereby senior Union officials would have subordinates charge illicit expenses to their credit cards to disguise the senior official's involvement.[115]   Mock told the Monitor that she denied the request because under UAW policy, the highest-ranking officer in attendance at an event—here, President Fain—should incur the expense for a business meal.[116]   Mock maintained that the policy is clear, so Fain was ultimately responsible and should have anticipated paying for any business expenses at the meeting.[117]   When asked by the Monitor if she considered the practicality of the situation in making her determination, Mock stated, "that's what the policy says."[118]

---

[111]   Email from K. Geromin to M. Mock (Jan. 26, 2024).

[112]   K. Geromin Interview (May 21, 2024).

[113]   K. Geromin Interview (May 21, 2024); M. Mock Interview (June 6, 2024).

[114]   K. Geromin Interview (May 21, 2024).

[115]   Monitor's Initial Status Report at 113-18.

[116]   M. Mock Interview (June 6, 2024).

[117]   M. Mock Interview (June 6, 2024).

[118]   M. Mock Interview (June 6, 2024).

36

Top Administrative Assistant Brooks expressed frustration at the denial because President Fain was not physically with him when he went to buy the pizza.[119] He also opined that it would have been more improper for him to use Fain's credit card without Fain present than for him to use his own card, an opinion Brooks said Compliance Director Schroeder shared.[120] But, of course, as a practical matter, restaurants typically allow orders to be placed over the internet and paid for with a credit card belonging to a person different from the one picking up the order or delivering it. Notwithstanding Brooks's frustration, the denial was consistent with the language of the policy, the view of the Union's longstanding Chief Accountant, and the Secretary-Treasurer's overall approach to exception denials otherwise evidenced by the Monitor's review.

Both Top Administrative Assistant Brooks and President Fain pointed to animosity from Secretary-Treasurer Mock as the reason that Mock denied this expense. For example, Fain said that Mock would deny *any* expense relating to Brooks;[121] in reality, however, Mock granted Brooks an exception for another expense for printing flyers that was submitted at the same time as his request for reimbursement for the pizza, finding that his use of his personal card for an otherwise legitimate business expense was excused because his UAW card was rejected.[122] And as noted above, Mock's strict interpretation of policy was applied across the board, consistent with

---

[119] C. Brooks Interview (May 31, 2024).

[120] C. Brooks Interview (May 31, 2024).

[121] S. Fain Interview (June 5, 2024). President Fain was not among those who reached out to provide the Monitor feedback on the draft report. To the extent that Fain challenges any part of his attributed statements in this report, the Monitor requested that a court reporter transcribe the Monitor's second interview with Fain so that there could be no discrepancy as to what was said. Fain, however, stated that he would only participate in the interview if it was not transcribed. In the interests of advancing the investigation, the Monitor agreed to proceed without a court reporter.

[122] C. Brooks Expense Report (Apr. 10, 2024).

the repeated recommendations of the Chief Accountant, and, based on the Monitor's investigation, did not target Brooks or anyone else in particular.

### 6.    Enhanced Corporate Cards

During her presentation of the Special Compliance Report, Compliance Director Schroeder raised the issue of members of President Fain's staff being denied Enhanced Corporate Cards by the Secretary-Treasurer's Office and recommended a motion to provide Enhanced Corporate Cards to President Fain's seven Top Administrative Assistants under the T&E Policy.[123]   The T&E Policy provides that "[c]ertain International Executive Board members and Senior Administrative Staff employees will receive Enhanced Corporate Cards."[124]   Under the T&E Policy, "the Secretary-Treasurer or their designee" is responsible for approving changes to Enhanced Corporate Card accounts.[125]

The Special Compliance Report stated that the Secretary-Treasurer's Office had denied Enhanced Corporate Card requests for President Fain's Top Administrative Assistants, and noted that it had done so by making "factually untrue" statements about the policy.[126]   The T&E Policy says that, in addition to IEB members, "Senior Administrative Staff" are eligible for Enhanced Corporate Cards.[127]   The Policy itself does not specify who constitutes "Senior Administrative

---

[123] IEB Meeting Minutes (Feb. 20, 2024).

[124] T&E Policy (Version 1.0, 1.1) at 3.

[125] T&E Policy (Version 1.0, 1.1) at 4.

[126] Special Compliance Report (Feb. 20, 2024) at 5.   Specifically, the Special Compliance Report stated that "[t]his request was denied by the Executive Assistant to the Secretary-Treasurer saying that only one person on President Fain's staff could have an Enhanced Credit Card" and "[b]ased on the way the policy is written, this is factually untrue."   Special Compliance Report (Feb. 20, 2024) at 5.   Under the Secretary-Treasurer's Office interpretation of the applicable guidelines, in addition to President Fain, Fain's Chief of Staff would have been eligible for an Enhanced Corporate Card, but at that time Fain did not have a Chief of Staff.

[127] T&E Policy (Version 1.0, 1.1) at 3.

38

Staff," but guidelines on Enhanced Corporate Cards in the IEB Toolkit's "Accounting Details" section list credit limits for Enhanced Corporate Cards for the following senior staff positions: Chief of Staff, Executive Administrative Assistant, General Counsel, Assistant Regional Director, Top Administrative Assistant to Vice President, and Deputy General Counsel.[128] They do not list any Top Administrative Assistants, other than those who report to Vice Presidents.[129]

Compliance Director Schroeder read the policy to include all Senior Administrative Staff, without regard to any limitations contained in the accompanying guidelines. When presenting the motion at the February 2024 IEB meeting, Schroeder explained that the only person in the President's Office with an Enhanced Corporate Card was President Fain and noted that his Top Administrative Assistants did not have them.[130] She also referenced the denial of Enhanced Credit Cards for the President's Top Administrative Assistants.[131] Documents reviewed by the Monitor showed that Top Administrative Assistant Brooks submitted a request to the Secretary-Treasurer's Office for an Enhanced Corporate Card.[132]

Secretary-Treasurer Mock told the Monitor that Todd Brien, Mock's Executive Administrative Assistant and Chief of Staff, recommended declining Top Administrative Assistant Brooks's request since Brooks's position was not included in the guidelines in the IEB Toolkit as being eligible for an Enhanced Corporate Card.[133]   Mock said she agreed with that

---

[128] UAW Enhanced Corporate Card Guidelines; IEB Toolkit Accounting Details.
[129] UAW Enhanced Corporate Card Guidelines.
[130] Special Compliance Report (Feb. 20, 2024) at 5; IEB Meeting Minutes (Feb. 20, 2024).
[131] Special Compliance Report (Feb. 20, 2023) at 5; IEB Meeting Minutes (Feb. 20, 2024).
[132] Email from C. Brooks to M. Schroeder (Feb. 8, 2024).
[133] M. Mock Interview (May 12, 2025).

39

recommendation and relied on Brien's expertise.[134]  She stated that if Brooks held one of the positions specified in the guidelines, she would have approved the application.[135]

The position taken by Secretary-Treasurer Mock was based on her interpretation of the T&E Policy and the corresponding guidelines provided in the IEB Toolkit as limiting "Senior Administrative Staff" to those listed therein.  As a matter of practice, this interpretation did not single out Top Administrative Assistant Brooks when denying his application.  To the contrary, before the February 20, 2024 motion, Mock had approved Enhanced Corporate Cards only for those who held positions identified in the written guidelines, and had rejected an application from someone else whose position was not listed.[136]  Further, based on the documents reviewed by the Monitor, as of December 2023, no Top Administrative Assistants had Enhanced Credit Cards except for those assigned to Vice Presidents—a role specified in the guidelines as being eligible for such cards.[137]

As with the other allegations lodged against Secretary-Treasurer Mock in the Special Compliance Report, the Monitor's investigation establishes that Mock was consistently applying the letter of the applicable policy and her interpretation of the associated guidelines.  Executive Administrative Assistant and Chief of Staff Brien's decision to reject Top Administrative Assistant

---

[134] M. Mock Interview (May 12, 2025).

[135] M. Mock Interview (May 12, 2025).

[136] Email from M. Mock to K. Geromin (Apr. 25, 2023) (granting request for credit card limit increases for IEB members); Email from M. Mock to K. Geromin (Apr. 27, 2023) (granting request for Enhanced Corporate Card for Assistant Regional Director); Email from M. Mock to K. Geromin (Apr. 27, 2023) (granting request for Enhanced Corporate Card for Assistant Regional Director); Email from M. Mock to K. Geromin (May 1, 2023) (granting request for Enhanced Corporate Card for Assistant Regional Director); Email from M. Mock to S. Steward (July 17, 2023) (denying request for temporary enhancement status for the Director of the CAP Department).

[137] Enhanced Credit Card Holders Chart (April 2023); Enhanced Credit Card Holders Chart (December 2023).

Brooks's application, and Mock's approval of that decision, were therefore consistent with their strict application of the policy, their previous approvals of Enhanced Corporate Cards for IEB members and those specified in the guidelines, and their denial when someone not specified in the guidelines applied for one.  Accordingly, the evidence does not support the allegation that Mock's Office engaged in a dishonest act by advancing a "factually untrue" basis for denying Brooks's application.  Further, although the documents provided to the Monitor do not include any requests for Enhanced Corporate Cards from any of Fain's other Top Administrative Assistants besides Brooks, if another Top Administrative Assistant had submitted a request, the reasoning would have been the same.

### B.    Allegations of Mock's Delay and Obstruction

The Special Compliance Report also accused Secretary-Treasurer Mock of "willful obstruction," alleging that Mock "used the departments that report to her to delay, obstruct and even block the work of other departments" to dictate how IEB members ran their regions or departments.[138]  For support, the Report alleged that there was a "pattern" of Mock "using the [P]urchasing [D]epartment to drag out purchases for the Communications and Organizing Departments" for weeks or months.[139]  The following examples were cited: (1) Mock allegedly improperly delayed approving a contract for a "media buy"—or consulting services—in Chattanooga, Tennessee; (2) Mock allegedly delayed and obstructed the launch of the UAW's online store; and (3) Mock allegedly delayed and obstructed the purchase of picket and yard signs during the strike of the Big Three automobile manufacturers.[140]  Compliance Director Schroeder

---

[138] Special Compliance Report (Feb. 20, 2024) at 1; IEB Meeting Minutes (Feb. 20, 2024).
[139] Special Compliance Report (Feb. 20, 2024) at 1; IEB Meeting Minutes (Feb. 20, 2024).
[140] Special Compliance Report (Feb. 20, 2024) at 1-2; IEB Meeting Minutes (Feb. 20, 2024).

presented on these examples at the February 20, 2024 IEB meeting—stating that Mock was "abusing the authority of her office" to obstruct the decisions of the IEB.[141]  In her interview with the Monitor, Mock said she had not heard allegations about the delays mentioned in the Special Compliance Report, and stated that "as part of my job, there's procedure you have to go through to have certain things approved."[142]

This subsection describes the relevant policies and procedures and then addresses the allegations of delays or obstruction raised in the Special Compliance Report.

### 1.  Procurement Policy

The UAW Constitution provides that the UAW "shall conduct their proprietary functions, including all contracts for purchase or sale. . . in accordance with the practice of well-run institutions, including the securing of competitive bids for major contracts."[143]

At the time of the actions underlying the allegations in the Special Compliance Report, the UAW had vendor-related guidelines for the vendor selection process, which were implemented in 2022 in response to the procurement and vendor schemes underlying the criminal convictions of UAW officials, which led to the Consent Decree.[144]  In particular, a group of documents referred to as the "Vendor Selection Process Documentation," "Final Vendor Processes Guide," and "Vendor Due Diligence Process Documentation" (or the "Guidelines"), established the relevant

---

[141] IEB Meeting Minutes (Feb. 20, 2024).

[142] M. Mock Interview (Apr. 18, 2024).

[143] UAW Const. Ethical Practices Code at 142.

[144] Monitor's Tenth Status Report, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (July 12, 2024), Civil No. 20-cv-13293, ECF No. 130 at 28-29, 62-63 ("Monitor's Tenth Status Report").

vendor due diligence requirements.[145]  The Guidelines lay out three types of approved due diligence processes:[146]

- A Request for Quotation ("RFQ" or "3-bid review") is the process in which a minimum of three competitive bids and/or quotes are obtained from vendors and analyzed by the UAW to determine which vendor provides the best value.  The Guidelines state that an RFQ "is used for standard purchases of goods and services and is the UAW's most common vendor selection process."[147]

- A Request for Proposal ("RFP") represents a more robust competitive bid process than an RFQ and is typically used for "procuring professional services for large-dollar contracts that span weeks or months for projects that are complex or technical in nature (e.g., construction project, actuarial services, consulting services)."[148]

- Sole-source selection is the process in which a single vendor is solicited, allowing the Union to bypass the RFQ and RFP competitive bid processes. The Guidelines state that "this process should be used infrequently and is typically used in rare circumstances where the goods or services are extremely unique."  Per the Guidelines, examples of "extremely unique" goods or services include when "only one vendor [is] capable of fulfilling a specific print & promotional order" or if "services are required for a specific area of expertise (e.g., an environmental law firm)."  The purchase requester is required to "provide written documentation supporting the specific reasons why a sole-source selection is required," and the vendor "must have written approval from the Secretary-Treasurer or their designee."[149]

---

[145] Vendor Selection Process Documentation (Apr. 25, 2022); Final Vendor Processes Guide; Vendor Due Diligence Process Documentation (Apr. 25, 2022).

[146] Vendor Selection Process Documentation (Apr. 25, 2022); Final Vendor Processes Guide; Vendor Due Diligence Process Documentation (Apr. 25, 2022).

[147] Vendor Selection Process Documentation (Apr. 25, 2022) at 1; Final Vendor Processes Guide; Vendor Due Diligence Process Documentation (Apr. 25, 2022).

[148] Vendor Selection Process Documentation (Apr. 25, 2022) at 1; Final Vendor Processes Guide; Vendor Due Diligence Process Documentation (Apr. 25, 2022).

[149] Vendor Selection Process Documentation (Apr. 25, 2022) at 1; Final Vendor Processes Guide; Vendor Due Diligence Process Documentation (Apr. 25, 2022).

## 2.  Conexion Contract (Media Buy in Chattanooga)

At the February 20, 2024 IEB meeting, Compliance Director Schroeder presented the approval of "the purchase of the media buy in Chattanooga, Tennessee" as an example of Secretary-Treasurer Mock allegedly "abusing the authority of her office" to obstruct the decisions of the IEB.[150]  Although the Special Compliance Report did not specify a particular act by Mock or elaborate on the "media buy in Chattanooga, Tennessee" at the February 20, 2024 IEB meeting, the Monitor learned through the investigation that the alleged ongoing issues refer primarily to allegations that Mock unduly delayed approval of the contract for a consulting firm called Conexion that President Fain and his staff wanted to use to support organizing efforts related to Volkswagen.[151]

Documentation reviewed by the Monitor showed that the request to approve the Conexion contract initially came to Director of Purchasing Charissa Fields and Secretary-Treasurer Mock seeking "sole-source" approval—*i.e.*, approval without competitive bidding—on December 22, 2023, the last business day in December before the holidays.[152]  President Fain and the Communications Department began negotiations with Conexion on December 6, 2023, and although the relevant documents show that they involved other departments at the UAW as early as December 8, 2023, Fain and the Communications Department did not involve Mock or Fields in the discussions until two weeks later.[153]

---

[150] IEB Meeting Minutes (Feb. 20, 2024).

[151] M. Schroeder Interview (June 5, 2024); Special Compliance Report (Feb. 20, 2024) at 2.

[152] Email from S. Fain to C. Fields (Dec. 22, 2023); M. Mock Interview (June 6, 2024).

[153] Email from C. Brooks to B. Dictor and T. Lamadrid (Dec. 8, 2023); Email from S. Fain to C. Fields (Dec. 22, 2023); M. Mock Interview (June 6, 2024).

After Purchasing Director Fields received the December 22, 2023 request for sole-source approval, documents reviewed by the Monitor indicate she reviewed the contracts and costs, discussed them with Secretary-Treasurer Mock, and, on December 26, 2023, relayed to President Fain that per the vendor policy, a three-bid vendor due diligence process was required.[154]  Mock agreed with Fields that the vendor should proceed through the regular and more rigorous three-bid process because this was not one of the "rare circumstances where the goods or services are extremely unique" as required for sole source contracts by the Guidelines, and because the vendor was a start-up business and the contract would cost a substantial amount of money.[155]

Secretary-Treasurer Mock recalled that once she and Purchasing Director Fields were notified about the vendor proposal, the Communications Department, which is part of the President's Office, began pressuring her to approve the vendor quickly.[156]  According to Mock, President Fain and his staff wanted to approve the Conexion contract through the sole-source process to cover three to six months' of work for approximately $500,000.[157]  The justification for using a sole-source contract was that the UAW wanted to "strategically . . . keep it quiet" that they were looking to buy billboard space because of anti-union sentiment in the South.[158]  But Mock also noted that the Communications Department's pressure on her to quickly approve the vendor was inconsistent with them sharing the Conexion proposal with multiple departments, including

[154] Email from C. Fields to S. Fain (Dec. 26, 2023).
[155] M. Mock Interview (Apr. 18, 2024); M. Mock Interview (June 6, 2024).
[156] M. Mock Interview (June 6, 2024).
[157] M. Mock Interview (June 6, 2024); Email from S. Fain to M. Mock (Dec. 28, 2023).
[158] M. Schroeder Interview (June 5, 2024).

45

Legal and Compliance, weeks before notifying Mock.[159] She characterized the last-minute request as "pinning it" on her to push through the proposal as a sole-source request.[160]

On December 28, 2023, following Purchasing Director Fields's response to President Fain that the vendor must undergo the three-bid process, Fain emailed Secretary-Treasurer Mock encouraging her to approve the sole-source contract because it is "crucial" that the UAW "act discreetly," adding that it is his "strong recommendation that we take a sole source purchasing approach."[161] Mock, Fields, and their teams then worked through the holidays to complete the due diligence on Conexion and, once they had completed their due diligence, again rejected the sole source vendor proposal in a January 2, 2024 email.[162] In that email, Mock told Fain that she had "very strong concerns about a rushed decision to spend half a million dollars plus, of our members' money with one sole media firm outside of the three-bid process" because "it does not allow for this firm and others, along with costs, to be compared and adequately vetted."[163] She suggested that the issue be brought to the attention of the IEB.[164]

Notwithstanding the claimed urgency of retaining this vendor, President Fain did not arrange for the vendor to be promptly presented to the IEB, which could have approved the vendor over the objection of the Secretary-Treasurer. Nor did the Communications Department initiate a

---

[159] M. Mock Interview (June 6, 2024).

[160] M. Mock Interview (June 6, 2024).

[161] Email from S. Fain to M. Mock (Dec. 28, 2023).

[162] Email from M. Mock to S. Fain (Jan. 2, 2024).

[163] Email from M. Mock to S. Fain (Jan. 2, 2024).

[164] Email from M. Mock to S. Fain (Jan. 2, 2024).

three-bid solicitation process. Instead, Fain waited an additional seven weeks, until February 20, 2024, at which time the sole-source contract was presented and approved by the IEB.[165]

During her interview with the Monitor, Secretary-Treasurer Mock explained that she was uncomfortable with this request after she learned through due diligence conducted by the Purchasing Department that Conexion was a new company about which the UAW had limited information.[166] Mock expressed to the Monitor that she was not willing to skip the mandated process just because the President's Office wanted to approve the vendor quickly, and she therefore concluded that it would be inappropriate to approve the contract as a sole-source agreement after completing the due diligence process on an expedited timeline over the holidays.[167]

According to President Fain, he had had several conversations with Secretary-Treasurer Mock about Conexion and indicated that she was impeding a collective bargaining goal that could be achieved only by quickly hiring the company.[168] He told the Monitor that he recalled the Conexion situation as his "breaking point" before the February 20, 2024 IEB meeting.[169]

Compliance Director Schroeder told the Monitor that President Fain suggested expressly naming Conexion in the Special Compliance Report, but Schroeder pushed back, telling Fain that it "wasn't a good idea" because it was within the Secretary-Treasurer's discretion to deny sole-source vendors, and that Mock had allowed Fain the opportunity to raise the issue with the IEB in January 2024, which he declined to do.[170] Schroeder also told the Monitor that, due to the delay,

---

[165] IEB Meeting Minutes (Feb. 20, 2024).
[166] M. Mock Interview (June 6, 2024).
[167] M. Mock Interview (June 6, 2024).
[168] S. Fain Interview (June 5, 2024).
[169] S. Fain Interview (June 5, 2024).
[170] M. Schroeder Interview (June 5, 2024).

the UAW missed the intended advertising opportunity.[171]  But this conclusion did not include consideration that Mock quickly acted on the application over the holidays, that she noted when she determined that a sole-source contract was inappropriate that Fain could go to the IEB, or that her decision could have been appealed to the IEB seven weeks earlier than it was.  None of these mitigating facts were included in Schroeder's presentation to the IEB, depriving the IEB of the context for Mock's actions or an alternative explanation as to why the media buy was delayed. The Monitor's investigation therefore did not substantiate the allegations that Mock unduly delayed the approval of the vendor contract; instead, Mock addressed the issue within a reasonable timeframe and applied Union policy regarding the appropriate due diligence on a vendor proposal.

### 3.   Feldman Strategies

When asked about the allegation in the Special Compliance Report regarding "ongoing issues with media buys," in addition to Conexion, interviewees cited delays by Secretary-Treasurer Mock in approving the contract for a public relations consulting firm called Feldman Strategies.

Communications Director Jonah Furman told the Monitor that Mock delayed approval of the contract for Feldman Strategies—a delay that he found to be "frustrating" and "consequential."[172]  Furman told the Monitor that he recommended to President Fain and Top Administrative Assistant Brooks that the UAW hire Feldman Strategies to cover certain media needs for the Union.[173]  Fain presented the Feldman Strategies contract for approval at the November 2023 IEB meeting.[174]  On November 29, 2023, the IEB approved the vendor and

---

[171] M. Schroeder Interview (June 5, 2024).

[172] J. Furman Interview (July 11, 2024).

[173] J. Furman Interview (July 11, 2024).

[174] IEB Meeting Minutes (Nov. 29, 2023).

Compliance Director Schroeder directed Mock's department to conduct due diligence to ensure there were no conflicts.[175]

Secretary-Treasurer Mock was copied on the emails regarding approval of the contract as it went through the due diligence process.[176] During that process, Mock's team identified to Mock what they thought were certain anomalies about the vendor, and the staff reported to Mock that they were uncomfortable approving Feldman Strategies as a sole-source vendor.[177]

As a result, on December 20, 2023, Purchasing Director Fields sent an email summarizing her concerns to Compliance Director Schroeder, Acting General Counsel Thomas Lamadrid, Secretary-Treasurer Mock, Chief Accountant Geromin, Executive Administrative Assistant and Chief of Staff Brien, and Director of the Print Shop Kris Lundberg.[178] More than three weeks later, on January 12, 2024, Schroeder sought more information on the vendor, and on January 22, 2024, responded to the group that the Purchasing Department should approve the vendor.[179] Mock's department approved the vendor shortly after Schroeder's decision.[180] Here, the Monitor's investigation did not bear out the allegation of improper delay attributable to Mock, as opposed to a reasonable time for the approval process—taken by both the Secretary-Treasurer's Office and the Compliance Department—stemming from appropriate due diligence on a vendor proposal.

---

[175] IEB Meeting Minutes (Nov. 29, 2023).

[176] Email from C. Fields to M. Schroeder and T. Lamadrid (Dec. 20, 2023).

[177] Email from C. Fields to M. Schroeder and T. Lamadrid (Dec. 20, 2023).

[178] Email from C. Fields to M. Schroeder, T. Lamadrid, M. Mock, K. Geromin, T. Brien, K. Lundberg (Dec. 20, 2023).

[179] Email from C. Fields to M. Schroeder (Jan. 22, 2024).

[180] Email from C. Fields to M. Schroeder (Jan. 22, 2024).

### 4.    Online Store

The Special Compliance Report also accused Secretary-Treasurer Mock of interfering with and delaying establishment of the Union's online store.[181]  At the February 20, 2024 IEB meeting, Compliance Director Schroeder raised the launch of the UAW's online store as an example of Mock allegedly "abusing the authority of her office" to obstruct the decisions of the IEB.[182]  The Special Compliance Report stated that in November 2023, the IEB voted to create an online store and "directed the Secretary Treasurer to work with [the] Communications Department to set up and establish such a store in 30 days," and that "[a]ll of the paperwork and materials have been provided to the Purchasing Department," but the store was not yet set up.[183]  The Report stated that "[d]iscussions between Communications and Purchasing, and on the IEB, have been ongoing since August."[184]

A member of President Fain's Communications Department told the Monitor that around September 2023, Fain proposed the idea of an online store and directed the Accounting and Communications Departments to work together on the concept.[185]  Chief Accountant Geromin stated that she discussed the request with Secretary-Treasurer Mock, and they assessed the necessary financial controls.[186]

In November 2023, Chief Accountant Geromin and Acting General Counsel Lamadrid presented proposals to the IEB on the structure of the online store.  The IEB approved a motion

---

[181]  Special Compliance Report (Feb. 20, 2024) at 2.
[182]  IEB Meeting Minutes (Feb. 20, 2024).
[183]  Special Compliance Report (Feb. 20, 2024) at 2; IEB Meeting Minutes (Feb. 20, 2024).
[184]  Special Compliance Report (Feb. 20, 2024) at 2.
[185]  J. Furman Interview (July 11, 2024).
[186]  K. Geromin Interview (May 21, 2024).

50

"that the Secretary-Treasurer's office and [P]urchasing complete a bid process and then approval process to the extent that it's needed to follow policy, as well as create a special fund within 30 days so the International can begin selling merchandise" that is "union made" and "American made."[187]  However, the store was not set up until April 2024.[188]

Secretary-Treasurer Mock recalled that after the November 2023 IEB meeting, the Communications Department put forward a particular vendor for a sole-source contract and wanted to skip the three-bid process,[189] in violation of the UAW's vendor Guidelines, as well as in direct contravention of the IEB's direction at the November 28, 2023 IEB meeting to "complete a bid process and then approval process to the extent that it's needed to follow policy."[190] On December 5, 2023, Chief Accountant Geromin emailed Mock and raised that endorsing the proposed vendor via the sole-source process would violate Union policy.[191]  Mock agreed with Geromin and stated that she did not see a basis for granting a policy exception.[192]  Mock told the Monitor that simply endorsing one vendor and avoiding the three-bid process went "against everything the Union stands for."[193]

The application of the standard three-bid due diligence process and the implementation of necessary controls were responsible for the time required to set up the store between November 2023 and April 2024.  Chief Accountant Geromin said that when setting up the store, Geromin and

---

[187] IEB Meeting Minutes (Nov. 28, 2023).

[188] J. Furman Interview (July 11, 2024).

[189] M. Mock Interview (June 6, 2024).

[190] M. Mock Interview (June 6, 2024); IEB Meeting Minutes (Nov. 28, 2023).

[191] Email from K. Geromin to M. Mock (Dec. 5, 2023); K. Geromin Interview (May 21, 2024).

[192] Email from M. Mock to K. Geromin (Dec. 5, 2023); M. Mock Interview (June 6, 2024).

[193] M. Mock Interview (June 6, 2024).

her team were "very thorough" in their assessment of the necessary financial controls.[194]  She

explained that there were many implications related to "sales tax filings, sales tax license, separate

reporting, [and] changes to the accounting system, which took time."[195]  A staff member who has

requested anonymity because they said they are fearful of retaliation by the President if they are

identified in this report stated that the due diligence took time because Accounting and Purchasing

had to review the Requests for Quotation and ensure the pricing was appropriate.[196]  The Secretary-

Treasurer's Office completed due diligence in March 2024, selected a vendor, and the online store

went live in April 2024.[197]  Notably, the due diligence process resulted in the selection of a vendor

different than the one that the President's Office had originally insisted be given the sole-source

contract.[198]

Chief Accountant Geromin told the Monitor that any delays concerning the store stemmed

from thorough due diligence efforts and there were "no purposeful delays" from her department.[199]

The investigation did not substantiate allegations of improper delay, as opposed to delays resulting

from the application of Union policies, necessary financial controls, and due diligence.

### 5. Signs

#### a. Picket Signs

The Special Compliance Report also alleged that Secretary-Treasurer Mock improperly

interfered with picket sign design and strategy during the strike of the Big Three automobile

---

[194] K. Geromin Interview (May 21, 2024).

[195] K. Geromin Interview (May 21, 2024).

[196] UAW Staff Interview.

[197] Email from J. Furman to Vendor (Apr. 25, 2024); UAW Staff Interview.

[198] Email from M. Mock to K. Geromin (Dec. 5, 2023); Email from J. Furman to Vendor (Apr. 24, 2024).

[199] K. Geromin Interview (May 21, 2024).

manufacturers in the Fall of 2023.[200]  The Report described Mock's actions as "an inappropriate misuse of the authority of the Secretary-Treasurer through the Purchasing Department to influence the operations of another department."[201]  Members of the Communications Department told the Monitor that Mock favored picket signs that the UAW had in storage over ordering newly designed signs that they had proposed, and also wanted yard signs for the strike, which delayed the sign printing and distribution process, resulting in the new picket signs not being ordered until after the strike began.[202]

On September 7, 2023, President Fain's Communications Department sent an email to Purchasing Director Fields and Secretary-Treasurer Mock proposing a design for picket signs for the strike, which was set to start on September 15, 2023, and in which thousands of workers went on strike at plants at each of the Big Three automobile manufacturers.[203]  When they received the proposal, Fields and Mock initially rejected the purchase of the signs because they believed the production timeline was unachievably short and the stock of picket signs already in the Union's possession were of higher quality than the proposed signs.[204]  Mock told the Monitor that she viewed the new signs as poor quality and a "waste [of] money."[205]  She reasoned that using the

---

[200]  Special Compliance Report (Feb. 20, 2024) at 1-2; IEB Meeting Minutes (Feb. 20, 2024).

[201]  Special Compliance Report (Feb. 20, 2024) at 2; IEB Meeting Minutes (Feb. 20, 2024).

[202]  J. Furman Interview (July 11, 2024)

[203]  Email from J. Furman to C. Fields (Sept. 7, 2023); J. Furman Interview (July 30, 2024); UAW, *New UAW Video Marks Anniversary of Historic "Stand Up" Strike Against Big Three Automakers and Significant Victories Since* (Sept. 13, 2024), available at https://uaw.org/new-uaw-video-marks-anniversary-of-historic-stand-up-strike-against-big-three-automakers-and-significant-victories-since/.

[204]  Email from C. Fields to J. Furman (Sept. 7, 2023); M. Mock Interview (June 6, 2024).

[205]  M. Mock Interview (June 6, 2024).

original signs the Union already had printed and paid for would get the Union more "bang for their buck."[206]

After Secretary-Treasurer Mock rejected the expense request on September 7, 2023, President Fain continued to insist that the Union use the newly designed signs.[207] The Purchasing Department submitted the vendor request and received a quote on September 8, 2023.[208] After some communications between Purchasing and Communications about the vendor request and the sign quality and quantity, Mock relented and the purchase order for the signs was entered on September 12, 2023, five days after the original request was made.[209] The first round of signs were shipped on September 19, 2023, four days after the beginning of the strike.[210] The Monitor found that Mock's reasons for initially denying the expense for several days were based on her legitimate concerns for efficient use of Union funds[211]

**b.    Yard Signs**

The Special Compliance Report also states that the Secretary-Treasurer's Office created a "different design that was not consistent with the messaging strategy of the Communications

---

[206] M. Mock Interview (June 6, 2024).

[207] M. Mock Interview (June 6, 2024).

[208] Vendor Quote Proposal (Sept. 8, 2023).

[209] Email from M. Mock to J. Furman (Sept. 8, 2023); Email from C. Fields to J. Furman (Sept. 11, 2023); Chart of Purchase Orders (2023).

[210] Email from C. Fields to E. McCalebb and B. Poling (Sept. 20, 2023); M. Mock Interview (June 6, 2024).

[211] In the limited feedback the Union provided to the Monitor in connection with this report, the Union stated that it disagreed with the Monitor's conclusion regarding "the relative significance attributed to certain facts (for example, the report seems to discount the importance of timely obtaining signs and billboards)." As with the Union's other feedback, the Union did not further explain or provide any factual corrections or supporting documentation for this claim. Indeed, the Union did not assert that the report's description of the timeline surrounding the purchase of signs and billboards was factually inaccurate. The Monitor has described the amount of time it took for the Secretary-Treasurer's Office to review and approve these purchases, has found the time to be reasonable, and has seen no evidence that Mock "used the departments that report to her to delay, obstruct or even block the work of other departments," as opposed to acting in a fiscally careful manner.

Department" for yard signs, noting that it was "not appropriate" for the Secretary-Treasurer's Office to "design yard signs, to use their office to influence the Communications Department's messaging strategy."[212]

At a September 18, 2023 meeting between, among others, Secretary-Treasurer Mock, President Fain, Vice President Chuck Browning, Vice President Boyer, Vice President Booth, and members of the Communications Department, Mock raised the issue of potential yard signs for the strike, saying that the UAW had not done yard signs before but she had received "many requests" for yard signs.[213] Although yard signs were initially not contemplated as part of the communications plan for the strike, Fain and others yielded to Mock's suggestion, but stated that the Communications Department should create the yard signs.[214] In response, Mock agreed but stated that she would like to "be a part of it" to ensure that the process was financially prudent.[215] Mock added that they needed to be "realistic" that the process would take time because her Office needed to "bid it out properly."[216]

On September 20 and 21, 2023, having not yet received a design from the Communications Department, Purchasing Director Fields sent Secretary-Treasurer Mock design options for the yard signs, noting that the Purchasing Department had matched the yard signs colors to the colors used by the Communications Department on the picket signs.[217] On September 21, 2023, Fields reminded Communications Director Furman in an email that she still needed "the information we

---

[212] Special Compliance Report (Feb. 20, 2024) at 2; IEB Meeting Minutes (Feb. 20, 2024).
[213] Audio Recording, UAW Meeting (Sept. 18, 2023).
[214] Audio Recording, UAW Meeting (Sept. 18, 2023).
[215] Audio Recording, UAW Meeting (Sept. 18, 2023).
[216] Audio Recording, UAW Meeting (Sept. 18, 2023).
[217] Email from C. Fields to M. Mock (Sept. 20, 2023); Email from C. Fields to M. Mock (Sept. 21, 2023).

talked about a few times that would be needed for the yard signs."[218]  Shortly thereafter, Furman

sent Fields a design for the yard signs and the number of yard signs needed for each region, which

Fields forwarded to Mock.[219]

On October 2, 2023, Communications Director Furman emailed Purchasing Director Fields

asking about the yard signs.[220]  Fields responded that she was finalizing the vendor for the signs,

which should be completed that week.[221]  She explained that they had to solicit twelve vendors to

find one that could handle the volume of yard signs.[222]  Furman then followed up again on October

13, 2023, and Fields responded that the signs were in production with four separate vendors with

expected delivery the following week.[223]  She stated that "the yard sign artwork is different" and

attached the designs previously prepared for Secretary-Treasurer Mock by the Purchasing

Department, explaining that the designs were created "during the delay" after "we asked for the

artwork and there was the back and forth going on. . ."[224]  Fields added that "[w]e were directed

per Secretary Treasurer Mock to utilize the attached designs which are in production now."[225]

Upon comparison of the design sent by Furman and the design ultimately used for the signs, the

colors appear to be the same.  The Communications Department's design reads, "UAW STAND

UP FOR OUR COMMUNITIES" and "UAW STAND UP AGAINST CORPORATE GREED."

The signs that Mock approved, and which were produced instead read, "THIS HOME STANDS

---

[218] Email from C. Fields to J. Furman (Sept. 21, 2023)

[219] Email from J. Furman to C. Fields (Sept. 21, 2023).

[220] Email from J. Furman to C. Fields (Oct. 2, 2023).

[221] Email from C. Fields to J. Furman (Oct. 2, 2023).

[222] Email from C. Fields to J. Furman (Oct. 2, 2023).

[223] Email from J. Furman to C. Fields (Oct. 13, 2023); Email from C. Fields to J. Furman (Oct. 13, 2023).

[224] Email from C. Fields to J. Furman (Oct. 13, 2023).

[225] Email from C. Fields to J. Furman (Oct. 13, 2023).

WITH THE UAW" and "WE STAND WITH THE UAW."  Both designs include two UAW wheels.[226]

When asked about her involvement with the yard signs and the design, Secretary-Treasurer Mock explained that, given this was her first strike as Secretary-Treasurer, she relied on the historical knowledge and experience of her team, particularly Executive Administrative Assistant and Chief of Staff Brien.[227]  Based on information she said that Brien provided her, Mock said that she understood that the Purchasing Department and Print Shop were historically responsible for preparing, designing, and ordering strike signs.[228]  When designing the yard signs, because Purchasing Director Fields and Print Shop Director Lundberg had been involved in sign production in the past, Mock said that she deferred to their expertise.[229]  Mock told the Monitor that it had been discussed at an earlier meeting that her Office would work with the Communications Department on the yard signs.[230]  Mock said that her Office submitted their own design for the yard signs because the Communications Department failed to provide her with the design until she signed off on their request for additional picket signs.[231]  Mock said she did not recall receiving the Communications Department's design until after Purchasing had already submitted their own design.[232]  As indicated by the documents reviewed by the Monitor and described above, although Purchasing did prepare a design of the yard signs before one was provided by Communications

---

[226] Email from C. Fields to J. Furman (Oct. 13, 2023).

[227] M. Mock Interview (May 19, 2025); M. Mock Interview (June 6, 2024).

[228] M. Mock Interview (May 19, 2025).  When asked about this assertion, Brien could not recall if had such a discussion with Mock or not.  T. Brien Interview (May 21, 2025).

[229] M. Mock Interview (June 6, 2024).

[230] M. Mock Interview (May 19, 2025).

[231] M. Mock Interview (May 19, 2025).

[232] M. Mock Interview (May 19, 2025).

(September 20, 2023), the design provided by Communications was received (September 21, 2023) prior to any designs being provided to potential vendors (September 25, 2023).[233]

The Monitor concludes that the Special Compliance Report was accurate in stating that Secretary-Treasurer Mock ordered yard signs that were designed by the Secretary-Treasurer's Office even though yard sign designs from the Communications Department were provided to her. Having received the design from the Communications Department on September 21, 2023, Mock should have either directed Purchasing to use those signs or she should have further engaged with the Communications Department if she preferred a different sign.

Although the Monitor finds Secretary-Treasurer Mock at fault, the Monitor's investigation did not bear out that this sequence of events amounted to a dereliction of Mock's duties as Secretary-Treasurer or a dishonest act. From a materiality perspective, yard signs were not part of the original communications plan around the strike and were adopted only after Mock raised the issue, and the alternative signs did not undermine or otherwise harm the Union in any demonstrable way. In addition, the Purchasing Department and Print Shop do appear to have had a significant role in designing picket signs in the past, lending credibility to Mock's statement that she acted under the assumption that she had jurisdiction over the issue. In other words, although the Monitor finds Mock at fault with respect to the design of the yard signs, this error did not rise to the standard necessary for reassigning eleven of her departments and two of her board appointments.

## C.    Alleged Abuse of Authority to Influence Votes

The Special Compliance Report also alleged that "[t]he most concerning big picture issue that has been brought to my attention is the Secretary-Treasurer's attempts to use the authority of

---

[233] Email from C. Fields to M. Mock (Sept. 20, 2023); Email from J. Furman to C. Fields (Sept. 21, 2023); Email from UAW Purchasing Requests to Vendor (Sept. 25, 2023).

her office to influence Board members' votes."[234] Compliance Director Schroeder did not provide any specific examples, but instead stated that she "received reports from many of you regarding this," describing it as "a pattern of Secretary-Treasurer Margaret Mock trying to influence current or future Board decisions by making both direct and indirect threats that she will obstruct a transaction or deny an expense request if her fellow Board members do not vote the way she would like."[235]  Through the investigation, the Monitor learned of two incidents related to the alleged use of Secretary-Treasurer Mock's authority to sway votes.  The two allegations were that:  (1) Mock supposedly threatened Regional Director David Green after he supported a measure to spend Union funds on electric car charging stations; and (2) Mock allegedly conditioned approval of Regional Director Mike Miller's vendor request and expense request on votes for her initiatives. This subsection addresses each of these allegations and finds them to be unsupported.

Compliance Director Schroeder spoke to Regional Directors Miller and Green to obtain details about their allegations for the Report.[236]  She did not speak with Secretary-Treasurer Mock about the allegations in the context of drafting the Report and, when asked why, said she had spoken to Mock about the issues in the past and "didn't think there was reason to rehash" them.[237]

### 1.    Regional Director Green

Compliance Director Schroeder told the Monitor that before the February 20, 2024 IEB meeting and while she was compiling the Special Compliance Report, Regional Director Green reported what Schroeder described to the Monitor as a "thinly veiled threat" from Secretary-

---

[234] IEB Meeting Minutes (Feb. 20, 2024).

[235] IEB Meeting Minutes (Feb. 20, 2024).

[236] M. Schroeder Handwritten Notes (Feb. 14, 2024); M. Schroeder Handwritten Notes (Feb. 15, 2024).

[237] M. Schroeder Interview (June 5, 2024).

59

Treasurer Mock.[238]   According to Schroeder, Green had told Schroeder that, after Green submitted a request for an architect for a new building in his region, Mock approved the request but said that she was doing so even though Green had supported using Union funds to build electric charging stations in California, a proposal that Mock had opposed.[239]

When asked about the veracity of this accusation, Regional Director Green recalled that Secretary-Treasurer Mock called him to inform him she approved his request "even though you supported those charging machines."[240]   Initially, Green told the Monitor that he did not feel threatened by Mock, and that he thought Mock's statement was "uncouth, but not an intimidation tactic" and "weird but it wasn't threatening or [quid] pro quo," adding that "[i]t was like a shot because she did not support the chargers."[241]   Indeed, Schroeder's handwritten notes from her discussion with Green on the topic state that Green had similarly told her that he "wouldn't call it quid pro quo."[242]   Green also told the Monitor in his initial interview that he had not had any problems with Mock, that she addressed issues and responded to him in a timely manner, and that he had not experienced delays from Mock.[243]

After a draft of this report was provided to the Union, Regional Director Green spoke to the Monitor's team in a follow-up interview.[244]   In this follow-up interview, Green acknowledged

---

[238] M. Schroeder Interview (June 5, 2024).

[239] M. Schroeder Interview (June 5, 2024); D. Green Interview (May 28, 2024).

[240] D. Green Interview (May 28, 2024).

[241] D. Green Interview (May 28, 2024).  Green also told the Monitor that he and Mock "aren't going to agree on everything but we still need to work together."

[242] M. Schroeder Handwritten Notes (Feb. 14, 2024) (Schroeder's notes entitled "Dave Green Call 2/14/24" state that Green needed a request approved and "MM told him that even though he voted w/ Pres Fain for something he wanted, she was still going to approve" and indicates the question "Threat of not approving in future?"  Schroeder's notes also read that Green "wouldn't call it quid pro quo.").

[243] D. Green Interview (May 28, 2024).

[244] D. Green Interview (June 16, 2025).

that he had previously made the statements referenced above and reiterated that he did not feel threatened by Secretary-Treasurer Mock.[245]  However, he also stated, for the first time, that notwithstanding his prior statement to the Monitor that Mock had "said something weird but it wasn't threatening" he now viewed Mock's statements as "maybe somewhat threatening for future votes," asserted that "it was a threatening statement," and said that Schroeder's description of Mock's statement as a "thinly veiled threat" was "probably somewhat correct."[246]  But Green also reiterated in the interview that he "never felt threatened by Margaret [Mock] and still [does not]."[247]  When asked about the discrepancy between his statements in his initial interview and his follow-up interview, Green acknowledged his prior account to the Monitor, but stated that when he was previously interviewed, "I said what was on my mind at the time."[248]

Secretary-Treasurer Mock acknowledged that she told Regional Director Green she would still approve his request for an architect[249] even though he voted in favor of the separate issue, but expressed that she did so jokingly.[250]  Mock promptly approved Green's request, and when she later learned that Green was upset by her response, she said that she called him and let him know it was only a joke and to "clear it up."[251]  Given that Green himself has said that he did not feel threatened by Mock or that she engaged in intimidation tactics; that he told Compliance Director Schroeder and the Monitor that Mock's comments were not intended as offering a quid pro quo

[245] D. Green Interview (June 16, 2025).

[246] D. Green Interview (June 16, 2025).

[247] D. Green Interview (June 16, 2025).

[248] D. Green Interview (June 16, 2025).

[249] Based on the Monitor's review of documents produced by the UAW, it appears the "architect" referred to by Mock was an architectural firm that was approved for Region 2B's new office after the normal three-bid process.

[250] M. Mock Interview (June 6, 2024).

[251] M. Mock Interview (June 6, 2024).

61

for future votes; and that Mock's statement, on its face, includes no threat, the Monitor finds the allegation that Mock had threatened Green to be unsupported.

## 2.    Regional Director Miller

When asked about the allegation that Secretary-Treasurer Mock attempted "to use the authority of her office to influence Board members' votes,"[252] Regional Director Miller told the Monitor that he contacted Mock in the Fall of 2023 to request approval for a sole-source vendor to write a grant proposal and Mock responded that she could not "see approving this until people vote on my budget proposal" that she planned to present at the November 2023 IEB meeting.[253] Notes from the Compliance Director indicate that Miller told her that Mock had said that she "couldn't approve the spending of any more money unless Mike told her he will vote for [the] budget initiative at [the] November IEB [meeting]."[254] Schroeder told the Monitor she recalled Miller telling her that Mock "basically said to him I'm only going to approve it if you agree to approve my budgets."[255]  In his interview with the Monitor, Miller stated that Mock never said that she expected Miller to vote in favor of her budget proposal and claimed that he did not tell Schroeder that she did, stating "I never actually alleged that she conditioned vendor and expense requests on votes for her initiative, never alleged that."[256]  Instead, Miller stated that he believed that Mock's delays in approving his vendor requests to be an abuse of her position, and equated

---

[252] Special Compliance Report (Feb. 20, 2024) at 1.

[253] M. Miller Interview (May 14, 2024).  Based on the Monitor's review of documents produced by the UAW, it appears that this vendor was approved on November 20, 2023, eight days prior to Mock presenting the budget at the November 28, 2023 IEB meeting.  Email from MyUAWSystem to E. Jansen (Nov. 20, 2023).

[254] M. Schroeder Handwritten Notes (Feb. 15, 2024).

[255] M. Schroeder Interview (June 5, 2024).

[256] M. Miller Interview (June 17, 2025).

Mock's reluctance to not approve his request until the upcoming IEB meeting as threatening him that she would not approve his request unless he voted her way.[257]

When asked about this incident, Secretary-Treasurer Mock denied telling Regional Director Miller that she would not approve his request to engage the vendor unless he voted in favor of her budget proposal.[258]  Instead, Mock told the Monitor that Miller had asked for approval for a grant writer via the sole-source process rather than the three-bid process contemplated by the vendor Guidelines.[259]  Mock told the Monitor that that she did not tell Miller that she thought that she would not be able to authorize further expenses if the budget was not approved.[260]  Mock said that the conversation she had with Miller was about the nature of his request, and they did not discuss whether it would or would not be approved.[261]

The Monitor finds that regardless of whether Regional Director Miller or Secretary-Treasurer Mock's recollection of the meeting is credited, the allegation in the Special Compliance Report is unsubstantiated.  Miller's account of what Mock said, on its face, is that she did *not* explicitly condition her approval of his expense request on a vote for her budget, but that he instead interpreted that as her intent.  But the statement that Miller alleges Mock made does not support that interpretation, and it instead expresses a more temporal condition—that she could not support approving an expense until a budget was approved.  Moreover, Mock approved Miller's request

---

[257] M. Miller Interview (May 14, 2024); M. Miller Interview (June 17, 2025).  Miller also recounted other allegations of delay by Mock which he said were relevant to his interpretation of Mock's statement.  Those allegations were among those discussed above, all of which the Monitor found to be unsubstantiated.

[258] M. Mock Interview (June 6, 2024).

[259] M. Mock Interview (Apr. 18, 2024).

[260] M. Mock Interview (Apr. 18, 2024).

[261] M. Mock Interview (Apr. 18, 2024).

more than a week before the IEB meeting where the budget was discussed,[262] and there is a potential inconsistency in Miller's account given Schroeder's description of her meeting with Miller.[263]

The Monitor finds that the Special Compliance Report's assertion to the IEB about "a pattern of Secretary-Treasurer Margaret Mock trying to influence current or future Board decisions by making both direct and indirect threats that she will obstruct a transaction or deny an expense request if her fellow Board members do not vote the way she would like" to be inaccurate and not substantiated. Neither incident included an actual alleged threat, let alone demonstrated a "pattern" of such behavior.

## III.    Allegations Against President Fain

Secretary-Treasurer Mock alleged in her complaint to the Monitor that President Fain removed her oversight of eleven Union departments and two external board positions in retaliation against her because she was unwilling to approve expenditures of Union resources to individuals and entities associated with the President's Office that violated Union policy.[264]  She further alleged that in addition to punishing her, Fain removed the departments from her oversight to lessen the strict financial oversight and adherence to policy she applied, and to follow through on previous retaliatory threats he had publicly made, sending a message to other gatekeepers that failure to approve the President's requests would result in a similar fate to the one that she has suffered.[265]

---

[262] Email from MyUAWSystem to E. Jansen (Nov. 20, 2023).

[263] Miller stated that he did not think that Schroeder's notes of their conversation indicate that he said anything different to her from what he told the Monitor because the word "unless" was "ambiguous" and "can mean different things."  M. Miller Interview (June 17, 2025).

[264] Monitor Meeting with M. Mock (Feb. 26, 2024).

[265] Monitor's Tenth Status Report at 21; Monitor Meeting with M. Mock (Feb. 26, 2024).

The Monitor's investigation substantiated Secretary-Treasurer Mock's allegations.  As set forth further both above and below, the investigation uncovered evidence showing that Fain acted with retaliatory intent, including that: (A) the findings in the Special Compliance Report that were listed as a basis for removing Mock's oversight were pretextual, almost entirely unsupported, and were influenced by members of the President's Office; (B) President Fain and those in his inner circle executed a plan to strip Mock of her departments by influencing the drafting of the Special Compliance Report and orchestrating the motion by Regional Director Dickerson in a manner that cloaked their involvement and made it appear that others were driving the effort to remove Mock's departments; (C) Fain maintained a hostility against Mock; and (D) Fain's actions were previewed in a public pronouncement he made months earlier that he would take action against anyone who "messed" with certain members of his inner circle.  Further detail regarding each of these areas is set forth below.

### A.    The Stated Reasons for the Removal of Secretary-Treasurer Mock's Oversight Were Without Support

Under the UAW Constitution, the President's power to remove any field assignment made to any elected officer is limited.  It requires a standard "that the officer has been derelict in their duty or been guilty of a dishonest act."[266]  To determine whether the actions to strip Secretary-Treasurer Mock were retaliatory, the Monitor first considered if the proffered, nonretaliatory justifications for the claim that Mock was "derelict" in her duty were valid.  Here, those stated reasons—as outlined in the Special Compliance Report—did not support the actions taken against Mock.

---

[266] UAW Const., art. 13, § 4.

65

As detailed in the preceding section, which catalogues each of the allegations against Secretary-Treasurer Mock and the results of the Monitor's investigation into their veracity, the evidence showed that the actions taken by Mock did not amount to a "dereliction of duty" or a "dishonest act." Instead, her actions largely reflected her fulfillment of the requirements and duties set forth in the UAW Constitution for the Secretary-Treasurer to perform, including the consistent application of Union financial policies. Mock stated—and the evidence supports—that she took a strict approach in administering these policies because of the recent history of corruption at the Union and to fulfill the promise she had made when she ran for office that she would strictly enforce the rules in order to avoid the possibility of further abuses.[267] The evidence detailed above further demonstrates that her strict application of the Union's policies was typically at the recommendation of the Union's long-standing Chief Accountant and was consistently applied regardless of who was requesting the exception, directly contradicting the accusation that she had weaponized or politicized her Office. Indeed, the only substantiated claim from the Special Compliance Report had nothing to do with "weaponizing" or "politicizing" her office. It was that Mock had ordered Union yard signs whose design was slightly different from the ones proposed by the Communications Department.

In all, the Monitor's investigation found that the stated justifications for removing Secretary-Treasurer Mock's departments because she was derelict in her duties, as reflected in the allegations and conclusions of the Special Compliance Report, were unsupported.

### B.       The Sanctions Against Secretary-Mock Were Premeditated and Cloaked

After determining whether the stated reasons for punitive actions are valid or not, the next step was for the Monitor to determine if there was evidence indicating whether the actions taken

---

[267] M. Mock Interview (June 6, 2024).

by President Fain against Secretary-Treasurer Mock were taken with a good faith but mistaken belief that the allegations against her were true, or whether the evidence demonstrated that he acted with an illegitimate, retaliatory intent.

One indicator of intent is looking at how those allegations were put together, how they were presented to the IEB, and how the removal of Secretary-Treasurer Mock's departments was effectuated.  For example, if the evidence demonstrated that the Special Compliance Report was independently and fairly prepared by the Compliance Department without any influence by President Fain and his staff, and that the action to remove Mock's departments based on those findings was directly and transparently presented to the IEB, that would indicate that Fain's actions, although based on false information, were taken in good faith.  The evidence, however, demonstrated that the preparation of the erroneous Special Compliance Report was heavily influenced by the President's Office, was pretextually prepared to support an already-made decision to seek to remove Mock's assignments, and that the motion to support the removal of Mock's departments was scripted by Fain and his staff to make it appear that someone else was behind it, all evidence of an illegitimate and retaliatory intent.

1.   **President Fain and his Office Pre-Determined to Seek to Remove Departments from Secretary-Treasurer Mock's Supervision and then Closely Coordinated the Motion Before the IEB**

Various witnesses described discussions in the weeks before the February 20, 2024 IEB meeting about stripping from Secretary-Treasurer Mock the departments under her supervision, well before the Special Compliance Report was completed, demonstrating that the decision to take action against Mock was made prior to the Report and independent of its findings.  In other words, the evidence demonstrates that the preparation of the Report was intended to serve as an after-the-

67

fact justification for the already-made decision to take action against Mock, as opposed to the other way around.

President Fain admitted to the Monitor that he determined to put the plan into action to remove Secretary-Treasurer Mock's departments.[268] He further acknowledged that although the UAW Constitution permitted him to do so on his own finding that she was derelict in her duties, he said that he decided to contact Regional Directors Dickerson and English prior to the February 20, 2024 IEB meeting to ask that they make and second a motion to support the removal of all departments reporting to Mock that were not mandated by the Constitution.[269] When asked by the Monitor why he reached out to Dickerson and English to make the motion, as opposed to taking action himself, Fain admitted that he wanted the motion to come from them, and not from himself.[270] He justified taking this step to cloak his actions because Dickerson and English, like Mock, are Black women,[271] and that he "wanted to reach out to Laura [Dickerson] and LaShawn [English] as they're African American because I know accusations happen all the time if you're a white male."[272] He explained that if he overtly took action himself, he feared he would be vulnerable to accusations of racism, and that "I thought it would be better coming from [Dickerson] than me, a white guy."[273]

Regional Director Dickerson confirmed that President Fain had reached out to her to discuss the motion, and that the findings of the Special Compliance Report were irrelevant to his

---

[268] S. Fain Interview (June 5, 2024).
[269] S. Fain Interview (June 5, 2024).
[270] S. Fain Interview (June 5, 2024).
[271] S. Fain Interview (June 5, 2024).
[272] S. Fain Interview (June 5, 2024).
[273] S. Fain Interview (June 5, 2024).

request and her agreement that she make the motion.[274]  Dickerson told the Monitor that two or three weeks before the February 20, 2024 IEB meeting—well before the date that Top Administrative Assistant Brooks told the Monitor that the Report "came together"[275]—she had a phone conversation with Fain in which they discussed that Dickerson would make a motion and include the language from the UAW Constitution to support the removal of Secretary-Treasurer Mock's assignments.[276]  Dickerson said that she told Fain she would make the motion and that she and Fain discussed the "wording of the motion."[277]  Dickerson said that Fain did not need Dickerson to make the motion to support the removal of Mock's assignments because she believed that he already had the authority under the Constitution to do it himself, but that Fain "may have had some concern" regarding allegations of "discrimination in the [news]papers on [Mock's] part."[278]  Dickerson said she thought there might be "concern on [Fain's] part because [Mock is] a Black woman" and that Mock would "put that all in the [news]papers."[279]  Dickerson said Fain did not express those concerns to her.[280]

Regional Director Dickerson told the Monitor that the Special Compliance Report did not factor in her decision to agree to make the motion.[281]  Indeed, she said that President Fain never mentioned the Special Compliance Report or its findings in their discussions, and that she was

---

[274] L. Dickerson Interview (May 30, 2024).
[275] C. Brooks Interview (May 31, 2024).
[276] L. Dickerson Interview (May 30, 2024).
[277] L. Dickerson Interview (May 30, 2024).
[278] L. Dickerson Interview (May 30, 2024).
[279] L. Dickerson Interview (May 30, 2024).
[280] L. Dickerson Interview (May 30, 2024).
[281] L. Dickerson Interview (May 30, 2024).

unaware of the Report until she heard it presented at the February 20, 2024 IEB meeting.[282] Dickerson thus acknowledged that the Report had nothing to do with her agreeing to make the motion. Similarly, Dickerson said she was not aware of any allegations that Mock engaged in an "abuse of power" prior to the meeting.[283]

Instead, Regional Director Dickerson said that she was willing to make the motion because of "challenges" she had with the Secretary-Treasurer's Office under Mock, and was "more than ready to make a motion out of frustration," particularly as it related to alleged delays in donation checks and building repairs.[284]  She said that she believed that if Mock was relieved of these assignments, it would "afford [Mock] more time to focus on [her] core constitutional responsibilities as outlined in the UAW Constitution" and prevent future delays with the Secretary-Treasurer's Office.[285]  Dickerson also said she herself had raised issues regarding Mock to President Fain at an IEB meeting after Fain was sworn in.[286]  Dickerson described that, as time went on, Fain appeared "frustrated" about complaints that she and others were making regarding delays from the Secretary-Treasurer's Office.[287]  According to Dickerson, Fain instructed her to make the motion to support the removal of Mock's departments after Schroeder delivered her compliance report.[288]

---

[282] L. Dickerson Interview (May 30, 2024).

[283] L. Dickerson Interview (May 30, 2024).

[284] L. Dickerson Interview (May 30, 2024).  These allegations were among those referenced above that were investigated by the Monitor and found to be without merit.

[285] L. Dickerson Interview (June 17, 2025).

[286] L. Dickerson Interview (May 30, 2024).

[287] L. Dickerson Interview (May 30, 2024).

[288] L. Dickerson Interview (May 30, 2024).

Although Regional Director Dickerson said that she was unaware of the Special Compliance Report before hearing it for the first time at the February 20, 2024 IEB meeting, she included a reference to it in her motion. This was presumably because she was reading language that President Fain's Top Administrative Assistant Brooks had scripted for her prior to the meeting. Brooks set forth the language in a February 16, 2024 text message to Fain and Communications Director Furman reviewed by the Monitor:

> For Laura and LaShawn: Per Article 13, Section 3 through 5 of the UAW Constitution, the International President has the power to withdraw any field assignments to any elected officer when they become convinced that the officer has been derelict in their duty or is guilty of a dishonest act. **Based on the compliance department report, I would like to make a motion in support of President Fain withdrawing all of the field assignments assigned to the Secretary Treasurer with the exception of any constitutionally mandated departments so that the Secretary Treasurer can focus on complying with their core constitutional obligations.**[289]

The Monitor did not locate any responses or forwards of this text message in the documents provided to the Monitor, but Dickerson confirmed that Fain had texted the language to her in advance of the IEB meeting,[290] calling into further question the completeness of the Union's document production. The bolded language in Brooks's text message is nearly the exact language read by Dickerson when she made the motion at the February 20, 2024 IEB meeting.[291] Specifically, Dickerson stated the following:

> Based on the Compliance Report that we just heard and many of the challenges that have been expressed by many people sitting around this table throughout the day, I make a motion in support of President Fain withdrawing all of the field assignments assigned to the Secretary-Treasurer with the exception of any constitutionally

---

[289] Text Message from C. Brooks (Feb. 16, 2024) (emphasis added).
[290] L. Dickerson Interview (June 17, 2025).
[291] Text Message from C. Brooks (Feb. 16, 2024); IEB Meeting Minutes (Feb. 20, 2024).

71

mandated departments so that the Secretary-Treasurer can focus on complying with the core constitutional obligations of the office. Thank you.[292]

President Fain also said that he had reached out to Regional Director LaShawn English in advance of the February 20, 2024 IEB meeting and told her that he would "appreciate it" if she would second a motion against Secretary-Treasurer Mock that would support removal of her departments.[293] According to Regional Director Brandon Mancilla, Fain also told him before the meeting that English was going to second the motion, and this was part of the plan described by Top Administrative Assistant Brooks in the text quoted above, which mentions "LaShawn" by name.[294]

Regional Director English's account differed.  English told the Monitor that she was not aware of the motion to support the removal of Secretary-Treasurer Mock's departments in advance, or the Special Compliance Report, until Compliance Director Schroeder read the Report, and Regional Director Dickerson made the motion at the IEB meeting.[295] English told the Monitor that seconding the motion was not planned beforehand, but because no one else was seconding it, she did.[296]

That the decision to remove Secretary-Treasurer Mock's departments was made in advance of the Special Compliance Report was corroborated by others as well.  Regional Director Mancilla told the Monitor that, in late January or early February 2024, Top Administrative Assistant Brooks told Mancilla that "one of the things that could happen is removing some departments" from

---

[292] IEB Meeting Minutes (Feb. 20, 2024
[293] S. Fain Interview (June 5, 2024).
[294] B. Mancilla Interview (June 20, 2024).
[295] L. English Interview (May 30, 2024).
[296] L. English Interview (May 30, 2024).

Secretary-Treasurer Mock.[297]    Compliance Director Schroeder similarly recounted Brooks discussing the possible removal of Mock's departments. She told the Monitor that she had heard from Brooks "rumors" that "there may be some actions taken by [the] Board or President," and that removal of Mock's departments was one of the options discussed.[298] Brooks also recounted to the Monitor that there were many ongoing discussions of how to respond to Secretary-Treasurer Mock, including removing her departments.[299]

President Fain also discussed the removal of Secretary-Treasurer Mock's departments with certain other IEB members in advance of the February 20, 2024 meeting. Fain told the Monitor that, prior to the February 20, 2024 IEB meeting, he called "almost all of [the IEB members]" to alert them to Mock's behavior and that it needed to be discussed.[300] Fain said he thought the best remedy was to remove Mock's assignments, so he discussed that option and the planned motion with IEB members on these calls.[301]

But only a small subset of IEB members recalled President Fain's calling them in advance of the February 20, 2024 IEB meeting:

- Regional Director Daniel Vicente told the Monitor that a few days before the IEB meeting, Fain called to tell him that he planned to make a presentation regarding his issues with Secretary-Treasurer Mock, and asked Vicente to "keep an open mind."[302]    Vicente said he assumed Fain's presentation was critical of Mock, and that Fain did not ask for Vicente to vote in his favor.[303] Vicente told Fain that he would keep an open mind and

---

[297] B. Mancilla Interview (June 20, 2024).

[298] M. Schroeder Interview (June 5, 2024).

[299] C. Brooks Interview (June 13, 2024).

[300] S. Fain Interview (June 5, 2024).

[301] S. Fain Interview (June 5, 2024).

[302] D. Vicente Interview (June 21, 2024).

[303] D. Vicente Interview (June 21, 2024).

"vote in the interest" of his region.[304] Vicente said he did not have advance copies of any documents that would be used at the IEB meeting, but he anticipated that "it would be an unpleasant meeting."[305]

- Regional Director Mancilla recounted that Fain called him in mid-February 2024 to say he wanted to "move forward and remove departments" from Mock and that the "Board needed to discuss."[306] Fain told Mancilla that Regional Director Dickerson would make a motion at the IEB meeting and Regional Director English would second it.[307] Mancilla did not recall why Dickerson would make a motion as opposed to Fain, but Mancilla commented that Dickerson is "really well-respected" on the IEB.[308]

- Vice President Browning recalled that about a week prior to the February 20, 2024 IEB meeting, Fain brought up his frustration with Mock and "indicated some compliance issues."[309] Browning told the Monitor that Fain told him there would be a report about these issues at the upcoming IEB meeting and Fain was considering changing Mock's assignments.[310] Browning recalled that he told Fain the President had the right to transfer assignments and did not need a particular reason for doing so.[311] Browning did not see the Special Compliance Report before the February 20, 2024 IEB meeting, nor did he ask to see it.[312]

Notwithstanding President Fain's statement that he contacted "almost all" IEB members in advance, only the four members noted above (Vice President Browning, Regional Director Dickerson, Regional Director Mancilla, and Regional Director Vicente) recall receiving notice from Fain, and, of those, only three of them recalled to the Monitor discussions regarding removing Secretary-Treasurer Mock's departments. The remaining nine IEB members said that they either

---

[304] D. Vicente Interview (June 21, 2024).

[305] D. Vicente Interview (June 21, 2024).

[306] B. Mancilla Interview (June 20, 2024).

[307] B. Mancilla Interview (June 20, 2024).

[308] B. Mancilla Interview (June 20, 2024).

[309] C. Browning Interview (May 6, 2024).

[310] C. Browning Interview (May 6, 2024).

[311] C. Browning Interview (May 6, 2024).

[312] C. Browning Interview (May 6, 2024).

did not recall receiving any outreach from Fain or had not spoken to Fain about the planned motion (Mock, Vice President Booth, Vice President Boyer, Regional Director English, Regional Director Green, Regional Director Steve Dawes, Regional Director Brandon Campbell, Regional Director Miller, and Regional Director Tim Smith), although there is contradictory evidence, noted above, indicating that English was notified by Fain in advance of the meeting.[313]

2.   **President Fain and his Office Initiated and Influenced the Drafting of the Special Compliance Report**

With respect to creation of the Special Compliance Report, President Fain acknowledged to the Monitor that he had "asked [Schroeder] to put together a list of things [regarding Mock] and we can discuss with the Board."[314] This "list" eventually became the Special Compliance Report, although Fain told the Monitor that he could not specifically recall who decided it should be a formal report.[315] Top Administrative Assistant Brooks told the Monitor that the decision to issue the Report was a "collaborative" decision between Compliance Director Schroeder and Fain. He also stated that Schroeder "decided" something needed to be done about Secretary-Treasurer Mock's behavior and that the Compliance Department should issue a report.[316] Schroeder did not recall exactly when she decided she would present the Special Compliance Report at the February 20, 2024 IEB meeting, but said that "at some point" she began drafting a document that included

---

[313] M. Mock Interview (Apr. 18, 2024); M. Booth Interview (May 6, 2024); R. Boyer Interview (May 8, 2024); L. English Interview (May 30, 2024); D. Green Interview (May 28, 2024); S. Dawes Interview (June 13, 2024); B. Campbell Interview (June 20, 2024); M. Miller Interview (May 14, 2024); T. Smith Interview (June 17, 2024).

[314] S. Fain Interview (June 5, 2024).

[315] S. Fain Interview (June 5, 2024).

[316] C. Brooks Interview (May 31, 2024).

the various issues people had raised to her.[317]  She recalled that it was "sometime in 2024" that she had a phone call with Fain in which they discussed the formal Report.[318]

Regardless, documents reviewed by the Monitor indicated that the process was heavily influenced by Fain's aides.  A substantial portion of the Special Compliance Report was drafted by Top Administrative Assistant Brooks and Communications Director Furman, including the proposed motions that arose out if its findings, and the rest was edited by them.  This included Brooks providing the language for the specific motions for IEB consideration that changed certain policies and overruled Secretary-Treasurer Mock's denial of certain exceptions (including for his own expenses).  Brooks first circulated the document containing those motions to Fain and other members of the President's Office (but not Schroeder) on January 15, 2024.[319]  Brooks then sent the document to Schroeder on February 7, 2024, saying this is "a first draft of resolutions for Shawn to bring to the IEB based on the issues list," stating it is an "updated" version of a document they had "discussed earlier."[320]  Brooks also noted that they would be meeting with Fain on the following Monday, February 12, 2024, about the draft.[321]  The list of motions were included in Schroeder's Special Compliance Report and became part of her presentation to the IEB.  Besides some minor changes in wording, the only variance was the decision to have Schroeder, instead of Fain, advance the applicable motions, thereby giving them the imprimatur of coming from the Compliance Department.

---

[317] M. Schroeder Interview (June 5, 2024).

[318] M. Schroeder Interview (June 5, 2024).

[319] Email from C. Brooks to B. Dictor, S. Fain, J. Furman, B. Shepherd (Jan. 15, 2024).

[320] Email from C. Brooks to M. Schroeder (Feb. 7, 2024).  The timing of the conversation Brooks references when he says the document is updated from what they "discussed earlier" is unclear from the documents produced to the Monitor.

[321] Email from C. Brooks to M. Schroeder (Feb. 7, 2024).

76

As to other portions of the Special Compliance Report, Top Administrative Assistant Brooks told the Monitor that he encouraged multiple people, including his direct reports, to send "everything they could related to obstruction" by Secretary-Treasurer Mock to Compliance Director Schroeder.[322] This included Regional Director Mancilla, who told the Monitor that he and his Assistant Director sent materials to Schroeder at Brooks's direction.[323] According to Brooks, the Report came together quickly, and was only drafted within a week of the February 20, 2024 IEB meeting, although the documentary evidence demonstrates that the "compliance resolutions" that eventually became about half of the Special Compliance Report, mentioned above, was drafted at least a month earlier.[324] Schroeder said she knew Brooks had "people send me things because emails said, 'Chris told me to send this to you.'"[325]

Compliance Director Schroeder told the Monitor that she did not conduct any formal interviews for the Report, but also acknowledged that she had spoken to some of the people who sent her documents and information, including Regional Director Green, Regional Director Miller, Regional Director Mancilla, Jim McNeill in the Communications Department, Communications Director Furman, Top Administrative Assistant Brooks, and clericals in the Organizing Department.[326] Schroeder recalled speaking with Miller one-on-one and took notes during that conversation, and she thought that her conversation with Brooks and Furman may have occurred

---

[322] C. Brooks Interview (June 13, 2024).
[323] B. Mancilla Interview (June 20, 2024).
[324] C. Brooks Interview (May 31, 2024).
[325] M. Schroeder Interview (June 5, 2024).
[326] M. Schroeder Interview (June 5, 2024).

on a conference call.[327]  She also spoke with Purchasing Director Fields about the strike signs and

Conexion contract but did not frame the conversation as soliciting information for a report.[328]

Compliance Director Schroeder also said she received input about the Report itself from

others in the President's Office, such as Top Administrative Assistant Brooks and

Communications Director Furman, because she wanted their "input on my tone but not in

content."[329]  However, Furman, who confirmed he received a draft of the Special Compliance

Report from Schroeder prior to the February 20, 2024 IEB meeting, said that he edited the Report

both substantively and for readability.[330]  A review of Furman's edits indicates that they were in

fact substantive and impactful.  For example, documents reviewed by the Monitor[331] show that on

February 18, 2024, Furman emailed Schroeder telling her that he removed from a draft of the

Report her conclusions as to Secretary-Treasurer Mock's motives for alleged obstruction.[332]  In

this same email thread, Furman proposed his own conclusion for the Report, emailing Schroeder,

"Then I think it closes with something like: As your Compliance Director, it is clear that

compliance as a principle is being broadly misapplied and weaponized for either personal,

political, or simple bureaucratic reasons that are harming this Board, this organization, our staff,

and our membership.  These proposals should go a long way towards fixing that, but we must be

---

[327] M. Schroeder Interview (June 5, 2024).

[328] M. Schroeder Interview (June 5, 2024).

[329] M. Schroeder Interview (June 5, 2024).

[330] J. Furman Interview (July 11, 2024).

[331] The Monitor was unable to locate in the Union's production of documents the original draft of the Special Compliance Report that set forth the alleged motive that Schroeder apparently drafted, nor was the Monitor able to locate any redline drafts of the Report with line-by-line edits of Schroeder, Furman, and Brooks. The Union did, however, produce email correspondence between Schroeder, Furman, and Brooks in which they discussed various edits that each of them proposed to the Report.

[332] Email from J. Furman to M. Schroeder and C. Brooks (Feb. 18, 2024).

vigilant as an organization to ensure that we don't fall back into obstruction or lose sight of our mission of ethically serving our membership."[333]   This was read by Schroeder verbatim at the February 20, 2024 IEB meeting.[334]   Brooks also confirmed to the Monitor that he provided verbal and written edits and suggestions for the Report, explaining that he wanted to make sure the Report was "correctly characterizing" what was going on in the departments.[335]

President Fain and members of his staff met to discuss a draft of the Special Compliance Report in the days before the February 20, 2024 IEB meeting:  documents indicate that they met first, on Friday, February 16, 2024, and, second, on Monday, February 19, 2024, the day before the IEB meeting and a day after Communications Director Furman drafted its conclusion.[336] According to Fain's assistant at the time, both meetings were recorded in Fain's calendar under the title "Re compliance report,"[337] and the list of attendees for these meetings included President Fain, Compliance Director Schroeder, Top Administrative Assistant Brooks, and Top Administrative Assistant Jason Wade, among others.[338]   Schroeder said she thought she only attended the second of the two meetings, meaning that the first was likely conducted without her.[339]

Several of these individuals recalled meeting about the Special Compliance Report in advance of the February 20, 2024 IEB meeting:

- Compliance Director Schroeder recalled that she attended a meeting regarding the Special Compliance Report the Monday before the February

---

[333] Email from J. Furman to M. Schroeder and C. Brooks (Feb. 18, 2024).  In the same email chain, Furman also proposed a broad restructuring of the report that Schroeder accepted.
[334] IEB Meeting Minutes (Feb. 20, 2024).
[335] C. Brooks Interview (June 13, 2024).
[336] K. Tarpey Interview (May 15, 2024).
[337] K. Tarpey Interview (May 15, 2024).
[338] K. Tarpey Interview (May 15, 2024).
[339] K. Tarpey Interview (May 15, 2024); M. Schroeder Interview (June 5, 2024).

20, 2024 IEB meeting, during which she shared the draft Report.[340] According to Schroeder, President Fain saw a draft but did not provide comments.[341]

- President Fain's Top Administrative Assistant Wade said that a few days prior to the February 20, 2024 IEB meeting, he attended an "unplanned . . . read through of the [Special Compliance] Report."[342] Wade did recall one issue from the Report related to the denial of exception requests for taxis, which he said reminded him of his complaint about Secretary-Treasurer Mock denying his own exception request.[343]

- Top Administrative Assistant Brooks recounted that he received a read out of Schroeder's Report prior to the February 20, 2024 IEB meeting.[344]

Compliance Director Schroeder told the Monitor that, once she began compiling the Special Compliance Report, she did not have a conversation with Secretary-Treasurer Mock.[345] Schroeder told the Monitor that she previously spoke with Mock about the issues raised in the Report and "didn't think there was reason to rehash" them.[346] Similarly, President Fain told the Monitor that he did not talk to Mock about the Report before the meeting because he had already talked to her "over and over on these issues."[347] Mock confirmed to the Monitor that no one spoke with her before the February 20, 2024 IEB meeting about the allegations in the Report or the proposal to strip her of her departments, and that she felt she was "ambushed" at the meeting.[348]

---

[340] M. Schroeder Interview (June 5, 2024).

[341] M. Schroeder Interview (June 5, 2024).

[342] J. Wade Interview (June 10, 2024).

[343] J. Wade Interview (June 10, 2024).

[344] C. Brooks Interview (June 13, 2024).

[345] M. Schroeder Interview (June 5, 2024).

[346] M. Schroeder Interview (June 5, 2024).

[347] S. Fain Interview (June 5, 2024).

[348] M. Mock Interview (Apr. 18, 2024).

Compliance Director Schroeder did recall speaking to Purchasing Director Fields when compiling information about the Conexion contract issue and the strike signs.[349] Aside from this conversation with Fields, Schroeder said that she did not otherwise contact members of the Secretary-Treasurer's Office in connection with the creation of the Special Compliance Report. As a result, Schroeder appears to have conducted no analysis of the Secretary-Treasurer's overall approach to granting and denying exceptions to determine whether or not, as Schroeder stated in her Report, Mock "politicized and weaponized" the T&E Policy, or, on the other hand, whether Mock consistently applied the T&E Policy and treated all applicants the same. Similarly, she did not speak to Chief Accountant Geromin to determine whether Mock unilaterally denied exceptions, or if she consulted with the Chief Accountant and followed her advice, in each instance where a policy exception cited in the Report was described as "politicized and weaponized."

In all, the Special Compliance Report was plagued by a failure to take customary investigative steps in determining the facts presented, along with the extensive role that Communications Director Furman and Top Administrative Assistant Brooks had in drafting the Report, including its conclusion.

### C.      Further Evidence of Retaliatory Motivation

Next, in further determining whether President Fain's intent when he orchestrated the removal of Secretary-Treasurer Mock's departments was in good faith or retaliatory, the Monitor looked to prior statements made or actions taken by Fain that could provide insight as to his state of mind. The Monitor's investigation uncovered the following additional evidence of retaliatory intent: (1) a meeting at which Fain publicly warned that he would "slit" or "cut" the "fucking throats" of anyone who "messed" with members of his inner circle; (2) two incidents in which

---

[349] M. Schroeder Interview (June 5, 2024).

Fain demonstrated open hostility to UAW personnel working in departments based on his belief that Mock had ordered actions that those employees had carried out, departments that Fain ultimately removed from Mock's oversight; and (3) anecdotal evidence of Fain's hostility toward Mock.

### 1.    The "Slit [Their] Fucking Throats" Incident

Numerous interviewees told the Monitor about a staff meeting attended by Secretary-Treasurer Mock, other IEB members, and approximately 300 other UAW personnel around October 2023, at which President Fain told the UAW staff present that he would "slit" or "cut" the "fucking throats" of anyone who "messed" with certain members of his inner circle.   Nearly all interviewees who recounted this scenario to the Monitor said they interpreted Fain's words as a serious threat that if they went against him or these referenced members of his inner circle, they would be retaliated against.

- Secretary-Treasurer Mock recalled that at the meeting, Fain was saying he has brilliant people around him and asked Top Administrative Assistant Gotinsky, Top Administrative Assistant Paul Caucci, Outside Counsel Benjamin Dictor, Top Administrative Assistant Stacie Steward, Top Administrative Assistant Brooks, and Communications Director Furman to stand up with him.   Fain then said that he would "cut their throats" if anyone messed with these people.   Mock said she and others interpreted this remark as threatening.[350]

- A Regional Director told the Monitor that during the meeting, Fain stood up and "brag[ged] about Kevin [Gotinsky] and Jo[nah Furman]" and said, "if anyone ever messes with them, I will slit their effing throats" and "used the F-word."   According to the Regional Director, after Fain said this, "the room was quiet" and you "could hear a pin drop."   He said that Fain's tone was that "he'd do it right then" and that Fain "was not kidding."[351]

- A Top Administrative Assistant to one of the Vice Presidents recalled a meeting in October 2023 at which Fain, in front of "hundreds of people,"

[350] M. Mock Interview (June 6, 2024).
[351] S. Dawes Interview (June 13, 2024).

said that "anybody who messes with my staff, I will cut your fucking throats." She said that she understood this to mean that if anyone interferes with Fain's staff, they would be removed from the UAW. She described Fain's tone as serious.[352]

- A different Regional Director also recounted Fain using language at the meeting that he would "cut the fucking throats" of anyone who messed with his people.[353] He added that Fain's comment "speaks to retribution" since Fain is the "most powerful person."[354]

- A Vice President recalled that, while speaking at the meeting, Fain pointed to two of his Top Administrative Assistants, Paul Caucci and Kevin Gotinsky, and said to the room, "If anyone fucks with them, I'll slit their throat."[355]

- When asked Fain's intention behind the statement, Top Administrative Assistant Gotinsky said "it was in the moment" and "Fain knew after the fact that he maybe shouldn't have said it."[356] Gotinsky explained that Fain made the statement because Gotinsky and Caucci "sid[ed]" with Fain and supported Fain's candidacy for President before he was a popular choice.[357]

When asked about these concerns, President Fain told the Monitor that he was praising staff members who had worked on a contract and pointed at two of his Top Administrative Assistants, and said, "if anyone messes with [them], I'll slit their throats."[358] Fain told the Monitor that he meant that he would "die for them."[359] Fain said that he was laughing and smiling when he said the comment and later found out that people found it offensive.[360] No one the Monitor interviewed recalled Fain smiling or laughing when he said it, and no one said that he appeared to

---

[352] N. Current Interview (June 11, 2024).

[353] B. Campbell Interview (June 20, 2024).

[354] B. Campbell Interview (June 20, 2024).

[355] R. Boyer Interview (May 8, 2024).

[356] K. Gotinsky Interview (July 17, 2024).

[357] K. Gotinsky Interview (July 17, 2024).

[358] S. Fain Interview (June 5, 2024).

[359] S. Fain Interview (June 5, 2024).

[360] S. Fain Interview (June 5, 2024).

be joking.  When asked how others took the message, Gotinsky told the Monitor that there are "some haters that still don't like him," but the attendees "understood it how he meant it."[361]

Several of the actions cited in the Special Compliance Report or during the investigation invoked Secretary-Treasurer Mock's refusal to provide exceptions or expedite matters for the members of Fain's inner circle, to whom he was apparently referring at the meeting.  For example, as discussed above, Communications Director Furman and Top Administrative Assistant Brooks both pushed for quick approval of the Conexion and Feldman Strategies contracts, which Secretary-Treasurer Mock refused to grant.  Brooks was also the subject of Mock's refusal to allow exceptions to the policy for his purchase of pizza or approving an Enhanced Corporate Card for him.  Indeed, Mock specifically cited several of these examples in her complaint to the Monitor as examples of actions that she believed gave rise to retaliatory animus on the part of President Fain, and Fain himself described Mock's refusal to grant the single-source contract for Conexion as his "breaking point."[362]

### 2.    Incidents Involving Two Additional Departments

The Monitor investigated two incidents cited by Secretary-Treasurer Mock in her allegations in which President Fain allegedly demonstrated hostility and anger toward personnel from departments under Mock's oversight, after they had taken actions that Fain believed had been instigated by Mock.  Fain stripped both of these departments from her supervision:  the Print Shop and Properties and Maintenance Departments.[363]

---

[361] K. Gotinsky Interview (July 17, 2024).

[362] Monitor Meeting with M. Mock (Feb. 26, 2024); S. Fain Interview (June 5, 2024).

[363] President's Office Organizational Chart (Feb. 23, 2024).

84

### a.    Print Shop Incident

Secretary-Treasurer Mock pointed to an incident in November 2023 where President Fain verbally attacked employees in the Print Shop by, according to Mock, "curs[ing] them out" and "[getting] in their face" because of a decision Fain believed was made by Mock.[364]

The incident arose after President Fain had heard that Secretary-Treasurer Mock wanted her photograph to appear on the back of the Stellantis highlighter alongside Fain's photograph, which is a publication describing the tentative contract between the Union and the company.[365]

According to witnesses who asked to remain anonymous because they fear retaliation from President Fain, Fain approached the Head of the Print Shop and launched into what was described as a "tirade."[366]  He reportedly asked, "who told you to put [Mock's] motherfucking photo on there?  This is my motherfucking membership," and yelled, "who the fuck runs this motherfucking department?"[367]  According to Vice President Boyer, who spoke with an employee who Fain yelled at after the Print Shop Incident, the employee was "visibly shaken" and "crying."[368]

President Fain acknowledged that he was upset after learning from Communications Director Furman that there were issues with the highlighters because Secretary-Treasurer Mock wanted her picture on the back of it.[369]  Fain admitted that he yelled and that he "got shitty."[370]

Secretary-Treasurer Mock said that right after this incident, she talked to President Fain, who again cursed her out.  She explained that she did not back down, saying "he was

---

[364] Monitor Meeting with M. Mock (Feb. 26, 2024).
[365] S. Fain Interview (June 5, 2024); UAW Staff Interview.
[366] UAW Staff Interview.
[367] UAW Staff Interview.
[368] R. Boyer Interview (May 8, 2024).
[369] S. Fain Interview (June 5, 2024).
[370] S. Fain Interview (June 5, 2024).

motherfucking me and then I motherfucked him back and then I hung up at that point because it didn't make sense."[371]

Following the motion at the February 20, 2024 IEB meeting, President Fain transferred the Print Shop Department from Secretary-Treasurer Mock's oversight to his own.[372]

### b.    Banner Incident

Secretary-Treasurer Mock also mentioned in her complaint that President Fain had "cussed" out members of the Properties and Maintenance Department over putting a banner on the Solidarity House building because he thought that Mock was holding it up.[373]  Mock and other interviewees told the Monitor that in October 2023, Fain expressed disagreement with directions from UAW staff—which he assumed came from Mock—that he could not hang a banner on the façade of the Solidarity House building because of concerns that installing such a banner would void the warranty on the newly reconstructed Solidarity House.  They reported that Fain reacted poorly to this news, cursing out an employee.[374]

Secretary-Treasurer Mock wrote an email to President Fain expressing her concern over his treatment of the employee, stating that the employee's "forthright response did not justify the severe reprimanding he received" and that Fain's reaction "risks fostering a toxic work culture where employees may feel reluctant to voice their concerns or share their value-added ideas."[375]  When asked about the Banner Incident, Fain told the Monitor that he and his team were considering a "Stand Up" banner across the building.  When the employee told them that they

---

[371] M. Mock Interview (Apr. 18, 2024).

[372] President's Office Organizational Chart (Feb. 23, 2024).

[373] Monitor Meeting with M. Mock (Feb. 26, 2024); M. Mock Interview (Apr. 18, 2024).

[374] M. Mock Interview (Apr. 18, 2024); UAW Staff Interview.

[375] Email from M. Mock to S. Fain (Oct. 9, 2023).

could not hang the banner because of structural concerns, Fain thought it was Mock who was interfering with his idea and called the employee.[376]  Fain claimed that he did not raise his voice on the call, nor did he think he used the word "fuck."[377]

Following the motion at the February 20, 2024 IEB meeting, President Fain transferred the Properties and Maintenance Department from Secretary-Treasurer Mock's oversight to his own.[378]

### 3.    Anecdotes of Hostility Toward Secretary-Treasurer Mock

During this investigation, the Monitor learned of further evidence of President Fain's anger towards Secretary-Treasurer Mock and her refusal to accede to his demands.  For example, on one occasion, a staff member who has requested anonymity because they said they are fearful of retaliation by the President if they are identified in this report overheard Fain accusing Mock of denying an expense because she hated Top Administrative Assistant Brooks, which Mock denied.[379]  The staff member told the Monitor that they heard Mock defend herself by saying that she has a fiduciary responsibility to the organization and Fain responded, "Your only responsibility is to sign the fucking check."[380]  This same employee also said that they heard Fain shouting and

---

[376] S. Fain Interview (June 5, 2024).

[377] S. Fain Interview (June 5, 2024).

[378] President's Office Organizational Chart (Feb. 23, 2024).

[379] UAW Staff Interview.

[380] UAW Staff Interview.  In the limited feedback the Union provided to the Monitor in connection with this report, the Union stated that "there appear to be fundamental misunderstandings between the Monitor and the International Union related to the constitutional authority of the IEB to operate the union and the roles of the President and Secretary-Treasurer within that constitutional structure."  As with the Union's other feedback, the Union did not further explain or provide any factual corrections or supporting documentation for this claim, even after the Monitor requested that the General Counsel promptly provide support for his statement in writing or in a call or video conference.  However, the Union previously outlined its position concerning the roles of the IEB, President, and Secretary-Treasurer in correspondence between the Monitor and the Union following the February 2024 IEB meeting.  Letter from Union to Monitor (March 26, 2024); Letter from Union to Monitor (Apr. 17, 2024).  Specifically, the Union described the Secretary-Treasurer as having merely a "recording and reporting role" under the UAW Constitution, limited to

swearing at Mock and recalled that Mock told Fain to stop swearing at her.[381]  On other occasions,

another staff member who has requested anonymity because they said they are fearful of retaliation

by the President if they are identified in this report would hear Mock on the phone with Fain and

say things like, "I am not going to keep letting you curse at me like that."[382]  At times, Mock would

eventually yell or curse back at Fain.[383]

## IV.    CONCLUSION

As detailed above, the Monitor's investigation found that Secretary-Treasurer Mock was

falsely accused of misconduct, and that therefore there was no basis for removing departments

from her oversight or reassigning her board positions.  The Monitor's investigation further found

that President Fain acted with illegitimate and retaliatory intent when he removed Mock's

departments and board assignments.  For these reasons, Fain's actions should be immediately

reversed, with each of Mock's departments and assignments reinstated.  The Monitor is deferring

bringing any charges at this time as the Monitor continues to investigate various other allegations

concerning a retaliatory pattern of conduct concerning Fain.  The Monitor will update the Court

further concerning those activities in a future report.

* * *

---

receiving and depositing the Union's money, reporting expenses, and paying its bills.  Letter from Union to Monitor (Apr. 17, 2024).  However, as detailed in the Monitor's Tenth Status Report, the Secretary-Treasurer's role is critical to maintain the checks and balances within the Union's organizational structure and prevent abuses similar to those that led to the Consent Decree.  Monitor's Tenth Status Report at 28-35.  The Union's characterization of the Secretary-Treasurer's role as simply 'recording and reporting' would render the second highest position in the Union as little more than a rubber stamp for the decisions of the President.  In any event, even if the Secretary-Treasurer's role was purely ministerial, it would be irrelevant to the Monitor's findings that the allegations that she "politicized" or "weaponized" her position were false and that President Fain's actions against her were illegitimate and retaliatory.

[381] UAW Staff Interview.

[382] UAW Staff Interview.

[383] UAW Staff Interview.

Pursuant to Paragraph 58 of the Consent Decree, the foregoing Report constitutes the Twelfth Status Report of the Monitor, Neil M. Barofsky.

**Date:  June 17, 2025**

_____
Neil M. Barofsky, Monitor

*Respectfully filed with the Court on behalf of the Monitor by counsel to the Monitor,*

/s/ Michael W. Ross
Michael W. Ross
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, New York 10036
(212) 891-1600 (t)
(212) 891-1699 (f)

89

**CERTIFICATE OF SERVICE**

I hereby certify that on June 17, 2025, the foregoing Report was served electronically on all counsel of record via the CM/ECF system.  In addition, pursuant to Paragraph 58 of the Consent Decree, the foregoing Report was served on consent by electronic mail upon the United States, the UAW's International President, the International Executive Board, and designated counsel for UAW.

/s/ Michael W. Ross
Michael W. Ross