# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,     )

     )

        Plaintiff,     )

     )

     v.     )     Case No. 20-13293

     )     Honorable David M. Lawson

INTERNATIONAL UNION, UNITED     )

AUTOMOBILE, AEROSPACE, AND     )

AGRICULTURAL IMPLEMENT     )

WORKERS OF AMERICA,     )

     )

        Defendant.     )

# MONITOR'S THIRTEENTH STATUS REPORT

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

I.    UPDATE ON COMPLIANCE ACTIVITIES ................................................... 12

  A.  Progress Regarding the Monitor's Recommendations ..................................... 12

    1. All Staff Meetings ...................................................................................... 13

    2. Policy Implementation ................................................................................ 16

      a.    Procurement Policy .......................................................................... 16

      b.    CAP and PAC Policy ....................................................................... 17

      c.    Cash Policy ....................................................................................... 18

    3. Hiring Processes and Job Descriptions ....................................................... 18

    4. IT Modernization Working Group ............................................................... 21

    5. Internal Audit .............................................................................................. 22

  B.  The Union's Culture Remains Steeped in Fear and Division ........................... 24

  C.  The Union's Culture is Hampering Implementation of Compliance Reforms ................. 32

    1. Divisions are Interfering with the Compliance Department ............................ 32

      a.    Reluctance to Report Concerns to the Compliance Department ............. 34

      b.    Independence of the Internal Audit Function ............................. 37

    2. Continued Delays in Formalizing a Budget Process ......................................... 41

  D.  The Union's Culture Committee ........................................................................ 48

  E.  Challenges with Other Compliance-Related Functions ................................... 54

  F.  Indications of Positive Progress ......................................................................... 56

Pursuant to Paragraph 58 of the Consent Decree (Dkt. No. 10), the Court-appointed Monitor, Neil M. Barofsky, respectfully submits to the Court this thirteenth status report ("Thirteenth Status Report") concerning the monitorship of the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "Union" or the "UAW").

## INTRODUCTION

Four and a half years into the monitorship, the UAW has made progress building the necessary structural foundations for a sustainable ethics and compliance program. The Union has invested considerable time and resources to establish its first-ever Compliance Department, adopted critical policies, professionalized its Internal Audit function, and enhanced how it receives reports of, and then investigates and remediates, alleged misconduct. Many Union personnel in the Accounting, Purchasing, Information Technology Systems ("ITS"), Legal, Compliance, and Human Resources ("HR") Departments have contributed to these meaningful improvements. The Union has implemented or partially implemented a number of the Monitor's recommendations for reform and is making progress in key areas. To be sure, more work needs to be done, and certain neglected areas must be focused on, but with a concentrated and sustained effort, there is a clear path for the Union to put in place the necessary structural elements for lasting reform.

Those structural building blocks are essential to the Union's ethics and compliance program, but they are only half of the necessary equation for fostering a program that is effective and sufficient in deterring corruption. Whether the Union can timely implement a compliance framework that successfully deters the type of financial misconduct that led to the Consent Decree depends on whether the UAW can also foster a culture of compliance. Even the most robust structural reforms cannot be successfully implemented amidst a culture of division and retaliation. They can only thrive in a culture that embraces the Union's ethical code and compliance rules with

1

the same enthusiasm that it shows for a successful organizing drive or a successfully negotiated contract. Without such cultural reform, it is only a matter of time before abuse and corruption creep back into the Union as an inevitable byproduct of leaders who foster a culture of divisiveness or who treat compliance rules and ethical norms as niceties that can be discarded when they become inconvenient. As of the date of this Thirteenth Status Report, for the reasons discussed below, the Union does not appear to be on the path to sustainable cultural reform.

The reality is stark: the current prioritization of political infighting and settling personal grievances over meaningful reform are stalling improvement and undermining good faith attempts to complete the necessary compliance infrastructure. Recent experience shows this to be true. The Union spent a great deal of time and resources building a Compliance Department that could learn to guide the Union without the need for external oversight. But instead of leading the Union forward, the Compliance Department became a tool for the President's Office in its campaign of retaliation against the Secretary-Treasurer. As detailed in the Monitor's Twelfth Status Report, and which will be further described in an upcoming supplement to that report,[1] the President's Office cast aside the Compliance Department's independence and used it as a Trojan horse to advance false accusations against the Secretary-Treasurer in order to limit her authority to serve as a check on the spending of Union funds.[2] This misuse and abuse of the Compliance Department went beyond just diminishing the Secretary-Treasurer's Office's ability to serve as a robust check and balance on the President's Office's spending power, it also left the Compliance Department

---

[1] The Monitor has recently provided the Union with a draft of the supplement to the Twelfth Status Report for feedback in advance of filing it with the Court in the near future.

[2] Monitor's Twelfth Status Report, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (June 17, 2025), Civil No. 20-cv-13293, ECF No. 152 ("Monitor's Twelfth Status Report").

leaderless, its reputation diminished, and its independence called into question.  A culture that tolerates such actions is not compatible with long-term reform.

The Union now stands at a genuine inflection point.  The challenges to timely adopting the necessary reforms to produce a culture of compliance are difficult, but not insurmountable.  It is not too late to reset and commit to the compliance and cultural reforms necessary to safeguard Union members' interests.  The recent resignation of the Compliance Director creates space to promptly install robust new compliance leadership genuinely committed to independence and transparency.  The senior leaders of the Union can still learn from these recent mistakes, reverse course, and renounce the same-old culture of fear and retaliation and embrace one of inclusion and reform.  Indeed, the Monitor has observed some green shoots of positive change since some of the abuses described in the Twelfth Status Report have been exposed.  For example, the Monitor has observed some instances of cooperation between the President's Office and the Secretary-Treasurer's Office in recent weeks—cooperation that offers a glimpse of what is possible when leaders work constructively toward shared goals.

In other words, the path toward compliance is right in front of the Union.  Whether the Union seizes this moment to choose that path instead of the one it currently is on depends on what its leaders do next and how they do it.  If the Union prioritizes completing its structural reforms while also squarely and finally addressing the cultural side of the equation—calming fears of retaliation, bridging internal divisions, committing to full transparency, and firmly putting members' interests above political differences—it may well be able to achieve the necessary level of reform in a timely manner.  This includes immediately undoing the acts of retaliation detailed in the Monitor's Twelfth Status Report, for no organization can credibly claim that it is fostering

a culture of non-retaliation while at the same leaving in place retaliatory sanctions against a senior officer who was punished for her enforcement of the Union's anti-corruption policies.

The Monitor will continue to work with the Union during this critical period and will assess and report on whether the Union's actions match its stated commitment to reform.

**Structural Progress Toward Sustainable Reform**

Notwithstanding the cultural challenges detailed in this Report, the Union has made progress since the Tenth Status Report in adopting important structural compliance reforms. A detailed table outlining the Union's progress on each of the Monitor's recommendations is included as Exhibit A.

A few key examples, detailed in this Report, highlight the Union's recent progress:

- The Union finalized and fully adopted its Procurement Policy in Spring 2025, with comprehensive training for all International Union staff. The Union has adopted an electronic system for requesting and approving disbursements under the Policy.

- The Union has also made progress on formalizing hiring processes, creating a rubric for identifying which positions are political appointments versus competitive hires and developing guidelines and flowcharts to provide transparency about hiring processes. As of October 2025, the Union had created job descriptions for over 85% of its unelected positions, with plans to complete job descriptions for all remaining positions.

- The Union has also continued its commitment to bi-annual All Staff meetings, holding both in-person and virtual meetings that included presentations on compliance and ethics, the Union's Code of Conduct, anti-retaliation provisions, and Union policies and procedures.

- The Union has also made progress on its CAP and PAC Policy, with plans to submit the Policy to the IEB for approval in the near future, and has made progress centralizing oversight of Regional CAP and PAC accounts.

- The Union's IT Modernization Working Group is working to present a detailed proposal for addressing the Union's IT modernization needs to the IEB by the end of this year.

- Internal Audit completed all of its 2024 audit reports in August 2025, covering a range of topics including risk areas previously identified by the

4

Monitor.  The Union's improved collaboration with Internal Audit has facilitated the timely completion of these audits.

These continued improvements, building on the work previously reported on in the Tenth Status Report, demonstrate that when Union personnel work collaboratively and commit to transparency and accountability, the Union can achieve meaningful compliance reform.[3]

**Cultural Barrier to Lasting Compliance Reform**

Building structural reforms such as an independent Compliance Department or adopting strict policies to deter and prevent the theft of member resources are essential; but these measures will ultimately prove ineffective at preventing corruption if they are not faithfully and successfully implemented.  And, as recent events at the Union demonstrate, a toxic culture of division and retaliation at the highest levels of the organization is preventing the Union from successfully implementing even the most carefully constructed reforms.

The diminished stature of the Compliance Department is the central example of how a culture rife with division has already stunted the Union's progress in implementing compliance reform.  As described further below, and noted above, the Compliance Department has made significant efforts to establish itself within the Union and carry out its remit since the Tenth Status Report.  Those include adding staff, improving compliance monitoring activities, conducting trainings, and formalizing communications with Union staff about compliance efforts.  But the capture of the Compliance Director by the President's Office as part of the infighting between the President and Secretary-Treasurer compromised this progress and has led to a widespread loss of

---

[3] *See* Monitor's Tenth Status Report, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (July 12, 2024), Civil No. 20-cv-13293, ECF No. 130 ("Monitor's Tenth Status Report").

confidence in the Department precisely when it needs to be driving compliance improvements within the Union.

The Compliance Director resigned from the position after the Monitor uncovered evidence that she had been fully co-opted by the President's Office in their retaliatory effort to remove departments from the Secretary-Treasurer's oversight and attempted to conceal her role in those efforts from the Monitor.  Evidence produced to the Monitor after the publication of the Twelfth Status Report provided additional details about the extent to which the President's Office corrupted the process of preparing the Special Compliance Report in order to present false accusations against the Secretary-Treasurer.  Among other actions, President's Office personnel rewrote large portions of the supposedly independent Special Compliance Report and inserted new charges and inflammatory allegations that the Compliance Director later falsely presented to the IEB as the results of an assertedly "independent" and "objective" investigation.  The documents also demonstrated that the Compliance Director and the President's Office were aware of the weakness of some of the allegations against Secretary-Treasurer Margaret Mock included in the report, that the Compliance Director participated in advance of the February 2024 IEB meeting in the President's Office's selection of departments to be removed from the Secretary-Treasurer's oversight, and that the Compliance Director deleted text messages with the President's Office that directly contradicted her previous account to the Monitor about her role in these events.

The Compliance Department's lack of independence manifested itself in other ways that are adversely affecting the Union's ability to implement compliance reform:

- **Loss of Trust.**  Employees have informed the Monitor that distrust of the Compliance Department has chilled them from raising compliance concerns.  One senior employee in a financial control function stated they are increasingly reluctant to report issues to the Department.

- **Ethics Hotline Oversight.**  Personnel and members have reported reluctance to contact the Compliance Department or the Ethics Hotline—

now managed by the Compliance Department—with one member sharing the view that the Compliance Department is "all tied in together and crooked."

- **Interference with Internal Audit.** The Compliance Department designated itself as the contact point between the Union and Internal Audit, potentially chilled risk assessment interviewees by sitting in on Internal Audit interviews, and used its influence to reduce Internal Audit's 2025 audit plan from 30 audits to 14, including deferral of five audits deemed "high risk."

These are the definition of unforced errors. And since the Monitor's Tenth Status Report, other compliance reforms have also stalled out because of the Union's divisive culture. For example, division between the President and Secretary-Treasurer has delayed implementation of a formal budgeting process—one of the Monitor's first recommendations in 2021. After more than a year of collaborative work with IEB approval and an external consultant, the President's Office waited until October 2024 to voice its objection to the proposed framework, with the President describing the presentation as "garbage" and "bullshit." The IEB then directed the two offices to work together, essentially putting the process back to "square one." For months afterward, the two offices made no meaningful attempt to move forward, and the process only restarted under the Monitor's oversight. More than a year has passed since the prior framework was rejected and still nothing has been presented in its place. The Union must push through the divisiveness and make progress on this important reform.

These cultural problems are also contributing to an environment in which Union personnel are fearful to call out corruption or misconduct for fear of losing their jobs, the death knell for an effective anti-corruption regime. This concern was previewed in the Tenth Status Report, in which the Monitor warned that "[d]ivisions within the Union are [] having a negative impact on Union

morale and, if left unaddressed, could further drag down the Union's pace of reform."[4]  At that time the Monitor reported on Internal Audit's 2023 Culture Assessment ("2023 Culture Assessment"), which found, among other things, that nearly half of survey participants did not believe the UAW enforced its anti-retaliation policy; that when asked why they would not report misconduct if they saw it, approximately 49% of respondents said they would decline to report misconduct out of fear of retaliation; and that over 30% of participants who reportedly witnessed unethical behavior or misconduct said they did not report it.[5]  This is critical for the Union to overcome, as corruption can flourish in an organization when perpetrators of misconduct have little reason to fear that their actions will be reported because witnesses are too intimidated to say something if they see something.

Unfortunately, that record has continued.  Since Spring 2024, when Internal Audit released the 2023 Culture Assessment Report, reports to the Monitor have continued to emphasize how divisiveness and retaliation have deepened fears among Union staff:

- One IEB member told the Monitor people are "scared to death, scared to lose jobs if they don't march to [the President's] tune" because his approach is "you're either with me or against me," and that there is "absolutely" a "big fear of people losing their jobs."

- Union employees described feeling "constantly on eggshells" regarding the President's potential to retaliate, fearing they will lose their jobs for saying "too much" or appearing to be "on the Secretary-Treasurer's side."

- One employee told the Monitor that the culture of fear and retaliation at the UAW has never been this bad.

- Another UAW employee stated that the atmosphere at Solidarity House is worse than it's ever been, with all of the retaliation and harassment.

---

[4] Monitor's Tenth Status Report at 4.

[5] Monitor's Tenth Status Report at 4, 14; 2025 Culture Assessment Pulse Survey Draft Report at 18, 20 (Nov. 6, 2025) ("Draft Pulse Survey Report").

Further comments from Union personnel on this topic are detailed below.

This failure to correct the UAW's culture of fear and retaliation has recently been corroborated by a "pulse" culture survey ("Pulse Survey") conducted by the Union's Internal Audit function earlier this year.  The data from that survey indicates that the respondents are not seeing improvement in the Union's culture.[6]  For example, and of particular concern, when asked why they would not report misconduct if they saw it, approximately 51% of respondents said they would decline to report misconduct out of fear of retaliation, similar to the 49% that was reported in the 2023 Culture Assessment.[7]  In addition, only approximately 43% of respondents reported that they believe the UAW enforces its anti-retaliation policy—down from approximately 51% reported in the 2023 Culture Assessment.[8]  Further, only approximately 59% of respondents reported that senior leadership promotes the importance of ethical behavior throughout the UAW, down from approximately 73% reported in the 2023 Culture Assessment.[9]

To combat these cultural issues, in 2024 the Union established a Culture Committee intended to help the Union finally turn the page on its cultural challenges.  But here too, the impact of this potentially significant structural reform has been blunted by a culture that does not adequately value the primacy of ethical reform, non-retaliation, and transparency.  The IEB created a Culture Committee to implement Internal Audit's recommendations from the 2023 Culture Assessment, many of which overlapped with already existing and unimplemented recommendations previously made by the Monitor.  When the Committee was created, the Monitor applauded the reform and recommended, and the Union agreed, that addressing the fear of

---

[6] *See* Draft Pulse Survey Report (Nov. 6, 2025).

[7] Draft Pulse Survey Report at 20 (Nov. 6, 2025).

[8] Draft Pulse Survey Report at 18 (Nov. 6, 2025).

[9] Draft Pulse Survey Report at 18 (Nov. 6, 2025).

retaliation should be a "top priority" of the nascent Culture Committee.[10]  But the Union delayed the convening of the Committee, and when it was finally launched, it soon narrowed the Culture Committee's remit to address only four of the eleven recommendations from the 2023 Culture Assessment, discarding, among others, the "high priority" of addressing retaliation.  Although the Culture Committee has made some limited progress in some areas—such as supporting All Staff meetings and establishing a new mentorship program—other Culture Committee initiatives have stalled, and the Committee has not shown any demonstrable impact on the continued divisions within the Union.

Although the Monitor has requested to attend the Culture Committee meetings so that he could best support its efforts and provide accountability through transparency, that request was rejected—first by the Committee itself, and then later by the IEB.  In rejecting the Monitor's request, some IEB members cited, among other things, the fear that transparency with the Monitor would lead to negative reports about issues discussed by the Committee.  This retreat from accountability and transparency is yet another barrier to implementing effective reform.  Shielding the Culture Committee's work from the Monitor will only serve to hamper the Monitor's ability to work with the Union toward sustainable reform and to effectively address the hurdles that the Committee has yet to overcome.  In short, although the Union has commendably set up the Culture Committee as a tool to drive cultural reform, it has sapped it of the ability to do so successfully by limiting its mandate in practice and barring robust transparency and collaboration with the Monitor.

---

[10] Monitor's Tenth Status Report at 20-21 (Rec. 46 and Union's Response to Rec. 46).

**The Path Forward**

The UAW's compliance regime is at a crossroads.  Many of the necessary structural reforms are being built.  Policies and procedures are being adopted by the IEB.  Oversight mechanisms are being put in place.  But the Union still must successfully implement these reforms, and it will not be able to do so unless and until it overhauls its approach to reforming its culture.

Whether the Union seizes this moment will determine whether the Union can build a sustainable compliance program capable of protecting members' dues from the fraud, waste, and abuse that necessitated this monitorship.  It will require confronting uncomfortable truths about the culture of fear and retaliation.  It will require learning from past mistakes and taking the necessary measures to avoid repeating them.  It must reverse the prior acts of retaliation against the Secretary-Treasurer.  It must quickly hire a highly qualified and independent Compliance Director and Ethics Officer, and change the governance of the Compliance Department so that it has greater structural independence from the President's Office.  It will require respecting that independence and ensuring it serves the membership rather than political agendas of the President or individual IEB members.  It will require genuine transparency with the Monitor and a willingness to address rather than conceal challenges.  And it will require Union leaders to calm fears of retaliation, bridge internal divisions, and firmly put members' interests above their own political differences.

As the Union's governing body, the IEB has the power and the responsibility to ensure that the Union's compliance program succeeds.  The members deserve leadership that will prioritize their interests over political infighting.  The Monitor will continue to work with the Union and its IEB during this critical period and will assess and report on whether the Union's actions match its stated commitment to timely reform.

## I.      UPDATE ON COMPLIANCE ACTIVITIES

In the Tenth Status Report, the Monitor updated the Court on the status of the UAW's efforts to establish a compliance regime that could sustainably prevent fraud, dishonesty, and unethical practices at the Union.  As detailed in that report, although the Union had made important progress in building the basic infrastructure of a compliance program—such as establishing new departments, policies, committees, and procedures—the Union still struggled with implementing those measures with a culture of compliance in which Union staff felt ethical behavior was the "rule[] of the road."[11]

This Thirteenth Status Report updates the Court on the overall pace of the Union's compliance reforms.  It also addresses how internal division within the Union and the politicization of the Union's Compliance Department have negatively affected the implementation of those reforms.  This Report also addresses recent positive signs of reform and collaboration that the Union should use as a chance to build on to address lingering cultural issues.

### A.      Progress Regarding the Monitor's Recommendations

The Monitor has observed progress by the Union in adopting certain of the Monitor's recommendations for compliance and control enhancements.  As detailed below, in many areas, personnel within the Union have continued to work diligently to address the Monitor's recommendations and improve the Union's ethics and compliance program.  A table charting the Union's progress on the Monitor's recommendations—which are largely overseen by the Compliance Department—is included as Exhibit A.  It will be important for the IEB to nourish these ongoing efforts.  Highlights of the Union's progress are discussed below.

---

[11] Monitor's Tenth Status Report at 2; Monitor's Initial Status Report, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (Nov. 11, 2021), Civil No. 20-cv-13293, ECF No. 49 at 6 ("Monitor's Initial Status Report").

### 1. All Staff Meetings

In the Initial Status Report, the Monitor recommended that the UAW conduct an annual All Staff meeting hosted by the President and IEB members at which senior leaders convey the core tenets of the Union's Ethical Practices Codes and the culture of compliance expected of every official, employee, and member of the UAW.[12] The Monitor's Tenth Status Report discussed the UAW's first All Staff meeting held in November 2022, but noted there had been no subsequent All Staff meetings for nearly two years. The Monitor thus recommended that the Union hold another All Staff meeting by mid-November 2024 and commit to annual All Staff meetings.[13]

In response, the Union began holding two All Staff meetings annually, one virtual meeting every spring and one in-person meeting every fall:[14]

- The Union held a week-long, in-person All Staff meeting from September 30, 2024, to October 4, 2024. That All Staff meeting was attended in person by more than 500 staff members and included two days of staff-wide presentations led by senior Union officials and department heads.[15] Consistent with the Monitor's recommendations, the first day of the 2024 All Staff meeting included presentations by Union staff on compliance and ethics messaging and related activities, including the Union's Code of Conduct, the Union's anti-retaliation policy, and avenues for reporting misconduct.[16]

---

[12] Monitor's Initial Status Report at 73 (Rec. 1(a)) ("Joining and building on a recommendation made by Exiger, the Monitor recommends that the UAW: (a) Conduct an annual 'Town Hall' (or 'All Staff' meeting like the one held on September 10, 2021) hosted by the President and International Executive Board ('IEB') members conveying the core tenets of the Ethical Practices Codes and the culture of compliance expected of each and every official, employee and member of the UAW[.]").

[13] Monitor's Tenth Status Report at 78 (Rec. 1.1) ("Within four months of this Report, the Union should hold an 'All Staff' meeting hosted by the President, Compliance Director, and IEB conveying the core tenets of the Ethical Practices Codes and the culture of compliance expected of each and every official, employee and member of the UAW, and commit to a scheduled annual meeting.").

[14] Meeting with former Compliance Director (Oct. 21, 2024); All Staff Meeting IEB Presentation Deck at 13 (Nov. 12, 2024). The Culture Committee also recommended holding All Staff meetings and that the IEB be involved in developing content for them. IEB Meeting Minutes (Nov. 13, 2024).

[15] 2024 All Staff Meeting Agenda at 1 (Sept. 30, 2024-Oct. 4, 2024); All Staff Meeting IEB Presentation at 5 (Nov. 12, 2024).

[16] UAW All Staff Meeting (Sept. 30, 2024).

- This year, the Union held a virtual All Staff meeting from June 16, 2025, to June 17, 2025. The virtual All Staff meeting included presentations from the Compliance Department discussing compliance and ethics related messaging, including key portions of the Union's Code of Conduct, such as its anti-retaliation provisions.[17] The President was the only IEB officer to present and he stated "the UAW won't tolerate retaliation. I'm going to say it again; retaliation will not be tolerated. If somebody speaks up in good faith and they see something wrong, they deserve praise not punishment. Retaliation can take many forms: exclusion, negative employment actions, and harassment are all unacceptable. False, malicious claims will not be tolerated either. Integrity works both ways."[18]

- The Union held another in-person All Staff meeting from October 20, 2025, to October 21, 2025. As with the 2024 All Staff meeting, this meeting was attended by hundreds of staff members and featured two days of staff-wide presentations and learning opportunities. Regarding ethics and compliance, the All Staff meeting included one presentation on the Ethics Hotline and one presentation by the interim Compliance Department leaders. The Secretary-Treasurer discussed the Union's efforts to improve its financial policies and controls, and the President emphasized the importance of working together to achieve the UAW's goals, stating to staff that "the Union [has] your back."[19]

Meetings at which senior Union officials overtly message the importance of ethics and compliance are important to promoting those values at the Union. The statements made by President Shawn Fain at the June 2025 All Staff meeting were commendable and necessary.

But the actions of senior leaders must match their words. As described in the Twelfth Status Report and forthcoming supplement, the President's Office utilized a critical component of the Union's compliance infrastructure—the Compliance Director—to take retaliatory actions against the Secretary-Treasurer, including the removal of numerous departments from her oversight. These actions have undoubtedly contributed to the environment of fear of retaliation at

---

[17] UAW Virtual All Staff Meeting (June 17, 2025).

[18] UAW Virtual All Staff Meeting (June 16, 2025).

[19] UAW All Staff Meeting (Oct. 20-21, 2025).

the Union.[20]  And the IEB stood by this decision even after the Twelfth Status Report detailed the ways in which the President's Office retaliated against Secretary-Treasurer Mock for insisting on compliance with UAW policies.[21]   In the aftermath of IEB members engaging in retaliatory conduct and then doing nothing to remedy it, the President's remarks condemning retaliation at the June All Staff meeting will ring hollow.  That has been reflected in Internal Audit's Draft Pulse Survey Report, discussed below, which was conducted in June and July 2025, and indicated that approximately half of the respondents reported that they would not be willing to report misconduct if they witnessed it out of fear of retaliation, and only approximately 43% reported they believe that the Union enforces its anti-retaliation policy.[22]

It is vitally important that President Fain and the IEB continue the message of the importance of anti-retaliation conveyed at the June 2025 All Staff meeting.  But to address the damage done by the actions to the Union's culture described in the Twelfth Status Report and to take a meaningful step to putting an end to the continued fear of retaliation still present at the Union, President Fain and the IEB must walk the walk in addition to talking the talk.  This requires the Union and the IEB to face uncomfortable truths and past mistakes, and to learn from them.  An important step would be implementing all of the Monitor's recommendations to combat retaliation,

---

[20] Monitor's Twelfth Status Report at 82-84.

[21] The IEB said that it is waiting for the results of the Monitor's investigation into allegations that Secretary-Treasurer Mock unilaterally suspended the Union's investment policy and failed to return to compliance with that policy before deciding whether to restore the Secretary-Treasurer's departments.  IEB Meeting Minutes (Aug. 6, 2025).  However, the results of that investigation are irrelevant to the recommendation here, and given the extensive evidence in the Monitor's Twelfth Status Report, any further delay in returning these departments to her supervision is unjustified and retaliatory.  Furthermore, even if it was relevant, that investigation is largely concluded, the Monitor continues to see no justification for the continued withholding of those departments from Mock's supervision.

[22] Draft Pulse Survey Report at 18, 20 (Nov. 6, 2025).

including immediately reinstituting the departments that were stripped from the Secretary-Treasurer's supervision as part of the retaliation against her.[23]

## 2.      Policy Implementation

The Union has taken strides to finalize long outstanding policies, including the Procurement Policy and the Community Action Program and Political Action Committee ("CAP and PAC") Policy.  Nonetheless, the Union still must approve and implement the CAP and PAC Policy, complete migration of regional CAP and PAC accounts under centralized oversight, and prepare and finalize the Cash Policy.  More detail on these efforts is included below and in the attached Exhibit.

### a.      Procurement Policy

As of the Tenth Status Report, the Union had implemented and trained Union staff on vendor selection and due diligence processes—components of the Union's procurement process—but the complete Procurement Policy remained in draft form.[24]  The Monitor recommended that the Union finalize, approve, and implement the full Procurement Policy by the end of 2024.[25]  Under the direction of the Purchasing and Accounting Departments, the IEB approved the

---

[23] In the Twelfth Status Report, the Monitor concluded that the Secretary Treasurer was "falsely accused of misconduct, subjected to retaliatory action by [President] Fain, and improperly stripped of her responsibility for various departments and board assignments," and recommended that the Union immediately "return [the Secretary-Treasurer's] departmental responsibilities and board assignments."  Monitor's Twelfth Status Report at 1-2.  The Monitor has also made several other recommendations related to retaliation, including that the Union improve training, enhance policies, and that the IEB provide messaging regarding the 2023 Culture Assessment and anti-retaliation to Union staff and members.  Monitor's Initial Status Report at 105, 136, 140 (Recs. 14, 32, 37); Monitor's Tenth Status Report at 20 (Rec. 46).  More detail regarding the status and implementation of these recommendations can be found in Exhibit A to this Report.

[24] Monitor's Tenth Status Report at 61-63.

[25] Monitor's Tenth Status Report at 63 (Rec. 18.1) ("By the end of 2024, the Union should finalize, approve, and fully implement the Procurement Policy, including the development and issuance of training for all International staff on the full Policy.").

Procurement Policy in March 2025, with adoption and training commencing shortly thereafter.[26]
The Monitor observed the Union's training on the Procurement Policy and has received positive
reports regarding its implementation.[27] The Union has also adopted and trained International
Union staff on a new electronic system for the request and approval of disbursement of Union
funds under the Policy.[28] The Monitor will continue to observe and report on progress in this key
area.

### b. CAP and PAC Policy

As of the Tenth Status Report, the Union still had not finalized or implemented a CAP and
PAC Policy or implemented centralized controls over funds in all of the CAP and PAC bank
accounts, a risk area identified years earlier. Specifically, the Monitor recommended that by the
end of 2024, the Union "finalize, approve, and implement the CAP and PAC Policy, and commit
to a timeline for completing Regional CAP and PAC account centralization efforts to ensure the
International Union has oversight over all such accounts."[29] In August 2025, the CAP Department,
under the leadership of a new National CAP Director, substantially revised the draft CAP and PAC
Policy with input from key stakeholders and IEB members and plans to submit the Policy to the
IEB for approval in the near future.[30] The Union has also made progress centralizing oversight of
the Regional CAP and PAC accounts. As of the date of this Report, the UAW has fully migrated

---

[26] IEB Meeting Minutes (Mar. 6, 2025). The Monitor's team observed the final Procurement Policy training webinar on June 3, 2025.

[27] Procurement Policy Training Webinar (June 3, 2025); Meeting with UAW (July 11, 2025); Meeting with UAW (Aug. 21, 2025); Meeting with UAW (Oct. 9, 2025).

[28] Electronic Payment Request Training (June 10, 2025).

[29] Monitor's Tenth Status Report at 57-58 (Rec. 22.1).

[30] Meeting with UAW (Sept. 30, 2025).

all accounts to the centralized system for three Regions, and is in process of migrating the CAP and PAC accounts for the three remaining Regions.[31]

The Monitor will continue to observe and report on progress and recommends that the IEB act with urgency to approve the CAP and PAC Policy and complete the migration of the remaining accounts.

### c.      Cash Policy

The Union's draft Cash Policy is the final policy contemplated as of the Initial Status Report that has yet to be implemented.  The draft Cash Policy applies to the management, review, approval, and exception processes related to cash managed by the UAW, with the exception of Black Lake.[32]  The former Compliance Director informed the Monitor that prioritization of the Procurement Policy and CAP and PAC Policy, along with the delays in onboarding a new Chief Accountant, delayed the Union's efforts to finalize, approve, and implement the draft Cash Policy.[33]  Now that these roadblocks have been addressed, the Union should proceed with preparing, finalizing, and implementing the draft Cash Policy.

### 3.      Hiring Processes and Job Descriptions

In the Tenth Status Report, the Monitor reported that the Union had not yet developed a consistent hiring process.  The Union had not defined a clear process for determining which positions would be subject to a competitive hiring process and which would be filled through political appointments; it had also not created job descriptions for many roles.[34]

---

[31] Meeting with UAW (Oct. 13, 2025); CAP and PAC Accounts Status Update (Oct. 2025).
[32] Draft Cash Policy (Dec. 14, 2021).
[33] Meeting with former Compliance Director (Mar. 18, 2025).
[34] Monitor's Tenth Status Report at 68-70.

Over the past fifteen months, the Union has made considerable progress in implementing the Monitor's recommendations in these areas.  To clarify its approach to filling positions through political appointments as opposed to competitive hiring processes,[35] the Union created a rubric for identifying which positions at the Union are political appointments, which are subject to competitive hiring, and which are both.[36]  The HR Department created that rubric with input from the President's Office and the Secretary-Treasurer's Office.[37]  Before hiring for an open position, Union leaders are required to work with the HR Department,[38] which is tasked with informing Union leaders that all job postings must include a job description and assists in updating an existing job description or drafting a new one for the position.[39]  The HR Department is also tasked with encouraging UAW leaders to post positions internally and externally for competitive hiring, even when the leader is able to otherwise politically appoint their preferred individual to the position.[40]  For example, the Union utilized a competitive hiring process to fill the Research Department's Director position—a role that could have been filled either through a competitive hiring process or appointment according to the rubric provided by the Union.[41]  The Union is generating hiring

---

[35]  Monitor's Tenth Status Report at 70-71 (Rec. 11.2) ("Within three months of this Report, and with the direct support of the President's Office and the Secretary-Treasurer's Office, the UAW should clarify its approach to filling positions through political appointments versus competitive hiring processes in order to ensure that the Union consistently hires competent personnel that will uphold its culture of compliance. The Union should articulate and generate a list of which International staff roles are classified as political appointments so that it can consistently determine how to fill open roles, regardless of changes in leadership.").

[36]  UAW Job Classifications Tracking Sheet.

[37]  Meeting with UAW (Dec. 12, 2024).

[38]  Meeting with UAW (July 9, 2025); Meeting with UAW (Aug. 26, 2025).

[39]  Meeting with UAW (July 9, 2025).

[40]  Meeting with UAW (July 9, 2025).

[41]  Meeting with UAW (Oct. 14, 2025); UAW Job Classifications Tracking Sheet; UAW Job Postings Tracking Sheet.

process guidelines and flowcharts, and plans to provide further transparency to International Union employees regarding its hiring processes by publishing and circulating these resources.[42]

In addition, the Union has made progress on its commitment to implement the Monitor's recommendation to create job descriptions for all International Union job positions, and include them with job postings, whether posted externally or internally.[43] The HR Department has been working on creating job descriptions for occupied roles and providing Union leaders with standardized templates to guide drafting job descriptions for new or open positions.[44] As of October 2025, the Union has created job descriptions for over 85% of its positions, with approximately 30 more to go.[45] While many of the positions that remain without a job description are more senior positions at the Union (*e.g.*, Top Administrative Assistant positions), consistent with the Monitor's recommendation, the Union plans to create job descriptions for all unelected positions.[46]

The Monitor commends the Union's progress in this area and reiterates the importance of completing this work. Doing so will assist Union personnel in defining baseline responsibilities for each position, improve transparency and accountability to avoid the appearance of nepotism if otherwise unqualified personnel are appointed, and ensure that personnel selected for leadership roles in the Union are competent to perform them.[47]

---

[42] Meeting with UAW (July 9, 2025); Meeting with UAW (Aug. 26, 2025); Meeting with UAW (Oct. 14, 2025); Hiring Process Overview Communication; Hiring Process Steps.

[43] Meeting with UAW (Apr. 10, 2025); Meeting with UAW (July 9, 2025); Monitor's Tenth Status Report at 70-71 (Rec. 9.2) ("By the end of 2024, and with the direct support of the President's Office and the Secretary-Treasurer's Office, the UAW should prepare job descriptions for all existing positions at the International Union.").

[44] Meeting with UAW (July 9, 2025).

[45] UAW Job Descriptions Tracking Sheet.

[46] Meeting with UAW (Oct. 14, 2025); UAW Job Descriptions Tracking Sheet.

[47] *See* Monitor's Tenth Status Report at 69-70.

####    4.    IT Modernization Working Group

In the Tenth Status Report, the Monitor detailed the Union's formation of the IT Modernization Working Group and its efforts to update and improve the Union's IT systems.[48] The Monitor recommended that the IT Modernization Working Group present a proposal for addressing the Union's IT modernization needs to the IEB by mid-November 2024.[49]

More than a year after the Tenth Status Report, the IT Modernization Working Group has still not presented an IT Modernization proposal to the IEB.  Since July 2024, the IT Modernization Working Group has undergone significant turnover leading to a delayed review process.[50]  Under the direction of the ITS Department and with contributions from other key stakeholders, the IT Modernization Working Group plans to present a detailed proposal to the IEB by the end of this year.[51]

In all, the Monitor has observed the Union engage in a thorough and thoughtful process despite the significant turnover within the IT Modernization Working Group.[52]  But that work has not resulted in a proposal to the IEB, which the Monitor recommended occur by mid-November of 2024.[53]  The Monitor encourages the Union to expeditiously complete this overdue project.

---

[48] Monitor's Tenth Status Report at 64-66.  Since the Tenth Status Report, the Union has changed the name of the "IT Modernization Project" to the "Modernization Project" to reflect the broad impact of the Project on Union's technological systems and processes and encourage engagement with the Project across UAW departments.

[49] Monitor's Tenth Status Report at 65-66 (Rec. 23.1) ("Within four months of this Report, the IT Modernization Working Group should present a detailed proposal for addressing the Union's IT Modernization needs to the IEB.").

[50] Meeting with UAW (June 12, 2025).

[51] Meeting with UAW (June 12, 2025); Meeting with UAW (July 23, 2025); Meeting with UAW (Oct. 15, 2025).

[52] IT Modernization Working Group Meeting (Apr. 23, 2025); IT Modernization Working Group Meeting (May 20, 2025); IT Modernization Working Group Meeting (June 2, 2025); IT Modernization Working Group Meeting (June 12, 2025).

[53] Monitor's Tenth Status Report at 65-66 (Rec. 23.1).

5.      **Internal Audit**

As detailed in the Initial Status Report, an Internal Audit function "helps an organization identify and correct compliance and risk issues" by serving as an "independent, objective evaluator of an organization's governance, its compliance with its own policies and procedures, and the strength of its internal controls."[54]   In order to promote the independence of Internal Audit, the Monitor recommended that the Union "clarify the roles, responsibilities, and reporting structure of its Internal Audit function."[55]   The Monitor's Tenth Status Report detailed Internal Audit's substantial work identifying risk areas within the Union, developing audit plans, and conducting audits.  The report also identified delays in both the Union's provision of information to its Internal Audit function that impacted Internal Audit's ability to complete audits on schedule, and the Union's follow-through in remediating Internal Audit's audit findings.[56]

To address the Union's delays in this area, the Monitor recommended that the Union and Internal Audit agree upon an annual schedule for the upcoming year's audits that identifies the highest priority audits to complete and specifies dates by which the Union will provide to Internal Audit documentation and information for each high priority audit.[57]   The Monitor also recommended that the IEB monitor the Union's ability to meet the agreed upon deadlines with

---

[54]  Monitor's Initial Status Report at 86-87.

[55]  Monitor's Initial Status Report at 89.

[56]  Monitor's Tenth Status Report at 44-49.  The Union previously employed another internal audit firm, Deloitte, which also performed other services for the Union.  In the Initial Status Report, the Monitor recommended that the Union clarify the roles, responsibilities, and reporting structure of the Union's Internal Audit function, which the Monitor reported as implemented in the Tenth Status Report.  Monitor's Initial Status Report at 86-89 (Rec. 8); Monitor's Tenth Status Report at 45.

[57]  Monitor's Tenth Status Report at 49 (Rec. 47) ("To facilitate the timely completion of audit reports pursuant to the yearly audit plan, the Union and Internal Audit should confer and agree upon (1) a schedule for 2024 and subsequent years' audits that identifies the highest priority audits to complete for the year; and (2) specific dates by which the Union will provide to Internal Audit documentation and information for each high priority audit.  The IEB should monitor the Union's ability to meet the deadlines agreed to with Internal Audit, and where necessary, provide additional resources to facilitate Internal Audit's work.").

Internal Audit, and where necessary, provide additional resources to facilitate Internal Audit's work.[58]

Over the past year, the Monitor has observed improved collaboration between Union personnel and the Union's Internal Audit function.  The Compliance Department has taken the lead to help Union personnel understand the remit of Internal Audit and facilitate the flow of information to Internal Audit to perform its work.[59]  The Compliance Department's responsibilities with respect to Internal Audit have included (1) ensuring that Union auditees and its Internal Audit function are aligned on audit scope, (2) answering Union auditees' questions about Internal Audit's work, (3) following up with Union auditees on Internal Audit's recommendations and the Union's remediation efforts, and (4) setting and adjusting Internal Audit's audit schedule.[60]  The Compliance Department is also working to implement the Union's backlog of more than 180 findings from audits conducted by its Internal Audit function from 2022 to 2024, including tracking the backlog, meeting with teams at the Union to track remediation efforts, and coordinating with Internal Audit on remediation actions.[61]

As a result of the Union's efforts to improve the efficiency of its work with Internal Audit, in August 2025, Internal Audit completed all of its 2024 audit reports.[62]  Audit reports completed since the Tenth Status Report covered a range of topics including risk areas previously identified by the Monitor.  Among the audits' findings, Internal Audit identified certain high-risk areas, which include the following:

---

[58] Monitor's Tenth Status Report at 49 (Rec. 47).

[59] Meeting with Internal Audit and UAW (Sept. 6, 2024).

[60] Meeting with Internal Audit and UAW (Sept. 6, 2024).

[61] Meeting with Internal Audit and UAW (Feb. 13, 2025).

[62] IEB Meeting Minutes (May 13, 2025); Internal Audit IEB Presentation at 4 (Aug. 7, 2025).

- The Conference Registration Income and Expense audit identified instances of non-compliance with the Conference Policy, including discrepancies between conference budgets and expenditures and lack of supporting documentation, as well as non-compliance with the three-bid venue selection process.[63]

- The Entity Level Controls audit identified as "high risk" findings the absence of: (i) a process to evaluate employee performance, (ii) a budget process, and (iii) a tool to evaluate the effectiveness of the IEB.[64]

- The P-Cards and Accounts Payable audit identified a high-risk finding related to segregation of duties.  Specifically, the audit found numerous bank accounts that allowed specific users to initiate internal transfers between accounts, which increases the risk of fraud and misuse of funds.[65]

It will be important for the Union to work with Internal Audit to address these findings. The Monitor will assess and report on the Union's responses to Internal Audit's findings and its efforts to remediate compliance gaps and weaknesses.

**B.    The Union's Culture Remains Steeped in Fear and Division**

Despite the Union's ongoing adoption of important structural compliance improvements, it continues to struggle with a culture rife with division at the highest levels of the organization that is impeding the effective implementation of reforms.

By way of background, the Monitor's Initial Status Report described how a "culture of fear" persisted at the Union, even after the criminal convictions leading to the Consent Decree.  It reported on the results of a 2021 assessment conducted by the Union's Internal Audit function that revealed that UAW employees had expressed "fear of retaliation or intimidation for individuals speaking out on issues," "limited visibility and transparency across all levels," and "a lack of

---

[63] Internal Audit IEB Presentation at 7 (Aug. 7, 2025).
[64] Internal Audit IEB Presentation at 13 (Feb. 19, 2025).
[65] Internal Audit IEB Presentation at 8 (Nov. 14, 2024).

accountability at all levels for violations of cultural policies."[66]  The Union's consultant at the time, Exiger, echoed these concerns.[67]  Exiger's prior work with the Union revealed that the Union had an "unhealthy culture" in which staff feared losing their jobs for speaking up and a lack of emphasis on non-retaliation in its written policies and procedures.[68]

The Monitor's Tenth Status Report reported on how these fears persisted as of roughly the halfway point of the monitorship.  It reported on the culture of fear and retaliation at the Union and the negative impact of the Union President's then-recent decision to strip the Secretary-Treasurer of oversight of numerous Union departments—based on allegations later determined by the Monitor to be unsubstantiated and retaliatory.[69]

Among other things, the Tenth Status Report pointed to the results of the 2023 Culture Assessment of Union staff performed by Internal Audit and released in Spring 2024.[70]  The 2023 Culture Assessment highlighted employees' negative descriptions of the overall culture at the UAW, including with descriptions like "toxic," "divided," and "fractured."[71]  It reported on a widespread fear of retaliation that had taken hold at the Union, with nearly half of survey participants answering they did not believe that the UAW as a whole enforced its anti-retaliation policy.[72]  The 2023 Culture Assessment had alarming findings, including that nearly half of survey participants saying that they did not believe the UAW enforced its anti-retaliation policy.[73]  The

---

[66] Monitor's Initial Status Report at 72.

[67] Monitor's Initial Status Report at 72.

[68] Monitor's Initial Status Report at 72.

[69] Monitor's Twelfth Status Report at 22-23.

[70] Monitor's Tenth Status Report at 12.

[71] Monitor's Tenth Status Report at 15.

[72] Monitor's Tenth Status Report at 14.

[73] Draft Pulse Survey Report at 18, 20 (Nov. 6, 2025); Monitor's Tenth Status Report at 4, 14.

2023 Culture Assessment also found that, when asked why they would not report misconduct if they saw it, approximately 49% of respondents said they would decline to report misconduct out of fear of retaliation, and found that over 30% of participants who reportedly witnessed unethical behavior or misconduct responded they in fact did not report the misconduct.[74]

Notwithstanding the call to action raised by the 2023 Culture Assessment and the Monitor's Tenth Status Report, the Union has done little to effectively address the culture of fear and division, and, since that time, the Monitor has continued to receive reports that reflect the same fears and divisions as previously reported.[75]  Numerous personnel told the Monitor that antagonism between the President and Secretary-Treasurer as well as the President's stripping of Stellantis from the oversight of Vice President Rich Boyer is creating an us-versus-them culture in which personnel fear that they will be retaliated against by the President's Office for taking any action the President views unfavorably.

The concerns reported to the Monitor since Spring 2024, after Internal Audit published the 2023 Culture Assessment, emanate from different corners of the Union, including from IEB members.  A number of individuals only spoke to the Monitor on the condition of anonymity because of their own fear of retaliation.  For example:

- One IEB member told the Monitor people are "scared to death, scared to lose jobs if they don't march to [the President's] tune" because his approach is "you're either with me or against me."[76]  The member said that people are afraid to push back against any of the President's ideas or actions

---

[74] Draft Pulse Survey Report at 18, 20 (Nov. 6, 2025); Monitor's Tenth Status Report at 4, 14.  The 2023 Culture Assessment asked respondents to choose the response(s) that best described their interaction with unethical behavior or misconduct over the previous 12 months, and included "I did not report the unethical behavior or misconduct that I observed" as a response.  2023 Culture Assessment Report at 26 (Apr. 11, 2024).  The Pulse Survey did not include this question.  Draft Pulse Survey Report at 26-27 (Nov. 6, 2025).

[75] In response to a draft of this Report, the Union objected to the Monitor citing anecdotal evidence of the continued fears of retaliation, noting that the Monitor does not cite a statistically representative sample of Union staff.

[76] IEB Member Interview.

because there is the looming question of "who's next?"[77]  This member said that there is "absolutely" a "big fear of people losing their jobs" under the President's administration.[78]

- A different IEB member said that, after the Secretary-Treasurer's reassignments, the member believes the President is vindictive and wants payback.[79]  The member shared that they have heard about another IEB member's fears of retribution and that their assignments will be taken away.[80]

- A member of the Secretary-Treasurer's Office told the Monitor that the Secretary-Treasurer's Office struggles to accomplish tasks because Union staff who report to the President fear the political ramifications of working with the Secretary-Treasurer's Office.[81]  The employee described tension and disrespectful behavior during meetings between the offices.[82]

- A second employee reported that the situation between the President's Office and the Secretary-Treasurer's Office is akin to "stepchildren getting bounced around between the President and the Secretary-Treasurer.  It weighs on us."[83]  The employee told the Monitor that it "[j]ust seems like a lot of dysfunction within the organization and I think it hinders growth and development."[84]

- A third employee told the Monitor that after President Fain's actions towards the Secretary-Treasurer, they feel "constantly on eggshells" regarding the President's potential to retaliate and fear losing their job for saying "too much" or appearing to be "on the Secretary-Treasurer's side."[85]

- A fourth employee described the removal of assignments from the Secretary-Treasurer as a "power move" that has left an environment of fear and intimidation at the Union.  The employee told the Monitor that they

---

[77] IEB Member Interview.

[78] IEB Member Interview.

[79] IEB Member Interview.

[80] IEB Member Interview.

[81] Meeting with UAW (Feb. 26, 2025).

[82] UAW Staff Interview.

[83] Meeting with UAW (Dec. 13, 2024).

[84] Meeting with UAW (Dec. 13, 2024).

[85] UAW Staff Interview.

know of three employees who experienced aggression from the President but did not speak up because they feared retaliation.[86]

- A fifth employee told the Monitor that there was a "chilling effect" when the Secretary-Treasurer's departments were removed.  The employee told the Monitor that the fear of retaliation existed before the reassignments "and got worse after."  The employee said that, because of this fear, people are "reluctant to speak up" for fear of retaliation and they "don't want to be put in [the] bullseye or they feel like they'll get steamrolled."[87]  The employee said that the President's Office's efforts to collaborate on projects were perceived to actually be designs to "launch another attack" against the Secretary-Treasurer's Office.[88]

- A sixth employee told the Monitor that the culture of fear and retaliation at the UAW has worsened under the President and that the employee and others at the UAW are fearful of elevating concerns.  The employee said that, following the removal of the Secretary-Treasurer's assignments, staff do not know how to report concerns or to whom to report them and that they "live in fear."  The employee said their own staff have expressed that they do not raise concerns because they do not want to be "next on the list," "next on the chopping block," or have some other "negative impact."[89]

- A seventh employee said that the Union's current state is the "worst culture [the UAW] ha[s] had ever."[90]

- An eighth employee told the Monitor that the retaliation at the Union has never been this bad.[91]

- A ninth UAW employee told the Monitor that, due to retaliation and harassment, the atmosphere at Solidarity House is worse than it's ever been, with all of the retaliation and harassment.[92]

As referenced above, the Union's Internal Audit function conducted a recent Pulse Survey

in June and July 2025 to implement the Monitor's recommendation and assess the Union's

---

[86] UAW Staff Interview.

[87] UAW Staff Interview.

[88] Meeting with UAW (Apr. 3, 2025).

[89] UAW Staff Interview.

[90] UAW Staff Interview.

[91] Outreach to Monitor's Hotline.

[92] Outreach to Monitor's Hotline.

progress in addressing concerns about retaliation.[93]   Internal Audit has shared a Draft Pulse Survey

Report summarizing the survey results with the Union and plans to present the report to the IEB

at the upcoming November IEB meeting.[94]   Data from the Draft Pulse Survey Report corroborates

the anecdotal evidence cited above.[95]   For example, as noted above, when asked why they would

not report misconduct if they saw it, approximately 51% of respondents indicated that they would

not report misconduct because they fear retaliation, a similar percentage as the approximately 49%

of respondents who reported the same fear of retaliation in the 2023 Culture Assessment.[96]   In

addition, only approximately 43% of respondents reported that they believe the UAW enforces its

anti-retaliation policy—down from approximately 51% reported in the 2023 Culture

---

[93] Monitor's Tenth Status Report at 20 (Rec. 46(b)) ("The Union should implement semi-annual 'pulse' surveys of Union employees to assess progress in addressing concerns about retaliation"); Meeting with UAW (May 14, 2025); Meeting with Internal Audit and UAW (Sept. 22, 2025).

[94] Draft Pulse Survey Report (Nov. 6, 2025). In response to a draft of this Report, the Union objected to the Monitor including substantive information from the Pulse Survey in this Report. The Union instead recommended that the Monitor report on the Pulse Survey in a "subsequent report, and after Internal Audit has explained the survey." The Union also raised the following concerns: "First, the IEB has not seen this survey. It is highly problematic for the Monitor to publish statements about the survey before the IEB has been apprised of and given an opportunity to review the report. Second, the survey had a significantly lower participation rate than two years ago – with responses received from less than half of the Union's workforce. Although the firm conducting the survey ('Internal Audit') has asserted that the survey is still representative, this assertion has not been fully explained and does not address the fact of lower participation. Random sampling and lower participation are not the same thing. Third, there does not appear to be any benchmarking. We will address these concerns separately and in greater detail with Internal Audit. Fourth and finally, the results include data which reflect some nuances in the divisions since the last survey in 2023. These include comments such as 'Don't trust Monitor to investigate in a timely manner and be fair.'" The Monitor notes these limitations in participation, but has included some of the data from the survey given its relevance to the discussion of the Union's failure to adequately address ongoing concerns regarding a culture of fear and retaliation, particularly since the actions taken by the President's Office against Secretary-Treasurer Mock. The results included above are consistent with the prior 2023 Culture Assessment Report, the reports to the Monitor's hotline discussed in this Report, and the Monitor's own observations. With respect to participation, the Monitor recognizes that the average number of respondents to the Pulse Survey in 2025 was lower than the 2023 Culture Assessment—with a drop from 75% to 48% participation—but Internal Audit noted that "the mix of people who responded to this year's survey is similar to the prior survey." Draft Pulse Survey Report at 5 (Nov. 6, 2025).

[95] Draft Pulse Survey Report at 5 (Nov. 6, 2025).

[96] Draft Pulse Survey Report at 20 (Nov. 6, 2025).

Assessment.[97]   Finally only approximately 59% of respondents reported a belief that senior leadership promotes the importance of ethical behavior throughout the UAW, down from approximately 73% reported in the 2023 Culture Assessment.[98]   Once the Draft Pulse Survey Report is finalized, the Monitor urges the Union to share the results of the Pulse Survey with the entire Union staff expediently along with a plan to address its findings.

Unfortunately, Union personnel's fears of retaliation also extend to their cooperation with the Monitor.  Since Spring 2024, the Monitor has received numerous reports that UAW personnel fear retaliation by the Union if they speak to the Monitor.  Reports include the following:

- An employee said that UAW staff fear that they will be retaliated against by the President's Office and lose their jobs if they reach out to the Monitor.[99]

- A second employee expressed that they were "really concerned about retaliation" and they were sure that the President was "going to find out eventually" that they were speaking with the Monitor.  The employee said the President's actions are "pure retaliation."  The employee said that the President "is going to retaliate against me when he hears this."[100]

- A third employee told the Monitor that they were "nervous" about the President learning the information they had shared with the Monitor because of potential retaliation.  They explained that it is "challenging" to know "who to go to for what" and there is concern that "if you do it wrong" there will be a "reprimand."[101]

- A fourth employee told the Monitor that if it got back to the UAW that this employee had talked to the Monitor, they believed that the President's Office staff would attempt to cut off their compensation.[102]

- Echoing these staff concerns, a senior official also told the Monitor that they were "afraid" to share information with the Monitor or raise issues with

---

[97] Draft Pulse Survey Report at 18 (Nov. 6, 2025).

[98] Draft Pulse Survey Report at 18 (Nov. 6, 2025).

[99] Meeting with UAW (Nov. 5, 2024).

[100] UAW Staff Interview.

[101] UAW Staff Interview.

[102] UAW Staff Interview.

President Fain or his Office because the official believed that President Fain would "be vindictive" and take action against them.[103]

The publication of the Twelfth Status Report—which publicly reported on the retaliatory actions of the President—led to reports to the Monitor that underscored the culture of fear and division within the Union:

- An employee said that after the Twelfth Status Report was filed, "[f]or the first time in a long time, I have a molecule of hope that maybe the crazy bullying and aggressive behavior will be addressed, or at least it's known and we're not pretending it's not happening. Maybe it will make the day-to-day job easier if people are more willing to speak up if they see something."[104]

- A second employee, shortly after the Twelfth Status Report was published, said that the report "vindicated" their experience with the UAW's retaliatory and "unethical" culture and expressed hope that the report would "slow" the Union's slide towards further dysfunction.[105] The same employee added that they found the IEB's response to the Twelfth Status Report and its failure to condemn the retaliatory conduct detailed in that report to be inadequate. They said that the IEB's response "[m]akes [UAW staff] feel like they can't talk to the Monitor."[106]

These reports confirm the Monitor's own observations that the Union's culture remains mired in fear and distrust, and the Union cannot afford for these issues to remain unaddressed. UAW personnel are less likely to raise concerns of ethical breaches, corruption, or financial malfeasance if they believe Union leadership will not act on them or that they will be retaliated against for raising them. As already discussed in the Tenth Status Report, it remains "essential for the Union to seize the moment to address the concerns of its staff with a sense of energy and urgency."[107]

---

[103] UAW Staff Interview.

[104] Meeting with UAW (June 18, 2025).

[105] Meeting with UAW (June 19, 2025).

[106] Meeting with UAW (Sept. 19, 2025).

[107] Monitor's Tenth Status Report at 6.

### C.     The Union's Culture is Hampering Implementation of Compliance Reforms

These cultural issues at the UAW are impacting the Union's compliance reforms in concrete and adverse ways.  In the Tenth Status Report, the Monitor warned that division between the President's Office and the Secretary-Treasurer's Office was "having a negative impact on Union morale and, if left unaddressed, could further drag down the Union's pace of reform."[108] The Monitor urged prompt attention to remediating that culture of division lest it further harm the Union's progress toward lasting compliance reform.  But those divisions have persisted, creating an "us versus them" mentality that is interfering with basic decision-making at the Union and is slowing progress on key issues of financial reform, including several examples detailed below.

### 1.     Divisions are Interfering with the Compliance Department

Perhaps most concerning, animosity between the President's Office and the Secretary-Treasurer's Office has compromised and undermined the independence and effectiveness of the Compliance Department, the Union's core control against corruption, fraud, and unethical practices—a department still in its nascent stages.

As the Monitor observed in his Initial Status Report, establishing a dedicated and effective compliance function within an organization is a key step toward building a sustainable compliance regime.[109]  The Monitor recommended that the Union create a Compliance Department with a dedicated compliance officer because such a function could help the Union turn the page on its troubled past.[110]  Formed three years ago, the Compliance Department performs many important roles, including monitoring compliance with Union policies and procedures, receiving,

---

[108] Monitor's Tenth Status Report at 4.
[109] Monitor's Initial Status Report at 74-75.
[110] Monitor's Initial Status Report at 74-75, 83 (Rec. 4).

investigating, and remediating non-compliance, and identifying solutions to address gaps in the Union's control framework.[111]

The Compliance Department made significant efforts to improve its resourcing and carry out its remit.[112]  For example, since the Tenth Status Report, the Compliance Department has onboarded two staff members, received approval for additional staffing, and improved the depth and breadth of its compliance monitoring activities.[113]  It has formalized communications with Union staff about Union-wide compliance efforts,[114] started building an infrastructure for performing risk assessments,[115] conducted compliance-focused trainings,[116] and improved the Department's presence and visibility into Union conferences.[117]  In other words, the Union was well on its way to successfully implementing one of the Monitor's most important recommendations in effectively establishing the infrastructure for a robust and credible Compliance Department.

Yet, the capture of the Compliance Director by the President's Office as part of the infighting between the President and Secretary-Treasurer has compromised the Compliance Department.  As detailed in the Twelfth Status Report and its upcoming supplement, the former Compliance Director joined an effort by the Union's President to retaliate against the Secretary-Treasurer.  In February 2024, she presented an unfounded and erroneous Special Compliance

---

[111] Monitor's Tenth Status Report at 37-38, 81-84.

[112] Monitor's Tenth Status Report at 37-40.

[113] *See* IEB Meeting Minutes (Mar. 6, 2025).

[114] Meeting with former Compliance Director (Mar. 18, 2025).

[115] Meeting with Compliance Department (July 25, 2025).

[116] UAW Virtual All Staff Meeting (June 16-17, 2025).

[117] The Compliance Department has attended and monitored various conferences, including the Union's Financial Officers' Conference from March 10-14, 2025.  Meeting with Compliance Department (Mar. 10, 2025).

Report that was drafted or dictated in large part by the President's Office for the purpose of retaliating against the Secretary-Treasurer, even as the Compliance Director suggested that it was being offered "independently by the Compliance Department."[118]

As newly produced documents have demonstrated—and which the Monitor will describe further in a forthcoming supplement to the Twelfth Status Report—rather than being unaware of the plan to remove Secretary-Treasurer Mock's departments from her supervision, the Compliance Director was an integral part of it.  Days before the February 2024 IEB meeting, she participated in a meeting with the President and his Top Administrative Assistant where they discussed her draft report and went over a list of departments that they planned to strip from the Secretary-Treasurer.  Shortly after, she suggested that an additional department be added to the list that was not originally included.  The newly produced documents also demonstrated that the Compliance Director deleted text messages with the President's Office that directly contradicted her previous account to the Monitor about her role in these events.  The Compliance Director recently resigned from her position, soon after being confronted with this newly found evidence.

Over the year prior to the Compliance Director's resignation, the Compliance Department had come to be viewed as a politicized arm of the President's Office, seen by many as pursuing his political agenda rather than helping the Union identify and remediate legitimate compliance deficiencies.  Some examples, detailed below, illustrate the key challenges to the perception of the Compliance Department's independence and effectiveness.

a.      **Reluctance to Report Concerns to the Compliance Department**

In the Tenth Status Report, the Monitor discussed the efforts the Union has undertaken to receive and investigate reports of misconduct, one of those efforts being the use of the UAW's

---

[118] Monitor's Twelfth Status Report at 5-11, 75-81.

Ethics Hotline.[119]  Since that time, the Union transitioned management and oversight of its Ethics Hotline from a third-party vendor, Capgemini (formerly Exiger), to the Compliance Department. Since the transition, the Compliance Department hired additional personnel to support its management of the Ethics Hotline.[120]  The Monitor has observed that the transfer of responsibility for managing the Ethics Hotline responsibilities from a vendor to the Compliance Department has generally gone smoothly.[121]

Yet, even if the Union may be effectively managing the logistics of the Ethics Hotline, numerous reports to the Monitor indicate that both the Ethics Hotline and the Compliance Department are viewed with skepticism by some within the Union, and therefore, may not be serving their intended purposes of providing avenues for reporting concerns.  Personnel and members have reported to the Monitor a reluctance to report ethical concerns to the Ethics Hotline or Compliance Department for fear that the Compliance Department is not trustworthy, independent, or sufficiently insulated from the influence of the President's Office.  These reports include the following:

- The Monitor told one complainant their complaint was outside the Monitor's remit and informed them they could contact the Compliance

---

[119] Monitor's Tenth Status Report at 79-82.

[120] Meeting with Compliance Department (Jan. 14, 2025).

[121] Meeting with Compliance Department (Apr. 7, 2025).  One issue faced by the Ethics Hotline has been a high number of complaints falling outside of the scope of topics the Ethics Hotline is designed to address. To educate personnel on the scope of appropriate Ethics Hotline reporting, and to implement the Monitor's recommendations to publicize avenues for members to report misconduct at the International Union level, Compliance Department personnel have engaged in an "awareness campaign," which is comprised of a series of presentations across the UAW regions that educate members and leaders about the Ethics Hotline. In May 2025, the Compliance Department also presented to the IEB on the Ethics Hotline.  *See* Ethics Hotline Awareness Campaign IEB Meeting Presentation (May 13, 2025).  The Compliance Department has also recently developed a quick reference guide about the Ethics Hotline, as well as updated and refined the Ethics Hotline Frequently Asked Questions.  *See* Meeting with Compliance Department (July 10, 2025).

Department.  But the complainant refused to do so because they believed that the Compliance Department is "all tied in together and crooked."[122]

- One individual reported their belief that any report screened by the Compliance Department will not get "a fair shake."[123]

- One senior employee serving in a financial control function informed the Monitor that they are increasingly reluctant to report issues to the Compliance Department.[124]

- One individual reported that they had filed an Ethics Hotline complaint, but that they did not have confidence in the Compliance Department, and did not expect the complaint to be addressed.[125]

- One employee shared their view that the former Compliance Director was not independent because she is close friends with other senior-level staff members in the President's Office.[126]  This same employee expressed distrust in the former Compliance Director's team, remarking that they do not have trust in the Compliance Department.[127]

- Another individual summarized their feelings about the transition of the Ethics Hotline in-house as "a fox guarding the henhouse."[128]  This reporter also told the Monitor that they had difficulty getting in touch with the Compliance Department,[129] and remarked that they believe the Compliance Department purposefully makes it difficult to contact them in order to reduce the number of complaints they receive.[130]

- One employee indicated that they attempted to contact the Compliance Department regarding their complaints but reported that the former Compliance Director was not helpful.[131]

---

[122] Outreach to Monitor's Hotline.

[123] Outreach to Monitor's Hotline.

[124] Meeting with UAW (June 19, 2025); Meeting with UAW (July 28, 2025).

[125] Outreach to Monitor's Hotline.

[126] Outreach to Monitor's Hotline.

[127] Outreach to Monitor's Hotline.

[128] Outreach to Monitor's Hotline.

[129] Outreach to Monitor's Hotline.

[130] Outreach to Monitor's Hotline.

[131] Outreach to Monitor's Hotline.

- Another staff member described to the Monitor their belief that the former Compliance Director faced "immense pressure" to be biased in favor of the President's Office.[132]

Internal reporting avenues, like the Ethics Hotline and the Compliance Department, are key to the Union's ability to detect and remediate potential misconduct once the monitorship ends, and the Union must make it a priority to restore the perception that it can be trusted. That mistrust of the Compliance Department is sowing mistrust of the Ethics Hotline is particularly troublesome, because the Compliance Department is tasked with promoting the Ethics Hotline as a credible reporting avenue.

To be clear, the Monitor has not observed any instances in which the Compliance Department has acted unprofessionally in its oversight of the Ethics Hotline. But, if Union personnel perceive that the Compliance Department's involvement in staffing the Ethics Hotline renders it an unsafe avenue to report concerns, they will be less likely to use it. As a consequence, the Union would inevitably have less visibility into potential malfeasance that would otherwise be reported, investigated, and remediated. To preserve the integrity of the Ethics Hotline, the Union needs to address the suspicion and fear around the Compliance Department or risk eroding the progress that has gone into establishing the Ethics Hotline as a reliable reporting avenue to escalate compliance concerns within the Union.

### b.    Independence of the Internal Audit Function

As detailed above and in the Monitor's past reports, a robust and independent Internal Audit function provides a crucial check on the UAW and its compliance infrastructure to ensure that the Union's governance, policies, procedures, and internal controls are functioning properly

---

[132] Meeting with UAW (Apr. 3, 2025).

and effectively.[133]  At present, however, the tainted perception of the Compliance Department risks bleeding into Internal Audit's work, which in turn risks undermining the actual or perceived independence of Internal Audit.

Since the Monitor's Tenth Status Report, the Compliance Department has taken a more active role in managing the Union's relationship with Internal Audit, particularly as the Compliance Department has increased its staff.[134]  That has had some positive results, discussed above; but the Compliance Department has also inserted itself into Internal Audit's work in ways that may compromise the independence, or perceived independence, of Internal Audit.  For example:

- In a departure from past practice, Compliance Department personnel have attended Internal Audit's risk assessment interviews with IEB members and department heads, although they were not invited by Internal Audit.[135]  The purpose of the interviews is for Internal Audit to gather information about where Union personnel perceive risks to the safety and soundness of the Union's operations.  These interviews inform the holistic risk assessment Internal Audit provides each year to the IEB and shapes Internal Audit's audit plan for the following year.[136]  For that reason, it is important to the integrity of Internal Audit's risk assessment process that UAW personnel provide candid input to Internal Audit.  The Compliance Department's participation in Internal Audit interviews may chill that candor  and should cease immediately.

- The Compliance Department has also designated itself as the singular point of contact between the Union and Internal Audit, limiting IEB members'

---

[133] Monitor's Initial Status Report at 86-87; Monitor's Third Status Report at 21-22; Monitor's Tenth Status Report at 44-45.

[134] Meeting with Internal Audit and UAW (Sept. 6, 2024); Meeting with Internal Audit and UAW (Dec. 12, 2024).

[135] Meeting with Compliance Department (July 25, 2025).  In response to a draft of this Report, the Union shared with the Monitor that Internal Audit and all but one interviewee consented to Compliance Department personnel joining risk assessment interviews, with the Compliance Department not joining after the one interviewee objected.  Nonetheless, the concerns raised in this Report remain unchanged.  The presence of Compliance Department personnel in these interviews may chill witnesses who are being interviewed by Internal Audit, particularly if the Compliance Department is perceived as being a conduit to the President's Office.

[136] IEB Meeting Minutes (Feb. 21, 2024).

and other Union leaders' access to the Union's Internal Audit function.[137] In particular, after the Secretary-Treasurer's Office sought to meet with Internal Audit to discuss a potential audit, the Compliance Director said that all communications with Internal Audit about potential audits should be directed through the Compliance Department. Despite that effort to restrict communications, the Secretary-Treasurer's Office eventually met with Internal Audit.[138]

The Compliance Department's insertion into the work of Internal Audit has had tangible consequences, most visibly on Internal Audit's audit plan for 2025. As presented to the IEB in February 2024, Internal Audit's 2025 audit plan consisted of 30 audits, including an audit of the Compliance Department itself.[139] Following discussion with the Compliance Department, in February 2025, Internal Audit presented to the IEB an updated 2025 audit plan.[140] The revised audit plan removed 16 audits from the 2025 audit plan, including five audits deemed "high risk" by Internal Audit and an audit of the Compliance Department itself.[141]

The close involvement of the Compliance Department in Internal Audit's work is also at odds with the Union's initial vision for Internal Audit and how it ought to function: as independently as possible from the Union's existing apparatuses. From its conception, Internal Audit's "mission and charter" contemplated that Internal Audit would have a direct reporting line to the IEB and the Secretary-Treasurer in order to promote Internal Audit's independence.[142] When a new external service provider assumed Internal Audit responsibilities in 2022, it recommended a solid reporting line to the IEB with a dual dotted reporting line to the Compliance

---

[137] IEB Meeting Minutes (May 13, 2025).

[138] Meeting with UAW (July 1, 2025); Meeting with UAW (July 7, 2025).

[139] Internal Audit Update IEB Presentation at 7-8 (Feb. 21, 2024).

[140] Meeting with Internal Audit and UAW (Feb. 13, 2025); IEB Meeting Minutes (Feb. 19, 2025); Internal Audit IEB Presentation at 7 (Feb. 19, 2025).

[141] IEB Meeting Minutes (Feb. 19, 2025); Internal Audit IEB Presentation at 7 (Feb. 19, 2025); Compliance Department Internal Audit Update IEB Presentation at 8 (Feb. 19, 2025).

[142] Internal Audit Charter at 1-2.

Department and the Secretary-Treasurer's Executive Administrative Assistant.[143]   Internal Audit followed that practice, working with both the Compliance Department and the Secretary-Treasurer's Office to coordinate Internal Audit's annual risk assessments and audits.[144]   Beginning in 2025, however, the Compliance Department consolidated control over the Union's communications with Internal Audit, cutting out the Secretary-Treasurer's Office, culminating in a formal announcement by the former Compliance Director to the IEB in May 2025 that communications with Internal Audit must "go through the Compliance Department."[145]

For the Union to cement a sustainable compliance regime that lasts beyond the term of the monitorship, it will be important for the Union to effectively implement an independent and objective Internal Audit function.  To promote the actual and perceived independence of Internal Audit, ensure Internal Audit has direct access to the IEB to share its risk assessments and proposed audit plans, and facilitate the free flow of information between Internal Audit and both the President's Office and Secretary-Treasurer's Office, Internal Audit should have an unencumbered line of communication with the IEB and with other offices within the Union.

---

**Monitor's Recommendation No. 8.1:**  The Monitor recommends that the IEB formally adopt: (1) a solid reporting line for Internal Audit to the IEB, including reporting directly to the IEB the results of Internal Audit's annual risk assessment and recommended annual audit plan; (2) dotted reporting lines for Internal Audit to the Compliance Department and the Secretary-Treasurer's Office; and (3) periodic reporting to the Compliance & Ethics Committee.

- **Union's Response:**  Based on discussion with the Monitor, the UAW will take this recommendation under advisement.  The UAW commits to having further discussions regarding governance structure, including but not limited to appropriate reporting lines, for Internal Audit.

---

[143] Internal Audit Reporting Structure IEB Presentation at 3 (Nov. 16, 2022); IEB Meeting Minutes (Nov. 16, 2022).

[144] Meeting with Internal Audit and UAW (Aug. 28, 2023); Meeting with Internal Audit and UAW (Dec. 6, 2023).

[145] IEB Meeting Minutes (May 13, 2025).

- **Monitor's Reply:** The Monitor reiterates the importance of maintaining an Internal Audit function that can serve as a meaningful check on the effectiveness of the Union's operational and financial controls. The Monitor will work with the Union to address how best to implement reporting lines that foster Internal Audit's independence.

## 2. Continued Delays in Formalizing a Budget Process

Apart from the Compliance Department, division between the President and Secretary-Treasurer has stalled the Union's implementation of a formal budgeting process—one of the first recommendations made by the Monitor four years ago.

At the outset of the monitorship, the Union had no budgeting process. As discussed in the Monitor's Initial Status Report, establishing a formal budgeting process is a key component of successful financial reform, because it allows an organization to set financial priorities, properly allocate resources, promote transparency, hold leadership accountable for their use of the organization's resources, and deter malfeasance.[146] The Monitor observed, as did the Union's own consultant, that budgets help deter malfeasance, and "without a budget, it is easier to avoid scrutiny of wasteful and improper spending, like renting a villa for three months on the Union's dime."[147] The Monitor recommended the Union "implement a formal budgeting process, starting no later than fiscal year 2023."[148] The Union partially accepted the recommendation, stating that the Union agreed that "some form of a budget process is appropriate[.]"[149]

By the time of the Tenth Status Report, despite some delays, work on developing a budgeting process was finally underway. In August 2023, the Union's IEB approved the engagement of an external consultant to develop a three-phased process for designing and then

---

[146] Monitor's Initial Status Report at 106-07.
[147] Monitor's Initial Status Report at 106.
[148] Monitor's Initial Status Report at 106-07.
[149] Monitor's Initial Status Report at 106-07.

implementing a formal budgeting process. It was understood by IEB members at the time that this was a crucial step in the process, with President Fain stating "once we start down this road to make this commitment [to the three-phase plan,] we're in it. . . . I don't know how we back away from it[.]"[150] As detailed in the Tenth Status Report, the Union worked with that consultant to devise a budget process.[151]

Over the ensuing months, the Union's progress was led by the Secretary-Treasurer's Office, with input from—and approval by—the IEB. For example, in November 2023, the Union's external consultant and then-Chief Accountant (who sits within the Secretary-Treasurer's Office) conducted a detailed question-and-answer session with the IEB regarding the design of the budgeting process.[152] Over the following months, the external consultant and former Chief Accountant rolled out a framework process and development timeline through training and introductory sessions for senior Union leadership, including IEB members, the President's Office, and the Secretary-Treasurer's Office.[153]

By mid-2024, the Union had made meaningful progress toward finally implementing a budgeting process, with IEB approval and oversight. For example, in May 2024, following another in-depth budgeting process discussion with the IEB, the IEB approved a budgeting process planning calendar document and responsibility matrix document for the budget process.[154] By the

---

[150] IEB Meeting Minutes (Aug. 10, 2023).

[151] Monitor's Tenth Status Report at 66-67.

[152] IEB Meeting Minutes (Nov. 30, 2023).

[153] Budget Process Meeting with IEB Members and their Staff, Secretary-Treasurer's Office, and President's Office (Mar. 19, 2024); UAW Budget Process Meeting with IEB Members and their Staff, Secretary-Treasurer's Office, and President's Office (Mar. 21, 2024).

[154] Monitor's Tenth Status Report at 67; IEB Meeting Minutes (May 2, 2024); Planning Calendar Process Document (May 2, 2024); Responsibility Matrix Process Document (May 2, 2024). The IEB also approved a motion "to accept" the external consultant's report "in its entirety." IEB Meeting Minutes (May 2, 2024).

summer of 2024, the time of the Monitor's Tenth Status Report, the Union had completed the design phase and was in the midst of standardizing a budget methodology for every UAW department to use across the organization.[155]

That progress was set back in the Fall of 2024.  On October 24, 2024, the Monitor observed a special meeting of the IEB—convened at the Secretary-Treasurer's request—for the Secretary-Treasurer's Office to provide an update on the budgeting process and obtain approval for the next phase of work.  At the outset of the meeting, President Fain announced that he had recently "asked [his] team to look into what they're seeing to get a true accounting of where we are" with the Union's finances.[156]  Based on the information received from his staff, President Fain expressed disbelief in what he characterized as an overly negative financial picture of the Union previously presented by the Secretary-Treasurer's Office.[157]  President Fain then pre-empted the meeting and invited his staff to give their own presentation, which they had not shared previously with the Secretary-Treasurer's Office or the Monitor.[158]  That presentation included predictions of revenue based on future organizing activity and projected strength of investment income.  Following his staff's presentation, the President reiterated that, "all I've heard for the last year and a half is the sky is falling and we're getting ready to fall off a cliff, and I'm not seeing that."[159]  The Secretary-Treasurer stated that her office had not seen or contributed to the President's Office's presentation

---

[155] Monitor's Tenth Status Report at 66-67.

[156] IEB Meeting Minutes (Oct. 24, 2024).

[157] IEB Meeting Minutes (Oct. 24, 2024).

[158] IEB Meeting Minutes (Oct. 24, 2024); President's Office Analysis of UAW Finances IEB Presentation (Oct. 24, 2024).

[159] IEB Meeting Minutes (Oct. 24, 2024).

and could not "sanction it" or speak to whether the information in the presentation, including assumptions about future revenue and investment income, was factually accurate.[160]

The special meeting then proceeded with the Secretary-Treasurer's Office presenting the proposed budgeting process for IEB approval.[161]   The Secretary-Treasurer's Office proposed a comprehensive budgeting process resulting from the work performed by the Union over the past year in consultation with members of the IEB and their top staff and the IEB-approved outside consultant.[162]   The proposed budget process included methodologies to allocate income and expenses across different departments within the Union.[163]   But President Fain decried the Secretary-Treasurer's Office's presentation as "garbage" and "the same bullshit I've heard from companies over the years."[164]   President Fain claimed that because of the financial information recently discovered and presented by his Office earlier in the meeting, and the President' Office's claimed lack of involvement in developing the budget methodology, "we're nowhere near ready to make a decision today."[165]   President Fain and other IEB members also said that the budgeting framework proposal did not reflect a consensus for the Union's spending goals and priorities, despite the prior and repeated approval and involvement of the IEB detailed above.[166]

---

[160] IEB Meeting Minutes (Oct. 24, 2024).  Secretary-Treasurer's Office personnel also raised questions regarding the investment income figures included in the presentation.  IEB Meeting Minutes (Oct. 24, 2024).

[161] IEB Meeting Minutes (Oct. 24, 2024).

[162] Monitor's Tenth Status Report at 66-67.

[163] *See* IEB Meeting Minutes (Oct. 24, 2025).

[164] IEB Meeting Minutes (Oct. 24, 2024).

[165] IEB Meeting Minutes (Oct. 24, 2024).

[166] IEB Meeting Minutes (Oct. 24, 2024).

At the end of the October 2024 meeting, at President Fain's urging, the IEB voted to shelve the proposed budgeting framework.[167] The IEB then voted to create a new "Budget Committee"— one led by the President's Office, with support from the Secretary-Treasurer's Office, and including representatives from each IEB member—to propose an entirely new budgeting process.[168] Some senior Union officials told the Monitor that the IEB's decision meant that the Union's formal budgeting plans were put back to "square one," and that the Secretary-Treasurer's Office, which was traditionally a steward of UAW funds, had effectively been demoted beneath the President's Office in the budget process.[169]

For months following the October 2024 meeting, the President's Office and Secretary-Treasurer's Office made no meaningful progress on the budget process. The Monitor observed that the Secretary-Treasurer's Office and President's Office struggled to work collaboratively in order to even form a new Budget Committee, let alone devise a new budget framework. In December 2024, the Secretary-Treasurer's Office and the President's Office met once to begin the process of determining the Union's budget methodology, but ended the meeting without reaching consensus on the next steps for convening a first Budget Committee meeting.[170] The President's

---

[167] IEB Meeting Minutes (Oct. 24, 2024).

[168] IEB Meeting Minutes (Oct. 24, 2024). Only the Secretary-Treasurer voted against the IEB's approved motion, which stated in full: "[T]he [P]resident's [O]ffice, with support from the [S]ecretary-[T]reasurer, convene a committee with involvement from each member of the IEB, either themselves or their designee, to make a new proposal for a budget process." IEB Meeting Minutes (Oct. 24, 2024). The Budget Committee includes each IEB member or their designee. IEB Meeting Minutes (Oct. 24, 2024); Meeting with UAW (July 21, 2025).

[169] Compliance and Ethics Committee Meeting (Oct. 28, 2024); Meeting with UAW (Nov. 12, 2024).

[170] Meeting with President's Office and Secretary Treasurer's Office (Dec. 3, 2024).

Office and the Secretary-Treasurer's Office did not meet again to discuss a budget framework proposal until May 2025.[171]

After a series of meetings between the Monitor and personnel from the Secretary-Treasurer's Office and the President's Office, the two offices finally re-engaged to advance the budget process.[172]  Representatives from the President's Office and the Secretary-Treasurer's Office with relevant subject-matter expertise, including the Union's new Chief Accountant,[173] formed a small working group and are now working collaboratively with the Monitor to advance the project.  With the Monitor's encouragement, this working group, along with the Union's same outside consultant approved by the IEB in August 2023, have begun reconstructing a high-level budget framework and proposed processes for implementing a more detailed budget methodology.[174]

In August 2025, the IEB unanimously approved the group's proposal to convene the first meeting of the newly formed Budget Committee to set budget priorities and goals before the November 2025 IEB meeting.[175]  The working group scheduled the first Budget Committee meeting for October 20, 2025, and planned to present its new proposed budget methodology and approach with the Budget Committee for feedback and discussion in advance of a presentation to

---

[171] Meeting with UAW (Jan. 22, 2025); Meeting with UAW (Jan. 27, 2025); Meeting with UAW (Jan. 28, 2025); Meeting with Secretary-Treasurer's Office and President's Office (May 8, 2025).

[172] Meeting with President's Office (June 11, 2025); Meeting with Secretary-Treasurer's Office (June 18, 2025); Meeting with Secretary-Treasurer's Office (June 20, 2025); Meeting with President's Office and Secretary-Treasurer's Office (June 27, 2025).

[173] A new Chief Accountant was hired in March 2025, and started in April 2025.

[174] Meeting with Secretary-Treasurer's Office and President's Office (June 27, 2025); IEB Meeting Minutes (Aug. 6, 2025).

[175] Meeting with UAW (July 21, 2025); IEB Meeting Minutes (Aug. 6, 2025); President's Office and Secretary-Treasurer's Office Joint Budget IEB Presentation at 7 (Aug. 6, 2025).

the IEB in November 2025.[176]  However, even though the working group, including personnel in the President's Office, had signed off on the joint presentation, President Fain and his Chief of Staff intervened at the last minute, cancelling the meeting with no explanation provided at the time other than the President's Office was not ready to share this information with the IEB.[177] President's Office personnel in the working group subsequently explained the President's view that the joint presentation should (1) focus on describing the budget process in more general terms; and (2) contemplate harvesting potential investment gains, and reflect the impact of potential investment activities on budgeting decisions.[178]  The working group is now jointly preparing for an updated presentation to the IEB at the quarterly meeting scheduled for November 2025.  The working group plans to propose an approach that contemplates an interim, simpler "top-down" 2026 budget that will be developed by the working group, with feedback from the Budget Committee and approved by the IEB, and a more sophisticated, "bottom-up" 2027 budget to be developed later.[179]

It has now been over a year since the budget process was set back to "square one," and one of the proposed solutions, a newly formed Budget Committee, has still not even met.  Political division and lack of collaboration between the President's Office and Secretary-Treasurer's Office

---

[176] Meeting with UAW (Oct. 16, 2025).

[177] Meeting with UAW (Oct. 17, 2025); Meeting with UAW (Oct. 20, 2025).

[178] Meeting with Secretary-Treasurer's Office and President's Office (Oct. 30, 2025).

[179] In the working group's planned "top-down" budgeting process, overall budget targets and resource allocations will be preliminarily set by the budget working group, shared with the Budget Committee, and then approved by the IEB.  The relevant UAW regions, departments, and industries then work within the budget constraints set by the IEB.  In contrast, the working group's planned "bottom-up" process will start with the individual regions, departments, and industries creating their own unit-specific budget proposals consistent with their needs and the Union's priorities, as set by the IEB.  After a process of feedback and reconciliation, individual unit budgets are then consolidated by International leadership, and approved by the IEB.  Meeting with Secretary-Treasurer's Office and President's Office (Oct. 7, 2025); Meeting with Secretary-Treasurer's Office and President's Office (Oct. 16, 2025); Budget Committee Discussion Draft Presentation (Oct. 20, 2025); Updated Budget Committee Discussion Draft Presentation (Oct. 30, 2025).

stalled progress for months until the Monitor intervened and brought subject matter experts from both sides together with the aim of working diligently together to present a consensus path forward. Despite the latest delay in presenting a consensus approach to the IEB, the President's Office and Secretary-Treasurer's Office must continue their recent prioritization of advancing necessary reform over political infighting that stalled the budget process. Further, the interim "top-down" methodology proposed for 2026 is a positive step, but the Union must act with urgency to ensure that an appropriate, all-inclusive budgeting process is implemented in 2027 or sooner. The Monitor will continue to assess and report on this work and urges both offices and the IEB to move expeditiously and collaboratively to complete this critical work.

### D.    The Union's Culture Committee

As described in the Monitor's Tenth Status Report, and referenced above, in April 2024, the IEB voted to "accept" the 2023 Culture Assessment Report that had identified lasting concerns about retaliation and a toxic culture at the Union, and formed a "Culture Committee" tasked with implementing Internal Audit's recommendation to address those issues.[180] At the time of the Tenth Status Report in July 2024, however, the Monitor observed that the Culture Committee had not demonstrated a sufficient sense of urgency in addressing the 2023 Culture Assessment's recommendations, which included recommendations to improve the Union's culture of fear.[181] As one example, the Monitor observed that the Culture Committee had not yet conducted its first meeting nearly three months after the IEB voted to create the Committee, and the Monitor urged the Committee to "develop and recommend to the IEB specific plans to implement the [2023

---

[180] Monitor's Tenth Status Report at 12-20.
[181] Monitor's Tenth Status Report at 12-20.

Culture Assessment Report's] recommendations."[182]   The Union's actions regarding the Culture Committee since then have not met the Committee's potential promise as a tool to address cultural issues at the Union.

Most importantly, the Culture Committee and other Union stakeholders have not made meaningful progress in implementing the first two recommendations of Internal Audit: addressing division within the UAW (Rec. 1); and addressing fears of retaliation within the Union (Rec. 2).[183] As discussed in the Tenth Status Report, after the Culture Committee was formed, the Monitor recommended that the Union make addressing divisions and retaliation a "top priority of the Culture Committee."[184]   At the time, the Union said it "agrees with the Monitor's recommendation" and was already in the "in the planning phase" of implementing specific recommended actions, such as mandatory training of IEB members on how to address sensitive workplace issues that can contribute to fears of retaliation.[185]   Since that commitment, however, the Union's efforts have largely stalled, displaying remarkable indifference to what should be a top priority.   For instance, the Union never even provided the training to IEB members, as it committed to do.[186]   Nor has the Union addressed the 2023 Culture Assessment's recommendation that it "impose serious consequences for those who commit retaliation."[187]   To the contrary, the IEB has left in place the retaliatory actions taken by the President's Office against the Secretary-

---

[182]   Monitor's Tenth Status Report at 6, 20 (Rec. 45).

[183]   2023 Culture Assessment Report at 7 (Apr. 11, 2024) (Rec. 1: "Address division within the organization"; Rec 2: "Increase communication to stress that retaliation will not be tolerated.   Review policies to ensure they encourage employees to come forward and impose serious consequences for those who commit retaliation").

[184]   Monitor's Tenth Status Report at 20-21 (Rec. 46).

[185]   Monitor's Tenth Status Report at 21 (Union's Response to Rec. 46).

[186]   Monitor's Tenth Status Report at 20-21 (Union's Response to Rec. 46); Meeting with UAW (Aug. 21, 2025).

[187]   2023 Culture Assessment Report at 7 (Apr. 11, 2024).

Treasurer even after the Monitor's Twelfth Status Report.  And as noted above, rather than tasking the Culture Committee to lead the charge against retaliation, the Union has stripped that responsibility from its portfolio, leaving it largely unaddressed as the fear of retaliation continues to fester.

To be sure, the Culture Committee has taken some steps to try to address the divisive culture at the Union.  For example, at the Culture Committee's recommendation, the Union held three All Staff meetings and also launched a pilot mentorship program in August 2025.[188]  But as noted above, any positive messaging around retaliation at an All Staff meeting will ring hollow without action to address retaliation, such as reversing the actions against Secretary-Treasurer Mock.  The Culture Committee only recently launched the pilot mentorship program, and it is not clear yet how, if at all, it will positively impact the Union's culture.

Further, after the Tenth Status Report was published, the Union announced that the Culture Committee would merely serve in an "advisory" role for seven of the eleven recommendations made by Internal Audit, including the recommendation to address fears of retaliation.[189]  And

---

[188] Meeting with UAW (Aug. 21, 2025); UAW All Staff Meeting (Sept. 30-Oct. 4, 2024); UAW Virtual All Staff Meeting (June 16-17, 2025) UAW All Staff Meeting (Oct. 20-21, 2025).

[189] IEB Meeting Minutes (Aug. 7, 2024); Culture Committee IEB Presentation (Aug. 7, 2024).  In August 2024, the Union determined that the Culture Committee would be responsible for four of the eleven Culture Assessment recommendations, with the remaining recommendations being "handled by other areas throughout the UAW."  IEB Meeting Minutes (Aug. 7, 2024).  The Culture Committee took responsibility for addressing division within the organization (Rec. 1); determining avenues to increase employee engagement and inclusion within the organization (Rec. 4); improving channels for communication within the organization (Rec. 6); and enhancing and promoting internally the vision and strategy of the UAW (Rec. 10).  IEB Meeting Minutes (Aug. 7, 2024).  The seven recommendations excluded from the Culture Committee's ambit, and the parts of the Union that the Union reported are responsible for addressing them, are: increasing communication to stress that retaliation will not be tolerated and reviewing policies to ensure they encourage employees to come forward and impose serious consequences for those who commit retaliation (Rec. 2, Education and Compliance Departments); continuing to investigate and address sexual harassment and ethical violation claims and holding people accountable; and additional training on the reporting of such violations (Rec. 3, HR, Civil Rights, and Compliance Departments); implementing a formal annual budget process to ensure financial and operational goals are understood and tracked (Rec. 5,

where they have acted on one of those seven recommendations, it has not advanced compliance with those recommendations.  For example, in the Tenth Status Report, the Monitor recommended that the Union, in consultation with the Culture Committee, address the Monitor and Internal Audit's recommendations to institute a performance management process, a critical part of helping to ensure that key positions within the Union are held by qualified individuals and to combat perceptions of nepotism.[190]  In January 2025, a performance management framework to address this recommendation was proposed to the Culture Committee for review, but it was rejected.[191]  Since then, the Union has not shared with the Monitor any updated plans to address the recommendations around creating a performance management process.  Thus, far from the Union's vision of having a centralized body with representatives designated by the IEB driving change and ensuring accountability for those tasked to bring it about, the Culture Committee is not playing an

---

Budget Committee); creating a formal performance management process to ensure employees are provided feedback to appropriately address performance gaps and develop roadmaps for advancement (Rec. 7, HR Department); defining job responsibilities for roles in each department and developing a formal succession planning process, including formalizing the onboarding of elected and appointed positions (Rec. 8, HR Department); investing in leadership development training (Rec. 9, Education Department); and continuing to further processes by ensuring timely implementation of policies and procedures (Rec. 11, Compliance Department).  IEB Meeting Minutes (Aug. 7, 2024).  The division of responsibility for addressing certain of those seven recommendations is a reasonable approach.  But the lack of progress in certain areas, such as fear of retaliation, illustrates that decentralizing responsibility to fix these cultural challenges is not working.  The Culture Committee should have retained responsibility for proposing solutions to the culture of retaliation, because it is so central to the Committee's remit.  And the IEB must exercise more direct, meaningful oversight of all cultural remediation efforts, whether undertaken by the Culture Committee or other functions in the Union.  The Monitor recommended similar IEB oversight in the Initial Status Report, and IEB engagement is even more necessary now.  As described in this Report, the Compliance and Ethics Committee has not lived up to its promise in driving reform, and the actions of the Compliance Department has not allayed the fears of retaliation.  To ensure oversight and accountability within the Union, it is imperative that the IEB immediately implement centralized oversight of implementation of the Monitor's and Internal Audit's recommendations.

[190] Monitor's Tenth Status Report at 71-75 (Rec. 12.2) ("The Monitor recommends that the Union, in consultation with the Culture Committee, ensure that the Leading for Change and Managing for Change training programs address the Monitor and Internal Audit's recommendations to institute a performance management process, including requirements that managers (i) define performance criteria and set job-specific goals, (ii) provide feedback to the personnel they manage on a periodic basis, and (iii) periodically assess the performance of the personnel they supervise relative to their goals.").

[191] Culture Committee Meeting Notes (Jan. 15, 2025); IEB Meeting Minutes (Mar. 6, 2025).

organizing and focusing role to implement seven of the eleven recommendations about the Union's culture that need addressing, and has been generally ineffective for the recommendations that it has retained.

Last, in a setback for transparency, the Culture Committee and the IEB have excluded the Monitor from participating in Culture Committee meetings.[192]  Members of the IEB and Culture Committee cited a variety of concerns—from fear of the Monitor reporting on negative issues to the public, to believing no help from the Monitor was needed, to concerns that transparency with the Monitor, and thus the public, would chill open dialogue.[193]  Instead of permitting the Monitor to observe and support the Culture Committee directly, the Union provides the Monitor notes from Culture Committee meetings which summarize the topics discussed at the meeting and anonymize the majority of the participants' statements.[194]

But barring the Monitor's attendance at meetings undermines the very purpose the Culture Committee is intended to promote.  Secrecy and lack of accountability are what fed the culture of corruption at the Union in the first place, to the point where a monitorship became necessary. UAW members have also noticed the Committee's lack of transparency.  At the July 2025 Culture Committee meeting, a member shared that they had received feedback from staff that members and staff do not know what is happening on the Culture Committee.[195]  Another member reiterated that same experience.[196]

---

[192] Culture Committee Meeting Notes (Sept. 3, 2024); IEB Meeting Minutes (Nov. 13, 2025).

[193] Culture Committee Meeting Notes (Sept. 3, 2024); IEB Meeting Minutes (Nov. 13, 2025).

[194] The Union generally provides these notes to the Monitor weeks and sometimes months after the meetings occur.  As of this Report, the Monitor has received Culture Committee meeting notes through the Committee's July 2025 meeting.

[195] Culture Committee Meeting Notes (July 23, 2025).

[196] Culture Committee Meeting Notes (July 23, 2025).

As the Monitor observed in the Initial Status Report, "[f]or an organization to promote compliance-minded behavior, transparency and information sharing must be the rules of the road. A corollary to encouraging employees to speak out when they see wrongdoing is promoting openness about leadership's expectations and decision-making, so that the rot of fraud and corruption is not given room to spread in shadowy places."[197]   Blocking the Monitor from efforts to rectify the Union's cultural challenges in order to hide them from the Monitor is counterproductive to the goal of cultural reform.

Indeed, barring the Monitor from meetings also hampers the Monitor's ability to work with the Union toward sustainable reform, particularly the Culture Committee's inability thus far to achieve its goals on its own.  With full transparency into the Committee's work, the Monitor can help the Committee make more impactful recommendations, avoid wasted efforts, champion its progress, and be a more effective agent of cultural reform.  For example, the Monitor could have helped the Culture Committee claim its role in helping the Union combat fears of retaliation and develop more ambitious proposals to address silos and division within the Union.  With greater transparency into its work, the Monitor can empower the Culture Committee to recommend more impactful reforms to the IEB and help clarify the Committee's role within the Union's compliance infrastructure.  Indeed, the pressing need for reform and an effective Culture Committee is perhaps no more self-evident than in the rationale expressed by multiple Union personnel for excluding the Monitor from the Committee's meetings—to shield the Committee and the Union from scrutiny and accountability.

---

[197] Monitor's Initial Status Report at 6.

### E.    Challenges with Other Compliance-Related Functions

The Union has experienced challenges with other compliance-related initiatives as well.

**Ethics Officer.**  In 2020, prior to the start of the monitorship, one of the Union's first steps toward cultural reform was the installation of an Ethics Officer.[198]  Among other things, the Ethics Officer was "empowered to investigate allegations, complaints, or matters referred to her, . . . hold hearings at her discretion," and prepare reports and recommendations for the Union.[199]  Following three years of service, the first Ethics Officer resigned in May 2023.  In 2024, the UAW hired and onboarded a second Ethics Officer.[200]  In May 2025, however, the second Ethics Officer notified the Union of her intent to resign amid allegations of a personal conflict of interest with the Union.[201]  Specifically, the Monitor received reports that the second Ethics Officer's spouse had been endorsed by a UAW regional CAP council in connection with the spouse's mayoral candidacy.[202]  The Monitor began to investigate this alleged conflict of interest, but the second Ethics Officer stopped responding to outreach from the Union and the Monitor.[203]  In August 2025, the Union accepted the second Ethics Officer's resignation, and informed the Monitor that UAW Compliance Department and Legal Department personnel would assume the Ethics Officer's responsibilities until a new Ethics Officer is hired.[204]

**Compliance and Ethics Committee.**  Formed in response to one of the Monitor's first recommendations, the Compliance and Ethics Committee reports directly to the IEB and is

---

[198]  Monitor's Initial Status Report at 68, 128-32.

[199]  Monitor's Initial Status Report at 129, 133.

[200]  IEB Meeting Minutes (Aug. 7, 2024); Meeting with Ethics Officer (Jan. 24, 2025).

[201]  Meeting with Compliance Department (July 10, 2025); Outreach to Monitor's Hotline.

[202]  Outreach to Monitor's Hotline.

[203]  Meeting with UAW (June 19, 2025); Meeting with Compliance Department (July 10, 2025).

[204]  Meeting with UAW (Aug. 20, 2025).

responsible for elevating compliance and ethics issues to UAW leadership.[205]  But the Compliance and Ethics Committee has not served in the key role envisioned for it, which was to ensure accountability for implementing the Monitor's recommendations and other reforms in a timely manner.[206]  The effectiveness and impact of the Compliance and Ethics Committee as a core governance and oversight body has not materially changed since the Monitor's Tenth Status Report, despite the Committee now including as standing members the Union's Chief Accountant, Director of ITS, and Director of Purchasing.[207]  Since the Tenth Status Report, Compliance and Ethics Committee meetings have typically featured extensive review of the President's and Secretary-Treasurer's expense reports and have not featured meaningful discussion regarding compliance and ethics-related topics and risk areas or the status of implementation efforts.[208]  As with other key compliance initiatives, the onboarding of a new Compliance Director will provide the Union an opportunity to revisit the Monitor's recommendations regarding the Compliance and Ethics Committee, and potentially improve the Committee's impact on the Union's overall compliance infrastructure.

---

[205] Monitor's Initial Status Report at 83-84 (Rec. 6); Monitor's Tenth Status Report at 40-44 (Rec. 6.1).

[206] Monitor's Initial Status Report at 83-84 (Rec. 6(a)) ("The Compliance and Ethics Committee should: (a) Oversee and be accountable for implementing the Recommendations in this Report, as well as other recommendations and policies (from Exiger, Internal Audit, and Deloitte described in this Report) that have stalled in implementation; until the Compliance and Ethics Committee is in place, the UAW should form a subcommittee of the IEB or some other similar mechanism with the appropriate stature and authority to oversee and be accountable for that work[.]").

[207] *See, e.g.,* Compliance and Ethics Committee Meeting (Feb. 10, 2025); Compliance and Ethics Committee Meeting (May 5, 2025); Compliance and Ethics Committee Meeting (July 28, 2025).

[208] Compliance and Ethics Committee Meeting (July 29, 2024); Compliance and Ethics Committee Meeting (Oct. 28, 2024); Compliance and Ethics Committee Meeting (Feb. 10, 2025); Compliance and Ethics Committee Meeting (May 5, 2025); Compliance and Ethics Committee Meeting (July 28, 2025).

F.      **Indications of Positive Progress**

Despite the myriad challenges facing the Union's efforts to establish a sustainable culture of compliance, the Monitor has very recently observed some positive signs.

For example, with the Monitor's assistance, leaders in the President's Office and Secretary-Treasurer's Office have recently demonstrated their ability to set aside individual grievances and work together in the interest of the Union.  Specifically, after a dispute arose in connection with the Union's now-released Fall 2025 *Solidarity* magazine financial report, the Monitor brokered meetings between the offices to resolve the dispute.  Both offices subsequently worked efficiently and collaboratively together and with the Monitor to resolve their differing viewpoints, and ultimately implemented a mutually agreeable presentation of the Union's finances.[209]

The Monitor is encouraged that, when prompted to do so, leaders in the President's Office and Secretary-Treasurer's Office successfully met and collaborated on a disputed issue.  Moving forward, the Union should build upon this recent success, and without prompting, continue to work collaboratively on key initiatives.  The Monitor will continue to report on the Union's progress in this area.

Further, the Union itself has taken some steps to acknowledge the seriousness of the issues with the Compliance Department and has begun to change course.  The Union is in the process of hiring a new Compliance Director.  This must be done with a sense of urgency, and the Monitor expects to work collaboratively with the Union to identify a candidate who will provide firm, independent leadership to anchor the Union's ethics and compliance program and fortify the reputation of the Compliance Department as a trusted compliance partner.[210]  The Union has also

---

[209] Meeting with UAW (Sept. 26, 2025); Meeting with UAW (Sept. 29, 2025); Meeting with UAW (Sept. 30, 2025).
[210] Meeting with UAW (Sept. 22, 2025).

sought input from the Monitor to enhance other important compliance-related initiatives within the Union, such as the Compliance and Ethics Committee.[211]

The Monitor welcomes the transparency into these important initiatives that will help sustain a robust and independent ethics and compliance program at the UAW. As these efforts proceed, it will be critical for the Union to acknowledge that the Compliance Department cannot afford to be seen as merely a tool of the President's Office that was co-opted into the retaliatory plans and actions against the Secretary-Treasurer. And the Union cannot easily correct that perception, given the current reporting structure for the Compliance Department: the Compliance Department sits within the President's Office and the Compliance Director reports to the President.[212]

The placement of the Compliance Department within the President's Office was the result of a recommendation by the Monitor, a recommendation that must now be revisited given the challenges to its independence described in this and in the Twelfth Status Report.[213] Thus, as guiding principles in considering a path forward, the Compliance Department should be moved out of the President's Office and report directly to the IEB. That will provide a direct avenue of communication that will ensure greater transparency between the Compliance Department and the IEB, and will reinforce the oversight role of the IEB for the work of the Compliance Department. A subgroup of IEB members should be selected to oversee the Compliance Department, and it is essential that group is inclusive of multiple political viewpoints, including the Secretary-Treasurer.

---

[211] Meeting with UAW (Sept. 22, 2025).

[212] President's Office Organizational Chart (Dec. 10, 2024).

[213] Monitor's Initial Status Report at 83 (Rec. 4) ("Joining and building on a recommendation made by Exiger, the Monitor recommends that the UAW establish a risk-based and right-sized Compliance function run by the Compliance Director that reports to the President's Office and to the Compliance and Ethics Committee described in Recommendation No 6.").

**Monitor's Recommendation No. 4.1:**  In order to better promote the independence of the Compliance Department, the Union should move the Compliance Department out of the President's Office and establish a direct reporting line to the IEB.

- **Union's Response:**  Based on discussion with the Monitor, the UAW will take this recommendation under advisement.  The UAW commits to having further discussions regarding governance structure, including but not limited to appropriate reporting lines, for the Compliance Department.

- **Monitor's Reply:**  The Monitor reiterates the importance of maintaining a Compliance Department that can serve as an independent safeguard against corruption, fraud, and unethical behavior, while growing the Union's culture of ethics and compliance.  The Monitor will work with the Union to address how best to implement reporting lines that promote Compliance Department's independence.

Further, during the term of the monitorship, it will be critical for the next Compliance Director to maintain regular and candid contact with the Monitor to ensure the independence of the Compliance Department and to best ensure effective implementation of compliance reforms at the Union.

The Monitor will continue to work with the Union in these important areas.

* * *

58

Pursuant to Paragraph 58 of the Consent Decree, the foregoing Report constitutes the eleventh report of the Monitor, Neil M. Barofsky.

**Date:  November 14, 2025**

_____
Neil M. Barofsky, Monitor

*Respectfully filed with the Court on behalf of the Monitor by counsel to the Monitor,*

/s/ Michael W. Ross
Michael W. Ross
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, New York 10036
(212) 891-1600 (t)
(212) 891-1699 (f)

**CERTIFICATE OF SERVICE**

I hereby certify that on November 14, 2025, the foregoing Report was served electronically on all counsel of record via the CM/ECF system.  In addition, pursuant to Paragraph 58 of the Consent Decree, the foregoing Report was served on consent by electronic mail upon the United States, the UAW's International President, the International Executive Board, and designated counsel for UAW.

 /s/ Michael W. Ross         
Michael W. Ross