**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-13293 |
| | ) | Honorable David M. Lawson |
| INTERNATIONAL UNION, UNITED | ) | |
| AUTOMOBILE, AEROSPACE, AND | ) | |
| AGRICULTURAL IMPLEMENT | ) | |
| WORKERS OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |


**SUPPLEMENT TO MONITOR'S TWELFTH STATUS REPORT**

**TABLE OF CONTENTS**

INTRODUCTION.................................................................................................. 1

I.   THE UNION'S RECENT PRODUCTIONS....................................................... 9

   A.   The Role of the President's Office in the Special Compliance Report........................... 11

      1.   The Compliance Director's Role in Removing Secretary-Treasurer Mock's
         Departments.............................................................................................. 11

      2.   The Compliance Director's Text Messages that Undermine Allegations Presented in
         the Special Compliance Report ............................................................ 16

      3.   Document Destruction ......................................................................... 25

   B.   The Role of the President's Office Staff in Planning and Executing the Plan to Strip
     Departments from the Supervision of the Secretary-Treasurer..................................... 28

   C.   The Motion to Withdraw the Secretary-Treasurer's Departments................................. 40

      1.   The President's Role............................................................................. 40

      2.   Document Destruction on President Fain's Phones ................................. 43

Pursuant to Paragraph 58 of the Consent Decree (Dkt. No. 10), the Court-appointed Monitor, Neil M. Barofsky, respectfully submits to the Court this report ("Supplement") supplementing the Monitor's Twelfth Status Report concerning the monitorship of the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "Union" or the "UAW").

## INTRODUCTION

On June 17, 2025, the Monitor filed the Twelfth Status Report reporting on the results of his investigation into competing allegations of misconduct between UAW President Shawn Fain and Secretary-Treasurer Margaret Mock. The investigation arose from accusations made in a "Special Compliance Report" that was presented to the Union's International Executive Board ("IEB") in February 2024 by the Union's Compliance Director claiming that Mock had abused her authority by "weaponizing" financial policies, "obstructing" Union operations, and seeking to "improperly influence" Board votes. The investigation also addressed counter-allegations that Fain had fabricated and advanced the charges against Mock in order to strip her of her oversight of eleven Union departments in retaliation for, among other things, Mock's refusal or reluctance to authorize improper expenditures of funds at the request of and/or for the benefit of those in the President's Office. The Monitor's investigation concluded that the allegations against Mock were almost entirely unsupported or unsubstantiated, and that Fain and his staff had acted on a premeditated, retaliatory plan that relied upon the UAW Compliance Director's Special Compliance Report as pretext for removing Mock's departments.[1] The Monitor recommended

---

[1] *See generally* Monitor's Twelfth Status Report, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (June 17, 2025), Civil No. 20-cv-13293, ECF No. 152 ("Monitor's Twelfth Status Report").

1

that Mock's department assignments be immediately reinstated, a recommendation that was rejected by the Union at that time.

Since that time, and after reviewing a draft of this Supplement and engaging constructively with the Monitor, the Union has agreed to implement a series of remedial actions intended to move the Union forward toward a more compliant and transparent culture. This includes the commendable decision to accept and implement the Monitor's recommendation to restore Secretary-Treasurer Mock's assignments, as well as other recommendations made in the Monitor's Twelfth and Thirteenth Status Reports, as described further below.[2]

Further, since the Twelfth Status Report, the Union has also produced additional relevant documents. As the Twelfth Status Report noted, the filing of that report was delayed significantly because the Union did not timely produce all relevant materials, and, even at the time of filing the Twelfth Status Report, the Union's production was still incomplete.[3] Given the extensive delay since the allegations had first been made—and in the interest of providing transparency to Union membership and closure to the unfounded allegations against Secretary-Treasurer Mock—the Monitor filed the Twelfth Status Report without a complete production, noting that he would update the Court should any subsequently produced documents impact the findings of the Twelfth Status Report.[4] Since then, the Union has produced more than 400 additional documents that

---

[2] Monitor's Twelfth Status Report at 88.

[3] As of the date of the Twelfth Status Report, the Union had not produced certain text and WhatsApp messages from approximately five custodians. *See* Monitor's Twelfth Status Report at 4 n.1.

[4] *Id.* As reported in the Monitor's Ninth Status Report, in April 2024 the Monitor opened an investigation into a Regional Director involving allegations of embezzlement. Monitor's Ninth Status Report, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (June 10, 2024), Civil No. 20-cv-13293, ECF No. 124, at 3-4. At the time of the Monitor's Twelfth Status Report, the investigation remained open pending the Union's production of all requested documents. The Union has since completed its document production. The Monitor has now closed this investigation without action, as the investigation did not substantiate the allegations or otherwise warrant pursuing disciplinary action.

necessitate the filing of this Supplement to the Twelfth Status Report to augment that report in two critical respects.

*First*, the newly produced documents demonstrate the extent of the President's Office's orchestration of the Special Compliance Report as part of its plan to retaliate against Secretary-Treasurer Mock. For example, included in the new documents was a text from President Fain's Top Administrative Assistant Chris Brooks[5] to Fain's Communications Director Jonah Furman to celebrate the success of their plan once the IEB voted to strip Mock of her departments: "my strategy was flawless this week. Like everything went perfectly to plan . . . it feels really good. Like [] how [I] imagine it feels to epically dunk on another player in basketball."[6] Similarly, the new documents show that the Compliance Director, contrary to both her prior denial to the Monitor and her insistence to the IEB that her work was "independent,"[7] was in fact a knowing and active participant in the plan. For example, they show that the Compliance Director actively participated in the selection of which departments would be stripped from Mock during a February 16, 2024 meeting with Fain and Brooks, and that after that meeting, she allowed Brooks and Furman in the President's Office to substantially "rewrite" the Special Compliance Report, or in Furman's words, to "land the plane."[8] Indeed, the new documents show that after this meeting, these President's Office personnel almost entirely rewrote the report, including adding false allegations that were

---

[5] Since the time of the events at issue, three key figures in the Monitor's investigation have had position changes. Chris Brooks's title changed from "Top Administrative Assistant" to "Chief of Staff," and as of the end of this year he will no longer be employed by the Union; Laura Dickerson's title changed from "Regional Director" to "Vice President"; and Jonah Furman now holds a different and subordinate position within the Communications Department, a result of discipline imposed by the Union for the actions he took as described in this Supplement. For ease of reference, and consistency with the Monitor's Twelfth Status Report, this Supplement uses the term "Top Administrative Assistant" to refer to Brooks, "Regional Director" or "Director" to refer to Dickerson, and "Communications Director" to refer to Furman.

[6] Text Message between C. Brooks and J. Furman (Feb. 22, 2024).

[7] Special Compliance Report (Feb. 20, 2024), at 1.

[8] Text Message between C. Brooks and J. Furman (Feb. 18, 2024).

left out of the initial drafts of that report, and excluding important exonerating information that would have demonstrated the falsity of their allegations.

*Second*, the newly produced documents provide evidence of obstruction or interference with the Monitor's investigation. This includes destruction of text messages on both the Compliance Director's and President Fain's phones—messages that were both material to the Monitor's investigation and responsive to the Monitor's document requests. At least 123 text messages from Fain's phones during critical time periods were deleted, including messages relating to his detailed instructions to Regional Director Laura Dickerson to make the motion against Secretary-Treasurer Mock, including precisely what to say and when to say it;[9] a meeting with Top Administrative Assistant Brooks and the Compliance Director to discuss the upcoming IEB meeting;[10] and a document material to a separate investigation being conducted by the Monitor in which Brooks wrote out an ultimatum that Fain conveyed to Vice President Rich Boyer before removing his oversight of the Stellantis Department.[11] Similarly, all text messages on the Compliance Director's phone between November 25, 2023, and March 23, 2024, were deleted— the period covering the planning and execution of the plan against Mock. Neither official was able to provide a credible explanation for these deletions, which followed a pattern of selective deletion rather than wholesale removal of conversation threads. Relatedly, the newly produced documents showed that the Compliance Director, Brooks, and Fain each made false or misleading statements to the Monitor during their interviews denying that they had discussed with one another the plan to remove Mock's departments prior to the February 2024 IEB meeting. Finally, although all three received hard copies of a handout prepared by Brooks for the February 16, 2024 meeting

---

[9] Text Message between S. Fain and L. Dickerson (Feb. 19, 2024).
[10] Text Message between C. Brooks and S. Fain (Feb. 12, 2024).
[11] Text Message between C. Brooks and S. Fain (May 28, 2024).

referenced above listing the departments to be stripped from Mock, that document was never produced to the Monitor, suggesting that all copies of it were also destroyed.

The Monitor provided a draft of this Supplement to the Union on November 14, 2025, including the reiteration of his recommendations that the acts of retaliation against Secretary-Treasurer Mock be immediately reversed and that some measure of accountability be adopted by the IEB.[12]  After the draft was distributed to all members of the IEB, and after constructive engagement between the Union and the Monitor, the Union notified the Monitor that it would be taking decisive and important steps to remediate the retaliatory actions of the President's Office:

- First, it will fully adopt the Monitor's recommendation to restore the eleven departments and two board positions that were improperly removed from Secretary-Treasurer Mock, as described in the Monitor's Twelfth Status Report.[13]

- Second, the Union has taken action with respect to Top Administrative Assistant Brooks and Communications Director Furman for their actions: Brooks will no longer be employed at the Union in any capacity as of December 31, 2025, and Furman has been suspended for two weeks without pay and demoted.

- Third, the Union has pledged to restore Vice President Boyer's oversight of the Stellantis Department.  Boyer alleged that President Fain's removal of his oversight of Stellantis was an act of retaliation, an allegation that is currently being investigated by the Monitor.  The Union should be commended for taking this action in advance of any formal recommendation and finding by the Monitor.

- Fourth, in response to a recommendation made in the Monitor's Thirteenth Status Report, the Union will improve transparency by granting the Monitor

---

[12] In order to ensure the factual accuracy of this Supplement, the Monitor provided the Union with a draft of the body of this Supplement in advance of its filing to solicit the Union's feedback, and to seek to correct any potential factual errors or to fill in any relevant and material information that the Monitor may have neglected to include.  In response to that draft, the Union helpfully provided comments and suggestions, many of which have been included in this Supplement.  In all events, the Monitor retained discretion to determine what facts should be included in the Supplement, with the key aim of a factually accurate report.

[13] These departments include:  The Technical Office and Professional (TOP), Women's, Warehouse, Pensions and Benefits, Auto/Labor Leader Insurance, Properties/Maintenance, Travel and Events, Union Building Corporate and Properties, Print Shop, IT, and Purchasing departments.  The two board positions include those on the AFL-CIO and IndustriALL Boards.

full access to the Union's Culture Committee, access which had previously been blocked by the IEB.

- Fifth, the Union announced that it will be accepting other key recommendations made by the Monitor in the Thirteenth Status Report to better assure the independence of the Compliance Department, including removing it from the President's Office entirely so that it will now report directly to the IEB itself.[14]

- Sixth, President Fain will reiterate to the Union as a whole, in a series of communications, the importance of maintaining a culture of compliance.

The Union has indicated that it intends to take the foregoing actions no later than January 9, 2026.

These significant actions represent a strong step forward for the Union as it grapples with the culture of fear and retaliation that has plagued it since before the monitorship began. As the Monitor has repeatedly emphasized, most recently in the Thirteenth Status Report, "to address the damage done by the actions to the Union's culture described in the Twelfth Status Report and to take a meaningful step to putting an end to the continued fear of retaliation still present at the Union, President Fain and the IEB must walk the walk in addition to talking the talk."[15] Restoring Secretary-Treasurer Mock and Vice President Boyer's assignments and holding Top Administrative Assistant Brooks and Communications Director Furman accountable are key actions, and critical first steps that signal to Union staff and membership that the Union is willing to address acts of retaliation, even at the highest level of the Union. After talking the talk about anti-retaliation, at trainings and at Town Hall meetings, these are the first steps in walking the walk

---

[14] The Compliance Department will have a reporting line to a subcommittee of the IEB, which will consist of five IEB members, including the President, the Secretary-Treasurer, and three other IEB members. The subcommittee members will elect a chair from among the three members other than the President and Secretary-Treasurer, to whom, as a functional matter, the Compliance Director will report. The IEB has also pledged to arrange a meeting between the Monitor's team and the final candidate for Compliance Director once this candidate has been identified and before extending an employment offer.

[15] Monitor's Thirteenth Status Report, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (Nov. 14, 2025), Civil No. 20-cv-13293, ECF No. 154, at 15 ("Monitor's Thirteenth Status Report").

as well, actions that undo the most visible and damaging act of retaliation of all—*i.e.*, baseless actions against one of the Union's most senior officials for strictly enforcing financial controls. To be clear, these actions will not be sufficient on their own, as it will be critical for the Union to maintain the progress toward cultural reform demonstrated by its actions in response to the facts in this Supplement. But, to be sure, the Union's commitments are a commendable and meaningful step forward, reflecting courageous action. Over the ensuing months, the Monitor will work with the Union to support its progress toward undoing the culture of fear that the unaddressed actions of the President's Office allowed to linger for too long. The Monitor will continue to observe and report on the Union's progress in this area.

As a result of the Compliance Director and Top Administrative Assistant Brooks no longer being employed by the Union, and the discipline against Communications Director Furman as described above, the Monitor does not intend to take further remedial action against them at this time, and would only revisit that decision if subsequent developments render it appropriate. As noted in the Monitor's Twelfth Status Report, decisions regarding discipline for any other individuals described in the Twelfth Status Report and this Supplement are still pending.[16]

As the Monitor noted in the Tenth and Thirteenth Status Reports, the Union must match its substantial commitment to building the infrastructure of a compliant organization with an equivalent commitment to establishing a cultural environment in which its reforms can truly take root and thrive.[17] Only with those twin pillars in place can Union membership feel confident in the status of the Union's compliance regime. The Monitor is encouraged by the actions of the

---

[16] Monitor's Twelfth Status Report at 13-16.
[17] Monitor's Tenth Status Report, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (July 12, 2024), Civil No. 20-cv-13293, ECF No. 130, at 3-6 ("Monitor's Tenth Status Report"); Monitor's Thirteenth Status Report at 5-10.

Union that signal the organization understands the need for cultural reform and is willing to take action to achieve it.

Further detail about the facts that led to the Union's important decision is detailed below.

## I.      THE UNION'S RECENT PRODUCTIONS

Although familiarity with the Twelfth Status Report is assumed, briefly by way of background, the Monitor's Twelfth Status Report described the role of the Union President's Office in instigating and influencing a "Special Compliance Report" made to the Union's International Executive Board ("IEB") at the February 20, 2024 IEB meeting, as well as President Shawn Fain having Regional Director Laura Dickerson make the motion to remove Secretary-Treasurer Margaret Mock's oversight of various Union departments instead of making the motion himself because he said he wanted to protect himself from accusations of racism.[18]  Documents produced by the Union after the Twelfth Status Report was issued have shed additional light on the topics covered in that report, demonstrated that multiple statements made to the Monitor by senior Union personnel were untrue, and revealed that senior officials may have deleted and destroyed documents that they otherwise would have been required to produce to the Monitor.

These recently produced documents fall generally into five categories:  (1) text messages between Top Administrative Assistant Chris Brooks and the former Compliance Director demonstrating that they withheld and suppressed mitigating evidence that undermined the allegations that they subsequently made against Secretary-Treasurer Mock; (2) a document demonstrating, as confirmed through interviews, that President Fain, Brooks, and the Compliance Director discussed the reassignment of the Secretary-Treasurer's departments days before the February 2024 IEB meeting, and that the Compliance Director made a specific recommendation that the Women's Department be included in a list of departments that would be removed, contradicting previous statements that all three had made to the Monitor; (3) a text message showing that President Fain transmitted a script written by Brooks to  Regional Director Dickerson,

---

[18] *See generally* Monitor's Twelfth Status Report.

which included specific directions as to when to make the motion to remove Mock's assignments and what she should say when making it; (4) text messages between Brooks and Communications Director Jonah Furman showing that they (a) had editorial control over the Special Compliance Report, (b) used that control to insert false and inflammatory allegations against Mock that Fain later used to justify the retaliation against her, and (c) helped conceive of and execute the plan to unfairly strip Mock of her departments and later celebrated their success in doing so; and (5) dozens of drafts of the Special Compliance Report showing the precise edits made by Brooks and Furman in advance of the February 2024 IEB meeting.[19]

The production of these documents, and the Monitor's subsequent investigation after their production, also brought to light that relevant and material text messages were deleted from the phones used by President Fain and the Compliance Director that should have been produced to the Monitor, as detailed below, and that the Compliance Director, Top Administrative Assistant Brooks, and Fain all made statements to the Monitor in their respective interviews that the belatedly produced documents demonstrate were false and/or misleading.  Shortly after the Monitor interviewed the Compliance Director and confronted her with the newly produced documents, she resigned, effective September 5, 2025.  After a draft of this Supplement was provided to the Union, it informed the Monitor that Brooks would no longer be employed at the Union as of December 31, 2025, a result of his resignation.

Further detail is included below.

---

[19] Notwithstanding the Court's December 16, 2024 Order, which required the Union to "produce without further delay" all responsive documents, the Union has continued to provide materials relevant to the Monitor's investigation into the competing allegations between President Fain and Secretary-Treasurer Mock, most recently on December 4, 2025.  Consent Decree Enforcement Order, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (Dec. 16, 2024), Civil No. 20-cv-13293, ECF No. 150 ("Consent Decree Enforcement Order").  The Union has indicated that, as of December 4, 2025, it has finally completed its production of documents responsive to the Monitor's requests regarding this investigation.

A.      **The Role of the President's Office in the Special Compliance Report**

The Union's production includes documents that demonstrate the degree to which the President's Office corrupted the independence of the Compliance Department during the preparation of the Special Compliance Report and that contradict the statements made to the Monitor by the Compliance Director, President Fain, and Top Administrative Assistant Brooks during the course of his investigation.

1.      **The Compliance Director's Role in Removing Secretary-Treasurer Mock's Departments**

The Monitor's Twelfth Status Report reported that the Compliance Director claimed to have had no knowledge about the plan to withdraw Secretary-Treasurer Mock's departments from her in advance of the February 20, 2024 IEB meeting and minimized the role of the President's Office in the drafting of the Special Compliance Report.  For example, as described in the Twelfth Status Report:

- In her June 2024 interview, the Compliance Director stated that she heard "rumors" from Top Administrative Assistant Brooks that there would be "actions taken" against Mock and that removing her departments was one of the options, but that she "didn't know what was coming."[20]  The Compliance Director dismissed that she had any role, saying that she was "not a psychic."[21]

- Further, the Monitor's Twelfth Status Report described a meeting on the Friday before the February 2024 IEB meeting where Brooks, President Fain, and several others met to discuss the Special Compliance Report.[22]  In

---

[20] Monitor's Twelfth Status Report at 73; Compliance Director Interview (June 5, 2024).
[21] Compliance Director Interview (June 5, 2024).
[22] Monitor's Twelfth Status Report at 79-80.

her June 2024 interview, the Compliance Director claimed that she had not attended that meeting because she was sick.[23]

- The Compliance Director claimed in her June 2024 interview that she had solicited input on the Special Compliance Report from Brooks and Communications Director Furman "on my tone. But not in content."[24]

As described below, newly produced documents—and the Monitor's subsequent interviews conducted with the benefit of these documents—demonstrate that the Compliance Director knew about and actively participated in the plan to strip Secretary-Treasurer Mock of supervision of her departments, was in fact present at the Friday, February 16, 2024 meeting at which details of the plan to strip Mock's departments were presented, and attempted to conceal her role in those efforts from the Monitor. The newly produced documents also disprove the Compliance Director's statement about the role of the President's Office in the drafting of the Special Compliance Report, which is discussed further below on page 28.

The newly produced documents, and the Monitor's subsequent re-interviews, revealed that, prior to the Friday, February 16, 2024 meeting, Top Administrative Assistant Brooks prepared a document that listed ten of the departments then under the Secretary-Treasurer's oversight and proposed to whom the departments should be reassigned.[25] This document, titled "Department Assignments," contained a table with two columns, "Department" and "Name." Under the "Department" column, the document listed the name of a department that was overseen by Secretary-Treasurer Mock; under the "Name" column was the name of the proposed person to whom that department would be reassigned. For example, the document listed "Jonah [Furman]" next to the Print Shop and Warehouse departments and "Laura [Dickerson]" next to the TOP

---

[23] Compliance Director Interview (June 5, 2024).
[24] Compliance Director Interview (June 5, 2024).
[25] Department Assignments Handout (Feb. 18, 2024); Text Message between C. Brooks and Compliance Director (Feb. 18, 2024); C. Brooks Interview (Sept. 30, 2025).

Department.  With one exception, these departments correspond exactly to the department reassignments implemented by President Fain after the IEB Meeting.[26]

The newly produced documents also included a text message from the Compliance Director to Top Administrative Assistant Brooks on Sunday, February 18, 2024, two days *after* the Friday meeting, and two days before the IEB meeting, in which the Compliance Director wrote to Brooks, "Looking at the document you handed out about department assignments, women's department is missing from it.  Not sure if the plan would be that she [Mock] can keep it as we didn't discuss that, but wanted to bring your attention to it."[27]  Brooks responded, "Thanks, that was an oversight on my part!"[28]  The metadata of the document indicates that Brooks edited the "Department Assignments" document later that day to add that the Women's Department would be reassigned to Regional Director LaShawn English.[29]

---

[26] President's Office Organizational Chart (Feb. 23, 2024); Department Assignments Handout (Feb. 18, 2024).  The "Department Assignments" document reflected that Delrico Loyd would receive the Strike Assistance Department.  Department Assignments Handout (Feb. 18, 2024).  However, after the February 2024 IEB meeting, Delrico Loyd received the Properties/Maintenance Department, which had been excluded from the document, and not the Strike Assistance Department.  The Strike Assistance Department remained in the Secretary-Treasurer's Office.

[27] Text Message between C. Brooks and Compliance Director (Feb. 18, 2024).  After the Union produced the February 18, 2024 text message from the Compliance Director to Top Administrative Assistant Brooks, the Monitor requested that the Union produce the "document [Brooks] handed out about department assignments" referenced in the Compliance Director's message, because that document had still not been produced to the Monitor.  The Union responded that it was unable to locate either the electronic or hard copy version of the document that was handed out at the February 16, 2024 meeting.  Instead, the Union produced a later-edited version of the document, which included the Women's Department.  The metadata for the document shows that the document was last printed on February 16, 2024, and last edited on February 18, 2024.  In her August 2025 re-interview, the Compliance Director told the Monitor that the only difference she remembered between the version that was printed and handed out at the February 16, 2024 meeting and the version that the Union produced to the Monitor was that the version handed out at the February 16, 2024 meeting did not include the Women's Department.  Compliance Director Interview (Aug. 22, 2025).  Brooks said that he did not have a specific recollection on the topic and did not mention additional edits in his September 2025 re-interview.  C. Brooks Interview (Sept. 30, 2025).

[28] Text Message between C. Brooks and Compliance Director (Feb. 18, 2024).

[29] Department Assignments Handout (Feb. 18, 2024); C. Brooks Interview (Sept. 30, 2025).

When asked about this text message and document in her re-interview, the Compliance Director admitted that she was in fact present at the Friday, February 16, 2024 meeting where Top Administrative Assistant Brooks presented a document that contained "a list of departments that were at the time under the Secretary-Treasurer and who it would be under moving forward."[30] She further acknowledged receiving a printed out copy of the department assignments handout at the meeting. The Compliance Director said that she subsequently raised the Women's Department because "it was missing [from the document] and it was under the Secretary-Treasurer."[31] She still claimed that she did not know in advance about the motion made to withdraw Secretary-Treasurer Mock's departments.[32]

These text messages and department assignments handout demonstrate that the Compliance Director presented false and/or misleading information to the Monitor in her June 2024 interview when she denied knowing that the President's Office would seek to strip Secretary-Treasurer Mock of her departments. In contrast to her earlier statements to the Monitor that she was "not a psychic" and "didn't know what was coming" before the February 20, 2024 IEB meeting with respect to the department reassignments,[33] these documents show the Compliance Director had advance knowledge of the department reassignments four days before they happened, referenced what departments "she [Mock] can keep" two days before the IEB meeting, and was an active participant in effectuating the reassignments by alerting Top Administrative Assistant Brooks to make sure that the Women's Department was included in the departments taken from Mock.

---

[30] Compliance Director Interview (Aug. 22, 2025).
[31] Compliance Director Interview (Aug. 22, 2025).
[32] Compliance Director Interview (Aug. 22, 2025).
[33] Compliance Director Interview (June 5, 2024).

The Compliance Director also presented false and/or misleading information to the Monitor when she told the Monitor that she "wanted [Top Administrative Assistant Brooks's and Communications Director Furman's] input on my tone. But not in content" during the drafting of the Special Compliance Report.[34] Further details on this misstatement are described below on page 28.

These newly produced documents also led Top Administrative Assistant Brooks to admit that his earlier statements to the Monitor were inaccurate. In his interview with the Monitor in May 2024, Brooks recalled attending a meeting before the IEB meeting where he discussed the Special Compliance Report with President Fain and the Compliance Director, but he stated that the decision about how to reallocate Secretary-Treasurer Mock's departments was not made until *after* the IEB voted to remove the departments.[35] Specifically, when asked when he began analyzing the constitutional allocation of power between the President and the Secretary-Treasurer, Brooks stated that this did not occur until after the meeting, once the Board had voted to reassign Mock's departments except those constitutionally mandated to the Secretary-Treasurer.[36]

In a follow-up interview with the Monitor after the production of these documents, Top Administrative Assistant Brooks was confronted with the text messages described above and asked whether removing Secretary-Treasurer Mock's departments was discussed in that February 16, 2024 meeting, and Brooks recanted his previous statements: "I know this came up in my last interview and think I was mistaken about that . . . we clearly discussed and I didn't remember correctly."[37] Brooks also claimed that he "didn't even remember" the department assignments

---

[34] Compliance Director Interview (June 5, 2024).
[35] C. Brooks Interview (May 31, 2024).
[36] C. Brooks Interview (May 31, 2024).
[37] C. Brooks Interview (Sept. 30, 2025).

handout when he had been asked about the allocation of Mock's departments in his May 2024 interview.[38]  Brooks further stated that he had made a "mistake" in saying they had not discussed transferring Mock's departments before the IEB meeting, and conceded that he was "thinking about" which departments could be constitutionally removed from Mock when he created the department assignments handout.[39]

The newly produced documents also revealed a contradiction in President Fain's statements to the Monitor.  In his June 2024 interview, when asked if he remembered talking to the Compliance Director about the possibility of removing Secretary-Treasurer Mock's departments before the February 2024 IEB meeting, President Fain stated, "No," and explained that he would not have done so "because that was a Board issue and discussion."[40]  However, when confronted with the belatedly produced February 16, 2024 department assignments handout in his recent interview, Fain acknowledged that he and the Compliance Director must have discussed the reassignment of Mock's departments before the IEB meeting.  Although he claimed not to have a specific recollection of the handout or the February 16 meeting, he conceded that "obviously we talked about this [document]" given its existence.[41]

### 2. The Compliance Director's Text Messages that Undermine Allegations Presented in the Special Compliance Report

The newly produced text messages also demonstrated that members of the President's Office successfully encouraged the Compliance Director to include spurious allegations and

---

[38] C. Brooks Interview (Sept. 30, 2025).
[39] C. Brooks Interview (Oct. 15, 2025).
[40] S. Fain Interview (June 5, 2024).
[41] S. Fain Interview (Oct. 10, 2025).

statements about Secretary-Treasurer Mock in the Special Compliance Report that they and the Compliance Director had reason to know were not well-founded.

**Alleged Vote Influencing.** *First*, the Compliance Director's Special Compliance Report, as presented to the IEB, began with noting that the "most concerning big picture issue" was "the Secretary-Treasurer's apparent attempts to use the authority of her office to influence Board members' votes."[42] As the Twelfth Status Report demonstrates, however, these allegations were unfounded.[43] Moreover, the newly produced documents underscore that the Compliance Director and members of the President's Office understood the weakness of their evidence yet nonetheless presented them as the "most concerning" of the issues presented to the Board.

To start, these allegations were not even contained in the original version of the Special Compliance Report that the Compliance Director drafted on her own. The alleged "attempts" to influence Board votes refer to two allegations, one from Regional Director Dave Green and one from Regional Director Mike Miller, that Secretary-Treasurer Mock threatened to withhold expense approvals in exchange for votes aligning with Mock's policy and budget goals. As explained in the Monitor's Twelfth Status Report, the Monitor found both allegations to be unsubstantiated.[44]

In the case of the allegations attributed to Director Green, the newly produced text messages contemplate that the Compliance Director, too, knew there was little merit to the allegation. On the evening of Thursday, February 15, 2024, after the Compliance Director had provided Top Administrative Assistant Brooks with a draft of her report (which did not include any allegation concerning Secretary-Treasurer Mock's supposed threats to Board members),

---

[42] Special Compliance Report (Feb. 20, 2024), at 1.
[43] Monitor's Twelfth Status Report at 58-64.
[44] Monitor's Twelfth Status Report at 58-64.

Brooks texted the Compliance Director asking if she "had spoken with Miller and Green."[45]  The Compliance Director, in an apparent explanation as to why she did not include the allegations in her report, responded:  "I did.  Green didn't have much that I can go off of, I can explain more tomorrow."[46]  This was inconsistent with what she had previously told the Monitor in her interview on June 5, 2024, when she said that she believed that Mock had made a "thinly veiled threat" to Green, but it was consistent with her notes of the conversation, which stated that Green "wouldn't call it quid pro quo."[47]

Despite her apparent misgivings, on February 18, 2024, two days after her meeting with Top Administrative Assistant Brooks and President Fain to discuss the report, the Compliance Director inserted a placeholder for this allegation at the bottom of a revised draft that she sent to Brooks and Communications Director Furman on the morning of Sunday, February 18, 2024, writing "[INSERT trying to influence board votes – do not say quid pro quo]" to signal that additional content needed to be drafted but that it should not allege a "quid pro quo," presumably in deference to her notes of her conversation with Green.[48]  Later that day, Furman left a comment on the Compliance Director's draft, saying that the Compliance Director "should lead with the 'trying to influence board votes' section" before moving into the "pattern of obstruction and denials of spending," thereby using the allegation to frame the rest of the Special Compliance Report when she addressed the IEB.[49]  The Compliance Director then implemented Furman's

---

[45] Text Message between C. Brooks and Compliance Director (Feb. 15, 2024).
[46] Text Message between C. Brooks and Compliance Director (Feb. 15, 2024).  When asked in the recent interview what she meant by "Green didn't have much that I can go off of" and why she nonetheless made it part of the "most concerning" issue of her report, the Compliance Director said she could not remember. Compliance Director Interview (Aug. 22, 2025).
[47] Monitor's Twelfth Status Report at 59-62; Compliance Director Handwritten Notes (Feb. 14, 2024).
[48] Special Compliance Report draft (Feb. 18, 2024, 8:27 AM); Compliance Director Interview (Aug. 22, 2025); Email from Compliance Director to C. Brooks and J. Furman (Feb. 18, 2024) (sharing the draft).
[49] Special Compliance Report draft (Feb. 18, 2024, 12:50 PM); Email from J. Furman to Compliance Director (Feb. 18, 2024).

direction by inserting language that this allegation was the "most concerning" issue and moving the issue to be the first one discussed.[50]  A few hours later, Brooks edited this paragraph to add the false allegation that the Secretary-Treasurer was "us[ing] the authority of her office to influence" votes and that it was a "serious" ethical concern.[51]  When re-interviewed by the Monitor about this, Furman admitted that he "moved words and paragraphs around" but said the purpose was to accomplish the Compliance Director's "stated desires for what [the] message should be."[52]  Brooks said he could not remember the specific content he added or specific conversations with the Compliance Director.  He claimed that he "tried really hard . . . [to] accurately characterize the obstruction the departments I oversaw were facing" and "make sure [the report was] accurate and clear."[53]

**Alleged Improper Denials of Enhanced Corporate Credit Cards.**  *Second*, during her presentation of the Special Compliance Report, the Compliance Director told the IEB that the Secretary-Treasurer's Office had improperly denied Enhanced Corporate Cards to President's Office senior staff, including Top Administrative Assistant Brooks, by making "factually untrue" statements about the Travel & Expense Reimbursement Policy ("T&E Policy").[54]  The Monitor's investigation found the T&E Policy to be ambiguous and discovered that Secretary-Treasurer Mock and her Office had relied on the guidelines in the IEB Onboarding Toolkit—which provided explicit guidance as to which employees would receive Enhanced Corporate Cards—to make her decision.[55]  As detailed in the Twelfth Status Report, the Secretary-Treasurer's Office consistently followed those guidelines when approving or denying enhanced credit cards, granting them when

---

[50] Special Compliance Report draft (Feb. 18, 2024, 3:39 PM).
[51] Special Compliance Report draft (Feb. 18, 2024, 5:07 PM).
[52] J. Furman Interview (Oct. 3, 2025).
[53] C. Brooks Interview (Sept. 30, 2025).
[54] Special Compliance Report (Feb. 20, 2024), at 4-5.
[55] Monitor's Twelfth Status Report at 38-41.

the applicant's position was among those referenced in the Toolkit and denying them when not. But there was no evidence at the time of the drafting of the Twelfth Status Report that the Compliance Director or members of the President's Office had been aware of the IEB Onboarding Toolkit or the Secretary-Treasurer's Office's reliance on it when determining whether to grant or deny applications for the Enhanced Corporate Cards.

But in a newly produced text message from Friday, February 16, 2024, Top Administrative Assistant Brooks sent pictures of the relevant guidelines on Enhanced Corporate Cards from the IEB Onboarding Toolkit to the Compliance Director, stating, "Was just given this. This is from 'IEB Onboarding Toolkit…'" The Compliance Director responded, "Wtf. I have never seen that document. Can you get copies of it? MM [Margaret Mock] got that at IEB onboarding if it was in that toolkit." Brooks noted that he had a copy to share and wrote, "None of that is in the policies you shared…It's weird because the document doesn't reference any policy. And in the IEB tool kit binder, it refers to itself as a policy. So I kind of wonder if it's something that accounting just made up and put in there and is claiming as policy?" The Compliance Director agreed: "Right it's definitely not the policy but likely something accounting put together to try to simplify. More 'current practice' than actual policy. I will investigate."[56]

In her re-interview, the Compliance Director said that she did not remember what steps she supposedly took to "investigate" the language in the IEB Onboarding Toolkit.[57] Yet, despite knowing and concluding that the IEB Onboarding Toolkit was a "current practice" and guiding aid to the Accounting Department to help them ensure that the Enhanced Corporate Card policy was uniformly applied, the Compliance Director failed to make any mention of it to the IEB or in

---

[56] Text Message between C. Brooks and Compliance Director (Feb. 16, 2024).
[57] Compliance Director Interview (Aug. 22, 2025).

her report, let alone include it as an explanation that would have fully justified the Secretary-Treasurer's Office's denial of the Enhanced Corporate Cards.  Instead, she stated the exact opposite, that Secretary-Treasurer Mock's Office had made "factually untrue" statements about the policy—language that did not appear in the Compliance Director's original draft of the report, but was added by her on February 18, 2024, after her text exchange with Top Administrative Assistant Brooks.[58]  Later that day, Brooks further edited the draft to falsely characterize the proposed resolution on Enhanced Corporate Cards as a "reform[]" meant to prevent Mock from using "the authority of [her] office to obstruct or even deny the decisions and directives of the IEB."[59]

In her recent interview, in addition to stating that she did not remember "investigating" this issue, the Compliance Director also said that she could not remember if she reviewed the IEB Onboarding Toolkit in coordination with the drafting of her Special Compliance Report, notwithstanding the clear evidence in the text message chain indicating that she had done so.[60] Top Administrative Assistant Brooks said that he too did not remember the specifics of any further conversation with the Compliance Director on the topic.[61]

**Alleged Obstruction of Procurement Process.**  *Third*, in her Special Compliance Report, the Compliance Director mentioned "ongoing issues with the media buy in Chattanooga" as another incident of the Secretary-Treasurer's "willful obstruction."[62]  In her June 2024 interview, the Compliance Director stated that these "ongoing issues" referred to allegedly undue delays in approving the contract for a consulting firm called Conexion that the President's Office wanted to

---

[58] Special Compliance Report draft (Feb. 18, 2024, 8:27 AM).
[59] Special Compliance Report draft (Feb. 18, 2024, 5:07 PM); Special Compliance Report (Feb. 20, 2024), at 3, 5.
[60] Compliance Director Interview (Aug. 22, 2025).
[61] C. Brooks Interview (Sept. 30, 2025).
[62] Special Compliance Report (Feb. 20, 2024), at 1-2.

21

use for its organizing drive of a Volkswagen plant in Chattanooga, Tennessee.[63]  As explained in the Twelfth Status Report, Secretary-Treasurer Mock felt uncomfortable rushing the requested "sole-source" approval as inconsistent with UAW policy and recommended to President Fain, in early January 2024, that if he wanted to press forward with a sole-source contract he should bring it to the IEB for decision.[64]  The Compliance Director explained in her June 2024 interview that she thought it "wasn't a good idea" to include the Conexion contract by name in her report because it was within Mock's discretion to deny sole-source vendors, and because Mock had given Fain the option of promptly raising it to the IEB and he took seven weeks to do so.[65]  However, the Compliance Director did not mention either of these factors in her presentation of the Special Compliance Report.[66]

The newly produced messages shed light on the Compliance Director's decision to exclude any specific mention of Conexion in the Special Compliance Report.  On February 18, 2024, the Compliance Director asked Top Administrative Assistant Brooks, "To confirm, Shawn [Fain] is requesting sole source approval for conexion [at the upcoming IEB meeting], right?"  Upon Brooks's confirmation, the Compliance Director wrote, "Thanks.  Want to make sure I reference it correctly," and asked for the email containing the Secretary-Treasurer's previous denial.[67]  Despite asking for these details, the Compliance Director did not mention the Conexion media buy in the draft she revised that afternoon.[68]  Later that evening, Brooks texted the Compliance Director, "Made a bunch of edits to the doc.  Tried to clarify as best as I could[.]  Suggested edits,

---

[63] Compliance Director Interview (June 5, 2024).
[64] Monitor's Twelfth Status Report at 44-48.
[65] Compliance Director Interview (June 5, 2024).
[66] Monitor's Twelfth Status Report at 44-48.
[67] Text Message between C. Brooks and Compliance Director (Feb. 18, 2024).
[68] Special Compliance Report draft (Feb. 18, 2024, 3:39 PM).

I should say."[69]  In those edits, Brooks noted the media buy issue and referenced Conexion by name, as an example of "willful obstruction."[70]  The Compliance Director accepted Brooks's "willful obstruction" sentence but did not accept the explicit reference to Conexion,[71] and responded:

- "We can talk about this tomorrow but I left out the Conexion piece intentionally.  I wasn't aware she [Secretary-Treasurer Mock] had said it should go to the board for approval.  While we may disagree, *I'm uncomfortable stating* that she blocked this as *that can be an appropriate response* and she *will have an opportunity to defend herself* here and may make that point back" (emphasis added).[72]

After the Compliance Director's response to Top Administrative Assistant Brooks, Communications Director Furman edited the draft to remove mentions of the consulting firm's name.[73]

This newly produced text message makes clear that when the Compliance Director levied her accusations against Secretary-Treasurer Mock to the IEB, she was well aware that the Secretary-Treasurer's actions with respect to Conexion could constitute "an appropriate response," yet still characterized Mock's actions regarding the Conexion contract as a primary example of Mock's alleged "abuse of authority."[74]  It also explains why the Special Compliance Report did not refer to Conexion by name, because, in the Compliance Director's words, she wanted to deny Mock the "opportunity to defend herself" to the IEB.  Yet again, the Compliance Director did not present the full picture of Mock's supposed "obstruction," did not disclose material information to

---

[69] Text Message between C. Brooks and Compliance Director (Feb. 18, 2024).
[70] Special Compliance Report draft (Feb. 18, 2024, 5:07 PM).
[71] Special Compliance Report draft (Feb. 18, 2024, 6:32 PM).
[72] Text Message between C. Brooks and Compliance Director (Feb. 18, 2024).
[73] Special Compliance Report draft (Feb. 18, 2024, 9:25 PM).
[74] Special Compliance Report (Feb. 20, 2024), at 1.

Mock and the IEB, and allowed her Special Compliance Report to be driven by the agenda of the President's Office staff.

When asked about this in her recent interview, the Compliance Director once again made non-credible statements, insisting that she did not cite the Conexion contract as an example of "obstruction" in her Special Compliance Report, despite the Special Compliance Report's plain language:  "The **willful obstruction** ranges from everything from the purchase of picket signs **to the purchase of the media buy in Chattanooga, Tennessee** . . ." and that the discussion of the media buy was immediately preceded by the Compliance Director stating that "[t]hat kind of obstruction is not an isolated incident."[75]

**Failure to Investigate.**  Taken together, the newly discovered messages between the Compliance Director and Top Administrative Assistant Brooks also shed light on why the Compliance Director, as the Monitor found in the Twelfth Status Report, "failed to take . . . customary investigative steps," including not speaking to Secretary-Treasurer Mock about the allegations.[76]  Had the Compliance Director done so, Mock presumably would have brought up the mitigating facts, including that she did not threaten Directors Green and Miller, that she relied on the IEB Onboarding Toolkit regarding the Enhanced Corporate Cards, and that she had given President Fain an opportunity to go the IEB in January 2024 about the Conexion contract, facts that the Compliance Director would then presumably have had to include in the Special Compliance Report.  Further, as described in more detail below, these texts demonstrate that many of the substantive allegations (including allegations about attempts to improperly influence Board votes, about picket signs, yard signs, and the UAW online store, and about the Conexion contract),

---

[75] Compliance Director Interview (Aug. 22, 2025); Special Compliance Report (Feb. 20, 2024), at 1-2 (emphasis added).
[76] Monitor's Twelfth Status Report at 11.

and all of the inflammatory language that was used to justify the stripping of Mock's departments from her supervision, were added as a result of Brooks's and Furman's intervention less than 48 hours before the February 2024 IEB meeting—and over a holiday weekend—so there was no time to do the factual investigation these allegations required.

### 3.   Document Destruction

Additional investigation by the Monitor since the production of these documents revealed that material and relevant text messages were deleted from the phones of the Compliance Director and President Fain.   Among the messages deleted from the Compliance Director's phone were those mentioned above that otherwise proved that she had provided false and/or misleading information to the Monitor in her interview.   Messages deleted from President Fain's phone included all messages with Top Administrative Assistant Brooks surrounding the events of the February 20, 2024 IEB meeting, from November 2023 to March 2024, and also text messages from the time period of the Monitor's separate investigation into Fain's stripping of oversight of the Stellantis Department from Vice President Rich Boyer.   In addition, the physical copies of the department reassignment handout, referenced above on page 14, provided by Brooks and received by Fain and the Compliance Director at the February 16, 2024 meeting, also appear to have been destroyed.[77]

**Text Messages.**   The text messages discussed above, on pages 17-24, between Top Administrative Assistant Brooks and the Compliance Director were produced from Brooks's phone, well after publication of the Twelfth Status Report, but none of them appeared in the complete set of text messages the Monitor received from the full image of the Compliance

---

[77] These text messages between the Compliance Director and Top Administrative Assistant Brooks and between President Fain and Brooks, as well as the department assignments handout, were encompassed in the Monitor's original document request from February 29, 2024, and should have been produced then. Letter from Monitor to UAW General Counsel (Feb. 29, 2024).

Director's phone.  Not only were these messages missing, but all the text messages between November 25, 2023, and March 23, 2024—the period leading up to and directly after the February 2024 IEB meeting—were missing from the Compliance Director's phone.  When the Compliance Director was asked about the absence of these text messages on her phone, she admitted that these text messages had been on her phone at some point but that she could no longer locate them.  She stated that the text messages had been deleted "in some fashion," but said that she could not explain what had happened.[78]  The Compliance Director confirmed that, given the existence of text messages in the text chain with Brooks both earlier and later in time than the deleted messages, the missing messages could not have been deleted by swiping to remove the entire chain and that each message would have had to have been individually selected for deletion.[79]

Similarly, relevant text messages were also missing from President Fain's imaged phone, including, among others, all of his text messages with Top Administrative Assistant Brooks from November 8, 2023, to March 24, 2024 (approximately the same time period as those that were deleted from the Compliance Director's phone).  Further detail on President Fain's missing messages is provided below.

**Department Assignments Handout.**  The physical copies of the department assignments handout were also apparently destroyed.  The Monitor learned about the existence of the handout based on the belatedly produced text message, discussed above on page 13, that references it.  When the Monitor requested the handout, the Union produced an electronic version of the

---

[78] Compliance Director Interview (Aug. 22, 2025).
[79] On the Compliance Director's phone, she was able to delete text messages in two ways: (1) by swiping to delete an entire conversation thread with a contact, which removes all messages exchanged with that person; or (2) by opening the conversation and manually selecting individual messages within the thread for deletion.  *See* Compliance Director Interview (Aug. 22, 2025).  Because messages from both before and after the deleted period remained on the Compliance Director's phone, she admitted that the first method could not have been used and the second, manually selecting each message for deletion, must have been used.  Compliance Director Interview (Aug. 22, 2025).

document found in Top Administrative Assistant Brooks's electronic files.  The metadata of the document showed the document had been last printed on Friday, February 16, 2024 (the day of the meeting at which it was discussed with President Fain and the Compliance Director), and last edited on February 18, 2024—the same date the Compliance Director pointed out to Brooks that the Women's Department was missing from the list.  The Union, Brooks, Fain, and the Compliance Director all said that they were unable to find the printed version of the document (which did not mention the Women's Department, as indicated in the Compliance Director's text message) that was handed out at the February 16, 2024 meeting.[80]

When asked about the handout received from Top Administrative Assistant Brooks at the February 16, 2024 meeting, the Compliance Director admitted that she had received a physical copy of it, but stated that she could not find a copy of the document and could not explain what had happened to it, despite her awareness of the obligation to preserve all relevant documents.[81] For his part, Brooks admitted that he must have printed copies for the Compliance Director and probably President Fain as well, but he too could not find a hard copy version of the document.[82] When asked if he intentionally destroyed the copies of the handout, Brooks stated that he did not "know what happened to them," although he later said he did not intentionally destroy the document.[83]  President Fain stated that he did not remember receiving the document and therefore did not know what happened to it.[84]

---

[80] Compliance Director Interview (Aug. 22, 2025); C. Brooks Interview (Sept. 30, 2025); S. Fain Interview (Oct. 10, 2025).
[81] Compliance Director Interview (Aug. 22, 2025).
[82] C. Brooks Interview (Sept. 30, 2025).
[83] C. Brooks Interview (Sept. 30, 2025).
[84] S. Fain Interview (Oct. 10, 2025).  As noted above on page 13, the Monitor asked the Union to look for the hard copies of the department assignments handout.  During President Fain's interview, UAW counsel explained that he had shared the revised version of the handout with President Fain and asked him if he had seen the document before, and when Fain said no, he was not asked to look for the document.  After the

**B.      The Role of the President's Office Staff in Planning and Executing the Plan to Strip Departments from the Supervision of the Secretary-Treasurer**

The Twelfth Status Report reported on the extensive involvement in the drafting of the Special Compliance Report by two members of President Fain's senior staff, Top Administrative Assistant Brooks and Communications Director Furman. It recounted that the Special Compliance Report was "heavily influenced" by Brooks and Furman; that they drafted a "substantial portion" of the report; and that both Brooks and Furman, along with others in the President's Office, met with the Compliance Director in the week leading up to the February 2024 IEB meeting to discuss the Special Compliance Report.[85]   According to the Monitor's June 2024 interview with the Compliance Director, as noted above on page 12, she solicited the input of the President's Office staff for "input on my tone.  But not in content."[86]

The Union's recent production of documents corroborated the Monitor's core finding about the extensive role of President Fain's staff in the drafting of the Special Compliance Report, but it has also shown more direct involvement by them than previously reported in orchestrating the Special Compliance Report as part of an overall plan to strip the departments from the Secretary-Treasurer's oversight.  Included in the production is a series of text messages exchanged in the days leading up to the Tuesday, February 20, 2024 IEB meeting, between Top Administrative Assistant Brooks and the Compliance Director, between Brooks and President Fain, and between Brooks and Communications Director Furman, as well as the iterative versions of the draft Special Compliance Report.  These new documents disprove the Compliance Director's claim to the Monitor that President Fain's staff only edited for tone, with the evidence showing that they drafted

---

Monitor requested that President Fain specifically look for this document in his files, President Fain did so and did not find the printed version of the document.  The Union relayed this to the Monitor.
[85] Monitor's Twelfth Status Report at 75-81.
[86] Compliance Director Interview (June 5, 2024).

or directed the content of the majority of the Special Compliance Report, including adding critical allegations not originally included, such as the reference to the media buy contract and Board vote influencing (discussed above on pages 17 and 21), as well as others.[87]

The relevant text chains began on Monday, February 12, 2024, eight days before the February 20, 2024 IEB meeting, when Top Administrative Assistant Brooks informed President Fain of a meeting scheduled that morning with the Compliance Director to "talk about compliance issues and the upcoming IEB meeting."[88]  Two days later, on Wednesday, February 14, 2024, Brooks requested a draft of the Special Compliance Report from the Compliance Director.  Brooks received a draft on February 15, 2024, and from there, Brooks shared the draft of the Special Compliance Report with Communications Director Furman, after which the two discussed their criticisms of it, and their need to "land the plane" so it would align with their goals:

- On Wednesday, February 14, 2024, Brooks texted the Compliance Director, asking "How is the report draft going? I keep sending folks your way. Apologies."  The Compliance Director replied, "It's coming along. Working on getting in touch with people, etc. . . . working on it this evening and tomorrow in large part.  I will have a draft to you before the meeting Friday."[89]

- The evening of Thursday, February 15, 2024, the night before the meeting between Brooks, Fain, and the Compliance Director, Brooks sent Furman a draft of the Special Compliance Report and noted, "Keep between us. Let me know if you have thoughts."  Furman responded with a critique of the

---

[87] In February 2024, the Monitor requested "All documents and communications related to the Compliance Director's Special Report."  In June and July 2024, at the Monitor's request that the Union confirm that they produced all versions of the Special Compliance Report, the Union searched for and provided the Word versions of the Special Compliance Report and any underlying metadata (*e.g.*, the date/time created, date/time last modified, etc.).  This process included the Union's IT department examining the Union's OneDrive and Outlook systems as well as the former Compliance Director's local computer.  On October 21, 2025, the Monitor reiterated his request for all versions of the Special Compliance Report, this time specifying that the Monitor expected the Union to produce the full "version history" of the report utilizing the Union's SharePoint, showing all edits, revisions, and changes made to the document.  On November 6, 2025, the Union's IT department retrieved and produced the full version history of the Special Compliance Report utilizing the Union's SharePoint as requested by the Monitor.

[88] Text Message between C. Brooks and S. Fain (Feb. 12, 2024).

[89] Text Message between C. Brooks and Compliance Director (Feb. 14, 2024).

draft, including that "we shouldn't start with these petty reimbursement policy things. I see there are bullets at the end where all the meat will be. I also just wouldn't phrase some of this stuff this way, and wouldn't lead with Chris Brooks issues."[90]

- On Friday, February 16, 2024, Brooks and President Fain met to discuss the Special Compliance Report with the Compliance Director, after which the Compliance Director began revising her original draft that night to include placeholders to signal forthcoming additional sections for the Conexion media buy and the influencing board votes allegations.[91]

- On the morning of Sunday, February 18, 2024, Brooks wrote again to Furman that he "[a]sked [the Compliance Director] to share latest version of her report with us. She welcomes help."[92] Soon after, the Compliance Director shared the post-February 16 meeting revised draft with Brooks and Furman via a Microsoft OneDrive link, stating that she was "Still working through [her] edits" and inviting Brooks and Furman "to alter/add/recommend any changes."[93]

- Later that day, Furman left a comment providing his opinion as to the structure of the report, including a recommendation that the Compliance Director "should lead with the 'trying to influence board votes' section."[94] Furman also drafted the report's conclusion.[95] After providing this feedback, Furman wrote to Brooks, "[The Compliance Director] just kind of hasn't written it, is my take? But we will land the plane." Brooks responded, "Not a writer is my sense. She is eager for the help."[96]

From there, and less than 48 hours before the start of the Tuesday, February 20, 2024 IEB meeting—with Monday, February 19 being Presidents' Day, a federal holiday—the two senior staff members discussed Top Administrative Assistant Brooks doing a "whole rewrite" of the draft

---

[90] Text Message between C. Brooks and J. Furman (Feb. 15, 2024).
[91] Special Compliance Report draft (Feb. 18, 2024, 8:27 AM). The placeholders—set off in brackets and denoted by the word "INSERT"—were removed from the next draft. The Compliance Director replaced the influencing Board votes placeholder with a new section about that allegation and deleted the Conexion media buy placeholder altogether. Special Compliance Report draft (Feb. 18, 2024, 3:39 PM).
[92] Text Message between C. Brooks and J. Furman (Feb. 18, 2024).
[93] Email from Compliance Director to C. Brooks and J. Furman (Feb. 18, 2024).
[94] Special Compliance Report draft (Feb. 18, 2024, 12:50 PM); Email from J. Furman to Compliance Director and C. Brooks (Feb. 18, 2024); Monitor's Twelfth Status Report at 78-79.
[95] Special Compliance Report draft (Feb. 18, 2024, 12:50 PM).
[96] Text Message between C. Brooks and J. Furman (Feb. 18, 2024).

Special Compliance Report, including mentions of content that he added to the report and how much time and effort it took Brooks to overhaul the report so that it would reflect their "vision:"

- Mid-afternoon on Sunday, February 18, 2024, the Compliance Director made additional edits to the draft implementing Communications Director Furman's feedback on restructuring, replacing the previous placeholder with a new section on the allegations that the Secretary-Treasurer had attempted to influence Board votes and, for the first time, adding allegations that the Secretary-Treasurer had delayed the purchase of picket and yard signs for the Stand Up Strike.[97]

- Upon receiving the Compliance Director's new draft, Brooks wrote to Furman: "I am significantly rewriting [the Compliance Director]'s report." In response Furman wrote, "I support you. Not sure what your convos have been like but it didn't seem like she had a vision for how to deliver it."[98]

- The two texted about details of what to include in the Special Compliance Report, including the Tennessee (Conexion) and Alabama media buys and the allegations that Secretary-Treasurer Mock had engaged in misconduct by denying the sole source contract, with Brooks explicitly stating that he added what would become an allegation of "willful obstruction" in the report, noting that they needed "to push resolution for media buy in Shawn's report and then [the Compliance Director] will further address in her report (I added it)."[99] Brooks also added the allegation about delays relating to the online store, which the Compliance Director's drafting also had not included at all.[100]

- That evening, Brooks wrote to Furman, "Did a whole rewrite of [the Compliance Director]'s report. I'm tapped. Gonna print and revisit everything tomorrow."[101] Brooks texted the Compliance Director, "Made a bunch of edits to the doc. Tried to clarify as best as I could. Suggested edits, I should say."[102]

---

[97] Special Compliance Report draft (Feb. 18, 2024, 3:39 PM); Email from Compliance Director to J. Furman and C. Brooks (Feb. 18, 2024).
[98] Text Message between C. Brooks and J. Furman (Feb. 18, 2024).
[99] Text Message between C. Brooks and J. Furman (Feb. 18, 2024).
[100] Special Compliance Report draft (Feb. 18, 2024, 5:07 PM).
[101] Text Message between C. Brooks and J. Furman (Feb. 18, 2024).
[102] Text Message between C. Brooks and Compliance Director (Feb. 18, 2024).

- Later that night, Furman further edited the Compliance Director's report, reporting back to Brooks that he too "[d]id a lot on [the Compliance Director]'s report."[103]

- The Compliance Director largely accepted their edits, and she and Brooks continued to make edits to the draft through February 19, 2024, narrowing the sections on the Conexion media buy and online store issues.[104]

With these newly produced text messages and iterative drafts of the Special Compliance Report, the Monitor was able to identify the extent of Top Administrative Assistant Brooks's "rewrite" and Communications Director Furman's edits, further calling into question the Compliance Director's prior statement that they had only edited her tone, "but nothing to do with content."[105]  The majority of the final Special Compliance Report was drafted directly by Brooks or by the Compliance Director at Furman's recommendation.  After Brooks and Furman met with the Compliance Director on Friday, February 16, 2024, and provided feedback on the report, the most inflammatory and false accusations against Secretary-Treasurer Mock were added to the draft, language that was apparently intended to justify the removal of Mock's departments under the UAW Constitution, which only allows such action upon evidence that an officer had "been derelict in [her] duty or been guilty of a dishonest act."[106]  Upon Furman's recommendation on February 18, 2024, the Compliance Director added language about the Secretary-Treasurer's Office's supposed "obstruction" and "weaponiz[ation]" of policy to the draft for the first time, copying the language Furman had provided in his comment.[107]  Also, as noted above, each of the examples of that alleged conduct—the alleged influencing of IEB member votes, the Conexion

---

[103] Text Message between C. Brooks and J. Furman (Feb. 18, 2024); Special Compliance Report draft (Feb. 18, 2024, 9:25 PM).

[104] Special Compliance Report draft (Feb. 19, 2024, 6:01 PM).

[105] Compliance Director Interview (June 5, 2024).

[106] UAW Const., art. 13, § 4.

[107] Special Compliance Report draft (Feb. 18, 2024, 3:39 PM) (showing that the Compliance Director added, almost verbatim, Furman's suggestion about a "pattern of obstruction and denials" and that "compliance as a principle is being broadly misapplied and weaponized").

media buy contract, and the allegations concerning the yard and picket signs and online store discussed in the Twelfth Status Report—were added directly by Brooks or by the Compliance Director at Furman's recommendation.[108]

Further, the Special Compliance Report became more inflammatory and more personally targeted at Secretary-Treasurer Mock in the iterations of the report after the February 16, 2024 meeting at which Top Administrative Assistant Brooks, President Fain, and the Compliance Director discussed the removal of Mock's departments. The initial draft of the Special Compliance Report did not blame Mock individually and instead focused on the exception denials conducted by the Secretary-Treasurer's Office in general.[109]   After the February 16, 2024 meeting, and presumably in response to the need to make the case to support the reassignment of Mock's departments, the Compliance Director revised the report to add new allegations, and when she did that, she added language that identified the Secretary-Treasurer by title, though not by name, as the individual that allegedly engaged in obstructive conduct. For example:[110]

- "The most concerning trend I see is ***the Secretary-Treasurer's*** apparent attempts to influence Board members' votes" (emphasis added).

- "Further, it is not the role of ***the Secretary-Treasurer*** to tell other officers how to run their regions or departments" (emphasis added).

- "To be clear, it was not the role of ***the Secretary-Treasurer*** nor purchasing to design yard signs" (emphasis added).

---

[108] Special Compliance Report draft (Feb. 18, 2024, 3:39 PM) (showing new drafted sections about influencing votes and the picket and yard signs in line with Furman's comment); Special Compliance Report draft (Feb. 18, 2024, 5:07 PM) (demonstrating Brooks's addition of a section on the Conexion media buy contract and the online store).

[109] Special Compliance Report draft (Feb. 15, 2024, 9:46 PM).

[110] Special Compliance Report draft (Feb. 18, 2024, 3:39 PM).

When Top Administrative Assistant Brooks rewrote that draft, he made the report far more sensational and inflammatory, and, for the first time, instances of the supposed obstruction became attributed to Secretary-Treasurer Mock by name, rather than by title.  For example:

- In her original draft from February 15, 2024, the Compliance Director wrote, "In large part, my concern is that our policies, specifically the Travel & Expense Reimbursement Policy, which are meant to be apolitical, are being politicized."[111]  This line remained unchanged until Brooks revised it on the evening of February 18 to say, "Unfortunately, the Travel and Expense Reimbursement policy, which is meant to be apolitical, but has been *egregiously politicized and weaponized* by the Secretary-Treasurer's office" (emphasis added).[112]

- In her revised draft from the afternoon of February 18, 2024, the Compliance Director wrote, "it is never appropriate to try to influence current or future decisions by making the direct or indirect threat that you will obstruct a transaction or deny a request if they do not vote the way you'd like."[113]  During his "whole rewrite," Brooks changed the line to, "What has come to my attention is a pattern of *Secretary-Treasurer Margaret Mock* trying to influence current or future Board decisions by making both direct and indirect threats that *she* will obstruct a transaction or deny an expense request if *her* fellow Board members do not vote the way *she* would like" (emphasis added).[114]

- In the same draft, as noted above, the Compliance Director wrote, "Further, it is not the role of the Secretary-Treasurer to tell other officers how to run their regions or departments."[115]  Brooks rewrote the sentence to say, "Additionally, there is a clear pattern of [] the Secretary-Treasurer *abusing the authority of her office* to tell the other officers of the Board how to run their regions or departments" (emphasis added).[116]

- In the same vein, the Compliance Director wrote, "Throughout the departments the Secretary-Treasurer is responsible for, the pattern of obstruction and denial has continued to spread."[117]  Brooks replaced this sentence with, "Based on reports from numerous staff and Board members, *Secretary-Treasurer Mock* has *actively used* the departments that report to

[111] Special Compliance Report draft (Feb. 15, 2024, 9:26 PM).
[112] Special Compliance Report draft (Feb. 18, 2024, 5:07 PM).
[113] Special Compliance Report draft (Feb. 18, 2024, 3:39 PM).
[114] Special Compliance Report draft (Feb. 18, 2024, 5:07 PM).
[115] Special Compliance Report draft (Feb. 18, 2024, 3:39 PM).
[116] Special Compliance Report draft (Feb. 18, 2024, 5:07 PM).
[117] Special Compliance Report draft (Feb. 18, 2024, 3:39 PM).

her *to delay, obstruct and even block* the other work of other departments"
(emphasis added).[118]

It was only after Communications Director Furman's feedback and Top Administrative
Assistant Brooks's rewrite that the false picture was painted of a Secretary-Treasurer who had
"willful[ly] obstruct[ed]" other departments, "weaponized" financial policies, and "significantly
violat[ed]" the Union's policies—none of which was in the Compliance Director's original draft
prepared before the February 16, 2024 meeting.[119]   These words were the ones repeated by
President Fain when he stated that Secretary-Treasurer Mock "weaponized" her job after Regional
Director Dickerson made the motion to strip Mock of her departments, with Dickerson using the
language that had been scripted by Brooks and given to her by Fain, as discussed below on page
40.[120]

The newly produced text message chains show—and the iterative drafts confirm—the
extent to which the President's Office staff controlled the substance of the Special Compliance
Report, and they demonstrate the falsity of the Compliance Director's statement to the IEB, in her
introduction to the substantive part of the Special Compliance Report, that the contents of the
report were "independent and apolitical."[121]   They also show that the Compliance Director
provided false and/or misleading information to the Monitor when she claimed in her June 2024
interview that she wanted input from the President's Office "on my tone.  But not in content."[122]
Instead, as these communications make clear, Top Administrative Assistant Brooks and
Communications Director Furman did not merely edit the tone of a draft or rephrase portions of

---

[118] Special Compliance Report draft (Feb. 18, 2024, 5:07 PM).
[119] Special Compliance Report draft (Feb. 15, 2024, 9:26 PM); Special Compliance Report (Feb. 20, 2024), at 1, 3, 6.
[120] IEB Meeting Minutes (Feb. 20, 2024).
[121] IEB Meeting Minutes (Feb. 20, 2024).
[122] Compliance Director Interview (June 5, 2024).

the report—rather, they did a "whole rewrite," adding the most incendiary claims and personalizing it as a direct attack on Secretary-Treasurer Mock so that it could be used as part of their overall strategy to retaliate against Mock by stripping her of the departments under her oversight.

Further, these text chains shed additional light on the extent to which the Special Compliance Report was part of a premeditated plan devised by the President's Office to retaliate against the Secretary-Treasurer, rather than an independent report of the Compliance Director on compliance-related issues as the Compliance Director represented it was. In a text chain from several weeks earlier, on January 3, 2024, the day after Secretary-Treasurer Mock had denied the Conexion sole-source contract and told President Fain that he could immediately appeal that decision to the IEB,[123] Top Administrative Assistant Brooks provided an explanation as to why President Fain did not take Mock up on her offer. In his text to Fain, he set forth the President's Office's plan to retaliate against Mock, stating that he and Communications Director Furman thought that "it would be most strategic to bring a list of issues regarding the [Secretary-Treasurer]'s office to the Board, so the media buy in Chattanooga is not seen in isolation, but as part of a larger problem."[124] As this text message shows, the plan to create a report with a list of issues for presentation to the IEB was devised approximately seven weeks before the IEB meeting, and the newly produced text chain between Brooks and Furman shows how they were carrying out that preexisting plan in the days before that meeting by rewriting the "list of issues" that would be used against Mock.

---

[123] Email from M. Mock to S. Fain (Jan. 2, 2024).
[124] Text Message among C. Brooks, S. Fain, and J. Furman (Jan. 3, 2024). This document was produced to the Monitor prior to the publication of the Twelfth Status Report.

As the text chains also show, Top Administrative Assistant Brooks and Communications Director Furman were not satisfied with the way that the Compliance Director had carried out their plan in her original draft, which did not specifically call out Secretary-Treasurer Mock and used straightforward noninflammatory language. They therefore stepped in to "land the plane" by doing a "whole rewrite" that would better carry out their "vision" for a report attacking the Secretary-Treasurer.[125]   When asked about the extent of their edits on the Special Compliance Report in a re-interview with the Monitor, Brooks said he had "[n]o idea what I added versus Jonah versus [the Compliance Director]" and did not "remember what language was added," even after being shown a comparison between the original and final drafts of the Special Compliance Report.[126]   In his re-interview, Furman did recall editing the report, explaining to the Monitor that the Compliance Director's draft was "not communicating what she wanted to communicate effectively," so he "moved words and paragraphs around" to help the Compliance Director make her points. When asked what he meant by "we will land the plane," Furman said he meant that the report was "not in the shape to be presented but we will get it in a shape to be presented."[127]

The newly produced texts further demonstrate the extent to which the entire plan to strip Secretary-Treasurer Mock of her assignments originated in the President's Office and was controlled by it. In particular, Top Administrative Assistant Brooks bragged in the days after the IEB had stripped Mock of her department assignments that "my strategy was flawless," and that its success was the equivalent of "epically dunk[ing] on another player in basketball." Specifically, on February 22, 2024, Brooks texted Communications Director Furman about his efforts.

- Furman asked, "What does it mean for print shop to be under me, since they have an AA (who is now out on medical)."

---

[125] Text Message between C. Brooks and J. Furman (Feb. 18, 2024).
[126] C. Brooks Interview (Sept. 30, 2025).
[127] J. Furman Interview (Oct. 3, 2025).

- Brooks responded, "It means whatever we want it to mean.  AAs still can be directed to report to other AAs.  And we can fire them.  Or demote them."

- Brooks added:  "*Also, can I just take a moment and say: my strategy was flawless this week.  Like everything went perfectly to plan.  That happens so very rarely.  But it feels really good.  Like [] how [I] imagine it feels to epically dunk on another player in basketball*" (emphasis added).

Communications Director Furman reacted to Brooks's message with a heart emoji.[128]  The Twelfth Status Report recounted part of Top Administrative Assistant Brooks's role in the plan to oust Secretary-Treasurer Mock, but it did not have the benefit of Brooks's assertion that he was the person who devised and personally carried out the strategy.[129]

The newly produced text messages also underscore the retaliatory intent of the President's Office to use the Special Compliance Report as part of a plan to exert more control over the Union by stripping Secretary-Treasurer Mock of the ability to insist on strict compliance with Union policies in the departments that she oversaw.   In a text-chain discussion between Top Administrative Assistant Brooks and Communications Director Furman after the February 2024 IEB meeting that showed their interest in controlling the departments, Furman made clear to Brooks his areas of concern and Furman's personal interest in the outcome:  "[D]id all of the departments land somewhere already?  Did she [Mock] lose the print shop?  Purchasing?  These are the crucial questions for me haha."[130]  Brooks confirmed that Mock did lose those departments, to which Furman responded, "Wow. It's a new day."[131]  When Brooks noted that Furman could receive control over the Print Shop, Furman responded, "thank god,"[132] and, as discussed above,

---

[128] Text Message between C. Brooks and J. Furman (Feb. 22, 2024).
[129] When asked about this comment in his September 2025 re-interview, Top Administrative Assistant Brooks stated that he meant that he was pleased with how the President's Report had gone—including the Special Compliance Report—and because he's "not tall and can't dunk" in real life, Brooks imagined the feeling would be similar to "epically dunk[ing]" on another person. C. Brooks Interview (Sept. 30, 2025).
[130] Text Message between C. Brooks and J. Furman (Feb. 20, 2024).
[131] Text Message between C. Brooks and J. Furman (Feb. 20, 2024).
[132] Text Message between C. Brooks and J. Furman (Feb. 20, 2024).

the two of them discussed how they now could "fire" "or demote" the Administrative Assistants who were running the Print Shop and the other reassigned departments.[133]

In all, the Union's recent productions provide greater clarity into the effort against the Secretary-Treasurer, namely the extent to which the President's Office staff engineered, coordinated, and influenced the Special Compliance Report and IEB meeting with their own self-interest in mind.[134]   Had these documents been produced earlier, they would have enabled the Monitor to more fully rebut the Compliance Director's false claims of independence and would have further demonstrated that the exercise was part of a plan to retaliate against the Secretary-Treasurer and consolidate her power and authority into the President's Office under false pretenses.   These documents would have better informed the direction of the Monitor's investigation and allowed the Monitor to reach the findings of the Twelfth Status Report more efficiently.   These documents also would have demonstrated an important fact for the Union with implications far broader than this investigation—that the UAW's Compliance Department had been fully co-opted by the President's Office and could not be trusted to act as an independent part of the Union under the Compliance Director's leadership, a topic discussed in the Monitor's Thirteenth Status Report.[135]   Taken together, these documents provide vital corroboration of what the Monitor heard from multiple witnesses and pieced together from other documents—that the President's Office staff devised and implemented an intentional plan to remove the Secretary-

---

[133] Text Message between C. Brooks and J. Furman (Feb. 22, 2024).
[134] The production includes other texts not mentioned above that also corroborate aspects of the Twelfth Status Report.   Throughout the recently produced text messages, the President's Office staff's opinion of Secretary-Treasurer Mock and her Office was clear, demonstrating an animus toward Mock that appeared to motivate their desire to strip Mock of supervision of her departments and assert control over them.   For example, in an undated text, Top Administrative Assistant Brooks wrote to Communications Director Furman and Top Administrative Assistant Brian Shepherd that "MM [Margaret Mock] is a pathological liar . . . Just rewriting history on everything." Text Message among C. Brooks, J. Furman, and B. Shepherd.
[135] Monitor's Thirteenth Status Report.

Treasurer's departments and manipulated the Compliance Department into presenting false and/or misleading information to the IEB to do so.  These messages provide direct evidence of this intent, aligning with the Monitor's conclusion that the removal of Secretary-Treasurer Mock's departments was premeditated to justify a retaliatory outcome.

### C.      The Motion to Withdraw the Secretary-Treasurer's Departments

The Monitor's Twelfth Status Report also explained how President Fain had said that he concealed his efforts to strip Secretary-Treasurer Mock of her departments by having Black IEB members bring and second the motion to do so, so as to shield himself from accusations of racism.[136]  The Monitor's investigation revealed that Regional Director Dickerson—who made the motion at the February IEB meeting to remove Mock's departments—discussed the removal of Mock's departments with Fain two or three weeks before the meeting.[137]  Later, on February 16, 2024, Top Administrative Assistant Brooks texted the language of the motion to Fain and Communications Director Furman, stating it was "[f]or Laura and LaShawn."[138]

### 1.      The President's Role

The new productions provide additional evidence about President Fain's role in orchestrating the motion made by Director Dickerson at the February 2024 IEB meeting.

Among the recently produced documents, the Monitor obtained a text message dated January 11, 2024, in which Top Administrative Assistant Brooks sent outside counsel the language from Article 13 of the UAW Constitution that was later used as justification to remove assignments from Secretary-Treasurer Mock.[139]  This text is the earliest instance of this constitutional language produced by the Union, demonstrating both the forethought with which the President's Office

---

[136] Monitor's Twelfth Status Report at 9-10, 67-68.
[137] Monitor's Twelfth Status Report at 68-69.
[138] Monitor's Twelfth Status Report at 71-72.
[139] Text Message between C. Brooks and B. Dictor (Jan. 11, 2024).

planned to remove Mock's departments and how this planning predated the Compliance Director's involvement.

The Union's belated production also included a text message from President Fain to Director Dickerson containing the language of the motion she would later make at the IEB meeting. In her interview, Dickerson told the Monitor that Fain had texted her the language of the motion in advance of the IEB meeting.[140] However, at the time of the Twelfth Status Report's publication, the Union had not produced that text.[141] The Union finally produced it on July 3, 2025, and notably, it was produced only from Dickerson's phone. The February 19, 2024 text—sent the day before the IEB meeting—shows Fain providing Dickerson with both the motion script and precise stage directions: "After [the Compliance Director] says, 'This concludes my special report', You can make this motion."[142] The text then recites the language that Dickerson largely used when making her motion, which Top Administrative Assistant Brooks had drafted and sent to Fain on February 16, 2024, marked "[f]or Laura and LaShawn."[143]

This document corroborates the Monitor's findings in the Twelfth Status Report about Top Administrative Assistant Brooks and President Fain's orchestration of the plan. It demonstrates that Fain provided Director Dickerson with the script Brooks had drafted and gave her careful instructions on exactly when to act. Significantly, unlike the Brooks text presented in the Twelfth Status Report, Fain's message includes a specific reference to the Compliance Director presenting a "special" report—as opposed to the regular compliance report typically presented at IEB

---

[140] L. Dickerson Interview (June 17, 2025).
[141] The Monitor called into question the completeness of the Union's document production in the Twelfth Status Report. Monitor's Twelfth Status Report at 71.
[142] Text Message between S. Fain and L. Dickerson (Feb. 19, 2024).
[143] Text Message among C. Brooks, S. Fain, J. Furman, and B. Dictor (Feb. 16, 2024).

meetings—potentially contradicting Dickerson's assertion that she had no advance knowledge of that report.[144]

The belated production of the text from President Fain to Director Dickerson also exposed contradictions in Top Administrative Assistant Brooks's testimony to the Monitor. On February 16, 2024, Brooks had texted Fain with motion language marked "[f]or Laura and LaShawn."[145] In his May 2024 interview—before the Union produced this text to the Monitor—Brooks claimed he did not know whether Dickerson knew about the motion before the IEB meeting and had "no impression" that she had advance knowledge of it.[146] However, in his October 2025 interview, when asked about his February 16, 2024 text to Fain with the motion language "[f]or Laura and LaShawn," Brooks acknowledged that he knew Fain was meeting with Dickerson and Director English[147] about the February 2024 IEB meeting, and that he had drafted "what a motion would look like if [a] motion was made at [the] meeting."[148] Even in this October 2025 interview, Brooks maintained that he had "no idea" whether Dickerson knew about the motion in advance, claiming

---

[144] L. Dickerson Interview (May 30, 2024). The Monitor also could have used the text to refresh President Fain's recollection when he said he didn't remember "whether Dickerson was aware of [the Compliance Director's] report." S. Fain Interview (June 5, 2024).

[145] Text Message among C. Brooks, S. Fain, J. Furman, and B. Dictor (Feb. 16, 2024).

[146] C. Brooks Interview (May 31, 2024).

[147] The Union's recent document productions also pertain to Regional Director English's involvement in the withdrawal motion. Also on February 19, 2024, Top Administrative Assistant Brooks wrote to Communications Director Furman, "I really appreciate all of your help getting everything ready for tomorrow. It's going to be quite the board meeting." In response, Furman wrote, "Glad I could help, but sorry to once again not fully be in the trenches. Did Shawn do his calls?" to which Brooks wrote, "And then some. On his way to meet LaShawn in person." Furman responded with a heart emoji. Text Message between C. Brooks and J. Furman (Feb. 19, 2024). Monitor's Twelfth Status Report at 72. In a follow-up interview with Director English, she stated that President Fain had met with her to vaguely ask for her support and maintained that he did not ask her to second the motion. L. English Interview (Aug. 19, 2025). The text also further contradicts Brooks's claim that he had "no impression" that Dickerson was going to make the motion to authorize the removal of the Secretary-Treasurer's departments, given his confirmation that Fain had made "his calls" and was "on his way to meet LaShawn in person." If Dickerson had not already agreed to make the motion, there would have been no need for Fain to meet with English to discuss her seconding that motion.

[148] C. Brooks Interview (Oct. 15, 2025).

he "didn't know how the conversation with her went . . . if [President Fain] brought it up, how she reacted, what she was gonna do.  I didn't discuss that with him."[149]  When asked if he recognized the motion language Dickerson stated in the IEB meeting as the language he wrote in his text to Fain, Brooks admitted, "I do now," while claiming he had not realized the similarities while sitting in the February 2024 IEB meeting.[150]

### 2. Document Destruction on President Fain's Phones

Although the Monitor had long sought all relevant communications from the Union regarding the Special Compliance Report, and noted the absence of any text message from President Fain to Director Dickerson in a draft of the Twelfth Status Report provided to the Union on May 30, 2025, the text message referenced above was not produced until July 3, 2025, weeks after the publication of the Twelfth Status Report.  As noted above on page 41, this message was produced only from Dickerson's files; it was not found among the text messages produced from the imaged versions of President Fain's phones.

The Monitor subsequently requested all text messages between President Fain and key custodians, including Director Dickerson, Top Administrative Assistant Brooks, and the Compliance Director.  In all, the Monitor uncovered at least 123 text messages with various participants that were deleted from Fain's phones.  Fain told the Monitor that he uses both his personal and work cell phones to communicate about UAW-related matters, so he produced text messages to the Monitor from both devices.[151]  The messages that were no longer on either of Fain's two phones when they were collected in November 2024 were:

- All text messages with Dickerson before June 30, 2024.

---

[149] C. Brooks Interview (Oct. 15, 2025).
[150] C. Brooks Interview (Oct. 15, 2025).
[151] S. Fain Interview (Oct. 10, 2025).

- At least 62 individual text messages with Brooks, including all text messages between November 8, 2023, and March 24, 2024 (the period leading up to and directly after the February 2024 IEB meeting), and all messages between March 24, 2024, and July 18, 2024 (the period leading up to and directly after the removal of the Stellantis Department from Vice President Boyer),[152] that were found on Brooks's phone. Texts exist on Fain's phones between Fain and Brooks before and after these dates, suggesting selective deletion, as discussed above on page 26.

- All of Fain's text messages with the Compliance Director before July 22, 2024, except for one from his work phone dated November 29, 2023. This includes 18 texts that were produced from the Compliance Director's imaged phone. This may not be the total count of deleted messages given the Compliance Director's own deletion of selected material texts, discussed above on pages 25-26.

- All group messages among Fain, Brooks, and outside counsel Ben Dictor between September 21, 2023, and September 16, 2024, 20 of which were produced from Brooks's and Dictor's phones. Messages before and after these dates existed on Fain's phone, suggesting selective deletion here as well.

Also missing from Fain's phones are: eight messages from early 2023 with Communications Director Furman; two messages among Fain, Brooks, and Furman from March 2023 and March 2024; and ten other group messages among various International Union staff between August 2023 and July 2024.

Among the 123 messages produced from the phones of others but not from President Fain's, the Monitor identified the following material text messages that had been deleted from Fain's phone: (1) the February 19, 2024 text message from Fain to Director Dickerson discussed above on page 41;[153] (2) the February 12, 2024 text message from Top Administrative Assistant Brooks to Fain informing Fain of a meeting that morning with the Compliance Director "to talk about compliance issues and the upcoming IEB meeting," also discussed above on page 29;[154] and

---

[152] In this time period, there was one text message found on President Fain's phone between Fain and Top Administrative Assistant Brooks's personal phone number on June 22, 2024.

[153] Text Message between S. Fain and L. Dickerson (Feb. 19, 2024).

[154] Text Message between C. Brooks and S. Fain (Feb. 12, 2024).

(3) a May 28, 2024 text message from Brooks to Fain providing talking points for a meeting Fain was about to conduct with Vice President Boyer in which Fain threatened to remove oversight of the Stellantis Department from him if he did not get "on the same team" as Fain, a document material to another ongoing Monitor investigation.[155]

When confronted with these missing text messages in an interview with the Monitor,[156] President Fain initially said that he could not explain their absence, stating only that they "could've been inadvertently deleted."[157]  Throughout the interview, he offered various possible theories for how they could have been inadvertently deleted, including that:

- "In the process of screen-capturing texts and going back and forth, I've had phones full of memory . . . in the process of looking I could have inadvertently deleted them."

- "I get a lot of texts on my personal phone from political things, junk mail, 'hey how you doing,' I delete those typically," suggesting he may have mistakenly deleted UAW-related messages while attempting to delete spam.

- While speaking from his phone at a podium, he accidentally deleted his speech notes and "had to ad lib," implying a similar accident could have occurred with these text messages.

- Someone else may have accessed his devices when he was not present, noting: "I leave my phones in my desk a lot in my office.  Been in meetings where I've left them."  Although he confirmed he has a passcode on his phone, he stated he did not remember when he had implemented it, acknowledging: "Used to never have them, I don't know at what point I put it on."[158]

None of these explanations match the record of deletion here.  As noted above, the text messages were not deleted wholesale; instead, text messages from specific periods of time were

---

[155] Text Message between C. Brooks and S. Fain (May 28, 2024).
[156] As with President Fain's previous interviews, the Monitor requested the presence of a court reporter to transcribe the interview and ensure accurate notetaking; however, as before, the Union refused this request.
[157] S. Fain Interview (Oct. 10, 2025).
[158] S. Fain Interview (Oct. 10, 2025).

deleted, while messages before and after that period remained on President Fain's phones. That pattern indicates that individual messages within the conversation threads were selectively deleted, rather than entire conversations being deleted at once. Moreover, the deletions were targeted to specific time periods that correspond directly to the events under investigation by the Monitor, and in some instances, correspond to similar dates of texts that were deleted from the Compliance Director's phone. When asked if he could explain how messages could be individually selected and deleted in this manner, Fain responded: "I can't right now. No." Fain also said that he did not recall any discussions with Top Administrative Assistant Brooks, the Compliance Director, or Regional Director Dickerson about deleting text messages.[159]

President Fain was asked about the three text messages highlighted above and similarly did not have an explanation for why they were missing. Regarding the February 12, 2024 text from Top Administrative Assistant Brooks about the meeting with the Compliance Director, Fain agreed that "it must have been deleted in some way because it's not on [his] phone" and agreed on the technical elements of selectively deleted messages, but when asked whether he intentionally deleted the message, Fain replied, "There's no reason why I'd need to. . . I don't know."[160]

President Fain was unable to provide any explanation for the missing messages. For example, when asked, "Are you able to explain why all the messages between you and Chris Brooks between November 8, 2023, and March 28, 2024, are not on your phone?" Fain answered

---

[159] S. Fain Interview (Oct. 10, 2025).

[160] S. Fain Interview (Oct. 10, 2025). President Fain sought to clarify his responses to questions about the deletions after a discussion with Union counsel. Initially, when asked whether he had deleted text messages with Top Administrative Assistant Brooks, the Compliance Director, Director Dickerson, and others, Fain responded: "I don't recall. Could've inadvertently happened but . . ." He gave similar "I don't recall" responses to multiple questions about whether he had deleted specific messages or text chains. After approximately thirty minutes of questioning on this topic, and after a discussion with UAW counsel which was described to the Monitor's representatives, Fain sought to clarify his response, stating: "To the best of my recollection I didn't delete them." S. Fain Interview (Oct. 10, 2025).

simply: "No."[161]  He gave the same answer when asked about other missing message chains with Regional Director Dickerson, the Compliance Director, and outside counsel Dictor.  Fain acknowledged that he understood his obligation to preserve potentially relevant documents, and stated that he had taken some safeguards by having the UAW's discovery counsel image his phones twice and ensure that the auto-delete function was turned off.  However, he could not explain why, if he had taken these safeguards, extensive text messages from time periods material to the events discussed in the Twelfth Status Report were nonetheless missing from his devices in a pattern consistent with deliberate, selective deletion.[162]

* * *

After the events outlined in this Supplement and the Twelfth Status Report, the Union's recent commitments hopefully will come to mark a turning point in the UAW's progress toward enhancing its culture of compliance and accountability.  The Union has committed to restoring Secretary-Treasurer Mock's departmental assignments, restoring the Stellantis Department to Vice President Boyer, allowing the Monitor access to the Culture Committee, and embracing structural changes to safeguard the independence of the Compliance Department so that it no longer directly reports to President Fain.  Further, the Union has disciplined Communications Director Furman and secured the resignations of Top Administrative Assistant Brooks and the Compliance Director.  In making these commitments and taking these actions, the Union has indicated that it may finally be prepared to move forward with transparency and a renewed commitment to compliance.  Ongoing vigilance will be essential, as will continued engagement with the Monitor about implementation of the Monitor's remaining compliance recommendations.  But the Monitor

---

[161] S. Fain Interview (Oct. 10, 2025).
[162] S. Fain Interview (Oct. 10, 2025).

is encouraged by the actions of the Union and is optimistic that the measures described in this Supplement signal a willingness to constructively work with the Monitor going forward as part of a collaborative effort toward installing a sustainable culture of compliance.

* * *

Pursuant to Paragraph 58 of the Consent Decree, the foregoing report constitutes the Supplement to the Twelfth Status Report of the Monitor, Neil M. Barofsky.

**Date:  December 18, 2025**

Neil M. Barofsky, Monitor

*Respectfully filed with the Court on behalf of the Monitor by counsel to the Monitor,*

 /s/ Michael W. Ross
Michael W. Ross
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, New York 10036
(212) 891-1600 (t)
(212) 891-1699 (f)

**CERTIFICATE OF SERVICE**

I hereby certify that on December 18, 2025, the foregoing report was served electronically on all counsel of record via the CM/ECF system.  In addition, pursuant to Paragraph 58 of the Consent Decree, the foregoing report was served on consent by electronic mail upon the United States, the UAW's International President, the International Executive Board, and designated counsel for UAW.

 /s/ Michael W. Ross 
Michael W. Ross
