**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-13293 |
| | ) | Honorable David M. Lawson |
| INTERNATIONAL UNION, UNITED | ) | |
| AUTOMOBILE, AEROSPACE, AND | ) | |
| AGRICULTURAL IMPLEMENT | ) | |
| WORKERS OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**MONITOR'S FOURTEENTH STATUS REPORT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

I.    FACTUAL BACKGROUND ...................................................................... 10

    A.   The Union's Investment Policy Framework .................................... 10

    B.   The Union Liquidated the Equity Portfolio and Suspended the Investment Policy (August 2023) ................................................... 15

    C.   The Union's Investment Professionals Discussed Reinvestment Strategy (October to November 2023) ................................................ 18

    D.   The IEB Directed That $74 Million Be Used to Pay Off Debt Rather Than Be Reinvested (November to December 2023)................ 22

    E.   The Union Continued to Maintain a Large Cash Balance and Union Officials Reinvested a Portion of It (January to November 2024) ...... 25

    F.   The President's Office Refocused on the Investment Policy Allocations (October 2024 to February 2025) .................................... 37

    G.   The Union Came Back Into Compliance with the Allocations Contained in the 2015 Investment Policy (February 2025 to June 2025) .................................... 46

II.    ALLEGATIONS ...................................................................................... 49

    A.   The Allegation that Secretary-Treasurer Mock Unilaterally Suspended the Investment Policy ..................................................... 50

    B.   The Allegation that the Decision to Keep the Investment Policy Suspended Was Unilaterally Made by Secretary-Treasurer Mock and her Office ................................. 50

    C.   The Amount Allegedly Lost From Failure to Reinvest More Promptly ........................ 58

    D.   Alleged Reporting Misstatements About Unrealized Gains ........................................ 63

    E.   Claim of Wrongful Retaliation........................................................ 66

        1.  Evidence of Retaliatory Intent ................................................ 67

III.    RECOMMENDATIONS ......................................................................... 76

Pursuant to Paragraph 58 of the Consent Decree (Dkt. No. 10), the Court-appointed Monitor, Neil M. Barofsky, respectfully submits to the Court this fourteenth status report ("Fourteenth Status Report") concerning the monitorship of the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "Union" or the "UAW").

## INTRODUCTION

This Report presents the findings of the Monitor's investigation into allegations made by the President's Office against Secretary-Treasurer Margaret Mock concerning the Union's management of its investments in the Union's "Strike Trust." In January 2025, the President's Office alleged that Secretary-Treasurer Mock and her Office had: (1) unilaterally suspended the Union's Investment Policy in August 2023 in preparation for strikes against the Big Three automakers; (2) unilaterally kept the Union out of compliance with that Policy for more than a year after the strikes ended; (3) caused the Union to lose at least $80 million in investment income as a result; and (4) knowingly misrepresented the value of the Union's investments to the International Executive Board ("IEB"). In response, Mock made a counter-allegation that these accusations were unfounded and continued the pattern of retaliatory conduct against her, as detailed in the Monitor's Twelfth Status Report and its Supplement.

After a thorough investigation, the Monitor has concluded that the President's Office's allegations of intentional wrongdoing by the Secretary-Treasurer are false, and that President's Office personnel continued their pattern of retaliatory actions against Secretary-Treasurer Mock by deliberately trumping up false charges of wrongdoing against Mock and then presenting them to senior Union officials. The damage to Mock's reputation was then exacerbated by leaks to the press of the false allegations that were then widely reported.

1

Although the specific allegations of affirmative misconduct against Secretary-Treasurer Mock were unfounded, the investigation nonetheless uncovered significant dysfunction, supervisory shortcomings, communication failures, and governance weaknesses that contributed to the Union's investments being out of alignment with the asset allocations set forth in its 2015 Investment Policy from after the strikes of the Big Three automakers were resolved in November 2023 until June 2025. Some of the dysfunction relating to the Union's investment record was attributable to subordinates who reported to Mock and for whom she was ultimately responsible, but the responsibility did not rest on their shoulders alone and was attributable to a variety of individuals and circumstances. As a result, this Report provides four recommendations designed to strengthen the Union's investment governance, improve communication and accountability, and prevent similar issues from arising in the future.

**The Allegations of Affirmative Misconduct Against Secretary-Treasurer Mock**

The President's Office advanced four allegations of affirmative misconduct against Secretary-Treasurer Mock, none of which was substantiated. The Monitor's assessment of each is set forth in the body of this Report, after a recitation of the factual findings from the investigation. Those findings are briefly summarized here.

**Unilateral Suspension of the Investment Policy.** The President's Office alleged that Secretary-Treasurer Mock and her Office acted "unilaterally" in August 2023 to suspend the Union's Investment Policy (*i.e.*, the policy that governs the manner in which the Union invests its funds, including those held for the purpose of funding strike activities). That allegation is untrue. In fact, the Policy was suspended after the IEB unanimously voted in August 2023 to do so.

**Unilaterally Keeping the Union Out of Compliance.** The President's Office alleged that "the decision to keep the [Investment P]olicy suspended was made by the Secretary-Treasurer's

2

Office unilaterally" and that Secretary-Treasurer Mock decided to "remain[] out of compliance" with the Policy after the Big Three contracts were ratified in November 2023.[1]  This allegation is also untrue.

The Union's Strike Trust remained out of compliance with the Union's Investment Policy for 19 months after the Big Three contracts were ratified based on a combination of actions, and inaction, by multiple Union personnel including not just Secretary-Treasurer Mock, but also the IEB, Union staff, the Union's outside investment consultant,[2] and the Union's Investment Advisory Committee.  This included:

- A November 2023 IEB vote to use $74 million of the liquidated funds to pay off a loan instead of reinvesting it in a manner consistent with the Investment Policy;

- Correspondence from the Union's Director of Investments to its outside investment consultant indicating that the IEB's decision to pay off the loan continued the suspension of the Investment Policy;

- Multiple IEB members and Investment Advisory Committee members being on notice about the Union's large cash balance after the Big Three contracts were ratified—indicating that funds had not been reinvested—and consenting to the outside investment consultant's recommendation of an incremental reinvestment approach.

The investigation found that Secretary-Treasurer Mock was not aware the Union was out of compliance with the terms of the Investment Policy, and that she made no decision—unilaterally or otherwise—to maintain the status quo.

On the other hand, the investigation showed that by November 2024, approximately two and a half months before the President's Office notified the Union's General Counsel and former Compliance Director about the breach of the Investment Policy, members of the President's Office,

---

[1] Compliance Memo on UAW Investment Policy and Practices (Jan. 27, 2025) ("Compliance Memo").
[2] The Union's outside investment consultant was from Segal Marco Advisors.  This consultant is referred to as "Segal Marco Consultant" throughout this Report.

including then-Chief of Staff Chris Brooks and then-Top Administrative Assistant Jonah Furman, had concluded that the Union's investments deviated from the Investment Policy, yet they did not notify Secretary-Treasurer Mock, the outside investment consultant, or the new Investment Advisory Committee Chair at that time; they also did not raise the issue with the Union's Legal and Compliance Departments until late January 2025.

As detailed further below, and in the body of this Report, when the facts are considered in their totality, the Union's failure to reinvest the proceeds of its Strike Trust was the result of errors and dysfunction across the organization, and did not fall solely at the feet of an affirmative, unilateral action by the Secretary-Treasurer herself, as alleged by the President's Office.

**The $80 Million Loss Allegation.**  The President's Office alleged that the Union lost at least $80 million by failing to return to compliance with the Investment Policy in a timely manner. This allegation is also untrue.  As detailed below, the calculation relied on a litany of flawed assumptions, including that it assumed immediate reinvestment of the funds during an ongoing strike while disregarding the IEB's directions; overstated the funds available for reinvestment, leaving nothing for day-to-day operations; assumed the immediate reallocation of illiquid alternative investments (*e.g.*, hedge funds) that could only have been liquidated with likely losses; assumed adherence to specific policy targets rather than acceptable ranges for compliance; and assumed that all equity investments (*e.g.*, stocks) would be placed in the highest-performing fund, which would have been, in and of itself, a violation of the Investment Policy.  The Union's outside investment consultant also told the Monitor that the calculation was not based on a sound approach to investing and included an assumption for reinvesting the Union's assets that would have been "reckless."

4

**Misrepresentation of the Union's Finances.**  The President's Office also alleged that Secretary-Treasurer Mock concealed from the IEB how much the Union's investments had grown in value, claiming Mock improperly reported only what the Union originally paid for its investments rather than their current market value.  This allegation is also untrue.

The Monitor found no evidence that Secretary-Treasurer Mock withheld information about the value of the Union's investments from the IEB.  Instead, the Secretary-Treasurer's Office followed longstanding Union practice in providing financial updates to the IEB.  This included providing cost values (what the Union paid for its investments) to the IEB on a quarterly basis and market values (reflecting current worth) to the IEB in external audit reports on a biannual basis.  The Secretary-Treasurer's Office also reported the cost values in LM-2 forms, which are filed annually with the Department of Labor and are publicly available on the Department's website.  The President's Office allegation was thus based on the false premise that Mock concealed critical investment information when her reporting practices to the IEB were transparent, followed standard accounting methods, and were consistent with longstanding Union practice.

**The Continued Pattern of Retaliation Against Secretary-Treasurer Mock**

The Monitor has also investigated Secretary-Treasurer Mock's allegation that these unfounded allegations by the President's Office continued the pattern of retaliation documented in the Monitor's Twelfth Status Report and its Supplement.  That charge is correct.  The President's Office's conduct bears all the hallmarks of retaliatory action prioritizing retribution against Mock over the Union's best interests.  For example, after the President's Office discovered the non-compliance with the Union's Investment Policy in mid-November 2024, rather than immediately notifying Mock, the outside investment consultant, the Compliance Department, or the Monitor, the President's Office instead sat on the information for two and a half months as they tried to

build a political case against Mock. Mirroring almost exactly his work to levy false charges against Mock in the "Special Compliance Report" detailed in the Monitor's Twelfth Status Report and its Supplement, then-Chief of Staff Brooks once again edited written charges setting forth Mock's supposed wrongdoing to insert definitive but unfounded accusations of misconduct, and added inflammatory and false allegations against Mock.

And as further evidence of their retaliatory intent, members of the President's Office, including the President himself, directly and indirectly interfered with and/or obstructed the Monitor's work, disregarding the Monitor's direction to refrain from repeating both unproven and already demonstrably false allegations lest they interfere with the Monitor's ongoing investigation. President Shawn Fain and former Chief of Staff Brooks did exactly that—repeating the false claims multiple times to the full IEB and other witnesses to the conduct being investigated.[3]

---

[3] The misconduct described in this Fourteenth Status Report shows that former Chief of Staff Brooks's pattern of retaliatory conduct continued beyond the events addressed in the Monitor's Twelfth Status Report, further justifying remedial action. *See* Monitor's Twelfth Status Report, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (June 17, 2025), Civil No. 20-cv-13293, ECF No. 152 ("Monitor's Twelfth Status Report"). As reported in the Supplement to the Twelfth Status Report, the Monitor previously decided not to take additional action against Brooks, because as a former employee who is not a UAW member, the available remedy for Brooks's misconduct would be a designation as a "barred person," the purpose of which is to remove the influence of the barred person from the Union. Supplement to the Monitor's Twelfth Status Report, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (Dec. 18, 2025), Civil No. 20-cv-13293, ECF No. 156, at 7 ("Supplement to the Monitor's Twelfth Status Report"); *see* Consent Decree ¶¶ 18(b)-(c), 29, 32, 34, 46. The Union has acknowledged that the members of the President's Office, including Brooks, made key unsubstantiated or exaggerated accusations against the Secretary-Treasurer and secured Brooks's resignation as of December 31, 2025. By securing Brooks's removal from the Union, the Union has accomplished the aims of that remedy. Should there develop a credible basis to find any threat of direct or indirect influence by Brooks at the Union notwithstanding his termination, or should additional relevant information about Brooks come to the Monitor's attention regarding actions taken either prior or subsequent to his departure, given the conduct described in the Supplement to the Twelfth Status Report and this Fourteenth Status Report, the formal designation of Brooks as a "barred person" under Paragraph 20(e) of the Consent Decree would be appropriate. As with the Monitor's Twelfth Status Report and its Supplement, decisions regarding discipline for retaliation and/or the interference or obstruction of the Monitor's investigations for any other individual referenced in this Report will be deferred until the Monitor completes his investigation and report into the allegations of misconduct and retaliation related to the 2024 action by President Fain to remove the Stellantis Department assignment from Vice President Rich Boyer. Monitor's Twelfth Status Report at 13-16; Supplement to the Monitor's Twelfth Status Report at 7.

**Compliance Failures and Recommendations**

Finally, although the Monitor found no evidence that the Secretary-Treasurer committed the affirmative misconduct of which she was accused, the investigation revealed significant governance and communication failures, including by those under the Secretary-Treasurer's supervision, that require remediation.

*First*, the Union's patchwork of IEB resolutions and policies created a significant lack of clarity about roles and responsibilities over the Union's investments. Numerous documents, resolutions, and policies govern the administration of the Union's invested funds. For example, under the UAW Constitution, the IEB is responsible for establishing "procedures and standards" by which the Secretary-Treasurer, as "custodian of the funds," must invest the UAW's funds. A 1996 IEB resolution assigns the five Union Officers—the President, Secretary-Treasurer, and three Vice Presidents—certain responsibilities with respect to the Union's investments, such as providing the investment guidelines for the Strike Trust to the outside consultants and professionals providing financial services to the Union, and periodically reporting on the Strike Trust's performance to the IEB. However, the Investment Advisory Committee operates in practice as the body responsible for oversight of the Secretary-Treasurer's investment activities, although the Committee has no formal charter of its own articulating this responsibility. In conducting its day-to-day responsibilities over investment management, the Secretary-Treasurer's Office relies extensively on an outside consultant, who also has responsibility for evaluating compliance with the Investment Policy. Indeed, a 2008 IEB resolution authorizes the Secretary-Treasurer to "rebalance the portfolio in order to maintain compliance with the asset allocation guidelines" in the Investment Policy Statement "only in accordance with the recommendations by" the outside investment consultant and determined by the Secretary-Treasurer "to be in the best interest of the

7

Strike Trust."  Further, it is not clear from the governing documents what role the IEB is intended to play in providing oversight beyond establishing the requisite standards.  Each of these roles must be clarified to best protect the Union against further compliance failures.

*Second*, the Monitor found that many of the relevant decision-makers lacked necessary qualifications and experience regarding the Union's investment portfolio.  President Fain's retaliatory actions against Secretary-Treasurer Mock in February 2024 (detailed in the Monitor's Twelfth Status Report) included replacing the Director of Investments with someone who characterized himself as "not an investment guy."  Nor does the job description for the Director of Investments position require any qualifications pertaining to finances or investments.  Similarly, the Investment Advisory Committee members were not well-equipped to provide oversight, as no Committee member remembered receiving training before assuming the position, and many members had not even seen the Investment Policy before voting to suspend it in August 2023.

*Third*, the Monitor's investigation showed that lines of communication within the Secretary-Treasurer's Office did not effectively notify UAW leadership about the non-compliant status of the Investment Policy.  The IEB's vote authorizing the liquidation of equities and policy suspension in August 2023 did not specify a reinvestment plan, and the Union's two Directors of Investment during the relevant period, as well as its Chief Accountant, were aware that the funds had not been completely reinvested but did not effectively raise the issue of policy compliance with Secretary-Treasurer Mock.  The Investment Advisory Committee, which was informed of the outside investment consultant's recommendation for reinvestment, failed to bring this approach to the Union Officers or the IEB for formal approval.  The Union Officers did not meet in 2024 apart from the regularly scheduled IEB meetings.  And Mock herself, as chair at that time, did not call an Investment Advisory Committee meeting for nine months in 2024, nor did her Office inform

the Committee members or Officers that $50 million had been reinvested in March 2024. Similarly, when the composition of the Investment Advisory Committee was changed in November 2024, the new Committee chair, then-Regional Director Laura Dickerson, did not raise any concerns, even though she was aware of the Union's investment allocations and large cash balance. And when the President's Office staff discovered that the Union's investments were not in line with the Investment Policy, they, too, did not raise the issue with Mock, the Investment Advisory Committee, the outside investment consultant, or the Monitor, and waited two and a half months before notifying the Compliance and Legal Departments. These failures of oversight and communication need to be addressed to ensure adequate oversight of the Union's funds in the future.

In light of these deficiencies, and as detailed further below, the Monitor has recommended to the Union that it should: (1) adopt a new Investment Charter that clarifies roles and responsibilities regarding the Union's investments; (2) establish qualifications for the Director of Investments position and the outside investment consultant; (3) mandate regular reporting requirements to the Investment Advisory Committee and the IEB; and (4) conduct yearly financial management training for the members of the Investment Advisory Committee and the IEB. The Union has told the Monitor that it looks forward to working with the Monitor to implement the recommendations.

Further detail in each of these areas is set forth below.[4]

---

[4] Consistent with past practice, the Monitor provided the contents of this Report to the Union to confirm the factual accuracy of its findings and to allow the Union to identify any alleged factual inaccuracies before publication. In each instance where the Union provided relevant feedback, the Monitor has either accepted the Union's suggestion by modifying the Report or identified the Union's position in a footnote—as expressed by the Union's Legal Department through its outside counsel—and explained why it was rejected. In all events, the Monitor retained complete discretion to determine the contents of this Report.

9

I.        **FACTUAL BACKGROUND**[5]

A.        **The Union's Investment Policy Framework**

The UAW Strike Trust contains the Union's cash and investments, which it uses to fund various activities.[6]   Despite its name, the Strike Trust is comprised of eleven different funds, addressing both strike-related and other activities.[7]   Relevant here are two funds in particular: the Strike and Defense Fund, a financial reserve established to support members during strikes and other major labor disputes,[8] and the General Fund, which covers the Union's day-to-day operating expenses including salaries, organizing campaigns, and administrative costs.[9]

Under the UAW Constitution, the Secretary-Treasurer is "the custodian of the funds" of the Union.[10]   The UAW Constitution provides that the Secretary-Treasurer "shall deposit sufficient funds of the International Union in some responsible bank or banks to meet current obligations of the International Union and shall invest the remainder of the funds under procedures and standards determined from time to time by resolution of the [IEB]."[11]

---

[5] The Union has requested that the Monitor remove all names from this Report and instead refer to individuals by their titles.  Notwithstanding that request, the Monitor has generally included names of relevant Union personnel in this Report in furtherance of transparency to the Union's members and the Court about the activities of the Union, which the Consent Decree enables the Monitor to provide.  *See* Consent Decree ¶ 55.  Doing so also avoids confusion given how many personnel discussed in the Report have changed titles over the course of time.  Including this information is consistent with the Monitor's past practice in which investigative reporting has included the names of relevant individuals, except where particular countervailing considerations would counsel otherwise, such as to address a concern about potential retaliation.

[6] K. Geromin Interview (Feb. 12, 2025); State of the Union Financial Overview IEB Presentation (June 2023).  The Strike Trust holds all investments not held by the Union's Master Pension Trust, which houses investments held for the benefit of pension plans.  Outline of Bal Harbour Resolutions dated 2-14-1996 (Dec. 31, 2023).

[7] The funds are denominated into these subgroups by the Union for internal accounting purposes.  K. Geromin Interview (Feb. 12, 2025); State of the Union Financial Overview IEB Presentation (June 2023).

[8] Solidarity Magazine: New Member Issue (Summer 2023), at 12.

[9] State of the Union Financial Overview IEB Presentation (June 2023); K. Geromin Interview (Feb. 12, 2025).

[10] UAW Const., art. 13, § 15.

[11] UAW Const., art. 13, § 15.

The IEB has implemented its responsibility to establish investment "procedures and standards" through a patchwork of overlapping and sometimes contradictory governance documents, practices, and procedures.[12]

**1996 Resolution.**   On March 15, 1996, the IEB adopted a resolution ("1996 Resolution") assigning responsibility[13] for various actions regarding the Strike Trust's investments to the "Officers of the International Union" ("Union Officers" or "Officers")—the President, Secretary-Treasurer, and three Vice-Presidents[14]—to "establish some accountability, and establish some reporting requirements [about the Union's investments] to the Executive Board."[15]   The Officers

---

[12] The Union represented that it produced all governing investment-related policies in response to the Monitor's requests.  The Monitor's investigation focused on these operative written policies and their application during the relevant time period.  When interviewed, current Union officials had limited knowledge about how investment-related policies may have been applied historically over the past 29 years, and a comprehensive historical review was beyond the scope of this investigation.

[13] The Union has taken the position that the description of the 1996 Resolution as assigning oversight responsibility for the Strike Trust's investments to the Officers of the International Union is overbroad and inconsistent with the function of the Investment Advisory Committee, which took over part of the role of the Officers after it was established.  But the plain language of the 1996 Resolution gives "sole authority" for certain responsibilities over the Strike Trust to the Union Officers.  The fact that the Union's practice differs from its policy does not change the policy's language.  Further, a document prepared by former Director of Investments Alan Karazia during the time period relevant to this investigation lists the "Officers of International Union, UAW" as having "[f]inal authority to make[] all investment decisions."  Outline of Bal Harbour Resolutions dated 2-14-1996 (Dec. 31, 2023).  As noted throughout this Report, the Union's articulation of roles and responsibilities concerning its investments is confusing and contradictory, and the Monitor has recommended, and the Union has agreed to, steps to revise its policies so the roles and responsibilities are clarified, as explained further below.

[14] Article 10, Section 1 of the UAW Constitution identifies the President, Secretary-Treasurer, and Vice Presidents as the Officers of the International Union, and separately provides for the election of "such International Executive Board Members as provided in Section 21" (*i.e.*, the Regional Directors).  The Constitution distinguishes the "International Officers" from "International Executive Board Members" (the Regional Directors) throughout.  *See, e.g.*, UAW Const., art. 30, §§ 1, 4, 15; art. 9; art. 11, §§ 10, 13.  The UAW's own website confirms that the five Officers of the UAW are "the president, secretary-treasurer and three vice presidents."  *International Executive Board*, UAW, https://uaw.org/executive-board/ (last accessed Apr. 30, 2026).  The UAW's Education Department publication on "UAW Basics" similarly states that "[t]he International Executive Board (IEB) consists of five officers (President, Secretary-Treasurer, and three Vice-Presidents) and nine Regional Directors."  UAW Basics (Pub. #515, rev. Mar. 2023), at 12, available at https://uaw.org/wp-content/uploads/2023/12/515-UAW-Basics-2023v4.pdf.  Every witness asked about the meaning of "Officers" confirmed that the term refers to the President, Secretary-Treasurer, and Vice Presidents.

[15] IEB Meeting Minutes (Feb. 14, 1996).

11

are collectively responsible for "provid[ing] investment guidelines or other instructions to" outside consultants and professionals providing financial services to the Union[16] and making "periodic reports to the IEB regarding the assets of the Strike Fund, the management of such assets, and the investment performance of such assets."[17]  Despite this articulation of responsibilities, in practice, most IEB members interviewed by the Monitor were unfamiliar with the 1996 Resolution during the Monitor's investigation,[18] and the Union Officers held no meetings outside of the regularly scheduled IEB meetings during the relevant time period of this investigation.[19]

**2008 Resolution.**   In October 2008, the IEB adopted a further resolution ("2008 Resolution") to address the fact that "certain adjustments will be needed from time to time to re-balance the portfolio to bring it back into line with the asset allocation guidelines as described in the Investment Policy Statement."[20]  The 2008 Resolution provided that "[t]he International Secretary-Treasurer is authorized to take such actions as are necessary to re-balance the portfolio in order to maintain compliance with the asset allocation guidelines as set forth in the Investment Policy Statement, provided that any such action must be determined by the Secretary-Treasurer to be in the best interest of the Strike Trust and be taken only in accordance with the recommendations by Segal Advisors, Inc. (or such future investment consultant as may be retained to provide similar

---

[16] 1996 Bal Harbour Resolution, ¶ 6.
[17] 1996 Bal Harbour Resolution, ¶ 7.  The 1996 Bal Harbour Resolution uses the term "Strike Fund" to refer to the Strike Trust.
[18] *See* M. Mock Interview (July 29, 2025); R. Boyer Interview (July 23, 2025).
[19] S. Fain Interview (Oct. 10, 2025).
[20] Resolution of the Officers of the International Union, UAW Relative to the Allocation of Investments in the International Union, UAW Strike Trust (Oct. 15, 2008) ("2008 Resolution").

advice in the future.)."[21]  Upon rebalancing, the Secretary-Treasurer must then provide "prompt notice" to the President and other Officers.[22]

**Investment Policy.**  On December 1, 2015, the Union Officers adopted a new Investment Policy Statement for the Strike Trust ("Investment Policy"), pursuant to the authority delegated to them under the 1996 Resolution.[23]  The Investment Policy requires that equity securities (*e.g.*, stocks) should make up between 22% and 38% of the total portfolio (with a target of 30%), with specified percentage ranges for domestic equities and international equities.[24]  The Policy also calls for specified ranges and targets for alternative investments (*e.g.*, hedge funds), and fixed income (*e.g.*, bonds).[25]

---

[21] 2008 Resolution, ¶ 1.  The Union has taken the position that the 2008 Resolution does not allow for the Secretary-Treasurer to disregard the target asset allocations set forth in the Investment Policy and was designed to further enable compliance with the asset allocations targets.  Although it is true that the purpose of authorization to rebalance is "to maintain compliance with the asset allocation guidelines as set forth in the Investment Policy Statement," 2008 Resolution, ¶ 1, the language of the resolution clearly states that the Secretary-Treasurer may not unilaterally rebalance; instead, any action must be "in the best interest of the Strike Trust" and "taken only in accordance with the recommendations by [the investment consultant] Segal Advisors, Inc."  *Id.*  Again, as noted below, the Monitor has recommended that the Union takes steps to clarify roles and responsibilities over investments, given the patchwork of overlapping and often contradictory policies and practices currently in place.

[22] 2008 Resolution, ¶ 3.

[23] Resolution of the Officers of the International Union, UAW for the Purpose of Adopting an Investment Policy With Respect to the Assets of the UAW Strike Trust (Dec. 1, 2015) ("2015 Investment Policy Statement").

[24] 2015 Investment Policy Statement, at 6.

[25] The Union has requested that the Monitor remove all references in this Report to the targets and ranges in the Investment Policy, as well as to the particular amounts of investments referenced in the Report.  The Union has expressed a concern that disclosing such information could be advantageous to employers during collective bargaining, but has also indicated that this concern is not sufficiently significant so as to rise to the level of an objection to disclosing that information pursuant to a colorable privilege claim implicating the Consent Decree and the Court's December 16, 2024 Order.  Consent Decree Enforcement Order, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (Dec. 16, 2024), Civil No. 20-cv-13293, ECF No. 150.  It is also not seeking to designate this information as "confidential" as it is also entitled to do under the Consent Decree.  *See* Consent Decree ¶¶ 53, 57.  The Monitor has retained the equity allocation targets and ranges, which are directly relevant to the findings herein, as well as certain other information that is publicly available and/or otherwise necessary for the Report's coherence, but has omitted other information, such as the Union's alternatives and fixed income targets and ranges, in light of the Union's request.

13

The Investment Policy provides that "the UAW will review this Policy periodically, and whenever a major change is apparent or necessary" and that "[o]ngoing rebalancing of the portfolio and adherence to the above asset allocation ranges will be coordinated by the UAW, working with the Investment Consultant."[26]  The Union's Investment Consultant has been Segal Marco Advisors ("Segal Marco") since 2004.[27]

Under the Investment Policy, the Secretary-Treasurer's Office coordinates the "day to day investment related activities."[28]  Consistent with that responsibility, the UAW staff role of Director of Investments—who coordinates with the Union's investment consultant, oversees implementation of investment decisions, and assists in the preparation of investment resolutions—sits within the Secretary-Treasurer's Office.[29]

**Investment Advisory Committee.**  The Investment Advisory Committee—which throughout 2023 until November 2024 was chaired by Secretary-Treasurer Mock and included Vice Presidents Chuck Browning and Rich Boyer, and Regional Director Steve Dawes—serves as a subcommittee of the IEB that receives information about and makes recommendations to the IEB about the Union's investments, though it has no official charter or formal grant of authority. In November 2024, President Fain changed the composition of the Investment Advisory Committee to make then-Regional Director Dickerson Chair and replaced Browning, Boyer, and

---

[26] 2015 Investment Policy Statement, at 6, 9.

[27] 2015 Investment Policy Statement, at 1; *see* United Auto Workers Strike Trust Analysis of Investment Performance (Dec. 31, 2024), at 64 ("4Q 2024 Segal Marco Report").  Segal Marco Advisors was formerly known as "Segal Rogerscasey, Inc." and "Segal Advisors, Inc."

[28] 2015 Investment Policy Statement, at 3.

[29] Executive Administrative Assistant Job Description (Sept. 2024), at 2; Outline of Bal Harbour Resolutions dated 2-14-1996 (Dec. 31, 2023); Secretary-Treasurer Organizational Chart (June 8, 2023).

Dawes with Regional Directors Brandon Mancilla, Mike Miller, and Daniel Vicente.[30]   The

Secretary-Treasurer remained on the Committee in a reduced role.

**Outside Consultants.**   As the 1996 and 2008 Resolutions and the 2015 Investment Policy

contemplate, the UAW has relied, and still relies extensively, on outside consultants for support

relating to investment issues.   As noted above, Segal Marco serves as the Union's investment

consultant, who, under the 2008 Resolution and 2015 Investment Policy, is responsible for making

recommendations to the Secretary-Treasurer on rebalancing the portfolio.[31]   The UAW's funds are

invested with various investment managers, coordinated through the UAW's custodian State Street

Global Advisors ("State Street"), who have responsibility for "reviewing [the policy] guidelines

on an ongoing basis to assure that they remain in compliance."[32]   Both Segal Marco and State

Street provide the Secretary-Treasurer's Office with regular reports on the Strike Trust's

investments.[33]   As discussed below, Segal Marco's reports were provided to the Secretary-

Treasurer's Office each quarter and to the Investment Advisory Committee when it met.   State

Street's more detailed custodial reports were provided to the Secretary-Treasurer's Office on a

monthly basis but were not regularly distributed beyond the Secretary-Treasurer's Office during

the relevant period.[34]

### B. The Union Liquidated the Equity Portfolio and Suspended the Investment Policy (August 2023)

In summer 2023, it became clear that the UAW might need to tap the Strike and Defense

Fund to ensure sufficient cash was available to provide benefits to members in anticipation of

---

[30] Email from D. Wallace on behalf of S. Fain to IEB (Nov. 8, 2024); Standing Committees of the International Executive Board (Nov. 8, 2024).
[31] 2008 Resolution, ¶ 1; 2015 Investment Policy Statement, at 6.
[32] 2015 Investment Policy Statement, at 3.
[33] 2015 Investment Policy Statement, at 8; *see, e.g.*, 4Q 2024 Segal Marco Report; State Street Working Trial Balance – Composite (Oct. 31, 2024).
[34] *See, e.g.*, Email from State Street to T. Brien (Apr. 3, 2024).

potential strikes against one or more of the Big Three automakers.[35] The Union's then-Director of Investments, Alan Karazia, working in the Secretary-Treasurer's Office, discussed the possibility of liquidating UAW investments with the Secretary-Treasurer's then-Executive Administrative Assistant, Todd Brien, and with the Union's outside investment consultant at Segal Marco ("Segal Marco Consultant" or "Consultant").[36] Given the potential breadth of the strikes, the Segal Marco Consultant[37] recommended that the Investment Policy be suspended, and that all equity securities in the Strike Trust be liquidated to cash.[38]

In full accordance with the UAW policies and practices described above, Secretary-Treasurer Mock proceeded to obtain approval from the Union's Investment Advisory Committee for a recommended course of action before presenting Segal Marco's proposal to the full IEB. On August 18, 2023, then-Director of Investments Karazia, on behalf of Mock, emailed the Investment Advisory Committee seeking their approval for the Union to: (1) suspend the Investment Policy Statement until Big Three contracts were ratified, (2) liquidate 100% of Strike Trust equities, (3) liquidate additional fixed income if needed, and (4) reinvest any remaining money after ratification in accordance with the Investment Policy Statement.[39] The Investment Advisory Committee unanimously approved the proposal by email the same day.[40]

---

[35] Email from A. Karazia to Segal Marco Consultant (May 10, 2023).

[36] A. Karazia Interview (Feb. 7, 2025); A. Karazia Interview (Nov. 12, 2025); Email from A. Karazia to K. Geromin (Aug. 16, 2023); Calendar Invite from A. Karazia to T. Brien (Aug. 18, 2023).

[37] References to the Segal Marco Consultant in this Report generally refer to the investment consultant at Segal Marco Advisors who was assigned to the Union's account. That individual has since retired, but was interviewed by the Monitor in connection with this investigation.

[38] M. Mock Interview (July 29, 2025); Segal Marco Consultant Interview (Feb. 7, 2025); Segal Marco Consultant Interview (Oct. 17, 2025).

[39] Email from A. Karazia to M. Mock, C. Browning, R. Boyer, and S. Dawes (Aug. 18, 2023).

[40] Emails from S. Dawes, R. Boyer, and C. Browning to A. Karazia (Aug. 18, 2023); Email from M. Mock to A. Karazia (Aug. 18, 2023).

Secretary-Treasurer Mock also notified President Fain.  On August 19, 2023, the day after the Investment Advisory Committee approved the proposal, Mock texted Fain the proposal language, who then shared it with then-Chief of Staff Chris Brooks and others.[41]  On August 22, 2023, Mock again texted Fain that she was being advised the Union needed to act that day, when the market was favorable.[42]

That same day, Secretary-Treasurer Mock emailed the full IEB for approval.  The email stated in relevant part:

> You are being asked to vote yes (aye) or no (nay) on the following.  We ask that you respond by 3 p.m. today as this is an urgent matter.
>
> The Secretary-Treasurer will need to liquidate investments in the Strike Trust to fund the potential strike payments.  The Secretary-Treasurer has been advised by Segal Marco Advisors to liquidate all equities in the Strike Trust which will raise approximately $340 million.  If additional money is needed, the Secretary-Treasurer has been advised by Segal Marco Advisors to liquidate the necessary amount from the fixed income portfolio. . . .
>
> The Investment Advisory Committee approved the actions below on Friday, August 18, 2023, and is recommending the International Executive Board also approve.
>
> Your approval is needed on the following actions:
>
> 1.  Suspend the Investment Policy Statement for the Strike Trust until the contracts for Ford, GM and Stellantis have been ratified.  This suspension will allow the Secretary-Treasurer to liquidate investments as recommended by Segal Marco Advisors without violating the Investment Policy Statement.
>
> 2.  Liquidate 100% of the equity position in the Strike Trust as soon as reasonably possible.
>
> 3.  If additional money is needed beyond liquidating the equity portfolio, liquidate the necessary amount from the fixed income portfolio.

---

[41] Text Message between M. Mock and S. Fain (Aug. 19, 2023); Text Message among S. Fain, C. Brooks, B. Dictor, and T. Lamadrid (Aug. 19, 2023).
[42] Text Message between M. Mock and S. Fain (Aug. 22, 2023).

4. Any money remaining after the contracts are ratified will be reinvested in the Strike Trust in accordance with the Investment Policy Statement.[43]

By August 23, 2023, every member of the IEB had voted in favor of the proposal.[44]

Following the vote, then-Director of Investments Karazia informed the Segal Marco Consultant that the Board had approved the suspension of the Investment Policy and that the Union would proceed with the liquidation,[45] and instructed State Street to liquidate $335 million in equity securities then held in the Strike Trust.[46] As a result, the Strike Trust's equity allocation dropped to 0%, placing it below the Investment Policy's target range of at least 22%.

### C. The Union's Investment Professionals Discussed Reinvestment Strategy (October to November 2023)

Before the Big Three contracts were ratified, the Union's investment professionals discussed the potential for reinvestment following the anticipated conclusion of the strike. The Segal Marco Consultant told the Monitor that during these discussions he recommended that the Investment Policy's asset allocations be adjusted to account for current conditions, although

---

[43] Email from A. Townsel on behalf of M. Mock to S. Fain, M. Booth, R. Boyer, C. Browning, B. Campbell, S. Dawes, L. Dickerson, L. English, D. Green, B. Mancilla, M. Miller, T. Smith, and D. Vicente (Aug. 22, 2023).

[44] Email from A. Townsel on behalf of M. Mock to S. Fain, M. Booth, R. Boyer, C. Browning, B. Campbell, S. Dawes, L. Dickerson, L. English, D. Green, B. Mancilla, M. Miller, T. Smith, and D. Vicente (Aug. 23, 2023).

[45] Email from A. Karazia to Segal Marco Consultant (Aug. 22, 2023). The Segal Marco Consultant responded, "Sounds good. I will be readily available during this time as events unfold." Email from Segal Marco Consultant to A. Karazia (Aug. 22, 2023).

[46] Email from T. Stankoff to State Street (Aug. 22, 2023); Email from State Street to T. Stankoff and A. Karazia (Aug. 29, 2023). The sale realized a significant gain. Under the UAW's Constitution and accounting rules, $188 million of this gain was allocated to the General Fund for operating use, while the remaining amount (representing the original cost basis) remained in the Strike and Defense Fund. K. Geromin Interview (June 16, 2025); UAW Const. art. 16, § 11(c). Although these amounts were denominated separately for internal accounting purposes, they were technically held together in the Union's "liquidity account."

18

neither then-Director of Investments Karazia nor then-Executive Administrative Assistant Brien remembered the Consultant providing this recommendation.

On October 25, 2023, the Segal Marco Consultant wrote to then-Director of Investments Karazia and then-Executive Administrative Assistant Brien, stating that "given that the Strike Trust (ST) IP [Investment Policy] is suspended until resolution of the strike, I want to keep you informed" of the gradual wind-down of several alternative investments.[47] He added, "If and when [the strike is] resolved, at that point, we will assess [where] we are, then reinstate the IP with appropriate adjustments as required."[48] When asked what he meant by "appropriate adjustments," the Segal Marco Consultant told the Monitor that he believed the Investment Policy would need revised asset allocations following the strikes.[49]

The Consultant told the Monitor that he understood the Union needed to ratify any decision to revise the Investment Policy, but that, based on his experience with the UAW, he believed there would be no issue with his recommendation because he said that the asset allocations had previously been revised multiple times at his suggestion.[50] Segal Marco's quarterly investment reports include a log of each of the changes to the asset allocations of the Union's funds going back to 1973, with about a dozen of these occurring while the Segal Marco Consultant worked with the Union.[51] Although the Segal Marco Consultant told the Monitor that each of these changes was enacted by an IEB resolution proposed by the Director of Investments at the time,[52]

---

[47] Email from Segal Marco Consultant to A. Karazia and T. Brien (Oct. 25, 2023).
[48] Email from Segal Marco Consultant to A. Karazia and T. Brien (Oct. 25, 2023).
[49] Segal Marco Consultant Interview (Oct. 17, 2025).
[50] Segal Marco Consultant Interview (Oct. 17, 2025).
[51] *See, e.g.*, 4Q 2024 Segal Marco Report at 19; *see also* A. Karazia Interview (Nov. 12, 2025).
[52] Segal Marco Consultant Interview (Nov. 17, 2025); Segal Marco Consultant Interview (Oct. 17, 2025).

neither the Union nor Segal Marco provided documentation that all of these policy changes were approved by the IEB.[53]

In the two weeks following his October 25, 2023 email, the Consultant repeatedly raised the issue of reinvesting the remaining liquidated assets, but staff at the Union put him off.  On November 1, 2023, he wrote to then-Director of Investments Karazia, "I am assuming that at least a portion of the previously liquidated equity assets will be redeployed to equity."[54]  He also returned to the issue regarding the investment targets, stating, "We will need to review the asset allocation targets."[55]  Eight days later, on November 9, 2023, the Consultant wrote: "What about reallocating the Strike Trust cash assets back to equity?  We should discuss that."[56]  Karazia responded that the Union would not reinvest the money until all the contracts were ratified, that the final strike costs would not be known until December, and that "there is talk of paying off the VEBA loan note with the money.  . . . There is a board meeting at the end of November to discuss all this so maybe we can discuss at the beginning of December."[57]

Although the Monitor was unable to obtain any written evidence that the Segal Marco Consultant provided the Union with specific new asset allocation target percentages, he told the Monitor that he recommended that the Union amend the Policy to establish a lower risk profile, targeting a materially lower percentage for total "risk" assets (equities and alternative investments

---

[53] Segal Marco produced some documentation of policy changes that did not fully match the changes listed in their reports, and the Union provided documentation of the 2015 Investment Policy change and the August 2023 Policy suspension, but did not produce documentation of any other change listed on the Segal Marco reports.

[54] Email from Segal Marco Consultant to A. Karazia (Nov. 1, 2023).

[55] Email from Segal Marco Consultant to A. Karazia (Nov. 1, 2023).  Notwithstanding the emails described in this Report, the Union has taken the position that there is no documentary evidence that the Segal Marco Consultant proposed changes to the Union's Investment Policy.

[56] Email from Segal Marco Consultant to A. Karazia (Nov. 9, 2023).

[57] Email from A. Karazia to Segal Marco Consultant (Nov. 9, 2023).  The Segal Marco Consultant responded, "Ok.  Sounds good."  Email from Segal Marco Consultant to A. Karazia (Nov. 9, 2023).

combined), instead of the Policy's comparably higher target.[58]  He said that he recommended these adjustments because conditions had changed: the new UAW Administration was more likely to strike, increasing the likelihood that assets would need to be sold to fund those strikes, and rising interest rates had increased returns on fixed income assets, decreasing the appeal of riskier equity securities.[59]

The Segal Marco Consultant said that he discussed these revisions of the Investment Policy allocations with then-Executive Administrative Assistant Brien, who agreed it should be changed.[60]  Brien told the Monitor that he did not recall these discussions with the Consultant.[61] The Consultant said that he did not discuss these issues with Secretary-Treasurer Mock, and the Monitor found no documents or other evidence that Secretary-Treasurer Mock participated in or was aware of any such discussions.

Further, as part of his regular quarterly reports about the Union's investment portfolio, the Segal Marco Consultant repeatedly indicated in his email to the Union that he would follow the Investment Policy and work to rebalance the portfolio.  For example, on November 3, 2023, the Segal Marco Consultant sent the quarterly report for the third quarter of 2023 to Secretary-Treasurer Mock, then-Executive Administrative Assistant Brien, and then-Director of Investments Karazia.  In the corresponding cover email, the Consultant wrote, "We will continue to re-balance and stay disciplined, following [the Strike] Trust[] Investment Policy.  Note that the S[trike] T[rust] asset allocations deviated from the Investment Policy as we prepared for the Strike.  We will work with you to rebalance that portfolio once the Strike is completely resolved."[62]  The first sentence

---

[58] Segal Marco Consultant Interview (Oct. 17, 2025); Segal Marco Consultant Interview (Nov. 17, 2025).
[59] Segal Marco Consultant Interview (Oct. 17, 2025).
[60] Segal Marco Consultant Interview (Oct. 17, 2025).
[61] T. Brien Interview (Oct. 14, 2025).
[62] Email from Segal Marco Consultant to M. Mock, T. Brien, and A. Karazia (Nov. 3, 2023).

quoted above, regarding "re-balanc[ing] and stay[ing] disciplined," was included in cover emails accompanying the Segal Marco quarterly investment reports for every quarter since at least the fourth quarter 2022.[63]

### D. The IEB Directed That $74 Million Be Used to Pay Off Debt Rather Than Be Reinvested (November to December 2023)

The Union ratified the last of the Big Three contracts as of November 20, 2023.[64] Approximately a week later, from November 28-30, 2023, the IEB met and discussed the Union's finances, including $188 million in realized gains from the sale of the Union's equity securities.[65] Although the IEB had voted in August 2023 that "any money remaining after the contracts are ratified" would be "reinvested in the Strike Trust in accordance with the Investment Policy," as noted above, at the November 2023 IEB meeting, the Board did not discuss the Investment Policy

---

[63] Email from Segal Marco Consultant to M. Mock, T. Brien, and A. Karazia (Jan. 31, 2023) ("In any market scenario, we will remain disciplined to the Investment Policy and rebalance portfolios as necessary."); Email from Segal Marco Consultant to M. Mock, T. Brien, and A. Karazia (May 2, 2023) ("We will continue to re-balance and stay disciplined, following the Trust's Investment Policy."); Email from Segal Marco Consultant to M. Mock, T. Brien, and A. Karazia (Aug. 3, 2023) ("We will continue to re-balance and stay disciplined, following the Trust's Investment Policies."); Email from Segal Marco Consultant to M. Mock, T. Brien, and A. Karazia (Feb. 1, 2024) ("We will continue to re-balance and stay disciplined, following each Trust's Investment Policy."); Email from Segal Marco Consultant to M. Mock, T. Brien, and A. Karazia (May 1, 2024) ("We will continue to re-balance and stay disciplined, following each Trust's Investment Policy."); Email from Segal Marco Consultant to M. Mock and T. Brien (Aug. 1, 2024) ("As always, we will remain disciplined to our Investment Policies and rebalancing will serve as an effective risk control mechanism."); Email from Segal Marco Consultant to M. Mock and T. Brien (Nov. 4, 2024) ("As always, we will remain disciplined to our Investment Policies and rebalancing will serve as an effective risk control mechanism."); Email from Segal Marco Consultant to M. Mock and M. Richardson (Jan. 31, 2025) ("We will continue to re-balance and stay disciplined, following the Trust's Investment Policies.").

[64] S. Fain Interview (Oct. 10, 2025).

[65] IEB Meeting Minutes (Nov. 28, 2023); UAW Finances Nov. 2023 IEB presentation.  Per the UAW Constitution, Article 16, section 11(c), the "interest and earnings" on investments received by the Strike and Defense Fund—which includes realized gains from sales of the Union's investments—are allocated to the General Fund for operational use, or "to such other purpose as the International Executive Board shall determine to be in the best interests of the UAW."

allocations, compliance with its provisions, or the reinvestment of the previously liquidated securities.

Instead, the IEB took actions that deviated from its earlier dictate that all of the remaining funds should be reinvested in accordance with the Investment Policy by directing that $74 million of the realized gains be used to pay off a loan held by Voluntary Employees' Beneficiary Association ("VEBA Note"), without reference to what to do with the remainder of the realized gains.[66]  Former Chief Accountant Kim Geromin presented options for utilizing the remaining liquidated assets, including reallocating them to the Strike and Defense Fund or leaving the money in the operating funds, which she described as the Union's "checking account."[67]  President Fain, however, supported Geromin's third recommendation to pay off the VEBA Note, stating, "I don't see the benefit of allocating money to the Strike [and Defense] Fund right now.  . . . There's no point in making that move."[68]  Vice President Browning urged caution and said the Board should

---

[66] The Union has objected to the characterization that the IEB's actions in November 2023 had the effect of superseding its August 2023 vote, asserting that the November 2023 vote did not nullify or rescind its earlier vote, nor concern investment allocations or the Investment Policy Statement.  The Union has also taken the position that the view of multiple witnesses interpreting the IEB's November 2023 vote as effectively abandoning its prior decision is irrelevant to whether the Investment Policy's asset allocation requirements were in fact still in place.  But, the Union's interpretation of the IEB vote in November 2023 events does not change the facts reported here: that the IEB's decision to use a portion of the remaining funds for something other than reinvestment was in fact a deviation of its prior directive that all of the liquidated funds be reinvested, and that it caused multiple staff members and the Union's outside consultant to conclude that the prior decision had been effectively abandoned, as they stated in interviews with the Monitor.  That understanding in turn impacted later reinvestment activities and the timeline by which those activities were undertaken.  Further, documentary evidence also reflects that the IEB's vote in November 2023 was a factor in the Union's failure to reinvest the remaining funds until June 2025. *See infra* Section I.E.  Moreover, the Union's characterization of the VEBA payment as "a *fraction* of the remaining cash" understates the significance of the IEB's action, as the $74 million payment represented a substantial portion of the funds available for reinvestment.  Email from D. Siewniak to T. Stankoff, A. Karazia, L. Scott, K. Geromin, and M. F. Sobczynski (Dec. 12, 2023); Email from D. Siewniak to K. Geromin (Dec. 14, 2023).
[67] IEB Meeting Minutes (Nov. 28, 2023).
[68] IEB Meeting Minutes (Nov. 28, 2023).

23

take more time to consider the issue, but no one else spoke against the approach.[69]  The motion passed unanimously.[70]

Multiple individuals told the Monitor that they interpreted the IEB's November 2023 vote as effectively abandoning its prior decision that all remaining liquidated funds should be reinvested, but that the IEB did so without giving new direction as to what should be done with the remaining cash balance.  For example, former Executive Administrative Assistant Brien told the Monitor that "we all thought that" the IEB was no longer saying to reinvest the remaining funds because they used the funds for another purpose.[71]  In turn, former Director of Investments Karazia told the Monitor that, based on his conversations with Brien, he understood that "the decision to pay the loan off superseded the original direction to liquidate, use [the] money for [the] strike and expenses, and return what was left over into investments," although he also said that he "assumed" the Investment Policy was back in place by February 2024.[72]  Secretary-Treasurer Mock agreed: "If we did a Board poll, and then we had a meeting after to do something different, that first direction was null and void because that second direction superseded that."[73]  The Segal Marco Consultant similarly told the Monitor that the Board's decision to pay off the VEBA Note

---

[69] IEB Meeting Minutes (Nov. 28, 2023).
[70] IEB Meeting Minutes (Nov. 28, 2023).
[71] T. Brien Interview (Nov. 10, 2025).
[72] A. Karazia Interview (Nov. 12, 2025).  The Union has taken the position that former Director of Investments Karazia used the word "superseded" in the sense that a fraction of the cash-on-hand should be directed to one particular debt, but not in the sense that the IEB had abandoned or rescinded or otherwise jettisoned its earlier vote in its entirety.  Yet, in his interview with the Monitor, Karazia discussed the total amount of funds remaining after strike expenses were paid, not just the $74 million allocated to the VEBA Note.  He stated that he thought "when the strike was ratified, we'd identify the money needed for strike and expenses, and soon after that we'd reinvest the money and reinstate the Investment Policy," and that the IEB's decision to pay off the VEBA Note modified this understanding.  A. Karazia Interview (Nov. 12, 2025).  Further, this characterization is consistent with the fact that Karazia received his information through former Executive Administrative Assistant Brien, and Brien believed the IEB's prior directive had been changed.  *See* T. Brien Interview (Nov. 10, 2025).
[73] M. Mock Interview (Nov. 21, 2025).

contributed to his understanding that the Investment Policy had not yet been reinstituted and was still suspended.[74]

In mid-December 2023, the UAW applied $74 million in cash to pay off the VEBA Note.[75] The remaining approximately $101 million in cash remained allocated to the General Fund and was invested in cash equivalent short-term instruments, earning a return of 5.2% in 2024.[76]

**E.** **The Union Continued to Maintain a Large Cash Balance and Union Officials Reinvested a Portion of It (January to November 2024)**

By early 2024, various Union officials responsible for the Union's finances communicated that the Union was still holding the remaining liquidated funds in cash:[77]

- In a January 4, 2024 email, then-Director of Investments Karazia confirmed to the Segal Marco Consultant that the Union was still holding off on returning to compliance with the Investment Policy, stating that there was

---

[74] Segal Marco Consultant Interview (Nov. 17, 2025). The Segal Marco Consultant's awareness of broader compliance matters is reflected in other communications with the Union during this period. For example, on December 20, 2023, after Segal Marco informed then-Director of Investments Karazia and then-Executive Administrative Assistant Brien about the pending sale of four alternative investment partnerships, the Consultant requested written authorization (as opposed to just oral approval) from the UAW to effectuate alternative partnership transactions, citing "today's environment of hyper focus on compliance." Email from Segal Marco Consultant to A. Karazia and T. Brien (Dec. 14, 2023); Email from Segal Marco Consultant to A. Karazia (Dec. 20, 2023). Karazia provided the requested authorization the same day. Email from A. Karazia to Segal Marco Consultant (Dec. 20, 2023).

[75] Email from D. Siewniak to T. Stankoff, A. Karazia, L. Scott, K. Geromin, M. F. Sobczynski (Dec. 12, 2023); Email from D. Siewniak to K. Geromin (Dec. 14, 2023); K. Geromin Interview (June 16, 2025).

[76] 4Q 2024 Segal Marco Report, at 13.

[77] The Union requested that the Monitor remove discussion of other Union personnel's awareness of the cash balance in the Strike Trust because mere awareness of a high cash balance does not in itself constitute notice of a compliance problem and because the Secretary-Treasurer's Office could have been phasing in compliance through tranches. The Union has also asserted that in late 2023 and early 2024, there was supposed to be a high cash balance, and the compliance problem arose throughout the remainder of 2024. The Monitor agrees that a high cash balance does not, on its own, signal a compliance problem. Like the other Union personnel listed here, Secretary-Treasurer Mock, too, was aware of the high cash balance but that alone did not put her on notice of a compliance issue for the reasons noted. In addition, the President's Office alleged that the remaining funds should have been reinvested immediately upon ratification of the Big Three contracts in November 2023, yet President Fain himself was notified in March 2024 that the "large amount of cash" from the liquidation of the Strike Trust was still "sitting" in cash. The Monitor includes evidence of other officials' contemporaneous awareness of the cash balance because it demonstrates that during the period when the President's Office claims reinvestment should have occurred, multiple Union officials, including President Fain, were made aware that the liquidated funds had not yet been reinvested. This evidence undermines the President's Office's claim that the failure to reinvest during this period was the product of "unilateral" action by the Secretary-Treasurer.

25

"[n]o decision yet on the reinvestment of the remaining strike liquidation proceeds," confirming they were still "assessing and evaluating the ST future liquidity needs."[78] Karazia did not recall raising these issues with Secretary-Treasurer Mock, but then-Executive Administrative Assistant Brien recalled discussing the "big pot of money" with Mock "several times."[79]

- Secretary-Treasurer Mock and President Fain were also informed that the Union held a large amount of funds in cash. In late January 2024, then-Chief Accountant Geromin highlighted the Union's large cash balance in her monthly financial report to Fain and Mock for December: "Investment income was just over $8 million for December, which is significantly higher than normal. We still have approximately $160 million in our strike trust liquidity account which is invested in short-term instruments that are generating strong returns."[80] Mock responded, confirming that she had "read it thoroughly."[81] In an interview with the Monitor, Mock said she was surprised at this time there were still funds leftover from the strike, as they had anticipated using all the funds for the strikes. She did not recall discussions about reinvesting the funds at this time.[82] Fain did not remember this email specifically, but said he "probably read" it but likely "stopped at a certain point."[83]

- In March 2024, then-Chief Accountant Geromin again sent an email to President Fain and Secretary-Treasurer Mock alerting them that there was still "a large amount of cash sitting in our liquidity account from the securities we sold in August to prepare for a Big 3 strike."[84] Geromin did not mention the cash balance in her reports after March 2024.[85]

**The February 2024 Investment Advisory Committee Meeting.** On February 1, 2024, the Segal Marco Consultant sent Secretary-Treasurer Mock, then-Director of Investments Karazia, and then-Executive Administrative Assistant Brien his quarterly "Strike Trust Investment Report," noting in the cover email that the Union's "asset allocations deviated from the Investment Policy

---

[78] Email from A. Karazia to Segal Marco Consultant and T. Brien (Jan. 4, 2024).
[79] T. Brien Interview (Nov. 10, 2025).
[80] Email from K. Geromin to M. Mock, S. Fain, and T. Brien (Jan. 31, 2024).
[81] Email from M. Mock to K. Geromin (Feb. 10, 2024).
[82] M. Mock Interview (July 29, 2025).
[83] S. Fain Interview (Oct. 10, 2025).
[84] Email from K. Geromin to M. Mock, S. Fain, and T. Brien (Mar. 4, 2024).
[85] *See, e.g.*, Email from K. Geromin to M. Mock and S. Fain (June 27, 2024). The Accounting Department fell behind on their monthly financial summaries and did not provide timely reports from July 2024 through September 2024. Email from L. Scott to D. Wallace (Oct. 16, 2024).

as we prepared for the Strike. We will work with you to rebalance that portfolio and review future liquidity."[86] Mock told the Monitor she read this language as signaling that the Consultant was "on top of it" and "doing their job," not that there was a compliance problem requiring her attention.[87]

On February 19, 2024, the Investment Advisory Committee met at Solidarity House.[88] That meeting was attended by Committee members Secretary-Treasurer Mock, Vice President Boyer, Vice President Browning, and Regional Director Dawes, as well as the Segal Marco Consultant, then-Director of Investments Karazia, and then-Executive Administrative Assistant Brien.[89] At the meeting, the Segal Marco Consultant brought copies of the quarterly financial report, which showed that 0% of the Union's investments were in equity securities.[90]

Segal Marco's report did not indicate non-compliance with the Investment Policy; instead, the "target" allocations in the report reflected the Union's current holdings—including a 0% equity allocation—rather than the Investment Policy targets.[91] The Consultant told the Monitor that he was under the impression the Investment Policy was still suspended and would be revised before being reinstated, so these targets reflected his recommendation as to the appropriate allocations at that time.[92] He said that he understood, based on conversations with then-Executive

---

[86] Email from Segal Marco Consultant to M. Mock, T. Brien, and A. Karazia (Feb. 1, 2024). The Segal Marco Consultant's email to Secretary-Treasurer Mock, then-Executive Administrative Assistant Brien, and then-Director of Investments Karazia containing the third quarter 2023 reports also contained similar language. Email from Segal Marco Consultant to M. Mock, T. Brien, and A. Karazia (Nov. 3, 2023).

[87] M. Mock Interview (Nov. 21, 2025).

[88] Email from A. Karazia to R. Boyer, C. Browning, and S. Dawes (Jan. 11, 2024).

[89] Email from A. Karazia to M. Mock, T. Brien, C. Browning, R. Boyer, S. Dawes, and Segal Marco Consultant (Jan. 12, 2024).

[90] Email from Segal Marco Consultant to M. Mock, T. Brien, and A. Karazia (Feb. 1, 2024); United Auto Workers Strike Trust Analysis of Investment Performance (Dec. 31, 2023), at 10 ("4Q 2023 Segal Marco Report").

[91] 4Q 2023 Segal Marco Report, at 10.

[92] Segal Marco Consultant Interview (Oct. 17, 2025). Although the Segal Marco Consultant had been informed by then-Director of Investments Karazia that the Investment Advisory Committee and IEB had "voted to suspend the IPS [Investment Policy Statement] until the contracts with GM, Ford and Stellantis

Administrative Assistant Brien, that the Union was having ongoing conversations about revising the allocations.[93]  When asked, Brien did not recall these conversations with the Consultant.[94]  The Monitor found no evidence that former Director of Investments Karazia or anyone else at the Investment Advisory Committee meeting objected to the target allocations presented by the Consultant.

Under the Union's consulting agreement with Segal Marco and the 2015 Investment Policy, the Segal Marco Consultant had responsibility to evaluate whether investment policies were being carried out and to make recommendations for rebalancing on a quarterly basis.[95]  However, according to the Consultant, because he believed that the Investment Policy remained suspended, as noted above, and would be revised before reinstatement, he did not raise compliance concerns with the Investment Advisory Committee or Secretary-Treasurer during this period.[96]

The Segal Marco Consultant's notes from the Investment Advisory Committee meeting indicate that, notwithstanding the 0% equity allocation target, he made a recommendation to reinvest in tranches: "Recommendations . . . ST – Redeploy assets into SSgA R3000 Index Fund in $50 million increments.  Approximately $150 million in cash – but future cash flow still uncertain,"[97] although this recommendation was not recorded in the meeting's agenda.[98]  There is no evidence that any Investment Advisory Committee members raised the issue of non-compliance with the Investment Policy, nor, as noted above, did the Consultant.[99]  In interviews with the

---

have been ratified," it does not appear that the Consultant received the actual language of the Board Poll. Email from A. Karazia to Segal Marco Consultant (Aug. 22, 2023).

[93] Segal Marco Consultant Interview (Oct. 17, 2025).

[94] T. Brien Interview (Oct. 14, 2025).

[95] Segal Advisors Investment Consulting Agreement (Nov. 11, 2015); 2015 Investment Policy Statement.

[96] Segal Marco Consultant Interview (Oct. 17, 2025).

[97] Segal Marco Consultant Meeting Notes (Feb. 19, 2024).

[98] Investment Advisory Committee Meeting Agenda (Feb. 19, 2024).

[99] The Union has pointed out that the Investment Advisory Committee relies on the Segal Marco Consultant to flag allocation or compliance issues.

28

Monitor, although some Investment Advisory Committee members could recall discussing the investment reports, none of the members could recall discussing the Union's allocation of assets or the Investment Policy.[100]  Further, although the Monitor requested minutes from this meeting from the Union, none were produced, notwithstanding that then-Director of Investments Karazia remembered taking minutes.[101]

Later that day, the Segal Marco Consultant sent an email, titled "Rebalancing," to then-Director of Investments Karazia and then-Executive Administrative Assistant Brien recommending that the Union "redeploy" cash to equities "using 2 or 3 tranches and an initial

---

[100] C. Browning Interview (July 24, 2025); S. Dawes Interview (July 25, 2025); R. Boyer Interview (July 23, 2025).

[101] The Monitor requested production of all Investment Advisory Committee meeting minutes, including from the February 19, 2024 meeting, but the Union has been unable to locate those minutes despite exhaustive searches.  The Union requested that the Monitor state that the Secretary-Treasurer's Office, as the custodian of such documents, has not, to date, produced the meeting minutes, and further stated that the Monitor made the request directly to the Secretary-Treasurer's Office.  The Monitor has not adopted this edit because it does not accurately characterize the course of the Monitor's requests for these documents.  Consistent with his longstanding practice, the Monitor directed his document requests, including his request for all Investment Advisory Committee meeting minutes, to the UAW's General Counsel's office. *See* Letter from Monitor to UAW General Counsel (Mar. 14, 2025).  The General Counsel's office managed the response, and its outside discovery counsel represented on June 11, 2025, that it had completed its production of Investment Advisory Committee meeting minutes, but the February 19, 2024 minutes were not included. *See* Email from Outside Discovery Counsel to Monitor (June 11, 2025).  The Monitor renewed his request after interviewing former Director of Investments Karazia on November 12, 2025, who confirmed he had taken minutes and handwritten notes at the meeting.  Subsequent productions coordinated through the General Counsel's office, including of Karazia's OneDrive files, still did not include the February 2024 minutes.  The Monitor team did eventually communicate directly with staff in the Secretary-Treasurer's Office, but only after the UAW's Associate General Counsel authorized the Monitor team to review potentially relevant hard copy materials that had been pulled from offsite storage and assembled in the Secretary-Treasurer's wing of Solidarity House.  When that initial review did not yield the February 2024 minutes, staff in the Secretary-Treasurer's Office offered to pull additional boxes from offsite storage.  The Union's Associate General Counsel was copied on or initiated all subsequent communications with the Secretary-Treasurer's Office regarding this effort, and the Monitor understood them to be part of the Union's broader search for the minutes—not a separate channel outside the General Counsel's purview. *See, e.g.*, Email from UAW Associate General Counsel to Secretary-Treasurer's Office Staff (Jan. 15, 2026).  On March 27, 2026, a staff member in the Secretary-Treasurer's Office confirmed that his review of those additional materials did not locate any responsive documents, and no one from the General Counsel's office indicated this was anything other than the conclusion of the Union's search.

29

contribution of ~$50 million."[102]  The Consultant told the Monitor that he envisioned two or three tranches of $50 million each, with a tranche reinvested every quarter or two, depending on how other aspects of the portfolio performed.[103]  This email was not forwarded to Secretary-Treasurer Mock or anyone else on the Investment Advisory Committee.

In an interview with the Monitor, the Segal Marco Consultant explained his emailed recommendation, stating that he had advised reinvesting $50 million in equities as a first step toward revised asset allocations.[104]  As noted above, after the strikes, the Segal Marco Consultant said that he believed the Union's total percentage of risk assets (which included equities) should be significantly less than the amount specified under the Investment Policy, and that based on past practice, the Union would accept his recommendations.[105]  A $50 million reinvestment would bring the proportion of risk assets within the range that he recommended.[106]  As noted above, the Monitor found no evidence that the Segal Marco Consultant provided the recommendation regarding reduced risk exposure to the Union in writing.

The Segal Marco Consultant told the Monitor he was not "in a rush to redeploy the assets"[107] and expected that the proportion of alternative assets would decrease and lower the total amount of risk assets, thus allowing the Union to reinvest an additional $50 million and stay within his new recommended range of risk assets for the Strike Trust.[108]  The Consultant also explained that, in February 2024, the Union's future liquidity needs remained unclear, such as how frequently

---

[102] Email from Segal Marco Consultant to T. Brien and A. Karazia (Feb. 19, 2024).
[103] Segal Marco Consultant Interview (Oct. 17, 2025).
[104] Segal Marco Consultant Interview (Oct. 17, 2025).
[105] Segal Marco Consultant Interview (Oct. 17, 2025).
[106] Segal Marco Consultant Interview (Oct. 17, 2025).
[107] Segal Marco Consultant Interview (Nov. 17, 2025).
[108] Segal Marco Consultant Interview (Oct. 17, 2025).  However, the proportion of alternative investments did not decrease significantly through 2024 as the Consultant had anticipated.  1Q 2024 Segal Marco Report, at 10; 4Q 2024 Segal Marco Report, at 10.

the Union would need cash to fund strikes or other expenditures.[109]  The Consultant said that he did not want to recommend reinvesting in equities or other less-liquid assets if the Union would need to access those funds soon, as selling them on short notice could result in losses.  He recalled then-Executive Administrative Assistant Brien telling him that not all strike expenses to local unions had been paid and that there would be increased organizing costs, which led him to be more conservative in reallocating money to equities.[110]

The Segal Marco Consultant's February 19, 2024 notes and email to then-Executive Administrative Assistant Brien and then-Director of Investments Karazia recommended reinvesting in tranches but did not explicitly propose revising the Investment Policy's target allocations.[111]  Although the Consultant stated in interviews that he orally recommended changing the asset allocations, his contemporaneous written communications from this period primarily referred to rebalancing in accordance with the existing Investment Policy.[112]

**The February 2024 Reorganization.**  As detailed in the Monitor's Twelfth Status Report, at the February 20, 2024 IEB meeting—the day after the Investment Advisory Committee meeting—the IEB voted to authorize President Fain to reassign the majority of Secretary-Treasurer Mock's departments.[113]  This reorganization removed then-Director of Investments Karazia, the

---

[109] Segal Marco Consultant Interview (Oct. 17, 2025).

[110] Segal Marco Consultant Interview (Oct. 17, 2025).

[111] Segal Marco Consultant Meeting Notes (Feb. 19, 2024); Email from Segal Marco Consultant to T. Brien and A. Karazia (Feb. 19, 2024).

[112] *See, e.g.*, Email from Segal Marco Consultant to M. Mock, T. Brien, and A. Karazia (Nov. 3, 2023) ("We will work with you to rebalance that portfolio once the Strike is completely resolved."); Email from Segal Marco Consultant to M. Mock, T. Brien, and A. Karazia (Feb. 1, 2024) ("We will work with you to rebalance that portfolio and review future liquidity.").  However, as noted above, the Segal Marco Consultant had sent an email previously in October 2023 noting his recommendation to "reinstate the I[nvestment] P[olicy] with appropriate adjustments as required."  Email from Segal Marco Consultant to A. Karazia (Oct. 25, 2023).

[113] *See generally* Monitor's Twelfth Status Report.  Separately, the Investment Advisory Committee was on the agenda to present at the February 20-22, 2024 IEB meeting, but that presentation did not occur.  IEB Meeting Agenda (Feb. 20-22, 2024); Segal Marco Consultant Interview (Nov. 17, 2025).  The Segal Marco Consultant's slide deck prepared in advance of that meeting, however, indicate that, had the Investment

Union's primary investment expert, from oversight of the Union's investment decisions by transferring him to the President's Office, while control over investments remained in the Secretary-Treasurer's Office.[114] The title of "Director of Investments" passed to then-Executive Administrative Assistant Brien, who by his own account, was ill-equipped for the role.[115] Although Brien had previously held the role of Director of Investments for a year under then-Secretary-Treasurer Ray Curry, he described himself as "not an investment guy" and stated that the reorganization "screwed up [the] whole infrastructure" and created "gaps in communication."[116] Brien explained how he and the other staff felt under-resourced and that requests for additional resources to Mock went unheeded because she did not want to hire someone outside of the Union.[117] In addition to relying on Segal Marco, Brien continued to rely on Karazia's knowledge and judgment. Brien described Karazia as his "internal train[er]" and "advisor" and identified Karazia as his main internal contact after the change in roles.[118]

**The March 2024 Reinvestment of $50 Million.** In late March 2024, then-Executive Administrative Assistant Brien carried out the Segal Marco Consultant's recommendation to invest the first $50 million tranche into equity securities.[119] Brien said he discussed the reinvestment with Secretary-Treasurer Mock beforehand, but said that he never explicitly told her that it was

---

Advisory Committee presented at the February 2024 IEB meeting, the topic would not have included redeploying the Union's large cash position. *See* UAW-Segal Marco IEB Presentation (Feb. 2024).

[114] *See* Email from A. Karazia to M. F. Sobczynski (Apr. 19, 2024).

[115] T. Brien Interview (Oct. 14, 2025).

[116] T. Brien Interview (Oct. 14, 2025).

[117] T. Brien Interview (Oct. 14, 2025). There is evidence that then-Executive Administrative Assistant Brien reached out to former Director of Investments Karazia for advice after he was moved to the President's Office. *See* Email from A. Karazia to T. Brien (Aug. 2, 2024). According to the Segal Marco Consultant, Karazia and Brien informed him that their responsibilities over investments consisted only around 5% of their time. Segal Marco Consultant Interview (Oct. 17, 2025).

[118] T. Brien Interview (Feb. 14, 2025).

[119] Email from T. Stankoff on behalf of T. Brien to K. Geromin, M. Mock, and M. F. Sobczynski (Mar. 26, 2024). Around this time, the Union still had a large cash balance. *See* Email from D. Siewniak to T. Stankoff, A. Karazia, L. Scott, K. Geromin, and M. F. Sobczynski (Apr. 2, 2024).

intended to bring the Union back into compliance with the Investment Policy. Instead, Brien told her, "we have the money, we need to start putting money back in" and that it was "a starting point" for "reinvesting some of our funds."[120] He told the Monitor that he believed the purpose of reinvesting the leftover funds—to comply with the Investment Policy—was "implied."[121]

Despite being copied on the email directing the reinvestment, Secretary-Treasurer Mock told the Monitor she was unaware of the decision until she received a phone call from State Street asking her to confirm the transaction.[122] Mock approved it, but said she got angry at then-Executive Administrative Assistant Brien for "mak[ing] transfers without telling [her]."[123] Mock did not recall any discussion at this time with Brien about being out of compliance with the Investment Policy or plans to reinvest monies into equities over time.[124] Mock said she understood this transaction to be routine portfolio rebalancing, and not as part of bringing the Union into compliance with the Policy.[125] Mock did not notify the other Union Officers of this transaction, as required by the 2008 Resolution.[126]

The $50 million purchase brought the proportion of equity securities to 5%, which was still below the Investment Policy's minimum target of 22%.[127] The reinvestment, however, brought the proportion of risk assets (equity securities and alternative investments) within the risk profile range the Segal Marco Consultant told the Monitor that he had suggested should be the target for a revised policy.[128] The Consultant said that no one from the UAW told him the 2015 Investment

---

[120] T. Brien Interview (Oct. 14, 2025); T. Brien Interview (Nov. 10, 2025).
[121] T. Brien Interview (Nov. 10, 2025).
[122] M. Mock Interview (July 29, 2025).
[123] M. Mock Interview (July 29, 2025).
[124] M. Mock Interview (July 29, 2025).
[125] M. Mock Interview (July 29, 2025).
[126] 2008 Resolution, ¶ 3.
[127] United Auto Workers Strike Trust Analysis of Investment Performance (June 30, 2024), at 10 ("2Q 2024 Segal Marco Report"); 2015 Investment Policy Statement, at 6.
[128] Segal Marco Consultant Interview (Oct. 17, 2025).

Policy had been reinstated and that he believed it was "understood" the Investment Policy would be revised consistent with his recommendations.[129]

**No Changes to the Union's Investments (April 2024 to November 2024).**  No further reallocations into equities were made following the March 2024 reinvestment.  During this period, Segal Marco continued to send quarterly investment reports to Secretary-Treasurer Mock and then-Executive Administrative Assistant Brien showing "target" allocations that differed from the 22% to 38% equity target in the Investment Policy.  On their face, these reports did not suggest a deviation from the Investment Policy because the Segal Marco Consultant told the Monitor that he had revised the allocation "targets" to reflect his view of what the targets should be based on his recommendations.  In other words, to appreciate a discrepancy with the Investment Policy, someone reviewing the reports would have had to notice that the targets stated in the reports differed from the targets in the Policy:

- **May 1, 2024:** Segal Marco sent the first quarter 2024 report, which showed an equity target allocation of 0% and a cash allocation target of 16%.  The Union's actual allocations generally aligned with these stated targets, showing 0% in equities and 17.5%, or $174 million, in cash.[130]

- **August 1, 2024:** Segal Marco sent the second quarter 2024 report, which showed that equity securities represented 5.1% of the Strike Trust's assets and the target allocation had been changed to 5%.  The report also showed that the Strike Trust held approximately $128 million, or 12.6%, in cash, with a target of 14%.[131]

- **November 4, 2024:** Segal Marco sent the third quarter 2024 report, which continued to show target allocations of 5% for equities and 14% for cash, generally aligning with the Union's actual holdings of 5.3% equities and 11.0%, or $112.7 million, cash.[132]

---

[129] Email from A. Karazia to Segal Marco Consultant (Aug. 22, 2023); Segal Marco Consultant Interview (Oct. 17, 2025).
[130] 1Q 2024 Segal Marco Report, at 10.
[131] 2Q 2024 Segal Marco Report, at 10.
[132] United Auto Workers Strike Trust Analysis of Investment Performance (Sept. 30, 2024), at 10 ("3Q 2024 Segal Marco Report").

In the cover emails of each report, the Segal Marco Consultant consistently highlighted the Trust's positive performance and returns, providing no signal that any corrective action was necessary,[133] and included statements that were typically included in his emails, that Segal Marco "will continue to re-balance and stay disciplined, following [the Strike] Trust's Investment Policy" and "[a]s always, we will remain disciplined to our Investment Policies and rebalancing will serve as an effective risk control mechanism."[134]

The Investment Advisory Committee has historically met before each quarterly IEB meeting; however, when the IEB met for their second quarter meeting in May 2024, the Committee did not meet. Therefore, the Investment Advisory Committee did not meet between February 2024 and November 2024, a period of nine months.[135] According to Union staff, the Chair of the Investment Advisory Committee, a position held by Secretary-Treasurer Mock during this period, is responsible for calling the meetings and creating the agendas.[136] Mock said that, in practice, then-Executive Administrative Assistant Brien and former Director of Investments Karazia were the ones to initiate and organize Investment Advisory Committee meetings.[137] Mock said that throughout this period she delegated oversight to Brien, on whom she relied to alert her to issues requiring her attention.[138] In an interview with the Monitor, Brien offered no clear explanation for the inaction, emphasizing his lack of experience and stating that he was waiting for further

---

[133] Email from Segal Marco Consultant to M. Mock, T. Brien, and A. Karazia (May 1, 2024).

[134] Email from Segal Marco Consultant to M. Mock and T. Brien (May 1, 2024); Email from Segal Marco Consultant to M. Mock and T. Brien (Aug. 1, 2024); Email from Segal Marco Consultant to M. Mock and T. Brien (Nov. 4, 2024). This line was language the Segal Marco Consultant would typically include in his cover emails referring to both the Strike Trust and Master Pension Trust policies. A. Karazia Interview (May 28, 2025); *see* Email from Segal Marco Consultant to M. Mock, T. Brien, and A. Karazia (Jan. 31, 2023).

[135] Investment Advisory Committee Meeting Agenda (Nov. 6, 2024).

[136] T. Brien Interview (Oct. 14, 2025).

[137] M. Mock Interview (July 29, 2025).

[138] M. Mock Interview (July 29, 2025); T. Brien Interview (Oct. 14, 2025).

35

instruction from Segal Marco, who, he said, never indicated a need to take further action other than the initial $50 million investment that was made in March 2024.[139] He also said that he was waiting for direction from the Secretary-Treasurer, notwithstanding her statement that she was relying on him.[140]

When pressed, then-Executive Administrative Assistant Brien said he understood Segal Marco's recommendation to reinvest "using 2 or 3 tranches and an initial contribution of ~$50 million" to mean that the Union should invest only the $50 million and no more.[141] Brien did not remember raising the issue of additional reinvestments or the need for compliance with or changes to the Investment Policy with Secretary-Treasurer Mock in the summer of 2024.[142]

In early June 2024, the Union's then-Chief Accountant Geromin reached out to then-Executive Administrative Assistant Brien to ask whether they did "another $50 million reinvestment" because she had heard that the Union would reinvest more into equities and "didn't see anything change."[143] Brien did not recall taking action after this email exchange or whether there was a plan at this time to reinvest the remaining proceeds.[144] Former Director of Investments Karazia remembered reminding Brien to reinvest funds after he moved to the President's Office, telling him, "You need to reallocate or go before the Board and change the policy statement."[145]

---

[139] T. Brien Interview (Oct. 14, 2025).

[140] T. Brien Interview (Nov. 10, 2025).

[141] T. Brien Interview (Oct. 14, 2025).

[142] T. Brien Interview (Nov. 10, 2025). The Union continued to hold a large cash balance in the Strike Trust liquidity account throughout this period. *See, e.g.*, Email from D. Siewniak to T. Stankoff, T. Brien, L. Scott, K. Geromin, and M. F. Sobczynski (May 30, 2024); Email from D. Siewniak to T. Stankoff, A. Karazia, T. Brien, L. Scott, K. Geromin, and M. F. Sobczynski (July 30, 2024).

[143] Email from K. Geromin to T. Brien (June 3, 2024); K. Geromin Interview (June 16, 2025).

[144] T. Brien Interview (Oct. 14, 2025).

[145] A. Karazia Interview (May 28, 2025). Throughout the summer of 2024, then-Executive Administrative Assistant Brien, former Director of Investments Karazia, and Accounting Department personnel received twice-a-week emails from Dawn Siewniak, a bookkeeper in the Accounting Department, notifying them of the cash balance in the Strike Trust liquidity account. *See, e.g.*, Email from D. Siewniak to T. Stankoff, T. Brien, L. Scott, and A. Karazia (Aug. 1, 2024).

Brien said that he did not recall these conversations with Karazia nor discussions with the Consultant about revising the Investment Policy.[146]  Karazia told the Monitor that if he had still been serving as Director of Investments, he would have ensured the additional reinvestment took place: "This happened because they reallocated.  Because they put me in the President's Office."[147]

The Segal Marco Consultant remembered following up with then-Executive Administrative Assistant Brien about reinvesting a second tranche of $50 million by email and by phone, but said there was "stuff going on internally that I wasn't privy to" and trusted Brien's judgment on how to implement his recommendation.[148]  The Monitor was not provided with the follow-up email the Segal Marco Consultant said he sent, nor was the Union able to find such email in its IT systems.  Brien had decided to retire at the end of August 2024, but his employment was later extended through the end of the year, and he retired as of December 31, 2024.[149]

### F.     The President's Office Refocused on the Investment Policy Allocations (October 2024 to February 2025)

Members of the President's Office began to pay attention to the investment allocations in November 2024 as part of the then-escalating conflict between the President's Office and Secretary-Treasurer's Office over budget planning.

After a special IEB Meeting in October 2024, the IEB voted to create a new "Budget Committee" led by the President's Office, with support from the Secretary-Treasurer's Office.[150]

---

[146] T. Brien Interview (Oct. 14, 2025).

[147] A. Karazia Interview (Nov. 12, 2025).

[148] Segal Marco Consultant Interview (Oct. 17, 2025).

[149] T. Brien Interview (Oct. 14, 2025).  Former Director of Investments Karazia also recently retired, leaving his position with the Pension & Benefits Department in 2025.  A. Karazia Interview (Feb. 7, 2025); President's Office Organizational Chart (Dec. 10, 2024); President's Office Organizational Chart (June 5, 2025).

[150] IEB Meeting Minutes (Oct. 24, 2024); Monitor's Thirteenth Status Report, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (Nov. 14, 2025), Civil No. 20-cv-13293, ECF No. 154, at 41-48 ("Monitor's Thirteenth Status Report").

The President's Office began requesting additional data about investment performance and the market value of the Union's investment assets.[151]

A meeting of the Investment Advisory Committee was scheduled for November 6, 2024, the first in nearly nine months.[152] President Fain requested that representatives of his Office attend, but Secretary-Treasurer Mock refused, informing Fain that the meeting was an "investment" meeting, not a "budgeting process" meeting.[153] Because Fain was one of the Union Officers responsible for investments under the 1996 Resolution, Mock should have permitted him or his designees to attend.

At the November 6, 2024 Investment Advisory Committee meeting, the Segal Marco Consultant provided investment reports for the Strike Trust that detailed the Union's assets and reported investment "targets" of 5% in equities and 14% in cash.[154] According to interviews with the Committee's members, there was no discussion at the meeting of the Investment Policy, the Union's cash position, or the need to reinvest the Union's cash position to bring it into compliance with the investment allocations contained in the 2015 Investment Policy.[155] After Secretary-Treasurer Mock's refusal to allow representatives of the President's Office to attend the meeting, on November 8, 2024, as part of a larger reorganization of IEB subcommittees, President Fain changed the composition of the Investment Advisory Committee, demoting Mock as Chair, but keeping her on the Committee, and replacing the three other members of the Committee with

---

[151] Email from C. Brooks to B. Parker, J. Dokho, and K. Geromin (Oct. 30, 2024).

[152] Investment Advisory Committee Meeting Agenda (Nov. 6, 2024).

[153] Email from D. Wallace on behalf of S. Fain to M. Mock, C. Browning, R. Boyer, S. Dawes, T. Brien, B. Parker, C. Brooks, J. Furman, M. Fazeli, W. Karges, and the former Compliance Director (Nov. 6, 2024); Email from M. Mock to S. Fain, C. Browning, R. Boyer, S. Dawes, T. Brien, B. Parker, C. Brooks, J. Furman, M. Fazeli, W. Karges, and the former Compliance Director (Nov. 6, 2024).

[154] Email from T. Brien to M. Mock, S. Dawes, C. Browning, R. Boyer, M. Richardson, and B. Parker (Nov. 6, 2024); 3Q 2024 Segal Marco Report, at 10.

[155] S. Dawes Interview (July 25, 2025); C. Browning Interview (July 24, 2025); R. Boyer Interview (July 23, 2025).

Regional Directors Miller, Vicente, and Mancilla.[156]   Then-Regional Director (now Vice President) Dickerson was appointed as the new Chair.[157]

At the November 12-14, 2024 IEB meeting, President Fain questioned the Union's investment returns, misstating that the Union had only earned a "one percent" return and characterizing the performance as "malpractice," "complete malfeasance," and "criminal."[158] New Investment Advisory Committee members then-Regional Director Dickerson and Director Mancilla requested that the Investment Advisory Committee meet with the Segal Marco Consultant before the end of the year to address these concerns about investment performance and strategy.[159]   The next day, Mock explained that the year-to-date return was 3.6% after advisory fees, and provided additional information on the makeup of the Union's investments.[160]   No allegations were made regarding compliance with the Investment Policy; the discussion focused solely on returns.

Although President Fain did not remember specifically, he told the Monitor that he "probably" told his then-Chief of Staff Brooks and Top Administrative Assistants Furman and Jason Wade to look into the low investment returns after the IEB voted to include the President's

---

[156] Email from D. Wallace on behalf of S. Fain to the IEB (Nov. 8, 2024); Standing Committees of the International Executive Board (Nov. 8, 2024).  President Fain has since replaced Regional Director Vicente with Regional Director Brandon Campbell.  Email from D. Wallace on behalf of S. Fain to IEB (Nov. 7, 2025).

[157] Standing Committees of the International Executive Board (Nov. 8, 2024).

[158] IEB Meeting Minutes (Nov. 13, 2024); IEB Meeting Minutes (Nov. 14, 2024).
No allegations were made at the November 2024 meeting regarding compliance with the Investment Policy or alleging misconduct by the Secretary-Treasurer's Office.  The discussion focused solely on investment returns and the performance of the Union's outside investment consultant, Segal Marco.

[159] IEB Meeting Minutes (Nov. 13, 2024).

[160] IEB Meeting Minutes (Nov. 14, 2024).

Office in the budget process.[161]   These President's Office staff, as well as the Assistant Director of the Research Department, Max Fazeli, conducted this review over the next several weeks.[162]

**The President's Office Concluded the Union Was Out of Compliance.**  By the end of the November 2024 IEB meeting, senior staff in the President's Office had quickly concluded the Union was out of compliance with the Investment Policy.   On November 13, 2024, Top Administrative Assistant Furman wrote in an email to Assistant Director Fazeli, "We are so profoundly out of range. . . . If we were just in line with the policy target, according to benchmarks we would've made . . . $165m in the past 12 months."[163]   Fazeli responded, "Some back of the napkin figures below . . . I think it illustrates the point that there has been a lot of $ left on the table due to bad allocations."[164]   Furman forwarded figures to then-Chief of Staff Brooks, telling him that they were "working on a slide deck that puts it all together."[165]

There is no evidence that the President's Office shared their conclusions with anyone during or immediately after the November 2024 IEB meeting, including President Fain, Chair of the Investment Advisory Committee Dickerson, Secretary-Treasurer Mock, or then-Executive Administrative Assistant Brien, although Top Administrative Assistant Wade told the Monitor that the President's Office was keeping Fain "in the loop" regarding its review.[166]

**Meetings with the New Investment Advisory Committee Chair.**  On November 21, 2024, then-Regional Director Dickerson met with then-Chief of Staff Brooks and Top Administrative Assistants Furman and Wade from the President's Office to prepare for a meeting

---

[161] S. Fain Interview (Oct. 10, 2025).
[162] C. Brooks Interview (Sept. 30, 2025); J. Furman Interview (Oct. 3, 2025).
[163] Email from J. Furman to M. Fazeli (Nov. 13, 2024).
[164] Email from M. Fazeli to J. Furman (Nov. 13, 2024).
[165] Email from J. Furman to C. Brooks (Nov. 13, 2024).
[166] J. Wade Interview (Oct. 1, 2025).

with Segal Marco the next day.[167]  When asked whether the President's Office staff told her the Union was out of compliance with the Investment Policy or about their calculation of potential losses of tens of millions of dollars, Dickerson stated she did not remember those issues being discussed.  She told the Monitor that if she had been told, she would have elevated the issue to the proper authorities, which she did not do at that time.[168]

Shortly after their meeting concluded, then-Chief of Staff Brooks sent then-Regional Director Dickerson a recap email with action items and questions for Segal Marco, including a question about the $112.7 million cash balance in the Strike Trust, questions about the 3.6% rate of return, and other items.[169]  There was no reference in the email to compliance with the asset allocations in the Investment Policy.

The next day, November 22, 2024, then-Regional Director Dickerson met with the Segal Marco Consultant, along with Secretary-Treasurer Mock and members of her Office.[170] According to Dickerson, during the meeting the Segal Marco Consultant reviewed the third quarter 2024 investment report "page by page," including the pages listing the current asset allocations, though Dickerson did not recall the details of the discussion.[171]  The primary focus was the rate of return discussed at the November 2024 IEB meeting.  Dickerson recalled that the Segal Marco Consultant explained the composite year-to-date return was actually 5%, which satisfied Dickerson's concerns.[172]  The Segal Marco report reviewed during the meeting showed the Strike

---

[167] L. Dickerson Interview (Dec. 8, 2025); Text Message between C. Brooks and L. Dickerson (Nov. 20, 2024); Text Message between C. Brooks and J. Furman (Nov. 14, 2024).
[168] L. Dickerson Interview (Dec. 8, 2025).
[169] Email from C. Brooks to L. Dickerson (Nov. 21, 2024).
[170] Calendar Invite from T. Brien to T. Brien, M. Mock, B. Parker, M. Richardson, A. Karazia, L. Dickerson, and Segal Marco Consultant (Nov. 19, 2024).
[171] L. Dickerson Interview (Dec. 8, 2025).
[172] L. Dickerson Interview (Dec. 8, 2025); 3Q 2024 Segal Marco Report, at 13.

Trust had 5.3% invested in equities (with a target of 5.0%) and $112.7 million in cash.[173] Dickerson did not remember whether these figures were concerning to her at the time and said compliance with the Investment Policy was not discussed during the meeting.[174] Secretary-Treasurer Mock similarly did not recall any discussion about compliance with the Investment Policy.[175]

**Document Disputes and Delay.** On November 22, 2024, the same day as the meeting with Segal Marco and in response to an October 31, 2024 request for documents and information from the President's Office in connection with the budget, the Secretary-Treasurer's staff created a Microsoft Teams folder with some, but not all responsive information.[176] On December 3, 2024, the Secretary-Treasurer's Office staff and the President's Office staff met to discuss the Union's budget.[177] On December 4, 10, and 11, 2024, the President's Office sent multiple requests for the latest investment report from State Street, which contained the amount of unrealized gains on the Union's investments, which went unanswered.[178] Secretary-Treasurer Mock said she was "trying to figure out a way to give them the information" in a way that "couldn't be manipulated" because she distrusted the President's Office based on their pattern of retaliation against her.[179] The report was eventually provided to the President's Office on December 13, 2024.[180]

---

[173] 3Q 2024 Segal Marco Report, at 10.

[174] L. Dickerson Interview (Dec. 8, 2025).

[175] M. Mock Interview (Nov. 21, 2025).

[176] Email from B. Parker to C. Brooks, J. Dokho, and K. Geromin (Nov. 22, 2024). Documents not shared at this time included: the monthly financial summaries for July through September 2024; the budget forecast for 2024; revenue increase forecasts for non-Big Three contract victories; and a breakdown of every major category of expense with crosstabs for each Region and industry.

[177] Meeting with UAW (Dec. 3, 2024); Calendar Invite from Scandinavian Room to T. Brien, C. Brooks, J. Dokho, S. Fain, M. Fazeli, J. Furman, K. Geromin, M. Mock, B. Parker, M. Richardson, L. Scott, and J. Wade (Nov. 26, 2024).

[178] Emails from M. Fazeli and C. Brooks to K. Geromin (Dec. 4, Dec. 10, Dec. 11, 2024).

[179] M. Mock Interview (July 29, 2025).

[180] Email from K. Geromin to C. Brooks and M. Fazeli (Dec. 13, 2024).

On January 8, 2025, then-Chief of Staff Brooks, Top Administrative Assistants Wade and Furman, and Assistant Director Fazeli briefed President Fain on their findings.[181]   Although the slide deck they prepared clearly set out their conclusion that the Union was out of compliance with the 2015 Investment Policy allocations, Fain did not recall when he learned of the non-compliance.[182]   No one from the President's Office raised the issue with anyone else for another two weeks.

On January 27, 2025, the President's Office presented its findings in a memo and presentation to the Union's former Compliance Director and General Counsel William Karges, alleging that the Secretary-Treasurer had unilaterally decided to suspend the Investment Policy and keep it suspended, costing the Union at least $80 million in expected investment earnings, and had withheld investment information from the IEB.[183]

When asked what accounted for the length of time between concluding there was non-compliance in mid-November 2024[184] and notifying the Compliance and Legal Departments at the end of January 2025, members of the President's Office had various responses:

- Then-Chief of Staff Brooks said it was not a "delay," insisting that they were "actively pursuing these questions" and being "really careful."[185] Brooks also noted that the Union "basically shuts down in December" due to employee vacations.[186]

- Top Administrative Assistant Furman said, "there was a lot of not knowing if we were reading this right," and they didn't take action until they could speak to Segal Marco.[187]

---

[181] Text Message between C. Brooks and J. Furman (Jan. 6, 2025); Text Message between C. Brooks and M. Fazeli (Jan. 8, 2025); Text Message between C. Brooks and J. Furman (Jan. 8, 2025).
[182] UAW Budget Preparation Presentation (Jan. 8, 2025), at 4; S. Fain Interview (Oct. 10, 2025).
[183] Email from C. Brooks to W. Karges and the former Compliance Director (Jan. 27, 2025).
[184] Email from J. Furman to M. Fazeli (Nov. 13, 2024).
[185] C. Brooks Interview (Sept. 30, 2025).
[186] C. Brooks Interview (Sept. 30, 2025).
[187] J. Furman Interview (Oct. 3, 2025).

- Top Administrative Assistant Wade echoed that they "wanted to get other eyes on it" to ensure they were understanding the information correctly, but that they "weren't trying to do an investigation" or "make it complete."[188] Wade also cited the holiday "shutdown" as a justification.[189]

Although the President's Office staff could have quickly verified the numbers they had seen by asking then-Executive Administrative Assistant Brien, Secretary-Treasurer Mock, and/or Chair of the Investment Advisory Committee Dickerson to clarify whether the Union was out of compliance, they did not do so, nor did they alert any of these officials of their concerns.[190]

On January 30, 2025, the former Compliance Director and General Counsel Karges notified the Monitor of the allegations.[191] The former Compliance Director provided the Monitor with the slide deck and Compliance Memo prepared by the President's Office (discussed below), stating that "[t]he President's [O]ffice has so far focused on understanding the current problems and fixing them to ensure that the International Union realizes appropriate investment income going forward" and that the President's Office requested that the former Compliance Director and the General Counsel "investigate the entire scope of the situation and determine from a compliance perspective what happened[.]"[192]

On January 31, 2025, then-Regional Director Dickerson met with then-Chief of Staff Brooks and Top Administrative Assistants Furman and Wade for a meeting titled "Investment Policy discussion."[193] Dickerson did not have a clear recollection of this meeting, stating she could

---

[188] J. Wade Interview (Oct. 1, 2025).
[189] J. Wade Interview (Oct. 1, 2025).
[190] Todd Brien retired from the UAW at the end of December 2024. T. Brien Interview (Oct. 14, 2025). Bill Parker became Executive Administrative Assistant, and Makisha Richardson took over the role of Director of Investments. Secretary-Treasurer's Office Organizational Chart (Nov. 7, 2024).
[191] Email from former Compliance Director to Monitor (Jan. 30, 2025).
[192] Email from former Compliance Director to Monitor (Jan. 30, 2025). This Report cites to various emails and letters sent or received by members of the Monitor's team. As with prior reports, the report refers to agents of the Monitor simply the "Monitor" for simplicity and ease of reference.
[193] Email from C. Brooks to L. Dickerson, J. Furman, and J. Wade (Jan. 29, 2025).

not "tell you definitively" what was discussed.[194]  Shortly after the meeting, Brooks sent Dickerson and President Fain a memo stating the Union had lost "at least $80 million in expected investment earnings" and that "the decision to suspend the policy and to keep the policy suspended was made by the Secretary-Treasurer's Office unilaterally."[195]  When asked if this was the first time she became aware the Union was out of compliance with the Investment Policy, Dickerson stated: "It may have been . . . it may have been the first time that I was made aware."[196]

A few hours after receiving the memo from then-Chief of Staff Brooks, President Fain emailed Secretary-Treasurer Mock, copying the entire IEB and the Monitor, stating that the Union had lost "at least $80 million in expected investment earnings," informing Mock that he was calling an emergency IEB meeting for February 10, 2025, and demanding that she "explain this situation and what [her] office is doing about it."[197]  The Monitor responded to the former Compliance Director and General Counsel Karges on February 4, 2025, opening an investigation and advising the IEB to forego taking action to investigate the claims of misconduct until the Monitor agreed the Union could move forward.[198]

On February 7, 2025, then-Chief of Staff Brooks nonetheless called former Director of Investments Karazia to ask about his involvement with the Strike Trust and with the Investment Advisory Committee as Director of Investments.[199]  Later in the day, staff from both the President's and Secretary-Treasurer's Offices and the Segal Marco Consultant met to discuss returning the Union to compliance with the Investment Policy.  During the meeting, Brooks stated that the Union was out of compliance with the Investment Policy and had lost tens of millions of

---

[194] L. Dickerson Interview (Dec. 8, 2025).
[195] Email from C. Brooks to L. Dickerson and S. Fain (Jan. 31, 2025).
[196] L. Dickerson Interview (Dec. 8, 2025).
[197] Email from D. Wallace on behalf of S. Fain to M. Mock (Jan. 31, 2025).
[198] Email from Monitor to UAW General Counsel and former Compliance Director (Feb. 4, 2025).
[199] Email from C. Brooks to J. Wade, J. Furman, M. Fazeli, J. Dokho, and L. Dickerson (Feb. 8, 2025).

dollars in investment income as a result.[200] They reached consensus on immediate steps to begin addressing the non-compliance, including moving $50 million of cash into equities and selling a portion of the bond portfolio to bring the Union back in line with existing Investment Policy targets.[201]

### G. The Union Came Back Into Compliance with the Allocations Contained in the 2015 Investment Policy (February 2025 to June 2025)

At an emergency IEB meeting on February 10, 2025, the Board voted to direct the Investment Advisory Committee to develop a new investment policy and to "come into compliance with that policy at the soonest possible time."[202] Despite the Monitor's admonition not to repeat unproven allegations lest it influence witnesses or otherwise impact the Monitor's investigation,[203] and even though the Monitor specifically identified to the Union that the allegation that Secretary-Treasurer Mock had unilaterally suspended the Investment Policy was false, President Fain and then-Chief of Staff Brooks repeated false accusations against Mock to the full Board—with Brooks making the false allegation that there "was no vote to suspend the policy"[204] and Fain stating that, if not for Mock's failure to reinvest, the Union "would have recognized around $80,000,000 more

---

[200] Email from C. Brooks to B. Parker, Segal Marco Consultant, K. Geromin, J. Furman, J. Dokho, J. Wade, M. Fazeli, M. Richardson, M. Mock, and S. Fain (Feb. 7, 2025); K. Geromin Interview (Feb. 12, 2025).

[201] IEB Meeting Minutes (Feb. 10, 2025); 2015 Investment Policy Statement, at 6; 4Q 2024 Segal Marco Report, at 10.

[202] IEB Meeting (Feb. 10, 2025).

[203] Letter from Monitor to UAW General Counsel (Feb. 10, 2025).

[204] IEB Meeting Minutes (Feb. 10, 2025). By this date, the Monitor had already provided evidence that the Secretary-Treasurer had sought the IEB's approval to suspend the Union's Investment Policy in August 2023. Email from Monitor to UAW General Counsel and former Compliance Director (Feb. 4, 2025). This did not stop then-Chief of Staff Brooks from repeating the false allegation. The Union has taken the position that Brooks's statement can only be construed as an "allegation" when stripped from its context because Brooks was merely conveying his understanding that the Investment Policy was suspended during the strike right before the statement in question. But Brooks was conveying the *Segal Marco Consultant's* understanding that the Policy had been suspended, not his own. And, while Brooks had admitted earlier in the meeting that there had been a Board vote, this statement further supports the Monitor's finding that Brooks was knowingly bringing false allegations: *i.e.*, he knew there had been a Board vote and yet still stated as fact, in front of multiple potential witnesses, that there had been no vote to suspend the Policy.

than what we currently have."[205]   Following that meeting, on February 13, 2025, the Union

reinvested an additional $50 million into equities, bringing the proportion of equities to 10%.[206]

At the February 19, 2025 IEB meeting, the Board reiterated the directive to sell bonds to

fund further equity purchases, setting aside for later consideration the development of a new

policy.[207]  Over the next several months, Union officials met to discuss the process for returning

to compliance with the Investment Policy.[208]

At the May 2025 IEB meeting, the IEB passed a motion to "move approximately $95

million from our bond holdings into equities—making our equity holdings approximately 22% of

our portfolio."[209]  By the end of June 2025, the Union sold $115 million in bonds and money

market holdings and used the proceeds to purchase $42 million in domestic equity securities and

$73 million in international equity securities, bringing the Union back into compliance with the

Investment Policy at the low end of the required equity allocation (22%).[210]

---

[205] IEB Meeting Minutes (Feb. 10, 2025).  The allegations that the Secretary-Treasurer had lost the Union $80 million and had "intentionally misled[]" the IEB were also raised by President Fain at the regularly scheduled IEB meeting later in the month.  IEB Meeting Minutes (Feb. 19, 2025).

[206] Email from T. Stankoff to State Street (Feb. 12, 2025); 4Q 2024 Segal Marco Report, at 10.

[207] IEB Meeting Minutes (Feb. 19, 2025).

[208] The February 19, 2025 IEB resolution instructed the Secretary-Treasurer's Office to sell only bonds with realized gains to fund the equity purchases.  IEB Meeting Minutes (Feb. 19, 2025).  This "gain harvesting" approach proved to be unworkable, resulting in the months-long delay to getting back into compliance with the Investment Policy.  As Union officials attempted to carry out the IEB's resolution, they learned that selling only assets with realized gains would negatively impact the bond portfolio and risk the Strike Trust's long-term health.  The Segal Marco Consultant emphasized that bond managers could not "harvest portfolio gains" "without disrupting the portfolio strategy," but the President's Office expressed an unwillingness to sell bonds that would realize both gains and losses in light of the IEB's resolution.  *See* Email from Segal Marco Consultant to M. Fazeli and M. Mock (Mar. 3, 2025).  This impasse persisted until the General Counsel explained that the IEB's directive to only liquidate top-performing bonds would leave the Strike Trust with a higher proportion of under-performing assets and risk the Trust's long-term performance.

[209] IEB Meeting Minutes (May 14, 2025).

[210] Email from Segal Marco Consultant to M. Richardson (May 20, 2025); Email from Segal Marco to M. Richardson (Jun. 18, 2025); T. Miller Interview (Sept. 24, 2025); Email from T. Miller to J. Dokho, K. Geromin, and M. Fazeli (Aug. 1, 2025).

Secretary-Treasurer's Office staff have since been taking steps to propose an adjustment to the Investment Policy as recommended by the Segal Marco Consultant.  According to current Chief Accountant Tim Miller, the revised Policy "will lower the recommended stock exposure" by 10%.[211]  However, because no new policy has been adopted, the allocations set forth in the 2015 Investment Policy remain in effect.

---

[211] T. Miller Interview (Sept. 24, 2025).

## II.    ALLEGATIONS

On January 27, 2025, then-Chief of Staff Brooks, Top Administrative Assistants Wade and Furman, and Assistant Director Fazeli presented a slide deck and Compliance Memo to the former Compliance Director and General Counsel Karges containing several allegations against the Secretary-Treasurer's Office.[212]   In short, the President's Office alleged that the Secretary-Treasurer and her Office:

> A.    Unilaterally took the Union out of compliance with their investment policies in August 2023;
>
> B.    Unilaterally kept the Union out of compliance since that date;
>
> C.    Cost the Union $80 million dollars in lost investment income; and
>
> D.    Misrepresented the Union's finances by utilizing a cost-based method of accounting and actively withholding market value information from the IEB.

---

[212] Compliance Memo (Jan. 27, 2025); UAW Investment Policy Compliance Discussion Presentation (Jan. 27, 2025).  Similar to its position with respect to former Chief of Staff Brooks as set forth in footnote 204, the Union has also taken the position that the Monitor's characterization of the assertions made by the President's Office against Secretary-Treasurer Mock as "allegations" of wrongdoing or retaliation is inaccurate; that the description of the former Compliance Director and the General Counsel's notification to the Monitor of the investment compliance issues as "allegations" is misleading as they viewed the assertions as a compliance issue; that the Monitor should report that there was merely a compliance violation; and that the UAW Officers consistently took appropriate actions based on the information provided to them at the time.  But that position is not consistent with the facts found during the investigation. To start, there is no question that serious allegations of deliberate misconduct were made.  The President's Office's Compliance Memo accused Mock of "unilaterally," "intentionally," and "actively" causing financial harm to the Union, violating UAW policy, and withholding critical financial information from the IEB—allegations that, if true, would constitute serious financial misconduct by a senior Union official.  The Monitor has investigated and reported on those allegations regardless of how the Union's Legal and Compliance Departments interpreted them, and the Union itself has previously acknowledged that the President's Office members made key unsubstantiated or exaggerated accusations against the Secretary-Treasurer in their briefings of late January 2025.  Second, the factual predicate for the Union's position— that the UAW Officers took appropriate actions—is inconsistent with the facts found by the investigation, which, among other things, demonstrate a pattern of exaggerating allegations against Mock in order to build a case against her as part of a pattern of retaliation.  In short, it is difficult to characterize the President's Office's claims as anything other than allegations of serious financial misconduct when they accused the Secretary-Treasurer of intentionally misrepresenting the Union's finances and actively causing financial harm to the Union through her actions.

In response, Secretary-Treasurer Mock levied competing allegations that these accusations were unfounded and part of a pattern of retaliatory conduct against her.[213] The Monitor opened an investigation on February 4, 2025, which has included the review of more than 16,000 documents and approximately two dozen interviews.

### A. The Allegation that Secretary-Treasurer Mock Unilaterally Suspended the Investment Policy

The President's Office's Compliance Memo alleged that the Secretary-Treasurer acted "unilaterally" in August 2023 to suspend the Investment Policy. As detailed above in Section I.B, this allegation is false, as President Fain and then-Chief of Staff Brooks should have well known.[214] Based on the advice of relevant financial advisors, Secretary-Treasurer Mock sought and obtained Fain's and then the IEB's unanimous approval to suspend the Policy in connection with the Big Three strikes.

### B. The Allegation that the Decision to Keep the Investment Policy Suspended Was Unilaterally Made by Secretary-Treasurer Mock and her Office

From August 2023 until June 2025, the Strike Trust deviated from the asset allocations set forth in the 2015 Investment Policy. The President's Office alleged that "the decision . . . to keep the [Investment P]olicy suspended was made by the Secretary-Treasurer's Office unilaterally" and that the Secretary-Treasurer made the decision to "remain[] out of compliance"[215] after the Big Three contracts were ratified in November 2023.[216] These allegations are not supported by the

---

[213] M. Mock's Initial Position Statement (Feb. 10, 2025).

[214] *See* Text Message between M. Mock and S. Fain (Aug. 19, 2023); Email from A. Townsel on behalf of M. Mock to S. Fain, M. Booth, R. Boyer, C. Browning, B. Campbell, S. Dawes, L. Dickerson, L. English, D. Green, B. Mancilla, M. Miller, T. Smith, and D. Vicente (Aug. 23, 2023). President Fain notified then-Chief of Staff Brooks about the Board poll once he was notified by Secretary-Treasurer Mock. Text Message among S. Fain, C. Brooks, B. Dictor, and T. Lamadrid (Aug. 19, 2023).

[215] Compliance Memo (Jan. 27, 2025); UAW Investment Policy Compliance Discussion Presentation (Jan. 27, 2025), at 7-8.

[216] S. Fain Interview (Oct. 10, 2025).

evidence and, in particular, ignore the participation of other individuals in the decisions and activities that together had the consequence of continuing the effective suspension of the 2015 Investment Policy.

**Lack of Awareness by the Secretary-Treasurer.**  To start, the investigation found no evidence that Secretary-Treasurer Mock made any decision, unilateral or otherwise, to keep the Union out of compliance with the Investment Policy.  Although part of her responsibilities as Secretary-Treasurer was to be aware of instances of non-compliance,[217] there was no evidence that Mock actually had that knowledge, which she confirmed to the Monitor in her interviews.[218]  To

---

[217] A. Karazia Interview (Nov. 12, 2025); T. Brien Interview (Oct. 14, 2025).

[218] M. Mock Interview (July 29, 2025); M. Mock Interview (Nov. 21, 2025).  During the course of the Monitor's investigation, the President's Office claimed that, after the non-compliance came to light, the Secretary-Treasurer made a statement at an investment meeting held on March 8, 2025, admitting that she had made a unilateral decision to keep the Union out of compliance.  According to Top Administrative Assistant Wade, in the meeting held on March 8, 2025, the Secretary-Treasurer said that she had previously told then-Executive Administrative Assistant Brien not to go back into compliance with the Investment Policy because of the risk of a market downturn.  Wade said this statement showed knowledge and intentional action on behalf of Secretary-Treasurer Mock.  J. Wade's Handwritten Notes (Mar. 8, 2025); J. Wade Interview (July 18, 2025).  However, Mock told the Monitor that her statement at this meeting was made not because she knew the Union had been out of compliance with the Policy in 2024, but because she was responding to the discussion in the meeting about avoiding losses during the reinvestment process that had just commenced in 2025.  She also explained that she was repeating information that she had learned since the allegations were made against her in January 2025 and emphasized that she never told Brien not to get back into compliance.  M. Mock Interview (Nov. 21, 2025).  Brien could not recall whether Mock ever told him not to reinvest the remaining funds or not to get back into compliance with the Policy, but when asked whether Mock told him not to bring the Investment Policy issue to the Investment Advisory Committee or the IEB, Brien said it "doesn't sound like something she would tell me."  T. Brien Interview (Oct. 14, 2025).  Both the Segal Marco Consultant and the Monitor attended the March 8, 2025 meeting and did not understand Mock's statement to be such an admission.  Segal Marco Consultant Interview (Nov. 17, 2025).

The Union has taken the position that the Monitor should move this discussion to the body of the Report, and that Mock's statement at the March 8, 2025 meeting undercuts the notion that the former chief of staff's recitation that the Secretary-Treasurer "made a unilateral decision to keep the Union out of compliance" was knowingly false.  The Monitor has retained the discussion in a footnote because Mock's statement at the March 8, 2025 meeting—made after the allegations had been raised and while she was responding to discussion about the *then-ongoing reinvestment process* and not the relevant time period under investigation—is not probative of her state of mind during the relevant period (August 2023 to January 2025).  That she described a rationale for caution during the then-ongoing process in 2025 does not establish that she possessed the knowledge or intent necessary for the "unilateral" and "intentional" misconduct alleged by the President's Office historically.  The footnote also does not undercut the Monitor's finding that Brooks knowingly made false allegations; Brooks's knowledge that the IEB voted to suspend

51

be sure, Mock and other members of the Secretary-Treasurer's Office were fully on notice that the Strike Trust's equity allocation ranged from 0% to 5.3% during the relevant time and that the Union held a substantial amount in cash,[219] but, there was no evidence of her awareness that these percentages violated the Policy.  Mere awareness of a high cash balance did not itself constitute notice of a compliance problem, and there was no evidence that Mock believed the Union was out of compliance with the Policy, nor that she made any decision regarding compliance with the Policy.

Secretary-Treasurer Mock stated that she relied on the experts in her Office—then-Director of Investments Karazia and later then-Executive Administrative Assistant Brien—to raise any policy compliance issues, and they did not do so.[220]  This was confirmed by the investigation. There was no documentary evidence that they notified Mock; and Karazia acknowledged that he did not alert Mock to non-compliance, although he told the Monitor that he informed Brien on three occasions that the remaining funds needed to be reinvested.[221]  Brien similarly said he did not recall expressly raising reinvestment of funds as a matter of policy compliance with Mock, stating only that he told her, "we have the money, we need to start putting money back in," in spring 2024.[222]

The Monitor did identify two emails to Secretary-Treasurer Mock from the Segal Marco Consultant that referenced a "deviat[ion]" from the Investment Policy.  The first, sent in November 2023, was prior to the ratification of the Big Three contracts, when the Policy was undisputably

---

the Policy is established by contemporaneous documentary evidence, regardless of any later statement by Mock.

[219] *See* 4Q 2023 Segal Marco Report, at 10; 3Q 2024 Segal Marco Report, at 10; Email from K. Geromin to S. Fain and M. Mock (Jan. 4, 2024).

[220] M. Mock Interview (July 29, 2025).

[221] A. Karazia Interview (Feb. 7, 2025); A. Karazia Interview (May 28, 2025).

[222] T. Brien Interview (Oct. 14, 2025); T. Brien Interview (Nov. 10, 2025).

suspended.[223]   The second, sent in February 2024, stated: "Note that the S[trike] T[rust] asset allocations deviated from the Investment Policy *as we prepared for the Strike*.  We will work with you to rebalance that portfolio and review future liquidity." (emphasis added).[224]   This language, written in the past tense, could reasonably be read as referring only to the deviation that occurred during strike preparation in August 2023 and ongoing, typical efforts to rebalance, rather than signaling an ongoing compliance issue, particularly when the commitment to rebalancing the portfolio was a statement included in almost every quarterly email from Segal Marco.[225]   As noted above, when asked about this email, Mock explained that she read that as the Segal Marco Consultant being "on top of it" and "they're doing their job as investment advisors."   She stated that she did not read this email as noting a "problem" with the Union's policy compliance that needed resolving.[226]   The Segal Marco Consultant also explained that in February 2024, he believed the Policy was still suspended and would be revised, so from his perspective, there was no ongoing compliance issue to alert Mock about.[227]

**Awareness of Others.**   Furthermore, Secretary-Treasurer Mock was hardly alone among the IEB members with responsibility concerning the Union's investments who were aware of the Union's large cash balance.   Multiple Union Officers and Investment Advisory Committee members had responsibilities for aspects of the investment process and were put on notice about the existing cash balance after the ratification of the Big Three contracts when the Investment Policy was meant to be reinstated, yet none of them raised compliance with the Policy as an issue that needed to be addressed.   Former Investment Advisory Committee Members Browning, Boyer,

---

[223] Email from Segal Marco Consultant to M. Mock, T. Brien, and A. Karazia (Nov. 3, 2023).
[224] Email from Segal Marco Consultant to M. Mock, T. Brien, and A. Karazia (Feb. 1, 2024).
[225] A. Karazia Interview (May 28, 2025); *see* Email from Segal Marco Consultant to M. Mock, T. Brien, and A. Karazia (Jan. 31, 2023).
[226] M. Mock Interview (Nov. 21, 2025).
[227] Segal Marco Consultant Interview (Oct. 17, 2025).

and Dawes received the fourth quarter 2023 Segal Marco Report, which indicated that the Union had a $157 million cash balance and was "targeting" 0% in equities, and discussed the plan for reinvesting these funds with the Segal Marco Consultant at their February 2024 meeting.[228] These Committee members also received the third quarter 2024 report in November 2024 indicating that the Union's large cash balance remained and that the Union only had 5.3% invested in equities.[229] And former Regional Director Dickerson, when she became chair of the Investment Advisory Committee in November 2024, similarly reviewed the third quarter results with the Segal Marco Consultant and did not notice any compliance concerns.[230] President Fain, along with Mock, received financial summaries from former Chief Accountant Geromin in January and March 2024 that explicitly flagged that there was still a large cash balance that resulted from the August 2023 equity liquidation[231] and multiple members of the President's Office had actual knowledge in mid-November 2024 that the Union's investments deviated from the 2015 Investment Policy allocations but took no steps to notify anyone (other than Fain) until January 27, 2025, thereby contributing to the length of time no action was taken.

**The Role of Segal Marco.** There is also no evidence that the Segal Marco Consultant raised the issue of policy compliance directly to Secretary-Treasurer Mock. According to the Consultant, he did not do so because he believed that the 2015 Investment Policy was suspended by the UAW pending determination by the Union of what its new investment allocations should be.[232] The Consultant told the Monitor that he deferred to then-Executive Administrative Assistant

---

[228] 4Q 2023 Segal Marco Report, at 10; Segal Marco Consultant Meeting Notes (Feb. 19, 2024).
[229] 3Q 2024 Segal Marco Report, at 10.
[230] L. Dickerson Interview (Dec. 8, 2025).
[231] Email from K. Geromin to S. Fain and M. Mock (Jan. 4, 2024); Email from K. Geromin to S. Fain and M. Mock (Mar. 3, 2024).
[232] Segal Marco Consultant Interview (Oct. 17, 2025).

Brien about the Union's future cash needs and the process for bringing policy changes to the IEB and believed that the Investment Policy was still suspended throughout the relevant time period.[233]

**The IEB's November 2023 Decision.** Further, as detailed in Section I.D, the allegation that Secretary-Treasurer Mock acted unilaterally understates the significance of the IEB's actions in November 2023, which were not taken by Mock, but by the Board. In November 2023, the IEB issued a new directive to use a sizeable chunk of the liquidated funds to pay off the VEBA Note, without dictating what should happen with the remaining cash. That decision was inconsistent with the August 2023 directive that all assets be reinvested and, even if unintentionally, caused Mock, then-Executive Administrative Assistant Brien, and then-Director of Investments Karazia to state that they believed that the IEB's prior directive had been modified, and supported the Segal Marco Consultant's impression that the Policy remained suspended after November 2023.

In all, although there is no evidence that the IEB consciously decided to modify its prior directive, the IEB's vote led various individuals involved in the decision-making to believe the

---

[233] Segal Marco Consultant Interview (Oct. 17, 2025). The Union has taken the position that the Report does not address that the Segal Marco Consultant has significant incentives to make after-the-fact statements that he believed the policy to be suspended in order to reduce his own culpability. But the same could be said of nearly all of the witnesses cited in this Report. Moreover, at least portions of his account are corroborated by contemporaneous emails, such as the email to him from then Director of Investments Karazia stating that there had been "[n]o decision yet on the reinvestment of the remaining strike liquidation proceeds," confirming they were still "assessing and evaluating the ST future liquidity needs," as well as the Consultant's emails regarding making "appropriate adjustments" to the asset allocations and "review[ing] the asset allocation targets." Email from A. Karazia to Segal Marco Consultant and T. Brien (Jan. 4, 2024); Email from Segal Marco Consultant to A. Karazia and T. Brien (Oct. 23, 2023); Email from Segal Marco Consultant to A. Karazia (Nov. 1, 2023). The Monitor has reported the facts of what the Consultant said and what the documents show, and has pointed out where there is an absence of corroborating documentation, but did not find evidence that the Consultant lied to the Monitor. And, even setting aside the Consultant's statements entirely, the record independently supports the Monitor's finding that Mock did not engage in affirmative misconduct.

55

prior directive had been modified and thus contributed to the Union remaining out of compliance with the investment targets of the Investment Policy.

**The Interplay of Systemic Deficiencies.**  The period was characterized by confusion and dysfunction, not an intentional effort to thwart policy compliance:

- The IEB's November 2023 decision to pay off the VEBA Note necessarily meant that its prior directive to reinvest *all* of the remaining strike fund proceeds had been modified, but it did not provide direction for the remaining cash.

- The Investment Advisory Committee did not meet between February and November 2024, and there is no evidence that compliance with the Investment Policy was discussed at either meeting.

- The Union Officers did not meet at all in 2024 beyond the regularly scheduled IEB meetings.

- Former Executive Administrative Assistant Brien was overwhelmed by responsibilities in the wake of the February 2024 department reorganization and ill-equipped for the task after former Director of Investments Karazia was removed from his position.  He was planning to retire shortly and was waiting on Segal Marco to advise him on next steps.  Karazia, the Union's primary investment expert, was no longer in the Secretary-Treasurer's Office.  Had President Fain not retaliated against Mock by stripping her of the department to which Karazia belonged, the lapses in communication over the investment allocations may never have occurred.

- The Segal Marco Consultant stated that he was awaiting further information on future liquidity needs before proposing a revised Investment Policy and did not use his quarterly reports to signal non-compliance, stating that he believed that the Policy remained suspended and that the Union would formally accept his recommendation to revise the Policy in the future.

**The Failure of Notification.**  There is evidence that others at the Union—who Secretary-Treasurer Mock relied on to monitor and raise issues with the Union's finances and investments— were aware that the Union was out of alignment with the asset allocations of the 2015 Investment Policy, but none of them raised the issue with Mock.  Former Executive Administrative Assistant Brien, former Director of Investments Karazia, and former Chief Accountant Geromin all received

56

twice a week emails signaling the high cash balance in the Strike Trust liquidity account,[234] Brien and Karazia had received Segal Marco's emailed recommendation on reinvesting in tranches, and Brien received the Segal Marco reports throughout 2024; yet, at no time did any of them notify Mock that there was a compliance issue.

Moreover, multiple members of the President's Office knew that the Union was out of compliance since at least November 13, 2024.[235] Despite stating in November 2024 that the Union was "profoundly" out of compliance, the President's Office did not raise the issue with then-Executive Administrative Assistant Brien, Secretary-Treasurer Mock, or Investment Advisory Committee Chair Dickerson, and did not raise it to the Union's General Counsel and former Compliance Director until January 27, 2025.[236]

Even though members of his Office said that he was kept "in the loop,"[237] President Fain denied knowing that the allocations were out of compliance with the 2015 Investment Policy throughout 2024, and there is no documentary evidence showing that he was aware prior to January 8, 2025, when he was provided with a detailed presentation on how the "[c]urrent investment asset allocation is *significantly out of compliance* with IEB Policy on approved allocations."[238] Even then, it took an additional 19 days before the General Counsel and former Compliance Director

---

[234] *See, e.g.*, Email from D. Siewniak to T. Stankoff, A. Karazia, L. Scott, K. Geromin, and M. F. Sobczynski (Aug. 3, 2023); Email from D. Siewniak to T. Stankoff, T. Brien, L. Scott, K. Geromin, and M. F. Sobczynski (May 16, 2024).

[235] Email from J. Furman to M. Fazeli (Nov. 13, 2024).

[236] Email from C. Brooks to W. Karges and the former Compliance Director (Jan. 27, 2025).

[237] J. Wade Interview (Oct. 1, 2025).

[238] S. Fain Interview (Oct. 10, 2025). On January 6, 2025, then-Chief of Staff Brooks scheduled a meeting with Fain on January 8, 2025, for a "budget update discussion" and asked Assistant Director Fazeli to "put together an updated slide deck." Text Message between C. Brooks and J. Furman (Jan. 6, 2025). A slide deck presentation created on January 7, 2025, titled "UAW Budget Preparation," appears to have been printed and presented at the meeting with Fain. Text Message between C. Brooks and M. Fazeli (Jan. 8, 2025). Brooks remembered "going through how best to communicate these complicated issues" with Fain. C. Brooks Interview (Sept. 30, 2025). The presentation explained that the Union was out of compliance with the Investment Policy. UAW Budget Presentation (Jan. 8, 2025).

were notified of the lapse in compliance.  In other words, in addition to finding the allegation against Secretary-Treasurer Mock to be false, the Monitor has also found that from mid-November 2024 forward, the President's Office was largely responsible for the lack of compliance with the Investment Policy, and from at least January 8, 2025, that responsibility also fell on President Fain.

To be clear, in determining that the allegation against Secretary-Treasurer Mock is false, the Monitor is not condoning these events.  There were numerous compliance and communications breakdowns that must be remediated, as discussed in Section III below.

### C.      The Amount Allegedly Lost From Failure to Reinvest More Promptly

The President's Office's Compliance Memo alleged that the Union lost at least $80 million in investment income by failing to return the Strike Trust to compliance with the Investment Policy after the Big Three contracts were ratified in November 2023.[239]  That allegation is false, and based on flawed assumptions about the timing, amount, and the manner in which reinvestment could have occurred.   It also undercuts the President's Office's own responsibility for the lapse in compliance by failing to raise alarms in mid-November 2024.

At Top Administrative Assistant Furman's request, Assistant Director Fazeli prepared a calculation estimating the potential foregone investment gains from non-compliance with the Investment Policy.[240]  Fazeli calculated approximately $83 million, assuming that if the Union had prospectively reallocated all liquidated cash that was not later used to pay strike funds or pay down the VEBA Note to align with the 2015 Investment Policy targets on October 1, 2023, the invested assets would have generated these additional returns based on actual 2023-2024 equities market

---

[239] Compliance Memo (Jan. 27, 2025).
[240] Email from J. Furman to M. Fazeli, C. Brooks, and J. Wade (Jan. 21, 2025); M. Fazeli Interview (July 31, 2025).

performance.[241]  In other words, the calculation presumed that on October 1, 2023, Secretary-Treasurer Mock would have disregarded the IEB's direction to liquidate all funds until the conclusion of the strike—which was still ongoing—and somehow knew both the precise amounts that the Union would ultimately pay in strike costs *and* that the IEB would later direct $74 million to pay off the VEBA Note.  But these assumptions were incorrect and, as detailed below, Mock had no reason to make those calculations as of October 2023.

To conduct this calculation, Assistant Director Fazeli used the following methodology: For each of the four quarters beginning October 1, 2023, through September 30, 2024, he took the total amount of funds in the Strike Trust at the end of the quarter and calculated the amount of the return the Trust would have earned if the funds had been allocated according to the target percentages in the 2015 Investment Policy throughout that entire quarter.  He called this hypothetical figure the "approved return."[242]  Fazeli then compared the "approved return" to the Strike Trust's actual return for each quarter.  The difference between these two figures represented what he characterized as the Union's "loss of potential earnings" for that quarter.[243]  Fazeli repeated this process for each quarter and then added the quarterly "loss of potential earnings" together, along with an estimated figure for the last quarter of 2024 (October 1, 2024, through December 31, 2024), to arrive at his total amount of $83 million of alleged foregone gains over the entire period.[244]

---

[241] Investment Scenario Calcs spreadsheet (Jan. 22, 2025); M. Fazeli Interview (July 31, 2025).  In his interview, Assistant Director Fazeli told the Monitor he calculated that the Union had foregone approximately $83.5 million in both investment gains and investment fee savings, but "backed it down to a round number to give a margin of error . . . that's where [the] $80 million [figure in the Compliance Memo] comes from."  M. Fazeli Interview (July 31, 2025); *see also* Investment Scenario Calcs spreadsheet (Jan. 22, 2025).

[242] Investment Scenario Calcs spreadsheet (Jan. 22, 2025); M. Fazeli Interview (July 31, 2025).

[243] M. Fazeli Interview (July 31, 2025).

[244] Investment Scenario Calcs spreadsheet (Jan. 22, 2025); M. Fazeli Interview (July 31, 2025).

Although the Monitor is not attempting to offer his own calculation of any foregone investment gains, it is clear that Assistant Director Fazeli's calculation was based on deeply flawed and inaccurate assumptions that significantly exaggerated any loss amount. In his interview with the Monitor, Fazeli conceded that there were problems with the methodology used to calculate the $80 million figure, and that upon reflection, there were aspects of the calculation that "could've been done differently."[245] The methodological problems with the calculation included the following:

- **Assumed immediate full reinvestment during the strike.** For the period October 1 to December 31, 2023, Fazeli's calculation estimated that approximately $295 million should have been invested in equities, yielding approximately $35 million in returns.[246] This would have required Secretary-Treasurer Mock to both disregard the IEB's directions and have impossible foreknowledge of strike costs and the VEBA payment.

- **Overstated available funds.** Fazeli assumed that all cash not spent on strikes or the VEBA Note would be reinvested, leaving nothing for day-to-day operations.[247] Former Chief Accountant Geromin told the Monitor that the Union regularly kept at least $20 million in cash for operating expenses.[248] Fazeli admitted that this "could've been done differently."[249]

- **Assumed immediate reallocation of illiquid alternative investments.** Fazeli also assumed that assets in the alternatives portfolio could immediately be reallocated to the equity portfolio.[250] But alternative investments are typically illiquid and cannot be quickly sold to be available for reallocation to equities. The Segal Marco Consultant informed the Monitor that liquidating those positions could only have been done with significant losses.[251] Because equities significantly outperformed alternative investments during the entire period, this assumption inflated Fazeli's calculation because it credited the Union with hypothetical equity-level returns on funds that were locked in illiquid alternative investments.[252]

---

[245] M. Fazeli Interview (July 31, 2025).
[246] Investment Scenario Calcs spreadsheet (Jan. 22, 2025).
[247] Investment Scenario Calcs spreadsheet (Jan. 22, 2025).
[248] K. Geromin Interview (June 16, 2025).
[249] M. Fazeli Interview (July 31, 2025).
[250] Investment Calcs Spreadsheet (Jan. 22, 2025).
[251] Segal Marco Consultant Interview (Oct. 17, 2025).
[252] Investment Scenario Calcs Spreadsheet (Jan. 22, 2025).

Fazeli told the Monitor that he did not understand the illiquidity of the alternatives portfolio when creating this calculation.[253]

- **Used policy targets rather than acceptable ranges.**  Fazeli assumed the Union needed to achieve the 30% equity target rather than the 22% minimum required for compliance.[254]  Notably, when the Union did return to the compliance with the Investment Policy, it in fact targeted the lower end of this range.[255]  This difference would have reduced both the amount needed to be invested and the corresponding "loss" from not investing that amount.

- **Assumed all equity investments in highest-performing fund.**  Fazeli's calculation assumed that all equities would be invested in the Russell 3000 index fund, which experienced exceptionally strong returns in 2024, earning 23.8%.[256]  However, the Investment Policy required that equity investments be split between domestic and international equities.[257]  The international MSCI ACWI index earned only 5.23% in 2024.[258]  Fazeli acknowledged that assuming all equity investments in the highest-performing domestic fund overstated the calculation.[259]

- **Ignored restrictions in the 2008 Resolution.**  Fazeli's calculations also ignored the requirements of the 2008 Resolution, which would have allowed Secretary-Treasurer Mock to unilaterally rebalance the portfolio "only in accordance with the recommendations by [Segal Marco]."[260]  But according to the Segal Marco Consultant, he was recommending the opposite, advocating for a lower risk exposure.

- **Attributed losses to the period when President's Office had actual knowledge.**  Fazeli's calculations estimated approximately $10 million in foregone gains in the fourth quarter of 2024, but the President's Office had actual knowledge that the Union's investments were not in alignment with the allocations in the Investment Policy by November 13, 2024, midway through the fourth quarter.[261]  It therefore makes no sense to attribute any "losses" for this time period solely to the Secretary-Treasurer.

---

[253] M. Fazeli Interview (July 31, 2025).

[254] Investment Calcs Spreadsheet (Jan. 22, 2025); 2015 Investment Policy Statement, at 6.

[255] *See* UAW Investment Allocation Change per Segal Recommendation Memo (June 26, 2025).

[256] 4Q 2024 Segal Marco Report, at 13.

[257] 2015 Investment Policy Statement, at 6.

[258] *See MSCI ACWI ex USA IMI Index*, MSCI, https://www.msci.com/indexes/index/664211 (last accessed Apr. 29, 2026) (under "Performance").

[259] M. Fazeli Interview (July 31, 2025).

[260] 2008 Resolution, ¶ 1.

[261] Investment Scenario Calcs spreadsheet (Jan. 22, 2025); Email from J. Furman to M. Fazeli (Nov. 13, 2024); *see* Text Message between C. Brooks and J. Furman (Jan. 6, 2025); UAW Budget Preparation Presentation (Jan. 8, 2025).

Assistant Director Fazeli acknowledged these limitations and that the calculation was intended to be "a general estimate to give [a] scale of the difference in gains," and "an idealized example, not completely accurate but a ballpark.  I wanted to see the order of magnitude about the numbers, I did not realize that it would become a conversation as it did.  As it did become a bigger thing, I knew it wasn't supposed to be perfect."[262]

When asked whether he had an understanding of how his calculations would be used, Assistant Director Fazeli said, "No . . . Other than to understand the magnitude of the difference between what we would've gotten and what we did get."  Fazeli told the Monitor that it was "daunting" to see his calculation reported publicly and that he tried "to look at [the] numbers and what they mean regardless of anybody else or political matters," though he was "certainly not perfect."  When asked how he would characterize the calculation, Fazeli clarified that "[f]rom a technical standpoint, I wouldn't call it a loss," and that he would instead say "lost potential earnings."[263]

The Segal Marco Consultant rejected the idea that there was any real loss.  The Consultant explained that the calculations assumed perfectly timing the market by reinvesting all cash at once, which is not a sound investment approach unless one can see the future.  He said that returning to an immediate 30% equity allocation given the market conditions at the time would have been "reckless" and a "violation of the prime directive of any trust" to ensure assets are "reasonably available when called upon."[264]  Further, it is also possible that if the issue had been raised to the IEB or the Union Officers earlier, as it should have been, the Union's investment portfolio would have been in a similar position.  The UAW had followed Segal Marco's advice for years, and the

---

[262] M. Fazeli Interview (July 31, 2025).
[263] M. Fazeli Interview (July 31, 2025).
[264] Segal Marco Consultant Interview (Oct. 17, 2025).

Investment Advisory Committee appears to have signed off on the Consultant's more conservative approach in February 2024, indicating that, had the Consultant's rebalancing recommendation been presented to the IEB or the Union Officers for consideration, it would have been accepted.

Finally, even assuming there were foregone gains, responsibility could not be solely attributed to the Secretary-Treasurer. Multiple people had responsibility under UAW policy and practice for overseeing the Strike Trust's allocations, as detailed in this Report.

### D.      Alleged Reporting Misstatements About Unrealized Gains

The President's Office also alleged that Secretary-Treasurer Mock presented an inaccurate and incomplete picture of the Union's financial condition by reporting only cost-based valuations of the Strike Trust while "intentionally and actively withholding" market value information from the IEB. Specifically, the President's Office alleged that "unrecognized gains of the Strike and Defense Fund assets should be treated as investment income," and that by presenting the IEB with cost-basis accounting instead of reporting the market value of the Union's investments, Mock failed to disclose millions in unrealized gains as General Fund "earnings" that the President's Office alleged were required to be transferred to the General Fund under Article 16, Section 11(c) of the UAW Constitution.[265] In the President's Office's view, this failure to disclose was "intentionally misleading" to the IEB about the Union's financial condition.[266]

These allegations are also false. The Monitor found no evidence that Secretary-Treasurer Mock intentionally misled the IEB about the Union's financial condition. To start, for as long as

---

[265] Compliance Memo (Jan. 27, 2025). Under Article 16, Section 11(c) of the UAW Constitution, "The interest and earnings on investments received by the International Union Strike and Defense Fund shall be allocated to the International Union General Fund or to such other purpose as the International Executive Board shall determine to be in the best interests of the UAW." At issue is the definition of "earnings" under this provision, and whether this definition includes unrealized gains, or only realized gains.

[266] Compliance Memo (Jan. 27, 2025); UAW Investment Policy Compliance Discussion Presentation (Jan. 27, 2025), at 3, 8; IEB Meeting Minutes (Feb. 19, 2025).

anyone at the Union can remember, the UAW has always interpreted "earnings" to mean only *realized* gains—gains from the actual sale of securities—not *unrealized* gains that exist only as fluctuations in market value.  Former Chief Accountant Geromin, who served from 2007 to 2024, told the Monitor that "for [accounting] purposes, earnings do not include unrealized gains or losses," and that the Union has never used unrealized gains in the way that the President's Office claimed is required.[267]  When asked whether unrealized gains had ever been allocated to the General Fund, Geromin responded emphatically: "No! Never ever ever!"[268]  Former Vice President Browning, who had served under three Secretary-Treasurers, stated that "everything's been reported out the same way forever," and that the information Secretary-Treasurer Mock reported is the "standard information that's presented, that's been the same."[269]

Although the Union's practice has generally been to use cost-basis accounting for regular reporting, the Monitor was provided with limited evidence that during past periods of significant financial stress, the IEB was presented with and discussed the value of unrealized gains at IEB meetings.[270]  However, there is no evidence this was ever regular practice or that Secretary-

---

[267] K. Geromin Interview (Feb. 12, 2025); Text Message between K. Geromin and M. Richardson (Apr. 7, 2025); K. Geromin Interview (June 16, 2025).

[268] K. Geromin Interview (Feb. 12, 2025).

[269] IEB Meeting Minutes (Feb. 20, 2025); C. Browning Interview (July 24, 2025).

[270] Specifically, at the November 2025 IEB Meeting, Regional Director Campbell passed out minutes from an August 2015 IEB meeting that stated that the Union does not "recognize unrealized gains" so "you won't see [unrealized gains] in our financial statements."  The minutes also state that the Union historically had liquidated assets to realize gains "when the economy is at its worst and UAW at its worst."  IEB Meeting Minutes (Aug. 11, 2015).  This understanding is also reflected in Regional Director Dawes's statements at the November 2025 meeting:

> "[S]o I think the history of our institution is we've done it when we had to do it.  Or we've done it for a purpose, like to get ready for the strike, for example.  Just doing it for a purpose.  I don't know that we ever did it just to do it, to realize gains, right.  Because I think that becomes very dangerous unless you're at a point where you got so much and you need to take some off.  If you're at that point, I think you're good.  But to do it just to pay the bills is a very slippery slope."

IEB Meeting Minutes (Nov. 19, 2025).

Treasurer Mock's use of cost-basis accounting in 2024 departed from standard Union reporting practices.

This approach was also consistent with the UAW's external reporting. As explained by the Union's outside auditor, Calibre, the UAW uses modified cash-basis accounting in its financial reports, which recognizes revenues and expenses when cash is received or paid out.[271] Under this method, investments are reported at cost rather than market value, and gains are recognized as revenue only when securities are sold.[272] Calibre discloses the fair market value in its biannual audit reports, which Secretary-Treasurer Mock regularly provides to the IEB.[273] In addition, the Department of Labor requires unions to file annual LM-2 financial disclosure forms, which are publicly available on the Department's website.[274] With respect to investments, the Department only requires unions to report cost and book value (the lower of cost or market value) in the LM-2s—not market value.[275] Consistent with this requirement, the Secretary-Treasurer reported the cost and book value of the Union's investments in its annual LM-2 filings with the Department of Labor.[276] The Monitor found no evidence that reporting the cost basis was improper, or that Secretary-Treasurer Mock withheld market value information from the IEB.[277]

---

[271] Calibre Interview (Jan. 10, 2023); Will Kenton, *Cash Basis Accounting: Definition, Example, Vs. Accrual*, INVESTOPEDIA, https://www.investopedia.com/terms/c/cashbasis.asp (last updated Jan. 29, 2025).
[272] K. Geromin Interview (June 16, 2025).
[273] Calibre Interview (Feb. 7, 2025); *see, e.g.*, Email from A. Townsel on behalf of M. Mock to IEB (June 9, 2023; Consolidated Financial Statements, at 15 (Dec. 31, 2022) (reporting the cost value, fair value, and unrealized appreciation of the UAW's investment securities).
[274] 29 U.S.C. § 431(b); 29 C.F.R. § 403.2.
[275] *See* 29 C.F.R. § 403.3; LM-2 Form Instructions, Schedule 5 (2025); *see also Reporting Investments on Form LM-2*, OFFICE OF LABOR-MANAGEMENT STANDARDS, https://www.dol.gov/agencies/olms/compliance-assistance/tips/reporting-investments-form-lm-2 (last updated May 29, 2024).
[276] Calibre Interview (Jan. 10, 2023); LM-2 Form (2025), Schedule 5.
[277] Further, under the 1996 Resolution, the Union Officers collectively have the responsibility to "make periodic reports to the IEB regarding the assets of the Strike Fund, the management of such assets, and *the investment performance of such assets*." 1996 Bal Harbour Resolution, ¶ 7 (emphasis added). Accordingly, even if it was somehow a violation to use cost-basis accounting, it would be inaccurate to state that Secretary-Treasurer Mock held responsibility for this violation alone.

65

### E.  Claim of Wrongful Retaliation

Secretary-Treasurer Mock contends that the allegations made against her by the President's Office regarding the Union's investment policy compliance are a continuation of the retaliatory pattern documented in the Monitor's Twelfth Status Report and its Supplement, in which President Fain removed eleven departments from her supervision in February 2024 based on false allegations.[278] The Monitor finds that Mock is correct, and that the current accusations fit a pattern of retaliation. The Union, too, has acknowledged and plans to address the Monitor's findings that the President's Office made key unsubstantiated or exaggerated accusations against the Secretary-Treasurer in this instance, consistent with the pattern of retaliation detailed in the recent Supplement to the Monitor's Twelfth Status Report.[279] For example, the key architect behind these allegations, then-Chief of Staff Brooks, left the Union's employment as of December 31, 2025, and Mock's departments were returned to her authority as of January 9, 2026.[280] These are strong steps forward that signal the Union's willingness to address acts of retaliation.

To be clear, there were legitimate concerns about how the Union handled the investment issues described above, including actions taken within the Secretary-Treasurer's Office for which Secretary-Treasurer Mock is ultimately responsible. Then-Executive Administrative Assistant Brien and/or the Investment Advisory Committee should have brought the Segal Marco Consultant's revised approach for reinvestment—provided at the February 19, 2024 Investment Advisory Committee Meeting and reflected in a follow-up email—to the Union Officers or the IEB. Although the Monitor found no intentional wrongdoing by Mock, as Brien's supervisor and as Chair of the Investment Advisory Committee during part of this period, she certainly shares

---

[278] M. Mock's Second Supplement to Initial Position Statement (July 24, 2025); Monitor's Twelfth Status Report; Supplement to the Monitor's Twelfth Status Report.
[279] Supplement to the Monitor's Twelfth Status Report.
[280] Supplement to the Monitor's Twelfth Status Report at 5-6.

responsibility with others for the delay in notification.  Moreover, when the President's Office requested investment documents in November and December 2024, Mock did not provide the necessary level of transparency required of her and denied their staff access to the November 6, 2024 Investment Advisory Committee meeting and delayed production of certain documents. Transparency remains a core value in a compliant organization, and as a Union Officer, the President had a right to attend that meeting and see those documents without delay.

However, none of these concerns justified the manner in which the President's Office responded to the investment compliance issues, as detailed below.

### 1.      Evidence of Retaliatory Intent

The President's Office's conduct bears all the hallmarks of retaliatory action prioritizing retribution against Secretary-Treasurer Mock over the Union's best interests.

**Ten-Week Delay.**  The President's Office's failure to notify anyone who could address the issue for ten weeks strongly supports Secretary-Treasurer Mock's retaliation claim.  By mid-November 2024, senior staff in the President's Office had concluded that the Union was "profoundly" out of compliance.  Rather than immediately notifying Mock, the Segal Marco Consultant, the Compliance Department, the Chair of the Investment Advisory Committee, and the Monitor, the President's Office staff conducted their own investigation to build a case against Mock.

When questioned about this ten-week delay, President's Office members offered implausible explanations that further demonstrate the retaliatory nature of their conduct.  Then-Chief of Staff Brooks claimed that the delay resulted from their "intent to be really careful."[281] This claim is not credible given that the resulting allegations were so clearly erroneous.  Given the

---

[281] C. Brooks Interview (Sept. 30, 2025).

two and a half months the members of the President's Office spent supposedly being "really careful," even with the intervening holidays, they could have easily discovered that it was the IEB—including President Fain himself—that suspended the Investment Policy, not Mock unilaterally.[282]   They also could have developed a more credible calculation of loss than the exaggerated numbers presented to the IEB and later leaked to the press, and realized that the Union had always used cost-based accounting and that Mock, following decades of precedent, had not "actively withheld critical investment income information from the IEB."[283]

The timing also undermines the credibility of the President's Office's actions: when they finally acted on January 31, 2025, they characterized the investment issues as an "emergency" requiring immediate action within days, yet they had sat on their findings for ten weeks, and President Fain himself had personally been aware for *at least* three weeks, having received a presentation on the issue on January 8, 2025.  Although they indeed raised an important compliance issue, the issue could and should have been raised in November when they came to believe there was a significant policy violation, with Top Administrative Assistant Furman and Assistant Director Fazeli noting that "[w]e are so profoundly out of range" and that there was "a lot of $ left on the table due to bad allocations."[284]   Or, at the very least, by January 8, 2025, by which time Fain had been notified of the compliance breach.

---

[282] Email from S. Fain to M. Mock, M. Booth, R. Boyer, C. Browning, B. Campbell, S. Dawes, L. Dickerson, L. English, D. Green, B. Mancilla, M. Miller, T. Smith, and D. Vicente (Aug. 22, 2023) ("I vote YES").  In fact, then-Chief of Staff Brooks had been directly informed of the Board Poll to suspend the Investment Policy and liquidate the equities portfolio in August 2023.  Text Message among S. Fain, C. Brooks, B. Dictor, and T. Lamadrid (Aug. 19, 2023).

[283] Compliance Memo (Jan. 27, 2025).

[284] Emails between J. Furman and M. Fazeli (Nov. 13, 2024); *see also* Email from J. Furman to C. Brooks (Nov. 13, 2024).  The Union has taken the position that the Monitor's claim that the President's Office "sat on" their findings for ten weeks as evidence of retaliation ignores that it took the President's Office time to understand whether there was a compliance issue requiring further action.  But there is no credible evidence to support this conclusion.  Members of the President's Office clearly believed there was a "profound[]" compliance issue as of this date and that it had cost the Union potentially tens of millions of dollars in lost

**Lodging False and Inflammatory Allegations.**  Further evidence of retaliatory intent is the manner in which then-Chief of Staff Brooks edited the presentation deck, adding even more inflammatory and false allegations in a manner virtually indistinguishable from his previous acts of retaliation against Secretary-Treasurer Mock described in the Supplement to the Monitor's Twelfth Status Report.[285]

Prior to the January 27, 2025 meeting with the General Counsel and the former Compliance Director, Assistant Director Fazeli prepared a presentation reflecting the President's Office's findings.[286]  After Fazeli circulated his draft, then-Chief of Staff Brooks edited the deck and drafted a separate Compliance Memo in order to "orient Karges and [the former Compliance Director]."[287]  Brooks's edits repeatedly turned tentative, preliminary findings into definitive accusations of misconduct:

- Whereas Fazeli's draft said decisions "appear to have been (?) unilaterally" made, Brooks changed this to say, "the decision to suspend the policy and to keep the policy suspended was made by the Secretary-Treasurer's Office unilaterally in violation of UAW policy."[288]

---

investment income.  Yet, they did not raise their concerns with anyone who could quickly determine the extent of the breach and address it for 10 weeks.  As noted above, the President's Office's members' claim that they were taking time to understand the issue and attempting to be careful is undermined by the falsity of the allegations and the exaggerated nature of the loss amount, including allegations that could be readily disproven based on even minimal due diligence.  It also does not explain why they would not have immediately notified their fears to the Investment Advisory Committee, Secretary-Treasurer Mock or the Segal Marco Consultant, who would have been in the best position to confirm the compliance breach and remediate it.  It is also undermined by the similar course of conduct described in the Monitor's Twelfth Status Report, discussed *infra*.  The President's Office followed that same retaliatory course of conduct here.

[285] Supplement to the Monitor's Twelfth Status Report.

[286] UAW Investment Policy Compliance Discussion Presentation (Jan. 27, 2025); Email from M. Fazeli to C. Brooks, J. Wade, and J. Furman (Jan. 24, 2025).

[287] Compliance Memo (Jan. 27, 2025); Text Message among C. Brooks, J. Furman, J. Wade, and M. Fazeli (Jan. 27, 2025) (Brooks: "Just finished a quick memo to help orient Karges and Marni.  Can y'all look this over and give feedback before noon?").  Top Administrative Assistant Furman is the only one who provided feedback.

[288] UAW Investment Policy Compliance Presentation Draft (Jan. 23, 2025), at 6; UAW Investment Policy Compliance Discussion Presentation (Jan. 27, 2025), at 7-8; Compliance Memo (Jan. 27, 2025).

- Whereas Fazeli initially noted in passive voice that "significant investment gains have been missed out on" without assigning individual blame or a specific amount,[289] Brooks changed the language to say that Secretary-Treasurer Mock's Office caused "an estimated loss of at least $80 million in expected investment earnings." In a comment to the deck, Brooks said that he made this edit as part of an effort "to drive the point about the losses due to being out of compliance a little more explicitly."[290]

- Brooks also added additional false allegations not in Fazeli's original draft, including stating that the losses were "the direct result of decisions that were unilaterally made by the ST's office,"[291] and that Mock's presentations "consistently misrepresented investment income forecasts."[292]

As detailed in Sections II.A through II.D above, each of these allegations was false. By systematically transforming compliance concerns into false accusations of serious financial misconduct, Brooks demonstrated his willingness to cast aside facts in favor of trying to inflict maximum reputational damage on Mock.

The conduct fits a larger pattern of retaliation against Secretary-Treasurer Mock, described in the recently issued Supplement to the Monitor's Twelfth Status Report. The President's Office followed an identical playbook in both instances: the President's Office identified what it claimed to be a significant problem requiring prompt remediation, but rather than taking immediate action, left the issue unresolved while building a false and inflammatory political case against the Secretary-Treasurer that was then leaked to the public. As explained in the Supplement, in January

---

[289] In Assistant Director Fazeli's original PowerPoint draft, he included approximately 12 slides at the end titled "Additional Slides (not for Monday's discussion)." UAW Investment Policy Compliance Presentation Draft (Jan. 23, 2025). These were removed from the presentation before it was presented to the Compliance and Legal Departments. *See* UAW Investment Policy Compliance Discussion Presentation (Jan. 27, 2025). In one of those additional slides, Fazeli mentioned his $80 million calculation, but this figure was not included in the earlier slides that were intended for presentation.

[290] UAW Investment Policy Compliance Presentation Draft (Jan. 23, 2025), at 6; UAW Investment Policy Compliance Discussion Presentation (Jan. 27, 2025), at 7-8; Compliance Memo (Jan. 27, 2025); Email from SharePoint Online to M. Fazeli (Jan. 24, 2025).

[291] UAW Investment Policy Compliance Discussion Presentation (Jan. 27, 2025), at 8; Email from SharePoint Online to M. Fazeli (Jan. 24, 2025).

[292] UAW Investment Policy Compliance Discussion Presentation (Jan. 27, 2025), at 8; Email from SharePoint Online to M. Fazeli (Jan. 24, 2025).

2024, after Mock refused to waive Union policy by approving a single-source contract, President Fain followed then-Chief of Staff Brooks's counsel and chose not to seek immediate IEB approval and instead spent seven weeks developing "a list of issues regarding the ST's office."[293] Similarly, the President's Office sat on the supposed "emergency" regarding non-compliance for ten weeks (and President Fain himself for nearly three weeks) so that they could incorporate it into another series of false allegations against Mock authored by Brooks.[294] This consistent pattern across multiple incidents over more than a year demonstrates that the retaliation is not isolated misconduct.

**Repeating False Allegations in Presence of Witnesses.** As further evidence of an intent to retaliate, President Fain and then-Chief of Staff Brooks persisted in repeating the false allegations against Secretary-Treasurer Mock even after the Monitor warned them not to do so. The Monitor had given this instruction because the Monitor had already determined that certain of those allegations were false, and repeating these false allegations to witnesses could influence their recollections when the Monitor later sought to interview them, thereby interfering with and obstructing the Monitor's investigation into the allegations.

Despite the Monitor's explicit instructions, President Fain and then-Chief of Staff Brooks repeatedly and immediately violated them.

- For example, only three days after the Monitor opened the investigation, Brooks contacted witnesses about the allegations. On February 7, 2025, Brooks interviewed former Director of Investments Karazia about his involvement with the Investment Advisory Committee,[295] in blatant disregard of the Monitor's instructions to avoid any attempt to influence witnesses.

---

[293] Supplement to the Monitor's Twelfth Status Report at 36; Text Message among S. Fain, C. Brooks, and J. Furman (Jan. 3, 2024).
[294] Supplement to the Monitor's Twelfth Status Report.
[295] *See* Email from C. Brooks to J. Wade, J. Furman, M. Fazeli, J. Dokho, and L. Dickerson (Feb. 8, 2025).

- Later that day, Brooks called a meeting with Secretary-Treasurer's Office staff and the Segal Marco Consultant during which he discussed the allegations against Mock.[296] Former Chief Accountant Geromin told the Monitor that then-Chief of Staff Brooks "tried to get [the Segal Marco Consultant] to agree with him" on the $80 million loss amount during this meeting.[297] The Consultant confirmed this dynamic, telling the Monitor that Brooks "used some aspects of truth and mixed in with his own narratives, which is powerful because when it has elements of truth, it's hard to disprove it."[298] This is precisely the type of witness contamination the Monitor warned against.

Further, on February 10, 2025, in a letter to the Union's General Counsel, the Monitor explicitly asked the Union to postpone the "emergency" IEB meeting scheduled for later that day in order to refrain from "repeating allegations that have not yet been proven"[299] because the Monitor had already determined "the materials appear to contain some errors."[300] Fain nevertheless proceeded with the IEB meeting, and at the beginning of that meeting, the Monitor reiterated the Monitor's earlier instruction that "discussing allegations that have not yet been proven or discussions of past conduct in this forum risks interfering with our investigation."[301] Yet, in disregard of the Monitor's warnings, Fain and Brooks repeated the false claims, including the allegation the Monitor had already identified as false—that Secretary-Treasurer Mock had unilaterally suspended the Investment Policy.[302] For example, Brooks declared to the IEB that, "There was no vote to suspend the policy."[303] This was demonstrably false, as Brooks himself had received a text message from Fain in August 2023 indicating that the IEB would be voting to approve the Investment Advisory Committee's recommendation to suspend the Investment

---

[296] Email from C. Brooks to B. Parker, Segal Marco Consultant, K. Geromin, J. Furman, J. Dokho, J. Wade, M. Fazeli, M. Richardson, M. Mock, and S. Fain (Feb. 7, 2025).
[297] K. Geromin Interview (Feb. 12, 2025).
[298] Segal Marco Consultant Interview (Oct. 17, 2025).
[299] Letter from Monitor to UAW General Counsel (Feb. 10, 2025); IEB Meeting Minutes (Feb. 10, 2025).
[300] Email from Monitor to UAW General Counsel and former Compliance Director (Feb. 4, 2025).
[301] IEB Meeting Minutes (Feb. 10, 2025).
[302] IEB Meeting Minutes (Feb. 10, 2025).
[303] IEB Meeting Minutes (Feb. 10, 2025).

Policy.[304]  Knowingly making such a false statement after being explicitly directed not to repeat unproven allegations is clear evidence of bad faith and retaliatory intent.  Fain also disregarded the Monitor's warnings, repeating the false allegation that the Union had lost $80 million in investment income: "[T]he direction was . . . when the three contracts were ratified, that we would go back to that, the established policy and investment policy. . . . We would have recognized around $80,000,000 more than what we currently have."[305]

After the meeting, Brooks emailed the Monitor challenging several aspects of the Monitor's February 10, 2025 letter.  Brooks conceded that he called a meeting with Secretary-Treasurer's Office staff and the Segal Marco Consultant—key witnesses to the Monitor's investigation—on February 7, 2025, and sought clarification as to whether it was acceptable to discuss alleged misconduct with witnesses while the Monitor is investigating and whether it was permissible to do so outside the presence of the Monitor.[306]  The Monitor responded that these questions were already addressed in the Monitor's February 10, 2025 letter and in prior reports and meetings and reiterated that Brooks should not "discuss alleged misconduct with key witnesses to an investigation while the Monitor has a pending investigation."[307]

Despite the Monitor's repeated warnings, at the next IEB meeting on February 19, 2025, President Fain escalated his false accusations even further, stating that Secretary-Treasurer Mock was "intentionally misleading this [B]oard" about the Union's finances, that "this board is making decisions when they're being misled and not given all the information," and that "we're not getting all the information as a [B]oard."[308]  Fain also repeated the allegation that "tens of millions of

---

[304] Text Message among S. Fain, C. Brooks, B. Dictor, and T. Lamadrid (Aug. 19, 2023).
[305] IEB Meeting Minutes (Feb. 10, 2025).
[306] Email from C. Brooks to Monitor (Feb. 11, 2025).
[307] Email from Monitor to C. Brooks (Feb. 14, 2025).
[308] IEB Meeting Minutes (Feb. 19, 2025).

dollars, probably $80,000,000 or ballpark in unrealized gains we would have got. But the direction of this board was not followed."[309] When the Monitor interjected at the end of the meeting to reiterate the Monitor's position, cautioning the Board that "[t]he question of whether the [S]ecretary-[T]reasurer violated the [I]nvestment [P]olicy and caused the [U]nion losses of tens of millions of dollars is the subject of a current [M]onitor investigation" and "that repeating unproven allegations and discussing past conduct risks interfering with the [M]onitor's ongoing investigation,"[310] Fain and then-Chief of Staff Brooks disregarded the instruction by asserting that the allegations were not allegations at all, but facts. Brooks said: "I don't believe anybody made any claims about what the [S]ecretary-[T]reasurer did or did not do. . . . [T]here's a difference between facts, which is what President Fain is saying, and allegations. A fact is something like if you're a fan of Twin Peaks, Laura Palmer is dead, right, or is murdered, and the allegation would be [the Monitor] murdered her, right?"[311] When the Monitor responded that he "heard earlier an allegation that the [S]ecretary-[T]reasurer has intentionally misrepresented the state of the [U]nion's finances to the [B]oard and also the tens of millions of dollars of losses,"[312] Fain responded: "That's a fact. That's not an allegation. We did not get all the information. We didn't get accurate information."[313]

**Disclosure to the Press and the Public.**[314] The manner in which the false allegations were disclosed to the public and press provides additional evidence of retaliation. On June 17, 2025,

---

[309] IEB Meeting Minutes (Feb. 19, 2025).
[310] IEB Meeting Minutes (Feb. 19, 2025).
[311] IEB Meeting Minutes (Feb. 19, 2025).
[312] IEB Meeting Minutes (Feb. 19, 2025).
[313] IEB Meeting Minutes (Feb. 19, 2025).
[314] The Union has requested that the Monitor remove this subsection as unnecessary and inaccurate. The Monitor disagrees. The leak to the press is relevant to assessing Secretary-Treasurer Mock's allegation of retaliation. The leak was made before the allegations against Mock could be disproven and the leak harmed Mock's reputation pursuant to a scheme of retaliation, which is relevant to this Report.

74

the Monitor published his Twelfth Status Report, detailing his findings that Secretary-Treasurer Mock had not been derelict in her duties and that President Fain and the President's Office had retaliated against Mock by removing her departments.[315]

Six days later, *Reuters* published a story on the false allegations against Secretary-Treasurer Mock based on information and documents leaked by Union personnel. The *Reuters* article, which cited "seven UAW officials and employees" as sources, quoted a public statement issued by the majority of the IEB which stated that Mock "is under investigation by the [M]onitor for a significant compliance failure regarding our union's investments" and included specific details about the alleged misconduct not yet revealed publicly. For example, the article stated that these sources said that an "investment blunder" cost the Union "$80 million in potential gains," based on the assumption that the Investment Policy "includes 30% allocation in a fund that tracks the Russell 3000 index."[316] As detailed in Section II.C above, this assumption—which was featured in the President's Office's deeply flawed and inflated calculations—is wrong on two levels: the Policy requires only a 22% minimum in equities (not 30%), and requires a split between domestic and international equities rather than concentrating in any single index. The *Reuters* article, in turn, was cited by the U.S. House of Representatives Committee on Education and Workforce's letter to the Union notifying them of a newly initiated investigation by the Committee into these allegations and requesting documents and information.[317]

---

[315] Monitor's Twelfth Status Report.

[316] Hall and Eckert, *Exclusive: UAW investment blunder cost the union an estimated $80 million, documents show*, REUTERS (June 23, 2025), https://www.reuters.com/sustainability/uaw-investment-blunder-cost-union-an-estimated-80-million-documents-show-2025-06-23/.

[317] Committee on Education and Workforce, U.S. House of Representatives, Oversight Letter (Sept. 11, 2025).

## III.    RECOMMENDATIONS

The facts uncovered by the Monitor's investigation evidence significant dysfunction and communication failures at the Union.  There were multiple points of breakdown:

- The August 2023 Board Poll did not specify a plan or timeline for reinvestment.

- The November 2023 VEBA payment decision caused Secretary-Treasurer's Office staff to question the prior directive but did not provide new direction.

- The Investment Advisory Committee failed to notify Union Officers not on the Committee about the Segal Marco Consultant's recommendation for reinvestment.

- Secretary-Treasurer Mock did not call a meeting of the Investment Advisory Committee for nine months nor inform the other Union Officers of the $50 million reinvestment in spring 2024.

- President Fain's retaliatory reorganization replaced the Director of Investments with someone who considered himself to be "not an investment guy."[318]

- Multiple officials were confronted with, yet did not question, the large cash balance.

- Then-Executive Administrative Assistant Brien did not advocate to Mock or anyone else for a revised Policy to be brought to the Union Officers.

- The Union Officers did not understand their responsibilities under the 1996 Resolution, believing the Investment Advisory Committee was responsible for making recommendations about the Union's investments and that final authority on the Union's investments remained with the IEB, though neither the 1996 Resolution nor the 2015 Investment Policy mentions these two bodies.

Each of these points highlights gaps and areas of confusion that the Union needs to address to ensure that trust funds are adequately safeguarded.

**Corporate Governance & Clarity in Roles.**  There is a significant lack of clarity over roles and responsibilities, contributing to gaps in communication and accountability.  The

---

[318] T. Brien Interview (Oct. 14, 2025).

76

patchwork of the 1996 Resolution, 2008 Resolution, and the 2015 Investment Policy creates overlapping and confusing responsibilities that need to be straightened out with a new Resolution and Policy that formally supersede all prior IEB actions and set forth roles and responsibilities over the Strike Trust in a single governing document.

**Qualifications.**  The relevant decision-makers lacked necessary experience.  By his own admission, then-Executive Administrative Assistant Brien was "not an investment guy" and was ill-equipped for the Director of Investments role.  The job description for Brien's Executive Administrative Assistant position does not require any qualifications related to finances or investments.[319]  The Segal Marco Consultant stated that given the size of the Union's assets, the UAW "should have someone more dedicated and with more investment experience."[320]  Former Director of Investments Karazia told the Monitor that the "position requires expertise or at least investment knowledge" and that it would be an improvement to have minimum qualifications for the position.[321]  Similarly, the Investment Advisory Committee was not well-positioned to oversee the Union's compliance with the Policy, as numerous Committee members told the Monitor they had never seen the Investment Policy when they voted to liquidate the equity portfolio in August 2023.[322]  Further, unlike with prior UAW administrations, no member of the Union's Legal Department attended Investment Advisory Committee meetings in 2024 to flag potential legal issues.[323]  The Union should take the necessary steps to ensure that there is a qualified Director of Investments and that training is conducted for all decision-makers on any oversight committee so that they can best fulfill their obligations to the Union.

---

[319] Executive Administrative Assistant Job Description, at 2-3 (Sept. 2024).
[320] Segal Marco Consultant Interview (Oct. 17, 2025).
[321] A. Karazia Interview (Nov. 12, 2025).
[322] R. Boyer Interview (July 23, 2025); S. Dawes Interview (July 25, 2025).
[323] *See* Investment Advisory Committee Meeting Minutes (June 6, 2022).

**Communication.**   The lines of communication within the Secretary-Treasurer's Office failed to effectively notify UAW leadership of the status of the Investment Policy.  The Secretary-Treasurer did not question the high liquidity account balance and did not call Investment Advisory Committee meetings for nine months in 2024.   The Secretary-Treasurer's then-Executive Administrative Assistant, Brien, did not raise that the Union was out of alignment with the 2015 Investment Policy.  The Union Officers did not meet at all in 2024.  And senior officials in the President's Office learned of the discrepancy in November 2024 and sat on it for more than two months.

The Monitor looks forward to working with the Union to develop these safeguards and will continue to report on and provide transparency into these important issues.

---

**Monitor's Recommendation No. 49:** To streamline and clarify the governance responsibilities currently set forth in the 1996 Resolution, 2008 Resolution, and 2015 Investment Policy, the Union should adopt a new Investment Charter and/or Resolution to establish and outline the responsibilities and roles related to investments.  The Investment Charter should specify at a minimum (a) the final authority over investments; (b) policy-setting and decision-making responsibility, including making recommendations for investment targets and allocations; and (c) responsibility for day-to-day operations, including direct oversight of the Union's outside investment consultant and execution of policy directives.

- **Union's Response:** The Union said it will work with the Monitor to implement the recommendations.

- **Monitor's Reply:** The Monitor will work with the UAW to implement this Recommendation.

**Monitor's Recommendation No. 50:** The Investment Charter and/or Resolution should establish the necessary qualifications for the Director of Investments and outside investment consultants with responsibility for directing or managing the Union's investments.

- **Union's Response:** The Union said it will work with the Monitor to implement the recommendations.

- **Monitor's Reply:** The Monitor looks forward to working with the Union to implement this Recommendation.

**Monitor's Recommendation No. 51:** To enhance regularity, transparency, and accountability for the Union's investments, the Investment Charter and/or Resolution should establish the cadence

---

of communications to the IEB on investment-related activities, including a regular cadence of reporting for the Investment Advisory Committee, the Director of Investments, and outside investment consultant.

- **Union's Response:** The Union said it will work with the Monitor to implement the recommendations.

- **Monitor's Reply:** The Monitor will work with the Union to implement this Recommendation.

**Monitor's Recommendation No. 52:** Building on the Monitor's and Internal Audit's recommendations that the UAW implement a formal budgeting process and invest in various forms of leadership training, the IEB should engage a qualified third party, which may include the Union's outside investment consultant, to deliver yearly, mandatory financial management and literacy training to the IEB and Investment Advisory Committee. This training should cover investment management, budgeting, and any other topics supporting the IEB's fiduciary responsibilities over Union funds.

- **Union's Response:** The Union said it will work with the Monitor to implement the recommendations.

- **Monitor's Reply:** The Monitor looks forward to working with the Union to implement this Recommendation.

\* \* \*

Pursuant to Paragraph 58 of the Consent Decree, the foregoing Report constitutes the fourteenth report of the Monitor, Neil M. Barofsky.

**Date: April 30, 2026**

Neil M. Barofsky, Monitor

*Respectfully filed with the Court on behalf of the Monitor by counsel to the Monitor,*

/s/ Michael W. Ross
Michael W. Ross
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, New York 10036
(212) 891-1600 (t)
(212) 891-1699 (f)

79

**CERTIFICATE OF SERVICE**

I hereby certify that on April 30, 2026, the foregoing Report was served electronically on all counsel of record via the CM/ECF system.  In addition, pursuant to Paragraph 58 of the Consent Decree, the foregoing Report was served on consent by electronic mail upon the United States, the UAW's International President, the International Executive Board, and designated counsel for UAW.

  /s/ Michael W. Ross
Michael W. Ross