**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-13293 |
| | ) | Honorable David M. Lawson |
| INTERNATIONAL UNION, UNITED | ) | |
| AUTOMOBILE, AEROSPACE, AND | ) | |
| AGRICULTURAL IMPLEMENT | ) | |
| WORKERS OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**MONITOR'S SIXTEENTH STATUS REPORT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

I.   PRESIDENT FAIN'S REASONS FOR REMOVING VICE PRESIDENT BOYER'S ASSIGNMENT .............................................................................................................. 9

     A.   Concessions on Absenteeism ................................................................. 12

     B.   Profit Sharing ......................................................................................... 15

     C.   Employee Vehicle Lease Program .......................................................... 18

     D.   Kokomo Battery Facilities ...................................................................... 21

     E.   Belvidere Assembly Plant ....................................................................... 24

     F.   Puerto Rico Conference ........................................................................... 26

     G.   Refusal to Work with the President's Office ........................................... 29

II.  VICE PRESIDENT BOYER'S ALLEGATIONS OF RETALIATION ............................ 33

     A.   The Stated Reasons in President Fain's Letter for Vice President Boyer's Removal Were Not Substantiated ............................................................ 34

     B.   Evidence of Retaliatory Intent ................................................................ 35

          1. Warren Stamping .............................................................................. 35

          2. The May 29 Ultimatum and Vice President Boyer's Refusal to Make Personnel Changes ........................................................................... 39

     C.   President Fain's Allegations Against Vice President Boyer Were Not Made in Good Faith ................................................................................. 41

     D.   Vice President Boyer's Other Allegations of Retaliation ......................... 44

          1. NTC Bonuses ................................................................................... 44

          2. Worker's Compensation ................................................................... 45

i

Pursuant to Paragraph 58 of the Consent Decree (Dkt. No. 10), the Court-appointed Monitor, Neil M. Barofsky, respectfully submits this sixteenth status report ("Sixteenth Report") concerning the monitorship of the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "Union" or the "UAW").

## INTRODUCTION

This Report presents the findings of the Monitor's investigation into competing allegations advanced by two of the senior-most officers of the UAW. On May 29, 2024, UAW President Shawn Fain removed Vice President Rich Boyer's oversight of the UAW Stellantis Department in a letter that accused Boyer of seven separate allegations of dereliction of duty and misconduct. In response, Boyer filed a formal complaint with the Monitor alleging that Fain's removal of his oversight was retaliatory, claiming that Fain had taken action against Boyer after Boyer refused Fain's request that he make personnel changes on his staff, declined to intervene in Fain's fiancée's sister's worker's compensation claim, and failed to approve a cash bonus that would have benefited a pool of non-UAW employees at the Stellantis National Training Center ("NTC") which included Fain's fiancée. After a thorough investigation, and as detailed further below, the Monitor has concluded that none of the seven stated reasons offered by Fain justified the removal of Boyer's Stellantis oversight and that, instead, Fain's actions were improper and fit into what has become a recurring pattern of retaliation. As detailed in the Monitor's Supplement to the Twelfth Status Report, the Union reversed Fain's decision and restored the Stellantis Department to Boyer by January 9, 2026.

**President Fain's Allegations Against Vice President Boyer**

The seven allegations advanced in President Fain's letter accused Vice President Boyer of a range of acts of deception and malicious conduct adverse to the interests of the Union's

1

membership.  These allegations were phrased in such a way as to support a finding that Boyer had committed a "dereliction of duty" under the UAW Constitution, which permits the President to remove a field assignment from an officer.  But the Monitor's investigation found that each of the seven allegations was either unsupported, unfounded, or—to the extent it had some factual basis— exaggerated to include a component of deception or a level of misconduct to support a charge of dereliction that was simply not present.  In several instances, the allegations improperly shifted responsibility for shortcomings or mistakes made by the President's Office during their negotiations with Stellantis onto Boyer.  In other instances, Fain knew his characterizations were false at the time he conveyed them in writing.  In short, none of the seven allegations, individually or collectively, supported a finding that Boyer had acted with the "malice or improper motivation" or the "culpable intent" that the Union's Public Review Board ("PRB") has previously found to be required for a finding of dereliction of duty.  The Monitor's assessment of each allegation is set forth in further detail in the body of this Report.  Those findings are summarized briefly here:

- **Absenteeism Concessions.**  President Fain's letter alleged that Vice President Boyer "agreed to concessions on absenteeism and hid those concessions from the President's Office until after the deal was finalized." The Monitor's investigation found that the concealment alleged by Fain did not occur.  Although Boyer's team did agree to concessions on attendance policies, the evidence showed that the President's Office was made fully aware of those concessions through multiple counterproposals and communications shared during the course of negotiations, before the contract was signed.  Members of the President's Office, including Fain's own top aides, confirmed to the Monitor that they were aware of the absenteeism concession discussions and did not object or intervene.

- **Profit Sharing.**  President Fain's letter alleged that Vice President Boyer, "without [Fain's] consent or foreknowledge," agreed to delay the implementation of supplemental employee profit-sharing from 2024 to 2025, contrary to what Fain claimed he had negotiated.  Although the start date in the contract initialed by Boyer was set for 2025, the Monitor's investigation found that the allegation against Boyer was unfounded.  Fain himself acknowledged to the Monitor that he never explicitly negotiated a specific 2024 start date with Stellantis; no other witness recalled any such

agreement; and Stellantis management told members of Boyer's team that they understood the start date to be 2025. Moreover, Boyer was unaware of Fain's intent that the payments should start in 2024, as the profit-sharing provision was negotiated directly by the President's Office—at times excluding Boyer from the discussions—making it the President's Office's responsibility to ensure the final contract reflected whatever Fain may have intended.

- **Employee Vehicle Lease Program.** President Fain's letter alleged that Vice President Boyer "agreed in private with the company" to exclude the employee vehicle lease program from the collective bargaining agreement, contrary to Fain's prior negotiations that such a benefit would be included in the contract. The Monitor's investigation found this, too, to be unsubstantiated. Multiple witnesses confirmed that it was Boyer, not Fain, who had negotiated the issue of vehicle leasing with Stellantis, and that the offer of a company policy—rather than a contractual provision—originated with Stellantis in direct response to Boyer's demands. To the extent that Fain alleged that he had obtained a prior agreement to include the benefit in the contract, the Monitor was unable to corroborate that claim and found no evidence that Boyer was ever informed of any such agreement by the President's Office. As such, the evidence did not substantiate the allegation that Boyer was derelict in accepting Stellantis's offer to provide the benefit via a company policy rather than a contractual term.

- **Kokomo Battery Plants.** President Fain's letter alleged that Vice President Boyer had "failed to develop a plan to appropriately address the significant issues impacting our members at Stellantis," citing in particular the failure to finalize an agreement with Stellantis's joint venture battery plants in Kokomo, Indiana. The Monitor's investigation found this allegation to be unsubstantiated. There was a delay in employing UAW workers at the Kokomo battery plants, but it stemmed from the contractual terms negotiated by the President's Office—which obtained only a "reasonable and good-faith efforts" commitment from Stellantis, not a guarantee—and from Stellantis's initial failure to reach agreement with its joint venture partner, Samsung. Far from failing to develop a plan, Boyer persistently pressed Stellantis on the issue, and as a result of his efforts, Stellantis management recommitted that Kokomo would be a UAW site. Fain was informed of that recommitment on May 15, 2024, in an email from Stellantis that noted it had told Boyer that it had "recommitted the current Kokomo Battery Plant will be UAW"—two weeks before Fain removed the Stellantis Department from Boyer, purportedly because of Boyer's inaction.

- **Belvidere Assembly Plant.** President Fain's letter alleged that Vice President Boyer and his department "remained completely silent" and took "no substantive action" as Stellantis repeatedly pushed back on its commitments to reopen the Belvidere Assembly Plant. The Monitor's investigation found this allegation to be untrue, as Fain himself

3

acknowledged during an interview with the Monitor. Boyer repeatedly engaged with Stellantis's senior management—including its Chief Operating Officer—about Belvidere's delayed reopening, and Boyer's engagement was documented in communications that were copied to Fain. Fain acknowledged in his interview with the Monitor that he and Boyer "were talking throughout the process" and that he knew about Boyer's meetings with Stellantis—an admission that directly contradicted his letter's claim that Boyer was "completely silent."

- **Puerto Rico Council Meeting.** President Fain's letter alleged that Vice President Boyer decided to hold the Stellantis Council meeting in Puerto Rico "despite [Fain's] repeated objections," thereby harming the Union's organizing efforts. The Monitor's investigation found this allegation to be exaggerated. Boyer did hold the Council meeting in Puerto Rico, which resulted in negative press, but Fain's objections were raised at a single International Executive Board ("IEB") meeting—not repeatedly—and the meeting site was approved by a full vote of the IEB, over Fain's objection.

- **Refusal to Work with the President's Office.** Finally, President Fain's letter alleged that Vice President Boyer "repeatedly refused to work with senior staff from the President's Office." The Monitor's investigation found that although Boyer spoke harshly to a member of the President's Office on one occasion and told him that he would not work with him—inappropriate conduct that Boyer acknowledged and promptly apologized for—there is no evidence that Boyer "refused to work" with the President's Office on the Stellantis negotiations, let alone repeatedly. Indeed, following Boyer's apology, the member of the President's Office regularly participated in daily morning round-up meetings with Boyer and/or his team. An additional incident cited not by Fain but by another member of the President's Office involved conflicting accounts about whether Boyer permitted that official to attend all meetings relevant to his assignment, but that official confirmed that Boyer's staff kept him regularly updated and informed. Moreover, members of the President's Office, including Fain himself, were regularly involved with the Stellantis negotiations, at times excluding Boyer. This does not constitute "repeatedly refus[ing] to work with" the President's Office and does not meet the standard for dereliction of duty.

**The Removal Was Retaliatory**

The Monitor's investigation further found that President Fain's removal of the Stellantis Department from Vice President Boyer was retaliatory. As with the Monitor's analysis of the retaliation claims by Secretary-Treasurer Mock, detailed in the Monitor's Twelfth Status Report and its Supplement, the Monitor applied a multi-step framework: examining first whether the

4

stated reasons were substantiated; and then, having found them to be false or exaggerated, examining what other reasons Fain may have had for taking action against Boyer and whether those reasons were legitimate, including whether Fain had a good-faith but mistaken belief in the allegations or instead had acted with retaliatory intent. That analysis yielded clear answers at each step.

*First*, and as detailed above and below, President Fain's stated reasons for taking action against Vice President Boyer were false and pretextual. *Second*, Fain did not act in good faith— his own admissions, corroborated by the documentary record and witness testimony, demonstrated that he was aware that at least several of the allegations were false at the time he made them. For instance, on Belvidere, Fain admitted he knew Boyer had been actively engaged with Stellantis throughout the period he accused Boyer of being "completely silent." On profit sharing, Fain acknowledged he had never stated a specific start date in negotiations, yet accused Boyer of undermining a date he had not negotiated. On absenteeism, contemporaneous counterproposals document that Fain and his Office received notice of the concessions during bargaining, directly disproving his claim that Boyer hid them. And on Kokomo, Fain received written memorialization from Stellantis on May 15, 2024—two weeks before he removed the Stellantis Department from Boyer—that Stellantis had "recommitted [to Boyer that] the current Kokomo Battery Plant will be UAW" and that they had developed a "directional plan" to hire and backfill positions with UAW members, directly undercutting Fain's allegation that Boyer had "failed to develop a plan."

The evidence further demonstrated that the removal was in fact motivated by grounds *not* cited by President Fain in the May 29 letter. This included at least two other incidents that Fain acknowledged as motivation for his action against Vice President Boyer but which he did not put

5

in his letter—presumably because he recognized that these reasons could not constitute legitimate grounds for a dereliction of duty finding.

*First*, President Fain told the Monitor that his decision to remove the Stellantis Department from Vice President Boyer was motivated by Boyer's settlement of approximately 200 health and safety grievances at the Warren Stamping plant, which resolved dangerous working conditions—including roof leaks, broken ventilation systems, and a waste oil-covered floor—that the local union had been seeking to address for nearly a year. Boyer's settlement frustrated an alternative strategy that Fain had been developing but had not shared with Boyer. When Boyer reported to Fain that he had resolved the grievances, Fain told Boyer he did not "give a fuck" and that there were underlying issues he would not share. After this, Fain told the Monitor that he decided he "needed to do something." Over the following two days, he directed then-Top Administrative Assistant Chris Brooks to draft what would become the May 29 letter that set forth the seven allegations and removed the Stellantis Department from Boyer.

*Second*, before sending his May 29 letter, President Fain delivered Vice President Boyer an ultimatum via two memoranda drafted by then-Top Administrative Assistant Brooks: fire and demote two of his senior Stellantis Department staff or lose the Stellantis assignment. Boyer refused, telling Fain he would not let Fain "bully" him. Fain admitted he expected Boyer to refuse. Within hours, Fain issued the May 29 letter that laid out the seven accusations against Boyer and which formally removed Boyer's oversight of the Stellantis Department. These two undisclosed reasons for punishing Boyer were not legitimate reasons for a finding of dereliction of duty—Boyer's settlement of health and safety grievances on behalf of his members and his refusal to dismiss his own staff at the President's demand were both within the legitimate exercise of his assigned duties as the UAW Vice President overseeing the Stellantis Department.

6

Adding to the evidence of bad faith, President Fain deleted from his phone nearly all text messages with then-Top Administrative Assistant Brooks during the critical period—March through July 2024—including the message from Brooks that contained the ultimatum talking points that Fain delivered to Boyer.  Also apparently destroyed was the memorandum directing the personnel changes Fain wanted Boyer to make.

**Pattern of Retaliation**

Further support for the Monitor's finding of retaliation comes from the pattern of conduct that should be familiar to the Court.  As detailed in the Monitor's Twelfth Status Report and its Supplement, President Fain employed a substantially similar approach in retaliating against Secretary-Treasurer Mock:  identifying a pretextual basis for adverse action after Mock exercised her legitimate authority in a way that displeased him, enlisting then-Top Administrative Assistant Brooks to draft documentation of false allegations, and destroying relevant evidence.  In both instances, Fain turned to Brooks to generate the paperwork; in both cases, the stated allegations were false or exaggerated and contradicted by evidence; in both cases, evidence was deleted; and in both cases, the true reasons for the action were ones Fain apparently understood could not withstand scrutiny and so were withheld from the documentation he caused to be created.

**Additional Finding: Abuse of Presidential Authority**

The Monitor also found, in the course of this investigation, that President Fain acted improperly and abused the authority of his office in connection with matters involving his fiancée and her sister.  *First*, the Monitor substantiated the claim that President Fain acted improperly to obtain financial benefits for his fiancée through a bonus for employees at the NTC, which Vice President Boyer declined to approve.  *Second*, the Monitor found that Fain abused his authority

when he pressed Boyer, a Stellantis Senior Vice President, and others to intervene on behalf of his fiancée's sister, a UAW member employed at a Stellantis plant, in a worker's compensation matter.

In addition, although the Monitor has uncovered evidence in this and in the Monitor's prior reports warranting potential disciplinary action, he has deferred a decision about any remedial action pending further consultation with the parties to the Consent Decree. Further detail concerning the Monitor's findings is set forth below.[1]

---

[1] Consistent with past practice, the Monitor provided the factual contents of this Report to the Union to confirm the factual accuracy of its findings and to allow the Union to identify any alleged factual inaccuracies before publication. The Union, through their outside counsel, provided some comments (which the Monitor has taken under consideration) but claimed that it did not have sufficient time to provide full factual feedback, despite multiple opportunities for the Union to do so over a twenty-day period. The Monitor also provided the Union with the opportunity to object to any attorney-client privileged or collective bargaining material contained in this Report. The Union proposed edits to address its assertion of these privileges, and the Monitor accepted each of the Union's proposals.

## I. PRESIDENT FAIN'S REASONS FOR REMOVING VICE PRESIDENT BOYER'S ASSIGNMENT

Under the UAW Constitution, the UAW President may "withdraw any field assignment made to any elected officer when they become convinced that the officer has been derelict in their duty or been guilty of a dishonest act."[2] In a May 29, 2024 "Inter-Office Correspondence" letter to Vice President Boyer, President Fain wrote that he was removing oversight of the Stellantis Department from Boyer "out of deep concern over your dereliction of duty as Vice President and the egregious impact such action has had on our membership."[3] The letter advanced seven separate allegations against Boyer that Fain claimed as the basis for his finding that Boyer was in "dereliction of duty." Specifically, the letter alleged that Boyer had:

- Agreed to concessions on employee absenteeism policies during contract negotiations with Stellantis and hid those concessions from the President's Office until after the deal was finalized;

- Agreed to delay what Fain claimed was the previously agreed upon implementation of supplemental employee profit sharing from 2024 to 2025, without Fain's consent;

- Undermined Fain by privately agreeing with Stellantis to include an employee vehicle lease program as a company policy, rather than as codified in the contract, as Fain claimed he had previously negotiated;

- Failed to "develop a plan" to finalize an agreement at the Kokomo battery plants;

- Remained completely silent as Stellantis delayed the launch of new products and hiring plans for the reopening of the Belvidere Assembly Plant;

- Decided to hold the Stellantis Council in Puerto Rico, despite Fain's repeated objections, thereby harming the Union's organizing drives; and

---

[2] UAW Const. art. 13, § 4. President Fain cited this provision as justification for the removal of the Stellantis Department from Vice President Boyer. Letter from S. Fain to R. Boyer (May 29, 2024).
[3] Letter from S. Fain to R. Boyer (May 29, 2024).

9

- Refused to work with the President's Office on Stellantis bargaining issues.

Fain sent the letter to the IEB. The news was then leaked to the press, making his accusation that Boyer had been "derelict in his duty" public.[4]

The seven allegations contained in the letter included accusations that Vice President Boyer engaged in significant acts of deception or malicious conduct that favored Stellantis and injured the interests of UAW members. For example, the letter broadly accused Boyer of "agree[ing] to watered-down language in private" and "allow[ing] the company to backtrack on what they actually agreed."[5] More specifically, the letter said that Boyer "hid . . . concessions" from the President's Office, agreed to delay previously negotiated employee benefits "without [Fain's] consent or foreknowledge," "agreed in private with the company" to limit an employee benefit, and remained "completely silent" and took "no substantive action" as Stellantis continued to delay progress on the reopening of a UAW-staffed plant.

These allegations of deception and wrongdoing toward the interests of members were phrased in a manner that was consistent with the standard for what constitutes a "dereliction of duty" under the UAW Constitution. According to the PRB, the body responsible for adjudicating appeals of IEB decisions, a dereliction of duty entails "malice or improper motivation,"[6] or "a culpable intent to injure the charging party or a disregard of that interest so flagrant it could be considered as willful and wanton."[7] By contrast, generally speaking, an "exercise[] [of] poor

---

[4] Email from D. Wallace on behalf of S. Fain to R. Boyer (May 29, 2024); *see, e.g.*, Kalea Hall et al., *UAW Vice President Rich Boyer removed as head of Stellantis department*, DETROIT NEWS (May 30, 2024), https://www.detroitnews.com/story/business/autos/chrysler/2024/05/30/uaw-vice-president-rich-boyer-out-as-head-of-stellantis-department/73906549007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z115846e1144xxv115846d--64--b--64--&gca-ft=173&gca-ds=sophi.

[5] Letter from S. Fain to R. Boyer (May 29, 2024).

[6] *Powell v. UAW International Executive Board*, PRB No. 1466, at 8 (2004) (citing *Comley v. Noble*, 1 PRB 347 (1965)).

[7] *Maewethers Marshall v. Local 1364, UAW*, 1 PRB 522, 526 (1969).

judgment"[8] or "fail[ing] to do [one's] job properly"[9] do not constitute a dereliction of duty, nor does a disagreement as to how an issue should be handled.[10]

As detailed below, the investigation showed that none of President Fain's allegations of dereliction of duty or malicious or deceptive conduct on the part of Vice President Boyer were substantiated.[11]   Instead, the investigation showed that the seven cited reasons were either unsupported, unfounded, or, to the extent that they had some factual basis, were exaggerated to include a component of deception or a level of misconduct that was not present.   In several instances, the allegations improperly shifted responsibility for shortcomings or mistakes during negotiations made by the President's Office onto Boyer.   As a result, each of the seven allegations that formed the basis for Fain's dereliction of duty charge against Boyer was invalid.   Or, in the

---

[8] *Powell*, PRB No. 1466, at 8.

[9] *Valdez v. Local Union 31, UAW*, PRB No. 1139, at 300 (1996).

[10] *Gardner v. UAW Local Union 653 Executive Board*, PRB No. 1292, at 586 (2000).  The Monitor reviewed PRB decisions concerning charges of "dereliction of duty," the standard cited by President Fain for removing Vice President Boyer's assignment.  Those decisions deal with charges of a dereliction of duty as charged under Article 31 of the UAW Constitution, as opposed to Article 13, which permits the Union President to remove a field assignment "when they become convinced that the officer has been derelict in their duty."  Previously, the Union took the position that the Article 13 standard is entirely subjective and requires only that the President is actually convinced of the dereliction of duty, regardless of whether the officer actually has been derelict.  *See* Statement of the International Union, UAW in Response to the Monitor's Twelfth Report, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (June 20, 2025), Civil No. 20-cv-13293, ECF No. 153, at 2-3 ("Union's Statement").  This position makes little sense.  Although the President has discretion to determine there was a dereliction of duty under Article 13, that discretion is not unlimited and must be based on facts, not false allegations or conjecture, or for retaliatory purposes.  *See, e.g.*, *Craig v. IEB*, PRB No. 1891, at 14 (2024) (noting that discretion cannot be used "for a reason deemed impermissible under the E[thical] P[ractices] C[odes] or external law").  However, even if the standard was a subjective one, it was still not met, because the Monitor found that Fain did not have a good-faith belief in the allegations that he advanced against Boyer.

[11] In addition to the support cited in this Report, there were additional corroborating witnesses for the facts of the Report who asked to remain anonymous, including for fear of retaliation.  Because their evidence was merely corroborative of the other evidence already cited in this Report, the Monitor has not cited those interviews in order to protect the witnesses from retaliation.

words of the operative PRB case law, Fain did not base his removal decision upon "well-established fact."[12]

As reported in the Supplement to the Monitor's Twelfth Status Report, the Union's IEB rescinded President Fain's decision and restored Vice President Boyer's oversight of the Stellantis Department by January 9, 2026.[13]

## A.    Concessions on Absenteeism

The first reason in President Fain's letter alleged that Vice President Boyer, "[d]espite the fact that [Fain] was clear going into bargaining that [the Union] would accept no concessions, [] agreed to concessions on absenteeism and hid those concessions from the President's Office until after the deal was finalized."[14]

The Monitor's investigation found that the portion of this claim that would be material to whether Vice President Boyer acted with dereliction of duty—that Boyer "hid" the concessions from the President's Office until after the contract was signed as opposed to sharing them before— was unsubstantiated and untrue.   To be sure, Boyer's team did agree to concessions on absenteeism—changes to Stellantis's employee attendance policies that primarily (1) tied an employee bonus to attendance metrics, (2) ran Family and Medical Leave ("FMLA") concurrently with vacation time, and (3) changed the attendance procedure to a point-based discipline process,

---

[12] Ethical Practices Codes Democratic Practices § 3; *UAW Local Union 2320 v. UAW International Executive Board*, PRB No. 1873, at 15-16 (2024); *Gaston-Kelley v. UAW DaimlerChrysler Department*, PRB No. 1476, at 14 (2004) ("*Gaston-Kelley I*") (holding that the Constitution's guarantee of due process does not permit a Department Director to summarily remove a representative without first investigating and making findings to support the removal decision); *see also Bickerstaff v. International Vice President, Stellantis Department*, PRB No. 1868, at 9 (2023) (making a decision upon the findings of an investigation); *Franklin v. UAW Stellantis Department*, PRB No. 1853, at 17 (2022).

[13] *See* Supplement to the Monitor's Twelfth Status Report, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (Dec. 18, 2025), Civil No. 20-cv-13293, ECF No. 156, at 5 ("Supplement to the Monitor's Twelfth Status Report").

[14] Letter from S. Fain to R. Boyer (May 29, 2024).

and each were more restrictive than the prior contract. But the evidence demonstrated that the President's Office was made fully aware of the concessions and made no objection to their inclusion. For example, the President's Office received several counterproposals[15] documenting the discussions concerning concessions on at least three different occasions between September and October 2023, including from Boyer's team. This included, on September 12, 2023, Outside Counsel Ben Dictor sending Counterproposal #3 to President Fain's Top Administrative Assistants Brooks, Paul Caucci, and Jason Wade, and Research Director Jeff Dokho. The counterproposal included language that made clear that a concession regarding absenteeism was still being discussed. The counterproposal stated that Stellantis had concerns about "persistent levels of high unplanned absenteeism" and that the parties were in active discussions about "various changes" to address the issue.[16] In response, Dokho emailed Bob Mikulan, an Assistant Director in the President's Office, flagging that Stellantis's attendance proposals were "still on the table."[17] Then, on September 20, 2023, Boyer sent Counterproposal #5 directly to Fain, who forwarded it to Dictor and three members of his staff.[18] This counterproposal stated that the parties had agreed to parts of the absentee concessions that Fain later falsely claimed were hidden from him. The counterproposal stated that the parties agreed to tie the Quality Achievement Award (an employee bonus) to plant-level attendance targets.[19] The counterproposal also stated that Stellantis would "[c]hange the current attendance discipline procedure to a point-based discipline process."[20] Later,

---

[15] Counterproposals are joint negotiation documents that memorialize both what each side has proposed and what the parties have already agreed to. As such, they do not reflect confidential collective bargaining materials.

[16] Counterproposal #3 (Sept. 12, 2023).

[17] Email from J. Dokho to B. Mikulan (Sept. 12, 2023).

[18] Email from D. Reeder on behalf of R. Boyer to S. Fain (Sept. 20, 2023); Email from S. Fain to C. Brooks, B. Dictor, J. Wade, and P. Caucci (Sept. 20, 2023).

[19] Counterproposal #5 (Sept. 19, 2023); *see also* UAW Response to Counterproposal #5 (Sept. 21, 2023).

[20] Counterproposal #5 (Sept. 19, 2023).

13

on October 19, 2023, Brooks sent Counterproposal #9 directly to Fain and his team, which stated that the parties had agreed on the absenteeism concessions, in particular that the Quality Achievement award would be based on both plant-level absenteeism targets and individual employee metrics and that "FMLA leave [would] run concurrent" with vacation time "except for 40 hours that remain in employees vacation bank."[21]

Across the drafts shared with President Fain and his Office, they made clear that during the negotiating sessions, the absenteeism concession became progressively more concrete—moving from an issue under active discussion to terms the parties had agreed upon—and the President's Office received each version.  The contract had not yet been signed at this point, giving the President's Office multiple opportunities to object or seek to reverse Vice President Boyer's actions if they believed them to not be in the best interests of the Union.  They did not do so.

Further, members of the President's Office told the Monitor that they were aware of the discussions regarding the absenteeism negotiations and concessions.  For example:

- President Fain's Top Administrative Assistant Caucci recalled a daily round up meeting where Vice President Boyer discussed Stellantis's concerns about employee attendance and absenteeism and Stellantis's request that FMLA leave run concurrently with vacation time to address their concerns, which was a consistent request made by Stellantis and was a concession in the final agreement.[22]

- Outside Counsel Dictor, who advised the President's Office, told the Monitor that absenteeism was a "frequent subject in negotiation" with Stellantis, that the parties were "bargaining over" it during those negotiations, and that he remembered at least one specific discussion with Stellantis on the issue.[23]

---

[21] Counterproposal #9 (Oct. 19, 2023); Email from C. Brooks to S. Fain, J. Dokho, J. Wade, J. Furman, R. Turner-Bailey, M. Fazeli, P. Caucci, and B. Dictor (Oct. 19, 2023).
[22] P. Caucci Interview (July 18, 2024).
[23] B. Dictor Interview (June 18, 2024).

In all, Vice President Boyer's disclosure of the concessions to the President's Office defeats the allegation that he concealed them from the President's Office. In other words, although the Monitor found that Boyer did agree to certain concessions as alleged, the allegation that would warrant a finding of dereliction of duty—that he "hid" those concessions from Fain "until after the deal was finalized"—is demonstrably untrue and appears to have been fabricated.

### B.   Profit Sharing

The second allegation in President Fain's May 29, 2024 letter was that Vice President Boyer "without [Fain's] consent or foreknowledge, [] went and signed language that allowed the company to push back the implementation of profit sharing for supplemental employees to 2025," even though Fain had "bargained profit-sharing for all supplemental employees starting year one of the contract."[24]

The Monitor's investigation found that this allegation was unsubstantiated. President Fain's central claim—that Fain had explicitly bargained for supplemental employees at Stellantis to receive profit-sharing payments starting in 2024—was not supported by documentary or other evidence. The evidence did demonstrate that the President's Office took the lead in negotiating this provision and successfully negotiated the extension of profit-sharing eligibility to supplemental employees for the first time, but the Monitor found no evidence beyond Fain's own claims that he had secured agreement from Stellantis on a 2024 start date. To be sure, Vice President Boyer did initial the applicable page of the contract that governed the date on which the payments would start, but he had no role in negotiating the provision and no reason to suspect that it did not reflect whatever start date Fain may have thought he secured. The Monitor did not find evidence that Fain or anyone else communicated any intended start date to Boyer.

---

[24] Letter from S. Fain to R. Boyer (May 29, 2024).

*First*, President Fain himself acknowledged to the Monitor that he never explicitly specified that profit-sharing payouts would in fact begin in 2024, but that, instead, he believed that it was clear from the negotiations that supplemental employees would receive payouts "that next year."[25]  Although Fain felt his intent was clear, Vice President Boyer could not be found to be derelict in his duty for not adhering to an agreement that was never explicitly reached and of which he was never informed.  Significantly, other witnesses, in the President's Office and elsewhere, did not recall that a specific start date was discussed or agreed upon at the bargaining table, and although Fain said that he thought that the intent was clear, that was not a view shared by other participants in the negotiations.  For example, Outside Counsel Dictor, who was present for high-level profit-sharing discussions with Stellantis, recalled only that the broad demand was that "temps get profit share," not that a particular start date had been negotiated.[26]  Dictor told the Monitor that he did not "remember having [a] discussion" about whether it was "possible to get in [at the] start of [the] plan year," but he also said he was not present for the meeting at which the profit-sharing agreement was reached.[27]  Others who participated in the negotiations similarly had no recollection of Fain negotiating a 2024 start date, even though the UAW had successfully obtained that date in its negotiations with Ford and General Motors.  Indeed, in early 2024, after Ford and General Motors began to pay out profit sharing to supplemental employees and Stellantis did not, Boyer raised the issue with Stellantis.[28]  Stellantis management told members of Boyer's team that the UAW "never said [they] wanted it paid out for [the] 2023 plan year to Supplementals," and multiple witnesses told the Monitor that Stellantis understood that the intent

---

[25] S. Fain Interview (Dec. 17, 2024).
[26] B. Dictor Interview (June 18, 2024).
[27] B. Dictor Interview (June 18, 2024).
[28] R. Boyer Interview (Nov. 20, 2024).

during negotiations with Fain was to start payouts in 2025 and that Fain had never negotiated an earlier start date during the bargaining.[29]

*Second*, because the profit-sharing provision was negotiated by members of the President's Office, they should have been the ones to ensure that the contract reflected whatever President Fain may have intended.[30]  Fain, Outside Counsel Dictor, and then-Top Administrative Assistant Brooks negotiated the provision directly with Stellantis—at times excluding Vice President Boyer from the discussions entirely.[31]  Boyer told the Monitor that neither he nor his staff were responsible for negotiating profit sharing, and that as a result, the President's Office was in the best position for assuring that the terms it negotiated were reflected in the contract.[32]  Yet the President's Office did not do so.  Dictor said that the President's Office was "surprised" by the language when the issue later surfaced—confirming that the President's Office had not reviewed its own provision before the contract was ratified.[33]  Fain acknowledged that he did not closely review the profit-sharing provisions before ratification—he said he reviewed only the highlights, which did not articulate the effective start date for profit sharing, and assumed Boyer had reviewed the language.[34]  But Boyer told the Monitor that even if he had been focused on the profit-sharing language, he would not have known whether it differed from what the President's Office had

---

[29] H. Hawkins Meeting Notes (Jan. 9, 2024); R. Boyer Interview (July 25, 2024); R. Boyer Interview (Nov. 20, 2024).

[30] Profit sharing was an "economic issue," which numerous interviewees told the Monitor were under the President's Office's purview.  *See* J. Wade Interview (June 10, 2024); B. Dictor Interview (Nov. 18, 2024); S. Fain Interview (Dec. 17, 2024).

[31] R. Boyer Interview (Nov. 20, 2024).

[32] R. Boyer Interview (Nov. 20, 2024); Letter from R. Boyer to S. Fain (June 8, 2024).

[33] B. Dictor Interview (June 18, 2024).

[34] UAW Stellantis Hourly Agreement (Nov. 1, 2023), https://uaw.org/wp-content/uploads/2023/11/Stellantis_HourlyHighlighter.pdf; S. Fain Interview (Dec. 17, 2024).

17

agreed to, because he was not part of the negotiations and their intended terms were never communicated to him.[35]

In all, the evidence demonstrated that the President's Office—not Vice President Boyer—bore the responsibility for the profit-sharing provision, and that it was never made clear to Boyer or others that President Fain believed that he had negotiated a 2024 start date. As a result, the Monitor finds that although Boyer did initial the agreement, because the evidence did not support Fain's allegation that he had explicitly "bargained profit-sharing for all supplemental employees starting year one of the contract" or that Boyer was aware of Fain's intent, the evidence showed that Boyer acted in good faith and was not derelict in his duty.

### C. Employee Vehicle Lease Program

The third allegation made by President Fain was that Fain "bargained for an employee lease program at the negotiating table," and Vice President Boyer "subsequently agreed in private with the company that such a program would not be included within [the Union's] legally binding collective bargaining agreement but would only be a company policy." Fain added: "Thankfully, my staff learned of your private deal with management, and I was able to intervene to make certain that it was indeed included in our contract."[36]

The Monitor's investigation found that this allegation was also unsubstantiated. President Fain's letter claims that he bargained for the employee lease program and that Vice President Boyer then went behind his back to downgrade it to a company policy, but the evidence does not support this.

---

[35] R. Boyer Interview (Nov. 20, 2024).
[36] Letter from S. Fain to R. Boyer (May 29, 2024).

During negotiations, according to multiple witnesses, Vice President Boyer independently raised concerns that tier-two employees could not afford to buy Stellantis vehicles.[37]  In response, Stellantis offered the employee lease program—which provides UAW employees vehicle leasing benefits—as a company policy, outside the collective bargaining agreement.  On October 30, 2023, Stellantis Senior Vice President ("SVP") Chris Fields emailed Boyer with the offer and specifically noted that it was not something that had previously been part of the contract negotiations with President Fain or anyone else at the UAW: "the Company Car program is being extended as an extra benefit and was not part of the negotiations."[38]  As a company policy, Stellantis reserved the right to amend, suspend, or terminate the program at any time, whereas if it was included in the contract, Stellantis would be bound to offer the program for the duration of the contract.  Multiple witnesses told the Monitor that it was Boyer, not Fain, who initially raised the issue and that the offer of a company policy was in response to Boyer's demands rather than Fain's.[39]  Because the evidence does not support the existence of a prior agreement that the program would be within the contract, there is not sufficient evidence to support Fain's claim that Boyer "agreed in private" with Stellantis to remove the program from the contract and make it a policy.  Instead, the evidence shows that the company-policy structure originated with Stellantis in response to Boyer's demands.[40]  Moreover, even if Fain had separately negotiated to include the benefit in the contract and Stellantis had lied when it told Boyer otherwise, the Monitor found no evidence that the President's Office had communicated to Boyer that it had done so.  Thus, even if Fain's allegation that he had negotiated for the program at the bargaining table was true, Boyer was unaware of this

---

[37] *See, e.g.*, R. Boyer Interview (Nov. 20, 2024).
[38] Email from C. Fields to R. Boyer (Oct. 30, 2023).
[39] *See, e.g.*, R. Boyer Interview (Nov. 20, 2024).
[40] R. Boyer Interview (Nov. 20, 2024).

19

and therefore could not be derelict in his duty or act with any intent to "agree in private" to exclude this benefit from the contract.

The day after Stellantis offered the employee lease program, October 31, 2023, then-Top Administrative Assistant Brooks went to Vice President Boyer's team to review draft contract language and learned of the Stellantis offer. President Fain and Brooks insisted the program receive contractual protection, because as a company policy, Stellantis could revoke it at any time, and they claimed that Stellantis had verbally agreed that the program would be included in the contract, although the Monitor was unable to substantiate this claim with others. Fain called Stellantis and threatened to go back on strike, believing that the offer violated the verbal agreement.[41]

Vice President Boyer's team ultimately provided support for this effort, and the parties negotiated a Memorandum of Understanding ("MOU") that included binding contractual protection for the program.[42] In sum, although Boyer did initially agree that the lease program could be a company policy, the evidence did not support Fain's allegations that Fain had previously "bargained for an employee lease program at the negotiating table," that Fain or anyone else in the President's Office had made Boyer aware of their intent to include this benefit as a contractual provision, or that Boyer had somehow hidden any information regarding the provision from Fain. Boyer therefore could not have acted in dereliction of duty by "subsequently agree[ing]" to Stellantis's offer of an employee lease program policy.

---

[41] C. Brooks Interview (Sept. 30, 2025).
[42] C. Brooks Interview (Sept. 30, 2025); R. Boyer Interview (Nov. 20, 2024); Email from B. Dictor to S. Fain, C. Brooks, J. Wade, and P. Caucci (Nov. 3, 2023).

### D.      Kokomo Battery Facilities

The fourth allegation made by President Fain was that Vice President Boyer had "failed to develop a plan to appropriately address the significant issues impacting our members at Stellantis," specifically noting that there was "still no finalized agreement between the UAW and Stellantis regarding their joint venture battery plant at Kokomo, which has gone on to hire over a hundred new employees off the street in violation of the agreement we reached at the bargaining table."[43]

The Monitor's investigation found that this allegation was unsubstantiated and untrue.  The Monitor found that the delay in hiring UAW workers to staff Kokomo was a result of the terms regarding employing Union personnel that the President's Office negotiated, not Vice President Boyer.  Moreover, the evidence demonstrated that, in direct contradiction to Fain's allegation, Boyer was able to effectively "develop a plan" to overcome these contractual limitations and ensure that the battery plants were staffed with UAW members.

In November 2023, the President's Office negotiated with Stellantis a tentative agreement known as the "battery letter," which governed their relationship with respect to battery manufacturing at two facilities in Kokomo, Indiana.  Samsung held a controlling interest in the joint venture, so the battery letter provided only that Stellantis would "use reasonable and good-faith efforts" to obtain Samsung's agreement to employ UAW employees for battery production—a commitment that fell short of a guarantee.[44]  Outside Counsel Dictor, who advised the President's Office, led the negotiations of this agreement with President Fain's Top Administrative Assistant Wade.   Dictor, in his interview with the Monitor, called the agreement one of his "chief responsibilities."[45]  Vice President Boyer's Assistant Director, Steve Stahl, said that the issue was

---

[43] Letter from S. Fain to R. Boyer (May 29, 2024).
[44] Letter from C. Fields to S. Fain (Nov. 3, 2023) ("UAW Battery Letter").
[45] B. Dictor Interview (Nov. 18, 2024).

"mostly handled" by Dictor and that Boyer's team did not lead those discussions, although they did participate.[46] Dictor further confirmed that he had discussed the "reasonable and good-faith efforts" language with Fain and then-Top Administrative Assistant Brooks, and according to Dictor, "everyone understood what it was."[47]

The delay in finalizing the agreement resulted from Stellantis's failure to reach terms with its joint venture partner Samsung, not from inaction by Vice President Boyer. At the end of bargaining, Stellantis told the Union it needed thirty days to reach an agreement with Samsung.[48] The Stellantis executive who negotiated the agreement then left his position, and the thirty-day timeline was not met.[49] In February 2024, Samsung began hiring non-UAW members at the Kokomo facilities to undergo training in advance of battery production—contrary to the expectation, reflected in the battery letter, that UAW employees would staff it.[50] Boyer tried to "work around" the "reasonable good faith" language to make progress with Stellantis on getting the battery plants up and running with UAW workers, but the weak enforcement mechanism that the President's Office had negotiated limited his leverage.[51]

Despite what President Fain's May 29, 2024 letter alleges, Fain was aware that Vice President Boyer had a "plan" and actively pressed Stellantis to staff the plants with UAW workers. This included, on March 4, 2024, Boyer texting Fain a proposal to file a grievance over the battery plants; Fain rejected it. Boyer replied: "Ok, I just did not want to sit by and do nothing."[52] On April 8, 2024, Boyer met with Stellantis Senior Vice President Fields to discuss, among other

---

[46] S. Stahl Interview (Aug. 27, 2024).
[47] B. Dictor Interview (Nov. 18, 2024); UAW Battery Letter.
[48] S. Fain Interview (Dec. 17, 2024).
[49] S. Fain Interview (Dec. 17, 2024).
[50] Staff Meeting Agenda (Feb. 26, 2024).
[51] R. Boyer Interview (July 25, 2024); UAW Battery Letter.
[52] Text Messages between R. Boyer and S. Fain (Mar. 4, 2024).

things, Kokomo.  Two days later, on April 10, 2024, Fields sent an email to Fain confirming that meeting had taken place and that "Rich [Boyer] was seeking an update on Samsung's response."[53] On May 7, 2024, Boyer met with Stellantis Chief Operating Officer ("COO") Carlos Zarlenga, who committed that Kokomo would be a UAW site and agreed to a follow-up meeting on May 29, 2024.  On May 15, 2024, Fields emailed Fain (copying Boyer) memorializing the May 7 meeting, stating that Zarlenga had "recommitted the current Kokomo Battery Plant will be UAW," and that Boyer had pressed to "begin moving forward with the canvass [*i.e.*, hiring] process at Stellantis Kokomo plants."  The email further documented a staffing plan that Fields had developed with Boyer, stating that "Boyer and I discussed the following directional plan" for hiring and backfilling positions with UAW members.  Developing a plan was precisely what Fain claimed Boyer had failed to do.  Fields's email concluded that "significant progress has been made . . . regarding the Kokomo Battery Plant."[54]

Vice President Boyer's persistent communications advanced the objective that President Fain was seeking—Stellantis's formal written confirmation that Samsung had agreed with Stellantis that the Kokomo battery plants would be staffed with UAW workers.  That confirmation arrived just hours after Fain removed the Stellantis assignment from Boyer, supposedly for his inaction in moving this issue forward.  On May 29, 2024, Stellantis sent a letter signed by COO Zarlenga confirming that Samsung had agreed to follow the UAW-Stellantis agreement at the Kokomo battery plants.  That letter memorialized the commitments Stellantis had made to Boyer at the May 7 meeting, confirming that "[o]n Tuesday May 7th . . . several commitments were exchanged," including that the Kokomo "site will be UAW and will fall under the terms within

---

[53] Email from C. Fields to S. Fain (Apr. 10, 2024).
[54] Email from C. Fields to S. Fain (May 15, 2024).

the Battery Letter."[55]  The letter further confirmed that Samsung itself had agreed to follow the UAW-Stellantis terms—the very commitment whose absence Fain had cited as evidence of Boyer's failure.[56]  The evidence shows that the letter followed Boyer's sustained pressure:  it fulfilled the commitments Stellantis had reported in its May 15, 2024 email following Boyer's May 7 meeting with Zarlenga.[57]  When asked about Boyer's efforts, Fain acknowledged he knew Boyer had been meeting with Stellantis but said that, despite Stellantis's commitments in the May 29 letter, he did not view Boyer's continuing engagement with Stellantis as progress.[58]  The Monitor finds that Boyer did not act in dereliction of duty, and that Fain appears to have fabricated the allegation that Boyer had "failed to develop a plan."

### E.  Belvidere Assembly Plant

The fifth allegation in President Fain's letter was that Vice President Boyer and his department "remained completely silent" and took "no substantive action" though "Stellantis continues to pushback product launch dates and hiring plans for the reopening of the Belvidere assembly plant."[59]

The Monitor's investigation found that this allegation was unsubstantiated and untrue. Although it is true that Stellantis pushed back the reopening of the Belvidere plant, the claim that Vice President Boyer was "completely silent" in response is directly contradicted by the documentary record and was well known to President Fain at the time that he sent Boyer the letter. During the 2023 bargaining, Boyer's team negotiated with Stellantis to reopen the Belvidere plant with a new product, with an estimated production start of Q4 2027.  Boyer's Assistant Director

---

[55] Letter from C. Zarlenga to R. Boyer (May 29, 2024).
[56] Letter from S. Fain to R. Boyer (May 29, 2024); S. Fain Interview (Dec. 17, 2024).
[57] Letter from C. Zarlenga to R. Boyer (May 29, 2024).
[58] S. Fain Interview (Dec. 17, 2024).
[59] Letter from S. Fain to R. Boyer (May 29, 2024).

Stahl told the Monitor that Boyer "made [it] very clear" at the beginning of bargaining that the Union "wanted [to put] product back in Belvidere" and that the Union pushed for an assembly plant over Stellantis resistance.[60]

When Stellantis began delaying its commitments in early 2024, Vice President Boyer was not "silent," as President Fain alleged. For example, in March 2024, Boyer emailed Stellantis SVP Fields that Stellantis and "its members of management continue to make commitments and then renege on them" and that the "lack of respect the upper leadership has for me, and my members is shameful."[61] On May 7, 2024, Boyer met with Stellantis COO Zarlenga and received a revised timeline delaying production to Q4 2028—which Boyer called "bullshit" and said Zarlenga was "wasting [his] time."[62] Boyer told Stellantis he was "not happy about the retiming of the [Belvidere] allocation."[63]

President Fain admitted to the Monitor that his characterization of Vice President Boyer as being "silent" was not accurate, conceding that he and Boyer "were talking throughout the process."[64] On May 15, 2024, Stellantis SVP Fields sent Fain an update—copying Boyer—noting that Boyer and COO Zarlenga had scheduled a follow-up meeting for May 29 to "cover the Kokomo Battery Plant and [Belvidere] allocation and its retiming."[65] When asked whether Fain knew about Boyer's planned May 29 meeting with Zarlenga, Fain confirmed he did.[66]

---

[60] S. Stahl Interview (Aug. 27, 2024); *see also* Email from R. Boyer to C. Fields (Mar. 25, 2024).
[61] Email from R. Boyer to C. Fields (Mar. 25, 2024).
[62] R. Boyer Interview (Nov. 20, 2024).
[63] Email from C. Fields to S. Fain (May 15, 2024).
[64] S. Fain Interview (Dec. 17, 2024).
[65] Email from C. Fields to S. Fain (May 15, 2024). A letter from Zarlenga to Boyer confirmed this follow-up meeting. *See* Letter from C. Zarlenga to R. Boyer (May 29, 2024).
[66] S. Fain Interview (Dec. 17, 2024).

On May 29, 2024, Stellantis sent a letter signed by COO Zarlenga confirming Stellantis's plan to build a mid-sized pickup truck in Belvidere, although production would not start until Q4 2028.[67] President Fain told the Monitor that he did not view Vice President Boyer's meetings with Stellantis as progress, citing Stellantis's history of delays.[68] Though the timeline for the Belvidere plant was delayed, the evidence shows that Fain was aware that Boyer persistently and substantively engaged with Stellantis, demonstrating Fain's knowledge that his allegation that Boyer was "completely silent" was untrue.

### F. Puerto Rico Conference

The sixth allegation in President Fain's May 29, 2024 letter was that "despite [Fain's] repeated objections, [Vice President Boyer] decided to hold the Stellantis Council in Puerto Rico where [the UAW has] many members, but none that work for Stellantis. That decision has continued to haunt [the Union] in our new organizing drives, where anti-union employers have repeatedly thrown it in our face—just as [Fain] predicted they would."[69]

Although it is true that Vice President Boyer selected Puerto Rico as the location for the Stellantis Council meeting (a gathering of local Stellantis unit presidents to discuss contract and bargaining issues), and that the conference did generate some negative press, the Monitor's investigation found that President Fain's objections were made at a single IEB meeting and so were not "repeated," and that it was inappropriate to charge Boyer with dereliction of duty for going forward with the conference after the IEB had rejected Fain's position and approved Puerto Rico as the meeting location.

---

[67] Letter from C. Zarlenga to R. Boyer (May 29, 2024).
[68] S. Fain Interview (Dec. 17, 2024).
[69] Letter from S. Fain to R. Boyer (May 29, 2024).

26

Vice President Boyer did not initially seek IEB approval to have the meeting in Puerto Rico because he was under the belief that it was not necessary under the Conference Policy then in effect, which required IEB pre-approval for conferences with a "total estimated budget" over $400,000.[70]  Although the all-in estimated budget for the Puerto Rico conference exceeded that amount, Boyer's staff relied on the Union's "Detailed Event Plan" guidance document—a form staff used to calculate conference costs—which instructed staff to exclude costs incurred for lodging representatives of the local unions, who were responsible for their own lodging costs.[71]  Boyer's staff implemented the guidance document and estimated the cost of the conference at approximately $292,000—below the $400,000 threshold—so they did not seek IEB pre-approval. If local lodging and travel had been included, costs would have risen to approximately $584,000, above the threshold.[72]

President Fain found out about the location of the Stellantis Council the night before the November 30, 2023 IEB meeting from Top Administrative Assistant Caucci.[73]  Fain discussed the conference expenditures with the then-Compliance Director, who had an interpretation of the policy that was different from what was contained in the guidance documents.[74]  Fain therefore asked her to present the matter at the meeting.[75]  As the former Compliance Director explained at the IEB meeting, she identified a disconnect between the policy and the guidance document:  the policy refers to "total estimated budget" without distinguishing between union and local costs, while the guidance document instructed staff to exclude local costs.[76]  The former Compliance

---

[70] UAW Policy on Conference and Event Planning (Nov. 16, 2022).
[71] Detailed Event Plan for UAW Stellantis Council Meeting (Mar. 17-22, 2024).
[72] IEB Meeting Minutes (Nov. 30, 2023).
[73] P. Caucci Interview (July 18, 2024).
[74] S. Fain Interview (Dec. 17, 2024).
[75] IEB Meeting Minutes (Nov. 30, 2023).
[76] UAW Policy on Conference and Event Planning (Nov. 16, 2022); IEB Meeting Minutes (Nov. 30, 2023).

Director acknowledged that training on the policy "was supposed to be in March [2023]" but still had not yet occurred, and stated that she understood the underreporting of costs "was not intentional, clearly."[77]  Vice President Boyer's Administrative Assistant confirmed at the meeting that his team followed the guidance document as written and "there was no intent to embarrass the [V]ice [P]resident or the [P]resident or this Board."[78]   Boyer told the Monitor he had never included local costs in prior estimates and had never been told to do so, consistent with the former Compliance Director's confirmation that training on the policy had not yet occurred at the time.[79]

At the IEB meeting, President Fain stated his objections at length, particularly about the optics of the location and how it would harm the Union's organizing efforts, warning that "we're going to get our ass kicked about a council meeting in Puerto Rico" and that the negative publicity would be blamed on him:  "I'm not going to like fingers being pointed at me for authorizing something I didn't know a damn thing about."  He argued the Union should focus conferences on Detroit and Black Lake, citing concerns about cost, optics, and the Union's recent history of corruption-related scrutiny.[80]  Vice President Boyer responded that his intent was to support UAW members in Puerto Rico, which he said were "struggling right now" and "would enjoy us showing up out there," even though none of them worked for Stellantis.  Boyer also noted he believed he was under budget, but also acknowledged the optics concern.[81]   Regional Director Brandon Mancilla—whose region covers Puerto Rico—spoke in support of the location, noting that Puerto Rico members were "going through a lot" in the aftermath of recent hurricanes and a financial crisis, and that cost-wise the location might be "more reasonable than going to Orlando or some

---

[77] IEB Meeting Minutes (Nov. 30, 2023).
[78] IEB Meeting Minutes (Nov. 30, 2023).
[79] R. Boyer Interview (Nov. 20, 2024).
[80] IEB Meeting Minutes (Nov. 30, 2023).
[81] IEB Meeting Minutes (Nov. 30, 2023).

other place."[82] Then-Vice President Chuck Browning acknowledged Fain's comments but noted Boyer had booked the conference before this discussion, incurring approximately $300,000 in nonrefundable commitments, and "we can't get the money back."[83] Despite Fain's objections, the IEB voted to approve the conference, with Fain and then-Regional Director Laura Dickerson voting against.[84]

There was some negative press generated by the conference, although it does not appear to have been widespread.[85] But that standing alone cannot sustain a dereliction of duty allegation, particularly given that the location was endorsed by the IEB and that to the extent that Vice President Boyer's actions were inconsistent with UAW policy, the evidence demonstrates that it was the result of a good-faith reliance on UAW guidance and a failure of the Compliance Department to conduct timely training on the new policy. Boyer was therefore not derelict in his duty by having the conference in Puerto Rico.

### G. Refusal to Work with the President's Office

Finally, President Fain alleged in his letter that Vice President Boyer "repeatedly refused to work with senior staff from the President's Office that [Fain had] assigned to support [Boyer] and the Stellantis Department." The Monitor's investigation found although Boyer did speak

---

[82] IEB Meeting Minutes (Nov. 30, 2023).

[83] IEB Meeting Minutes (Nov. 30, 2023). Director Campbell noted that it would cost $300,000 to cancel the conference. IEB Meeting Minutes (Nov. 30, 2023).

[84] IEB Meeting Minutes (Nov. 30, 2023); P. Caucci Interview (July 18, 2024).

[85] Labor Union News, *Union Watchdog: UAW Leaders Bask in Puerto Rico as Members Get Laid Off* (Apr. 3, 2024), https://laborunionnews.substack.com/p/union-watchdog-uaw-leaders-bask-in; Labor Pains, *Margaritas and Mistreated Temps* (Apr. 2, 2024), https://laborpains.org/2024/04/02/margaritas-and-mistreated-temps/.

harshly to a member of the President's Office on one occasion, that was a one-off situation that Boyer apologized for and did not in itself amount to a dereliction of duty.

Although President Fain alleged that Vice President Boyer "repeatedly refused to work" with members of his Office, he only cited one occasion to the Monitor. Another member of the President's Office alleged a second incident:

- In his interviews with the Monitor, President Fain cited one specific incident in support of this allegation: Fain's Top Administrative Assistant Caucci arrived at the Stellantis Department as a President's Office liaison at the start of the 2023 bargaining.[86] On Caucci's first day at the Stellantis Department's Auburn Hills office (the UAW's Stellantis bargaining location), following a morning round-up meeting, Boyer called Caucci into his office and told him he did not need a "fucking babysitter" and told Caucci to "fucking get out."[87] Boyer confirmed this account.[88] Later that day, Boyer called Caucci to apologize.[89] After that incident, Caucci resumed attending the daily morning round-up meetings but did not participate in the remainder of the day's work, returning to Solidarity House. Caucci told the Monitor that Boyer "did not want me there" and "never asked if I wanted to come," and that Caucci does not "put [himself] in places that [he is] not invited."[90] But Caucci also said that he did not ask to be involved beyond the morning round-up meetings.[91] The Monitor found that other than his initial exchange with Caucci, there was no evidence that Boyer actually "repeatedly refused to work with" him.

- Although not cited by President Fain as a reason for his taking action against Boyer, Fain's Top Administrative Assistant Kevin Gotinsky told the Monitor that Boyer would not let Gotinsky attend certain Stellantis meetings.[92] In the spring of 2024, Fain asked Gotinsky to assist Boyer with respect to certain grievances filed with the Stellantis Warren Stamping plant (discussed further below), stating "I want you involved in everything that is going on."[93] These grievances involved significant health and safety issues at the plant, including waste oil leaks, roof leaks, broken pieces of metal

---

[86] S. Fain Interview (June 5, 2024); S. Fain Interview (Dec. 17, 2024).
[87] S. Fain Interview (Dec. 17, 2024); R. Boyer Interview (Nov. 20, 2024); P. Caucci Interview (July 18, 2024).
[88] R. Boyer Interview (Nov. 20, 2024).
[89] P. Caucci Interview (July 18, 2024).
[90] P. Caucci Interview (July 18, 2024).
[91] P. Caucci Interview (July 18, 2024).
[92] K. Gotinsky Interview (July 17, 2024).
[93] K. Gotinsky Interview (July 17, 2024).

cages falling near employees, broken ventilation and hilo fans, and non-functioning emergency lighting.[94]  Gotinsky told the Monitor that Fain wanted to learn more information about these grievances through Gotinsky's involvement.[95]  The evidence demonstrated that Boyer did allow Gotinsky to attend some meetings related to the Warren Stamping grievances, during which Gotinsky was able to gather information. Gotinsky said that he was excluded from other Warren Stamping meetings, but Boyer denied this, saying that Gotinsky was never excluded from any relevant meeting regarding Warren Stamping.[96]  Gotinsky acknowledged that even if he did not attend every meeting, Boyer's Assistant Director Greg Stoey kept him updated on issues at Warren Stamping "on [a] regular basis."[97]

These two instances—one of which was not alleged by President Fain—do not demonstrate that Vice President Boyer improperly and "repeatedly refused to work" with President's Office staff, and therefore do not support a finding that Boyer was derelict in his duty.  With respect to Top Administrative Assistant Caucci, Boyer was wrong and unprofessional to speak to Caucci in the way that he did, but he promptly apologized, and the Monitor found no evidence that he excluded Caucci from any meeting after that.  With respect to Top Administrative Assistant Gotinsky, there is conflicting evidence of whether Boyer excluded him from certain meetings but not others.  In either case, Gotinsky himself clarified that even if he was not present at a particular meeting, Boyer's staff made sure that Gotinsky received an update on the issues relevant to his remit, undermining any allegation that Boyer had "refused to work" with him.

The investigation did not uncover further evidence that Vice President Boyer refused to work with other senior staff members of the President's Office.  Indeed, the investigation showed that the President's Office staff maintained meaningful involvement in the Stellantis bargaining

---

[94] Warren Stamping Section 5 Local Negotiations spreadsheet (Apr. 18, 2024).
[95] K. Gotinsky Interview (July 17, 2024).
[96] K. Gotinsky Interview (July 17, 2024); Call with R. Boyer (May 15, 2026).
[97] K. Gotinsky Interview (July 17, 2024); G. Stoey Interview (Aug. 21, 2024); *see, e.g.*, Email from G. Stoey to K. Gotinsky (Apr. 18, 2024).

31

Case 2:20-cv-13293-DML-RSW   ECF No. 160, PageID.3422   Filed 06/25/26   Page 34 of 53

process throughout the negotiations.  President Fain, Outside Counsel Dictor, and then-Top Administrative Assistants Brooks and Wade all attended negotiation sessions with Stellantis.[98] Beginning in approximately September 2023, Fain's Top Administrative Assistant Caucci also joined those negotiation sessions.[99]  Boyer's staff also regularly copied the President's Office staff on negotiation communications, including counterproposals documenting the status of bargaining.[100]

Further, according to Vice President Boyer, as an elected Vice President, he had certain latitude given to him by the membership to manage the Stellantis Department without requiring the input of the President's Office at every juncture.  Boyer believed that his actions were intended to further his professional discretion, even as he still did collaborate with the President's Office. Again, although Boyer should not have cursed at Top Administrative Assistant Caucci—it was unprofessional and uncollaborative—he did not engage in conduct that meets the standard of dereliction of duty.[101]

---

[98] P. Caucci Interview (July 18, 2024); B. Dictor Interview (June 18, 2024).

[99] P. Caucci Interview (July 18, 2024).

[100] *See* Part I.A, *supra*, documenting specific counterproposals sent to President Fain and his team on September 12, September 20, and October 19, 2023.

[101] *See Valdez*, PRB No. 1139, at 300; *Gardner*, PRB No. 1292, at 586.  As noted above, dereliction of duty requires evidence of deceptive or malicious conduct intended to harm members.  President Fain's own conduct, as described in the Monitor's Twelfth Status Report, demonstrates that cursing at other officers or employees—while unprofessional and indicative of a toxic culture—could not reasonably have been seen by Fain as a dereliction of duty when he repeatedly engaged in the same conduct himself.  Monitor's Twelfth Status Report, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (June 17, 2025), Civil No. 20-cv-13293, ECF No. 152, at 81-88 ("Monitor's Twelfth Status Report").

## II. VICE PRESIDENT BOYER'S ALLEGATIONS OF RETALIATION

After receiving President Fain's letter, Vice President Boyer filed a complaint with the Monitor on May 29, 2024, alleging that Fain's removal of the Stellantis Department was retaliatory. Boyer claimed the actual motivations were: (1) Boyer's refusal to make personnel changes—firing Administrative Assistant Harvey Hawkins and demoting Top Administrative Assistant Joe Ferro—that Fain demanded by ultimatum on May 29, 2024; (2) Boyer's interference with the approval of bonuses to non-UAW employees of the Stellantis National Training Center ("NTC") that would have financially benefited Fain's fiancée; and (3) Boyer's refusal to help Fain's fiancée's sister obtain preferential treatment regarding a worker's compensation-related claim.[102]

The Monitor's investigation found that President Fain's removal of the Stellantis Department from Vice President Boyer was retaliatory. As with the Monitor's analysis of the retaliation claims by Secretary-Treasurer Mock, detailed in the Monitor's Twelfth Status Report, the Monitor applied a multi-step framework.[103] *First*, the Monitor examined whether the stated reasons for the adverse action were substantiated; if those reasons were false or exaggerated, that would indicate that Fain had an unstated ulterior motive for the removal. *Second*, having

---

[102] Call with R. Boyer (May 29, 2024). Later, Vice President Boyer also alleged that, in a phone call on January 22, 2025, former Top Administrative Assistant Brooks refused to reassign the Stellantis Department back to Boyer because he had "talked to the Monitor." Call with R. Boyer (Jan. 24, 2025). When asked, Brooks admitted that the call occurred but denied saying anything about the Monitor, instead stating that he told Boyer that they "should talk more about working together on [the] IPS [department]." C. Brooks Interview (Oct. 15, 2025). The Monitor reviewed documents confirming that the call occurred and that Boyer had asked to discuss getting the Stellantis Department back, but could not find additional evidence to corroborate Boyer's allegation that the department had not been given back because of Boyer's report to the Monitor. Given the contradictory accounts and lack of corroboration, the Monitor makes no determination with respect to this issue and has not included it in his determination that President Fain acted against Boyer with retaliatory intent.

[103] Monitor's Twelfth Status Report at 65-67.

determined, as detailed above, that the reasons cited in Fain's letter were unsubstantiated, the Monitor examined what actual reasons Fain may have had for taking action against Boyer, and whether those reasons were legitimate or retaliatory—that is, whether he punished Boyer for conduct that Fain may have disagreed with but that was within the legitimate scope of Boyer's duties.  As part of that inquiry, the Monitor also examined whether the evidence demonstrated that Fain may have had a good-faith but mistaken belief that the allegations in his letter were true, or whether the evidence instead demonstrated that Fain knew the stated reasons were false or exaggerated, thus suggesting retaliatory intent.

As discussed below, the Monitor determined that President Fain's allegations were unsubstantiated, that the actual reasons for his action were illegitimate and retaliatory, and that Fain advanced the false allegations in bad faith.

### A.    The Stated Reasons in President Fain's Letter for Vice President Boyer's Removal Were Not Substantiated

As detailed above, the facts underlying President Fain's publicly stated reasons for removing the Stellantis Department from Vice President Boyer were not substantiated.[104]  All seven were either unsupported, unfounded, or, to the extent that they had some factual basis, were exaggerated to include a component of deception or a level of misconduct that was not present. None of the seven allegations, individually or collectively, supported a finding of dereliction of duty.

That President Fain's publicly stated reasons for the removal were not factually substantiated supports the Monitor's finding that Fain had an ulterior, retaliatory motive for the removal.

---

[104] Letter from S. Fain to R. Boyer (May 29, 2024).

34

**B.      Evidence of Retaliatory Intent**

Having found that the stated reasons were unsubstantiated, the Monitor examined what actual reasons President Fain may have had for taking action against Vice President Boyer, and whether those reasons were legitimate or retaliatory—that is, whether he punished Boyer for conduct that Fain may have disagreed with but that was within the legitimate scope of Boyer's duties.

In his interview with the Monitor, President Fain acknowledged he removed the Stellantis Department from Vice President Boyer's supervision for reasons that were *not* in his letter: specifically that Boyer (1) settled grievances regarding the safety of Stellantis employees at Warren Stamping, thereby depriving Fain of a basis to pursue an alternative strategy that was not disclosed to Boyer; and (2) refused to fire or demote senior Stellantis Department Union officials so that Fain could put his own people in place.[105]  The investigation found that Boyer acted within his discretion in both instances, and that Fain's decision to punish him was improper retaliation.

**1.      Warren Stamping**

The most compelling evidence that President Fain acted with retaliatory intent against Vice President Boyer came from Fain himself.  He told the Monitor that his May 29, 2024 letter justifying his removal of Boyer's oversight of Stellantis was motivated by an incident that never appeared in the letter.  Fain said that it was Boyer's settlement of the health and safety grievances at the Stellantis Warren Stamping plant that motivated his decision to remove Stellantis from

---

[105] S. Fain Interview (June 5, 2024).

Boyer.[106]  The evidence demonstrates, however, that Boyer's actions were within his discretion and in the best interests of the members working at that plant.

Since at least summer 2023, workers at the Warren Stamping plant had been experiencing significant health and safety concerns and had filed grievances against Stellantis.[107]  These grievances involved dangerous conditions including roof leaks, poor ventilation caused by approximately 40 of the plant's 60 fans not working, and waste oil spills that created a slick, unsafe basement floor.[108]  One grievance alleged that a seven-foot metal bar from a safety cage had broken loose from a height of 100 feet and fallen near employees.[109]  The local union president whose members worked at the plant told the Monitor that he had been trying to get Stellantis to address these conditions since at least August 2023.[110]

By spring 2024, approximately 200 health and safety grievances had been filed against Stellantis.  The Union believed that Stellantis had been slow-walking the remediation process, but also acknowledged some progress—Stellantis had begun investing $8 million into the plant to address some of the issues.[111]  The local union president reached out to the International Stellantis Department for assistance in getting Stellantis to more promptly address the grievances, and Vice President Boyer's team—including Assistant Director Stoey—was actively working to resolve them with Stellantis, attempting to meet several times a week to discuss the issue.[112]  In early May 2024, the local union president, with support from Boyer's team, took a vote from the local

[106] S. Fain Interview (June 5, 2024).
[107] R. McKinney Interview (Aug. 29, 2024).
[108] K. Gotinsky Interview (July 17, 2024).
[109] Warren Stamping Section 5 Local Negotiations spreadsheet (Apr. 18, 2024).
[110] R. McKinney Interview (Aug. 29, 2024).
[111] Warren Stamping Section 5 Local Negotiations spreadsheet (Apr. 18, 2024); J. Ferro Meeting Notes (Apr. 18, 2024).
[112] R. McKinney Interview (Aug. 29, 2024); G. Stoey Interview (Aug. 21, 2024); Warren Stamping Section 5 Local Negotiations spreadsheet (Apr. 18, 2024).

membership to authorize a strike over the grievances, if necessary, which the membership approved.[113]   The local union president told the Monitor that he began to see more serious movement on Stellantis's part after the strike authorization vote.[114]

In response to the strike authorization and sustained pressure from Vice President Boyer's team in negotiations, Stellantis put together a task force to more quickly remediate the grievances, including repairs to the roof, restoration of ventilation systems, and remediation of the basement floor conditions.[115]   Given Stellantis's substantial response and having already received strike authorization from the local union, Boyer's team considered whether to act on the strike authorization to put even more pressure on Stellantis to move quickly, or to pursue a resolution letter that would formalize Stellantis's commitments to make the necessary safety repairs under the threat of strike if they did not promptly follow through.  Ultimately, Boyer and the local union president chose the latter path, reaching an agreement with Stellantis pursuant to a resolution letter that closed the grievances in exchange for Stellantis's written commitment to take the necessary remediation steps on a predefined schedule, all while retaining the Union's right to strike if Stellantis failed to follow through on its commitments.[116]   The President's Office was generally kept in the loop during this process.

Separately, and without disclosing his plan to Vice President Boyer, President Fain told the Monitor that he had identified the continued existence of these health and safety grievances at Warren Stamping as leverage for an alternative strategy that the Union has asked to be redacted

---

[113] R. McKinney Interview (Aug. 29, 2024); G. Stoey Interview (Aug. 21, 2024).
[114] R. McKinney Interview (Aug. 29, 2024).
[115] G. Stoey Interview (Aug. 21, 2024); R. McKinney Interview (Aug. 29, 2024); Stellantis Grievance Resolution Letter (May 23, 2024).
[116] Stellantis Grievance Resolution Letter (May 23, 2024); R. McKinney Interview (Aug. 29, 2024).

because it reflects confidential bargaining strategy.[117]  Boyer said that he was unaware of Fain's alternative strategy and that he had settled the grievances as part of his job to make sure that the union members working at Warren Stamping had a safe and secure environment to carry out their jobs.[118]

On May 27, 2024, President Fain learned that Vice President Boyer had reached resolutions on all the Warren Stamping grievances, which resulted in the promised removal of the safety hazards.[119]  Boyer told the Monitor that when he went to Fain's office to report on the resolved grievances and Stellantis's remediation investment, Fain did not care, stating he did not "give a fuck" and that there were underlying issues that he would not share with Boyer.[120]  Fain told the Monitor that Boyer's actions undermined his strategy and that the next day he decided he "needed to do something."[121]  Then-Top Administrative Assistant Brooks said that Fain "was pissed" at the time and "wanted to take action" about several "longstanding issues," so he asked Brooks for help in drafting the May 29 letter.[122]  As identified in the Monitor's Twelfth Status Report, its Supplement, and the Monitor's Fourteenth Status Report, Fain has a history of turning to Brooks to document allegations, and Brooks has a history of then documenting false allegations on behalf of Fain to justify retaliatory measures.[123]

---

[117] S. Fain Interview (June 5, 2024).
[118] R. Boyer Interview (Nov. 20, 2024).
[119] S. Fain Interview (June 5, 2024).
[120] R. Boyer Interview (July 25, 2024).
[121] S. Fain Interview (June 5, 2024).
[122] C. Brooks Interview (Sept. 30, 2025).
[123] *See* Monitor's Twelfth Status Report; Supplement to the Monitor's Twelfth Status Report; Monitor's Fourteenth Status Report, *United States v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.* (Apr. 30, 2026), Civil No. 20-cv-13293, ECF No. 158 ("Monitor's Fourteenth Status Report").

President Fain's Top Administrative Assistant Gotinsky, who, as noted above, was assigned to assist with the Warren Stamping grievances, acknowledged to the Monitor that Vice President Boyer had discretion to determine the outcome of the grievances and that Boyer's settlement of them was a "win" because it benefited the health and safety of the Union's membership and "needed to be cleaned up for years."[124] The local union president told the Monitor that he wanted to resolve the grievances after Stellantis began doing more substantial work required to address the concerns.[125] Boyer's Assistant Director Stoey confirmed that Stellantis had committed to a large investment in the plant, the local leaders were happy with the result, and the Union still had the fallback of a strike if Stellantis reneged.[126]

In all, the Monitor's investigation found that Vice President Boyer acted within his discretion with respect to the Warren Stamping grievances, prioritizing the safety of the members and achieving a result that was fully supported by the local union. It also found that President Fain retaliated against Boyer for doing so.

### 2. The May 29 Ultimatum and Vice President Boyer's Refusal to Make Personnel Changes

As noted above, according to President Fain, Vice President Boyer's settlement of the Warren Stamping plant grievances is what motivated Fain to remove Boyer's Stellantis Department assignment. The Monitor notes that this claim was not included in Fain's letter nor articulated directly to Boyer, presumably because Fain was aware that Boyer had acted within his discretion by settling the grievances and that it could not be a legitimate basis for a finding of dereliction of duty. But prior to sending the letter, and just two days after learning that Boyer had

---

[124] K. Gotinsky Interview (July 17, 2024).
[125] R. McKinney Interview (Aug. 29, 2024).
[126] G. Stoey Interview (Aug. 21, 2024).

settled the Warren Stamping grievances, Fain delivered an ultimatum to Boyer demanding that he fire certain personnel or lose the Stellantis Department.   On May 28, 2024, then-Top Administrative Assistant Brooks texted Fain "talking points" for a conversation with Boyer:  "You now have a choice: either we're on the same page or we are not . . . If we are on the same team, then you send this memo with dept changes.  If we aren't on the same team, then I'm taking Stellantis away from you."[127]   The required "dept changes" were firing Administrative Assistant Hawkins, demoting Top Administrative Assistant Ferro, and replacing Ferro with Fain's Top Administrative Assistant Gotinsky.

President Fain delivered this ultimatum to Vice President Boyer at a meeting early the next day.[128]  Boyer said Fain brought two documents to the meeting and read from one of them, stating the personnel changes Boyer must make.[129]  Upon being presented with it, Boyer refused to make the changes, telling Fain he would not let Fain "bully" him.[130]  Fain admitted to making the ultimatum and admitted that he expected Boyer to reject it.[131]  Later that afternoon, Fain removed the Stellantis Department from Boyer's oversight through the second document from the meeting—the May 29, 2024 letter described above[132]—in which neither the Warren Stamping plant grievances nor Boyer's refusal to fire or demote his top aides were included, even though these were the two reasons that Fain told the Monitor motivated the removal of the Stellantis

---

[127] Text Message between C. Brooks and S. Fain (May 28, 2024).  When asked, former Top Administrative Assistant Brooks told the Monitor that he did not remember writing a second memo describing the personnel changes, and President Fain was unable to find a second memo after searching.  C. Brooks Interview (Oct. 15, 2025); Email from UAW Discovery Counsel to Monitor (Nov. 6, 2025).

[128] Alleged Violations of UAW Ethical Practices Codes, Democratic Practices (June 9, 2024) ("Boyer's PRB Appeal").

[129] Boyer's PRB Appeal.

[130] R. Boyer Interview (Nov. 20, 2024).

[131] S. Fain Interview (June 5, 2024).

[132] C. Brooks Interview (Sept. 30, 2025); Email from C. Brooks to D. Wallace (May 29, 2024).

Department.[133]  Fain reassigned the Stellantis Department to his Top Administrative Assistant Gotinsky.[134]  Top Administrative Assistant Ferro moved to the Independent Parts and Suppliers ("IPS") Department, which Boyer already oversaw, and was replaced by Assistant Director Stahl. Administrative Assistant Hawkins was moved to the Appeals Department and was replaced by Assistant Director Stoey.[135]

Notably, and as discussed below, the memorandum that President Fain read to Vice President Boyer directing the personnel changes appears to have been destroyed, and the text message that contained the talking points for Fain's meeting with Boyer during which he delivered the ultimatum was deleted from Fain's phone.

### C.     President Fain's Allegations Against Vice President Boyer Were Not Made in Good Faith

Having identified President Fain's actual reasons for the removal, the Monitor turned to a related question:  whether Fain advanced the reasons stated in his letter in good faith, or instead knew them to be false and used them as a pretext to conceal his true retaliatory motives.  Taking together the evidence regarding Fain's seven allegations and the two incidents above, the Monitor found that Fain did not make his allegations in good faith, but used them instead to justify a

---

[133] Boyer's PRB Appeal; Letter from S. Fain to R. Boyer (May 29, 2024).

[134] Although secondary to the retaliation point, the personnel demands that President Fain conditioned on Vice President Boyer keeping the Stellantis Department appeared to be driven by personal animus and wanting to have greater control over Stellantis.  Regarding Administrative Assistant Hawkins, Fain conceded he wanted to get rid of Hawkins from the start of his presidency. S. Fain Interview (June 5, 2024). Multiple witnesses described Fain's longstanding animosity toward Hawkins, who had been Fain's previous supervisor. R. Suell Interview (July 30, 2024); P. Caucci Interview (July 18, 2024).  Regarding Top Administrative Assistant Ferro, Fain stated that replacing Ferro with his Top Administrative Assistant Gotinsky would let him "know if there's any side deviations" from the President's Office strategy—in other words, installing a loyalist to report back to Fain on Boyer's activities.  S. Fain Interview (June 5, 2024).

[135] Email from UAW General Counsel to Monitor (June 10, 2024); G. Stoey Interview (Aug. 21, 2024).

decision that was motivated by retaliatory animus. The following features of the record are particularly significant:

- ***Fain admitted another motivation that was different from his stated reasons.*** In his interviews with the Monitor, President Fain admitted that Vice President Boyer's settlement of the Warren Stamping grievances and Boyer's refusal to fire or demote certain personnel motivated his decision to remove the Stellantis Department from Boyer.[136] If Fain genuinely believed that these were legitimate bases for removing the Stellantis Department from Boyer, he would have presumably included them in his letter to Boyer. Similarly, if Fain believed that Boyer was truly derelict in his duty for the seven reasons stated in the letter, he would have only cited *those* reasons as his motivation during his interview with the Monitor. Instead, he volunteered a completely different reason—one he excluded from the letter.[137]

- ***The letter was drafted in response to an event it does not mention.*** The May 29 letter was drafted by then-Top Administrative Assistant Brooks at President Fain's request after Fain learned about the Warren Stamping grievance resolutions on May 27, 2024.[138] The seven events cited in the letter span September 2023 through early 2024—months before the removal. If those events genuinely motivated Fain's decision, one would expect the letter to have been drafted contemporaneously or shortly after those events occurred. Instead, the letter was produced days after Vice President Boyer settled the Warren Stamping grievances and weeks after Fain expressed his anger at Boyer after Boyer's refusals to take action that would have benefited Fain's fiancée and her sister, discussed further below.

- ***The evidence demonstrates that Fain knew that the allegations advanced in his letter against Boyer were untrue.*** As noted above, throughout his interviews, President Fain made statements that are inconsistent with the allegations in his own letter. For example, on Belvidere, Fain admitted that he and Vice President Boyer "were talking throughout the process" and that he knew Boyer had scheduled meetings with COO Zarlenga, contradicting the letter's allegation that Boyer "remained completely silent."[139] On the Puerto Rico location, Fain admitted that he only found out the Council

---

[136] S. Fain Interview (June 5, 2024).[137] *See* Letter from S. Fain to R. Boyer (May 29, 2024).
[137] *See* Letter from S. Fain to R. Boyer (May 29, 2024).
[138] S. Fain Interview (June 5, 2024); C. Brooks Interview (Sept. 30, 2025).
[139] *See* Part I.E, *supra*.

meeting would take place in Puerto Rico around the time of the November 2023 IEB meeting, contradicting his allegation that Boyer made the decision over Fain's "repeated objections."[140]   On profit sharing, Fain acknowledged that he had not stated a specific start date for the profit-sharing benefit during negotiations, yet he still stripped Boyer of Stellantis by alleging that Boyer undermined Fain by agreeing to "push back" a date that Fain had not even stated in negotiations.[141]   Moreover, there was documentary evidence that further demonstrated that Fain himself was aware his claims were untrue.  For example, Fain and his Office received at least three emails documenting the status of proposed absenteeism concessions, contradicting Fain's claim that Boyer "hid" them from him.[142]  Regarding the Kokomo battery plant, Fain was told in writing on May 15, 2024—two weeks before Boyer's removal—that Stellantis had "recommitted [to Boyer that] the current Kokomo Battery Plant will be UAW," and that Boyer had developed a "directional plan" with Stellantis to hire UAW workers, countering Fain's allegations that Boyer had "failed to develop a plan."[143]

- ***Fain's communications during the critical period were deleted.***  Nearly all of President Fain's text messages with then-Top Administrative Assistant Brooks between March 24, 2024, and July 18, 2024—the period in which the removal was planned and executed and in which the letter to Vice President Boyer was drafted—were deleted from Fain's phone, as documented in the Monitor's Supplement to the Twelfth Status Report.[144]  As noted above, the text message from Brooks containing the ultimatum talking points that Fain delivered to Boyer was recovered from Brooks's phone, not Fain's.[145]  Similarly, it appears that the memorandum that Fain read to Boyer during their meeting and directed Boyer to send regarding the personnel changes was similarly destroyed.[146]

- ***The pattern is consistent with prior retaliatory conduct.***  As detailed in the Monitor's Twelfth Status Report and its Supplement, President Fain

---

[140] S. Fain Interview (June 5, 2024); Letter from S. Fain to R. Boyer (May 29, 2024).

[141] *See* Part I.B, *supra*.

[142] *See* Part I.A, *supra*.

[143] Email from C. Fields to S. Fain (May 15, 2024); *see* Part I.D, *supra*.

[144] Monitor's Supplement to the Twelfth Status Report at 44.  As noted in that Report, there was one text message found on President Fain's phone in that time period between Fain and then-Top Administrative Assistant Brooks's personal phone number dated June 22, 2024.

[145] Monitor's Supplement to the Twelfth Status Report at 44-45.

[146] Email from UAW Discovery Counsel to Monitor (Nov. 6, 2025).

employed a substantially similar approach in retaliating against Secretary-Treasurer Mock:  trumping up pretextual allegations of misconduct to cover the fact that he was punishing a fellow officer for doing their job in a way that Fain did not like, enlisting then-Top Administrative Assistant Brooks to document those false allegations, and then seemingly destroying evidence.[147]   The repetition of this pattern further undermines a claim of good faith.

In light of this evidence, the Monitor found that President Fain did not hold a good-faith belief in the allegations set forth in his letter.  Rather, he knew them to be false or exaggerated and advanced them as a pretext to justify a removal that was, in fact, motivated by retaliatory animus.

### D.      Vice President Boyer's Other Allegations of Retaliation

The evidence cited above is sufficient to support the Monitor's finding that President Fain improperly retaliated against Vice President Boyer when he removed the Stellantis Department. Boyer cited two additional instances that supported his allegation that Fain's actions were retaliatory in nature.

#### 1.      NTC Bonuses

Vice President Boyer alleged that President Fain retaliated against him by removing the Stellantis Department because Boyer failed to accede to Fain's demand that he pursue a bonus for employees at the Stellantis National Training Center ("NTC") that would have financially benefited President Fain's fiancée.

The Monitor's investigation substantiated the claim that President Fain acted improperly to obtain financial benefits for his fiancée, and that Vice President Boyer's failure to approve the bonus may have contributed to Fain's retaliatory action against him.  The Monitor has not provided

---

[147] *See generally* Monitor's Twelfth Status Report; Monitor's Supplement to the Twelfth Status Report.

additional detail regarding his findings pending further consultation with the parties to the Consent Decree.

### 2.      Worker's Compensation

Vice President Boyer also alleged that President Fain removed the Stellantis Department because Boyer refused to provide preferential treatment to Fain's fiancée's sister regarding a worker's compensation-related claim.

In April 2024, President Fain's fiancée's sister was injured while working at a Stellantis plant.  Under Stellantis's worker's compensation protocol, an employee injured on the job must report to the plant, undergo evaluation by the plant doctor, and accept available restricted-duty work that accommodates any medical restrictions.[148]  According to witnesses interviewed by the Monitor, worker's compensation matters are typically initiated and handled at the plant or local level, with International servicing and benefits staff assisting when an issue cannot be resolved locally.[149]

As the investigation showed, after learning of the injury, President Fain attempted to seek preferential treatment for his fiancée's sister through four separate channels.

*First*, according to several witnesses, President Fain raised the issue with Stellantis SVP Fields, asking him to intervene because Fain felt his fiancée's sister should not have to return to the worksite and continue working until she was cleared by the plant doctor.[150]  On April 15, 2024, Fields texted Fain, stating "you are correct that [your fiancée's sister] needs to go through Medical [at the plant] . . . [she] did come to work today and health and safety met with her and she seemed

---

[148] E. Torres Interview (July 2, 2024).

[149] E. Torres Interview (July 2, 2024); V. Precopio Interview (Aug. 21, 2024).

[150] R. Boyer Interview (July 25, 2024); R. Boyer Handwritten Notes (May 23, 2024); P. Caucci Interview (July 18, 2024).

OK and they have her doing work within her restrictions. . . . Right now they're handling the case the exact way they normally would and not giving her any time off beyond what the doctor says she needs."[151]

On May 23, 2024, SVP Fields texted President Fain again:  "I think we have it squared away: The issue with [your fiancée's sister] is being taken care of this morning.  She . . . will get no points."  Fain responded, "Her claim is workman's comp . . . [and] the company d[octo]r is shifting the workman's comp burden onto the worker and taking money out of her pocket and responsibility away from the company.  This is unacceptable."  Fields offered to have one of his staff members call someone on Fain's team directly to sort it out.  Fain told Fields to call Vince Precopio, a UAW Benefits Representative.[152]  Fields called Vice President Boyer and relayed that Fain had texted him, that Fain was "not happy," and that Fain felt "his sister-in-law to be was not treated the way he expected her to be treated."  Boyer's notes from the call reflect that Fields told Boyer that Fain's fiancée's sister "was being treated the same way every member has always been treated."[153]

On May 30, 2024, President Fain followed up with SVP Fields via text:  "I'd like you to call Vince [Precopio] now if you will, I want to hear directly of the issues we're having because this isn't a one time thing."[154]

*Second*, President Fain raised the issue directly with Vice President Boyer.  Fain texted Boyer that the situation was "bullshit," that his fiancée's sister "should stay at home," and that she should not have to report for restricted-duty work.[155]  Boyer said that Fain contacted him because

---

[151] Text Messages between C. Fields and S. Fain (Apr. 15, 2024).
[152] Text Messages between C. Fields and S. Fain (May 23, 2024).
[153] R. Boyer Handwritten Notes (May 23, 2024).
[154] Text Messages between C. Fields and S. Fain (May 30, 2024).
[155] R. Boyer Interview (July 25, 2024).

"[SVP] Fields didn't do it and [fixing] it fell on me."[156] But Boyer declined to seek "preferential treatment" for Fain's fiancée's sister. He told the Monitor he informed Fain that he would not seek special treatment for Fain's family member because, as Boyer put it, "if you get hurt and I give you special privilege[s] and they find out, you get sued."[157] Boyer said Fain was "pissed off" after both Fields and Boyer declined to intervene.[158]

*Third*, President Fain contacted UAW Benefits Representative Precopio, requesting that Precopio look into the requirement that his fiancée's sister return to work. Precopio told the Monitor that Fain did not disclose his relationship to the employee when he made this request, and noted that Fain did not request any special treatment. Precopio explained that handling an inquiry like this fell within his role as a benefits representative and that he would have expected such a call regardless of which member was involved. Precopio said he did not learn of the employee's family relationship to Fain until later.[159]

According to Edgar Torres, the Assistant Director overseeing benefits in the Stellantis Department and Benefits Representative Precopio's supervisor, Precopio informed him that President Fain had reached out to him about the issue. Torres said that Precopio described that he had guided the employee through the procedure she needed to follow. When asked if there were any special treatment or advantages given to Fain's fiancée's sister because of her relationship to Fain, Torres said, "I would say no, but if your superior calls . . . you are going to act faster. You do have a reaction to it. You better take care of this person."[160]

---

[156] R. Boyer Interview (Nov. 20, 2024).
[157] R. Boyer Interview (Nov. 20, 2024); Call with R. Boyer (May 29, 2024).
[158] R. Boyer Interview (Nov. 20, 2024).
[159] V. Precopio Interview (Aug. 21, 2024).
[160] E. Torres Interview (July 2, 2024).

*Fourth*, President Fain enlisted the support of his Top Administrative Assistant Caucci. Fain called Caucci about Fain's fiancée's sister's injury soon after she was injured. According to Caucci, Fain said that Stellantis was demanding that she return to work.[161] Caucci then called Vice President Boyer's Top Administrative Assistant Ferro and asked if there was any reason why she had to report to work.[162] Caucci said that after their call, Ferro contacted Stellantis management about the incident to get more details.[163] A member of Stellantis management responded that they were "not asking [Fain's fiancée's sister] to come in after [a medical procedure]. . . but rather to check in with the doctor before . . . Chris [Fields] is apparently calling Shawn [Fain] right now to tell him that she needs to do this because this is how everyone is treated."[164]

In his interview with the Monitor, President Fain characterized his involvement as addressing a systemic problem rather than seeking a personal favor.[165] He told the Monitor that he had told Vice President Boyer "to let [Stellantis] know this was a fucking issue and this happens all the time and we get involved." Fain said he instructed Boyer to "look into it," and that Boyer agreed to call Assistant Director Torres.[166] Boyer denied this, telling the Monitor that he refused

---

[161] P. Caucci Interview (July 18, 2024).

[162] P. Caucci Interview (July 18, 2024). Top Administrative Assistant Caucci also texted Top Administrative Assistant Ferro and expressed frustration that the plant doctor directed President Fain's fiancée's sister to report to work, notwithstanding that her own doctor had allegedly told her to take off work. Text Messages between J. Ferro and P. Caucci (Apr. 16, 2024).

[163] P. Caucci Interview (July 18, 2024).

[164] Text Messages between J. Ferro and P. Caucci (Apr. 16, 2024).

[165] S. Fain Interview (June 5, 2024).

[166] S. Fain Interview (June 5, 2024). The Monitor's investigation found that it was Benefits Representative Precopio who contacted Assistant Director Torres after President Fain had called Precopio, not Vice President Boyer.

48

to intervene on Fain's fiancée's sister's behalf: "My interaction with Fain was me saying, 'this is the process.'"[167]

Although there is no direct evidence that Vice President Boyer's refusal to intervene in the worker's compensation matter caused President Fain to remove his leadership of the Stellantis Department, according to multiple witnesses, Fain was angry at Boyer for the refusal, which occurred approximately one month before Boyer's removal. This incident, combined with the Warren Stamping grievance resolution, reflects a pattern: in each instance, Boyer declined to act in a manner that was requested by Fain, and in each instance, Fain reacted with anger toward Boyer. Given this temporal proximity and Fain's resulting anger, the evidence supports an inference that this incident contributed to Fain's animosity toward Boyer, and therefore may have impacted the decision to retaliate against him.

President Fain inappropriately used the powers of his office to pursue a personal matter on behalf of a family member, an abuse of his authority. Fain took a matter in which he had a personal interest—the treatment of his fiancée's sister's injury—and pursued it through the powers of the UAW presidency, pressing it on Stellantis's senior management and on senior Union officials who ultimately reported to him. In doing so, he expended Union resources—his own time and that of a Vice President, an Assistant Director, and his Top Administrative Assistant—to seek relief from requirements that apparently applied to other Stellantis UAW members injured on the job.

The Monitor has deferred a decision about remedies for the conduct described in this and prior reports pending further consultation with the parties to the Consent Decree.

*     *     *

---

[167] R. Boyer Interview (July 25, 2024).

49

Pursuant to Paragraph 58 of the Consent Decree, the foregoing Report constitutes the Sixteenth Report of the Monitor, Neil M. Barofsky.

**Date: June 25, 2026**

Neil M. Barofsky, Monitor

*Respectfully filed with the Court on behalf of the Monitor by counsel to the Monitor,*

/s/ Michael W. Ross
Michael W. Ross
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, New York 10036
(212) 891-1600 (t)
(212) 891-1699 (f)

## CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2026, the foregoing Report was served electronically on all counsel of record via the CM/ECF system. In addition, pursuant to Paragraph 58 of the Consent Decree, the foregoing Report was served on consent by electronic mail upon the United States, the UAW's International President, the International Executive Board, and designated counsel for UAW.

 /s/ Michael W. Ross
Michael W. Ross

51